IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

                        Plaintiffs,

v.

INTUITIVE SURGICAL, INC.,

                        Defendant.

Civil Case No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC hereby file their Complaint against Defendant Intuitive Surgical, Inc. for monopolizing trade in the worldwide and domestic aftermarkets for service of Da Vinci surgical robots and the worldwide and domestic aftermarkets for service and replacement of Endowrist surgical robot instruments.  Plaintiffs allege the following upon personal knowledge as to their own acts and information and belief and investigation by counsel as to all other allegations.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC ("Restore" collectively) are Florida limited liability companies with their principal

address at 7506 Holley Circle, Panama City Beach, Florida.   They are sister companies with common ownership with majority control of both companies. Restore services surgical robots and related instruments.   Restore Robotics is the sales arm.  Restore Robotics Repairs is the operations arm.

2.      Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California.  Intuitive provides surgical robots, along with related parts, instruments, accessories, and services, to hospitals and surgical centers in Bay County in the Panama City Division of the Northern District of Florida and elsewhere.  Intuitive can be served with process through its registered agent C T Corporation System at 1200 South Pine Island Road, Plantation, FL 33324.

3.      Defendant is subject to the personal jurisdiction of this Court.

4.      This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22.   The Defendant has been engaged in interstate commerce during all relevant times of the complaint.

5.      Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2).  The Defendant is transacting and carrying on business in this District.

## ROBOTIC SURGERY

6.      With traditional open surgery, the surgeon uses one large incision to perform a procedure.  With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure.

7.      Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera.  The surgeon sits at a computer and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.



8.      Robotic surgery has a variety of practical advantages over laparoscopic surgery:

-   stereoscopic high-definition cameras for 3-D visibility

3

- additional arm for the surgeon to hold a third instrument

- wrist joints for expanded range of motion compared to human

- scalability to allow for small movements in the arms and instruments

- ergonomic console design to minimize surgeon fatigue.

## DA VINCI ROBOT

9.      Intuitive sells the Da Vinci surgical robot (image below).  From 1999 to 2015, the Da Vinci robot was the only surgical robot systems cleared by the FDA for sale in the market.



10.     Intuitive also sells all necessary instruments and accessories for the Da Vinci robot system.   Intuitive offers more than eighty different instruments, including a variety of forceps, retractors, and scissors, under the Endowrist brand.

They are the only instruments cleared by the FDA and foreign regulatory authorities for use with the Da Vinci robot system.

11.    The Da Vinci robot system is generally used for soft tissue surgery for areas of the body between the pelvis and the neck – primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery.  The Da Vinci robot system is indicated for adult and pediatric use.

12.    For the calendar year 2018, Intuitive reported $1,127.1 million in revenue for sales and leases of the Da Vinci robot system.  The average sales price was more than $1.5 million.  The purchase represents a significant capital equipment investment for the customer.

13.    As of December 31, 2018, Intuitive had an installed base of 4,986 da Vinci Surgical Systems, including 3,196 in the U.S., 872 in Europe, 651 in Asia, and 267 in the rest of the world.  Less than 10% are installed under an operating lease.

14.    Intuitive sells the Da Vinci robot system directly in the United States, Japan, South Korea, India, Taiwan, and most of Europe.  In other countries, Intuitive sells the Da Vinci robot system through exclusive distributorships with independent third parties.  Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

15.    In its latest annual report, Intuitive estimated that surgeons using the Da Vinci robot system completed approximately 1,037,000 surgical procedures of

various types in hospitals throughout the world during the year ended December 31, 2018.

## SURGICAL ROBOT MARKET

16.     Intuitive has monopoly power in the worldwide market for the sale of surgical robots.  Intuitive is able to exclude competition and maintain prices for Da Vinci robot system parts at supracompetitive levels.

17.     Surgical robots have no practical substitute.  Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery.  Moreover, certain procedures, such as prostatectomies, are only done now by robotic surgery.

18.     Due to the unique attributes of surgical robots, many surgeons prefer robotic surgery and require it to work at a given hospital.  As a result of perceptions about the reduced pain and scarring and increased safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

19.     Natural orifice surgical robots are not part of the surgical robot market. Natural orifice surgical robots simply do not compete with surgical robots.  For example, Medrobotic manufactures the Flex Robotic System for natural orifice endoscopic transluminal surgery.  The Flex Robotic System has a single flexible robotic scope with a camera for insertion in natural body orifices (image below).

