## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

                Plaintiffs,

    v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Civil Case No. 5:19-cv-55-MCR-MJF

## DEFENDANT'S DISPOSITIVE MOTION
## TO DISMISS FOR FAILURE TO STATE A CLAIM

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Intuitive

Surgical, Inc. ("Intuitive") moves to dismiss the Complaint filed by Plaintiffs

Restore Robotics LLC and Restore Robotics Repair LLC (collectively,

"Plaintiffs") for failure to state a claim upon which relief can be granted.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Plaintiffs' Complaint acknowledges that Intuitive developed, patented and

obtained FDA clearance for da Vinci surgical systems, the parts used in those

systems and the EndoWrist instruments that are necessary to perform surgery using

those systems.[1]  The Complaint also concedes that Intuitive's patent rights—which Plaintiffs do not challenge—prevent any other firm from manufacturing these products.

Nevertheless, Plaintiffs have filed this lawsuit in an attempt to exploit Intuitive's decades of innovation and to obtain through litigation what they cannot achieve through competition in the marketplace.  They claim that Intuitive has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing, or attempting to monopolize, two purported "aftermarkets" for (i) the service of da Vinci surgical robots, and (ii) the repair and replacement of EndoWrist instruments.  Plaintiffs allege that Intuitive has engaged in anticompetitive conduct that has unlawfully prevented them from competing in each of these "aftermarkets."

Plaintiffs' claims should be dismissed for three independent reasons.  ***First***, Plaintiffs lack standing to assert any antitrust claim because they fail to plead antitrust injury.  On the face of the Complaint, it is clear that Plaintiffs' alleged inability to compete in the two purported aftermarkets is not attributable to any

---

[1]  The Complaint references "Da Vinci robots" and "Endowrist" instruments, but Intuitive's products are called "da Vinci surgical systems" and "EndoWrist" instruments.  The da Vinci surgical system is actually a surgical tool that uses robotic-assistance to translate the surgeon's movements into corresponding movements of EndoWrist instruments attached to the da Vinci system.  In this memorandum of law, Intuitive will refer to these products by their correct names, except when quoting the Complaint.

conceivable antitrust misconduct.  Rather, Plaintiffs' purported injury flows from Intuitive's unchallenged patent rights, the limited basis of its FDA clearance and its plainly lawful refusal to deal with Plaintiffs (e.g., by not providing them with proprietary software needed to service da Vinci surgical systems).

***Second***, Plaintiffs fail to adequately plead that their "aftermarkets" constitute relevant antitrust markets.  There is a well-established judicial presumption against concluding that the type of single-brand aftermarkets (i.e., markets consisting of one firm's products) alleged in the Complaint are relevant antitrust markets.  Indeed, courts have held that single-brand aftermarkets only can be relevant antitrust markets if a plaintiff establishes that the defendant has monopoly power in a primary market that enables it to exercise power in the aftermarkets, or when a defendant has ***changed*** its distribution policies in a manner that "locks in" customers to purchasing products or services from the defendant. Because Plaintiffs fail to plausibly allege either of these circumstances, they fail to adequately plead that their purported aftermarkets are relevant antitrust markets.

***Third***, Plaintiffs fail to plausibly allege that Intuitive has engaged in any anticompetitive conduct.  Plaintiffs assert a hodgepodge of purported misconduct, including leveraging, tying and various refusals to deal.  But leveraging is not a legally cognizable antitrust theory, and Plaintiffs' tying allegations suffer from multiple fatal deficiencies.  Finally, the allegations that Intuitive has refused to deal

with Plaintiffs cannot state a claim because the antitrust laws do not require a company to take action to assist its competitors.

For each of these reasons, Intuitive respectfully requests that the Court dismiss Plaintiffs' Complaint.

## FACTUAL ALLEGATIONS AS ALLEGED IN THE COMPLAINT

### Intuitive and Its Products

***Robotic-Assisted Surgical Systems***.  Since 1999, Intuitive has manufactured and sold da Vinci surgical systems. (Compl. ¶ 9.)  Plaintiffs allege that da Vinci systems are "used for soft tissue surgery for areas of the body between the pelvis and the neck—primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery." (*Id*. ¶ 11.)  The Complaint further alleges that, like laparoscopic surgery, robotic-assisted surgery requires a surgeon to make several small incisions and to insert small tools, including a video camera, to perform a given procedure. (*Id*. ¶¶ 6-7.)

There are other manufacturers of robotic-assisted surgical systems. (*Id.* ¶¶ 19, 21.) "For example, Medrobotic manufactures the Flex Robotic System for natural orifice endoscopic transluminal surgery." (*Id*. ¶ 19.) "The Flex Robotic System sells for roughly half of the price of the Da Vinci robot system." (*Id.*)  In addition, in 2017, the FDA approved the "TransEnterix robot system," which "is sold under the Senhance brand name." (*Id.* ¶ 21.)

*Parts for da Vinci Surgical Systems*.  The parts for da Vinci systems "are specially designed and built for the Da Vinci robot system."  (*Id.* ¶ 28.)  "Due to [Intuitive's] patent protection and development costs," these parts "are not available through other commercial sources."  (*Id.* ¶ 29.)

