## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

               Plaintiffs,

   v.

INTUITIVE SURGICAL, INC.,

               Defendant.

Civil Case No. 5:19-cv-55-MCR-MJF

## DEFENDANT'S DISPOSITIVE MOTION
## TO DISMISS FOR FAILURE TO STATE A CLAIM

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Intuitive Surgical, Inc. ("Intuitive") moves to dismiss the First Amended Complaint ("FAC") filed by Plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC (collectively, "Plaintiffs") for failure to state a claim.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Plaintiffs apparently recognized the deficiencies in their original complaint, as rather than address the arguments in Intuitive's earlier-filed motion to dismiss, they filed the FAC.  But the FAC fares no better than the original complaint.

Plaintiffs acknowledge that Intuitive developed, patented and obtained FDA clearance for da Vinci surgical systems, the parts used in those systems and the

EndoWrist instruments used to perform surgery with those systems.  Plaintiffs further admit that Intuitive's patent rights—which Plaintiffs do not challenge—prevent other entities from manufacturing these products.  Plaintiffs also concede that Intuitive owns and controls the distributor's toolkit used by its authorized distributors to service da Vinci systems and the counter installed on EndoWrist instruments to monitor and limit their usage.  These acknowledgments and concessions doom the FAC.

This lawsuit is an attempt to exploit Intuitive's decades of innovation and to obtain through litigation what Plaintiffs cannot achieve through competition.  According to Plaintiffs, Intuitive has engaged in anticompetitive conduct consisting of "tying," entering into "exclusive dealing" agreements and refusing to deal with Plaintiffs by denying them access to the distributor's toolkit and the EndoWrist instrument usage counter.  On the basis of these allegations, Plaintiffs claim that Intuitive violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing, or attempting to monopolize, two purported "aftermarkets" for the (i) service of da Vinci surgical systems, and (ii) repair and replacement of EndoWrist instruments.  Plaintiffs also claim that Intuitive violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by entering into the purported tying and exclusive dealing arrangements.  However, the pleaded facts do not—and cannot—support these claims.

Plaintiffs' claims should be dismissed for three independent reasons.  ***First***, Plaintiffs lack standing to assert any antitrust claim against Intuitive because they fail to plead antitrust injury.  Specifically, Plaintiffs cannot meet their burden to plead that their inability to compete in the two purported aftermarkets is directly attributable to antitrust misconduct.  Rather, according to the FAC, Plaintiffs' inability to compete in the service of da Vinci systems is attributable to Intuitive's refusal to provide Plaintiffs with its distributor's toolkit, and Plaintiffs' inability to compete in the repair and replacement of EndoWrist instruments is attributable to Intuitive's refusal to provide Plaintiffs with access to its instrument usage counter.  Because Intuitive's refusal to deal with Plaintiffs is lawful, that conduct cannot give rise to antitrust injury.  In addition, Plaintiffs' theory that Intuitive should sell EndoWrist instruments without any use limitation fails because Intuitive's regulatory clearance for those instruments was contingent on testing data submitted to the FDA that supported use limitations.

***Second***, Plaintiffs fail to adequately plead that their "aftermarkets" constitute relevant antitrust markets.  The FAC alleges single-brand aftermarkets (i.e., markets consisting of one company's products) for service of da Vinci systems and repair and replacement of EndoWrist instruments.  However, single-brand aftermarkets can only be relevant antitrust markets in two instances:  (i) if a plaintiff establishes that the defendant has monopoly power in a primary market

3

that enables it to exercise power in the aftermarkets; or (ii) when a defendant has *changed* its distribution policies in a manner that "locks in" customers to purchasing products or services from the defendant.  Plaintiffs fail to plausibly allege either of these circumstances.

*Third*, Plaintiffs fail to plausibly allege that Intuitive has engaged in anticompetitive conduct.  Plaintiffs premise their Sherman Act § 2 claims on allegations that Intuitive has engaged in tying, exclusive dealing and refusals to deal, and they assert Sherman Act § 1 claims based on the same tying and exclusive dealing allegations.  Plaintiffs' tying and exclusive dealing allegations suffer from multiple fatal deficiencies, including that they fail to plausibly allege the existence of any tying or exclusive dealing arrangement, or that Intuitive has market power in any relevant antitrust market.  Finally, the allegations that Intuitive has refused to deal with Plaintiffs cannot state a claim because the antitrust laws do not require a company to assist its competitors.

For these reasons, the FAC fails to state a claim.  Given that Plaintiffs already amended their complaint once and that any further amendment would be futile, Intuitive respectfully requests that the Court dismiss the FAC with prejudice.

## ALLEGATIONS ASSERTED IN THE FAC

### Intuitive and Its Products

*Robotic-Assisted Surgical Systems*.  Since 1999, Intuitive has manufactured and sold da Vinci surgical systems.  (FAC ¶ 9.)  Plaintiffs allege that da Vinci systems are "used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck—primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery." (*Id*. ¶ 11.)  The FAC further alleges that, like laparoscopic surgery, robotic-assisted surgery requires a surgeon to make several small incisions and to insert small tools, including a video camera, to perform a given procedure.  (*Id.* ¶¶ 6-7.)

*Parts for da Vinci Systems*.  The parts for da Vinci systems "are specially designed and built for the da Vinci robot system."  (*Id.* ¶ 34.)  "Due to [Intuitive's] patent protection and development costs," these parts "are not available through other commercial sources."  (*Id.* ¶ 43.)

