## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**RESTORE ROBOTICS, LLC,**
and **RESTORE ROBOTICS**
**REPAIRS, LLC,**

      **Plaintiffs,**

**v.**                                  **Case No. 5:19cv55-TKW-MJF**

**INTUITIVE SURGICAL, INC.,**

      **Defendant.**
_____/

## ORDER DENYING MOTION TO DISMISS

      This antitrust case is before the Court on Defendant's motion dismiss (Doc. 16) Plaintiffs' amended complaint under Fed. R. Civ. P. 12(b)(6).  Plaintiffs filed a response in opposition to the motion (Doc. 18) to which Defendant filed a reply (Doc. 24).  No hearing is necessary to rule on the motion.

## I.  Background

      Defendant manufactures and sells surgical robots and related instruments—including the da Vinci robot system and the EndoWrist instruments used with the system—to hospitals and surgical centers around the world.  According to Plaintiffs, Defendant has monopoly power in the worldwide market for the sale of surgical robots and it uses this power to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels.

Plaintiffs provides parts and service for the maintenance of surgical robots and related instruments, and they claim that Defendant uses its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for the maintenance and repair of the surgical robots and related instruments.  Plaintiffs allege eight separate but related antitrust claims in their amended complaint:  monopolization (Counts One and Five) and attempted monopolization (Counts Two and Six) of the da Vinci robot service aftermarket and the EndoWrist instrument repair and replacement aftermarket in violation of 15 U.S.C. §2, and tying (Counts Three and Seven) and exclusive dealing (Counts Four and Eight) in each of those aftermarkets in violation of 15 U.S.C. §1.

## II.  Analysis

"Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases," *Spanish Broad. Sys. of Fla. v. Clear Channel Communs.*, 376 F.3d 1065, 1070 (11th Cir. 2004) (citation omitted), but the parties agree that the general *Twombly*[1]-*Iqbal*[2] standard governs the Court's review of the legal sufficiency of the amended complaint.  Under that standard, the amended complaint will survive Defendant's motion to dismiss if the well-pleaded factual allegations in the amended complaint "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S.

---

[1]  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[2]  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

at 570; *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (citations and quotation marks omitted) ("Plausibility is the key, as the well-pled allegations must nudge the claim across the line from conceivable to plausible.").

Plaintiff alleged antitrust violations under both section 1 and section 2 of the Sherman Act, 15 U.S.C., et seq.   Section 1 makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."   Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations."

## A.  Section 1 Claims (Counts Three, Four, Seven and Eight)

Generally, to state a claim under section 1 of the Sherman Act, a plaintiff must allege that the defendant (1) entered into an anticompetitive agreement (2) proximately causing antitrust injury (3) in a relevant market.[3]  *See Jacobs*, 626 F.3d

---

[3]  Arguably, a plaintiff alleging a section 1 claim also has to allege that the defendant's conduct has "no pro-competitive benefit or justification" if (as appears to be the case here) the claim is subject to the rule-of-reason standard of review.  *Spanish Broad Sys.*, 376 F.3d at 1071; *see also  Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006) ("[T]ying arrangements involving patented products should be evaluated under the [rule of reason] rather than under the per se rule[.]"); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 711 (11th Cir. 1984) ("[E]xclusive dealing arrangements are to be analyzed under the rule of reason.").  Defendant does not argue that Plaintiffs failed to allege the absence of any pro-competitive justification and, on that issue, Plaintiffs alleged that "[q]uality control is **not** a valid business justification for excluding third parties from servicing da Vinci robots" because Defendant already entrusts its distributor's

at 1336; *Spanish Broad. Sys.*, 376 F.3d at 1071-72.  Here, Defendant claims that Plaintiffs failed to adequately plead any of these elements.  The Court disagrees.

1.  Anticompetitive Agreements

Plaintiffs alleged two distinct, but related, claims of anticompetitive agreements—tying[4] and exclusive dealing.  Each is discussed in turn.

*a. Tying*

A tying arrangement is "an agreement by a party to sell one product [or service] but only on the condition that the buyer also purchases a different (or tied) product [or service]." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985) (quoting *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5 (1958)).  "[T]he essence of illegality in a tying arrangement is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1284 (11th Cir. 1982) (quoting *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 611 (1953)).  The elements of an illegal tying arrangement are:

---

toolkit to third-party distributors and Plaintiffs use "certified field service engineers with prior training and experience" with Defendant to work on the surgical robots.  *See* Doc. 14, at 20 (¶60) (emphasis added).  Accordingly, to the extent Plaintiffs were required to allege that Defendant's conduct has no pro-competitive benefit or justification, the Court finds that they adequately did so.

