# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

    Plaintiffs,

 v.

INTUITIVE SURGICAL, INC.,

     Defendant.

INTUITIVE SURGICAL, INC.,

    Counterclaimant,

 v.

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

    Counterclaim Defendants.

Civil Case No. 5:19-cv-55-TKW-MJF

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSE

Defendant Intuitive Surgical, Inc. ("Intuitive") hereby sets forth the

following Answer and Affirmative Defense to Plaintiffs' Second Amended

Complaint (the "SAC").  Except as otherwise expressly set forth below, Intuitive

denies knowledge or information sufficient to form a belief as to the truth or falsity

of each and every allegation contained in the SAC.  Any allegation, averment,

contention or statement in the SAC not specifically and unequivocally admitted is

denied, including any statement in a heading.  Intuitive preserves all objections

regarding the admissibility of any allegations or statements made in the SAC or in

this Answer and Affirmative Defense.  Intuitive responds to each of the paragraphs

of the SAC as follows:

## RESPONSE TO "PARTIES, JURISDICTION, AND VENUE"

**Paragraph 1:**     Plaintiffs Restore Robotics LLC and Restore Robotics Repair
LLC ("Restore" collectively) are Florida limited liability companies with their
principal address at 7506 Holley Circle, Panama City Beach, Florida. They are
sister companies with common ownership having majority control of both
companies. Restore services surgical robots and related instruments. Restore
Robotics is the sales arm. Restore Robotics Repairs is the operations arm. Plaintiff
Clif Parker Robotics LLC ("CPR") is a Florida limited liability company with its
principal address at 7506 Holley Circle, Panama City Beach, Florida. CPR is
operated by Clif Parker, who is majority owner of Plaintiff Restore Robotics LLC.
CPR purchases surgical instruments and sells them directly, and indirectly through
RR.

1.     Intuitive denies the allegations in paragraph 1 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 2:**     Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware
corporation with its principal place of business at 1020 Kifer Road, Sunnyvale,
California. Intuitive provides surgical robots, along with related parts, instruments,
accessories, and services, to hospitals and surgical centers in Bay County in the
Panama City Division of the Northern District of Florida and elsewhere. Intuitive
can be served with process through its registered agent C T Corporation System at
1200 South Pine Island Road, Plantation, FL 33324.

2.     Intuitive admits that it is a Delaware corporation with its executive

offices at 1020 Kifer Road, Sunnyvale, California, but otherwise denies the

allegations in the first sentence of paragraph 2.  Intuitive admits that it provides

surgical systems along with related parts, instruments, accessories and services, to

hospitals and surgical centers in Bay County and elsewhere but otherwise denies

the allegations in the second sentence of paragraph 2.  Intuitive admits the

allegations in the third sentence of paragraph 2.

**Paragraph 3:**     Defendant is subject to the personal jurisdiction of this Court.

3.     Intuitive admits the allegations in paragraph 3.

**Paragraph 4:**     This action is brought under Section 2 of the Sherman Act, 15
U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and
26. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and
1337(a) and 15 U.S.C. §§ 15 and 22. The Defendant has been engaged in interstate
commerce during all relevant times of the complaint. The state law claims are
brought under Sections 203 and 205 of the Oklahoma Antitrust Reform Act, 79
Okla. Stat. §§ 203, 205. The Court has supplemental jurisdiction over the state law
claims under 28 U.S.C. § 1367.

4.     Intuitive admits the allegations in the first, second and third sentences

of paragraph 4.  Intuitive denies the allegations in the fourth and fifth sentences of

paragraph 4 because Plaintiffs have withdrawn their state law claims.  (ECF No.

73.)

**Paragraph 5:**     Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. §
1391(c)(2). The Defendant is transacting and carrying on business in this District.

5.     Intuitive admits that venue is proper and that it transacts and carries

on business in this District but otherwise denies the allegations in paragraph 5.

## RESPONSE TO "ROBOTIC SURGERY"

**Paragraph 6:**    With traditional open surgery, the surgeon uses one large incision to perform a procedure. With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure.

6.    Intuitive denies the allegations in paragraph 6 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 7:**    Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera. The surgeon sits at a computer and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.

7.    Intuitive admits that one form of robotic-assisted surgery uses several

incisions for the insertion of small tools, including a magnified, high-definition 3D

video camera and that the surgeon may sit at the computer and use hand controls to

manipulate the instruments, which are attached to the system by robotic arms with

joints.  Intuitive otherwise denies the allegations in paragraph 7.

**Paragraph 8:**    Robotic surgery has a variety of practical advantages over laparoscopic surgery:

- stereoscopic high-definition cameras for 3-D visibility

- additional arm for the surgeon to hold a third instrument

- wrist joints for expanded range of motion compared to human

- scalability to allow for small movements in the arms and instruments

- ergonomic console design to minimize surgeon fatigue.

8.      Intuitive denies the allegations in paragraph 8 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

## RESPONSE TO "DA VINCI ROBOT"

**Paragraph 9:**      Intuitive sells the da Vinci surgical robot (image below). From 1999 to 2015, the da Vinci robot was the only surgical robot system cleared by the FDA for sale in the market.

9.      Intuitive admits that it sells da Vinci Surgical Systems and that the da Vinci Surgical System was cleared by the FDA for general laparoscopic surgery in 2000.  Intuitive otherwise denies the allegations in paragraph 9.

**Paragraph 10:**      Intuitive also sells all necessary instruments and accessories for the da Vinci robot system. Intuitive offers more than eighty different instruments, including a variety of forceps, retractors, and scissors, under the EndoWrist brand. They are the only instruments cleared by the FDA and foreign regulatory authorities for use with the da Vinci robot system.

10.      Intuitive admits that it sells instruments and accessories for da Vinci Surgical Systems and that it sells more than eighty different multi-port da Vinci instruments that have been cleared by the FDA and foreign regulatory authorities. Intuitive denies the allegations in the third sentence of paragraph 10 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive otherwise denies the allegations in paragraph 10.

**Paragraph 11:**      The da Vinci robot system is generally used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck — primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery. The da Vinci robot system is indicated for adult and pediatric use.

5

11.     Intuitive admits that da Vinci Surgical Systems are designed to enable surgeons to perform a wide range of surgical procedures, within gynecologic, urologic, general surgery, cardiothoracic and head and neck specialties and that certain da Vinci Surgical Systems are indicated for adult and pediatric use. Intuitive otherwise denies the allegations in paragraph 11.

**Paragraph 12:**     For the calendar year 2019, Intuitive reported $1,346.1 million in revenue for sales and leases of the da Vinci robot system. The average sales price was more than $1.5 million. The purchase represents a significant capital equipment investment for the customer.

12.     Intuitive admits that for the year ended December 31, 2019, it reported $1,346.1 million in revenue for sales and leases of da Vinci Surgical Systems and that the average sales price of the da Vinci Surgical System, excluding the impact of systems shipped under operating leases and Ion systems, was approximately $1.52 million, but otherwise denies the allegations in the first and second sentences of paragraph 12.  Intuitive denies the allegations in the third sentence of paragraph 12 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 13:**     As of December 31, 2019, Intuitive had an installed base of 5,582 da Vinci Surgical Systems, including, including 3,531 in the U.S., 977 in Europe, 780 in Asia, and 294 in the rest of the world. Less than 15% are installed under an operating lease.

13.     Intuitive admits the allegations in paragraph 13.

**Paragraph 14:**     Intuitive sells the da Vinci robot system directly in the United States, Japan, South Korea, India, Taiwan, and most of Europe. In other countries,

Intuitive sells the da Vinci robot system through exclusive distributorships with independent third parties. Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

14.   Intuitive admits that it sells da Vinci Surgical Systems through direct sales organizations in the United States, Japan, South Korea, India, Taiwan and Europe (excluding Spain, Portugal, Italy, Greece and most Eastern European countries) and that it sells da Vinci Surgical Systems through distributors in other countries.  Intuitive otherwise denies the allegations in paragraph 14.

**Paragraph 15:**   In its latest annual report, Intuitive estimated that surgeons using the da Vinci robot system completed roughly 1.2 million surgical procedures of various types in hospitals throughout the world during the year ended December 31, 2019.

15.   Intuitive admits that in its latest annual report, Intuitive estimated that surgeons using its technology completed approximately 1,229,000 surgical procedures of various types in hospitals throughout the world during the year ended December 31, 2019.

## RESPONSE TO "SURGICAL ROBOT MARKET"

**Paragraph 16:**   Intuitive has monopoly power in the worldwide and domestic markets for the sale of surgical robots for minimally invasive soft tissue surgery. In the worldwide and domestic markets, Intuitive is able to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels.

16.   Intuitive denies the allegations in paragraph 16.

**Paragraph 17:**   There is a relevant product market or submarket for surgical robots. Surgical robots have no practical substitute. Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery. Moreover, certain

7

procedures, such as prostatectomies, are increasingly performed now by surgeons operating exclusively with surgical robots.

