IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

|  |  |
|---|---|
| RESTORE ROBOTICS LLC,<br>RESTORE ROBOTICS REPAIRS LLC,<br>and CLIF PARKER ROBOTICS LLC,<br><br>                Plaintiffs,<br><br>   v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>                Defendant.<br><br>INTUITIVE SURGICAL, INC.,<br><br>              Counterclaimant,<br><br>   v.<br><br>RESTORE ROBOTICS LLC and<br>RESTORE ROBOTICS REPAIRS LLC,<br><br>         Counterclaim Defendants. | Civil Case No. 5:19-cv-55-TKW-MJF |

**DEFENDANT'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT**

PUBLIC REDACTED VERSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Intuitive Surgical, Inc. ("Intuitive") respectfully moves for summary judgment (i) dismissing all claims filed by Plaintiffs Restore Robotics LLC, Restore Robotics Repairs LLC and Clif Parker Robotics LLC ("CPR") (collectively "Restore") (ECF No. 77, Counts I-VIII) and (ii) ruling that Restore is liable for tortious interference with Intuitive's customer contracts as alleged in Intuitive's counterclaims (ECF No. 49, Count IV).

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Intuitive designs, manufactures and sells da Vinci Surgical Systems ("da Vincis"), surgical instruments, including "EndoWrists," and accessories, which attach to the da Vinci during surgery.  Da Vincis have been used in almost ten million surgeries worldwide, and it is undisputed that these surgeries provide improved outcomes and fewer complications than alternative healthcare options. Intuitive has sold four generations of da Vincis—the Standard, the S, the Si and the Xi.  Intuitive has always marketed and sold its system, instruments and accessories as an integrated product.  Indeed, the da Vinci cannot perform surgery without Intuitive's proprietary instruments and accessories, which are designed and sold solely for use with the da Vinci.

Because of their complex architecture, and because they are used in surgeries where the consequence of instrument failure could be catastrophic, EndoWrists are tested, validated and sold as limited use or "resposable" instruments.  Intuitive has submitted its validation protocols and test results to the U.S. Food and Drug Administration ("FDA"), which has cleared the marketing and sale of EndoWrists with use limits under Section 510(k) of the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 360(k) (i.e., 510(k) clearance).

All EndoWrists include a programmed memory chip that communicates with the da Vinci and counts each time an EndoWrist is used in surgery (the "use counter").  To ensure patient safety, and consistent with the validation testing and FDA clearance, after an EndoWrist is used the specified, maximum number of times, the use counter causes the EndoWrist to be non-operational.  The EndoWrist is designed to be discarded at this point.  Intuitive has never offered any "repair" service to extend the number of times an EndoWrist may be used.  Instead, it sells customers new EndoWrists to replace old EndoWrists that have been used the maximum number of times.

Da Vincis require regular service, maintenance and repair to ensure optimal performance according to system specifications.  Intuitive has created proprietary software and procedures, referred to by Restore as the "distributor's toolkit" ("toolkit"), to perform numerous critical maintenance and repair tasks on da Vincis

2

and to appropriately calibrate the system. The toolkit is required to perform the requisite level of servicing to ensure the da Vinci is operating according to specifications.

Restore purports to have offered two services. 

The second service Restore purports to have offered is da Vinci service. However, much of the service to be performed on a da Vinci can only be performed with Intuitive's proprietary toolkit. Restore admittedly cannot perform this service because it lacks access to the toolkit.

All of Restore's antitrust claims against Intuitive fail as a matter of law and should be dismissed for at least three independent reasons:

*First*, all of Restore's EndoWrist "repair" claims should be dismissed because Restore cannot meet its burden to establish that its business was lawful; therefore, it cannot establish antitrust injury.  Given the undisputed record that (i)

████████████████████████████████████████████████████, (ii) ████████████████████████████████████

████████████████████████████ (iii) FDA has never cleared EndoWrist "repair," Restore cannot meet its burden to prove that its purported injury is directly attributable to Intuitive's alleged misconduct, as opposed to the FDA regulatory regime.  Restore also cannot establish antitrust injury regarding its EndoWrist "repair" business after October 2019—███████████████████████████████████

████████████—███████████████████████████████████████

████████████████████████.  Similarly, Restore's claims relating to da Vinci service should be dismissed because Restore cannot demonstrate that it was Intuitive, rather than Restore's admitted inability to provide complete servicing, that caused it harm.

*Second*, Restore cannot satisfy its burden to define a relevant antitrust market in which Intuitive allegedly has harmed competition.  Restore alleges aftermarkets for EndoWrist "repair and replacement" and da Vinci service, but it

cannot prove either purported market.  As a matter of law, the relevant market must be defined from Restore's perspective and, ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████.  Even if the markets were defined from the perspective of da Vinci customers, Restore could not establish that EndoWrists or da Vinci service occupy a relevant market distinct from the da Vinci.  If anything, the record demonstrates that the da Vinci, EndoWrists and service are sold as a single, integrated product.

