## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

RESTORE ROBOTICS LLC,
RESTORE ROBOTICS REPAIRS LLC,
and CLIF PARKER ROBOTICS LLC,

               Plaintiffs,

   v.

INTUITIVE SURGICAL, INC.,

               Defendant.

INTUITIVE SURGICAL, INC.,

               Counterclaimant,

   v.

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIRS LLC,

               Counterclaim Defendants.

Civil Case No. 5:19-cv-55-TKW-MJF

TO BE FILED UNDER SEAL

**PLAINTIFFS RESTORE ROBOTICS LLC, RESTORE ROBOTICS REPAIRS LLC, AND CLIF PARKER ROBOTICS LLC'S RESPONSE IN OPPOSITION TO DEFENDANT INTUITIVE SURGICAL, INC.'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309

William G. Harrison
HARRISON RIVARD DUNCAN & BUZZETT
101 Harrison Avenue
Panama City, FL 32401

Pursuant to Fed. R. Civ. Proc. 56, Plaintiffs Restore Robotics LLC, Restore Robotics Repairs LLC, and Clif Parker Robotics LLC ("Restore") and Counter-Defendants Plaintiffs Restore Robotics LLC, Restore Robotics Repairs LLC hereby file this response in opposition to the motion for summary judgment filed by Plaintiff Intuitive Surgical, Inc. ("Intuitive") regarding the antitrust claims and the tortious interference counterclaim.

## I.      Statement of Facts

Intuitive manufactures and sells the da Vinci brand of surgical robots for minimally-invasive soft-tissue surgery ("Surgical Robots").   The da Vinci Surgical System has an average sales price in the United States of ███████████████.

███████████████. The da Vinci is a closed system designed to operate with proprietary components and parts, e.g., robot arms, and the proprietary EndoWrist instruments. █████████████████████████████ Intuitive has deployed four generations of the robot – most recently the da Vinci S in 2006, the da Vinci Si in 2009, and the da Vinci Xi in 2014. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

Plaintiff's economics expert Professor Christina DePasquale defined a relevant product market for the sale of surgical robots for minimally-invasive surgery in the United States. She analyzed the peculiar characteristics, specialized uses, and unique benefits of surgical robots. DePasquale Rep. at 5-7. ████████

████████████████████████████████████████████████████████

██████████████████████████████ Despite the much higher initial and operating costs for the robot, hospitals are steadily converting to robotic surgery. DePasquale Rep. at 7-8.



████████████████████

Professor DePasquale also noted other indicia of a relevant market for surgical robots:

> There are distinct prices for surgical robots: the average sales price of a robot is more than $1 million while a laparoscopic tower costs

around $100,000.  There is an even bigger gap in the aftermarket prices. Moreover, surgical robot manufacturers do not closely monitor prices for laparoscopic equipment.  There are specialized vendors: Intuitive, TransEnterix, and Medrobotics have never manufactured equipment for laparoscopic surgery.  There are robotic surgery trade associations: the Society of Robotic Surgery and the Clinical Robotic Surgery Association. Hospitals and investors alike view it as a separate industry category.

DePasquale Rep. at 6 (footnotes and citations omitted).

Intuitive exercises a "very high degree of monopoly power" in surgical robots based on ████████████████████████████████.  DePasquale Rebuttal Rep. at 4.  Intuitive was the only manufacturer cleared by the FDA to sell Surgical Robots in the United States for nearly twenty years: TransEnterix's Senhance System was the "first real competitor to the da Vinci" to enter the market after receiving clearance from the FDA on October 13, 2017.  DePasquale Rep. at 8-9. Even at the end of 2019, Intuitive continued to control ████████ of the installed base for Surgical Robots in the United States.  DePasquale Rep. at 8.  ████████



There are "profound barriers to entry" to compete with Intuitive.  DePasquale Rep. at 10.  Every potential entrant must work around ████ patents held by Intuitive in the U.S and obtain clearance from the FDA for the robot and instruments for each indication for use.  Id. ████████████████████████████████

████████████████████████   Entry takes many years and hundreds of millions of

dollars.  DePasquale Rep. at 10.

████████████████████████████████████████████ Several
U.S. healthcare giants – Johnson & Johnson and Medtronic – have spent
years developing their own technology and are still years away from
obtaining clearance from the FDA to sell a finished product in the U.S.
Surgical Robot Market. ████████████████████████████████████████

Id. (footnotes omitted).

