**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

RESTORE ROBOTICS LLC,
RESTORE ROBOTICS REPAIRS LLC,
and CLIF PARKER ROBOTICS LLC,

                   Plaintiffs,

    v.

INTUITIVE SURGICAL, INC.,

                   Defendant.

INTUITIVE SURGICAL, INC.,

                   Counterclaimant,

    v.

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIRS LLC,

                   Counterclaim Defendants.

Civil Case No. 5:19-cv-55-TKW-MJF

**INTUITIVE SURGICAL, INC.'S OPPOSITION TO
MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY**

Defendant and Counterclaimant Intuitive Surgical, Inc. ("Intuitive") respectfully submits this Opposition to the Motion to Exclude Certain Expert Testimony filed by Plaintiffs and Counterclaim-Defendants Restore Robotics LLC, Restore Robotics Repairs LLC, and Clif Parker Robotics LLC (together, "Restore") ("Motion") (ECF 107).

## PRELIMINARY STATEMENT

The Motion challenges the admissibility of certain expert opinions of Heather Rosecrans, Dr. Sara Parikh and Dr. John Bomalaski.  As explained below, these expert witnesses opine on a number of topics relevant to Restore's Sherman Act claims and/or Intuitive's counterclaims.  Each expert has prepared a detailed report setting forth her or his opinions and explaining how they will assist the jury to understand the evidence being presented and determine facts in issue.  The Motion provides the Court with virtually no context concerning the litigation or information concerning the nature and scope of the anticipated testimony from any of the three experts.  Instead, it employs a scattershot approach, setting forth arguments that generally lack legal support and often mischaracterize the record. These arguments crumble under scrutiny, and are nothing more than a futile attempt to shield from the jury experts who are plainly qualified and who have employed reliable methodologies to arrive at their opinions.  For the reasons set forth below, the Motion should be denied.

## ARGUMENT

## I.  LEGAL STANDARDS

Expert testimony is admissible when the proponent establishes that (1) "the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in [*Daubert*]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Roberts v. Mitchell*, No. 3:20-cv-751-TKW-EMT, 2021 WL 2099306, at *1 (N.D. Fla. Mar. 31, 2021) (Wetherell, J.) (quoting *United States v. Delva*, 922 F.3d 1228, 1251 (11th Cir. 2019)).

The court's "gatekeeping function under Rule 702 is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Mitchell*, 2021 WL 2099306, at *2 (quoting *Hanna v. Ward Mfg., Inc.*, 723 F. App'x 647, 650 (11th Cir. 2018)).

"A district court may decide that nonscientific expert testimony is reliable based upon [the expert's] personal knowledge or experience." *American Gen. Life Ins. v. Schoenthal Family*, 555 F.3d 1331, 1338 (11th Cir. 2009) (internal quotation

omitted); *see also Brinkman v. Acct. Resol. Servs.*, No. 8:20-CV-2453-VMC-AAS, 2021 WL 4340413, at *3 (M.D. Fla. Sept. 23, 2021).  This Court routinely admits expert testimony based solely on the expert's training and experience.  *See Mitchell*, 2021 WL 209930, at *4-5 (holding expert opinions "sufficiently reliable because those opinions [we]re based on the relevant scholarship … other literature … studies … and [expert's] own experience as a scholar"); *TRA Farms, Inc. v. Syngenta Seeds, Inc.*, No. 5:12-CV-378-MW/EMT, 2014 WL 3844838, at *3 (N.D. Fla. Apr. 14, 2014) (holding expert's "experience-based opinion [wa]s sufficiently reliable" because it was based on the expert's "detailed observations" of Plaintiff's watermelon crops and growing practices, his "personal observations of the seeds discovered in [those] watermelons" and "his nearly 30 years of experience as a crop consultant that he relied upon in forming his opinions"); *Webber v. Nat'l Gen. Assurance Co.*, No. 4:14-cv-490-MW/CAS, 2015 WL 11109452, at *2 (N.D. Fla. Nov. 3, 2015) (holding expert opinions on RV mechanical problems were reliable because they "clearly flow[ed] from [the expert's] knowledge of the design of [RVs] and his extensive experience as an appraiser and RV dealer").

## II.   THERE IS NO BASIS TO EXCLUDE TESTIMONY FROM HEATHER ROSECRANS

### A.   <u>Heather Rosecrans's Qualifications and Expert Opinion</u>

Heather Rosecrans is an FDA regulatory affairs consultant who specializes in 510(k) clearance issues.  (Mot. Appx. No. 4 ("Rosecrans Rep.") ¶1.)  Between

1978 and 2010, Ms. Rosecrans worked at FDA's headquarters in the office responsible for 510(k) submissions.  (*Id.* ¶¶3-12.)  Notably, between 1992 and 2010, Ms. Rosecrans served as the head of FDA's 510(k) program and was the "primary contact [at FDA] on issues related to the implementation of the 510(k) requirements under [the Federal Food, Drug, and Cosmetic Act ("FDCA")] to ensure the uniform interpretation of the law."  (*Id.* ¶¶8-13.)  Since leaving FDA, Ms. Rosecrans has consulted on issues relating to 510(k) submissions and stayed abreast of developments at FDA concerning the 510(k) program.  (*Id.* ¶¶14-16.)

Intuitive retained Ms. Rosecrans to opine on issues concerning 510(k) clearance and related regulatory requirements.  Ms. Rosecrans opines that by selling customers Interceptor boards as part of "repaired" EndoWrist instruments ("EndoWrists"),[1] Restore placed finished medical device components into commerce, and was thus a "manufacturer" requiring 510(k) clearance.  (*Id.* ¶¶91-111, 134-146.)   In addition, Ms. Rosecrans opines that by overriding EndoWrist use limits with the Interceptor, Restore significantly changed EndoWrist's intended use, and was thus a "remanufacturer" requiring 510(k) clearance.  (*Id.* ¶¶112-146.)  Ms. Rosecrans offers additional opinions that relate to the regulatory positions

---

[1]  Restore offers a service—which it deceptively calls EndoWrist "repair"—that involves the insertion into S or Si EndoWrists of the "Interceptor," a printed circuit board, that disables Intuitive's use counter, allowing the EndoWrists to be used beyond their prescribed and FDA-cleared use limits.  (ECF 109 at 14.)