Once the scope is locked in position, the surgeon can insert two miniaturized flexible instruments through the tube for performing throat, neck, and colorectal surgical procedures.  The robot can only operate instruments introduced through the tube inserted into the natural body orifice.  Therefore, it is only indicated for a limited range of procedures.  It is not indicated for pediatric use.  The Flex Robotic System sells for roughly half of the price of the Da Vinci robot system.  Medrobotic shipped approximately 10 Flex natural body orifice surgical robots in calendar 2018.



20.    There are significant barriers to entry into the surgical robot market. The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States.  The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States.  Intuitive holds numerous patents blocking development of competing robot systems.  Surgeons already have significant training and extensive experience

invested in the Da Vinci robot system.  The large hospital systems with significant demand for robot surgery already have a sizeable installed base of Da Vinci robots.

21.     TransEnterix is the only other manufacturer of commercially available surgical robots after receiving clearance from the FDA in 2017 (image below).  The TransEnterix robot system is sold under the Senhance brand name.



22.     TransEnterix is not a direct competitor to Intuitive in surgical robots. The Senhance Surgical System is only intended for use in gynecological surgery, colorectal surgery, cholecystectomy, and inguinal hernia repair.

23.     The Senhance Surgical System is not intended for cardiothoracic surgery, urologic surgery, or most other procedures intended for the Da Vinci robot system.  The Senhance Surgical System is not indicated for pediatric use.

24.     Intuitive has a 98% to 99% market share in the surgical robot market with or without TransEnterix.  Intuitive shipped 926 Da Vinci surgical robots in

calendar year 2018. TransEnterix shipped approximately 10 Senhance surgical robots worldwide in calendar year 2018.

25. As a result of its monopoly power in surgical robots, Intuitive is able to charge supracompetitive prices for its Da Vinci robots. For calendar year 2018, Intuitive had an overall gross margin on product sales of more than 70%. The gross margin is likely higher for sales directly to end users.

26. Intuitive has also leveraged its monopoly power in the primary market for surgical robots into the aftermarkets for Da Vinci robot parts and service and Endowrist instrument repairs and replacement.

## DA VINCI ROBOT PARTS AFTERMARKET

27. Intuitive has monopoly power in the worldwide aftermarket for a cluster of Da Vinci robot system parts that are only available from Da Vinci and are necessary to provide full service on the Da Vinci robot system ("Da Vinci robot parts"). Intuitive is able to exclude competition and maintain prices for Da Vinci robot parts at supracompetitive levels.

28. There is a relevant product market for the Da Vinci robot parts, which includes the robot arm assemblies, master tool manipulators (MTMs), printed circuit boards (PCBs), and other components. Unlike batteries, bulbs, and power cables, the Da Vinci robot parts are specially designed and built for the Da Vinci robot system.

29.    There are significant barriers to entry into the aftermarket for the Da Vinci robot parts.  Due to patent protection and development costs, they are not available through other commercial sources.  In addition, the Da Vinci robot system requires an Intuitive product serial number for the replacement part in order to restart the robot system.  Intuitive also excludes competition in the sale of the Da Vinci robot parts by requiring customers to purchase a parts and service contract from Intuitive with the purchase of the robot.

30.    At this time, Intuitive has a 100% market share in the sale of Da Vinci robot parts.  For calendar year 2018, Intuitive had an overall gross margin on product sales of more than 70%.

31.    Intuitive has also leveraged its monopoly power in the aftermarket for Da Vinci robot parts into the aftermarket for Da Vinci robot service.  Intuitive ties Da Vinci robot parts to the purchase of Da Vinci robot service.

**DA VINCI ROBOT SERVICE AFTERMARKET**

32.    Intuitive has monopoly power in the worldwide aftermarket for service of Da Vinci robot systems.  Intuitive is able to exclude competition and maintain prices for Da Vinci robot service at supracompetitive levels.

33.    Intuitive provides a one-year warranty on the Da Vinci robot system. If the customer purchases the robot system, Intuitive requires a service contract at

the time of purchase at an annual rate typically in the range of $100,000 to $200,000 per year.

34.     On a lease of the robot system, the customer is responsible for insuring the robot system and for paying the cost of repairs on the return of the robot system at the termination of the lease. If the customer leases the robot system, Intuitive also requires a service contract at the time of leasing for the term of the lease from the expiration of the warranty to the end of the lease, which can be an additional three or more years.