*EndoWrist Instruments*.  "Intuitive offers more than eighty different instruments . . . under the Endowrist brand."  (*Id.* ¶ 10.)  EndoWrist instruments "are the only instruments cleared by the FDA and foreign regulatory authorities for use with the Da Vinci robot system."  (*Id.*)  "The [FDA] has a rigorous process for clearing any surgical robot instruments for sale in the United States."  (*Id.* ¶ 59.)  In addition, "Intuitive holds numerous patents blocking development of competing instruments for use on the Da Vinci robot system."  (*Id.*)

## Plaintiffs and Their Business

In 2018, Plaintiffs "began to offer service contracts for the Da Vinci" surgical system.  (*Id.* ¶ 37.)  Plaintiffs allege that they "specialize[] exclusively in the Da Vinci robot" and are "the only known competitor to Intuitive in Da Vinci robot service domestically or worldwide."  (*Id.* ¶¶ 37, 40.)  In 2018, Plaintiffs also "began to offer repair services for Endowrist instruments."  (*Id.* ¶ 57.)

## The Service of da Vinci Systems

Plaintiffs allege that "Intuitive provides a one-year warranty on the Da Vinci robot system.  If the customer purchases the robot system, Intuitive requires a

service contract at the time of purchase at an annual rate typically in the range of $100,000 to $200,000 per year." (*Id.* ¶ 33.) Plaintiffs assert that "the initial costs of the system are so high that the prices of service are not a factor in the initial purchase of the system." (*Id.* ¶ 49.)

According to the Complaint, there is "a cluster of Da Vinci robot system parts that are only available from [Intuitive] and are necessary to provide full service on the Da Vinci" surgical system. (*Id.* ¶ 27.) Plaintiffs also allege that "customers and third parties are unable to provide full service on the [da Vinci system] without access to [Intuitive's] service software." (*Id.* ¶ 42.) "The service software cannot be practically or reasonably duplicated by a customer or ISO" because it "is based on the Da Vinci robot system design and specifications, which are not available to third parties." (*Id.* ¶ 44.) Moreover, Plaintiffs assert that a customer or ISO cannot "perform[] the simplest of repairs, such as cleaning off a screen" because Intuitive "refus[es] to disclose the meanings of the error codes that appear on the device." (*Id.* ¶ 46.)

**The Repair and Replacement of EndoWrist Instruments**

Plaintiffs allege that "Intuitive installs a programmed memory chip inside each new Endowrist instrument to prevent the instrument from being used for more than a certain number of procedures." (*Id.* ¶ 60.) Plaintiffs are "unable to reset the usage count during service of Endowrist instruments for the Da Vinci Xi and X

robot systems." (*Id.*)  "As a result, most customers are forced to replace, rather than service, their Endowrist instruments." (*Id.*)

Plaintiffs allege that "Intuitive typically sells the Endowrist instruments for roughly $2,000 to $3,000," but that "the initial costs of the system are so high that the prices of the instrument are not a factor in the initial purchase of the system." (*Id.* ¶ 66.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  While all well-pleaded factual allegations in a complaint must be accepted as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (citation omitted).  Indeed, a complaint based on conclusory allegations should be dismissed because Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Id.* at 678-79.

At the motion to dismiss stage, a court can also consider facts subject to judicial notice.  "Federal Rule of Evidence 201 provides that a court may, when requested by a party who supplies 'the necessary information,' take judicial notice

of an adjudicative fact 'at any stage of the proceeding' if it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Leroy v. Medtronic, Inc.*, No. 3:14cv284/MCR/CJK, 2015 WL 4600880, at *5 (M.D. Fla. July 29, 2015) (Casey Rodgers, J.) (quoting Fed. R. Evid. 201(b)(2), (d)).  For example, "[c]ourts in this circuit and elsewhere have taken judicial notice of . . . FDA public records . . . without transforming a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment." *Id.* (collecting cases).

## ARGUMENT

Plaintiffs bring claims under Section 2 of the Sherman Act, alleging that Intuitive has monopolized or attempted to monopolize two putative "aftermarkets" for (i) the "service of Da Vinci surgical robots," and (ii) the "service and replacement of Endowrist surgical robot instruments."  (Compl. at p. 1.)

A monopolization claim "under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Similarly, attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Plaintiffs' monopolization and attempted monopolization claims fail for three independent reasons. ***First***, Plaintiffs fail to adequately plead that they have suffered antitrust injury, as opposed to mere harm to their business. ***Second***, Plaintiffs fail to adequately plead that their alleged aftermarkets are relevant antitrust markets. ***Third***, Plaintiffs fail to adequately plead that Intuitive has engaged in any anticompetitive conduct.

## I.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD ANTITRUST INJURY

In order to have standing to bring an antitrust claim, a plaintiff must allege "antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The antitrust injury requirement ensures that a plaintiff can recover only if [its] loss stems from a competition-***reducing*** aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum, Inc.*, 495 U.S. 328, 344 (1990); *see also Brunswick*, 429 U.S. at 488 (the antitrust laws "were enacted for 'the protection of competition not competitors'" (citation omitted)).

9

Accordingly, courts routinely dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury is directly attributable to anticompetitive conduct by the defendant. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Comm'cns, Inc.*, 376 F.3d 1065, 1076 (11th Cir. 2004) (citation omitted) (affirming dismissal of Section 2 claims because plaintiff failed to allege its injury resulted from "practices [that] have harmed competition"); *City of Pittsburgh* v. *W. Penn. Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998) (explaining that "antitrust injury must be caused by the antitrust violation—not a mere causal link, but a direct effect," while affirming dismissal of antitrust claims for failure to plead antitrust injury); *Axis, S.p.A. v. Micafil, Inc*., 870 F.2d 1105, 1107 (6th Cir. 1989) (affirming dismissal of antitrust claim because "any injury that [plaintiff] may have suffered did not flow directly from [defendant's] presumably unlawful act").