*EndoWrist Instruments*.  "Intuitive offers more than eighty different instruments . . . under the EndoWrist brand."  (*Id.* ¶ 10.)  EndoWrist instruments "are the only instruments cleared by the FDA and foreign regulatory authorities for use with the da Vinci robot system."  (*Id.*)  "The [FDA] has a rigorous process for clearing any surgical robot instruments for sale in the United States."  (*Id.* ¶ 70.)  In

addition, "Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system." (*Id.*)

**Plaintiffs and Their Business**

In 2018, Plaintiffs "began to offer service contracts for the da Vinci" system. (*Id.* ¶ 47.)  Plaintiffs allege that they "specialize[] exclusively in the da Vinci robot" and are "the only known competitor to Intuitive in da Vinci robot service." (*Id.* ¶¶ 47-48.)  In 2018, Plaintiffs also "began to offer repair services for EndoWrist instruments." (*Id.* ¶ 69.)

**Service of da Vinci Systems**

Plaintiffs allege that "at the time of purchase or lease of a da Vinci robot system[,] . . . Intuitive forces customers to enter long-term service contracts of five years or more to get access to the da Vinci robot system." (*Id.* ¶¶ 49-50.)  "The first year of service is free under the product warranty, and the remaining four years are at a stated service price typically in the range of $100,000 to $200,000 per year." (*Id.* ¶ 51.)[1]

---

[1]  Though not a basis for this motion to dismiss, Intuitive notes that Plaintiffs' allegations regarding its service agreements—as well as many other allegations in the FAC—are inaccurate.  For example, contrary to what is asserted in the FAC, Intuitive does not force customers purchasing da Vinci systems to pay for multi-year service contracts.  Customers receive one year of service from Intuitive at a price included in their purchase of the system, and the purchase of any additional service is optional.

"Intuitive provides a distributor[']s toolkit on an exclusive basis to its independent third-party distributors for use in their designated territories with all necessary documentation, software, and passwords to service da Vinci robot systems." (*Id.* ¶ 55.)  Plaintiffs allege that "Intuitive denies access to the toolkit on any terms to any other third party, including potential competitors in robot service." (*Id.*)

According to the FAC, "[i]t is essential to competition in da Vinci robot service that independent service operators ('ISOs') have access to the toolkit to provide complete da Vinci robot service." (*Id.* ¶ 56.)  "For example, ISOs need the documentation to know the meaning of the error codes appearing on the da Vinci robot system to perform repairs on the system." (*Id.*)  "It is often impossible to identify a system error without knowing the meaning of the error code." (*Id.* ¶ 57.) "In addition, the service software is necessary to test the robot arms during preventative maintenance[,] . . . necessary to input the Intuitive serial number after replacing any da Vinci robot part" and "necessary to remove the reminder message after performing preventative maintenance or repairing the robot system." (*Id.* ¶ 58.)  "The service software cannot be practically duplicated by a customer or ISO." (*Id.* ¶ 59.)

**Repair and Replacement of EndoWrist Instruments**

Plaintiffs allege that "Intuitive installs a programmed memory chip inside each EndoWrist instrument to prevent the instrument from being used for more than a certain number of procedures." (*Id.* ¶ 73.)  Plaintiffs also allege that "Intuitive has exclusive control over the usage counter and denies access to it," and Intuitive "designed the memory chip to deny access by third parties (including customers and ISOs) to reset the usage counter to zero for additional uses." (*Id.*)[2]

According to the FAC, "[i]t is essential to competition in the EndoWrist instrument aftermarket that ISOs have the ability to reset the usage counter after servicing the instrument." (*Id.*)  Plaintiffs have "been unable so far to develop or obtain technology to reset the usage count during repair service of EndoWrist instruments for the da Vinci X and Xi robot systems." (*Id.* ¶ 74.)  "In addition, the usage counter cannot be economically duplicated for the remainder of the installed base of da Vinci robot systems." (*Id.* ¶ 75.)

───────────────

[2]  While Intuitive accepts Plaintiffs' allegations as true for purposes of this motion, Plaintiffs' characterization of the memory chip inside limited-life EndoWrist instruments, and their purported need to "reset" the chip, is misleading.  Limited-life EndoWrist instruments include memory chips to assure that the instruments are not used beyond their validated number of uses, as indicated on the labeling required and approved by the FDA.  The chip is located inside the instrument casing; in order to "reset" it, per Plaintiffs' apparent business model, one must physically disassemble the instrument.  Limited-life EndoWrist instruments are ***not*** designed to be disassembled in this fashion by anyone—including Intuitive.  Rather, the instruments are designed to be discarded after reaching their intended maximum number of uses.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While well-pleaded factual allegations in a complaint must be accepted as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted). Indeed, a complaint based on conclusory allegations should be dismissed because Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.

## ARGUMENT

Plaintiffs bring claims under Sherman Act § 2, alleging that Intuitive has monopolized, or attempted to monopolize, two putative "aftermarkets" for "da Vinci robot service" (Counts I, II) and repair and replacement of Endowrist instruments (Counts V, VI). They also bring claims under Sherman Act § 1, alleging that Intuitive has engaged in unlawful tying (Counts III, VII) and exclusive dealing (Counts IV, VIII) in each "aftermarket."

To state a claim under Sherman Act § 1 or § 2, a plaintiff must plausibly allege (i) that the defendant engaged in conduct that harmed competition (i.e.,

anticompetitive conduct), (ii) the existence of a well-defined relevant antitrust market in which the anticompetitive conduct occurred and (iii) that the plaintiff suffered antitrust injury. *See, e.g.*, *Jacobs v. Tempur-Pedic Int'l, Inc*., 626 F.3d 1327, 1336 (11th Cir. 2010); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073-77 (11th Cir. 2004).

Because Plaintiffs fail to satisfy any of these requirements, their claims should be dismissed.