[4]  Here, although multiple tying arrangements are alleged among the da Vinci robot systems, robot maintenance services, robot replacement parts, and the EndoWrist instruments, the Court will refer to them as a single tying arrangement based on their interrelated nature.

(1) a tying and a tied product[,] (2) evidence of actual coercion by the seller that in fact forced the buyer to purchase the tied product[,] (3) that the seller have sufficient market power in the tying product market to force the buyer to accept the tied product[,] (4) anticompetitive effects in the tied market[,] and (5) involvement of a not insubstantial amount of interstate commerce in the tied product market.

*Amey*, 758 F.2d at 1502-03 (citation, quotation marks, and original alteration omitted).  Defendant only challenges the second, third, and fourth elements in its motion to dismiss.

With respect to the second element, actual coercion may be satisfied "by showing that the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product." *Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1418 (11th Cir. 1987).  Here, Plaintiffs have not attached a copy of Defendant's standard sales or lease agreement to their amended complaint and they have offered no direct evidence of the subjective perceptions of Defendant's customers; however, this is not fatal (or surprising because Plaintiffs are Defendant's competitors, not its customers) because the amended complaint includes allegations from which actual coercion can be plausibly inferred.  *See, e.g.,* Doc. 14, at 17-18 (¶¶51-52) (referencing the service agreement requiring customers to purchase service for Defendant's products from Defendant), 23 (¶72) (restricting customer use of the purchased products and requiring Defendant's approval for "any repairs or service during or after th[e] usage limit").  Accordingly, Plaintiffs adequately alleged this element.

5

With respect to the third element, Defendant disputes the existence of the aftermarkets alleged by Plaintiffs. However, as discussed below, Plaintiffs plausibly established the existence of the aftermarkets identified in the amended complaint.

With respect to the fourth element, anticompetitive effects, the plaintiff is required to show that "the combined price for the tying and tied products was greater than if they had been sold independently." *Metzler v. Bear Auto. Serv. Equip. Co., SPX*, 19 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998) (citing *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982)). Here, although Defendant argues that the allegations in the amended complaint regarding the independent pricing of the services are insufficient because they rely on the prices for the services provided by Plaintiff which are more limited than the services provided by Defendant, *see* Doc. 16, at 32 n.12, these allegations are sufficient, under the circumstances, to withstand Defendant's motion to dismiss.

Accordingly, Plaintiffs have adequately alleged tying.

b. *Exclusive Dealing*

An exclusive dealing arrangement is permissible (and not a violation of the antitrust laws) unless it forecloses competition in the relevant market. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333 (1961). Courts are required to pay attention to the "practical effect" of exclusive dealing arrangements, and the Eleventh Circuit has held that courts should "consider 'market realities' rather than

6

'formalistic distinctions.'" *McWane, Inc. v. FTC*, 783 F.3d 814, 834-35 (11th Cir. 2015). Here, Defendant alleges that the arrangements with its customers are not exclusive and that the aftermarkets in which they allegedly foreclose competition do not exist for antitrust purposes. The Court disagrees.

Defendant's challenge to the arrangements' exclusivity rests on the sort of formalism that both the Supreme Court and the Eleventh Circuit have eschewed. As with the tying claims, Plaintiffs have provided sufficient factual support to plausibly allege that Defendant's arrangements with its customers are—for practical purposes—exclusive. According to Plaintiffs, the arrangements (which also tie the da Vinci robots to services and products in the aftermarkets) span at least four years, involve costs in the hundreds of thousands of dollars, *see* Doc. 14, at 17 (¶51), restrict customer use of purchased products, and require Defendant's approval for servicing, *id.* at 23 (¶72), thereby creating a market reality in which Defendant's customers cannot, without expense and difficulty, turn to its competitors in the aftermarkets.[5] In other words, as alleged, the arrangements have the practical effect of excluding dealing to the point of harm to competition.

---

[5] Defendant points to the alleged avoidance of the one-year warranty on the entire da Vinci robot that befalls customers who accept service on the robot's parts from anyone other than Defendant as evidence that the arrangements are not formalistically exclusive. However, this allegation just as easily supports the position that as a practical matter, the arrangements are exclusive because customers who opt for a competitor suffer a significance consequence.