17.     Intuitive denies the allegations in the first and second sentences of

paragraph 17.  Intuitive denies the allegations in the third and fourth sentences of

paragraph 17 because it is without knowledge or information sufficient to form a

belief as to the truth of the allegations therein.

**Paragraph 18:**     Due to the unique attributes of surgical robots, many hospitals believe that robotic surgery leads to shorter hospital stays and greater patient satisfaction. Many surgeons strongly prefer robotic surgery and require it to work at a given hospital. As a result of perceptions about the reduced pain and scarring and increased safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

18.     Intuitive denies the allegations in paragraph 18 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 19:**     There is a very low cross-elasticity of demand between robotic and laparoscopic surgery. The estimated cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic surgery. (Exhibit 1 (Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018)).) In addition, the estimated cost per procedure of acquiring and servicing the surgical robot is an additional $1,701 for robotic surgery. Id. Nevertheless, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. Id.

19.     Intuitive denies the allegations in the first sentence of paragraph 19.

Intuitive denies the allegations in the second, third and fourth sentences of

paragraph 19 because it is without knowledge or information sufficient to form a

belief as to the truth of the allegations therein.

**Paragraph 20:**    In response to much higher prices for use of surgical robots, customers are not switching to use of laparoscopic equipment. Id. In fact, they are replacing their laparoscopic equipment with surgical robots at much higher prices. Id. In other words, customers in the surgical robot market strongly prefer surgical robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market.

20.    Intuitive denies the allegations in paragraph 20 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 21:**    The industry and the public recognize surgical robots as a separate economic entity. The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots. There are several professional and trade associations focused on robotic surgery — e.g., the Society for Robotic Surgery and the Clinical Robotic Surgery Association. Surgical robots have very peculiar characteristics. Supra at ¶¶ 7-8. In addition, surgical robots have very distinct prices. Supra at ¶ 19. Manufacturers specialize in surgical robots. Surgeons specialize in robotic surgery. Robotic surgery requires specialized training and experience.

21.    Intuitive denies the allegations in paragraph 21 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 22:**    Orthopedic robots are not part of the surgical robot market. Orthopedic robots are not a practical substitute for surgical robots. They are designed for assisting in removal of bone and aligning prosthetics for knee and hip replacement. They are not indicated for use in minimally invasive soft tissue surgery.

22.     Intuitive denies the allegations in the first and second sentences of paragraph 22.  Intuitive denies the allegations in the third and fourth sentences of paragraph 22 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 23:**     There are significant barriers to entry into the surgical robot market. The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States. New entrants require five to ten years and several hundred million dollars from design concept to regulatory clearance or approval by the FDA. The FDA is now reportedly requiring new entrants to obtain premarket approval, which is much more difficult than 510(k) premarket clearance. The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States. Intuitive holds numerous patents blocking development of competing robot systems. Surgeons already have significant training and extensive experience invested in the da Vinci robot system. The large hospital systems with significant demand for robot surgery already have a sizable installed base of da Vinci robots. Intuitive secures agreements with customers that they will not purchase any competing robots from other manufacturers.

23.     Intuitive denies the allegations in the first and ninth sentences of paragraph 23.  Intuitive admits that its surgical systems have been cleared pursuant to a rigorous FDA process, but otherwise denies the allegations in the second, third, fourth, fifth and eighth sentences of paragraph 23 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that as of December 31, 2019, it held ownership or exclusive field-of-use licenses for more than 3,500 U.S. and foreign patents, but otherwise denies the allegations in the sixth sentence of paragraph 23. Intuitive admits that it offers technical training relating to the use of the da Vinci

Surgical System to doctors and medical staff but otherwise denies the allegations

in the seventh sentence of paragraph 23 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 24:**     TransEnterix received clearance from the FDA to market and
sell surgical robots on October 13, 2017. The TransEnterix robot system is sold
under the Senhance brand name (image below). The Senhance Surgical System
mounts each of its three arms on a separate patient cart.

24.     Intuitive denies the allegations in paragraph 24 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 25:**     TransEnterix is not a direct competitor to Intuitive in surgical
robots. The Senhance Surgical System is only intended for use in gynecological
surgery, colorectal surgery, cholecystectomy, and inguinal hernia repair.

25.     Intuitive denies the allegations in the first sentence of paragraph 25.

Intuitive denies the allegations in the second sentence of paragraph 25 because it is

without knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 26:**     The Senhance Surgical System is not intended for
cardiothoracic surgery, urologic surgery, or most other procedures intended for the
da Vinci robot system. The Senhance Surgical System is not indicated for pediatric
use.

26.     Intuitive denies the allegations in paragraph 26 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

11

**Paragraph 27:**     Medrobotics received clearance for a natural orifice surgical robot on July 23, 2015. The Medrobotics natural orifice surgical robot is sold under the Flex brand name. The Flex Robotic System has a single flexible robotic scope with a camera for insertion in natural body orifices (image below). The robot can only operate instruments introduced through the tube inserted into the natural body orifice.

27.    Intuitive denies the allegations in paragraph 27 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 28:**     Medrobotics is not a direct competitor to Intuitive in surgical robots. Due to its design limitations, it is only indicated for a limited range of procedures. It is not indicated for pediatric use.

28.    Intuitive denies the allegations in the first sentence of paragraph 28.

Intuitive denies the allegations in the second and third sentences of paragraph 28

because it is without knowledge or information sufficient to form a belief as to the

truth of the allegations therein.

**Paragraph 29:**     Intuitive has a 98% to 99% market share in the worldwide and domestic surgical robot markets with or without TransEnterix and Medrobotics. They are the only three manufacturers of commercially available surgical robots in the United States. Intuitive shipped 1,119 da Vinci surgical robots worldwide, including 728 domestically, in calendar year 2019. TransEnterix shipped 4 Senhance surgical robots worldwide, including none domestically, in calendar year 2019. Upon information and belief, Medrobotics shipped less than 10 Flex natural orifice surgical robots worldwide, in calendar year 2019.

29.    Intuitive denies the allegations in the first sentence of paragraph 29.

Intuitive denies the allegations in the second, fourth and fifth sentences of

paragraph 29 because it is without knowledge or information sufficient to form a

belief as to the truth of the allegations therein.  Intuitive admits that it shipped

1,119 da Vinci Surgical Systems in the year ended December 31, 2019 and that

728 of these da Vinci Surgical Systems were shipped in the United States but

otherwise denies the allegations in the third sentence of paragraph 29.

**Paragraph 30:**     As a result of its monopoly power in surgical robots, Intuitive is able to, and does, charge supracompetitive prices for its da Vinci robots. For example, the da Vinci robot typically costs at least 50% more than the published price for the Flex surgical robot of $980,000.

30.     Intuitive denies the allegations in the first sentence of paragraph 30.

Intuitive admits that for the year ended December 31, 2020, the average sales price

of the da Vinci Surgical System, excluding the impact of systems shipped under

operating leases or usage-based arrangements and Ion systems, was approximately

$1.5 million, a figure that is more than 50% greater than $980,000, but otherwise

denies the allegations in the second sentence of paragraph 30 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 31:**     Intuitive is able to charge very high prices relative to costs, which is also indicative of supracompetitive prices and market power. For calendar year 2019, Intuitive had an overall gross margin on product sales of more than 70%. (Intuitive 2019 Form 10-K at 55.) The gross margin is likely higher for sales directly to end users. By comparison, TransEnterix had a negative gross margin on sales. (TransEnterix 2019 Form 10-K at 54.) Medrobotics is a private company and does not disclose financial performance.

31.     Intuitive denies the allegations in the first sentence of paragraph 31.

Intuitive admits that for the year ended December 31, 2019, its product gross profit

represented 70.2% of product revenue, but otherwise denies the allegations in the

13

second and third sentences of paragraph 31.  Intuitive denies the allegations in the

fourth and fifth sentences of paragraph 31 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 32:**     For calendar year 2019, Intuitive had a net margin of 30.7%.
(Intuitive 2019 Form 10-K at 55.) By comparison, General Electric, which is a
major manufacturer of medical imaging equipment, had a net margin for its
healthcare segment operations of 19.5%. (General Electric 2019 Form 10-K at 17.)

32.     Intuitive admits that for the year ended December 31, 2019, the net

income attributable to Intuitive was 31% of total revenue, but otherwise denies the

allegations in the first sentence of paragraph 32.  Intuitive denies the allegations in

the second sentence of paragraph 32 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**RESPONSE TO "AFTERMARKETS:
PARTS, SERVICE, AND INSTRUMENTS"**

**Paragraph 33:**     Intuitive has also used its monopoly power in the primary
market for surgical robots to acquire and maintain monopoly power in the
aftermarkets for da Vinci robot parts, da Vinci robot service, and EndoWrist
instrument repairs and replacement.