*Third*, Restore cannot meet its burden to prove that Intuitive engaged in anticompetitive conduct.  Restore appears to allege four tying claims that all fail because Restore cannot establish:  (i) separate tying and tied products; (ii) that Intuitive has market power in any purported tying product; or (iii) anticompetitive effects in any purported tied product market.  With regard to proving anticompetitive effects, this Court already held that "[Restore] is required to show that 'the combined price for the tying and tied products was greater than if they had been sold independently.'"  *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19cv55-TKW-MJF, 2019 WL 8063989, at *3 (N.D. Fla. Sept. 16, 2019) (citation omitted).  ██████████████████████████████████████████████ ████████████████████████████████████████████.  In addition, Restore's exclusive dealing claims mirror its tying claims

5

and fail for many of the same reasons.

*Further*, because there is no evidence supporting CPR's one allegation—that Intuitive purportedly told customers not to sell CPR unused or partially used EndoWrists—judgment should be entered in Intuitive's favor on any CPR "claim."

*Finally*, Intuitive should be granted summary judgment on its tortious interference counterclaim. The undisputed facts establish that Restore knowingly induced at least 11 customers to breach their contracts with Intuitive by using Restore's services, causing damage to Intuitive in an amount to be proven at trial.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The da Vinci System and Its Components

1.      Intuitive sells the da Vinci, maintenance services for the da Vinci and associated instruments and accessories to hospitals and surgical centers worldwide. (ECF No. 49 ("Counterclaims")/ECF No. 51 ("Counterclaims Answer") ¶¶2, 11.) Most of these instruments incorporate "EndoWrist" technology with wristed joints for natural dexterity. (*Id.* ¶17.)

2.      EndoWrists attach to the da Vinci's mechanical arms, and doctors use hand controls at the surgeon's console to manipulate EndoWrists during surgery. (*Id.* ¶15.)

3.      Intuitive has developed and commercialized the Standard, the S, the Si and the Xi da Vinci generational platforms. (*Id.* ¶16.)

4.     EndoWrists include a use counter.  (ECF No. 77 ("SAC") ¶85.)  After an EndoWrist is used the specified number of times, the use counter will not allow instruments to be used beyond the prescribed number of procedures.  (*Id.*)

5.     Da Vincis require servicing, including "preventative maintenance." (Counterclaims/Counterclaims Answer ¶¶33-34.) ███████████████████████ ████████████████████████████████████████ )

6.     ██████████████████████████████████ ████████████████████████████████████████████ ██████████████ The terms "service laptop" and "toolkit" are used interchangeably to refer to "all necessary documentation, software, and passwords to service da Vinci robot systems."  (SAC ¶55; ████████████████████ ██████████████████ ) The toolkit includes "documentation to know the meaning of the error codes appearing on the da Vinci robot system to perform repairs on the system."  (SAC ¶56.)

7.     "[T]he service software is necessary to test the robot arms during preventative maintenance."  (*Id.* ¶58; ████████████████████████████ .)  "The service software is also necessary to input the Intuitive serial number after replacing any da Vinci robot part," and "to remove the reminder message after performing preventative maintenance or repairing the robot system."  (SAC ¶58.)

8. ████████████████████████████████████████████

████████████████████████████████████

9. ████████████████████████████████████████████

████████████████████████ (Ex. 5 §§ 5.1.)  Intuitive only sells da Vinci parts

directly to customers as part of da Vinci service.  (SAC ¶54.)

**Da Vincis, Service, Parts and EndoWrists Are Sold as a Single Product**

10. Intuitive's historical filings explain that the da Vinci platform is a

product with multiple components, including a "surgeon's console, a patient-side

cart, a high performance vision system and [Intuitive's] proprietary instruments."

(Ex. 6 at 1; Ex. 7 at 1.)

11. ████████████████████████████████████████████

████████████████████████████████████████████████

████████  ████████████████████████████  ████████

████████████ )

12. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████



13.

15. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16. Intuitive performs clinical risk analyses on a system-wide level, accounting for issues with the system and all "subsystem[s]," including EndoWrists. (Ex. 15 at Intuitive-00538327.)

17. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮



20.

21.

22.

23.     Medrobotics sells the Flex Robotic System for use in minimally invasive surgeries as a single product with accessories, internal software, warranty and support services included and may terminate its agreement with a customer if the customer "uses the system with any accessory not made or approved by Medrobotics." (Ex. 21 at 36-37.)

**EndoWrists Have 510(k) Clearance**



24.

25.

**Restore and Its da Vinci "Servicing" and EndoWrist "Repair" Businesses**

26.   Restore Robotics Repairs, LLC is owned by Clif Parker ▮▮▮▮▮

▮▮ ; Restore Robotics LLC is owned by Clif Parker ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ .  (SAC ¶1; ▮▮▮▮▮▮▮▮▮▮▮▮▮ .)