When customers initially acquire their da Vinci, they sign the Intuitive Sales,

Licensing, and Service Agreement ("SLSA").  ████████████  Intuitive requires that

the customer only use EndoWrist instruments on the da Vinci for the maximum

number of uses set forth in the instrument catalog – typically 10 uses for the

instruments used with the da Vinci S and da Vinci Si models.  ████████████

███████████████████████████████   (Da Vinci Si instrument

catalog).   The SLSA prohibits the customer from repairing or refurbishing the

instruments.[1] ████████████████████   Sections 5.2(E) and 8.  In addition,

the SLSA provides that Intuitive can refuse to provide any service on the robot if

_____

repairs have been made by an individual other than an Intuitive technician.[2]  See, e.g., █████████████████, at Section 5.2(A).

So long as hospitals do not violate the terms of the SLSA, they can place "separate orders . . . from time to time" to purchase the necessary EndoWrist instruments as needed for the life of the robot from Intuitive at prices and terms (such as the usage limit) to be determined by Intuitive at the time of the purchase of the instrument.  See, e.g., █████████████████, at Section 8.  So long as hospitals do not violate the terms of the SLSA, they can also obtain preventative maintenance and other service for the robot under contracts of one or more years – or time and materials at an hourly rate of ██████ plus the cost of parts – from Intuitive.  ████████

███████████████████

████████████████████████████████████████

███████████████████   There are actually two relevant EndoWrist aftermarkets – the S/Si EndoWrist aftermarket and the X/Xi EndoWrist aftermarket. DePasquale Rep. at 4 n.2.  "The da Vinci S and da Vinci Si robots are only compatible and cleared for use with EndoWrist instruments designed, engineered, and manufactured for the da Vinci S and da Vinci Si robots.  The same is true of the

─────────────────────

[2] ████████████████████████████████████████
████████████████████████████████████████
████████████████

instruments for use with the da Vinci X and da Vinci Xi." Id.; see also Intuitive-0000129 (Da Vinci Si instrument catalog), Intuitive-00000105 (Da Vinci X/Xi instrument catalog).

In addition, the requests for clearance do not mention any prohibition on refurbishment of the instruments for an additional cycle of uses.

6



The Si EndoWrists were not included in the Extended Use Program in 2019,

---

https://www.nytimes.com/2019/03/11/health/robotic-surgery-cancer.html, https://www.intuitive.com/en-us/about-us/company/statement-fda-safety.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

See, e.g., id.  Intuitive reaps gross margins in excess of ███, which are indicative of monopoly power in the EndoWrist aftermarket.  DePasquale Rep. at 15, DePasquale Rebuttal Rep. at 6-9.

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

The average annual price for a service contract is ████████████ per year.  See, e.g, DePasquale Rep. at 21.  In the alternative, the customer can obtain service based on time and materials at ████████████████████████

hour for labor and travel time plus the list price for any parts.  DePasquale Rep. at 10, Intuitive-00154125.  Intuitive reaps gross margins in excess of █████, which are indicative of monopoly power in the service aftermarket.  DePasquale Rep. at 12, DePasquale Rebuttal Rep. at 6-9.

Restore was founded in Summer 2018 to provide a competitive alternative for hospitals interested in servicing EndoWrist instruments to extend their useful lives. Parker Dep. at 26:7-26:23.  Restore Robotics handled sales, and Restore Robotics Repairs handled repairs.  Parker Dep. 60:3-60:21.  Kevin May, the managing member of the operating company Restore Robotics Repairs, has been involved in the service and manufacturing of medical devices for over 30 years.  May Dep. at 18:14-20:25.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████    ████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████

[REDACTED]

When operating, Restore offered a reasonable alternative to Intuitive's overpriced instruments and service plans. DePasquale Rep. at 21. Restore offered refurbished instruments that ranged anywhere from [REDACTED] off the price of a new Intuitive instrument. Id. Similarly, while Intuitive's service contracts run about [REDACTED] per year, Restore offered similar contracts for [REDACTED] per year. Id. Such competition would make robotic surgery available to hospitals (and thus patients) that may not otherwise be able to afford it. Id.



## II.    Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a

---

[4] As discussed above, clearance is not necessary for a hospital to repair its own reusable device or hire a third party to repair it.

genuine issue for trial." *Nesbitt v. Candler Cty.*, 945 F.3d 1355, 1357 (11th Cir. 2020) (citations and quotation marks omitted).

> [A] district court must view all evidence and make all reasonable inferences in favor of the non-moving party. And if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment. Rather, the court must hold a trial to get to the bottom of the matter.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (citations and quotation marks omitted).