Restore adopted and the reasonableness of Intuitive's actions in response, including:

(i)      EndoWrists received 510(k) clearance from FDA as limited use devices subject to use limits, and any attempt to remove such limits is not permitted (*id.* ¶¶ 73-76);

(ii)     FDA's finding of substantial equivalence between EndoWrists and predicate devices does not mean that the two types of instruments are identical or that EndoWrist's 510(k) clearance does not encompass use limits (*id.* ¶¶77-82);

(iii)    Intuitive's marketing and sale of EndoWrists with use limits was consistent with FDA's 510(k) clearance and labeling requirements (*id.* ¶¶83-90);

(iv)     Restore's position that there are only two categories of instruments that receive 510(k) clearance (single-use or multi-use) is incorrect (*id.* ¶¶128-130);

(v)      Intuitive's customer communications that conveyed Restore required 510(k) clearance for EndoWrist "repairs" were appropriate and based on a reasonable interpretation of FDA law (*id.* ¶¶91-150); and

(vi)     Restore failed to adequately investigate whether 510(k) clearance was needed for its "repair" business prior to making that representation to customers (*id.* ¶¶151-155).

Restore does not challenge Ms. Rosecrans's qualifications, and thereby concedes that she is qualified to provide expert testimony.  Rather, Restore argues

that (1) her opinions "will not be helpful to the trier of fact" because "[t]he Court has already ruled that it will not adjudicate the question of whether Restore must obtain clearance for its instrument repairs from the FDA"; and (2) her methodology is unreliable because 'there is too great an analytical gap' between her opinion and the facts in the case." (Mot. at 3-4.) For the reasons described below, Restore's arguments fail.

### B.   Ms. Rosecrans's Opinions Are Relevant to Issues to Be Decided in Resolving Restore's Sherman Act Claims

Although unclear from the Motion, Restore appears to challenge the relevance of Ms. Rosecrans's opinions to Intuitive's counterclaims. (*See* Mot. at 4 (citing as sole authority for its exclusion argument the Court's motion to dismiss ruling on Intuitive's counterclaims).) Restore ignores that Ms. Rosecrans's opinions are offered for and relevant to numerous issues to be decided in resolving Restore's Sherman Act claims.

*First*, as set forth in Intuitive's motion for summary judgment, Restore bears the burden to prove that its business was lawful in order to establish antitrust injury. (ECF 109 at 4, 24-29.) Restore cannot meet this burden because a superseding regulatory scheme—the requirement that Restore obtain 510(k) clearance to lawfully market its "repair" service—breaks the chain of causation. (*Id.* at 25 (citing *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868

F.3d 132, 163-165 (3d Cir. 2017); *RSA Media, Inc., v. AK Media Grp. Inc.*, 260
F.3d 10, 15 (1st Cir. 2001)).)

The undisputed record demonstrates that FDA has repeatedly and
unambiguously stated that "repair" of EndoWrists using the Interceptor technology
requires 510(k) clearance, which Restore has not received.  (ECF 109 at 17-22.)
To the extent the Court determines any fact issues exist concerning Restore's
ability to establish the legality of its business, Ms. Rosecrans's opinions would
assist the trier of fact by providing a road map to the 510(k) regulatory framework
(Rosecrans Rep. ¶¶17-60), the requirements for a 510(k) and the review process
(*id.* ¶¶32-51), FDA's approach to remanufacturing, refurbishing and servicing (*id.*
¶¶66-69), Restore's compliance with these regulations and rules (*id.* ¶¶91-130,
134-139, 151-55), and the import of FDA's interactions with Restore and its
licensor, Rebotix, concerning 510(k) clearance for the Interceptor technology (*id.*
¶¶140-146).  These opinions would also help the jury determine any fact issues
concerning Restore's allegation that it offers permissible "repair services" under
FDA regulations.  (ECF 77 ("Compl.") ¶¶80-81.)

Courts permit FDA expert testimony when compliance with FDA
regulations is relevant to resolution of antitrust injury or any other element of
plaintiff's claims.  *See e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mkt., Sales
Prac. & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2021 WL 2577490, at *34-36

(D. Kan. June 23, 2021) (finding FDA expert's testimony helpful to the trier of fact when offered to rebut defendants' argument that FDA's delayed approval "'br[oke] the chain of causation' and preclude[ed] defendants from incurring liability" (citation omitted)); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, MDL No. 2445, et al., 2020 WL 6887885, at *45-48 (E.D. Pa. Nov. 24, 2020) (rejecting argument that expert's opinions concerning violations of FDA regulations were irrelevant because "those violations are relevant to Plaintiffs' proof of an overarching scheme that had an anticompetitive effect").[2] Ms. Rosecrans's opinions are thus relevant and helpful to a jury should any material fact issue exist—which it does not—with respect to Restore's requirement to prove antitrust injury.

*Second*, in alleging that Intuitive engaged in anticompetitive conduct, Restore alleges that EndoWrist use limits are: (i) meant solely to extract monopoly profits (Compl. ¶88); (ii) not based on any FDA regulatory requirements (*id.* ¶89); (iii) not justified given FDA's substantial equivalence determination, which is

---

[2]  Courts have also permitted FDA experts in the context of product liability cases to opine on whether defendants have complied with applicable FDA regulations, including regulations governing the 510(k) process, so long as the compliance or noncompliance with FDA regulations is not the ultimate legal issue presented before the jury. *See, e.g.*, *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1329 (M.D. Fla. 2015); *Cason v. C.R. Bard, Inc.*, No. 1:12-CV-1288-MHS, 2015 WL 9913809, at *12 (N.D. Ga. Feb. 9, 2015).

based on predicate laparoscopic instruments that do not have use limits (*id.* ¶91); and (iv) not part of EndoWrist's 510(k) clearance (*see id.* ¶93).  Ms. Rosecrans offers a number of opinions that will assist the jury in determining these issues, including:  (i) FDA cleared EndoWrists as limited use devices subject to use limits; (ii) it is impermissible to remove EndoWrist's use limits given FDA's clearance of EndoWrists with use limits; (iii) Intuitive's position that EndoWrist's 510(k) clearance included use limits was reasonable.[3]  (*See supra* at 5-6.)