35.     At the end of each term, Intuitive typically offers an additional service contract.  In the absence of coverage under warranty or contract, Intuitive charges for parts and $995 per hour for travel and service.

36.     For the calendar year 2018, Intuitive reported $635.1 million in revenue and $421.2 million in gross profit for robot services.  Intuitive had an operating margin of 66.3% on robot services.

37.     Restore began to offer service contracts for the Da Vinci robot system in 2018.  Restore is the only known competitor to Intuitive in Da Vinci robot service domestically or worldwide.

38.     Restore typically offers service contracts at effective rates of less than 50% of the effective rates offered by Intuitive.

39.     There is a relevant market for the service of Da Vinci robots worldwide. There may be a relevant submarket for the service of Da Vinci robots in the United States.

40.     There are significant barriers to entry into Da Vinci robot service. Given the technical requirements and safety concerns, customers expect and require that the service provider have training, experience, and certification in servicing the Da Vinci robot system.  Restore specializes exclusively in the Da Vinci robot and only uses Da Vinci certified field service engineers with prior training and experience at Intuitive on servicing the Da Vinci robot system.  Given the significant capital investment and the critical patient needs, customers require that the service provider have the dedicated capacity to service the machine within a short time frame.  Restore has the capacity to service Da Vinci robots worldwide.

41.     Intuitive is able to impose additional barriers to entry into the market and maintain its monopoly power, *i.e.*, its ability to raise prices and exclude competition, through various types of exclusionary and predatory conduct:

- requires service contract with the purchase or lease of robot system

- prohibits customer or ISO from servicing robot during term of contract

- ties purchase of robot parts to purchase of robot service by customers

- ties purchase of accessories to purchase of preventative maintenance

- does not disclose descriptions of error codes to customers or ISOs

12

-   does not disclose service procedure documentation to customers or ISOs

-   does not allow customers or ISOs to have access to the service software

42.     For example, customers and third parties are unable to provide full service on the robot without access to the service software.  The service software is necessary to test the robot arms during preventative maintenance.  The service software is necessary to input the Intuitive serial number after replacing any Da Vinci robot part. The service software is necessary to remove the reminder message after performing preventative maintenance or repairing the robot system.

43.     The service software is a set of standalone executable applications created with the MATLAB programming language.  The source code is encrypted and hidden from users.

44.     The service software cannot be practically or reasonably duplicated by a customer or ISO.  The service software is based on the Da Vinci robot system design and specifications, which are not available to third parties.

45.     Intuitive also locks in customers for service by requiring new purchasers and lessees to agree to a service contract for one of four Da Vinci service plans.  The contracts are an additional two or more years beyond the warranty year. The plans vary in the scope of coverage.  Nevertheless, the contracts effectively lock in the customers for all service and repairs: the service contract excepts Intuitive from its obligations to provide any services under the contract if any repairs,

including repairs not covered by the service plan, are made by the customer or an ISO.

46.     Intuitive also prevents the customer or ISO from diagnosing and performing the simplest of repairs, such as cleaning off a screen, by refusing to disclose the meanings of the error codes that appear on the device.

47.     Quality control is not a valid business justification for excluding third parties from servicing Da Vinci robots.  Intuitive provides a distributors toolkit on an exclusive basis to its independent third-party distributors for use in their designated territories with all necessary documentation, software, and passwords to service Da Vinci robot systems.  Moreover, Restore uses former Intuitive personnel, *i.e.*, Da Vinci certified field service engineers with prior training and experience at Intuitive in servicing Da Vinci robot systems, to provide Da Vinci robot service.

48.     Customers do not have the ability to switch robot systems.  There are no surgical robot systems that directly compete with the Da Vinci robot system.  In addition, switching costs are prohibitively high.  Surgical robot systems have an average sales price of $1.5 million.

49.     Intuitive is not constrained in the aftermarket for robot service by competition in lifecycle pricing because the Da Vinci robot system has no practical substitutes or price competition.  Moreover, the initial costs of the system are so high that the prices of service are not a factor in the initial purchase of the system.

14

50.     Many customers have little or no information for projecting needs for service, repair, and replacement of system parts or robot instruments.