Here, Plaintiffs have failed to plead antitrust injury in either the purported aftermarket for the service of da Vinci systems or the purported aftermarket for the repair and replacement of EndoWrist instruments.  While Plaintiffs allege that they have been unable to compete in those putative markets, their own allegations establish that this purported injury is not attributable to any anticompetitive conduct; rather, it flows from Intuitive's patent rights (which Plaintiffs do not challenge), the FDA's clearance of Intuitive's EndoWrist instruments (which is

limited to ensure their safety and effectiveness) and Intuitive's refusal to deal with Plaintiffs (which is clearly lawful).  These admissions are fatal to all of Plaintiffs' claims, and require dismissal of their entire Complaint.

### A.   Plaintiffs Fail to Allege Antitrust Injury in the Purported Aftermarket for the Service of da Vinci Systems

Plaintiffs concede that there is "a cluster of Da Vinci robot system parts that are only available from [Intuitive] and *are necessary to provide full service* on the Da Vinci robot system."  (Compl. ¶ 27 (emphasis added).)  Those parts "are not available through other commercial sources" because of Intuitive's "patent protection and development costs."  (*Id.* ¶ 29.)  In addition, Plaintiffs acknowledge that "customers and third parties are *unable to provide full service* on the robot without access to [Intuitive's] service software."  (*Id.* ¶ 42 (emphasis added).)  Further, Plaintiffs allege that they are *unable to "perform[] the simplest of repairs*, such as cleaning off a screen" because Intuitive "refus[es] to disclose the meanings of the error codes that appear on the device."  (*Id.* ¶ 46 (emphasis added).)

Thus, according to the Complaint, Plaintiffs' inability to compete in the service of da Vinci systems is attributable to Intuitive's patent rights and its alleged refusal to provide Plaintiffs with access to its service software and the meanings of its error codes.  But Plaintiffs do not challenge Intuitive's patent rights.  And Intuitive's alleged refusal to deal with Plaintiffs cannot violate the Sherman Act.  To the contrary, it is well established that "as a general matter, the Sherman Act

'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (alteration in original) (citation omitted). Even an alleged monopolist has sweeping rights to unilaterally refuse to deal because otherwise it could be compelled to allow its competitors to exploit the value of its investments—the very outcome that Plaintiffs seek in this lawsuit.  As the Supreme Court has explained:

> Firms may acquire monopoly power by establishing an infrastructure
> that renders them uniquely suited to serve their customers.
> Compelling such firms to share the source of their advantage is in
> some tension with the underlying purpose of antitrust law, since it
> may lessen the incentive for the monopolist, the rival, or both to invest
> in those economically beneficial facilities.

*Id.* at 407-08.

Accordingly, courts have held that an alleged refusal to deal cannot violate the antitrust laws absent a narrow circumstance not alleged here:  when the refusal terminates a prior course of voluntary dealing for an anticompetitive purpose.  *See Covad Comm'cns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) ("[T]he unilateral termination of a voluntary course of dealing [is] a requirement for a valid refusal-to-deal claim."); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (affirming dismissal of refusal to deal claim because "[defendant] did not terminate any prior course of dealing"); *LiveUniverse, Inc. v.*

12

*MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) (affirming dismissal of refusal to deal claim because plaintiff "failed to allege either a voluntary arrangement between it and [defendant], or that any such arrangement was profitable to [defendant]").

The decision in *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007), is directly on point.  In that case, plaintiffs alleged that elevator manufacturers monopolized, or attempted to monopolize, the "maintenance market[s] for [their] own elevators" by "designing the elevators to prevent servicing by other providers . . . ; refusing to sell competitors the parts, tools, software or diagrams necessary to service the elevators; and obstructing competitors' attempts to purchase elevator parts." *Id.* at 52.  The Second Circuit affirmed the dismissal of plaintiffs' claims, explaining that "because plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim." *Id.*

Here, Plaintiffs do not allege that Intuitive ever provided its service software or disclosed the meanings of its error codes to Plaintiffs or any other competitor. As such, Intuitive's alleged refusal to provide that software or to disclose that information to Plaintiffs now is entirely consistent with its prior course of dealing

and cannot violate the antitrust laws.  In these circumstances, the purported harm to Plaintiffs flowing from that conduct cannot constitute antitrust injury.

**B.   Plaintiffs Fail to Allege Antitrust Injury in the Purported Aftermarket for the Repair and Replacement of EndoWrist Instruments**

Plaintiffs acknowledge that they cannot replace EndoWrist instruments because those instruments "are only available from Intuitive" (Compl. ¶ 55), the FDA "has a rigorous process for clearing any surgical robot instruments for sale in the United States" (*id.* ¶ 59), and "Intuitive holds numerous patents blocking development of competing instruments for use on the Da Vinci robot system." (*Id.*)  Instead, Plaintiffs allege that they only seek to repair (not replace) EndoWrist instruments, but that Intuitive "installs a programmed memory chip inside each new Endowrist instrument to prevent the instrument from being used for more than a certain number of procedures"; therefore, "customers are forced to replace, rather than service, their Endowrist instruments." (*Id.* ¶ 60.)  Thus, the totality of Plaintiffs' alleged inability to compete in the repair and replacement of EndoWrist instruments is attributable to Intuitive's unchallenged patent rights and the design and scope of regulatory clearance of the EndoWrist instruments themselves.

Plaintiffs' allegations concerning the designed obsolescence of EndoWrist instruments fail to plead antitrust injury for two separate reasons.  ***First***, Plaintiffs fail to allege that the product design constitutes anticompetitive conduct.  As the

Second Circuit held in *Elevator Antitrust Litigation*, an alleged monopolist's "designing [a product] to prevent servicing by other providers" amounts to a refusal to deal, and such conduct cannot violate the antitrust laws unless the defendant terminated a prior course of voluntary dealing. *See Elevator Antitrust Litig.*, 502 F.3d at 52. Because Plaintiffs do not allege that Intuitive previously sold EndoWrist instruments without limiting the number of procedures in which they could be used, Plaintiffs fail to plead that Intuitive's conduct is anticompetitive.