## I.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD ANTITRUST INJURY

In order to have standing to bring any antitrust claim, a plaintiff must allege "antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co. v. Monsanto Co*., 105 F.3d 1372, 1374 (11th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977)). "The antitrust injury requirement ensures that a plaintiff can recover only if [its] loss stems from a competition-***reducing*** aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *see also Brunswick*, 429 U.S. at 488 (the antitrust laws "were enacted for 'the protection of competition not competitors'" (citation omitted)).

Accordingly, courts routinely dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury

is ***directly attributable*** to anticompetitive conduct by the defendant.  *See Spanish Broad. Sys.*, 376 F.3d at 1076 (affirming dismissal of Sherman Act claims because plaintiff failed to allege injury resulted from "practices [that] have harmed competition"); *City of Pittsburgh* v. *W. Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998) (explaining that "antitrust injury must be caused by the antitrust violation—not a mere causal link, but a direct effect," while affirming dismissal of claims seeking damages and injunctive relief for failure to plead antitrust injury); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) (affirming dismissal of antitrust claim because "any injury that [plaintiff] may have suffered did not flow directly from [defendant's] presumably unlawful act").

Here, Plaintiffs have failed to plead antitrust injury in either the purported aftermarket for service of da Vinci systems or the purported aftermarket for repair and replacement of EndoWrist instruments.  While Plaintiffs allege that they have been unable to compete in those putative markets, their own allegations establish that their purported injury is not directly attributable to any anticompetitive conduct.  Rather, it flows from Intuitive's refusal to deal with Plaintiffs—which is clearly lawful.  These admissions are fatal to Plaintiffs' claims and require dismissal of the FAC.

**A.     Plaintiffs Fail To Allege Antitrust Injury in the Purported Aftermarket for Service of da Vinci Systems**

According to their own allegations, Plaintiffs' inability to compete in the service of da Vinci systems is directly attributable to Intuitive's refusal to provide them with "access to the ***essential distributor's toolkit***." (FAC ¶ 49 (emphasis added).) Plaintiffs concede that in order to compete in the service of da Vinci systems, "[i]t is *essential*" for ISOs to "have access to the toolkit." (*Id.* ¶ 56 (emphasis added).) The distributor's toolkit provides "all necessary documentation, software, and passwords to service da Vinci robot systems." (*Id.* ¶ 55.) "For example, ISOs need the documentation to know the meaning of the error codes appearing on the da Vinci robot system to perform repairs on the system" (*id.* ¶ 56) because "[i]t is often impossible to identify a system error without knowing the meaning of the error code." (*Id.* ¶ 57.) "In addition, the service software is necessary to test the robot arms during preventative maintenance[,] . . . necessary to input the Intuitive serial number after replacing any da Vinci robot part" and "necessary to remove the reminder message after performing preventative maintenance or repairing the robot system." (*Id.* ¶ 58.)

As a matter of law, Intuitive's alleged refusal to deal with Plaintiffs cannot violate the Sherman Act. To the contrary, it is well established that "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own

independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (alteration in original) (citation omitted).  Even an alleged monopolist has sweeping rights to unilaterally refuse to deal because otherwise it could be compelled to allow its competitors to exploit the value of its investments—the very outcome that Plaintiffs seek in this lawsuit.  As the Supreme Court has explained:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.

*Id.* at 407-08.

Accordingly, an alleged refusal to deal cannot violate the antitrust laws absent a narrow circumstance not alleged here:  when the refusal terminates a prior course of voluntary dealing.  *See Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) ("[T]he unilateral termination of a voluntary course of dealing [is] a requirement for a valid refusal-to-deal claim."); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (affirming dismissal of refusal to deal claim because "[defendant] did not terminate any prior course of dealing"); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) (affirming dismissal of refusal to deal claim because plaintiff "failed to

allege either a voluntary arrangement between it and [defendant], or that any such arrangement was profitable to [defendant]").

The decision in *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007), is directly on point. In that case, plaintiffs alleged that elevator manufacturers monopolized, or attempted to monopolize, the "maintenance market[s] for [their] own elevators" by "designing the elevators to prevent servicing by other providers . . . ; refusing to sell competitors the parts, tools, software or diagrams necessary to service the elevators; and obstructing competitors' attempts to purchase elevator parts." *Id.* at 52. The Second Circuit affirmed the dismissal of plaintiffs' claims, holding that "because plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim." *Id.*

Here, Plaintiffs do not allege that Intuitive ever provided its distributor's toolkit to them. To the contrary, the FAC alleges that "Intuitive denies access to the toolkit on any terms to . . . potential competitors in robot service." (FAC ¶ 55.) As such, Intuitive's alleged refusal to provide its distributor's toolkit to Plaintiffs now is consistent with its prior course of dealing and cannot violate the antitrust

laws.[3]  Like the elevator manufacturers' refusal to provide competitors the

materials necessary to service their elevators, Intuitive's refusal to provide

Plaintiffs the essential distributor's toolkit is not anticompetitive and, therefore,

cannot give rise to antitrust injury.

**B.     Plaintiffs Fail To Allege Antitrust Injury in the Purported Aftermarket for Repair and Replacement of EndoWrist Instruments**

As alleged in the FAC, Plaintiffs' inability to compete in the repair and

replacement of EndoWrist instruments is directly attributable to Intuitive's refusal

to provide Plaintiffs with access to the EndoWrist instrument usage counter.