Defendant's challenge to the aftermarkets' existence is addressed below in the discussion of the relevant markets.

Accordingly, Plaintiffs have adequately alleged exclusive dealing.

2.  Antitrust Injury

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant['s] acts unlawful." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  A plaintiff can recover only if its loss is directly attributable to the defendant's anticompetitive conduct.  *Id.* at 1449-50; *see also Spanish Broad. Sys.*, 376 F.3d at 1076 ("[A defendant's business practices] do not give rise to a federal antitrust claim without factual allegations specifically addressing how the[] practices have harmed competition.").  Here, Defendant does not dispute that tying and exclusive dealing arrangements generally can cause antitrust injury, and Plaintiffs alleged that Defendant's arrangements do so by effectively precluding competition in the aftermarkets, enabling Defendant to charge its customers supracompetitive prices.

Defendant claims that Plaintiffs' injuries are solely attributable to its refusal to deal with Plaintiffs with respect to the distributor's toolkit and usage counter (which, as discussed below, is not anticompetitive conduct in this case), but that is

too narrow of a reading of the amended complaint.[6]   Although not having the distributor's toolkit and the usage counter impacts Plaintiffs' ability to compete, they have alleged that they are able to compete some without the toolkit and counter but could compete more—even without the toolkit and counter—but for the tying and exclusive dealing arrangements, which allegedly harm not only Plaintiffs as Defendant's competitors but also competition in the aftermarkets in general.

Accordingly, Plaintiffs have adequately alleged antitrust injury.

3.  Relevant Markets

Market definition is "essentially a factual question."  *McWane, Inc. v. FTC*, 783 F.3d 814, 825 (11th Cir. 2015).  However, "antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets."  *Jacobs*, 626 F.3d at 1336.

Antitrust claims require market definition, and "[d]efining the relevant market requires identification of both the product at issue and the geographic market for that product."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) (citing *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978));

---

[6]  Defendant also claims that Plaintiffs' injuries are attributable to federal regulations, but Defendant has provided limited support for its argument that the Food and Drug Administration (FDA) regulatory framework pursuant to which Defendant's products were "cleared" for surgical use breaks the chain of proximate causation, thereby preventing Plaintiffs from establishing antitrust injury.  Plaintiffs have persuasively distinguished this case from the one Third Circuit case cited by Defendant, *see* Doc. 18, at 14-15, and in any event, the FDA clearance in this case does not require tying and exclusive dealing arrangements in contravention of antitrust law.

*see also Jacobs*, 626 F.3d at 1336.  Defendant does not raise the issue of geographic market definition, and even if it had, the Court would find that Plaintiffs adequately pleaded this market aspect, *see, e.g.*, Doc. 14, at 12-13 (¶¶35-36).  Thus, the Court will focus on market in terms of product.

When defining the market in terms of product (rather than geography), "[a] court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because if consumers view the products as substitutes, the products are part of the same market." *Jacobs*, 626 F.3d at 1337-38 (citation, quotation marks, and original alteration omitted).  For product submarkets, other factors considered include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 1337.  Generally, a relevant antitrust market will not be limited to just one brand because "every manufacturer has a 'natural' monopoly in the sale and distribution of his own products." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978).  However, courts may recognize a one-brand market[7] for antitrust purposes under certain circumstances:

---

[7] It is immaterial the one-brand market in this case is an aftermarket.  *Cf. Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 479 n.29 (1992) (citations omitted) ("[O]n the occasions when the [Supreme] Court has considered tying in derivative aftermarkets by manufacturers, it has

when, for example, the vertically integrated manufacturer uses his dominant position at one level of competitive activity to eliminate competition at another level,[8] or when . . . the firm's product is so unique or so dominant in the market in which it competes that any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed.

*Id.*

Here, Plaintiffs allege that the primary product market is surgical robots and the aftermarkets at issue are maintenance service and replacement parts for surgical robots and the related instruments.  Defendant responds that there is no separate market for surgical robots because the instruments of laparoscopic surgery and similar techniques offer reasonably interchangeable substitutes.