33.     Intuitive denies the allegations in paragraph 33.

**Paragraph 34:**     There is a relevant aftermarket for worldwide sale of the cluster
of da Vinci robot parts that are specially designed and built for the da Vinci robot
system, including the robot arm assemblies, master tool manipulators (MTMs),
printed circuit boards (PCBs), and other components (collectively "da Vinci robot
parts"). They are unique. There are no substitutes for da Vinci robot parts. Intuitive
sells da Vinci robot parts to customers around the world. There may be a relevant
submarket for the domestic sale of da Vinci robot parts.

34.     Intuitive denies the allegations in the first, second, third and fifth sentences of paragraph 34.  Intuitive admits that it sells parts for da Vinci Surgical Systems, but otherwise denies the allegations in the fourth sentence of paragraph 34.

**Paragraph 35:**     There is a relevant aftermarket for the service of da Vinci robots worldwide. The da Vinci robot system is very technical and expensive. Service requires specialized training and experience. There are da Vinci robot systems installed throughout the world. Intuitive and Restore specialize in da Vinci robot service to customers inside and outside the United States. There may be a relevant submarket for the service of da Vinci robots in the United States.

35.     Intuitive denies the allegations in the first and sixth sentences of paragraph 35.  Intuitive denies the allegations in the second sentence of paragraph 35 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that servicing da Vinci Surgical Systems requires specialized training and experience and that Intuitive provides service on da Vinci Surgical Systems to customers inside and outside the United States.  Intuitive otherwise denies the allegations in paragraph 35.

**Paragraph 36:**     There is a relevant aftermarket for the repair and replacement of EndoWrist instruments worldwide. There are no substitutes for EndoWrist instruments. They are specially designed and built for the da Vinci robot system. There are da Vinci robot systems installed throughout the world. Intuitive and Restore provide EndoWrist instrument repair or replacement to customers inside and outside the United States. There may be a relevant submarket for the repair and replacement of EndoWrist instruments in the United States.

36.     Intuitive denies the allegations in the first, second and sixth sentences of paragraph 36.  Intuitive admits that it designs and manufactures EndoWrist

instruments for da Vinci Surgical Systems and that Intuitive sells EndoWrist

instruments to customers inside and outside the United States.  Intuitive otherwise

denies the allegations in paragraph 36.

**Paragraph 37:**     The da Vinci robot parts aftermarket, da Vinci robot service
aftermarket, and EndoWrist instrument aftermarket are separate from the surgical
robot market. Since Intuitive had and has monopoly power in the surgical robot
market, Intuitive has not been, and is not, prevented from acting anticompetitively
in the aftermarkets. Since Intuitive had and has monopoly power in the da Vinci
robot part market, Intuitive has not been, and is not, prevented from acting
anticompetitively in the robot service aftermarket.

37.     Intuitive denies the allegations in paragraph 37.

**Paragraph 38:**     In addition, Intuitive has an installed base of more than 2,000
da Vinci robot systems acquired by customers when Intuitive was the only
manufacturer in the surgical robot market. Those customers face significant
switching costs. Surgical robot systems have an average sales price of more than
$1.5 million. The remaining customers take a massive risk in spending more than
$1 million on a robot that is not supported by Intuitive. Their physicians have
already been trained on the da Vinci robot system. Furthermore, no other
manufacturer has a critical mass of installed systems. It is unclear whether
competing systems will even be supported over the lifecycle of the robot.

38.     Intuitive admits that it has installed base of more than 2,000 da Vinci

Surgical Systems, but denies the remaining allegations in the first sentence of

paragraph 38.  Intuitive admits that for the year ended December 31, 2020, the

average sales price of the da Vinci Surgical System, excluding the impact of

systems shipped under operating leases or usage-based arrangements and Ion

systems, was approximately $1.5 million, but otherwise denies the allegations in

the third sentence of paragraph 38.  Intuitive admits that it offers technical training

relating to the use of the da Vinci Surgical System to doctors and medical staff but

otherwise denies the allegations in the fifth sentence of paragraph 38 because it is

without knowledge or information sufficient to form a belief as to the truth of the

allegations therein.  Intuitive denies the allegations in the second, fourth, sixth and

seventh sentences of paragraph 38 because it is without knowledge or information

sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 39:**     Even now, customers are unable to calculate lifecycle costs at
the time of purchase because they have little or no information for projecting the
costs of robot parts and service or instruments. Assuming that the customer has a
service agreement at a flat rate, it is still very difficult to project costs on a per use
or life cycle basis. In order to forecast the cost per use, the customer must know
how often the robot will be used. In order to project the cost over the lifecycle, the
customer must know how often the instruments will be used and replaced. Yet the
customer typically cannot forecast demand for a surgical robot. Surgeons may have
varying degrees of adaption to a surgical robot at a new location or for a new
procedure. Competing hospitals may or may not acquire their own robots. The
FDA may or may not add new indications for use of the robot system.

39.     Intuitive denies the allegations in paragraph 39 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 40:**     The costs for instruments are also unpredictable. The customer
cannot predict the timing for replacing instruments: Intuitive has complete control
over the usage limits on the EndoWrist instruments and has changed the usage
limits unilaterally without notice. As the sole manufacturer of EndoWrist
instruments, Intuitive also has complete control over the prices for new EndoWrist
instruments.

40.     Intuitive denies the allegations in the first sentence of paragraph 40

and the part of the second sentence stating that "[t]he customer cannot predict the

timing for replacing instruments" because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive denies the remaining allegations in paragraph 40.

**Paragraph 41:**     If the customer is paying for service based on time and materials after the expiration of the service agreement, the customer also faces unpredictable repair costs. The need for repairs on the robot system is unpredictable. So is the price. Intuitive is the only manufacturer of the da Vinci robot parts. Intuitive does not publish the prices for da Vinci robot parts. There has never been a competitive market with multiple vendors offering competitive prices on the parts or the service. Intuitive also retains control of the decision to repair or replace a part. For example, a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm.

41.     Intuitive denies the allegations in the first, second and third sentences of paragraph 41 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that it manufactures parts for da Vinci Surgical Systems, but otherwise denies the allegations in the fourth, fifth, sixth, seventh and eighth sentences of paragraph 41.

**RESPONSE TO "DA VINCI ROBOT PARTS AFTERMARKET"**

**Paragraph 42:**     Intuitive has monopoly power in the worldwide and domestic aftermarkets for da Vinci robot parts. Intuitive is able to exclude competition and maintain prices for da Vinci robot parts at supracompetitive levels.

42.     Intuitive denies the allegations in paragraph 42.

**Paragraph 43:**     There are significant barriers to entry into the aftermarket for the da Vinci robot parts. Due to patent protection and development costs, they are not available through other commercial sources. In addition, the da Vinci robot system requires an Intuitive product serial number for the replacement part in order to restart the robot system. Intuitive also excludes competition in the sale of the da Vinci robot parts by requiring customers to purchase a parts and service plan from Intuitive with the purchase of the robot.

43.     Intuitive denies the allegations in the first sentence of paragraph 43. Intuitive denies the allegations in the second sentence of paragraph 43 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive denies the allegations in the third and fourth sentences of paragraph 43.

**Paragraph 44:**     At this time, Intuitive is the only manufacturer of da Vinci robot parts and has a 100% market share in the sale of da Vinci robot parts. For calendar year 2019, Intuitive had an overall gross margin on product sales of more than 70%. Upon information and belief, Intuitive has gross margins in excess of 90% for da Vinci robot parts.

44.     Intuitive denies the allegations in the first and third sentences of paragraph 44 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that for the year ended December 31, 2019, its product gross profit represented 70.2% of product revenue, but otherwise denies the allegations in the second sentence of paragraph 44.

### RESPONSE TO "DA VINCI ROBOT SERVICE AFTERMARKET"

**Paragraph 45:**     Intuitive has monopoly power in the worldwide and domestic aftermarkets for service of da Vinci robot systems. Intuitive is able to exclude competition and maintain prices for da Vinci robot service at supracompetitive levels.

45.     Intuitive denies the allegations in paragraph 45.

**Paragraph 46:**     For the calendar year 2019, Intuitive reported $724.2 million in revenue and $475.0 million in gross profit for robot services. Intuitive had an operating margin of 65.6% on robot services.

46.     Intuitive admits that for the year ended December 31, 2019, it reported $724.2 million in revenue and $475.0 million in gross profit for services and that it had an operating margin of 65.6% in services.  Intuitive otherwise denies the allegations in paragraph 46.

**Paragraph 47:**     Restore began to offer service for the da Vinci robot system in 2018. Restore is the only known competitor to Intuitive in da Vinci robot service domestically or worldwide. Restore typically offers service at effective rates of less than 50% of the effective rates offered by Intuitive.

47.     Intuitive denies the allegations in paragraph 47 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 48:**     There are significant barriers to entry into da Vinci robot service. Given the technical requirements and safety concerns, customers expect and require that the service provider have training, experience, and certification in servicing the da Vinci robot system. Restore specializes its surgical robot service exclusively on the da Vinci robot and only uses da Vinci certified field service engineers with prior training and experience at Intuitive on servicing the da Vinci robot system. Given the significant capital investment and the critical patient needs, customers require that the service provider have the dedicated capacity to service the machine within a short time frame. Restore has the capacity to service da Vinci robots worldwide.