---

[1] FDA has authority under FDCA to regulate medical devices. 21 U.S.C. §§ 301-392. If a product meets the definition of "device," it will be regulated by FDA as a medical device and be subject to premarket and postmarket regulatory controls. 21 U.S.C. § 321(h). Unless exempt, Class II devices require 510(k) clearance. *See* 21 U.S.C. §§ 360(k)-(m), 360c(a)(1)(A), 360c(f)(1), 360c(i). A "manufacturer" of new, non-exempt, Class II medical device must obtain 510(k) clearance before introducing its device into commercial distribution in the U.S. *See* 21 C.F.R. § 807.81(a)(2); 21 C.F.R. § 807.20(a).

27. ███████████████████████████████████████████████

███████████████████████████████████████████████

28.    In 2018, Restore began selling da Vinci "servicing" and EndoWrist "repairs" to hospitals and surgical centers. (SAC ¶¶47, 81.) ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

29. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████

█████████████████

30. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

31. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████



32.

33.

34.

35.

36. █████████████████████████
███████████████████████████████
███████████████████████████████████
███████████████████████████████
████████████████████

37. ███████████████████████████
███████████████████████████████
████████████████████████████████
████████████████████████████████
███████████

38. ██████████████████████████
███████████████████████████████████
███████████████████████████
███████████████████████████████
███████████████████████████
██████████████████████████
███████████████████████

2 ███████████████████████████████
███████████████████████████████████
███████████████████████████████
████████████████████████





40.

41.

43.

44. ████████████████████████████████
████████████████████████████████████
████████████
████████████████████████

45. ████████████████████████████████
████████████████████████████████████
████████████████████████████████
███ I ████████████████████████████
████████████████████████████████████
██████████████████████████████
████████████

47. ████████████████████████████████
████████████████████████████████
████████████
████████████████████████████
████████████████████████████████████
████████████████████████████

49. ████████████████████████████████
████████████████████████████████████
██████████████████████



50.

51.

52.

53.

54. 

55.

56.

57.

58. 

59.

60.

61.

62.



63.

64.

65. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

66.   According to public records, FDA has not cleared the Iconocare

510(k).  (*See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm

(last visited Nov. 11, 2021).)

67. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

68. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

**Professor DePasquale's Analysis**

69. █████████████████████████████████████

███████████████████████████████████████████



70.

71.

72.

73.

## ARGUMENT

## I.   RESTORE CANNOT ESTABLISH ANTITRUST STANDING

The Eleventh Circuit "employs a two-prong test for antitrust standing." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013).  Plaintiff must establish (i) that it has suffered "antitrust injury" and (ii) that it is "an 'efficient enforcer' of the antitrust laws."  *Id.*

Restore's claims suffer from three sets of standing deficiencies.  ***First***, all of Restore's EndoWrist "repair" claims should be dismissed because Restore cannot meet its burden to establish that its business was lawful; therefore, it cannot prove antitrust injury—i.e., that its harm was directly caused by Intuitive's alleged misconduct, as opposed to the FDA regulatory regime.  ***Second***, Restore's claims relating to EndoWrist "repairs" after October 2019— ████████████████ ████████████████████████—should be dismissed because ████████ ████████████████████████████████████████████████.

***Third***, Restore cannot prove antitrust injury regarding its da Vinci service claims. It is undisputed that Restore cannot provide a significant amount of service because it lacks Intuitive's toolkit and proprietary technology.  Given these limitations, Restore cannot prove there is any demand for its "da Vinci" service.[3]

---

[3]  At the motion to dismiss stage, the Court allowed Restore's claims to proceed because it alleged that it could "compete some without the toolkit and counter but could compete more … but for the alleged tying and exclusive dealing

*(cont'd)*

A.   **All of Restore's EndoWrist Claims Should Be Dismissed Because It Cannot Meet Its Burden To Prove That Its "Repair" Business Was Lawful, and, Therefore, Cannot Establish Antitrust Injury**

To establish antitrust injury, Restore must prove its purported injury is

***directly attributable*** to anticompetitive conduct. *Restore*, 2019 WL 8063989, at \*4

(citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991));

*see also Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376

F.3d 1065, 1076-77 (11th Cir. 2004) (affirming dismissal of antitrust claims

because plaintiff failed to allege injury resulting from "practices [that] have

harmed competition").  Restore cannot meet this burden because its claimed injury

"is caused by a regulatory scheme rather than by the defendant's actions," as it is

"beyond fair dispute" that "a regulatory or legislative bar can break the chain of

causation in an antitrust case."  *See In re Wellbutrin XL Antitrust Litig. Indirect*

*Purchaser Class*, 868 F.3d 132, 163-66 (3d Cir. 2017); *see also RSA Media, Inc. v.*