## A.    Antitrust Standing

In order to prevail at summary judgment, Restore must offer evidence of the fact that it suffered a loss that is "directly attributable to the defendant's anticompetitive conduct." *Restore Robotics*, 2019 WL 8063989, at *4 (N.D. Fla. Sept. 16, 2019).  There is no dispute that Restore entered the business of repairing EndoWrists more than three years ago.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

> [A] defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from [entering the market].  As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market.

*Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991);[5] *see also*

*Lucasys Inc. v. PowerPlan, Inc.*, 2021 WL 5279391, at *9 (N.D. Ga. Sept. 30, 2021)

(discussing the ability to ramp up business to create new product to enter relevant

product market but for anticompetitive actions of defendant).  ████████████████

████████████████████████████████████████

---

[5] "The degree to which a business must take affirmative steps is mitigated by the impact of the antitrust violation, which we assume to have occurred when analyzing standing."  *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 740 (5th Cir. 2015).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

     ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

### 1.      Lawful Business

There is no dispute that Restore entered the business of repairing EndoWrists more than three years ago.  While Restore has put its EndoWrist business on hold because of the futility of that line of business without relief in this case from the

Court, Supra at 4-5 and 12-13, Intuitive has offered no evidence in its motion that the FDA has sought, much less obtained, any injunction to stop Rebotix from continuing to repair EndoWrist ████████████████████████████████████

████████████████████████████

It is true that the customer plaintiffs in one of the patent settlement cases were required to show that one of the defendants would have been able to circumvent the *blocking patent* in dispute and launch its generic drug if the defendants had not settled their patent dispute.  In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class, 868 F.3d 132, 166 (3d Cir. 2017).  But Restore has clear evidence that it would have launched its business because it did launch its business. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

There is no dispute that the FDA has cleared, rather than approved, the EndoWrist instruments.  Clearance is "by no means comparable" with approval. *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1317 (11th Cir. 2017).  The clearance process "is focused on equivalence." *Id.*  The EndoWrist instruments have never been "formally reviewed . . . for safety or efficacy" in the clearance process.  Id.  The FDA only considered "whether the device is indeed the equivalent of a preexisting device—regardless of how unsafe or ineffective the grandfathered device happens

to be." *Id.* █████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

Nevertheless, Intuitive contends that it is undisputed that Restore must obtain clearance from the FDA to repair *reusable* medical devices. The Ninth Circuit did find that a physician had improperly reused *single-use* plastic needle guides for prostate biopsies in violation of the FDCA. *United States v. Kaplan*, 836 F.3d 1199, 1210 (9th Cir. 2016). While the court found that the single-use plastic needle guide had been "held for use" by the physician and "consumed" by the patient, the panel expressly declined to consider whether the "reusable stainless-steel guides, an item that can be properly and safely reused," could be considered "held for sale" under the FDCA. *Id.* at 1210 n. 7.



██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

### 2.      Repair Capabilities

Restore has offered evidence of the fact that Restore and Rebotix did not renew the distribution agreement because Intuitive was blocking Restore from competing in the market for repairing EndoWrists.  Supra at 12-13.  ███████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

Nevertheless, Intuitive insists that that these facts are not a basis for the existing claims of illegal tying, exclusive dealing, and attempted and actual monopolization of the aftermarket for EndoWrists.      Dkt. 109 at 30 (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004)).  In *Gilmour*, the plaintiff asserted a new claim ***under contract law*** in defense of summary judgment based on the old claims ***under tort law*** asserted in its complaint. Id. at 1315 (11th Cir. 2004).  The facts here are part and parcel of the existing claims

---

6██████████████████████████████████████████

███████████

of antitrust violations in the EndoWrist aftermarket in the complaint. They were the

subject of discovery. Restore has not brought new claims under some other area of

the law.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████    ██████████    ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

      ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ Restore had experience in

providing repairs and had access to a repair facility and repair technicians to continue

in the business. May Dep. at 22:8-22:21, 105:7-105:15. ███████████████

███████████████████████████████████████████████████

**3.      Service Market**

**B.     Product Aftermarkets**

"The relevant product and geographic market is a question of fact." *Graphic Prod. Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1569 (11th Cir. 1983).[7]

**1.     Market Definition**

A product market consists of "products that have reasonable interchangeability for the purposes for which they are produced." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 828 (11th Cir. 2015).   Contrary to the instant motion, the inquiry is defined from the perspective of the customers: "the product at issue and all reasonable substitutes *available to consumers*."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) (emphasis added).  "Courts routinely rely on qualitative economic evidence to define relevant markets." *McWane, 783 F.3d* at 829 (citations omitted).