**Third**, Restore challenges Intuitive's procompetitive justifications for representing to customers that use of Restore "repaired" instruments lacking 510(k) clearance was unsafe.  (*See* Compl. ¶¶99-100.)  These communications about which Restore complains inform customers of the risks of using Restore-"repaired" EndoWrists that lack 510(k) clearance.  (Ex. 1 at Intuitive-00044524-25.)  Ms. Rosecrans's opinions on whether Restore's "repair" service required 510(k) clearance will assist the jury in determining whether Intuitive had reasonable (and procompetitive) grounds to warn customers that Restore's remanufactured EndoWrists lacked 510(k) clearance.  Courts have found such

---

[3]  In its motion for summary judgment, Restore concedes that it is a material question of fact concerning Intuitive's motivations for enforcing EndoWrist use limits.  (*See* ECF 112 at 3 (describing the purported reasons why Intuitive forces its contractual requirements with use limits); *id.* at 7 (describing use limits as "imposed by Intuitive").)  These motivations include making sure EndoWrists are used and marketed consistent with their 510(k) clearance.  (*See* Ex. 1.)

testimony by FDA experts on the reasonableness of defendant's conduct permissible and helpful to the jury.  *See Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1262-63 (N.D. Ala. 2017).

*Fourth*, as part of its argument that it is permitted to override EndoWrist use limits, Restore alleges that FDA only recognizes single-use and multi-use instruments, and thus "repair" of the multi-use EndoWrists is permissible.  (Ex. 2 at Restore-00012175.)  Ms. Rosecrans offers opinions that will assist the fact finder in understanding that this position is not supported by FDA regulations and practice.  (*See supra* at 6.)

In sum, to the extent Restore's claims move beyond summary judgment, Ms. Rosecrans's opinions will assist the jury in determining fact issues relevant to those claims, and are thus admissible.

### C.    The Court is Permitted to Adjudicate Restore's Compliance With FDA Regulations

Restore claims the Court has held that "it will not adjudicate the question of whether Restore must obtain clearance for its instrument repairs from the FDA." (Mot. at 4.)  In fact, the Court simply declined to determine the truth or falsity of Restore's representations concerning 510(k) clearance in the context of one of Intuitive's Lanham Act counterclaims.  *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2019 WL 8063988, at *2-3 (N.D. Fla. Nov. 14, 2019).  The Court relied on a narrow exception to the rule that the FDCA generally does not preclude

11

civil claims under the Lanham Act.[4]  This exception, which may no longer be good

law after the Supreme Court's decision in *POM Wonderful LLC v. Coca-Cola Co.*,

573 U.S. 102 (2014), applies only when a ***plaintiff's*** lawsuit to enforce the Lanham

Act "would 'circumvent the FDA's exclusive authority by seeking to prove that

defendants violated the FDCA, ***when the FDA did not reach that conclusion***.'"

*Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1199 (11th Cir. 2018)

(quoting *PhotoMedex*, 601 F.3d at 928) (emphasis added).[5]

　　　The circumstances in this case are totally distinct from those in *Hi-Tech*.

The Court has already dismissed Intuitive's counterclaim that arguably impinges

on the FDA's exclusive purview, *Restore Robotics,* 2019 WL 8063988, at *2-3,

and the only remaining claims that implicate the FDCA are Restore's antitrust

claims.  Restore is not seeking to enforce the FDCA; however, to support its claims

---

[4]  It is well-established that the FDCA does not preclude parties from "protect[ing] their commercial interests by suing competitors [under the Lanham Act] for false advertising, even for products regulated by the FDA."  *Belcher Pharm. LLC v. Hospira Inc.*, 1 F.4th 1374, 1380-81 (11th Cir. 2021) (interpreting and applying *POM Wonderful*, 573 U.S. at 115, 118.

[5]  The Eleventh Circuit recognized this exception based on the Ninth Circuit's holding in *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010).  *Hi-Tech Pharm.,* 910 F.3d at 1199.  Judge Chhabria recently held in related litigation against Intuitive that "*PhotoMedex* is no longer good law" following the Supreme Court's decision in *POM Wonderful*, and that a Lanham Act claim challenging the truthfulness of advertisements concerning 510(k) clearance was not precluded by the FDCA.  *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.* ("*SIS*"), No. 21-CV-03496-VC, 2021 WL 5474898, at *6 (N.D. Cal. Nov. 23, 2021).

under the Sherman Act, it is required to prove antitrust injury and that Intuitive engaged in anticompetitive conduct.  And the undisputed facts demonstrate that FDA repeatedly stated that inserting the Interceptor into EndoWrists to override use limits requires 510(k) clearance.  (ECF 109 at 26-27.)

Restore's attempt to draw a broader preclusion principle to shield scrutiny of its Sherman Act claims is wholly improper.  There is no categorical bar to the Court's evaluation of Restore's compliance with FDA regulations for purposes of determining an element of Restore's claims.  *See, e.g.*, ECF 109 at 25-26 (citing cases permitting courts to evaluate the legality of conduct under a regulatory scheme to determine antitrust standing); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, MDL No.  2445, 2020 WL 6887885, at *47 (E.D. Pa. Nov. 24, 2021).  Indeed, as Judge Chhabria recently held in the related *SIS* litigation, "[c]ourts regularly evaluate the lawfulness of a party's behavior under federal regulations.  That the regulations here come from the FDA make no difference."  *SIS*, 2021 WL 5474898, at *7 n.8.