51.     As a result of the exclusionary conduct, Intuitive, directly and indirectly through its exclusive distributors, has maintained a market share in Da Vinci robot service of more than 99%, worldwide and domestically for nearly 20 years.  Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

52.     At this time, Restore is the only known competitor to Intuitive and its exclusive distributors for Da Vinci robot service.  Restore has less than $1 million in annual revenue in Da Vinci robot services.

53.     Intuitive has acted with the clear intent to exclude competitors and impair competition in Da Vinci robot service.  On or about February 12, 2019, Intuitive sent a letter to Restore demanding that Restore "immediately cease and desist" from "contacting Intuitive's customers to offer services related to Intuitive's products."

54.     As a result of the exclusionary conduct, Intuitive and its exclusive distributors are able to charge supracompetitive prices for Da Vinci robot service. Intuitive charges roughly double the rates offered by Restore for the same services.

## ENDOWRIST INSTRUMENT AFTERMARKET

55.     Intuitive has monopoly power in the worldwide aftermarket for the repair and replacement of Endowrist instruments.  The Endowrist instruments are necessary to perform surgery with the Da Vinci robot system and are only available from Intuitive.  Intuitive is able to exclude competition and maintain prices for the repair and replacement of Endowrist instruments at supracompetitive levels.

56.     For the calendar year 2018, Intuitive reported $1,962.0 million in revenue for instruments and accessories.  For calendar year 2018, Intuitive had an overall gross margin on product sales of more than 70%.

57.     Restore began to offer repair services for Endowrist instruments in 2018.  The customer is able to purchase repair services instead of instrument replacement.  Restore offers repair rates that are at least 25% on average below replacement rates offered by Intuitive.

58.     There is a relevant product market for the repair and replacement of Endowrist instruments.  They are specially designed and built for the Da Vinci robot system.  There are no practical substitutes.

59.     There are significant barriers to entry into the repair and replacement of Endowrist instruments.  The Food and Drug Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States.  The relevant regulatory agencies must also approve any surgical robot instruments for sale in the

16

European Union and elsewhere outside the United States.  Intuitive holds numerous patents blocking development of competing instruments for use on the Da Vinci robot system.  At this time, Intuitive has a 99% market share in the aftermarket for repair and replacement of Endowrist instruments.

60.     Intuitive is able to impose additional barriers to entry into the market and maintain its monopoly power, *i.e.*, its ability to raise prices and exclude competition, by preventing Endowrist instruments from being used after limited number of reuses (typically 10).  Intuitive installs a programmed memory chip inside each new Endowrist instrument to prevent the instrument from being used for more than a certain number of procedures.  Restore is unable to reset the usage count during service of Endowrist instruments for the Da Vinci Xi and X robot systems. The installed base is predominantly Da Vinci Xi and Da Vinci X robots, which were introduced in 2014 and 2017 respectively.  As a result, most customers are forced to replace, rather than service, their Endowrist instruments.

61.     In addition, Intuitive inhibits Da Vinci customers from servicing their Endowrist instruments through the terms on the Da Vinci robot system warranty: any third-party service on the Endowrist instruments voids Intuitive's one-year warranty on the entire Da Vinci robot system.

62.     Intuitive also leverages its monopoly power in the market for surgical robots and the aftermarkets for Da Vinci robot parts and service into the aftermarket

17

for Endowrist instrument repair and replacement.  At the time of purchase, Intuitive requires new purchasers and lessees to agree to a service contract of two years or more.  The customers often renew the service contracts to ensure access to Da Vinci robot parts.  The service contracts exempt Intuitive from its obligations to provide any services under the contract if any repairs, including repairs not covered by the service plan, are made by the customer or an ISO.

63.    Product safety is not a legitimate procompetitive justification for preventing customers from using the Endowrist instrument after 10 uses or excluding third parties from servicing Endowrist instruments.   The Endowrist instruments are based on preexisting endoscopic instruments with extended or unlimited uses.  Intuitive initially sought and obtained clearance by the FDA for the sale of the Endowrist instruments by comparing them to standard endoscopic instruments that were "essentially identical in terms of shape, size, function, and tissue effect."  Intuitive claimed that the Endowrist instruments were "substantially equivalent" to the predicate devices "in terms of safety and effectiveness."  Again, the predicate devices have extended or unlimited uses.  In addition, Transenterix does not put any limits on the number of uses of instruments for the Senhance robot system.