***Second***, the FDA regulatory framework also precludes Plaintiffs from establishing antitrust injury. The Third Circuit's decision in *City of Pittsburgh* is instructive. In that case, plaintiff sued two electric utilities, alleging that an unlawful merger between the defendants prevented plaintiff from purchasing electric service from one of the defendants, Allegheny Power. *See City of Pittsburgh*, 147 F.3d at 261-62. But Allegheny Power's ability to sell electric service to plaintiff was contingent on regulatory approval from the Pennsylvania Public Utility Commission, which Allegheny Power never received. *See id.* at 266. While plaintiff alleged that Allegheny Power would have obtained the requisite regulatory approval absent the challenged merger, the Third Circuit held that plaintiff "cannot foist [its] version of what might have been on the court under the rubric of antitrust injury." *Id.* at 267. Rather, "[t]he presence of the regulatory

15

scheme and need for [regulatory] approval . . . cuts the causal chain and converts

what might have been deemed antitrust injury in a free market into only a

speculative exercise." *Id.* at 267-68.

Here, as Plaintiffs acknowledge, Intuitive was required to—and did—obtain

clearance from the FDA in order to market its EndoWrist instruments.  (*See*

Compl. ¶¶ 10, 59.)  Specifically, Intuitive demonstrated to the FDA that its

EndoWrist instruments were "'substantially equivalent' to . . . predicate devices 'in

terms of safety and effectiveness'" (*id.* ¶ 63), as was required to obtain FDA

clearance pursuant to Section 510(k) of the Food Drug & Cosmetic Act, 21 U.S.C.

§ 360(k).[2]  As is reflected in the FDA's publicly-available 510(k) summaries of its

decisions clearing Intuitive to market EndoWrist instruments,[3] the FDA granted

regulatory clearance based on Intuitive's representation that these instruments "are

---

[2]  Any company intending to market a new medical device must submit and obtain
clearance of a premarket notification containing information that allows the FDA
to determine whether the device is "substantially equivalent" to a legally marketed
device that does not require premarket approval.  *See* 21 U.S.C. § 360(k);
21 CFR § 807.92.

[3]  Pursuant to Federal Rule of Evidence 201, Intuitive respectfully requests that the
Court take judicial notice of these 510(k) summaries, which are publicly available
on the FDA's website.  (*See infra* n. 4.)  As this Court has recognized, "[c]ourts in
this circuit and elsewhere have taken judicial notice of similar FDA public records
under similar circumstances."  *Leroy*, 2015 WL 4600880, at *5-6 (granting
"judicial notice of several FDA Premarket Approval Database Listings relating to
the various components of the products at issue in this litigation" because those
documents "are publicly available on the FDA website and [their] 'accuracy cannot
reasonably be questioned'" (quoting Fed. R. Evid. 201(b)(2))).

programmed with a maximum number of surgical procedures based upon life testing."[4]  The instruments were "subjected to life testing representing worst case . . . to confirm the instruments met the projected life of each re-usable instrument."[5]  Nevertheless, Plaintiffs apparently seek to force Intuitive to sell these EndoWrist instruments without any limitation on the number of procedures in which they can be used.  Just as in *City of Pittsburgh*, however, the regulatory framework—and the need to seek FDA clearance to market any new medical device—cuts the causal chain and prevents Plaintiffs from establishing antitrust injury based on their theory that Intuitive should be required to sell a new product (i.e., EndoWrist instruments with no maximum number of uses).

_____

[4]  *See, e.g.*, Ex. 1, 510(k) Summary for *da Vinci SP* Surgical System, *EndoWrist SP* Instruments and Accessories (K182371) from 510(k) Premarket Notification Database, at 2 (Mar. 12, 2019) (*EndoWrist SP* Instruments "are programmed with a maximum number of surgical procedures based upon life testing"), https://www.accessdata.fda.gov/cdrh_docs/pdf18/K182371.pdf; Ex. 2, 510(k) Summary for *da Vinci* Surgical System, Model IS4000 (K131861) from 510(k) Premarket Notification Database, at 4 (Mar. 26, 2014) (IS4000 *EndoWrist* Instruments "are programmed with a maximum number of surgical procedures based upon life testing"), https://www.accessdata.fda.gov/cdrh_docs/pdf13/K131861.pdf; *see also* Ex. 3, 510(k) Summary for *EndoWrist* 5mm Thoracic Graspers (K173415) from 510(k) Premarket Notification Database, at 1 (May 30, 2018) ("The *EndoWrist* 5mm Thoracic Grasper . . . is programmed for a limited number of uses to ensure reliability and consistent performance."), https://www.accessdata.fda.gov/cdrh_docs/pdf17/K173415.pdf.

[5]  Ex. 2, 510(k) Summary for *da Vinci* Surgical System, Model IS4000, at 7.

For these reasons, Plaintiffs' inability to compete in the repair and replacement of EndoWrist instruments is not attributable to anticompetitive conduct and cannot constitute antitrust injury.

## II.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD THAT THEIR "AFTERMARKETS" ARE RELEVANT ANTITRUST MARKETS

In order to state a claim under Section 2 of the Sherman Act, a plaintiff must plausibly allege that a defendant has monopolized or attempted to monopolize a relevant antitrust market. *See JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1284 (M.D. Fla. 2003) ("Defining a relevant market is essential to establishing a monopolization claim under section 2 of the Sherman Act."); *see also Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997) ("Essential to either a § 2 monopolization or attempted monopolization claim is the defining of the relevant market, which is the antitrust plaintiff's burden.").