Plaintiffs allege that they seek to repair EndoWrist instruments, but that "Intuitive

installs a programmed memory chip inside each EndoWrist instrument to prevent

the instrument from being used for more than a certain number of procedures" and

that the chip is designed "to deny access by third parties (including customers and

ISOs) [that would enable them] to reset the usage counter to zero for additional

uses." (FAC ¶ 73.)[4]  Thus, Plaintiffs allege that "[i]t is ***essential*** to competition in

---

[3]  Intuitive's provision of the toolkit to its own distributors is not a "prior course of dealing" with Plaintiffs and, therefore, cannot provide a basis for Plaintiffs' refusal to deal claim.  *See LiveUniverse*, 304 F. App'x at 557 (refusal to deal claim failed because while plaintiff alleged "a prior course of dealing ***between [defendant] and its users***, nothing in the complaint suggests an agreement, or even an implicit understanding, ***between [defendant] and [plaintiff]***").

[4]  Plaintiffs acknowledge that they cannot replace EndoWrist instruments because those instruments "are only available from Intuitive" (FAC ¶ 66), "Intuitive holds

*(cont'd)*

the EndoWrist instrument aftermarket that ISOs have the ability to reset the usage counter after servicing the instrument." (*Id.* (emphasis added).)

Plaintiffs fail to plead antitrust injury for two separate reasons. ***First***, as with Intuitive's refusal to provide access to its distributor's toolkit, Intuitive's refusal to provide access to its EndoWrist instrument usage counter cannot constitute anticompetitive conduct. As the Second Circuit held in *Elevator Antitrust Litigation*, an alleged monopolist's "designing [a product] to prevent servicing by other providers" constitutes a lawful refusal to deal where there is no allegation that the defendant terminated a prior course of voluntary dealing with those competitors. *See Elevator Antitrust Litig.*, 502 F.3d at 52. Here, because Plaintiffs do not allege that Intuitive ever provided them with access to its EndoWrist instrument usage counter, they fail to plead that Intuitive's conduct is anticompetitive.

***Second***, the FDA regulatory framework also precludes Plaintiffs from establishing antitrust injury. The Third Circuit's decision in *City of Pittsburgh* is instructive. In that case, plaintiff sued two electric utilities, alleging that an unlawful merger between those defendants prevented plaintiff from purchasing

_____
*(cont'd from previous page)*
numerous patents blocking development of competing instruments for use on the da Vinci robot system" (*id.* ¶ 70), and the FDA "has a rigorous process for clearing any surgical robot instruments for sale in the United States." (*Id.*)

16

electric service from one defendant, Allegheny Power. *See City of Pittsburgh*, 147 F.3d at 261-62. But Allegheny Power's ability to sell electric service to plaintiff was contingent on regulatory approval, which Allegheny Power never received. *See id.* at 266. While plaintiff alleged that Allegheny Power would have obtained the requisite regulatory approval absent the challenged merger, the Third Circuit held that plaintiff "cannot foist [its] version of what might have been on the court under the rubric of antitrust injury." *Id.* at 267. Rather, "[t]he presence of the regulatory scheme and need for [regulatory] approval . . . cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise." *Id.* at 267-68.

Here, as Plaintiffs acknowledge, Intuitive was required to—and did—obtain clearance from the FDA to market its EndoWrist instruments. (*See* FAC ¶¶ 10, 70.) Specifically, Intuitive demonstrated to the FDA that its EndoWrist "instruments were 'substantially equivalent' to predicate devices already on the market'" (*id.* ¶ 79), as required to obtain FDA clearance pursuant to Section 510(k) of the Food Drug & Cosmetic Act, 21 U.S.C. § 360(k).[5] As reflected in the FDA's 510(k) summary of its decision clearing Intuitive to market the IS4000 EndoWrist

_____

[5] Any company intending to market a new medical device must submit and obtain clearance of a premarket notification containing information that allows the FDA to determine whether the device is "substantially equivalent" to a legally marketed device that does not require premarket approval. *See* 21 U.S.C. § 360(k); 21 C.F.R. § 807.92.

instruments used in the da Vinci Xi system (attached as Exhibit 4 to the FAC), the FDA granted regulatory clearance based on Intuitive's representation that these instruments "are programmed with a maximum number of surgical procedures based upon life testing."[6]  The instruments were "subjected to life testing representing worst case . . . to confirm the instruments met the projected life of each re-usable instrument."[7]  Nevertheless, Plaintiffs apparently seek to force Intuitive to sell these EndoWrist instruments without any limitation on the number of procedures in which they can be used.  Just as in *City of Pittsburgh*, however, the regulatory framework—and the need to seek FDA clearance to market any new medical device—cuts the causal chain and prevents Plaintiffs from establishing antitrust injury based on their theory that Intuitive should be required to sell a different product (i.e., EndoWrist instruments with no use limitation).[8]

---

[6]  ECF No. 14-4, FAC Ex. 4 at 4.

[7]  *Id.* at 7.

[8]  Plaintiffs assert that the particular usage limitations for certain EndoWrist instruments are unsupported (and too low).  (*See* FAC ¶¶ 77-84.)  These arguments are irrelevant to their antitrust claims; Plaintiffs do not allege (because they cannot) that the FDA cleared these EndoWrist instruments for unlimited use.

Plaintiffs also argue that "Intuitive sets much longer usage limits for . . . training instruments" than for "an instrument sold for clinical use."  (*Id.* ¶ 80.)  But training instruments are distinguishable from instruments used for clinical purposes because "[t]raining instruments are not approved for human use."  (ECF No. 14-2, FAC Ex. 2 at 13 n.1.)

For these reasons, Plaintiffs' inability to compete in the repair and replacement of EndoWrist instruments is not directly attributable to any anticompetitive conduct and cannot constitute antitrust injury.