Plaintiff's amended complaint contains sufficient support for its claim that surgical robots constitute a market distinct from similar surgical instruments. Plaintiffs alleged "a very low cross-elasticity of demand between robotic and laparoscopic surgery" and used the large price spread between surgical robots and laparoscopic equipment as circumstantial evidence.  Doc. 14, at 7 (¶¶19-20) (citing to a *Journal of the American Medical Association* research letter to argue that

---

not adopted any exception to the usual antitrust analysis, treating derivative aftermarkets as it has every other separate market."); *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1261 (11th Cir. 1998) (treating the "pool heater aftermarket" as "the pool heater market").

  [8]  *Cf. Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 479 n.29 (1992) (citations and quotation marks omitted) ("[P]ower gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next.").

although surgical robots cost far more than laparoscopic equipment to maintain, they are in much greater demand). They also alleged that "customers in the surgical robot market strongly prefer surgical robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market," *id.* (¶20), that "[t]he industry and the public recognize surgical robots as a separate economic entity," *id.* at 8 (¶21), and that there is a professional association focused on robotic surgery, *id.* Additionally, Plaintiffs listed five characteristics peculiar to surgical robots that make the robots superior to laparoscopic equipment, *id.* at 4 (¶8), and they alleged that "[m]anufacturers specialize in surgical robots" and "[s]urgeons specialize in robotic surgery," evoking the factors of unique production facilities, distinct customers, and specialized vendors. *Id.* at 8 (¶21). Accepting these facts as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have plausible alleged that surgical robots make up a distinct product market, which is the primary market that is the basis of the aftermarkets at issue in this case.

Plaintiffs also plausibly alleged the existence of an aftermarket for the maintenance and repair of surgical robots although, at times, Plaintiffs collapse the distinction between the aftermarkets of maintenance service and replacement parts for surgical robots, on the one hand, and the aftermarkets of da Vinci robot service and EndoWrist instruments, on the other, leading to the issue of one-brand market definition. This collapse makes sense, however, in light of Plaintiffs' allegation that

Defendant has "a 98% to 99% market share in the worldwide and surgical robot markets" with or without the only other two manufacturers of "commercially available surgical robots." *Id.* at 10 (¶29).

Under these circumstances, both exceptions for one-brand market definition apply here. *See Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978). Indeed, the crux of the entire amended complaint is that the vertically integrated Defendant has used its monopoly power in the primary market of surgical robots to eliminate competition in the related aftermarkets. *See* Doc. 14, at 12 (¶33); *see also* Doc. 18, at 4. Moreover, as alleged, Defendant's products occupy a position unique and dominant enough in the markets to warrant one-brand market definition. *See, e.g.*, Doc. 14, at 6 (¶18) (mentioning "the *unique* attributes of surgical robots") (emphasis added), 12 (¶34) ("[Da Vinci robot parts] are *unique*.") (emphasis added); Doc. 14-4, at 5 ("The EndoWrist instruments have a *unique* articulating design[.]") (emphasis added); *see also* Doc. 14, at 16 (¶45), 21 (¶66) (on Defendant's alleged "monopoly power" and corresponding ability to "exclude competition" in the aftermarkets).

Accordingly, the amended complaint has plausibly alleged relevant antitrust markets.

13

**B.  Section 2 Claims (Counts One, Two, Five and Six)**

Plaintiffs alleged both monopolization and attempted monopolization under section 2 of the Sherman Act.  Each is discussed in turn.

1.  Monopolization

A section 2 monopolization claim is comprised of two elements: "(1) the possession of [illegal[9]] monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Morris Communs. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293-94 (11th Cir. 2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market."  *Id.* at 1294 (citation omitted).  "The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market."  *Id.* (citation omitted).

---

[9]  Defendant possesses patents that effectively give it a *legal* monopoly in the primary product market of surgical robots.  However, in this suit, Plaintiffs do not challenge Defendant's monopolization (or attempted monopolization) in the primary market; rather, they sue under the theory that Defendant's patents do not allow it to expand its legal monopoly in the primary market into the aftermarkets through anticompetitive means.

a. *Monopoly Power*

Here, Plaintiffs plausibly alleged Defendant's monopoly power in the relevant aftermarkets.  *See* Doc. 14, at 16 (¶45), 21 (¶66).  Plaintiffs claimed that they are "the only known competitor to [Defendant and its exclusive distributors,] in da Vinci robot service domestically or worldwide," *id.* at 16 (¶47), 20 (¶62), and that "[Defendant], directly and indirectly through its exclusive distributors, has maintained a market share in da Vinci robot service of more than 99% worldwide and domestically for nearly 20 years," *id.* at 20 (¶61).  They further claimed that "[a]t this time, [Defendant] has a 99% market share in the aftermarket for repair and replacement of EndoWrist instruments." *Id.* at 22-23 (¶70).  According to Plaintiffs, Defendant uses this extremely high degree of market power to charge supracompetitive prices and to prevent any competitor from competing with Defendant in the aftermarkets.  This is the very definition of monopoly power.