48.     Intuitive denies the allegations in paragraph 48.  Intuitive denies the allegations in the second, third, fourth and fifth sentences of paragraph 48 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 49:**     Intuitive is able to impose additional barriers to entry into the market and maintain its monopoly power, i.e., its ability to raise prices and exclude

competition, through various types of exclusionary and predatory conduct: foreclosing access to the market by entering service contracts of five years or more at the time of purchase or lease of a da Vinci robot system, tying da Vinci robot service to da Vinci robot parts, denying access to the essential distributor's toolkit.

49.     Intuitive denies the allegations in paragraph 49.

**Paragraph 50:**     For example, Intuitive forces customers to enter long-term service contracts of five years or more to get access to the da Vinci robot system. Intuitive thereby locks in most of the installed base and forecloses competitors from most of the da Vinci robot service market. More than 60% of the installed base (3,697) has been shipped in the last five years.

50.     Intuitive admits that more than 60% of its installed base of da Vinci

Surgical Systems has been shipped within the last five years, but denies the

remaining allegations in paragraph 50.

**Paragraph 51:**     The majority of Da Vinci robot systems are sold, rather than leased, to the customer. The sales agreements require a service contract at the time of purchase. The standard sales agreement includes a five-year period of service. The first year of service is free under the product warranty, and the remaining four years are at a stated service price typically in the range of $100,000 to $200,000 per year.

51.     Intuitive admits that it has sold, rather than leased, the majority of da

Vinci Surgical Systems shipped to its customers.  Intuitive otherwise denies the

allegations in paragraph 51.

**Paragraph 52:**     As of December 31, 2019, a total of 658 da Vinci robot systems — or less than 12% of the installed base — had been installed under a lease agreement. (Intuitive 2019 Form 10-K at 47.) On a lease of the robot system, the customer is responsible for insuring the robot system and for paying the cost of repairs on the return of the robot system at the termination of the lease. If the customer leases the robot system, Intuitive also requires a service contract at the time of leasing, again typically in the range of $100,000 to $200,000 per year after the free warranty in the first year, for the term of the lease, which is typically four to seven years.

52.     Intuitive admits that as of December 31, 2019, a total of 658 da Vinci Surgical Systems, which is less than 12% of Intuitive's installed base of da Vinci Surgical Systems, had been installed under a lease agreement.  Intuitive admits that a customer leasing a da Vinci Surgical System is responsible for insuring the surgical system and for paying the costs of repairs on the return of the surgical system at the termination of the lease.  Intuitive otherwise denies the allegations in paragraph 52.

**Paragraph 53:**     Intuitive also secures long-term contracts for service of two years or more with existing customers rolling off their original service agreement. Intuitive has more than 90% of the installed base locked into long-term service agreements that were executed before Restore began to offer da Vinci robot service in 2018. Intuitive reports that "substantially all" of the installed base has contracts for da Vinci robot service with Intuitive. (Intuitive 2019 Form 10-K at 21.) Intuitive thereby forecloses competitors from access to "substantially all" of the da Vinci robot service market.

53.     Intuitive admits that it has reported that "substantially all" of its customers have sourced services on their da Vinci Surgical Systems from Intuitive through service contract commitments or time and materials contracts.  Intuitive otherwise denies the allegations in paragraph 53.

**Paragraph 54:**     Intuitive also forces customers to purchase da Vinci robot service from Intuitive to get access to da Vinci robot parts. Intuitive only sells da Vinci robot parts directly to customers as part of the robot service. When Intuitive has learned that a hospital system was using Restore for robot service, Intuitive has informed the customer that its hospitals would not be able to purchase da Vinci robot parts for any service performed by Restore.

54.     Intuitive admits that it sells parts for da Vinci Surgical Systems, but

otherwise denies the allegations in paragraph 54.

**Paragraph 55:**     In addition, Intuitive denies access to customers and third
parties to the distributor's toolkit. Intuitive provides a distributors toolkit on an
exclusive basis to its independent third-party distributors for use in their designated
territories with all necessary documentation, software, and passwords to service da
Vinci robot systems. Intuitive has exclusive control of the distributor's toolkit and
limits each distributor to using the toolkit in its exclusive territory. Intuitive denies
access to the toolkit on any terms to any other third party, including potential
competitors in robot service.

55.     Intuitive admits that it contracts with certain distributors to sell and

service da Vinci Surgical Systems outside the United States, and as part of the

contractual relationship, provides certain tools and test equipment to the

distributors and does not provide access to other third parties, including purported

competitors.  Intuitive otherwise denies the allegations in paragraph 55.

**Paragraph 56:**     It is essential to competition in da Vinci robot service that
independent service operators ("ISOs") have access to the toolkit to provide
complete da Vinci robot service. For example, ISOs need the documentation to
know the meaning of the error codes appearing on the da Vinci robot system to
perform repairs on the system. The error codes are a number system without any
description or explanation.

56.     Intuitive admits that certain tools and test equipment are necessary to

provide complete maintenance or servicing for da Vinci Surgical Systems.

Intuitive further admits that the tools and test equipment are necessary to

understand the meaning of error codes appearing on da Vinci Surgical Systems,

and that the error codes are a number system.  Intuitive otherwise denies the

allegations in paragraph 56.

**Paragraph 57:**     The error codes cannot be practically duplicated. It is often
impossible to identify a system error without knowing the meaning of the error
code.

57.     Intuitive admits that the meaning of error codes appearing on da Vinci

Surgical Systems must be understood in order to provide service and that it is often

impossible to identify a system error without knowing the meaning of the error

code, but otherwise denies the allegations in paragraph 57 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 58:**     In addition, the service software is necessary to test the robot
arms during preventative maintenance. The service software is necessary to input
the Intuitive serial number after replacing any da Vinci robot part. The service
software is necessary to remove the reminder message after performing
preventative maintenance or repairing the robot system.

58.     Intuitive admits that certain technology that operates with software is

often necessary to perform maintenance on the components of da Vinci Surgical

Systems, but otherwise denies the allegations in paragraph 58.

**Paragraph 59:**     The service software cannot be practically duplicated by a
customer or ISO. The source code is encrypted and hidden from users. The service
software is based on the da Vinci robot system design and specifications, which are
not available to third parties.

59.     Intuitive denies the allegations in the first sentence of paragraph 59

because it is without knowledge or information sufficient to form a belief as to the

truth of the allegations therein.  Intuitive admits that its service software source

code is encrypted and that its da Vinci Surgical System specifications are not

provided to third parties, but otherwise denies the allegations in the second and

third sentences of paragraph 59.

**Paragraph 60:**     Quality control is not a valid business justification for excluding third parties from servicing da Vinci robots. Intuitive provides the distributor's toolkit to third parties already. Moreover, Restore uses former Intuitive personnel, i.e., da Vinci certified field service engineers with prior training and experience at Intuitive in servicing da Vinci robot systems, to provide da Vinci robot service.

60.     Intuitive denies the allegations in the first sentence of paragraph 60.

Intuitive admits that pursuant to contracts, it provides certain distributors certain

tools and test equipment.  Intuitive further admits that Restore has hired former

Intuitive personnel.  Intuitive otherwise denies the remaining allegations in the

second and third sentences of paragraph 60 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 61:**     As a result of the exclusionary conduct, Intuitive, directly and indirectly through its exclusive distributors, has maintained a market share in da Vinci robot service of more than 99% worldwide and domestically for nearly 20 years. Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

61.     Intuitive denies the allegations in paragraph 61.

**Paragraph 62:**     At this time, Restore is the only known competitor to Intuitive and its exclusive distributors for da Vinci robot service. Restore has less than $1 million in annual revenue in da Vinci robot services.

62.     Intuitive denies the allegations in paragraph 62 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 63:**     Intuitive has acted with the clear intent to exclude competitors
and impair competition in da Vinci robot service. On or about February 12, 2019,
Intuitive sent a letter to Restore demanding that Restore "immediately cease and
desist" from "contacting Intuitive's customers to offer services related to
Intuitive's products."

63.     Intuitive denies the allegations in the first sentence of paragraph 63.

Intuitive admits the allegations in the second sentence of paragraph 63.

**Paragraph 64:**     Intuitive has taken extreme measures to prevent Restore from
providing da Vinci robot service. For example, Ardent Health Service allowed its
da Vinci robot service contracts with Intuitive to expire for its two robots at
Hillcrest Medical Center and its one robot at Hillcrest Hospital South in Tulsa,
Oklahoma. Ardent had not been having any problems with the robots. Intuitive was
aware that Hillcrest was looking at Restore Robotics for its da Vinci robot service.