*AK Media Grp. Inc.*, 260 F.3d 10, 15 (1st Cir. 2001).  To withstand summary

judgment, Restore "must point to evidence ***affirmatively showing*** that [it had

satisfied the legal requirements to engage in the business at issue]."  *Wellbutrin XL*,

868 F.3d at 166 (emphasis added); *see also In re Canadian Imp. Antitrust Litig.*,

470 F.3d 785, 791 (8th Cir. 2006) (no antitrust injury because plaintiff's inability

---

arrangements."  *Restore*, 2019 WL 8063989, at \*4.  The undisputed facts now
establish that Restore cannot lawfully compete in EndoWrist "repair" and cannot
compete at all in da Vinci service without the toolkit.

to import prescription drugs was "caused by the federal statutory and regulatory scheme adopted by the [FDA]" and "not by the conduct of the defendants"); *Modesto Irrigation Dist. (MID) v. Pac. Gas & Elec. Co.*, 158 F. App'x 807, 808 (9th Cir. 2005) (no antitrust injury because plaintiff failed to obtain approval from local commission to provide electricity, and, thus, was "not a lawful competitor").

Restore cannot establish that its injury is directly attributable to Intuitive's alleged misconduct because it cannot affirmatively show that its business was legal.  It is undisputed that neither Restore nor Rebotix ever obtained 510(k) clearance for their "repair" process ████████████████. (SOF ¶¶45-52.) ██

 Restore cannot

demonstrate that its EndoWrist "repair" business was lawful.

Restore may argue that its business was lawful because "servicing" hospital-owned instruments is not commercial distribution, and therefore is not subject to FDA's jurisdiction. This argument is meritless. A device is considered to be in "commercial distribution" if it is "held or offered for sale." 21 C.F.R. 807.3(b). The fact that a hospital maintains ownership of a device is irrelevant to whether it was "held or offered for sale" under the FDCA. Courts have held that the FDCA should be construed liberally in line with its "overriding purpose to protect the

---

[4] A "remanufacturer" of a non-exempt, Class II medical device is required to obtain 510(k) clearance before introducing its device into commercial distribution. 21 C.F.R. § 807.81(a)(2); 21 C.F.R. § 820.3(o); 21 C.F.R. § 807.20(a). A "remanufacturer" is anyone who significantly changes the intended use of a medical device or its safety or performance specifications. 21 C.F.R. § 820.3(w).

public health." *United States v. Article of Drug (BactoUnidisk),* 394 U.S. 784, 798

(1969).  Accordingly, courts have interpreted "held for sale" language broadly in

the context of other FDCA provisions.  *See United States v. Sullivan*, 332 U.S. 689,

696 (1948).  For example, courts have routinely held that doctors' use of drugs and

devices for treatment is "held for sale" even though there is no sale of the product

to the patient.  *See United States v. Evers*, 643 F.2d 1043, 1050 (5th Cir. 1981);

*United States v. Diapulse Corp. of Am.*, 514 F.2d 1097, 1098 (2d Cir. 1975) (per

curiam).

The Ninth Circuit recently rejected the argument that an adulteration

provision of the FDCA did not apply to a physician's reuse of single-use guides for

prostate biopsies because they were not "held for sale."  *United States v. Kaplan,*

836 F.3d. 1199, 1209-10 (9th Cir. 2016).  In *Kaplan*, the physician argued, like

Restore, that "title and possession of the guides were not transferred to patients,"

and therefore "there was no sale."  *Id.* at 1209.  The court rejected this argument

because the physician was "a commercial actor in a commercial setting, using a

commercial product," and thus reuse of the guides meant they were "held for sale."

*Id.* at 1210; *see also United States v. Rhody Dairy, L.L.C.*, 812 F. Supp. 2d 1239,

1242-44 (W.D. Wash. 2011) (farmer administering drugs to cattle met "held for

sale" requirement); *United States v. 10 Cartons, Labeled in Part* "*Hoxsey*," 152 F.

Supp. 360, 364-65 (W.D. Pa. 1957) (rejecting argument that prescribing a drug did

not constitute being "held for sale," reasoning that "it is not the holding for sale in a technical legal sense which gives rise to federal jurisdiction in cases arising under [21 U.S.C. § 334(a)] but the fact that the channels of commerce have been used").

Restore's EndoWrist "repairs" indisputably involved commercial transactions, commercial actors and commercial products.  Specifically, it is undisputed that ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  Thus, Restore "held or offered for sale" in commercial distribution EndoWrists ███████████████, subjecting Restore to FDA oversight.

In sum, Restore cannot meet its burden to establish that its EndoWrist "repair" business was lawful.  Thus, Restore cannot prove antitrust injury, and all its EndoWrist "repair" claims should be dismissed.