Here, Professor DePasquale concluded that there is a relevant primary market for surgical robots for minimally-invasive surgery and separate relevant aftermarkets for (1) repairing and replacing the instruments for use with the da Vinci and (2) maintaining and servicing the da Vinci itself.  DePasquale Rep. at 3-4.  She carefully explained how the surgical robot market is not constrained by competition from laparoscopic surgical equipment.  DePasquale Rep. at 5-8, DePasquale Rebuttal Rep.

---

[7]  The findings of the jury concerning the market "should be overturned on appeal only if clearly erroneous or where there is no evidence to support the finding below." Id.

at 4-7.  She noted that surgical robots have many unique benefits and that hospitals were willing – and did incur – significant costs to convert operating rooms and surgical staff and procedures from laparoscopic to robotic surgical equipment.[8] DePasquale Rep. at 5-8. █████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████   In addition, she specifically walked through the *Brown Shoe* factors.[9] DePasquale Rep. at 6.

### 2. Separate Products

Furthermore, Professor DePasquale explained why there were separate aftermarkets for refurbished instruments and robot service for the da Vinci. DePasquale Rep. at 16-18, DePasquale Rebuttal Rep. at 3-4.  The Supreme Court asks whether there is sufficient consumer demand so that it is efficient for a firm to

---

█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████

[9] In defining product submarkets, the Eleventh Circuit has "long looked" to the factors set forth by the Supreme Court in *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962), including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *McWane,* 783 F.3d at 828.

provide the tied product separately from the tying product. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). Here, Intuitive does not sell the robot, the service, and the instruments in a bundled price through a managed service contract. DePasquale Rebuttal Rep. at 3. Nor does any other producer in the United States. Id. In fact, customers purchase instruments and service in the aftermarkets at prices and terms set by Intuitive after the purchase of the robot.



In addition, Professor DePasquale found "ample evidence" of significant consumer demand by hospitals to obtain independent third-party repair and service for their medical devices generally – and obtain the instruments and service separately from the da Vinci specifically. DePasquale Rep. at 16-18.

████████████████████████  ████████████████████████

████████████████ Moreover, Professor DePasquale found that customers prefer to purchase the instruments and the service separately to manage costs. Id. at 3-4.

Contrary to the teaching of the Supreme Court, Intuitive still insists that the EndoWrist instruments and the da Vinci service "cannot constitute separate products as a matter of law." Dkt. 109 at 37. First, Intuitive argues that it has "always bundled sales of the robot with the instruments and service." As discussed above, this is contrary to the facts. In fact, Intuitive never agrees to provide the instruments or the service for the life of the robot at any price. Intuitive merely exerts its monopoly power in surgical robots to prohibit customers from turning to competitive alternatives in the instrument and service aftermarkets.

Second, Intuitive claims that other surgical robot manufacturers in the market bundle the instruments and service with the robot. As a preliminary matter, it is not relevant because Intuitive itself does not bundle the instruments and service with the robot. ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ That fact only underscores that Intuitive does not bundle the instruments and

---

[10] Instead, Intuitive relies on its monopoly power in the primary market for surgical robots to impose terms in the SLSA that prevent da Vinci users from turning to third parties in the aftermarkets after the purchase of the robot.

service with the da Vinci.  Moreover, there are billions of reasons why Intuitive does

not bundle them or need to bundle the instruments and service with the da Vinci.

## C.      Anticompetitive Conduct

Intuitive denies that there is evidence of illegal tying or exclusive dealing in

this case.  Doc. 109 at 40.

### 1.      Illegal Tying

"A tying arrangement is an agreement by a party to sell one product but only

on the condition that the buyer also purchases a different (or tied) product, or at least

agrees that he will not purchase that product from any other supplier." *Kodak*, 504

U.S. at 451 (citation and internal quotation marks omitted).  The plaintiff can prevail

on a tying claim by showing four elements under a per se analysis:

> 1) that there are two separate products, a "tying" product and a "tied"
> product; 2) that those products are in fact "tied" together—that is, the
> buyer was forced to buy the tied product to get the tying product; 3) that
> the seller possesses sufficient economic power in the tying product
> market to coerce buyer acceptance of the tied product; and 4)
> involvement of a "not insubstantial" amount of interstate commerce in
> the market of the tied product.

*Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1574 (11th Cir. 1991); *see also*

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1296 n.4

(11th Cir. 2010) ("A tying arrangement violates § 1 of the Sherman Act if the seller

has market power in the tying product market and the tying arrangement affects a

substantial volume of commerce in the tied product market.").[11]   Intuitive only challenges the first and third elements – separate products and tying power – of the per se analysis.  Doc. 109 at 41.  Intuitive also argues that the tying claims in this case must be analyzed under the rule of reason and that Restore is therefore required to show anticompetitive effects in the tied market.[12]  Id.

---

[11] *Thompson*, 934 F.2d at 1574 (citations omitted):

> Any alleged antitrust violation may be analyzed under either a per se rule or a rule of reason. This Court has held that unless the alleged anti-competitive behavior falls within a few narrow classes, the behavior should be analyzed under the rule of reason. While tying arrangements are one of the classic per se forms of anti-competitive behavior, we have recognized that tying claims can also be analyzed under the rule of reason. Court has held that, unless the plaintiff is able to show all the elements of a per se tying claim, the claim must be analyzed under the rule of reason.

[12] Respectfully, this Court erred in observing in dicta that "tying arrangements involving patented products should be evaluated under the [rule of reason] rather than under the per se rule" under *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 36 (2006).  *Restore Robotics*, 2019 WL 8063989, *3 n.3.  The Supreme Court in *Illinois Tool Works* was merely addressing the issue of whether the existence of a patent was per se evidence of market power in a tying product.  547 U.S. at 31.  That was the "per se rule" at issue in the case.  The Supreme Court was referring to the analysis of market power specifically in tying agreements – rather than the analysis of tying agreements generally – "in cases like *Fortner II* and *Jefferson Parish*." *Id.* at 42.  Thus, the Supreme Court merely held that illegal tying "must be supported by proof of power in the relevant market rather than by a mere presumption thereof." *Id.* at 43.  A tying arrangement can still be subject to per se analysis.  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 n. 7 (9th Cir. 2012); *see also Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1296 n.4 (11th Cir. 2010).

### a.   Separate Products

Intuitive renews its argument that there are no separate aftermarkets for repairing and replacing EndoWrist instruments or servicing da Vinci robots. As discussed in Section II.B.2, Professor DePasquale has properly defined instrument and service aftermarkets. Restore agrees that Professor DePasquale did not define a parts aftermarket separately from the service aftermarket. To the extent that Count 3 relies on tying service to parts, Restore abandons that aspect of the claim.

### b.   Market Power

For purposes of a tying claim, market power is the ability of the seller "to force a purchaser to do something that he would not do in a competitive market."[13] *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14 (1984). "The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." *Kodak*, 504 U.S. at 464. Here, Intuitive has a ▮▮▮▮ share of the surgical robot market and a ▮▮▮ share of the da Vinci service aftermarket. DePasquale Rep. at 12. In addition, Intuitive charges monopolistic prices and has succeeded in blocking successful entry of much cheaper alternatives in the instrument and service aftermarkets. DePasquale Rep. at 12, 21. In the face of evidence of increased prices and excluded competition, the defendant bears a

---

[13] Contrary to the suggestion in the motion, a tying claim does not require a showing of *monopoly power* in the tying product. *Kodak*, 504 U.S. at 481 ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

"substantial burden" of showing at summary judgment that "an inference of market power is unreasonable." *Kodak*, 504 U.S. at 469.

Here, Intuitive is not constrained in the aftermarkets because the da Vinci is so dominant and so unique in the primary market as well. DePasquale Rep. at 16; *see also Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978). In fact, Intuitive does not dispute that the da Vinci is unique in its technology – such as its immersive 3DHD, tremor control, intuitive motion, and wristed instruments – along with its extensive knowledge and experience base among its network of surgeons and its clearances for an unparalleled scope of use. Dkt. 109-37 at 80 & n.233. Moreover, there is abundant evidence of its dominant position in the surgical robot market. Supra at 3.

Intuitive only raises two points. Dkt. 109 at 42-43. First, Intuitive notes that Professor DePasquale did not define a parts aftermarket separate from the service aftermarket. As discussed in Section II.C.1.b above, Restore is abandoning Count 3 to the extent that the claims relies on tying service to parts. Second, Intuitive argues that the tying claims are dependent on the expert testimony of Professor DePasquale and refers the Court to its separate motion to exclude that testimony. Restore disputes that her testimony on the issue must be excluded under *Daubert* and addresses the admissibility of her opinions in its separate response to that motion.