### D.  <u>Ms. Rosecrans's Opinions Are Reliable</u>

Restore's argument that there is "'too great an analytical gap' between [Ms. Rosecrans's] opinion and the facts in the case" is unfounded.  As an initial matter, Restore mischaracterizes the "facts in the case."  Far from knowingly permitting anyone to deploy the "repair" technology at issue, FDA has repeatedly informed

Restore (and Rebotix, the licensor of the technology) that "repair" of EndoWrists by overriding the use counter is remanufacturing that requires 510(k) clearance. (ECF 109 at 26-27.)  Indeed, just recently, on November 16, 2021, FDA informed Rebotix that it "may be remanufacturing the da Vinci S EndoWrist Instruments . . . in a manner that potentially violates the FD&C Act," and demanded Rebotix submit a written response to the Allegations of Regulatory Misconduct Team.[6] (Ex. 3.)  This letter is consistent with FDA's stated position, as well as the conclusion of Restore's own regulatory consultant who testified that insertion of a printed circuit board, like the Interceptor, into an EndoWrist requires 510(k) clearance.  (ECF 109 at 21.)

Ms. Rosecrans analyzed these facts and others in the record in preparing her report.[7]  She drew upon FDA law and regulations (none of which Restore disputes)

---

[6]  In light of this new evidence, and after Rebotix submits its response to FDA's November 16, 2021 letter (which is due on December 16, 2021), Intuitive anticipates submitting a supplemental report for Ms. Rosecrans on the opinions she expects to offer at trial addressing these developments.

[7]  Restore's argument that Intuitive "does not believe 510(k) clearance is necessary to repair the instruments" is meritless.  (Mot. at 4.)  It is based on a mischaracterization of an Intuitive document reflecting that Intuitive, which holds 510(k) clearance for EndoWrists, believed it could create a "Non-Filing Justification," commonly known as a "Letter to File," instead of submitting a 510(k).  (*See* Intuitive Surgical, Inc.'s Response in Opposition to Restore's Motion for Summary Judgment ("Intuitive MSJ Opposition") at 7, which is being filed concurrently with this opposition.)  Nor would such an analysis apply to Restore's use of the Interceptor technology to override use limits.  (Mot. Appx. No. 4 ¶133.)  In any event, the record is replete with evidence that Intuitive took the position that
*(cont'd)*

and her own extensive experience with 510(k) clearance (none of which Restore challenges), and explained how they supported her opinions.  Such a methodology is plainly reliable under *Daubert* and its progeny.  *See, e.g.*, *Roberts*, 2021 WL 209930, at *1, 4 (finding expert testimony "sufficiently reliable" where based on expert's experience and relevant scholarship).  If anything, Restore is criticizing Ms. Rosecrans's conclusions and her interpretation of the record, but that is not a proper ground for challenging an expert's reliability, and goes to the weight or her opinion, not its admissibility.  *Id.*

## III.   THERE IS NO BASIS TO EXCLUDE TESTIMONY FROM DR. SARA PARIKH

### A.    Dr. Sara Parikh's Qualifications and Expert Opinion

Intuitive has asserted claims for false advertising and unfair competition arising out of Restore's willful deception of customers concerning the nature, safety, effectiveness, cost and authorization of its service to override EndoWrist use limits.  (ECF 49 ¶¶60-72, 77-80.)  Restore's advertising features a variety of deceptive claims, including falsely:  (1) characterizing Restore's service as a mere "repair" without disclosing that Restore breaks into and makes major modifications to EndoWrists; (2) touting cost savings for customers; (3) indicating that Restore is

---

Restore's "repair" process, which entailed insertion of the Interceptor to override use limits, required 510(k) clearance.  (*See, e.g.*, Ex. 4.)

*(cont'd)*

authorized or approved by Intuitive; and (4) obscuring the negative consequences for customers who use Restore's unauthorized services.[8]  (*See* Intuitive MSJ Opposition at 41-42.)

To support its claims of willful deception, Intuitive retained Dr. Sara Parikh to "measure how prospective customers of Restore's services perceive Restore's advertising with respect" to certain claims Intuitive has identified as deceptive. (Mot. Appx. No. 5 ("Parikh Rep.") ¶¶1, 6.)  Dr. Parikh is the president of a marketing research and consulting firm, and has over 30 years of experience designing and conducting original research studies on behalf of a wide range of clients, including in connection with Lanham Act litigation.  (*Id.* ¶1.)

Based on undisputed testimony from Restore's corporate designees, Dr. Parikh's survey sample included individuals reflecting "a mix of decision-makers at hospitals and surgery centers" whom Restore targeted with its marketing.  (*Id.* ¶¶8, 15.)  Respondents were asked several questions about the messages conveyed to them by Restore's "main flyer" that undisputedly was utilized as part of Restore's marketing efforts.  (*Id.* ¶18; Ex. 5; Ex. 6, Parker Tr. 161:16-162:25 & Ex. 5.)  Most of the questions—including the first five—were open-ended and sought

---

[8]  Restore's other deceptive statements include literally false advertising claims that were not specifically addressed by Dr. Parikh's survey, and thus are not directly pertinent to the Motion.  (*See, e.g., id.* ¶¶1, 3, 6-8, 35-36, 44-49, 62.)

verbatim responses.  (Parikh Rep. ¶¶28, 32.)  These were followed by questions asking respondents whether they did ***or did not*** have beliefs about cost savings and whether Restore is authorized, approved, or endorsed by the manufacturer of da Vinci systems.  Respondents who did have such beliefs were asked open-ended questions about why they had those beliefs.

Based on the survey results, Dr. Parikh concluded, *inter alia*, that Restore's advertising:  (i) communicates general "repair" services; (ii) does not adequately convey the physical modifications that Restore actually performs on EndoWrists; (iii) is not transparent about risks of using Restore's service; (iv) communicates a clear cost savings message; and (v) conveys to a significant portion of consumers that Restore is authorized, approved, or endorsed by Intuitive.  (*Id.* ¶54.)