64.    In addition, the FDA permits servicing of approved medical devices by third parties.  Third-party service does not affect the safety and effectiveness of the

instrument or affect the indications for use.  The ISO returns the instrument to its original specifications to meet its original intended use.  The service does not significantly affect device performance or safety specifications.  After undergoing third-party service, Endowrist instruments have passed ISO simulated life testing to fifty or more additional uses.

65.     Customers do not have the ability to switch robot systems.  There are no surgical robot systems that directly compete with the Da Vinci robot system.  In addition, switching costs are prohibitively high.  Surgical robot systems have an average sales price of $1.5 million.

66.     Intuitive is not constrained in the aftermarket for instruments by competition in lifecycle pricing because the Da Vinci robot system has no practical substitutes or price competition.  Moreover, the initial costs of the system are so high that the prices of the instrument are not a factor in the initial purchase of the system.  Intuitive typically sells the Endowrist instruments for roughly $2,000 to $3,000.

67.     Many customers have little or no information for projecting needs for service, repair, and replacement of system parts or robot instruments.

68.     As a result of the exclusionary conduct, Intuitive, directly and indirectly through its exclusive distributors, has maintained a market share in repair and replacement of Endowrist instruments of more than 99%, worldwide and

domestically for nearly 20 years.  Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

69.     Intuitive has acted with the clear intent to exclude competitors and impair competition in the repair and replacement of Endowrist instruments.  On or about February 12, 2019, Intuitive sent a letter to Restore demanding that Restore "immediately cease and desist" from resetting the memory chip after completing servicing an Endowrist instrument or "contacting Intuitive's customers to offer services related to Intuitive's products."

70.     As a result of the exclusionary conduct, Intuitive and its exclusive distributors are able to charge supracompetitive prices for repair and replacement of Endowrist instruments.  Intuitive is able to charge approximately 30% on average for Endowrist instrument replacement compared with Endowrist instrument repairs by ISOs.

## COUNT ONE – MONOPOLIZATION

## (DA VINCI ROBOT SERVICE)

71.     The foregoing allegations are expressly incorporated.

72.     Intuitive has willfully acquired and maintained monopoly power in the worldwide and domestic markets for Da Vinci robot service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

73.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the cost of entry and exit from the market, the loss of profits in the market, and damage to its reputation and goodwill.

## COUNT TWO – ATTEMPTED MONOPOLIZATION

## (DA VINCI ROBOT SERVICE)

74.    The foregoing allegations are expressly incorporated.

75.    Intuitive has attempted to monopolize the worldwide and domestic markets for Da Vinci robot service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.   Intuitive has the specific intent to monopolize the worldwide and domestic markets for Da Vinci robot service by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

76.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the cost of entry and exit from the market, the loss of profits in the market, and damage to its reputation and goodwill.

## COUNT THREE – MONOPOLIZATION

## (ENDOWRIST INSTRUMENT AFTERMARKET)

77.    The foregoing allegations are expressly incorporated.

78.    Intuitive has willfully acquired and maintained monopoly power in the worldwide and domestic markets for Endowrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

79.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the cost of entry and exit from the market, the loss of profits in the market, and damage to its reputation and goodwill.

## COUNT FOUR – ATTEMPTED MONOPOLIZATION
## (ENDOWRIST INSTRUMENT AFTERMARKET)

80.    The foregoing allegations are expressly incorporated.

81.    Intuitive has attempted to monopolize the worldwide and domestic markets for Endowrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Intuitive has the specific intent to monopolize the worldwide and domestic markets for Endowrist instrument repair and replacement by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

82.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the cost of entry and exit from the market, the loss of profits in the market, and damage to its reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask that this Court:

(a)     conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)     enter judgment awarding damages to Plaintiffs in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on its federal antitrust claims;

(c)     award Plaintiffs the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, on its federal antitrust claims;

(d)     enter injunctive relief in favor of Plaintiffs to prevent the threat of loss or injury by violation of the antitrust laws as provided in Section 16 of the Clayton Act, 15 U.S.C. § 26; and

(e)     order such other and further relief as this Court deems proper and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

Respectfully submitted on February 27, 2019.

23

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800 Telephone
(678) 868-2021 Fax
jeff@berhold.com

**COUNSEL FOR PLAINTIFFS**

*Applying for Admission Pro Hac Vice

This document was created in size 14 Times New Roman font.