Because Plaintiffs have failed to adequately plead that their purported aftermarkets are relevant antitrust markets, their claims fail for this reason alone.

### A.   Law Governing Market Definition and "Aftermarkets"

A "relevant market has two components," a geographic market and a product market. *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015). "[T]he plaintiff must define both the geographic market and the product market in which the defendant allegedly possesses increasing

18

power." *Id.*  A product market is defined by reference to "the reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993).  Similarly, a geographic market is "'the area of effective competition in which a product or its reasonably interchangeable substitutes are traded.'" *Duty Free Americas, Inc.*, 797 F.3d at 1263 (citation omitted).

Courts have only recognized "aftermarkets" as relevant antitrust markets in limited circumstances.  "An aftermarket is a type of derivative market, consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good."  Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.12(B) (4th ed. 2018).  These products are called "'after' markets because [they] are typically purchased in a later transaction than the purchase of the underlying primary good." *Id.*

There is a judicial presumption against defining single-brand relevant aftermarkets (i.e., a market in one firm's products) because manufacturers typically have high shares in purported aftermarkets for their own products.  *See Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) ("Because it would be inappropriate to punish a firm for its natural monopoly in its own products, courts [have] embraced a sweeping prohibition against analyzing alleged anticompetitive activity by focusing on single-branded relevant markets."

(collecting cases)); *see also Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Many firms supply unique and/or proprietary aftermarket parts and services for their primary market products.  As a result, they 'can be expected to have a very high percentage' share of the relevant aftermarket." (citation omitted)).

"[A] court may conclude that the aftermarket is the relevant market for antitrust analysis only if the evidence supports an inference of monopoly power in the aftermarket that competition in the primary market appears unable to check." *SMS Sys. Maintenance Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999).  There are two ways in which a plaintiff can establish that competition in the primary market is unable to check purported monopoly power in an aftermarket:  (i) by demonstrating that the primary market is not competitive because the defendant has monopoly power in that market; or (ii) if the primary market is competitive, by establishing that the defendant "locked in" customers to purchasing its aftermarket products or services through a change in its policies. *See SMS*, 188 F.3d at 21; *Harrison Aire*, 423 F.3d at 383; *Metzler*, 19 F. Supp. 2d at 1357-58.

The Supreme Court recognized the "lock-in" theory in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).  Specifically, the Court held that if a primary market is competitive, an aftermarket can be the relevant

market for antitrust analysis when customers are "locked in" to purchasing

aftermarket goods from the defendant and *after* that lock-in, the defendant ***changes***

its sales policy.  *See id.* at 457-58, 476.  In *Kodak*, a manufacturer of copiers and

the replacement parts and services necessary to repair those copiers, changed its

policy such that it only would sell replacement parts to customers that purchased

repair services from Kodak, as opposed to other service providers.  *See id*. at 476.

As a result, Kodak customers that purchased their copiers prior to this change in

policy were "locked in" to purchasing Kodak's repair services, even as Kodak

increased its prices for those services.  *See id.* at 457-58, 476.  And the competition

in the primary market for copiers did not provide a check on Kodak's power in the

aftermarket for its services that existed as a result of the "lock in."  *See id.* at 470-

73.

### B.   Plaintiffs Fail to Adequately Plead That Their Purported Aftermarkets Are Relevant Antitrust Markets

Plaintiffs have not pleaded that their alleged aftermarkets are relevant

antitrust markets because they have not plausibly alleged that Intuitive can wield

power in those alleged aftermarkets without being checked by competition in the

primary market.

*First*, they have failed to properly define their purported primary market for

"surgical robots," a failure that—by itself—prevents them from adequately

pleading that their "aftermarkets" are relevant antitrust markets. ***Second***, and in any event, Plaintiffs fail to plausibly allege a "lock in."

   1.   Plaintiffs Fail to Plausibly Allege That the Purported Primary
        Market for the Sale of "Surgical Robots" Is a Viable Market

Plaintiffs assert that Intuitive has monopoly power in a purported primary market "for the sale of surgical robots." (Compl. ¶ 16.)  The Court need not credit this legal conclusion because Plaintiffs fail to plausibly allege that there is a relevant market limited to robotic-assisted surgery, as opposed to other surgical techniques.

To the contrary, the Complaint suggests that hospitals view laparoscopic surgery as a reasonable substitute for robotic-assisted surgery because "robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery." (*Id.* ¶ 17.)  While Plaintiffs assert that "hospitals are expected to offer robotic surgery," that "many surgeons prefer robotic surgery" and that "many patients insist on robotic surgery" (*id.* ¶¶ 17-18), those conclusory allegations are insufficient to meet their burden to plead facts explaining why other surgical techniques—including laparoscopic surgery—are not reasonably interchangeable substitutes.  *See JES Properties*, 253 F. Supp. 2d at 1282 (holding that when a "proposed relevant market . . . clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in

plaintiff's favor, [the] relevant market is legally insufficient and a motion to dismiss may be granted").[6]

Notably, other antitrust decisions involving alleged restraints in surgical markets have not limited the relevant market to a particular surgical technique—as Plaintiffs seek to do here. *See, e.g.*, *Morgenstern v. Wilson*, 29 F.3d 1291, 1293-94, 1296 (8th Cir. 1994) (relevant product market for "adult cardiac surgery" encompassed different surgical techniques, such as "open-heart surgery, angioplasty, and other cardiac surgical procedures"); *Bhan v. NME Hospitals, Inc.*, 669 F. Supp. 998, 1019 (E.D. Cal. 1987) (relevant market was "surgical procedures"); *Welchlin v. Tenet Healthcare Corp.*, 366 F. Supp. 2d 338, 349 (D.S.C. 2005) (relevant market was "orthopedic surgery"); *Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1366 (W.D. Pa. 1982) (relevant market was "pediatric thoracic and cardiovascular surgery").