## II. PLAINTIFFS FAIL TO ADEQUATELY PLEAD THAT THEIR "AFTERMARKETS" ARE RELEVANT ANTITRUST MARKETS

As explained above (*see supra* pp. 9-10), to state a claim under Sherman Act § 1 or § 2, a plaintiff must plausibly allege the existence of a relevant antitrust market in which the defendant's alleged misconduct occurred.  Because Plaintiffs have failed to adequately plead that their purported aftermarkets are relevant antitrust markets, all of their claims fail for this reason alone.

### A.    Law Governing Market Definition and "Aftermarkets"

A "relevant market has two components," a geographic market and a product market.  *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015).  "[T]he plaintiff must define both the geographic market and the product market in which the defendant allegedly possesses increasing power."  *Id.* A product market is defined by reference to "[t]he reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes."  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (footnote omitted).

Courts have only recognized "aftermarkets" as relevant antitrust markets in limited circumstances.  "An aftermarket is a type of derivative market, consisting

of consumable goods or replacement components that must be used for the proper functioning of some primary good."  Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.12(b) (4th ed. 2018).  These products are called "'after' markets because [they] are typically purchased in a later transaction than the purchase of the underlying primary good."  *Id.*

There is a judicial presumption against defining single-brand relevant aftermarkets (i.e., a market in one company's products) because manufacturers typically have high shares in purported aftermarkets for their own products.  *See Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) ("Because it would be inappropriate to punish a firm for its natural monopoly in its own products, courts [have] embraced a sweeping prohibition against analyzing alleged anticompetitive activity by focusing on single-branded relevant markets." (collecting cases)); *see also Harrison Aire, Inc. v. Aerostar Int'l, Inc*., 423 F.3d 374, 381 (3d Cir. 2005) ("Many firms supply unique and/or proprietary aftermarket parts and services for their primary market products.  As a result, they 'can be expected to have a very high percentage' share of the relevant aftermarket." (citation omitted)).

"[A] court may conclude that the aftermarket is the relevant market for antitrust analysis only if the evidence supports an inference of monopoly power in the aftermarket that competition in the primary market appears unable to check."

20

*SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999).

There are two ways in which a plaintiff can establish that competition in the primary market is unable to check purported monopoly power in an aftermarket: (i) demonstrating that the primary market is not competitive because the defendant has monopoly power in that market; or (ii) if the primary market is competitive, establishing that the defendant "locked in" customers to purchasing its aftermarket products or services through a change in its policies. *See id.* at 21; *Harrison Aire*, 423 F.3d at 383; *Metzler*, 19 F. Supp. 2d at 1357-58.

The Supreme Court recognized the "lock-in" theory in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). Specifically, the Court held that if a primary market is competitive, an aftermarket can be the relevant market for antitrust analysis when customers are "locked in" to purchasing aftermarket goods from the defendant and ***after*** that lock-in, the defendant ***changes*** its sales policy. *See id.* at 457-58, 476. In *Kodak*, a manufacturer of copiers and replacement parts and services necessary to repair those copiers, changed its policy such that it only would sell replacement parts to customers that purchased repair services from Kodak. *See id.* at 476. As a result, Kodak customers that purchased their copiers prior to this change in policy were "locked in" to purchasing Kodak's repair services, even as Kodak increased its prices for those services. *See id.* at 457-58, 476. And the competition in the primary market for copiers did not

21

provide a check on Kodak's power in the aftermarket for its services that existed as a result of the "lock in."  *See id.* at 470-73.

### B.  Plaintiffs Fail To Adequately Plead That Their Purported Aftermarkets Are Relevant Antitrust Markets

Plaintiffs have not pleaded that their alleged aftermarkets are relevant antitrust markets because they have not plausibly alleged that Intuitive can wield power in those alleged aftermarkets without being checked by competition in the primary market.

*First*, they have failed to properly define their purported primary market for "surgical robots," a failure that—by itself—prevents them from adequately pleading that their "aftermarkets" are relevant antitrust markets.  *Second*, and in any event, Plaintiffs fail to plausibly allege a "lock in."

#### 1.  Plaintiffs Fail To Plausibly Allege That the Purported Primary Market for "Surgical Robots" Is a Relevant Antitrust Market

Plaintiffs assert that Intuitive has monopoly power in a primary market "for the sale of surgical robots."  (FAC ¶ 16; *see also id.* ¶ 33.)  The Court need not credit this legal conclusion because Plaintiffs fail to plausibly allege that there is a relevant market limited to robotic-assisted surgery, as opposed to other surgical techniques.

Indeed, the FAC's allegation that "hospitals may *or may not* acquire their own robots" (*id.* ¶ 39 (emphasis added)) undermines Plaintiffs' theory that

22

hospitals have no alternative to robotic-assisted surgery. While Plaintiffs assert that "hospitals are expected to offer robotic surgery," that "[m]any surgeons strongly prefer robotic surgery" and that "many patients insist on robotic surgery" (*id.* ¶¶ 17-18), those allegations are conclusory and should not be afforded any weight. In fact, the FAC suggests that hospitals may view laparoscopic surgery as a reasonable substitute for robotic-assisted surgery because "robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery." (*Id.* ¶ 17.) Accordingly, Plaintiffs have not satisfied their burden to plead facts explaining why other surgical techniques—including laparoscopic surgery—are not reasonably interchangeable substitutes for robotic-assisted surgery. *See JES Props., Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003) (When a "proposed relevant market . . . clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, [the] relevant market is legally insufficient and a motion to dismiss may be granted.").