b. *Predatory or Exclusionary Anticompetitive Acts*

Here, Plaintiffs have accused Defendant of the following predatory or exclusionary anticompetitive acts: tying of da Vinci robot products, da Vinci robot maintenance services, and EndoWrist products, *see, e.g.*, Doc. 14, at 15 (¶43), 17 (¶49), 23 (¶71); exclusive dealing, including "secur[ing] agreements with customers that [the customers] will not purchase any competing robots from other manufacturers," *id.* at 9 (¶23), creating "significant switching costs," *id.* at 13 (¶38),

and other "unpredictable" costs for customers, *id.* at 13-15 (¶¶39-41), "foreclosing access to the market by entering service contracts of five years or more at the time of purchase or lease of a da Vinci robot system," *id.* at 17 (¶49), and "lock[ing] [customers] into long-term service agreements," *id.* at 18 (¶53); sending of a cease-and-desist demand letter on Plaintiffs' contacting Defendant's customers to offer maintenance services and Plaintiffs' resetting the EndoWrist usage counter, *id.* at 28 (¶87); and refusal to provide Plaintiffs with access to the distributor's toolkit for the da Vinci robots, *id.* at 17 (¶49), and to the EndoWrist usage counter, *id.* at 23 (¶71). The tying and exclusive dealing allegations, discussed above, satisfy the second element of monopolization; however, the refusal to deal allegations, based on Plaintiffs' being denied access to the distributor's toolkit and usage counter, do not.

A private business—even one with monopoly power—may generally refuse to deal with whomever it chooses. *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004) (hereafter "*Trinko*"). The most common exception to this general rule occurs when a prior course of dealing exists between the plaintiff and the defendant. *See, e.g.*, *id.* at 408-09 (discussing the exception available under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)); *see also Covad Communs. Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) ("*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under

*Aspen*.").   Here, because Plaintiffs have alleged no prior course of dealing with Defendant, they must rely on another exception—either the essential facility doctrine or *Otter Tail*[10]—to overcome the general rule that a private business may refuse to deal with whomever it chooses.   Neither exception applies here.

     i. *Essential Facility Doctrine*[11]

"Under the essential facility [doctrine], a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain monopoly power in the relevant market." *Morris Communs.*, 364 F.3d at 1294.   In *Morris Communications*, the Eleventh Circuit affirmed a summary judgment in which the district court held that "access to proprietary information, not in the public domain," was not an essential facility for antitrust purposes.   235 F. Supp. 2d 1269, 1285 (M.D. Fla. 2002).   The district court reasoned that "a court's role is not to force access to proprietary information in the name of competition, as that would reduce incentive to innovate and ultimately harm consumers." *Id.*

Here, it is undisputed that the alleged essential facilities in this case—the distributor's toolkit and the usage counter—hold proprietary information and are

---

[10] *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973).

[11] The Court assumes for purposes of ruling on Defendant's motion to dismiss that the essential facility doctrine is a viable theory even though the Supreme Court stated in *Trinko* that "[w]e have never recognized such a doctrine." 540 U.S. at 411.

part of Defendant's patented products.  Specifically, the amended complaint alleges that the distributor's toolkit consists of "all necessary documentation, software, and passwords to service da Vinci robot systems," Doc. 14, at 18-19 (¶55), and the usage counter is "a programmed memory chip" that Defendant installs "inside each EndoWrist instrument to prevent the instrument from being used for more than a certain number of procedures," *id.* at 23-24 (¶73).  Accordingly, consistent with *Morris Communications*, the essential facility doctrine does not apply here.

### ii.  Otter Tail

Assuming *Otter Tail* provides Plaintiffs with an exception distinct from the essential facility doctrine, it is inapplicable here because it requires a showing that the product withheld from the plaintiff-competitor was "otherwise marketed or available to the public."  *Trinko*, 540 U.S. at 410; *see also Levine v. Bellsouth Corp.*, 302 F. Supp. 2d 1358, 1371 (S.D. Fla. 2004) (reasoning that "the defendant's refusal to provide to the competitor its product for the retail price" first requires the defendant to "set a retail price" by offering the product for retail).