64.     Intuitive denies the allegations in the first sentence of paragraph 64.

Intuitive admits that Ardent Health Service allowed service agreements with

Intuitive for its da Vinci Surgical Systems to expire, but otherwise denies the

allegations in the second sentence of paragraph 64.  Intuitive denies the allegations

in the third sentence of paragraph 64 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

Intuitive admits that by February 2020, it believed that Hillcrest was using or

considering using Restore Robotics for its da Vinci Surgical System service, but

otherwise denies the allegations in the fourth sentence of paragraph 64.

**Paragraph 65:**     On December 27, 2019, Intuitive removed Hillcrest from the customer portal and placed the three systems on time and materials status for any robot service, which is known to include a travel and labor rate of $995 per hour. On that same day, Hillcrest Medical Center noticed a blank vision cart touchscreen on one of its robots. Intuitive informed Hillcrest that the monitor must be replaced and quoted time and materials of more than $25,000. Hillcrest hired Restore to troubleshoot the issue. On January 11, 2020, Restore installed a new power supply for the touchscreen monitor and confirmed that the robot was fully functioning. The price was $7,100.

65.    Intuitive admits that it placed three Hillcrest systems on a time and materials status for da Vinci Surgical System service, which has a labor and travel rate of $995 per hour, and quoted a time and materials cost of more than $25,000, but otherwise denies the allegations in the first and third sentences of paragraph 65. Intuitive denies the allegations in the second, fourth, fifth and sixth sentences of paragraph 65 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 66:**     On January 14, 2020, Hillcrest reported an issue with a robot arm on the robot at Hillcrest Hospital South. Intuitive informed Hillcrest that it would cost more than $100,000 to replace the arm plus an additional sum for preventative maintenance for the robot to be operational. Hillcrest contacted Restore to troubleshoot the issue. Restore informed Hillcrest that Restore could replace the arm if necessary but did not have the toolkit to access the robot software and input the serial number for the replacement arm. Intuitive would have to input the serial number for any replacement arm for the robot to be operational.

66.    Intuitive denies the allegations in paragraph 66 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 67:**     On January 16, 2020, Restore was able to repair, rather than replace, the robot arm for $3,975. The robot was operational but had two remaining error codes. Restore could not troubleshoot the remaining errors without access to the software on the robot and informed Hillcrest that it would need to contact Intuitive regarding the remaining error codes.

67.     Intuitive denies the allegations in paragraph 67 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 68:**     On January 17, 2020, Kara Andersen Reiter, Intuitive Senior Vice President and General Counsel, and Romain St. Denis, Intuitive Vice President, notified the Chief Executive Officer, the Vice President of Risk Management and the Chief Medical Officer of Ardent Health Services in writing that Intuitive had learned that Ardent was "having or intends to have" its da Vinci robots serviced by an "unauthorized third party." In fact, Intuitive has never authorized a third party to service its robots.

68.     Intuitive admits that on January 17, 2020, Kara Andersen Reiter and

Romain St. Denis notified Ardent Health Services that Intuitive "understand[s] that

Ardent Health Services is using or considering using 'refurbished' EndoWrist®

instruments, obtained from and/or modified by a third party for use beyond the

programmed number of uses" and that "[b]ased on the terms of the Agreement and

the patient safety implications of the Systems being used with instruments

refurbished by an unauthorized third party, Intuitive may no longer accept your

service calls for such Systems."  Intuitive otherwise denies the allegations in

paragraph 68.

**Paragraph 69:**     In the letter, Intuitive explained that third parties did not have the "software tools necessary for proper [s]ystem maintenance." Intuitive further

stated that "Intuitive may no longer accept your service calls for Systems that were previously serviced by an unauthorized third party. Should Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been previously serviced by an unauthorized third party, Intuitive may not provide service for such a System."

69.     Intuitive denies the allegations in the first sentence of paragraph 69.

Intuitive admits the allegations in the second and third sentences of paragraph 69.

**Paragraph 70:**     On January 30, 2020, Chris Goss, the Intuitive field service engineer responsible for Hillcrest, contacted the surgery manager at Hillcrest Medical Center in Tulsa, Oklahoma. Mr. Goss explained he could monitor the robot remotely and threatened to shut down the da Vinci robots at Hillcrest if the hospital signed a service contract with Restore. Mr. Goss said Intuitive would make Hillcrest's robots "a big paper weight" if Hillcrest chose to use a third party for its robot service. Hillcrest banned Mr. Goss from the hospital.

70.     Intuitive admits that Chris Goss contacted the surgery manager at

Hillcrest Medical Center, but otherwise denies the allegations in paragraph 70.

**Paragraph 71:**     Shortly thereafter, the robot did cease to function in the middle of a procedure. The surgeon had to convert the procedure to open surgery with the patient on the operating table. Afterwards, Hillcrest disconnected the data cable that provides the remote connection between the robot and Intuitive.

71.     Intuitive denies the allegations in paragraph 71 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 72:**     On May 6, 2020, Hillcrest contacted Restore to troubleshoot a robot arm on the da Vinci robot in one of its operating rooms at Hillcrest Medical Center. Restore reminded Hillcrest that Intuitive would have to perform any repair of the robot arm because the repair or replacement of the arm would require access to the robot software through the service laptop and the service keys and that Intuitive does not provide such access to the owner or ISOs.

72.     Intuitive denies the allegations in paragraph 72 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 73:**     On May 7, 2020, Hillcrest contacted Intuitive for repair of the robot arm on a time and materials basis. Intuitive quoted an initial price to troubleshoot the arm. Ardent approved the quote. Later that day, Ardent revised its quote to include an additional sum for preventative maintenance. Early on May 8, 2020, Ardent approved the work order.

73.     Intuitive admits that on May 7, 2020, Hillcrest contacted Intuitive for repair, Intuitive quoted an initial price to troubleshoot the arm, subsequently revised the quote and Ardent approved the work order.  Intuitive otherwise denies the allegations in paragraph 73.

**Paragraph 74:**     Later that day, Intuitive instructed its field service engineer to cease the repair of the robot arm because the engineer observed that other parts elsewhere on the robot had not been installed by Intuitive. On May 11, 2020, Intuitive demanded that Ardent agree to the removal of any parts that had been replaced or repaired by anyone other than Intuitive and pay the additional sum to Intuitive for "preventative maintenance" on the robot, in addition to the cost of the repair of the arm, before Intuitive would restore functionality to the robot. In fact, Restore had only replaced the battery with the exact same model from the exact same battery manufacturer.

74.     Intuitive denies the allegations in paragraph 74.

**Paragraph 75:**     On May 12, 2020, Ardent agreed to the demands and beseeched Intuitive to "fix the robot ASAP." Shortly thereafter, Ardent signed a one-year service contract with Intuitive for the robot in question at Hillcrest retroactive to the prior contract expiration date of December 27, 2019 at a price of more than $100,000.

75.     Intuitive admits Hillcrest signed a one-year service contract with Intuitive retroactive to December 27, 2019 at a price of more than $100,000, but otherwise denies the allegations in paragraph 75.

**Paragraph 76:**     As a result of the exclusionary conduct, Intuitive and its exclusive distributors are able to charge supracompetitive prices for da Vinci robot service. Intuitive charges roughly double the rates offered by ISOs for the same services.

76.     Intuitive denies the allegations in the first sentence of paragraph 76. Intuitive denies the allegations in the second sentence of paragraph 76 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 77:**     Intuitive does not make up the difference to customers on supracompetitive prices for robot service by charging subcompetitive prices on its surgical robots, its robot parts, or its instrument replacements. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. Intuitive charges prices relative to costs for the products and services in its line of medical devices at least 20% higher than other major manufacturers of medical devices like General Electric. Supra at ¶ 32.

77.     Intuitive denies the allegations in the first and second sentences of paragraph 77.  Intuitive denies the allegations in the third sentence of paragraph 77 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

## RESPONSE TO "ENDOWRIST INSTRUMENT AFTERMARKET"

**Paragraph 78:**     Intuitive has monopoly power in the worldwide and domestic aftermarkets for the repair and replacement of EndoWrist instruments. The EndoWrist instruments are necessary to perform surgery with the da Vinci robot system and are only available from Intuitive. Intuitive is able to exclude

competition and maintain prices for the repair and replacement of EndoWrist instruments at supracompetitive levels.

78.    Intuitive denies the allegations in paragraph 78.

**Paragraph 79:**    For the calendar year 2019, Intuitive reported $2,408.2 million in revenue for instruments and accessories. For calendar year 2019, Intuitive had an overall gross margin on product sales of more than 70%.

79.    Intuitive admits the allegations in the first sentence of paragraph 79.

Intuitive admits that for year ended December 31, 2019, its product gross profit represented 70.2% of product revenue, but otherwise denies the allegations in the second sentence of paragraph 79.

**Paragraph 80:**    The FDA permits servicing of approved medical devices by third parties. The ISO repairs instruments to meet their original intended use. Third-party service does not affect the safety and effectiveness of the instrument or affect the indications for use. The instrument is maintained at, or returned to, its original safety and effectiveness. After undergoing third-party service, EndoWrist instruments have passed ISO simulated life testing to fifty or more additional uses.