**B.     Restore's EndoWrist Claims After October 2019 Also Should Be Dismissed Because It Lacked the Ability To Perform "Repairs" And Was Not Prepared To Launch Its Own Technology**

Restore seeks damages after October 2019 based on assumptions that in the but-for world: ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████  Because Restore omits these allegations from

its amended complaint (filed in March 2021), Restore should be barred from

pursuing these theories for this reason alone. *See Gilmour v. Gates, McDonald

and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (affirming dismissal of claims

first raised at summary judgment, explaining that "the proper procedure for

plaintiffs to assert a new claim is to amend the complaint").  Regardless, Restore

lacks standing to pursue either theory.

    ***First***, Restore cannot prove antitrust injury arising from ██████████

████████████████████████████████████  because there is no allegation, let alone

evidence, that Intuitive caused that outcome.  To the contrary, the record

establishes that █████████████████████████████████████████████████████

████  Thus, Restore cannot show that its inability to access ████████████████

██████████████████████  was "directly attributable" to Intuitive.  *Restore*, 2019 WL

8063989, at *4.

    ***Second***, Restore cannot prove antitrust injury regarding its theory ██████

███████████████████████████████████████████████████████████████████

████████.  Because Restore has not alleged (much less provided evidence) that

Intuitive prevented Restore from commercializing its own technology, it cannot prove antitrust injury regarding this theory.

Moreover, Restore cannot prove that it is an "efficient enforcer" of the antitrust laws regarding its claim for damages based on the EndoWrist "repair" business it has not launched. To meet its burden, Restore "must prove [it was] willing and able to enter the relevant market, but for the exclusionary conduct of [Intuitive]." *See Sunbeam*, 711 F.3d at 1273. Merely intending to enter the business is insufficient to establish standing. *See Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1255 (10th Cir. 2003); *see also Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562-63 (11th Cir. 1987) (plaintiff was unprepared to enter market because it had not prepared cash-flow estimates and financial statements, or obtained necessary permits). Instead, Restore must make "a showing of ***preparedness*** to enter the business." *Cable Holdings*, 825 F.2d at 1562 (emphasis added) (citation omitted).



31

████████████████████████████████████████

████████████████████████████

Thus, Restore lacks standing to pursue its EndoWrist claims after October 2019.

### C.   Restore Cannot Establish Antitrust Injury Regarding da Vinci Service

Restore cannot meet its burden to establish that Intuitive's alleged misconduct directly caused its alleged harm in the sale of da Vinci service. Rather, the record shows that Restore's inability to sell da Vinci service is directly attributable to its lack of access to Intuitive's toolkit and other proprietary technology, and this Court already held that Intuitive's refusal to provide these items to Restore "is not anticompetitive conduct." *Restore*, 2019 WL 8063989, at *4.

It is undisputed that Restore cannot provide complete preventative maintenance without access to the toolkit. While Restore purports to offer customers "preventative maintenance," Restore concedes in its complaint—████ ████████████—that the toolkit is required to provide *complete* preventative maintenance, including for critical steps such as testing robot arms. (SOF ¶¶6-8, 30.)

Separate from "preventative maintenance," Restore marketed spot da Vinci "repairs," but these "repairs" also require the toolkit. (*Id.* ¶¶28-29.) As Restore

32

concedes, servicers need "the documentation [available only through the toolkit] to know the meaning of the error codes appearing on the da Vinci robot system to perform repairs" and in order to remove the reminder message after repairing the robot system. (*Id.* ¶6.) Further, the types of da Vinci repairs that Restore could perform were limited █████████████████████████████████████████████ ███████████████████████████████████

Moreover, there is no evidence that Intuitive's alleged misconduct caused Restore to lose any da Vinci service business. To the contrary, lacking access to the toolkit's essential software, ████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████ there is no evidence that any customer would have used Restore's services with knowledge of its limitations. ██████████████████████████████████████████████ █████████████████████████████████████████

Thus, Restore is unable to establish harm to its da Vinci service business that is directly attributable to Intuitive's alleged misconduct and, therefore, cannot prove antitrust injury. For this reason alone, all of Restore's da Vinci service claims should be dismissed.

## II.   RESTORE CANNOT ESTABLISH THAT ITS PURPORTED AFTERMARKETS ARE RELEVANT ANTITRUST MARKETS

Restore bears the burden to define a relevant antitrust market in which Intuitive's alleged misconduct has harmed competition. *See, e.g.*, *Spanish Broad. Sys.*, 376 F.3d at 1074 ("Like claims under Section One, Section Two claims require harm to competition that must occur within a 'relevant', that is, a distinct market….").

Restore's claims turn on allegations that there are relevant aftermarkets "for EndoWrist instrument repair and replacement" and "da Vinci robot service." (SAC ¶¶106-29.)  Restore cannot establish the existence of either market for two separate reasons. *First*, because the relevant market must be defined from Restore's perspective (not the perspective of da Vinci customers), as a matter of law, the market must encompass all medical device services that Restore offers or could offer and, therefore, cannot be limited to EndoWrists or da Vinci service. *Second*, even if defined from the perspective of da Vinci customers, Restore cannot prove the existence of a market for EndoWrists or da Vinci service that is distinct from da Vinci systems.  Because Restore cannot establish a relevant market for EndoWrist repair and replacement or da Vinci service, all of its claims should be dismissed for this reason too.