### c.    Anticompetitive Effects

In the absence of a per se violation, the plaintiff must show anticompetitive effects through direct evidence (such as reduced output, increased prices, or decreased quality in the relevant market) or indirect evidence that the challenged restraint harms competition.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). Intuitive does not argue that Restore has failed to provide evidence that the ties here resulted in higher overall prices in the aftermarkets.

In fact, Professor DePasquale discussed the likely presence of supracompetitive prices based on the Lerner Index of Monopoly Power.  "There are generally accepted economic means of analyzing the probability that given prices are supracompetitive using price and marginal cost."   In re Aggrenox Antitrust Litig., 199 F. Supp. 3d 662, 667 (D. Conn. 2016).  The Lerner Index is a well accepted method of identifying evidence of supracompetitive prices and monopoly power.  In re Opana ER Antitrust Litig.,  2021 WL 2291067, at *9 (N.D. Ill. June 4, 2021), In re Aggrenox Antitrust Litig., 199 F. Supp. 3d at 667.

> In a perfectly competitive environment, the profit-maximizing price equals marginal cost. In such an environment, firms continue to expand production until their return in revenue no longer exceeds the cost of producing the next unit of production.
>
> In the real world, market forces put pressure on the relation between price and marginal cost to tend toward some optimal level. Moreover, prices reflect changes in marginal cost. In an environment with little competition, however, firms naturally can charge relatively

higher prices in relation to costs. "Accordingly, non-competitive performance could be indicated by prices greater than marginal cost ...."

In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1362–63 (N.D. Ga. 2000) (citations and parentheticals omitted).

Here, Professor DePasquale found Intuitive exercises a "very high degree of monopoly power" in robots based on its gross margins of ▇▇▇▇▇▇ from 2011 to 2019. DePasquale Rebuttal Rep. at 4 & n. 12. She made similar conclusions for the instrument aftermarket and the service aftermarket. DePasquale Rep. at 12, 15, DePasquale Rebuttal Rep. at 6-9. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Professor DePasquale also explained how the tying has substantial anticompetitive effects by preventing customers from turning to competitive alternatives at much lower prices and restricts the output in the aftermarkets by limiting the availability of robotic surgery due to the costs. DePasquale Rep. at 20-21. In fact, a significant number of customers would turn to the lower prices offered by Restore in the absence of the restraints. DePasquale Rep. at 31. Intuitive has

---

[14] "The median gross margin for S&P 500 companies is 37.4%. ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

excluded all competition in those aftermarkets and secured a 100% share of the aftermarkets.

Instead, Intuitive argues that customers would pay a higher combined price for the tying and tied products if they had been sold independently.  Dkt. 109 at 43-44 (citing *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1360, 1361-62 (S.D. Fla. 1998)).  But the customers at issue here – purchasers of Si instruments and service –already acquired their Si robots.  Intuitive discontinued the manufacture of and sale of the Si years ago after the introduction of the Xi in 2014.  ████

████████████████████████████████████████████████  In fact,

Intuitive is sunsetting its sale of instruments and service to support the Si.  ██████

████████████  it would not make economic sense for Intuitive to raise prices in the aftermarkets in response to competition in the aftermarkets.  DePasquale Rep. at 18-21, DePasquale Rebuttal Rep. at 15, DePasquale Dep. at 124:21-124:25, Dkt. 109-37 ¶ 154.  And the customers already paid the monopoly price for the robot.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████  Professor DePasquale explained that customers are forced to pay the highest possible combined price for the tying and tied products because they must buy the robots, the service, and the instruments at the separate monopolistic prices charged

by Intuitive for each of those products.  DePasquale Rep. at 4, 12-16, DePasquale Rebuttal Rep. at 4-5, 15.

If the instruments were not tied to the robots and the service, customers would still have to purchase the robot and service at the same monopolistic prices from Intuitive – but would have the option of repairing instruments with Restore at lower prices.  In other words, elimination of the tying would not change any of the prices charged by Intuitive – but would reduce overall prices for customers in the aftermarkets.  In sum, Intuitive does not offer a superior financial deal by tying one monopoly to another monopoly.

Professor DePasquale also cited the real-world example of the Polaroid camera from Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, Sixth Edition (2005), at 400-402.  DePasquale Rebuttal Rep. at 15.  ██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ But this is not the bundling of a free battery with a children's toy.  In fact, Professor DePasquale explains that ████████ a superior financial deal is "contrary to the economic reality in this case."  DePasquale Rebuttal Rep. at 15.