Restore does not challenge Dr. Parikh's qualifications, the helpfulness of the survey to a jury or numerous aspects of the survey that inform its reliability (e.g., the validity of the sample, data coding, analysis and quality controls).  Instead, Restore offers three limited challenges to Dr. Parikh's methodology, none of which have any merit.  Nor could those challenges possibly warrant exclusion of Dr. Parikh's opinions given the "general rule … that 'methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility.'" *FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, No. 17-23917-Civ-WILLIAMS/TORRES, 2019 WL 416817, at *5 (S.D. Fla. Feb. 1, 2019) (citation

omitted); *accord Edmondson v. Caliente Resorts, LLC*, No. 8:15-cv-2672-T-23TBM, 2017 WL 10591833, at *10 (M.D. Fla. Aug. 31, 2017) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, ***such situations will be rare***.") (emphasis added).

### B.     Dr. Parikh's Survey Is "Tied to the Real World"

Restore's first argument, that Dr. Parikh's survey "is not tied to the real world," is unfounded.  Restore does not dispute that the "main flyer" advertisement used for the survey was disseminated to the public, or that the survey's sample fairly represented Restore's target customers.  Nor does Restore suggest that the tested flyer did not adequately reflect Restore's communications.[9]  Indeed, Restore did not do other marketing such as TV ads, paid print ads or social media.  (Ex. 7, Vautrot Tr. 40:20-41:8, 55:4-14.)  These undisputed facts confirm that the survey is very much "tied to the real world" in which Restore marketed its "repair" service.

---

[9]  Even if Restore had so argued, that criticism would bear only on the survey's weight.  *See, e.g., Gibson v. BTS N., Inc.*, No. 16-24548-Civ-COOKE/TORRES, 2018 WL 888872, at *4 (S.D. Fla. Feb. 14, 2018) (finding criticism that survey "used only two of the 57 advertisements at issue in [the] case representing only two (or possibly three) of the thirteen [p]laintiffs" to be a jury question); *Edmondson*, 2017 WL 10591833, at *11 (finding "no basis to throw out" opinions where expert "tested three out of sixteen advertisements at issue in this action" and asserted they were "'representative'").

Restore misconstrues the nature of Dr. Parikh's survey when it argues that a consumer survey should "'present the applicable products in a manner that a consumer would encounter them in the actual marketplace.'"  (Mot. at 5 (quoting *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, No. 18-CV-81606-MIDDLEBROOKS, 2019 WL 7376782, at *6 (S.D. Fla. Sept. 26, 2019).)  That argument is inapposite because Restore (and the lone case to which it cites) is referring to surveys measuring ***likelihood of confusion in trademark infringement*** cases; there are no "applicable products" in Dr. Parikh's study concerning the message conveyed by Restore's ***false advertising***.

Restore's argument that Dr. Parikh erred in instructing respondents not to refer to outside sources because hospital purchasing decisions typically involve more than one individual (Mot. at 5) is unsupported and meritless.  In fact, had respondents been encouraged to consult other people or materials as Restore proposes, it would have violated fundamental principles of survey design to ensure objectivity and that respondents' impressions are truly their own, risking tremendous bias and variability.  *See, e.g.*, Ex. 8, Himanshu Mishra & Ruth M. Corbin, *Internet Surveys in Intellectual Property Litigation: Doveryai, No Proveryai*, 107 Trademark Rep. 1097, 1105 (2017) (noting risk to the validity of online surveys if "respondents consult other people or sources for answers to questions" because the researcher may be "unable to elicit true attitudes or

19

beliefs"); Ex. 9, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 307 (Shari Seidman Diamond & Jerre B. Swann eds., 2012) (Editor's Note) ("[I]t is advisable to give respondents a preliminary instruction that says something like…'We are interested in your opinions only, so please complete the survey without consulting anyone or anything else.'").  Dr. Parikh's survey design to limit respondents' consultation with outside sources thus does not detract from, but rather **bolsters** the reliability of her methodology.

### C.   The Limited Closed-Ended Questions In Dr. Parikh's Survey Are Appropriate and Are No Basis For Exclusion

Restore's argument that Dr. Parikh's survey should be excluded because it utilized a purportedly "leading" question is meritless for at least four reasons.

***First***, Restore incorrectly assumes that all closed-ended questions are inherently and improperly "leading."  The survey question at issue asked:  "Based on this advertisement, ***do you <u>OR</u> do you not*** believe that this company is authorized, approved, or endorsed by the manufacturer of the da Vinci surgical system, ***<u>OR</u> do you not have a belief***?"  (Parikh Rep. ¶51 (capitalization and underlining in original).)  As courts have recognized, that is not a "leading" question.  *See, e.g., vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 457 (D.S.C. 2019) (rejecting argument that question asking "Do you or do you not believe that this group of churches is affiliated with a national organization" was leading because the "question explicitly provides two possibilities, 'do you or do you not,'

negating any possible demand effect"); *Native American Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124 (HL), 2012 WL 1833877, at *8 (M.D. Ga. May 18, 2012) (noting that the "inclusion of the 'Don't Know' option works as a 'quasi-filter question to reduce guessing,' which lends credibility to the survey" (citation omitted)).

**Second**, there is nothing inherently problematic about closed-ended questions, and they are routinely recognized as appropriate in consumer surveys. *See Native American Arts*, 2012 WL 1833877, at *8 ("Closed-ended questions are not necessarily leading or improper."); Ex. 10, Shari Seidman Diamond, Reference Guide on Survey Research, in *Reference Manual on Scientific Evidence* 359, 391-94 (3d ed. 2011) (explaining that "[t]he questions that make up a survey instrument may be open-ended, closed-ended, or a combination of both"). As is customary in advertising surveys,[10] Dr. Parikh used a "funnel approach," starting with open-ended questions followed by more directed questions to "hone in on specific claims or messages that [she] sought to evaluate."[11] (Parikh Rep. ¶28.)