Because Plaintiffs have failed to plausibly allege that there is a relevant market limited to robotic-assisted surgery, they cannot establish that Intuitive has monopoly power in that purported market, nor can they demonstrate the

---

[6]  *See also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (affirming dismissal of Sherman Act claims where plaintiff alleged a relevant product market for visco-elastic foam mattresses, but "[t]he complaint provide[d] no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat visco-elastic foam mattresses differently than they do mattresses in general").

relationship between competition in any primary market (which they have failed to define) and conditions in the purported aftermarkets.  This failure alone precludes Plaintiffs from adequately pleading that their purported aftermarkets are relevant antitrust markets.  *See SMS*, 188 F.3d at 17 ("[A] court may conclude that the aftermarket is the relevant market for antitrust analysis ***only if*** the evidence supports an inference of monopoly power in the aftermarket that competition in the primary market appears unable to check."  (emphasis added)).

2.      In any Event, Plaintiffs Fail to
Plausibly Allege a "Lock-in" Theory

In addition to failing to plead a viable primary market (which is itself dispositive), Plaintiffs also fail to plausibly allege that Intuitive "locks in customers for service" when they purchase or lease a da Vinci system.  (Compl. ¶ 45.)

As explained above, the "lock-in" theory that the Supreme Court accepted in *Kodak* was premised on the defendant's ***change*** in policy regarding the sale of replacement parts and repair services for its product after consumers purchased the product.  Courts have subsequently held that absent such a change, a "lock-in" theory is not viable.  *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("[A]n antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,

124 F.3d 430, 440 (3d Cir. 1997) ("The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies."); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.,* 73 F.3d 756, 763 (7th Cir. 1996) ("The material dispute that called for a trial [in *Kodak*] was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines.").

The court in *Metzler* analyzed a purported lock in similar to that alleged here. In that case, plaintiffs claimed that defendant manufacturers of automotive diagnostic equipment had monopolized, or attempted to monopolize, an aftermarket for defendants' internal parts and repair services by allegedly refusing to sell those parts unless customers purchased defendants' repair services. *See Metzler*, 19 F. Supp. 2d at 1348. The district court rejected plaintiffs' attempt to define this purported relevant aftermarket because they could not satisfy the exception articulated in *Kodak*, given "that the defendants' policies and practices with respect to parts and services w[ere] generally known." *Id.* at 1352. As the court explained:

> Without a showing of a change in business policy, or other coercive practice which concealed the true cost of parts and repairs, the exception to the general rule—that the relevant market is the primary equipment market—cannot apply because the purchasers of the automotive diagnostic equipment knew about repair costs at the time they bought the equipment.

*Id.* at 1358.

25

Similarly here, Plaintiffs do not allege that Intuitive has changed its policies regarding the sale of replacement parts or repair services for da Vinci systems or EndoWrist instruments.  Nor do Plaintiffs allege that the costs of these replacement parts or repair services have increased over time or have somehow been concealed from customers.  To the contrary, the Complaint alleges that "Intuitive requires a service contract ***at the time of purchase*** at an annual rate typically in the range of $100,000 to $200,000."  (Compl. ¶ 33 (emphasis added).)[7]  Further, Plaintiffs allege that "the prices of service are not a factor in the initial purchase of the system" (*id.* ¶ 49) and that the "roughly $2,000 to $3,000" prices of EndoWrist instruments similarly "are not a factor in the initial purchase of the system." (*Id.* ¶ 66.)  Thus, the Complaint suggests that Intuitive's customers were aware of—and not concerned about—these costs at the time they purchased the da Vinci system, such that Plaintiffs cannot maintain their "lock-in" theory.[8]  Accordingly,

---

[7]  Though not a basis for this motion to dismiss, Intuitive notes that Plaintiffs' allegations regarding its service agreements are inaccurate.  Intuitive does not force customers that purchase da Vinci systems to pay for multi-year service contracts.  Rather, those customers receive one year of service from Intuitive at a price that is included in their purchase of the system.  The customer's purchase of any additional service is optional.

[8]  Plaintiffs allege that "[m]any customers have little or no information for projecting needs for service, repair, and replacement of system parts or robot instruments."  (Compl. ¶¶ 50, 67.)  But that allegation is "conclusory and not entitled to be assumed true."  *Iqbal*, 556 U.S. at 681.  In any event, mere allegations regarding "imperfect consumer information" cannot sustain a "lock-in" theory.  *See PSI Repair Servs.*, 104 F.3d at 820 ("[T]he [Supreme] Court rejected

*(cont'd)*

Plaintiffs have failed to adequately plead that their purported aftermarkets are relevant markets for antitrust analysis, and their failure to define such a relevant market—a requirement for any Section 2 claim—mandates the dismissal of each of their claims.

### III.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD THAT INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT

Finally, Plaintiffs' claims fail for the independent reason that they do not adequately plead that Intuitive has engaged in anticompetitive conduct. *See Duty Free Americas*, 797 F.3d at 1265 (affirming dismissal of attempted monopolization claim because "each of [Plaintiff's] allegations of anticompetitive conduct is insufficient to state a claim").