Plaintiffs' allegations regarding the purported cross-elasticity of demand between robotic-assisted and laparoscopic surgery are similarly deficient. "The cross-elasticity of demand measures ***the change*** in the quantity demanded by consumers of one product ***relative to the change*** in price of another." *Jacobs*, 626 F.3d at 1337 n.13 (emphases added). "[A] high cross-elasticity of demand

indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market." *Id.*  Plaintiffs allege that "[t]here is a very low cross-elasticity of demand between robotic and laparoscopic surgery" because "the estimated procedure volume for robotic surgery increased," even though the estimated "cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic surgery."  (FAC ¶ 19.)  These allegations have no bearing on cross-elasticity of demand because they do not address any ***change*** in prices or demand for robotic-assisted surgery relative to laparoscopic surgery.  *See U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 310-11 (3d Cir. 2010) (plaintiff failed to demonstrate cross-elasticity because it lacked "specific information relating to price increases or price stability for substitute products in relation to a rise in the price of [defendant's product]").[9]

Notably, other antitrust decisions involving alleged restraints in surgical markets have not limited the relevant market to a particular surgical technique—as Plaintiffs seek to do here.  *See, e.g.*, *Morgenstern v. Wilson*, 29 F.3d 1291, 1293-94, 1296 (8th Cir. 1994) (relevant product market for "adult cardiac surgery"

---

[9]  Far from alleging how a change in the price for robotic-assisted surgery relative to laparoscopic surgery affected consumer demand for either surgical technique, Plaintiffs do not even allege that there has been any change in price for robotic-assisted surgery.

encompassed different surgical techniques, such as "open-heart surgery, angioplasty, and other cardiac surgical procedures"); *Welchlin v. Tenet Healthcare Corp.*, 366 F. Supp. 2d 338, 349 (D.S.C. 2005) (relevant market was "orthopedic surgery"); *Bhan v. NME Hosps., Inc.*, 669 F. Supp. 998, 1019 (E.D. Cal. 1987) (relevant market was "surgical procedures"), *aff'd*, 929 F.2d 1404 (9th Cir. 1991); *Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1366 (W.D. Pa. 1982) (relevant market was "[pediatric] thoracic and cardiovascular surgery").

Because Plaintiffs have failed to plausibly allege a relevant market limited to robotic-assisted surgery, they cannot establish that Intuitive has monopoly power in that purported market. They also cannot demonstrate the relationship between competition in any primary market (which they have failed to define) and conditions in the purported aftermarkets, and this failure alone precludes Plaintiffs from adequately pleading that their purported aftermarkets are relevant antitrust markets. *See SMS*, 188 F.3d at 17 ("[A] court may conclude that the aftermarket is the relevant market for antitrust analysis ***only if*** the evidence supports an inference of monopoly power in the aftermarket that competition in the primary market appears unable to check." (emphasis added)).

        2.    <u>Plaintiffs Fail To Plausibly Allege a "Lock-in" Theory</u>

Plaintiffs also fail to plausibly allege that Intuitive "locks in" customers to purchasing service from Intuitive when they buy or lease a da Vinci system.

As explained above, the "lock-in" theory that the Supreme Court accepted in *Kodak* was premised on the defendant's ***change*** in policy regarding the sale of replacement parts and repair services for its product after consumers purchased the product.  Courts have subsequently held that absent such a change, a "lock-in" theory is not viable.  *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("[A]n antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997) ("The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies.").

The court in *Metzler* analyzed and rejected a purported lock-in similar to that alleged here.  In that case, plaintiffs claimed that defendant manufacturers of automotive diagnostic equipment had monopolized, or attempted to monopolize, an aftermarket for defendants' internal parts and repair services by allegedly refusing to sell those parts unless customers purchased defendants' repair services.  *See Metzler*, 19 F. Supp. 2d at 1348.  The district court rejected plaintiffs' attempt to define this purported relevant aftermarket because they could not satisfy the exception articulated in *Kodak*, given "that the defendants' policies and practices

26

with respect to parts and services w[ere] generally known." *Id.* at 1352.  As the

court explained:

> Without a showing of a change in business policy, or other coercive
> practice which concealed the true cost of parts and repairs, the
> exception to the general rule—that the relevant market is the primary
> equipment market—cannot apply because the purchasers of the
> automotive diagnostic equipment knew about repair costs at the time
> they bought the equipment.

*Id.* at 1358.

Similarly here, Plaintiffs do not allege that Intuitive has changed its policies

regarding the sale of replacement parts or repair services for da Vinci systems or

EndoWrist instruments.  Nor do Plaintiffs allege that the costs of these replacement

parts or repair services have increased over time or have somehow been concealed

from customers.  To the contrary, the FAC alleges that Intuitive requires "a service

contract *at the time of purchase*," pursuant to which "[t]he first year of service is

free under the product warranty, and the remaining four years are at a stated

service price typically in the range of $100,000 to $200,000."  (FAC ¶ 51

(emphasis added).)  Plaintiffs also acknowledge that the use limitations on

EndoWrist instruments are set forth in Intuitive's instrument catalogues.  (*Id.* ¶ 81.)

Thus, the FAC suggests that Intuitive's customers were aware of its policies when

they purchased the da Vinci system, such that Plaintiffs cannot maintain their

"lock-in" theory.[10]  Accordingly, Plaintiffs have failed to adequately plead that their purported aftermarkets are relevant markets for antitrust analysis, and their failure to define such a relevant market—a requirement for each of their claims—mandates the dismissal of the FAC.

## III.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD THAT INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT

Finally, all of Plaintiffs' claims fail for the independent reason that they do not adequately plead that Intuitive has engaged in anticompetitive conduct—whether they label it tying, exclusive dealing or refusing to deal, or assert the claims under Sherman Act § 1 or § 2.