Here, Plaintiffs have not alleged that Defendant has ever offered the distributor's toolkit or EndoWrist usage counter to the public.  Indeed, they alleged the opposite.  Doc. 14, at 18 (¶55) ("[Defendant] denies access to customers and third parties to the distributor's toolkit."), 24 (¶73) ("[Defendant] has exclusive control over the usage counter and denies access to it[.] . . . [Defendant] has designed

the memory chip [in the usage counter] to deny access by third parties (including customers and [independent service operators]) to reset the usage counter to zero for additional uses.").  Plaintiffs' reliance on *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248 (11th Cir. 2015), is misplaced: in that case, the defendant offered its products to the public and had a prior course of dealing with the plaintiff. *Id.* at 1257.   Because Plaintiffs have not alleged that Defendant makes the distributor's toolkit or usage counter available to the public, the *Otter Tail* theory does not apply here.

Nevertheless, even without the allegations of Defendant's refusal to deal, Plaintiffs have sufficiently addressed both elements of monopolization at the pleading stage.   Accordingly, Plaintiffs have stated plausible claims of monopolization under section 2.

### 2.  Attempted Monopolization

Attempted monopolization has three elements, but the only arguable distinction between monopolization and attempted monopolization in this case is that attempted monopolization requires a plaintiff to show the defendant's specific intent to monopolize.  *See Morris Communs. Corp.*, 364 F.3d at 1293 n.10 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)) ("To demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and

(3) a dangerous probability of achieving monopoly power.").[12]   Regarding Defendant's specific intent, Plaintiffs alleged that "[Defendant] has acted with the clear intent to exclude competitors and impair competition in da Vinci robot service," Doc. 14, at 20 (¶63), and "in the repair and replacement of EndoWrist instruments," *id.* at 28 (¶87).  For one instance of conduct supporting this allegation, they pointed to Defendant's cease-and-desist letter demanding, in part, that they not contact its customers to offer services relating to its products.  *Id.* at 20 (¶63), 28 (¶87).  The other anticompetitive conduct that Plaintiffs alleged of Defendant also supports the allegation that it intended to monopolize the markets, even considering that this conduct does not include Defendant's refusal to deal with Plaintiffs. Additionally, Plaintiffs provided factual allegations to show the supracompetitive nature of Defendant's pricing in the aftermarkets.  *Id.* at 21 (¶¶64-65), 28-29 (¶¶88-89).   Accordingly, Plaintiffs have stated plausible claims of attempted monopolization.

## **Conclusion**

In sum, for the reasons stated above, the amended complaint plausibly alleges section 1 claims for tying and exclusive dealing in the aftermarkets for da Vinci

---

[12]   Because Plaintiffs plausibly stated a claim for monopolization and doing so required adequately alleging the possession of monopoly power and the commission of predatory or exclusionary anticompetitive acts, they adequately alleged a dangerous probability of Defendant's achieving—or continuing to achieve—monopoly power and the conduct required for attempted monopolization.

robot service and EndoWrist instrument repair and replacement (Counts Three, Four, Seven, and Eight).  The amended complaint also plausibly alleges section 2 claims for monopoly or attempted monopoly in those aftermarkets based on tying and exclusive dealing, but not the refusal to deal (Counts One, Two, Five, and Six).

Accordingly, it is **ORDERED** that:

1. Defendant's motion to dismiss (Doc. 16) is **DENIED**, except insofar as the alleged section 2 claims are based in whole or in part on Defendant's refusal to provide Plaintiffs with the distributor's toolkit or usage counter.

2. Defendant shall answer the amended complaint within 14 days of the date of this Order.  *See* Fed. R. Civ. P. 12(a)(4)(A).

3. The parties shall confer, and within 21 days of the date of this Order, file an amended Rule 26(f) report, along with the agreed protocol for electronic discovery and the agreed protective order for trade secrets and other competitively sensitive information.  *See* Doc. 30, at 2 (¶2).

4. The previously-entered stay, *see* Doc. 30, at 1 (¶1), will remain in effect until the Court reviews and approves the discovery schedule proposed by the parties in their amended Rule 26(f) report.

**DONE and ORDERED** this 16th day of September, 2019.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**