80.    Intuitive denies the allegations in the first sentence of paragraph 80.

Intuitive denies the remaining allegations in paragraph 80 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 81:**    Restore began to offer repair services for EndoWrist instruments in 2018. The customer is able to purchase repair services instead of instrument replacement. Restore offers repair rates that are at least 25% on average below replacement rates offered by Intuitive. But for the anticompetitive conduct of Intuitive, Restore would be able to offer even lower repair rates and offer repair services on many more EndoWrist instruments.

81.     Intuitive denies the allegations in the first, second and third sentences of paragraph 81 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive denies the allegations in the fourth sentence of paragraph 81.

**Paragraph 82:**     There are significant barriers to entry into the repair and replacement of EndoWrist instruments. In order to work with the Da Vinci robot system, the instrument must have a serial number from Intuitive. Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system. The Food and Drug Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States. The relevant regulatory agencies must also approve any surgical robot instruments for sale in the European Union and elsewhere outside the United States. At this time, Intuitive has a 99% market share in the aftermarket for repair and replacement of EndoWrist instruments.

82.     Intuitive denies the allegations in the first, fifth and sixth sentences of paragraph 82.  Intuitive denies the allegations in the second sentence of paragraph 82.  Intuitive admits that as of December 31, 2019, it held ownership or exclusive field-of-use licenses for more than 3,500 U.S. and foreign patents, but otherwise denies the allegations in the third sentence of paragraph 82.  Intuitive admits that its surgical systems, instruments and accessories have been cleared pursuant to a rigorous FDA process, but otherwise denies the allegations in the fourth sentence of paragraph 82 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 83:**     Intuitive is able to impose additional barriers to entry into the market and maintain its monopoly power, i.e., its ability to raise prices and exclude competition, through various types of exclusionary and predatory conduct: tying

EndoWrist instrument replacement to acquisition of the da Vinci robot system, denying access to the essential EndoWrist instrument usage counter, and tying EndoWrist instrument replacement to da Vinci robot service.

83.    Intuitive denies the allegations in paragraph 83.

**Paragraph 84:**    Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get the da Vinci robot system. The standard sales and lease contracts provide that the customer "purchases" any instruments for use with the robot system. Nevertheless, the standard contract requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog. In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit.

84.    Intuitive admits that its standard agreement requires customers to

ensure appropriate use of the da Vinci Surgical System consistent with the system

documentation, which provides that any use of instruments beyond their

programmed number of uses is prohibited.  Intuitive further admits that it does not

permit any third party to "modify, disassemble, reverse engineer, alter, or misuse

the System or Instruments and Accessories" and also prohibits any repair,

refurbishment, or reconditioning of any EndoWrist instrument not approved by

Intuitive.  Intuitive denies the remaining allegations in paragraph 84.

**Paragraph 85:**    Intuitive enforces these contractual requirements with a usage counter. Intuitive installs a programmed memory chip inside each EndoWrist instrument to prevent the instrument from being used for more than a certain number of procedures regardless of whether the instrument is maintained at, or returned to, its original safety and effectiveness through service. Intuitive has exclusive control over the usage counter and denies access to it: the memory chip is programmed to delete all information on the circuit board necessary for the instrument to operate with the robot system immediately after reaching the usage limit. Intuitive has designed the memory chip to deny access by third parties

(including customers and ISOs) to reset the usage counter to zero for additional uses. Intuitive itself can service the instrument and reset or replace the usage counter. It simply chooses not to do so or provide ISOs with the means to do so. It is essential to competition in the EndoWrist instrument aftermarket that ISOs have the ability to reset the usage counter after servicing the instrument.

85.    Intuitive admits that it has conducts rigorous testing and identified a maximum use limit for EndoWrist instruments and that the maximum use limit ensures that instruments perform safely and reliably.  Intuitive further admits that it includes a programmed memory chip in each EndoWrist instrument that counts the number of uses.  Intuitive denies the remaining allegations in paragraph 85.

**Paragraph 86:**    The usage counter cannot be practically duplicated on the EndoWrist instruments at this time for use on most of the installed base of da Vinci robot systems. Restore has been unable so far to develop or obtain technology to reset the usage count during repair service of EndoWrist instruments for the da Vinci X and Xi robot systems. For that reason, Intuitive has intentionally withdrawn its support for certain S and Si instruments and announced its intention in writing to discontinue production of all S and Si instruments and technical support for the da Vinci S and Si in 2023 to force customers to switch to the da Vinci X and Xi robot systems.

86.    Intuitive denies the allegations in the first and second sentences of paragraph 86 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive denies the allegations in the third sentence of paragraph 86.

**Paragraph 87:**    In addition, the usage counter cannot be economically duplicated for the remainder of the installed base of da Vinci robot systems. Restore has paid a sizable license fee for technology to reset the usage count on EndoWrist instruments for the da Vinci Si robot systems. As a result, Restore has been forced to charge an additional 20% or more for repair services. Furthermore, the customer faces higher cost per use on the purchase of the original instrument:

the customer must obtain the instrument repair service before exercising the last available use, which would trigger the self-destruct mechanism.

87.     Intuitive denies the allegations in paragraph 86 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 88:**     Intuitive has designed the usage counter to extract consumer surplus, i.e., monopoly profits, from its customers. Instead of simply buying the instruments, the customer is forced to pay a usage fee. Intuitive is charging a price that is independent of, and far in excess of, the cost. When Intuitive has doubled the maximum number of uses on certain instruments, Intuitive has simply doubled the price of those instruments.

88.     Intuitive denies the allegations in paragraph 88.

**Paragraph 89:**     The usage limits are not based on any regulatory requirements from the FDA. Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing the usage limits. (See, e.g., Exhibits 2 and 3.)

89.     Intuitive denies the allegations in the first sentence of paragraph 89.

Intuitive admits the allegations in the second sentence of paragraph 89.

**Paragraph 90:**     In addition, the usage limits do not appear to be based on any scientific determination of the useful life of the instruments. There does not appear to be any clinical data in the public domain to support the limits on usage for the EndoWrist instruments. (Ex. 1 at 836.) There are no usage limits on the reusable instruments for the Senhance or Flex robot systems.

90.     Intuitive denies the allegations in the first and second sentences of

paragraph 90.  Intuitive denies the allegations in the third sentence of paragraph 90

because it is without knowledge or information sufficient to form a belief as to the

truth of the allegations therein.

**Paragraph 91:**     In fact, Intuitive's original premarket notifications to the FDA for the EndoWrist instruments were based on preexisting endoscopic instruments with unlimited uses. In order to get clearance to market the EndoWrist instruments for use in the United States, Intuitive was required to show that the instruments were "substantially equivalent" to predicate devices already on the market from other manufacturers of surgical instruments. The predicate devices — forceps, graspers, retractors, shears, etc. — did not have limits on the number of uses.

91.     Intuitive denies the allegations in paragraph 91.

**Paragraph 92:**     Intuitive's own instrument catalogs demonstrate that the useful lives of the instruments are much longer than their usage limits. Intuitive offers the exact same instruments (with the exact same materials and specifications) labeled for training. (Ex. 2 at 13. Ex. 3 at 31-32.) Yet Intuitive sets much longer usage limits for the training instruments. (Compare Ex. 2 at 13 with Ex. 2 at 15. Compare Ex. 3 at 31-32 with Ex. 3 at 34-36.) The industry does not distinguish between an instrument sold for clinical use and the same instrument sold for training use. Training instruments, like instruments for clinical use, must retain their functionality for the surgeon during use. The only difference is the generation of revenue for the hospital on a surgical procedure for an instrument in clinical use, which allows Intuitive to set a much lower usage limit and higher price in order to generate a much higher usage fee for the instruments in clinical use.

92.     Intuitive admits that it has set higher limits regarding the number of procedures for which certain EndoWrist instruments can be used when they are used for training than when they are used for clinical purposes.  Intuitive denies the remaining allegations in paragraph 92.

**Paragraph 93:**     Plaintiffs cannot find any of the usage limits for the reusable EndoWrist instruments from the da Vinci Si and S instrument catalog (10, 12, 15, 18, 20, or 30 uses or 100 closures) or the da Vinci Xi and X instrument catalog (10 or 15 uses or 100 closures) in any premarket notification 510(k) summary available in the FDA database. (Ex. 3 at 34-36. Ex. 2 at 15.) Moreover, Plaintiffs cannot identify any prohibition in the 510(k) summaries against service of the instruments to extend the useful life of the instruments or against the reset of the usage count after service of the instrument.

93.     Intuitive denies the allegations in paragraph 93 because it is without

knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 94:**     None of the 510(k) summaries refer to any tests showing that
the instruments begin to lose their functionality at the usage limit. Nor do they
refer to any tests showing that instrument service cannot maintain the safety and
effectiveness of the instrument for additional uses.