A.   **Because the Market Should Be Defined From Restore's Perspective, It Must Encompass All Instruments and Devices That Restore Can Service**

In antitrust cases brought by an allegedly excluded supplier, the relevant market is defined from the perspective of the supplier and includes any customer to which the supplier could sell its services. *See, e.g.*, *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) ("[T]he inquiry in the case of a shut-out supplier [is]:  to whom can the supplier sell?"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118-19 (10th Cir. 2008) (affirming dismissal of Sherman Act claims because alleged relevant market did not include "all of the[] potential consumers of windshield repair and replacement services" available to plaintiff); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004) ("[T]he concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*.") (emphasis added).[5]

Here, a properly defined relevant market must encompass all customers to which Restore sells or could sell its medical device services, and Restore cannot prove that its services are limited to da Vinci customers.  To the contrary, the

---

[5]  *See also Spectrofuge Corp. v. Beckman Instr., Inc.*, 575 F.2d 256, 283-84 (5th Cir. 1978) (analyzing market definition from plaintiff's perspective, including by examining its opportunities to service instruments of companies besides defendant).

35

undisputed facts establish that Restore and its affiliate, MediVision,



**B.    Even If Defined From Intuitive's Customers' Perspective, Restore Cannot Establish That Its Purported Markets for da Vinci Service and EndoWrist Repair Are Relevant Antitrust Markets**

"For [two items] to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide [one item] separately from [the other]." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). "Relevant evidence of separate and distinct consumer demand … is, *inter alia*, the history of the products being, or not being, sold separately, or the sale of the products separately in similar markets." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (citation omitted); *see also id.* at 140, 144-45 (affirming dismissal of tying claim for failure to plausibly allege premium cable services and set-top boxes were separate products because there was no "allegation that there has ever been separate sales of cable boxes and cable services in the United States").

Consistent with this precedent, courts have recognized that essential components of a product cannot constitute separate products as a matter of law. For example, in *Kentmaster Manufacturing Co. v. Jarvis Products Corporation*, 146 F.3d 691 (9th Cir. 1998), *amended*, 164 F.3d 1243 (9th Cir. 1999), the court held that plaintiff could not establish a relevant market for spare parts used with defendant's slaughterhouse equipment because those spares were essential to the operation of the equipment, were only manufactured by defendant, and customers were apprised that they would need to purchase them from defendant. *Id.* at 694. Plaintiff similarly sold its equipment and spares as part of a single product. *Id.* Accordingly, the court concluded that the "product is … a unit made up of equipment and of spares—a unit sold over a period where the purchaser of what might be called section A knows that eventually he will be buying complementary section B." *Id.*; *see also Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 966-67, 975 (9th Cir. 2008) (affirming dismissal of tying claim alleging that defendant's franchises were tied to credit-card processing services because "[defendant's] credit card services are an essential part of its franchise," demonstrating that "[t]he franchise and the method of processing credit transactions are not separate products, but part of a single product (the franchise)"); *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 274, 277 (N.D. Ill. 2019) (plaintiff failed to plausibly allege defendant's initial certification product was

separate from its maintenance of certification product because "adding a new component to the product that will cause customers to incur ongoing costs does not make the component a new product").

Service (including replacement parts) and EndoWrists are essential components of the da Vinci that customers agree to purchase over time from Intuitive.

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ Intuitive's historical public filings describe the da Vinci as an integrated product consisting of multiple parts, accessories and instruments. (*Id.* ¶10.)

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████



**Second**, other robotic-assisted surgical companies similarly bundle

components of their platforms.  For example, ███████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ Like the da

Vinci, ██████████████████████████████████████████

██████████████████████████████████████ In addition, Medrobotics has

sold its Flex Robotic System as a single product with accessories, internal

software, warranty and support services included, while maintaining the

contractual right to terminate customer contracts if the customer "uses the system

with any accessory not made or approved by Medrobotics." (*Id.* ¶23.)  This evidence illustrates that Intuitive's bundling is not an abuse of purported market power but rather a method of achieving strong net efficiencies for customers.

Given this undisputed evidence, Restore cannot establish the existence of any relevant market for da Vinci service (or parts) or EndoWrists that is separate from the da Vinci.