### d.    Unreasonable Restraint

In the absence of per se liability, the plaintiff must also offer evidence that the tying arrangement "unreasonably restrained competition." *Jefferson Parish*, 466 U.S. at 29.  Once the plaintiff offers evidence of a substantial anticompetitive effect, the burden shifts to the defendant to show a procompetitive rationale for the restraint.[15] *American Express*, 138 S. Ct. at 2284.  "[M]erely offering a rationale for a vertical restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a pro-competitive effect." *Graphic Prod. Distributors, Inc.*, 717 F.2d at 1576.  Intuitive references two rationales based on documents and testimony from fact witnesses – ensuring patient safety and providing customer guarantees.  Dkt. 99 at 45; see also Dkt. 99 at 39 and ¶¶ 16-20.

Of course, there is no safety defense in antitrust law.  *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 695 (1978).

> Exceptions to the Sherman Act for potentially dangerous goods and services would be tantamount to a repeal of the statute. In our complex economy the number of items that may cause serious harm is almost endless—automobiles, drugs, foods, aircraft components, heavy equipment, and countless others, cause serious harm to individuals or to the public at large if defectively made. The judiciary cannot indirectly protect the public against this harm by conferring monopoly privileges on the manufacturers.

---

[15] "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  Id.

Id. at 695–96.

Since product specifications are a less restrictive means of protecting quality, the Supreme Court has also uniformly rejected "goodwill" defenses for tying arrangements and has expressly refused to provide a broader exception for the health care industry. *Jefferson Parish*, 466 U.S. at 25 n.42.  Here, Intuitive could protect goodwill by specifying product standards for either the robot or the instruments.  It chooses not to do so.[16]

In fact, physicians here are "left to their own devices":

> ███████████████████████████████████  In fact, physicians are simply left to their own devices, quite literally, because Intuitive does not disclose performance specifications to the public for the surgeon to have any manufacturer guidance for determining functionality and safety on the first or any subsequent use of the EndoWrist instrument. ████████████████████████████████████████████ Of course, Intuitive could resolve any question regarding safety by disclosing performance specifications for the instruments, which allow the surgeon to assess the safety of the new, used, or repaired instrument, rather than simply blocking the surgeon from using repaired instruments.

---

[16] Intuitive could also protect its goodwill in the reputation of the robot by providing access to the toolkit.  Intuitive cannot have its cake and eat it too.  While Intuitive may be entitled to choose refuse access to the toolkit under the ruling of this Court, Intuitive cannot refuse access to the toolkit and argue at the same time that it prevents third-party service out of concern for maintaining the safety and reputation of the da Vinci.

DePasquale Rebuttal Rep. at 10-11 (citations omitted).[17]  See also Rosa Dep. at 50:5-52:19.

In fact, the usage limits themselves appear to be pretextual.  Intuitive limits nearly all Si EndoWrists to 10 uses.  ███████████  Those limits have not changed for more than 20 years.  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

In addition, Intuitive points to the limited one-year warranty on the robot in its SLSA.  ███████████████████████████████████████

---

[17] Professor DePasquale also explains why the restraints here do not promote innovation, address principal-agent issues, prevent free riding on intellectual property, or offer a "superior financial deal."  DePasquale Rebuttal Rep. 10-15.  Nor are they necessary to achieve such aims.  Id.  Note that these justifications are also pretextual.  ███████████████████████████████████████

██████████   ████████████████████████████████████████████████

████████████████████████████████████████   ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████   In fact,

Intuitive holds monopoly power in the robot market and can charge monopolistic prices that account for any incremental costs relating to the warranty.

Moreover, the limited one-year warranty itself provides the customer with the choice of using OEM aftermarket products and services only in exchange for free repair or replacement of the robot in the event of any defects in the robot.[18]   The warranty is voided if the customer turns to competitive alternatives in the aftermarket during that first year of ownership.  The limited one-year warranty does not restrict the customer from purchasing instruments and service from Intuitive.  Presuming that the limited one-year warranty itself has substantial procompetitive effects, the addition of the ties elsewhere in the SLSA takes away the customer's choice to take advantage or not take advantage of the warranty and binds the customer to Intuitive solely for instruments and service in perpetuity for the lifetime of the robot.