---

[10] *See* Ex. 11, Bruce P. Keller, Survey Evidence in False Advertising Cases, in *Trademark and Deceptive Advertising Surveys*, *supra*, at 179.

[11] Restore neglects to mention that Dr. Parikh derived a net confusion result by utilizing a parallel control question about whether respondents believe Restore is authorized, approved, or endorsed by Walgreens. (Parikh Rep. ¶33.) Even if the question at issue was "leading" (which it is not), the control would have accounted for any potential error or bias. Ex. 10 at 401.

*Third*, Restore ignores the fact that almost all of the questions in Dr. Parikh's survey were ***open-ended***.  As such, Restore's criticism is extremely limited and could not provide a basis for excluding the survey in its entirety.

*Fourth***,** it is well-established that Restore's challenge to supposedly "leading" questions would at most bear only on the survey's weight, not admissibility.  *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (alleged "poorly designed questions" only "affect the survey's weight, however, and not its admissibility")*; FTC v. On Point Glob. LLC*, No. 19-25046-Civ-SCOLA, 2021 WL 4891334, at *8 (S.D. Fla. Sept. 22, 2021) (criticism "[a]s to leading questions" is "more adequately considered an objection going to the weight of the evidence rather than is admissibility") (citation omitted); *Orange Lake Country Club v. Reed Hein & Assocs.*, 6:17-cv-1542-Orl-78DCI, 2019 WL 12536802, at *2 (M.D. Fla. Oct. 2, 2019) (even if questions were "leading," "such flaws go to the weight of the survey").

### D.    Dr. Parikh's Survey Results Are Probative of Whether Customers Have Been Deceived by Restore's Advertising

Restore purports to fault Dr. Parikh for not showing the tested flyer's "impact on the purchasing decision of hospitals in the real world of complex decision making."  (Mot. at 6.)  But that was not the purpose of Dr. Parikh's survey.

To succeed on a false advertising claim, a plaintiff must show:  (1)

advertising is "false or misleading"; (2) advertising "deceived, or had the capacity to deceive, consumers"; (3) "the deception had a material effect on purchasing decisions" (*i.e.*, "materiality"); (4) an effect on interstate commerce; and (5) injury. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  When statements are "literally true but misleading," plaintiffs "'must present evidence of deception'" such as "consumer surveys" or "expert testimony." *Id.* at 1261.

Expert testimony is helpful to the jury where "it logically advances a material aspect of the proposing party's case" and does not merely "offer[] nothing more than what lawyers for the parties can argue in closing arguments." *Delta T, LLC v. Dan's Fan City, Inc.*, No. 8:19-cv-1731-VMC-SPF, 2021 WL 2103074, at *5 (M.D. Fla. May 25, 2021) (citations omitted).  Here, Dr. Parikh's survey plainly "advances a material aspect" of Intuitive's case by constituting evidence of likely deception.  That Dr. Parikh did not specifically include a question on the separate element of "materiality" does not render her survey unhelpful to the jury.  A consumer survey measuring deception need not also address materiality to be probative.  *See, e.g.*, *Taylor v. Trapeze Mgmt., LLC*, No. 0:17-cv-62262-KMM, 2019 WL 1977514, at *2, 4 (S.D. Fla. Feb. 28, 2019) (finding expert's opinions about "a marketing research survey to explore possible confusion among consumers exposed" to challenged advertising went "to the heart of the Lanham Act issues in this case" and were "helpful to the fact-finder"); *Edmondson*, 2017

23

WL 10591833, at **8-10, 12 (denying motion to exclude "testimony regarding consumer confusion and deception" pertaining to survey about what consumers "understood" from advertising because it was "helpful to the fact-finder in this case"). *Cf. Buccellati Holding Italia SPA, v. Laura Buccellati LLC*, No. 13-21297-CIV-MOORE/TORRES, 2014 WL 11901585, at *7 (S.D. Fla. Apr. 14, 2014) (permitting survey experts to provide "testimony that addresses some, but not all, of the relevant factors" in establishing trademark likelihood of confusion).[12]

## IV.   THERE IS NO BASIS TO EXCLUDE TESTIMONY FROM DR. JOHN BOMALASKI

### A.   <u>Dr. Bomalaski's Qualifications and Expert Opinions</u>

Dr. Bomalaski is a gynecologic oncology surgeon with extensive training and decades of experience in both traditional and robotic-assisted surgery, and his opinions are fully supported by that training and experience.  He has performed more than 2,600 robotic-assisted surgeries using the Intuitive da Vinci Surgical System ("da Vinci").  (Mot. Appx. No. 3 ("Bomalaski Rep.") ¶3.)  Since May 2010, he has worked at Health First Physician Group, in Melbourne, Florida, as a

---

[12]  Restore states in conclusory fashion that "the survey is unfairly prejudicial under Fed. R. Evid. 403."  (Mot. at 6.)  Lacking any specifics, that argument should be summarily rejected.  *See, e.g.*, *Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*, No. 1:04-CV-2112-CAP, 2007 WL 4563873, at *10 (N.D. Ga. July 17, 2007) (rejecting motion to exclude survey on 403 grounds where evidence was probative of an issue in dispute and, "[t]o the extent that technical flaws [did] exist," they were "not likely to result in confusing the jury").

practicing surgeon, as well as Chief of Gynecologic Oncology Services, as Chair

of the Women's Cancer Tumor Board and as a member of Health First's Joint

Operations Committee, Oncology Strategic Committee, Operating Room

Committee, Robotic/Minimally Invasive Committee and the Holmes Hospital

Credentialing Committee.  (*Id.* App. A, at 1-2.)  For five years prior to that, he

served as President of Gynecologic Oncology of Brevard in Melbourne.  (*Id.*)  In

his gynecologic oncology practice, Dr. Bomalaski has conferred with scores of

other surgeons and cared for thousands of surgical patients.  (*Id.* ¶51.)