#### A.   Plaintiffs Fail to Adequately Plead That Intuitive Has Engaged in Anticompetitive Conduct in the Purported Aftermarket for the Service of da Vinci Systems

Plaintiffs assert that Intuitive has engaged in three types of anticompetitive conduct in the purported aftermarket for the service of da Vinci surgical systems: leveraging, tying and a refusal to deal. None of this alleged misconduct states a viable Section 2 claim.

_____

*(cont'd from previous page)*
the premise that imperfect consumer information resulting from basic market imperfections could be used as a basis to infer market power for purposes of the Sherman Act."  (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 (1984))).

1.    Plaintiffs' "Leveraging" Allegations Fail to State a Claim

Plaintiffs repeatedly allege that Intuitive has "leveraged" its purported monopoly power in the market for robotic-assisted surgical systems and aftermarket for da Vinci system parts in order to monopolize the aftermarket for the service of da Vinci systems.  (*See, e.g.*, Compl. ¶ 26 ("Intuitive has . . . leveraged its monopoly power in the primary market for surgical robots into the aftermarkets for Da Vinci robot parts and service and Endowrist instrument repairs and replacement."); *id.* ¶ 31 ("Intuitive has also leveraged its monopoly power in the aftermarket for Da Vinci robot parts into the aftermarket for Da Vinci robot service.").)

As a matter of law, however, "monopoly leveraging" does not constitute anticompetitive conduct.  *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991) ("Monopoly leveraging is just one of a number of ways that a monopolist can permissibly benefit from its position.  This does not mean, however, that such conduct is anticompetitive." (citation omitted)); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002) ("Neither the Eleventh Circuit nor the Supreme Court has accepted [monopoly leveraging as a] theory of antitrust violation."), *aff'd*, 364 F.3d 1288 (11th Cir. 2004); *see also Trinko*, 540 U.S. at 415 n.4 (stand-alone "leveraging" allegations are insufficient to state a Section 2 claim).

Thus, Plaintiffs' allegations regarding "leveraging" fail to plead anticompetitive conduct.

### 2.    Plaintiffs Fail to Plausibly Allege a Tying Claim

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985) (citation omitted). Not all tying arrangements violate the Sherman Act. *See id.* To prove an illegal tying arrangement, a plaintiff must establish five elements:

> (1) "a tying and a tied product"; (2) "evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied product"; (3) that the seller ha[s] sufficient market power in the tying product market to force the buyer to accept the tied product; (4) "anticompetitive effects in the tied market"; and (5) "involvement of a 'not insubstantial' amount of interstate commerce in the tied product market."

*Id.* at 1502-03 (first alteration in original) (citation omitted).

While Plaintiffs' tying theory is not clearly articulated, they appear to identify three different purported tying arrangements: they allege that Intuitive (i) "ties Da Vinci robot parts to the purchase of Da Vinci robot service" (Compl. ¶ 31), (ii) "ties purchase of accessories to purchase of preventative maintenance" (*id.* ¶ 41), and (iii) ties purchase of da Vinci system service to the purchase or lease of a surgical system by "requir[ing] a

service contract with the purchase or lease of [a] robot system." (*Id.*) Plaintiffs fail to state a tying claim for three reasons.

**First**, Plaintiffs fail to plausibly allege that Intuitive has coerced customers to purchase any product. Plaintiffs assert that Intuitive "ties Da Vinci robot parts to the purchase of Da Vinci robot service" and "ties purchase of accessories to purchase of preventive maintenance," but those assertions are wholly conclusory and, therefore, fail to plausibly allege coercion. *See Iqbal*, 556 U.S. at 678 ("mere conclusory statements [] do not suffice" to state a claim). For example, Plaintiffs do not allege that Intuitive has conditioned the sale of parts or accessories—let alone which parts or accessories—on customers' purchasing repair services or preventative maintenance from Intuitive. While Plaintiffs allege that Intuitive requires customers to enter into a service contract when they purchase or lease a da Vinci system, the Complaint fails to plead facts to support their assertion that the service contract "prohibits [a] customer or ISO from servicing [the] robot during [the] term of [the] contract." (Compl. ¶ 41.) To the contrary, the Complaint alleges that Plaintiffs can obtain service from ISOs and that such third-party service merely "excepts Intuitive from its obligations to provide any services under the contract." (*Id.* ¶ 45.)

***Second***, Plaintiffs fail to plausibly allege that Intuitive has market power in any purported tying market.  Indeed, Plaintiffs cannot satisfy this element because they fail to adequately plead that any of the purported tying markets is a relevant antitrust market.  While Plaintiffs assert that Intuitive has market power in the purported "aftermarket for Da Vinci robot parts" (*id.* ¶ 32), as set forth above, they cannot establish that such a single-brand aftermarket is a relevant antitrust market given their failure to plausibly allege that Intuitive has monopoly power in a well-defined primary market or that customers were "locked in" through a change in policy.  (*See supra* pp. 21-27.)  Any aftermarket for da Vinci robot "accessories" would not be a viable relevant market for the same reasons.  And as explained above (*see supra* pp. 22-24), Plaintiffs fail to plausibly allege that the purported market for robotic-assisted surgery is a viable relevant market.

***Third***, Plaintiffs fail to plead any anticompetitive effect in the purported tied market for the service of da Vinci systems.  In order to meet their burden regarding this element, Plaintiffs must allege "that the combined price for the tying and tied products was greater than if they had been sold independently."  *Metzler*, 19 F. Supp. 2d at 1361.  Plaintiffs have failed to satisfy this burden because they do not allege what the price of the purported tying products—da Vinci systems, parts and accessories—would

31

be absent the alleged ties.  Plaintiffs' assertion that they offer service

contracts at lower rates than Intuitive (Compl. ¶ 38) is insufficient because

"[a] determination of the value of the tied product[] alone would not indicate

whether the plaintiff indeed suffered any net economic harm, since a lower

price might conceivably have been exacted by the [defendant] for the tying

product." *Metzler*, 19 F. Supp. 2d at 1361 (third alteration in original)

(quoting *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.