### A.   Plaintiffs Fail To Plausibly Allege a Tying Claim

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985) (citation omitted).  Not all tying arrangements violate the Sherman Act.  *See id.*  To

---

[10] Plaintiffs allege that it is "very difficult [for customers] to project costs on a per use or life cycle basis" because "the customer typically cannot forecast demand for a surgical robot."  (FAC ¶ 39.)  That allegation is "conclusory and not entitled to be assumed true."  *Iqbal*, 556 U.S. at 681.  In any event, mere allegations regarding "imperfect consumer information" cannot sustain a "lock-in" theory.  *See PSI Repair Servs.*, 104 F.3d at 820 ("[T]he [Supreme] Court rejected the premise that imperfect consumer information resulting from basic market imperfections could be used as a basis to infer market power for purposes of the Sherman Act.").

prove an illegal tying arrangement under the rule of reason,[11] a plaintiff must establish five elements:

> (1) "a tying and a tied product"; (2) "evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied product"; (3) that the seller ha[s] sufficient market power in the tying product market to force the buyer to accept the tied product; (4) "anticompetitive effects in the tied market"; and (5) "involvement of a 'not insubstantial' amount of interstate commerce in the tied product market."

*Id.* at 1502-03 (first alteration in original) (citation omitted).

Plaintiffs appear to identify two purported tying arrangements in each of their putative aftermarkets.  In the "aftermarket" for service of da Vinci systems, Plaintiffs allege that Intuitive (i) "forces customers to purchase da Vinci robot service from Intuitive to get access to da Vinci robot parts" (FAC ¶ 54) and (ii) "force[s] customers to purchase da Vinci robot service to get the da Vinci surgical robot."  (*Id.* ¶ 97.)  In the "aftermarket" for repair and replacement of EndoWrist instruments, Plaintiffs allege that Intuitive (i) ties "EndoWrist instrument replacement to acquisition of the da Vinci robot system," and (ii) ties "EndoWrist instrument replacement to da Vinci robot service."  (*Id.* ¶ 71.)

---

[11] Because Intuitive's da Vinci system and EndoWrist instruments are patented products, Plaintiffs' tying claims are evaluated under the rule of reason.  *See Ill. Tool Works v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006) ("Tying arrangements involving patented products should be evaluated under [the rule of reason] rather than under the *per se* rule.").

Plaintiffs fail to state a tying claim for three reasons.  ***First***, Plaintiffs fail to plausibly allege that Intuitive has coerced customers to purchase any product.  Rather, Plaintiffs' allegations on this subject are conclusory and fail to adequately plead coercion.  *See Iqbal*, 556 U.S. at 678 ("mere conclusory statements[] do not suffice" to state a claim).  For example, Plaintiffs do not allege facts showing that Intuitive has conditioned the sale of parts—let alone which parts—on customers' purchasing da Vinci system service from Intuitive.  Similarly, there are insufficient factual allegations supporting Plaintiffs' theories that Intuitive forces customers to purchase service on the da Vinci system from Intuitive, or requires the purchase of EndoWrist instruments from Intuitive to obtain the da Vinci system or service on that system.  To the contrary, the FAC suggests that customers can accept third-party service and that doing so merely "voids Intuitive's one year-warranty on the . . . da Vinci robot system."  (FAC ¶ 85.)

***Second***, Plaintiffs fail to plausibly allege that Intuitive has market power in any purported tying market.  Indeed, Plaintiffs cannot satisfy this element because they fail to adequately plead that any of the purported tying markets is a relevant antitrust market.  While Plaintiffs assert that Intuitive has market power in the "aftermarket for da Vinci robot parts" (*id.* ¶ 42) and the purported aftermarket for "da Vinci robot service" (*id.* ¶ 109), as set

forth above, Plaintiffs cannot establish that any such single-brand aftermarket is a relevant antitrust market.  (*See supra* pp. 22-28.)  And as explained above (*see supra* pp. 22-25), Plaintiffs fail to plausibly allege that the purported primary or tying market for robotic-assisted surgery is a viable relevant market.

**Third**, Plaintiffs fail to plead any anticompetitive effect in the purported tied markets for the service of da Vinci systems and repair and replacement of EndoWrist instruments.  To meet their burden regarding this element, Plaintiffs must allege "that the combined price for the tying and tied products was greater than if they had been sold independently." *Metzler*, 19 F. Supp. 2d at 1361.  Plaintiffs have failed to satisfy this burden because they do not allege what the price of Intuitive's purported tying products—da Vinci systems, parts or service—would be absent the alleged ties.  Plaintiffs' assertions that they offer better rates than Intuitive for da Vinci service and EndoWrist repair and replacement are insufficient because "[a] determination of the value of the tied product[] alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the [defendant] for the tying product." *Metzler*, 19 F. Supp. 2d at 1361 (third alteration in original) (quoting *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.

1982)).[12]  In other words, Plaintiffs must allege what Intuitive would have

charged for the alleged tying products absent the alleged ties because, for

example, Intuitive could have increased the price for a da Vinci system if it

were sold in the absence of a service contract.

For these reasons, Plaintiffs fail to plausibly allege that Intuitive has

engaged in unlawful tying.

### B.   Plaintiffs Fail To Plausibly Allege An Exclusive Dealing Claim

"An exclusive dealing arrangement 'require[s] a purchaser not to deal with

others as a condition of dealing with the seller.'" *E.T. Barwick Indus., Inc. v.*

*Walter E. Heller & Co.*, 692 F. Supp. 1331, 1342 (N.D. Ga. 1987) (alteration in

original) (citation omitted), *aff'd sub nom. Barwick Indus. v. Heller & Co.*, 891

F.2d 906 (11th Cir. 1989) (table).  Exclusive dealing arrangements are permissible

"unless the court believes it probable that performance of the contract will

foreclose competition in a substantial share of the line of commerce affected."