94.     Intuitive denies the allegations in paragraph 94.

**Paragraph 95:**     Notably, Intuitive has apparently not filed any premarket
notification for the da Vinci S (also known as IS2000) or the da Vinci Si (also
known as IS3000) specifying limits on uses of instruments or endoscopes or any
testing in support of such limits in the 510(k) summary.

95.     Intuitive denies the allegations in paragraph 95.

**Paragraph 96:**     Instead, Intuitive has filed premarket notification for the later da
Vinci Xi model (also known as IS4000) to have every instrument limited to 5 uses
based on some of those instruments being tested and retaining useful life for 8
uses. (Ex. 4 at 7.) Yet the da Vinci Xi instruments have not been limited to 5 uses:
the usage counters are set to the 10 or 15 uses or 100 closures published in the
instrument catalogs. (Ex. 2 at 15.) At the same time, Intuitive has filed premarket
notification for the da Vinci Xi to have the endoscope without any limits on uses
based on the endoscope being tested and retaining useful life for 9 uses. (Ex. 5 at
4.)

96.     Intuitive denies the allegations in paragraph 96.

**Paragraph 97:**     Moreover, Intuitive recently announced that it was extending
the usage limits for da Vinci Xi instruments without any new clearance from the
FDA. Intuitive has maintained the existing limits on the da Vinci S and Si
instruments and has notified customers that it will cease production of instruments
for the da Vinci S and Si in 2023.

97.     Intuitive admits it is extending the number of uses of many of the

most common da Vinci X/Xi instruments, but otherwise denies the allegations in

the first sentence of paragraph 97.  Intuitive admits the allegations in the second

sentence of paragraph 97.

**Paragraph 98:**   Intuitive also forces customers to purchase EndoWrist
instrument replacements from Intuitive (rather than instrument service from third
parties) to get da Vinci robot service. The standard contract removes the obligation
of Intuitive to provide robot service under the terms of the service plan if any third
parties repair the instruments. In addition, any third-party service on the EndoWrist
instruments voids Intuitive's one-year warranty on the entire da Vinci robot
system.

98.   Intuitive denies the allegations in paragraph 98.

**Paragraph 99:**   For example, Kara Andersen Reiter, Intuitive Senior Vice
President and General Counsel, and Romain St. Denis, Intuitive Vice President,
notified the Chief Executive Officer, the Vice President of Risk Management and
the Chief Medical Officer of Ardent Health Services (which is the parent company
of Hillcrest Medical Center in Tulsa, Oklahoma) in writing on January 17, 2020
that Intuitive had learned that Ardent was "using or considering using 'refurbished'
EndoWrist® instruments . . . beyond the programmed number of uses." Intuitive
does not authorize any third party to repair EndoWrist instruments for additional
uses. At that time, Hillcrest had purchased and was using EndoWrist instruments
from Restore that had not reached their original usage limits and was considering
using Restore to service EndoWrist instruments service for use beyond their
original usage limits.

99.   Intuitive admits that on January 17, 2020, Kara Andersen Reiter and

Romain St. Denis notified Ardent Health Services that Intuitive "understand[s] that

Ardent Health Services is using or considering using 'refurbished' EndoWrist®

instruments, obtained from and/or modified by a third party for use beyond the

programmed number of uses."  Intuitive otherwise denies the allegations in the first

and second sentences of paragraph 99.  Intuitive denies the allegations in the third

sentence of paragraph 99 because it is without knowledge or information sufficient

to form a belief as to the truth of the allegations therein.

**Paragraph 100:**   In the letter, Intuitive stated that Intuitive may no longer accept
service calls for any da Vinci robot at Hillcrest that was being used with
instruments refurbished by an unauthorized third party. "Should Intuitive or its
personnel determine, after having accepted a service call or a purchase order for a
service call, such as after an Intuitive Field Service Engineer arrives at your site for
a service call, that the System has been used with instruments refurbished or
modified by an unauthorized third party, Intuitive may not provide service for such
a System." Since Restore does not have access to the Usage Counter to reset the
uses, Intuitive is able to detect any third-party service of EndoWrist instruments
and act on its threat to withhold da Vinci robot service. As a result of those threats,
Hillcrest has not serviced EndoWrist instruments with Restore.

100.   Intuitive admits the letter stated that "[s]hould Intuitive or its

personnel determine, after having accepted a service call or a purchase order for a

service call, such as after an Intuitive Field Service Engineer arrives at your site for

a service call, that the System has been used with instruments refurbished or

modified by an unauthorized third party, Intuitive may not provide service for such

a System," but otherwise denies the allegations in the first and second sentence of

paragraph 100.  Intuitive admits that it can detect third-party service of EndoWrist

instruments, but otherwise denies the allegations in the third sentence of paragraph

100.  Intuitive denies the allegations in the fourth sentence of paragraph 100

because it is without knowledge or information sufficient to form a belief as to the

truth of the allegations therein.

**Paragraph 101:**   Intuitive has also informed customers that they should not sell
unused or partially used EndoWrist instruments to Restore or buy such instruments

from Restore for use with the da Vinci robot and that the customer will violate its contract with Intuitive by using such instruments with the da Vinci robot. For that reason, hospitals have refused to sell unused EndoWrist instruments to Restore or CPR, which is operated by the majority owner of Restore, or buy such instruments from Restore or CPR. As general proposition, Intuitive does not object to the sale or purchases of EndoWrist instruments that have not reached their usage limits. Intuitive has targeted Restore, and CPR by extension, because Restore has the repair capacity and customer base to be a competitive threat to Intuitive in repair and replacement of EndoWrist instruments. When West Virginia University Medicine ("WVU") traded in its da Vinci Si robots in December 2019, the hospital considered the sale of its unused EndoWrist Si instruments to CPR. Intuitive informed WVU that the hospital should not sell the instruments to any entity affiliated with Restore.

101.   Intuitive denies the allegations in the first and fourth sentences of paragraph 101.  Intuitive denies the allegations in the second, fifth and sixth sentences of paragraph 101 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits the allegations in the third sentence of paragraph 101.

**Paragraph 102:**   As a result of the exclusionary conduct, Intuitive, directly and indirectly through its exclusive distributors, has maintained a market share in repair and replacement of EndoWrist instruments of more than 99% worldwide and domestically for nearly 20 years. Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

102.   Intuitive denies the allegations in paragraph 102.

**Paragraph 103:**   Intuitive has acted with the clear intent to exclude competitors and impair competition in the repair and replacement of EndoWrist instruments. On or about February 12, 2019, Intuitive sent a letter to Restore demanding that Restore "immediately cease and desist" from resetting the usage counter after completing servicing an EndoWrist instrument or "contacting Intuitive's customers to offer services related to Intuitive's products."

103.   Intuitive denies the allegations in the first sentence of paragraph 103. Intuitive admits that on or about February 12, 2019, it sent a letter to Restore Robotics LLC demanding that Restore Robotics LLC cease and desist from, among other things, "marketing and offering a servicing process in the course of which the use counter of Endo Wrist® instruments' memory device is manipulated and/or replaced to permit more than ten uses" or "contacting Intuitive's customers to offer services related to Intuitive's products."  Intuitive otherwise denies the allegations in the second sentence of paragraph 103.

**Paragraph 104:**   As a result of the exclusionary conduct, Intuitive and its exclusive distributors are able to charge supracompetitive prices for repair and replacement of EndoWrist instruments. Intuitive is able to charge approximately 30% higher prices on average for EndoWrist instrument replacement compared with EndoWrist instrument repairs by ISOs.

104.   Intuitive denies the allegations in the first sentence of paragraph 104. Intuitive denies the allegations in the second sentence of paragraph 104 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 105:**   Intuitive does not make up the difference to customers on supracompetitive prices for instrument replacement by charging subcompetitive prices on its surgical robots, its robot parts, or its robot service. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. Intuitive charges prices relative to costs at least 20% more for the products and services in its line of medical devices than other major manufacturers of medical devices like General Electric. Supra at ¶ 32.

105.   Intuitive denies the allegations in the first and second sentences of paragraph 105.  Intuitive denies the allegations in the third sentence of paragraph 105 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

### RESPONSE TO "COUNT ONE – MONOPOLIZATION (DA VINCI ROBOT SERVICE)"

**Paragraph 106:**   The foregoing allegations are expressly incorporated.

106.   To the extent Plaintiffs re-allege paragraphs 1-105, Intuitive reasserts its answers to those paragraphs.

**Paragraph 107:**   Intuitive has willfully acquired and maintained monopoly power in the worldwide and domestic markets for da Vinci robot service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

107.   Intuitive denies the allegations in paragraph 107.

**Paragraph 108:**   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

108.   Intuitive denies the allegations in paragraph 108.

### RESPONSE TO "COUNT TWO – ATTEMPTED MONOPOLIZATION  (DA VINCI ROBOT SERVICE)"

**Paragraph 109:**   The foregoing allegations are expressly incorporated.

109.   To the extent Plaintiffs re-allege paragraphs 1-108, Intuitive reasserts its answers to those paragraphs.

**Paragraph 110:**   Intuitive has attempted to monopolize the worldwide and domestic markets for da Vinci robot service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to monopolize the

worldwide and domestic markets for da Vinci robot service by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

110.   Intuitive denies the allegations in paragraph 110.

**Paragraph 111:**   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

111.   Intuitive denies the allegations in paragraph 111.

<u>**RESPONSE TO "COUNT THREE –**</u>
<u>**TYING (DA VINCI ROBOT SERVICE)"**</u>

**Paragraph 112:**   The foregoing allegations are expressly incorporated.

112.   To the extent Plaintiffs re-allege paragraphs 1-111, Intuitive reasserts

its answers to those paragraphs.