## III.   RESTORE CANNOT ESTABLISH THAT INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT

Restore alleges that Intuitive has engaged in anticompetitive tying and exclusive dealing, but it cannot establish any such alleged misconduct.[6]

### A.   Restore Cannot Establish Any Unlawful Tying Arrangement

To prove an illegal tying arrangement under the rule of reason,[7] a plaintiff must establish:

---

[6]  In addition to tying and exclusive dealing (Counts 3, 4, 7 and 8), Restore brings claims for monopolization and attempted monopolization (Counts 1, 2, 5 and 6). But these latter claims are based on the same alleged tying and exclusive dealing arrangements, coupled with actions like sending cease-and-desist letters that allegedly enable Intuitive to "enforce" those arrangements.  (SAC ¶¶99-101.) Accordingly, if Restore's tying and exclusive dealing claims fail, all of its claims must be dismissed.

[7]  Because the da Vinci and da Vinci parts are patented products, Restore's tying claims are evaluated under the rule of reason.  *See Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006) ("Tying arrangements involving patented products should be evaluated under the [rule of reason] rather than under the per se rule.").

(1) "a tying and a tied product"; (2) "evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied product"; (3) "that the seller ha[s] sufficient market power in the tying product market to force the buyer to accept the tied product"; (4) "anticompetitive effects in the tied market"; and (5) "involvement of a 'not insubstantial' amount of interstate commerce in the tied product market."

*Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502-03 (11th Cir. 1985) (first alteration in original) (citation omitted).

Restore appears to allege that Intuitive has engaged in four unlawful tying arrangements by conditioning:  (i) the provision of da Vinci parts on the purchase of da Vinci service; (ii) the sale of da Vincis on the purchase of da Vinci service; (iii) da Vinci service on the purchase of EndoWrists; and (iv) the sale of da Vincis on the purchase of EndoWrists.  (SAC ¶¶113, 125.)  Each tying claim fails because Restore cannot establish:  (i) separate tying and tied products; (ii) that Intuitive has market power in any purported tying market; or (iii) anticompetitive effects in any purported tied product market.

        1.      Restore Cannot Meet Its Burden To Establish That the da Vinci, Service, Parts and EndoWrists Constitute Separate Products

As discussed above (*see* Section II.B, *supra*), Restore cannot establish that the da Vinci, service, parts and EndoWrists are separate products.  The record illustrates that the da Vinci is a single, integrated product.  For this reason alone, each tying claim fails.

2.      Restore Cannot Meet Its Burden To Establish That
        Intuitive Has Market Power in Any Purported Tying Market

To meet its burden to prove that a defendant has market power in the tying

market to force customers to buy the tied product, a plaintiff must define the

alleged tying market.  *See Ill. Tool Works*, 547 U.S. at 43 (tying claim "must be

supported by proof of power in the relevant market"); *Teradata Corp. v. SAP SE*,

No. 18-cv-03670-WHO, 2021 WL 5178828, at *26 (N.D. Cal. Nov. 8, 2021)

("[B]ecause [plaintiff] has failed to properly define a tying market, there is no

triable issue of fact whether [defendant] has market power in a properly-defined

tying market.")  Moreover, "[c]onstruction of the relevant market and a showing of

monopoly power must be based on expert testimony." *Bailey v. Allgas, Inc*., 284

F.3d 1237, 1246 (11th Cir. 2002).

For these

reasons alone, summary judgment should be granted on Restore's claims that

Intuitive tied (i) service to parts and (ii) EndoWrists to service.

Moreover, Restore's claims that Intuitive tied service and EndoWrists to the

sale of the da Vinci (i.e., the alleged tying product) hinge on Professor

DePasquale's opinions that                                                        . Those opinions should

be excluded for the reasons explained in Intuitive's accompanying *Daubert*

motion, ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████. Without admissible expert testimony, Restore

cannot meet its burden to prove that Intuitive has market power in any purported

tying market.

3.   Restore Cannot Establish
     Anticompetitive Effects in Any Purported Tied Product Market

As this Court already held, to establish anticompetitive effects of a tying

arrangement, "the plaintiff is required to show that 'the combined price for the

tying and tied products was greater than if they had been sold independently.'"

*Restore*, 2019 WL 8063989, at *3 (quoting *Metzler v. Bear Auto. Serv. Equip. Co.*,

19 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998)); *see also Kypta v. McDonald's Corp.*,

671 F.2d 1282, 1285 (11th Cir. 1982) (same).   Accordingly, summary judgment

should be granted if a plaintiff cannot establish that the combined price of the tying

and tied products would be lower in the but-for world.   *See, e.g., Metzler* at 1361-

62 (granting summary judgment on tying claim because "even if the defendants

had unreasonably restricted the availability of their parts, causing high prices for

parts," plaintiff could not "show that the defendants' service rates were

supracompetitive, resulting in a higher package price for parts and service"); *Will

v. Comprehensive Acct. Corp.*, 776 F.2d 665, 672-73 (7th Cir. 1985) ("Plaintiffs

did not claim, let alone offer evidence to show, that the price they paid for the franchise-computation package is higher than the price for those two products purchased in separate markets … *Kypta* … holds that unless the plaintiff shows that the package price was elevated the suit must be dismissed without further ado.").