---

[18] The limited one-year warranty appears to cover the "System" but not the "Instruments and Accessories." ██████████████████████████████████████████
████████████

## 2.    Exclusive Dealing

In order to prevail at trial, Restore will need to show that the exclusive dealing arrangements in this case foreclose a "substantial share of the relevant market." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328, (1961).   The inquiry requires an analysis of the "practical effect" of exclusive dealing arrangements. *McWane*, 783 F.3d at 834 (quoting Tampa Electric).   The Eleventh Circuit looks at "market realities" rather than "formalistic distinctions."   *McWane*, 783 F.3d at 834-35 (11th Cir. 2015), *Restore Robotics*, 2019 WL 8063989, at *3.

In sum, Intuitive

forecloses competition in a substantial share, i.e., 100%, of the instrument and service aftermarkets.

Nevertheless, Intuitive makes three arguments.  Dkt. 109 at 46-47.  First, Intuitive points to its prior argument that there is no relevant instrument or service aftermarket.  Restore refers to its response above in Section II.B.2.  Second, Intuitive argues that the Restore cannot show that the arrangements in the SLSA are likely to result in supracompetitive prices for instruments or service.  Restore refers to its response above in Section II.C.1.c.

Finally, Intuitive argues that its customers are not required to formally enter long-term service contracts and that customers may opt for obtaining preventative maintenance and parts replacement on a "time and materials" basis from Intuitive. Of course, it does not change the fact that every customer is effectively locked into using Intuitive for their robot service and instrument replacement exclusively for the life of the robot.

### D.     Unused EndoWrists

Restore claims that Clif Parker Robotics ("CPR") has been injured by the anticompetitive conduct in this case because CPR obtains and sells partially used and unused EndoWrists that have not reached the usage limits imposed by Intuitive. Intuitive argues that there is no evidence supporting such an allegation. ████

████████████████████████████████████████████████████



### E.    Tortious Interference

Intuitive moves for summary judgment on its tortious interference claim. Intuitive agrees that it must show intentional and unjustified interference with the contractual or business relationship and that damages resulted from the tortious interference.[19]  Dkt. 109 at 47; *see also Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998).   Without evidence that Restore acted out of pure malice, a tortious interference claim may succeed if improper methods were used.  *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004), *Restore Robotics*, 2019 WL 8063988, at \*2 n.5.

In fact, customers would still use Restore but for the interference of Intuitive. Therefore, Intuitive has failed to show the undisputed fact that Restore

---

[19] As a preliminary matter, Restore disputes the fact that it knew the terms of any contracts between Intuitive and the customers at issue.  Se

obtained sales through improper means or the undisputed fact that Intuitive lost any sales through such improper means employed by Restore.

## III.    Conclusion

For the foregoing reasons, the motion for summary judgment should be denied.

Respectfully submitted on December 10, 2021.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800 (telephone)
jeff@berhold.com

/s William G. Harrison, Jr.
William G. Harrison
HARRISON RIVARD DUNCAN & BUZZETT
FL. Bar No. 0765058
101 Harrison Avenue
Panama City, FL 32401
850-769-1414 (telephone)
wharrison@harrisonrivard.com

**COUNSEL FOR PLAINTIFFS**

*Admitted Pro Hac Vice

Pursuant to Local Rule 7.1(F), the memorandum contains 9,818 words.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIRS LLC,

          Plaintiffs,

     v.

INTUITIVE SURGICAL, INC.,

          Defendant.

INTUITIVE SURGICAL, INC.,

          Counterclaimant,

     v.

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIRS LLC,

          Counterclaim Defendants.

Civil Case No. 5:19-cv-55-TKW-MJF

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2021, I served the **PLAINTIFFS RESTORE ROBOTICS LLC, RESTORE ROBOTICS REPAIRS LLC, AND CLIF PARKER ROBOTICS LLC'S RESPONSE IN OPPOSITION TO DEFENDANT INTUITIVE SURGICAL, INC.'S MOTION FOR SUMMARY JUDGMENT** to the following counsel of record via email:

| | |
|---|---|
| ALLEN J RUBY | allen@allenruby.com |
| ABRAHAM M ANDRADE, III | abraham.andrade@skadden.com |
| KAREN MARY LENT | karen.lent@skadden.com |
| LANCE A ETCHEVERRY | lance.etcheverry@skadden.com |
| MICHAEL H MENITOVE | michael.menitove@skadden.com |

MICHAEL SCOTT BAILEY       michael.bailey@skadden.com
MICHAEL WILLIAM FOLGER   michael.folger@skadden.com
JORDAN ADAM FEIRMAN     jordan.feirman@skadden.com
DAVID LEE MCGEE           dlm@beggslane.com

                    s/ Jeff Berhold
                  Jeffrey L. Berhold
                  COUNSEL FOR PLAINTIFFS