In this case, Dr. Bomalaski opines on the surgical benefits of the da Vinci, as

well as the risks and safety concerns that arise from (i) using EndoWrists that have

been modified to override the instruments' prescribed and FDA-cleared use limits;

and (ii) using da Vincis that have been "serviced" by companies or people that do

not have access to the full set of manufacturer specifications and software

necessary for comprehensive service.

Restore does not challenge Dr. Bomalaski's general qualifications or the

relevance of his opinions and helpfulness to the trier of fact.  Instead, Restore's

arguments are limited to whether Dr. Bomalaski's experiences provide a reliable

basis for certain of his opinions.  These arguments are meritless and do not warrant

exclusion of Dr. Bomalaski's opinions.

### B.   Dr. Bomalaski's Experiences Form a Reliable Basis For His Opinions

As an initial matter, Restore does not challenge Dr. Bomalaski's qualifications and experiences to offer expert opinions on many of the subjects in his report, including:

(i)     His comparison of traditional laparoscopic surgery with robotic-assisted surgery and the advantages of robotic-assisted surgery (*id.* ¶¶12, 18-40);

(ii)     His opinion that "[a]lmost all surgeries present risks to the patient," and that surgeons try to minimize those risks and maximize successful patient outcomes by, among other things, adhering to instrument manufacturers' recommended specifications as cleared by and federal regulators (*id.* ¶¶13-14, 17, 45);

(iii)     His opinion that "medical devices and instruments wear out over time and based on the number of uses, and there is a safety threshold beyond which equipment should not be used" (*id.* ¶46), and that "[s]urgeons therefore depend on the medical industry, medical publications and the FDA to determine how many times an instrument can be safely and reliably used" (*id.* ¶47);

(iv)     His opinion that the instrument "repair" process "involves actions that are completely invisible to the surgeons and patients" (*id.* ¶54); and

(v)     His opinion that the "services" Restore offers on da Vincis "raise[] serious concerns" (*id.* ¶¶60-62).

26

Instead, Restore asserts that Dr. Bomalaski's experience is inconsistent with, and therefore does not support, his opinions about the increased risks of using EndoWrists "repaired" by third parties or a da Vinci "serviced" by a third party. (Mot. at 7.)  Restore concedes, as it must, that an expert may rely solely or primarily on his experience as the basis for his opinion.  (Mot. at 7 (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)).)[13]  Contrary to Restore's assertion, Dr. Bomalaski's opinions on the risks of using "repaired" EndoWrists are fully consistent with his extensive training and experience.

Dr. Bomalaski's training and experience—predicated on the principal tenet of the Hippocratic Oath, "first do no harm," and his interaction with scores of surgeons—permit him to explain that, in his experience, surgeons are concerned primarily with patient safety and the minimization of surgical risks to that patient safety.  (*See* Ex. 12, Bomalaski Tr. 169:25-170:10 ("most surgeons would—would investigate if there was a concern or worry that some process or step in the

---

[13]  Federal Rule of Evidence 702 expressly contemplates the admissibility of expert opinion based on the expert's "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *see also Washington v. City of Waldo, Fla*., 1:15-CV-73-MW/GRJ, 2016 WL 3545909, *2-3 (N.D. Fla. Mar. 1, 2016) (admitting expert opinion regarding police hiring practices where expert "used his law enforcement experience, knowledge, and training in police practices, including his review of court cases, and evaluated the facts of the instant case to form his opinions").

treatment of those instruments or repair, were done in a way that could potentially affect their patients")).  Restore does not appear to disagree.

To minimize patient safety risks, to ensure adherence to surgical instrument manufacturers' recommended specifications and regulatory clearance and to inform their own decisions about the safety of the instruments they use, surgeons depend on a relationship of trust and coordination among themselves, their hospitals, instrument manufacturers and federal regulators.  (Bomalaski Rep. ¶¶13-14, 17, 45-50; Ex. 12, Bomalaski Tr. 163:9-164:1.)  According to Dr. Bomalaski, that relationship of trust and coordination is particularly important in connection with robotic-assisted surgery, where the instruments are more complex and their inner workings are invisible to the surgeon in the operating room.  (Bomalaski Rep. ¶54; Ex. 12, Bomalaski Tr. 112:10-22, 124:14-125:25; 174:18-175:4.)

Dr. Bomalaski opines that a modification to a surgical instrument that causes the instrument to fail to conform to the prescribed and FDA-cleared use limits increases the risks to patient safety.  (Ex. 12, Bomalaski Tr. 133:15-25, 176:25-177:12, 179:7-11.)  He opines, based on his many years of training and experience, that many surgeons would likely be concerned about an increased risk to patient safety if they learned that, without having obtained regulatory clearance, the surgical instruments they use had been modified to extend their useful life beyond the useful life recommended by the manufacturer and cleared by federal regulators.

(Bomalaski Rep. ¶¶54-55.)  And, based on years of experience in the care of thousands of cancer patients, Dr. Bomalaski offers the opinion that most patients, too, would likely have safety concerns if they learned that the surgical instruments used in their surgery had been so modified.  (*Id.* ¶51; Ex. 12, Bomalaski Tr. 160:5-8.)  Finally, Dr. Bomalaski offers his view that none of the materials he has reviewed would likely alleviate those concerns.  (Bomalaski Rep. ¶¶51-54; Ex. 12, Bomalaski Tr. 159:1-12.)

In an attempt to impugn Dr. Bomalaski's reliability, Restore resorts to mischaracterizations of Dr. Bomalaski's deposition testimony that ultimately fail.