1982)).[9]  In other words, Plaintiffs must allege what Intuitive would have

charged for the alleged tying products absent the alleged ties because, for

example, Intuitive could have increased the price for a da Vinci system if it

were sold in the absence of a service contract.  In fact, Plaintiffs suggest that

consumers would be willing to accept such a price increase because "the

prices of service are not a factor in the initial purchase of the system."

(Compl. ¶ 49.)

---

[9]  While Plaintiffs assert that they "typically offer[] service contracts at effective
rates of less than 50% of the effective rates offered by Intuitive" (Compl. ¶ 38),
Plaintiffs concede that they cannot "provide full service" because they lack access
to da Vinci system parts and service software.  (*Id.* ¶¶ 27, 42.)  Plaintiffs further
suggest that they cannot "perform[] the simplest of repairs" because they do not
know "the meanings of the error codes that appear on the device."  (*Id.* ¶ 46.)
Thus, as alleged, Plaintiffs do not offer the same range of services as Intuitive, and
any comparison of the respective costs is apples to oranges.

For each of these reasons, Plaintiffs fail to plausibly allege that Intuitive has engaged in unlawful tying.

        3.     <u>Plaintiffs Fail to Plausibly Allege a Refusal to Deal Claim</u>

Plaintiffs allege that Intuitive has refused to deal with Plaintiffs because it does not allow "access to [its] service software," "does not disclose service procedure documentation" and "does not disclose descriptions of error codes." (Compl. ¶ 41.)

As explained above (*see supra* pp. 11-14), Plaintiffs cannot state a refusal to deal claim because they do not allege that Intuitive terminated a prior course of voluntary dealing pursuant to which it provided its service software or disclosed its service documentation or error codes to Plaintiffs or other competitors.

**B.    Plaintiffs Fail to Adequately Plead That Intuitive Has Engaged in Anticompetitive Conduct in the Purported Aftermarket for the <u>Repair and Replacement of EndoWrist Instruments</u>**

Plaintiffs also fail to allege that Intuitive has engaged in any anticompetitive conduct in the purported aftermarket for the repair and replacement of EndoWrist instruments.

***First***, Plaintiffs fail to state a claim based on their allegation that Intuitive "installs a programmed memory chip inside each new Endowrist instrument" that "prevent[s] [the] Endowrist instruments from being used after limited number of reuses (typically 10)." (Compl. ¶ 60.) As explained above (*see supra* pp. 14-15),

these allegations amount to a refusal to deal claim that is not viable as a matter of law.[10]

*Second*, Plaintiffs fail to state a claim based on the allegation that Intuitive has tied its warranty on the da Vinci system to the purchase of repair services on EndoWrist instruments from Intuitive.  (*See* Compl. ¶ 61 ("Intuitive inhibits Da Vinci customers from servicing their Endowrist instruments" because "any third-party service on the Endowrist instruments voids Intuitive's one-year warranty on the entire Da Vinci robot system.").)  Courts have rejected claims alleging that a defendant has tied a warranty to repair services, provided that customers remain free to simply forego the benefits of the warranty.  *See, e.g.*, *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) (dismissing claim alleging tie of warranty to services because "[a]n owner of a new Xerox copier could forego the benefits of the warranty, buy service from Xerox or an independent provider, and purchase cartridges from the vendor of its choice").  Here, Plaintiffs do not plead facts explaining why a customer could not similarly forego the benefits of a warranty.

*Third*, Plaintiffs cannot state a claim based on their allegation that Intuitive "leverages its monopoly power in the market for surgical robots and the

---

[10] Plaintiffs note that Intuitive sent them a letter "demanding that [Plaintiffs] 'immediately cease and desist'" their attempts to "reset[] the [EndoWrist] memory chip."  (Compl. ¶ 69; *see also id.* ¶ 53.)  That cease-and-desist letter cannot constitute anticompetitive conduct because Plaintiffs do not allege that the letter was unlawful in any way or that it excluded them from any market.

aftermarkets for Da Vinci robot parts and service into the aftermarket for

Endowrist instrument repair and replacement." (Compl. ¶ 62.) As explained

above (*see supra* pp. 28-29), monopoly leveraging is not anticompetitive conduct.

## CONCLUSION

For each of the foregoing independent reasons, Intuitive respectfully

requests that the Court dismiss Plaintiffs' Complaint.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

Intuitive certifies that its counsel conferred by telephone with Plaintiffs'

counsel regarding this motion on April 24, 2019. The conference did not resolve

the issues raised in the motion.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Intuitive certifies this Memorandum complies with the word count limitation

set forth in Local Rule 7.1(F) because it contains 7,911 words, excluding the parts

exempted by said Local Rule.

Dated:  April 29, 2019                  Respectfully submitted,

/s/ David L. McGee
DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

ALLEN RUBY (*Pro Hac Vice*)
ABRAHAM M. ANDRADE III (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
Tel: (650) 470-4500
allen.ruby@skadden.com
abraham.andrade@skadden.com

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice Admission to be applied for*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com

Counsel for Defendant
Intuitive Surgical, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a copy hereof has been filed via CM/ECF for electronic

distribution to the following counsel of record on April 29, 2019:

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
Telephone:  (404) 872-3800
jeff@berhold.com

<u>/s/ David L. McGee</u>
DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com