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  "[I]n order to

---

[12] Plaintiffs assert that they "typically offer[] service at effective rates of less than 50% of the effective rates offered by Intuitive" (FAC ¶ 47), but concede that they cannot "provide complete da Vinci robot service" without access to the distributor's toolkit.  (*Id.* ¶ 56.)  Plaintiffs also allege that their EndoWrist instrument "***repair*** rates . . . are at least 25% on average below ***replacement*** rates offered by Intuitive."  (*Id.* ¶ 69 (emphases added).)  Thus, as alleged, Plaintiffs do not offer the same range of services as Intuitive, and any comparison of the respective rates is apples to oranges.

determine whether a substantial share of the competition has been foreclosed, the relevant product and geographic markets must first be determined." *E.T. Barwick,* 692 F. Supp. at 1344.

Plaintiffs fail to state a claim because they do not adequately plead the existence of any exclusive arrangement.  Plaintiffs allege that "Intuitive forces customers to enter long-term service contracts of five years or more" (FAC ¶ 50), but the FAC is devoid of any allegation that these service contracts are exclusive— i.e., that they preclude customers from accepting service from another provider. Plaintiffs also allege that "Intuitive has entered agreements with its customers to provide EndoWrist instrument repair and replacement on an exclusive basis." (*Id.* ¶ 112.)  But again, the FAC fails to plead facts to support this conclusory assertion.  If anything, Plaintiffs suggest that customers can accept third-party service and forgo the benefit of the warranty on the da Vinci system.  (*See id.* ¶ 85.)

Moreover, Plaintiffs' exclusive dealing claims fail because, as explained above (*see supra* pp. 22-28), they do not plausibly allege that either the aftermarket for service of da Vinci systems or for repair and replacement of EndoWrist instruments constitutes a relevant antitrust market.

C.    <u>**Plaintiffs Fail To Plausibly Allege An Unlawful Refusal To Deal**</u>

Plaintiffs allege that Intuitive has refused to deal with Plaintiffs by "denying access to the essential distributor's toolkit" (FAC ¶ 49) and "denying access to the essential EndoWrist instrument usage counter." (*Id.* ¶ 71.)

As explained above (*see supra* pp. 12-16), Plaintiffs cannot state a claim based on these refusals to deal because they do not allege that Intuitive terminated a prior course of voluntary dealing pursuant to which it provided Plaintiffs with the distributor's toolkit or the EndoWrist instrument usage counter.[13]

IV.    **PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE**

"[D]enial of leave to amend is justified by futility when the 'complaint as amended is still subject to dismissal.'" *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999) (citation omitted); *see also Yahav Enters. LLC v. Beach Resorts Suites LLC*, No. 1:15-cv-22227-KMM, 2016 WL 111361, at *4 (S.D. Fla. Jan. 11, 2016) (dismissing with prejudice because plaintiff "already amended its complaint once in response to the pleading deficiencies highlighted by Defendants in their initial motion to dismiss," and "many of the same pleading deficiencies still exist in the Amended Complaint").

---

[13] Plaintiffs note that Intuitive sent them a letter "demanding that [Plaintiffs] 'immediately cease and desist'" attempts to "reset[] the usage counter after completing servicing [of] an EndoWrist instrument." (FAC ¶ 87; *see also id.* ¶ 63.) The cease-and-desist letter cannot constitute anticompetitive conduct because Plaintiffs do not allege the letter was unlawful or excluded them from any market.

The FAC is Plaintiff's *second* failed attempt to plead antitrust claims based on conduct that cannot give rise to competitive injury in purported relevant aftermarkets that are not cognizable.  If anything, the revisions to the FAC merely emphasize that Plaintiffs cannot establish antitrust injury because their alleged inability to compete is directly attributable to lawful conduct.  (*See supra* pp. 12-16.)  Given Plaintiffs' inability to cure the deficiencies that Intuitive highlighted in its initial motion to dismiss, the FAC should be dismissed with prejudice.

## CONCLUSION

For each of the foregoing independent reasons, Intuitive respectfully requests that the Court dismiss Plaintiffs' FAC with prejudice.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

Intuitive certifies that its counsel conferred by telephone with Plaintiffs' counsel regarding this motion on April 24, 2019.  The conference did not resolve the issues raised in the motion.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Intuitive certifies this Memorandum complies with the word count limitation set forth in Local Rule 7.1(F) because it contains 7,900 words, excluding the parts exempted by said Local Rule.

Dated:  May 28, 2019                Respectfully submitted,

/s/ David L. McGee
DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

ALLEN RUBY (*Pro Hac Vice*)
ABRAHAM M. ANDRADE III (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
Tel: (650) 470-4500
allen.ruby@skadden.com
abraham.andrade@skadden.com

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice Admission to be applied for*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com

Counsel for Defendant
Intuitive Surgical, Inc.

36

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a copy hereof has been filed via CM/ECF for electronic

distribution to the following counsel of record on May 28, 2019:

      Jeffrey L. Berhold
      JEFFREY L. BERHOLD, P.C.
      1230 Peachtree Street, Suite 1050
      Atlanta, GA 30309
      Telephone:  (404) 872-3800
      jeff@berhold.com

                        /s/ David L. McGee
                        DAVID L. McGEE
                        Fla. Bar No. 220000
                        BEGGS & LANE, RLLP
                        501 Commendencia Street
                        Pensacola, FL 32502
                        Telephone: (850) 432-2451
                        dlm@beggslane.com