**Paragraph 113:**   Intuitive has tied da Vinci robot service to its surgical robots and robot parts, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Intuitive has forced customers to purchase da Vinci robot service to get the da Vinci surgical robot and da Vinci robot parts. Intuitive has sufficient economic power in the worldwide and domestic surgical robot markets and the worldwide da Vinci robot parts market to coerce customer acceptance of da Vinci robot service. The tying arrangements have had anticompetitive effects in the worldwide and domestic da Vinci robot service markets, which involves a not insubstantial amount of interstate commerce.

113.   Intuitive denies the allegations in paragraph 113.

**Paragraph 114:**   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

114.   Intuitive denies the allegations in paragraph 114.

## RESPONSE TO "COUNT FOUR –
## EXCLUSIVE DEALING (DA VINCI ROBOT SERVICE)"

**Paragraph 115:**   The foregoing allegations are expressly incorporated.

115.   To the extent Plaintiffs re-allege paragraphs 1-114, Intuitive reasserts its answers to those paragraphs.

**Paragraph 116:**   Intuitive has entered agreements with its customers to provide da Vinci robot service on an exclusive basis that have foreclosed competition in substantially all of the worldwide and domestic markets for da Vinci robot service and have resulted in higher prices and lower service in da Vinci robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

116.   Intuitive denies the allegations in paragraph 116.

**Paragraph 117:**   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

117.   Intuitive denies the allegations in paragraph 117.

## RESPONSE TO "COUNT FIVE –
## MONOPOLIZATION (ENDOWRIST INSTRUMENT AFTERMARKET)"

**Paragraph 118:**   The foregoing allegations are expressly incorporated.

118.   To the extent Plaintiffs re-allege paragraphs 1-117, Intuitive reasserts its answers to those paragraphs.

**Paragraph 119:**   Intuitive has willfully acquired and maintained monopoly power in the worldwide and domestic markets for EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

119.   Intuitive denies the allegations in paragraph 119.

**Paragraph 120:**   As a direct and proximate result of the foregoing conduct, Restore and CPR have been injured in their business and property, including the loss of profits in the market and damage to their reputation and goodwill.

120.   Intuitive denies the allegations in paragraph 120.

## RESPONSE TO "COUNT SIX – ATTEMPTED
## MONOPOLIZATION (ENDOWRIST INSTRUMENT AFTERMARKET)"

**Paragraph 121:**   The foregoing allegations are expressly incorporated.

121.   To the extent Plaintiffs re-allege paragraphs 1-120, Intuitive reasserts

its answers to those paragraphs.

**Paragraph 122:**   Intuitive has attempted to monopolize the worldwide and
domestic markets for EndoWrist instrument repair and replacement in violation of
Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to
monopolize the worldwide and domestic markets for EndoWrist instrument repair
and replacement by engaging in predatory conduct, has engaged in such conduct,
and has a dangerous probability of success in achieving monopoly power.

122.   Intuitive denies the allegations in paragraph 122.

**Paragraph 123:**   As a direct and proximate result of the foregoing conduct,
Restore and CPR have been injured in their business and property, including the
loss of profits in the market and damage to their reputation and goodwill.

123.   Intuitive denies the allegations in paragraph 123.

## RESPONSE TO "COUNT SEVEN –
## TYING (ENDOWRIST INSTRUMENT AFTERMARKET)"

**Paragraph 124:**   The foregoing allegations are expressly incorporated.

124.   To the extent Plaintiffs re-allege paragraphs 1-123, Intuitive reasserts

its answers to those paragraphs.

**Paragraph 125:**   Intuitive has tied EndoWrist instrument replacement to its
surgical robots and robot service, in violation of Section 1 of the Sherman Act, 15
U.S.C. § 1. Intuitive has forced customers to purchase EndoWrist instrument
replacements to get the da Vinci surgical robot and da Vinci robot service. Intuitive
has sufficient economic power in the worldwide and domestic surgical robot
markets and the worldwide and domestic da Vinci robot service markets to coerce

customer acceptance of EndoWrist instrument replacement. The tying arrangements have had anticompetitive effects in the worldwide and domestic aftermarkets for EndoWrist repair and replacement, which involves a not insubstantial amount of interstate commerce.

125.   Intuitive denies the allegations in paragraph 125.

**Paragraph 126:**   As a direct and proximate result of the foregoing conduct, Restore and CPR have been injured in their business and property, including the loss of profits in the market and damage to their reputation and goodwill.

126.   Intuitive denies the allegations in paragraph 126.

### RESPONSE TO "COUNT EIGHT – EXCLUSIVE DEALING (ENDOWRIST INSTRUMENT AFTERMARKET)"

**Paragraph 127:**   The foregoing allegations are expressly incorporated.

127.   To the extent Plaintiffs re-allege paragraphs 1-126, Intuitive reasserts

its answers to those paragraphs.

**Paragraph 128:**   Intuitive has entered agreements with its customers to provide EndoWrist instrument repair and replacement on an exclusive basis that have foreclosed competition in substantially all of the worldwide and domestic aftermarkets for repair and replacement of EndoWrist instruments and have resulted in higher prices and lower service in the worldwide and domestic EndoWrist repair and replacement aftermarkets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

128.   Intuitive denies the allegations in paragraph 128.

**Paragraph 129:**   As a direct and proximate result of the foregoing conduct, Restore and CPR have been injured in their business and property, including the loss of profits in the market and damage to their reputation and goodwill.

129.   Intuitive denies the allegations in paragraph 129.

## RESPONSE TO "PRAYER FOR RELIEF"

Responding to the unnumbered paragraph and each of its subparts under the heading "PRAYER FOR RELIEF," Intuitive denies that Plaintiffs are entitled to any damages, costs of suit, attorney's fees, injunctive relief or any other form of relief.

## RESPONSE TO "DEMAND FOR JURY"

Intuitive admits that Plaintiffs demand trial of their claims by jury to the extent authorized by law.

## PREAMBLE TO AFFIRMATIVE DEFENSE

Intuitive reserves the right to rely upon any of the following or additional defenses to claims asserted by Plaintiffs to the extent that such defenses are supported by information developed through discovery or evidence at trial and thus reserves the right to amend its Answer and Affirmative Defense.  By asserting the following affirmative defense, Intuitive does not allege or admit it has the burden of proof or the burden of persuasion with respect to any matter:

## FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands because Plaintiffs have acted contrary to applicable FDA regulations and/or engaged in other misconduct, including tortious interference with Intuitive's contracts and business relationships.

Dated:  April 12, 2021                    Respectfully submitted,

                                          s/ Karen Hoffman Lent
                                          KAREN HOFFMAN LENT (*Pro Hac
                                             Vice*)
                                          MICHAEL H. MENITOVE (*Pro Hac
                                             Vice*)
                                          SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP
                                          One Manhattan West
                                          New York, NY 10001
                                          Tel: (212) 735-3000
                                          karen.lent@skadden.com
                                          michael.menitove@skadden.com

                                          ALLEN RUBY (*Pro Hac Vice*)
                                          ALLEN RUBY, ATTORNEY AT LAW
                                          15559 Union Ave. #138
                                          Los Gatos, CA 95032
                                          Tel: (408) 477-9690
                                          allen@allenruby.com

                                          LANCE A. ETCHEVERRY (*Pro Hac
                                          Vice*)
                                          SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP
                                          525 University Avenue
                                          Palo Alto, CA 94301
                                          Tel: (650) 470-4500
                                          lance.etcheverry@skadden.com

                                          DAVID L. McGEE
                                          Fla. Bar No. 220000
                                          BEGGS & LANE, RLLP
                                          501 Commendencia Street
                                          Pensacola, FL 32502
                                          Tel: (850) 432-2451
                                          dlm@beggslane.com

## **CERTIFICATE OF SERVICE**

I CERTIFY that a copy hereof has been filed via CM/ECF for electronic

distribution to the following counsel of record on April 12, 2021:

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
Telephone:  (404) 872-3800
jeff@berhold.com

William G. Harrison, Jr.
HARRISON RIVARD DUNCAN & BUZZETT
101 Harrison Avenue
Panama City, FL 32401
Telephone:  (850) 769-1414
wharrison@harrisonrivard.com

/s/ Karen Hoffman Lent
KAREN HOFFMAN LENT
(*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com