Here, Restore cannot establish that the combined price for any alleged tying and tied product was greater than if they had been sold separately.



Thus, Restore cannot meet its burden to prove anticompetitive effects, and its tying claims should be dismissed for this reason alone.

Moreover, Restore cannot establish the absence of procompetitive justifications for Intuitive's challenged conduct. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (plaintiff must prove "(1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2)

that the conduct has no pro-competitive benefit or justification"); *Spanish Broad. Sys.*, 376 F.3d at 1071 (same).  As explained in Section II.B above, selling the da Vinci, service, parts and EndoWrists as an integrated product allows Intuitive ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   This deficiency is also fatal to Restore's tying claims.

### B.  Rebotix Cannot Establish Any Unlawful Exclusive Dealing Arrangement

Exclusive dealing arrangements are permissible "unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  "[I]n order to determine whether a substantial share of the competition has been foreclosed, the relevant product and geographic markets must first be determined." *E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1344 (N.D. Ga. 1987), *aff'd sub nom. Barwick Indus. v. Heller & Co.*, 891 F.2d 906 (11th Cir. 1989) (table).  Further, a plaintiff must prove both the exclusion of a significant competitor and "that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce

output below) the competitive level, or otherwise injure competition." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

Restore's Complaint alleges that Intuitive has entered into unlawful exclusive arrangements by forcing customers to purchase new EndoWrists and accept da Vinci service from Intuitive, rather than accept EndoWrist "repairs" or da Vinci "service" from Restore. (SAC ¶¶116, 128.) Restore's claims fail for multiple reasons, including because: (i) Restore cannot establish a relevant product market in which a substantial share of competition has been foreclosed because it has not defined a cognizable relevant market for repair and replacement of EndoWrists or da Vinci service (*see* Section II.B, *supra*); and (ii) Restore cannot establish that the probable effect of the purported exclusion will be to raise prices for the same reasons it cannot establish that prices of the alleged tying and tied products would be lower in the but-for world (*see* Section II.A.3, *supra*).

Finally, Restore's exclusive dealing claim relating to da Vinci service also fails because Restore has no evidence supporting its allegation that Intuitive "forces customers to enter long-term contracts of five years or more to get access to the da Vinci system." (SAC ¶50.) █████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

## IV.   CPR CANNOT ESTABLISH ANY MISCONDUCT REGARDING SALE OF UNUSED ENDOWRISTS

Restore alleges that Intuitive instructed customers—though it only identifies one such customer—to refrain from selling unused EndoWrists to, or buying such instruments from, Restore or CPR.  (SAC ¶101.)  Because no evidence supports this allegation, summary judgment should be granted on any claim based on this allegation.  And because this is the only allegation relating to CPR, Intuitive is entitled to summary judgment on all of CPR's claims.

## V.   INTUITIVE SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS TORTIOUS INTERFERENCE COUNTERCLAIM

To prove a tortious interference claim under Florida law, a party must establish: "(1) the existence of a business relationship or contract; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with that relationship by the defendant which induces or otherwise causes nonperformance; and (4) damages resulting from the tortious interference." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1343 (M.D. Fla. 2006)

47

(citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994)).

The undisputed facts establish that Restore is liable for tortiously interfering with at least 11 Intuitive hospital contracts. ███████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Accordingly, Intuitive is entitled to

██████████████████████████████ summary judgment on the liability component of its tortious interference counterclaim, with the only issue remaining to be tried the amount of damages Intuitive suffered.

## CONCLUSION

For the foregoing reasons, Intuitive respectfully requests that the Court grant summary judgment (i) dismissing all of Restore's claims and (ii) ruling that Restore is liable for tortious interference with Intuitive's customer contracts.

Dated:  November 12, 2021        Respectfully submitted,

/s/ Karen Lent

DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice*)
MICHAEL W. FOLGER (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com
michael.folger@skadden.com
MICHAEL S. BAILEY (*Pro Hac Vice*)
1440 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 371-7000
michael.bailey@skadden.com

ALLEN RUBY (*Pro Hac Vice*)
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690
allen@allenruby.com

**COUNSEL FOR DEFENDANT AND
COUNTERCLAIMANT INTUITIVE**

49

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Intuitive certifies this Memorandum complies with the 10,500 word count limitation set forth in the Court's November 5, 2021 Order regarding the word limits for summary judgment filings, excluding the parts exempted by Local Rule 7.1(F).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2021, I caused **DEFENDANT'S**

**DISPOSITIVE MOTION FOR SUMMARY JUDGMENT** to be served on the

following counsel of record by email:

| William Gerald Harrison, Jr. | wharrison@harrisonrivard.com |
| --- | --- |
| Jeffrey Berhold | jeff@berhold.com |

/s/ Karen Lent
KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com

51