*First*, Restore mischaracterizes Dr. Bomalaski's deposition testimony when it asserts that it is not important to Dr. Bomalaski to know how the instruments he uses were manufactured or repaired, whether the repairs comport with FDA certification standards and whether the repaired instruments he uses exceed the manufacturers' recommended usage limits.  (Mot. at 9.)  However, as Dr. Bomalaski explains in his opinion, he and other surgeons develop a relationship of trust with their hospitals, instrument manufacturers and federal regulators to ensure that all surgical instruments comply with the manufacturer's use recommendations and regulatory clearance (Bomalaski Rep. ¶¶13-14, 17, 45-50; Ex. 12, Bomalaski Tr. 163:9-164:1), and adherence to those recommendations and standards is vitally important.  Critically, Dr. Bomalaski's testimony that he did not know whether the

instruments he uses comply with FDA clearance procedures related to traditional laparoscopic instruments, *not* EndoWrists.  (Ex. 12, Bomalaski Tr. 107:21-25.)  And, notwithstanding Restore's inexplicable citation to testimony about how third parties handle traditional laparoscopic instruments (*not* EndoWrists) (*id.* at 108:1-8.), Dr. Bomalaski never testified that he did not know whether the instruments he uses exceed the manufacturer's recommendation for usage limits.

*Second*, Restore mischaracterizes Dr. Bomalaski's testimony when it asserts that he testified that he is comfortable using repaired surgical instruments, including EndoWrists, based on his hospital's quality control process and his own observations of the instruments before and during surgery.  (Mot. at 7.)  As he made clear in his report and deposition testimony, particularly with respect to the more complex instruments used in robotic-assisted surgeries, Dr. Bomalaski trusts his hospital to ensure that the surgical instruments he uses comply with the manufacturer's recommended use and regulatory clearance.  (Bomalaski Rep. ¶¶13-14, 17, 45-50, 54; Ex. 12, Bomalaski Tr. 112:10-22, 124:14-125:25, 163:9-164:1, 174:18-175:4.)  And the hospital at which Dr. Bomalaski practices does not use Restore to modify EndoWrists to extend their useful life beyond their

recommended and cleared useful life, suggesting that Dr. Bomalaski's trust has been well placed.[14]

***Third***, Restore mischaracterizes Dr. Bomalaski's testimony when it asserts that Dr. Bomalaski testified that surgeons and patients should know the details of how surgical instruments used in their surgeries were repaired.  (Mot. at 8-9.)  As explained above, Dr. Bomalaski opines only that surgeons and patients would likely be concerned if they learned that the instruments used in their surgeries were modified to extend the useful life beyond that which the manufacturer recommends—and that which FDA cleared—as safe.  (Bomalaski Rep. ¶¶51, 54; Ex. 12, Bomalaski Dep. 160:5-8.)  His extensive training and decades of experience amply support his opinions that overriding EndoWrist use limits without manufacturer approval and regulatory clearance increases the risks to patient safety.[15]

Finally, Restore's assertion that Dr. Bomalaski should have conducted a formal survey of the views of patients and other surgeons (Mot. at 8-9)—should be rejected.  Having conferred with scores of surgeons and cared for thousands of

---

[14]   *See* Ex. 13, Expert Report of Dr. Loren Smith (August 20, 2021), at 27, Table 5.

[15]   *See*, *e.g.*, *Allmond v. Akal Sec.*, 4:05-cv-96-HL, 2007 WL 988757, *4-5 (M.D. Ga. Mar. 29, 2007) (admitting expert opinion regarding hearing aids as reliable where expert drew "on his considerable clinical experience in the field of audiology").

patients over decades of practice, Dr. Bomalaski has enough training and experience as a gynecologic oncology surgeon to know, without conducting a formal survey, that surgeons and patients are concerned about the risks to patient safety, and would be concerned about an increase in those risks if they learned that the surgical instruments used in their surgeries had been modified in such a way that they no longer comported with the manufacturer's specifications or regulatory clearance.

In sum, Dr. Bomalaski's opinions that "repaired" EndoWrists and da Vincis "serviced" by third parties increase the risks to patient safety—and that surgeons and patients would likely be concerned about such increased risks—are entirely consistent with his extensive training and experience. And Dr. Bomalaski fully explains "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Mitchell*, 2021 WL 2099306, at *2. Restore's motion to exclude Dr. Bomalaski's opinions should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Restore's motion to exclude certain expert testimony should be denied in its entirety.

DATED:  December 10, 2021                 Respectfully submitted,

                                          /s/ Karen Lent_____


KAREN HOFFMAN LENT (*Pro Hac Vice*)     DAVID L. McGEE
MICHAEL H. MENITOVE (*Pro Hac Vice*)    Fla. Bar No. 220000
JORDAN A. FEIRMAN (*Pro Hac Vice*)      BEGGS & LANE, RLLP
SKADDEN, ARPS, SLATE,                   501 Commendencia Street
  MEAGHER & FLOM LLP                    Pensacola, FL 32502
One Manhattan West                      Telephone: (850) 432-2451
New York, NY 10001                      dlm@beggslane.com
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com
jordan.feirman@skadden.com


MICHAEL S. BAILEY (*Pro Hac Vice*)      ALLEN RUBY (*Pro Hac Vice*)
1440 New York Avenue, N.W.              Attorney at Law
Washington, DC 20005                    15559 Union Ave. #138
Tel: (202) 371-7000                     Los Gatos, CA 95032
michael.bailey@skadden.com              Tel: (408) 477-9690
                                        allen@allenruby.com

*Counsel for Intuitive Surgical, Inc.*

33

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Intuitive certifies this opposing memorandum complies with the 8,000 word count limitation set forth in Local Rule 7.1(F), excluding the parts exempted by Local Rule 7.1(F).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2021, I caused **INTUITIVE**

**SURGICAL INC.'S OPPOSITION TO MOTION TO EXCLUDE CERTAIN**

**EXPERT TESTIMONY** to be served on the following counsel of record by

email:

| William Gerald Harrison, Jr. | wharrison@harrisonrivard.com |
|---|---|
| Jeffrey Berhold | jeff@berhold.com |

/s/ Karen Lent

KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com