# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

RESTORE ROBOTICS LLC,
RESTORE ROBOTICS REPAIRS LLC,
and CLIF PARKER ROBOTICS LLC,

                Plaintiffs,

    v.

INTUITIVE SURGICAL, INC.,

                Defendant.

INTUITIVE SURGICAL, INC.,

                Counterclaimant,

    v.

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIRS LLC,

                Counterclaim Defendants.

Civil Case No. 5:19-cv-55-TKW-MJF

## INTUITIVE SURGICAL, INC.'S OPPOSITION TO
## <u>RESTORE'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Defendant and Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive") respectfully submits this Opposition to Plaintiffs and Counterclaim Defendants Restore Robotics LLC's and Restore Robotics Repairs LLC's ("Restore") Motion for Partial Summary Judgment ("Motion") (ECF 108).

## INTRODUCTION

The record confirms that Restore engaged in a widespread campaign to deceive customers into purchasing a "repair" service that Restore claimed was routine, cost-effective, and safe, and that would provide customers with EndoWrist instruments ("EndoWrists") as functional and reliable as new EndoWrists sold by Intuitive. In reality, Restore broke into EndoWrists and inserted the "Interceptor"—an unauthorized circuit board that overrode EndoWrists' use counters so that they could be used past their safe and FDA-cleared limits. The "repaired" instruments not only were qualitatively different from Intuitive-manufactured EndoWrists, but also were of lesser quality and posed risks to patients. Moreover, Restore deceptively promoted its services—for example, by claiming that Restore's technicians were qualified to service Intuitive products despite lacking up-to-date information about those products, and that Restore would save customers "$100,000 per year per robot" despite lacking support for that purported calculation.

Restore's arguments for summary judgment on certain of Intuitive's counterclaims mischaracterize the record and applicable law:[1]

**Computer Fraud and Abuse Act ("CFAA")**:

The CFAA prohibits, among other things, intentionally accessing or attempting to access a protected computer without authorization, causing loss. Restore argues that there is no evidence of an attempted violation.  But the record demonstrates that Restore attempted to access Intuitive's protected computer and network by soliciting a former Intuitive employee to "hack" into Intuitive devices. Restore's separate argument that its CFAA violation caused no "loss" already has been rejected by this Court, which recognized that "loss" may be established by evidence (since established in discovery) that Intuitive was forced to engage staff and counsel to investigate the proposed "hack" and plan a response.

**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**:

Restore argues that Intuitive has failed to identify evidence of harm to Florida consumers, but FDUTPA does not require injury specifically to consumers in Florida.  Rather, the statute protects out-of-state consumers where, as here, the unlawful conduct took place principally in Florida.  Regardless, the record

---

[1] Restore does not seek summary judgment on Intuitive's counterclaim for tortious interference with contract.

demonstrates that consumers—including at least one in Florida—were injured when they were deceived into purchasing Restore's inferior "repaired" EndoWrists.  Testimony from hospitals confirmed that their decisions to engage Restore were based on their (mis)understanding of the "repaired" instruments' quality controls, safety, and adherence to original specifications.  Customers also were injured because utilization of Restore's services disrupted their Intuitive service contracts and never led to the cost savings promised by Restore for instrument "repair" and servicing.

**Passing Off**:  Unlawful passing off takes place "when a producer misrepresents his own goods or services as someone else's."  *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.* 508 F.3d 641, 647 (11th Cir. 2007).  Here, Restore broke into and overhauled EndoWrists, and then presented the resulting qualitatively different and inferior instruments to customers as genuine Intuitive products bearing Intuitive trademarks.  Restore argues that its "repair" service cannot constitute an actionable "use in commerce" under the Lanham Act, but the Court already has rejected this argument.  Nor is Restore correct in claiming that the record lacks evidence of consumer confusion arising from Restore's passing off; in fact, there is strong evidence for the jury to consider when evaluating likelihood of confusion.

4

**False Advertising**:  By ignoring certain of its advertising statements challenged by Intuitive—namely, Restore's false claims (1) of cost savings and (2) that its service is a mere "repair" without disclosing what Restore actually does to EndoWrists—Restore essentially concedes this issue must go to the jury.  Even with respect to the statements that Restore addresses, Restore's arguments are conclusory and ignore evidence demonstrating that those statements are false and deceptive.

## RESPONSE TO RESTORE'S STATEMENT OF FACTS

Intuitive disputes the following statements in Restore's Statement of Facts:[2]

1. **"Even at the end of 2019, Intuitive continued to control roughly 99% of the installed base for Surgical Robots in the United States."  (Motion at 1.)**

   The proffered figure regarding Intuitive's installed base is irrelevant to Intuitive's market share.  Restore calculates Intuitive's installed base only within what Restore defines as a market for "Surgical Robots," but this purported market is underinclusive because it ignores the economic substitutability of other surgical solutions (like open and laparoscopic surgery) that compete with surgery done with Intuitive's da Vinci surgical systems ("da Vinci").  (ECF 109-37, Smith Rebuttal Report ¶¶85, 89-97.)

---

[2]  Record citations in Restore's statements are omitted.

2. **"Intuitive requires that the customer only use EndoWrist instruments on the da Vinci Surgical System for the maximum number of uses set forth in the instrument catalog" (Motion at 1-2.)**

The instrument catalog is not the basis for the use limit. As set forth in Intuitive's Motion for Summary Judgment and herein, maximum uses are established via extensive validation by Intuitive, and products with such limits receive FDA clearance. (ECF 109 at 2, 12.)

3.  **(Motion at 2 n.1.)**

The statement is copied verbatim from the report of Restore's proffered expert, Professor DePasquale, and is not undisputed factual evidence. Moreover, Professor DePasquale is offered as an economic expert, and has no expertise qualifying her to opine on ███████████████████████████████ ███████████████████████████ She also mischaracterizes the program, ignoring documents showing Intuitive's planning and testing. (*See* Ex. 1.)

(*Id*. at Intuitive-00367051-52.)

 (Ex. 1 at Intuitive-00367051-52.)

4. **"Intuitive itself has determined that no clearance is necessary for the repair of instruments." (Motion at 2 n.1.)**

This statement is from Professor DePasquale's report and is neither

undisputed factual evidence nor concerns issues within the bounds of her expertise.

The statement also is based on a mischaracterization of an Intuitive document

reflecting that Intuitive, which holds 510(k) clearance for EndoWrists, believed it

could create a "Non-Filing Justification," commonly known as a "Letter to File,"

(Ex. 2, Rosecrans Report ¶132) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(Ex. 1 at Intuitive-00367059.)  That belief was based on FDA guidance that

relieves "any 510(k) holder" (like Intuitive)—but *not* parties "who do not hold the

510(k)" (like Restore)—of burdens to submit new 510(k)'s for an existing device

and permits the holder to instead "review and approve changes to the device

design" and "document changes and approvals in the device master record" in a

"letter to file."  (Ex. 3 at 5, 7-8, 64-66, 74.)  Intuitive's assessment of its own

program is inapplicable to Restore.  (Ex. 2, Rosecrans Report ¶126.)  Moreover,

FDA recently suggested that even changes by Intuitive to extend the life of its instruments would require submission of a new 510(k).  (Ex. 4.)

**5.  "Tellingly, [Intuitive] responded to the entry of Restore into Si instrument repairs by extending the usage limits of the Xi instruments to induce customers to switch from the Si to the Xi, even though the Xi instruments had a history of higher return rates." (Motion at 2 n.1.)**

This statement is from Professor DePasquale's report, and is outside her purported expertise.  Restore offers no factual support for the proposition that Restore (or any other third party) impacted Intuitive's decision to evaluate whether certain X/Xi instruments could safely support additional uses or that extended uses were intended to induce customers to switch to the Xi system.  Professor DePasquale cites only the testimony of one individual, but that testimony does not suggest that Intuitive extended Xi instrument use limits "to induce customers to switch from the Si."  (Restore Ex. 30 at 11 n.39 (citing DeSantis Tr. 59:20-62:3).)[3] And Professor DePasquale acknowledged that Intuitive only "extended the usage limits for the X and Xi EndoWrists when those instruments finally reached the *lower failure rates* of the S and Si EndoWrist."  (*Id.* at 15 (emphasis added).)

---

[3] "Restore Ex." refers to exhibits filed with Restore's Motion for Summary Judgment.

6. **"From the inception of the company in 1995, Intuitive planned to derive its revenue largely from 'high margin reposable [sic] instruments which can be resterilized and reused *only for the number of times allowed by the company.*'" (Motion at 2.)**

The 1995 "draft" business overview cited by Restore does not support the above statement. (Restore Ex. 22 at Intuitive-00595675.) That document states Intuitive's expected revenue would be largely derived from resposable instruments because, at that time, Intuitive was considering a different business model that "anticipate[d] placing its systems in hospitals for little or no up-front charge." (*Id.*) Intuitive never implemented this model and other aspects of the "draft" business plan described in the document. (Ex. 5 at 24.) Restore also misleadingly describes use limits as "set by" Intuitive when they were submitted to and cleared by FDA. (Ex. 2, Rosecrans Report ¶¶114-119.)

7. **"Intuitive enforces this contractual requirement with a usage counter. Intuitive installs a programmed memory chip inside each EndoWrist instrument for the sole purpose to prevent the instrument from being used for more than a certain number of procedures. Intuitive has designed the memory chip to deny access by third parties (including customers and ISOs) to reset the usage counter to zero for additional uses after service and force the customer to purchase a new instrument from Intuitive." (Motion at 3.)**

The lone document cited by Restore to support this statement does not address the purpose or design of the use counter and does not indicate that Intuitive designed the counter to prevent third-party access. (Restore Ex. 21.) Restore also mischaracterizes the use counter as enforcement of a contractual term rather than a

measure developed for patient safety and required by FDA as part of 510(k)

clearance for EndoWrists.  (ECF 109 at 12; Ex. 2, Rosecrans Report ¶¶114-19.)

The use counter facilitates continued performance while maintaining safety by

ensuring instruments are only used for as many times as supported by their life

testing.  (ECF 109 at 2; Ex. 18, Howe Report ¶¶16, 56-71.)

**8. "'[S]ubstantially all' da Vinci users source their service from Intuitive. [S]ervice contracts restrict customers from repairing the robot themselves or through third parties. Intuitive is the sole manufacturer or exclusive distributor of the specially designed da Vinci robot parts." (Motion at 3.)**

Intuitive's service contracts do not prohibit third-party service, but rather

state that "Intuitive does not have an obligation to provide Services … where

installation, repair or adjustments have been made by an individual other than an

Intuitive technician or an individual approved by Intuitive."  (Ex. 6 at Intuitive-

00062431.)  While "substantially all" customers choose to source da Vinci service

from Intuitive (Motion at 3), this is unsurprising given that Restore's service

offering is ineffectual and non-viable, as confirmed by its employees' admissions

that they cannot fully service da Vincis (Ex. 7, Vautrot Tr. 112:17-113:7; Ex. 8,

Gordon Tr. 143:25-144:5).  Restore also has limited ability to replace parts (ECF

109-30 at Restore-00005580-82) and, for that reason among others, cannot provide

viable da Vinci service.  Restore acknowledges customers are not forced to accept

a service contract from Intuitive and, as Professor DePasquale notes, roughly 10%

of customers do not agree to Intuitive's long term service contracts.  (Restore Ex. 29 at 12.)

**9.  "Intuitive certifies its field service engineers through two-week training programs for each model of the da Vinci Surgical System."  (Motion at 4.)**

Intuitive's field service engineers are also required to participate in ongoing training on the da Vinci system.  (Ex. 9, Bair Tr. 31:14-33:5.)

**10. "Rebotix had already validated its repair process and testing through the independent third-party certification agency DQS_Med."  (Motion at 4.)**

Only FDA can validate or clear the sale of remanufactured EndoWrists in the United States (ECF 109 at 12 n.1, 27 n.4.), and as Restore acknowledges, DQS MED only certifies "devices to be sold and CE marked in the European region." (Ex. 10, Hamilton Tr. 156:2-9; *see also* Ex. 11, May Tr. 43:23-44:10.)[4]

Restore relies on the DQS MED report as a "validation" of its EndoWrist "repair" process, but the report is merely a summary of testing performed by "various vendors," the documentation and data for which Restore never received. (Ex. 11, May Tr. 41:10-48:17; 164:15-165:12; Ex. 13 at Restore-00005218; Ex. 14 at REBOTIX040764-66.)

_____

[4]  Even an argument that DQS MED certified the device to be marked in Europe would have no bearing on whether Rebotix or Restore can legally sell its services in the United States, and such an argument is unsupportable given the undisputed fact that Rebotix's predecessor company, Rebotix Panama, was enjoined from providing EndoWrist "repair" service in Denmark and Germany.  (Ex. 12 at Intuitive-00552756-59.)

DQS MED did not perform any "validation" or "testing" of Rebotix's "repair" process; rather, the report is a summary of documents it reviewed to assess the "technical file" of the Rebotix "repair" process. (Ex. 11, May Tr. 42:20-44:10.) Without testing data underlying the DQS MED report, Restore believed that it could not offer "validations" to concerned customers, and accordingly asked Rebotix to provide a (non-existent) document that would establish the EndoWrist "repair" did not require 510(k) clearance. (Ex. 13 at Restore-00005218.) Rebotix adulterated the DQS MED report before providing it to Restore (for its improper reliance), including by removing the word "remanufacturing" when used to describe the "repair" process (which would require 510(k) clearance). (Ex. 15, Gibson Tr. 187:1-213:8; *compare* Ex. 16 (Gibson Dep. Ex. 19) *with* Ex. 17 (Gibson Dep. Ex. 21).)

As explained by expert witness Dr. Robert Howe—whose testimony Restore has *not* sought to exclude—the Rebotix testing and "repair" processes designed to override EndoWrist use limits are deeply flawed, including because those processes imprecisely tighten cables within the instruments, do not account for the role of mechanical failures in limiting instrument life, and fail to establish instrument reliability using sound statistical techniques. (Ex. 18, Howe Report ¶¶72-79, 89-90, 109-112.)

11. **"In addition to resetting the usage limit, Restore inspected the instrument under industry safety standards.  May Dep. at 55:8-56:2."  (Motion at 4-5.)**

Restore relies on self-serving testimony from its personnel and offers no proof that it followed "industry safety standards" or that instrument inspections were regularly or adequately performed.  Such "standards" also are not pertinent to Restore's failure to secure FDA clearance, and "inspection" would not cure the dangers inherent in Restore's process for changing the EndoWrist's intended use, including dangers identified by Dr. Howe.  (Ex. 18, Howe Report ¶¶85-92.)

12. **"Restore also hired two former Intuitive field service engineers that were trained and certified on the da Vinci S and da Vinci Si to perform robot service on those models."  (Motion at 4-5.)**

Restore's only field service engineers, West Gordon and Bruce McDaniel, did not have adequate training to properly service da Vincis when they were working for Restore because:  (i) initial training is insufficient to service the da Vinci (Ex. 9, Bair Tr. 31:14-33:5); (ii) they were only trained and certified many years earlier (Ex. 8, Gordon Tr. 28:25-29:3; Restore Ex. 23 at Restore-00001619-22, 28); (iii) McDaniel was fired by Restore because "he wasn't the most professional" and his services were substandard and "wrong" (Ex. 8, Gordon Tr. 194:16-198:4); (iv) Gordon developed his own method for replacing technology in a manner inconsistent with Intuitive's protocols (*id.* 128:6-134:8); (v) Restore was limited in the da Vinci repairs it could perform because it lacked access to Intuitive's service software and replacement parts (Ex. 7, Vautrot Tr. 112:17-

113:7);[5] and (vi) Restore could not guarantee that da Vincis remained within Intuitive's specifications when Restore performed preventative maintenance (Ex. 8, Gordon Tr. 143:25-144:5).  Restore's da Vinci service also is inadequate because, as Dr. Howe opines, Restore cannot perform numerous necessary preventative maintenance tests, is unable to fully review error logs or perform system diagnostics, and is likely unable to perform repairs even if Restore correctly identified a system error.  (Ex. 18, Howe Report ¶¶143, 146.)  Restore's field service engineers did not perform EndoWrist "repair" for Restore, and neither were trained to perform work on EndoWrists while employed at Intuitive.  (*See* Ex. 8, Gordon Tr. 58:8-59:17.)

**13.** **"No customer testified that they believed that Restore was affiliated or endorsed by Intuitive.  In fact, many customers continued to use Restore even after Intuitive threatened to cut off their access to new instruments, accessories, or service.  Madewell Dep. at 26:4-27:15 and Ex. 7 and 8, McDonald Dep. at 20:18-22:19 and Ex. 3."  (Motion at 5-6.)**

There is strong evidence that Restore customers likely believed that Restore was affiliated or endorsed by Intuitive.  Intuitive's survey expert, Dr. Parikh, presented a representative sample of Restore's target customers with the "main flyer" that Restore utilized to market its services. (Ex. 19, Parikh Report ¶¶15-18 &

---

[5]  As this Court already held, Intuitive's refusal to provide Restore access to its service software (which Restore refers to as the "distributor's toolkit") is a lawful refusal to deal. *See Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19cv55-TKW-MJF, 2019 WL 8063989, at *4, *7-9 (N.D. Fla. Sept. 16, 2019).

nn.4-6; Ex. 20 at Restore-00027791.)  A significant proportion of Restore's target

customers—38% overall, and 27% net of the results of a control question—

expressed the belief that Restore's services were authorized, approved, affiliated,

or endorsed by Intuitive.  (Ex. 19, Parikh Report ¶¶53-54.)  In addition, at least one

hospital reached out to Intuitive directly to ask whether Intuitive was affiliated

with Restore.  (Ex. 21 at Intuitive-00214413.)  Restore itself recognized it needed

to change certain marketing materials to disclaim affiliation with Intuitive by

removing all "direct da Vinci references."  (*See* Ex. 20 at Restore-00027791-94.)

**14. "Conway Regional Hospital even suspected that Intuitive was sabotaging the instruments repaired by Restore.  Marks Dep. at 18:14-25:6." (Motion at 6.)**

Conway Regional Hospital discovered issues with instruments following

their "repair" by Restore.  (Ex. 22 at Restore-00001426-31.)  When Conway

returned the faulty "repaired" EndoWrists, Rebotix personnel requested

involvement with evaluating the returned instruments and suggested to Conway the

instruments were intentionally damaged.  (*Id.* at Restore-00001426-31.)  Mr.

Marks, from Conway, testified that he had no basis to believe that Intuitive had

even been at Conway when the instruments broke, let alone a basis to suspect that

Intuitive "sabotaged" the instruments.  (Ex. 23, Marks Tr. 18:14-25:6; 69:3-10.)

15. **"Intuitive itself told Hillcrest Medical Center that it would turn the robot into a paperweight if they used Restore to repair their robot.  Reed Dep. at 10:4-12:9, 15:21-17:15, and Ex. 1."  (Motion at 6.)**

Intuitive expressed its concern to Hillcrest that *Restore's* inadequate and

unsafe service would render the da Vinci useless (i.e., leave it as a "paperweight").

(Ex. 24.) █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ There is no evidence that Intuitive disabled any da Vinci used by a

Restore customer, and there is no evidence Intuitive could remotely disable a da

Vinci.

16. **"Before the filing of the ACC, Intuitive legal counsel was already aware that Restore did not tell customers that it was affiliated with Intuitive in any way [citing Intuitive-00313615]"  (Motion at 6.)**

The evidence Restore cites establishes only that *one* Intuitive customer

requested warranty information because that customer "ha[d] a company that [was]

able to reset the lives on the instruments but … [did] not want to void [its]

warranty," and the document does not mention Restore.  (Restore Ex. 20.)

17. **"In addition, Restore prominently marked instruments with two R's on the metal clips used to release the instrument from the robot arm before returning them to the hospital [citing Restore-00033130]."  (Motion at 6-7.)**

The screenshot of the "two R's on the metal clips" that Restore provides

does not demonstrate this process was regularly followed or communicated to

customers and belies any claim that the "R's" were "prominent."  (Restore Ex. 27.)

The "R's" are difficult to see; hence Restore highlighted them to the customer with

a large image of the instrument (now presented to the Court). 

18. **"Moreover, the [Restore] marketing materials themselves always sought to question the usage limits imposed by Intuitive.  E.g., REBOTIX-000642. Restore also noted on some flyers that it was not affiliated with Intuitive**. **REBOTIX-000642; see also AHS_MGMT_INTUITIVE_0000237, at 238."** **(Motion at 7.)**

Restore's reference to one of its communications does not support a claim

that Restore "***always*** sought to question the usage limits imposed by Intuitive."

Numerous marketing materials from Restore do not disclaim affiliation with

Intuitive.  (*See* ECF 32-2; Ex. 29; Ex. 30; ▮▮▮▮)  Even in the communication

depicted, the disclaimer is in very small print and therefore not prominent.  Dr.

Parikh's consumer survey demonstrated that a flyer that included small print on

this issue still deceived a significant proportion of customers as to affiliation.  (Ex.

19, Parikh Report ¶¶53-54.)  Restore's marketing materials also were rife with

misleading information about Intuitive's EndoWrists.[6]

---

[6]  Restore also repeatedly and incorrectly asserted that FDA clearance is not required for Restore's "repair" process.  (ECF 32-1 at 2; Ex. 32 at Restore-00039125; Ex. 33 at Restore-00012175; Ex. 34 at Restore-00002651.)  Restore made these representations after the FDA sent Rebotix a deficiency letter

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

### A.   Restore's Connections to Florida

1.    Restore is a Florida limited liability company with its principal address in Panama City Beach, Florida.  (ECF ¶1.)

2.    Restore directed consumers to send their instruments to St. Petersburg, Florida, where the instruments were serviced and "repaired" by Rebotix Repair LLC.  (Ex. 7, Vautrot Tr. 130:1-12; Ex. 35-37.)

3.    Restore marketed and sold EndoWrist "repairs" to consumers in Florida.  (*See* Ex. 38-40.)

4.    Restore sold EndoWrist "repairs" to Panama City Surgery Center located in Panama City, Florida.  (Motion at 13.)

5.    Restore worked with distributors that marketed Restore's EndoWrist "repair" and da Vinci "service" to Florida hospitals.  (*See, e.g.*, Ex. 41, Parker Tr. 108:19-109:2; Ex. 42 at Restore-00024629-33; Ex. 43.)

### B.   EndoWrists and Restore's "Repairs"

6.    EndoWrists are designed to cease operating when they reach their validated use limits.  (Ex. 18, Howe Report ¶¶6, 25.)

---

concerning 510(k) clearance and later informed Rebotix that it was a remanufacturer subject to 510(k) requirements, and even though Restore is now seeking 510(k) clearance for the exact same "repair" process.  (ECF 109 at 17-22.)

7.    Restore's "repair" process involves insertion of the Interceptor into the EndoWrists to override use limits, causing them to function beyond their validated useful lives, inconsistent with the EndoWrists' original specifications. (ECF 109 at 12, 14.)

8.    Following Restore's "repair," its customers received EndoWrists qualitatively different from, and inferior to, genuine Intuitive EndoWrists.  (Ex. 18, Howe Report ¶¶8-9, 17-19, 41-43, 65-118.)

9.    Restore-"repaired" EndoWrists contained new and unauthorized circuit boards, did not meet original instrument specifications, and were not adequately tested to ensure safe and effective use beyond FDA-cleared limits.  (Ex. 18, Howe Report ¶¶8-9, 17-19, 41-43, 65-118; ECF 109-34 at Restore-00001541, Restore-00001561-66.)

10.    ████████████████████████████████
████████████████████████████████████████
██████████████████████████████  ████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████

11.    Restore-"repaired" instruments failed when used beyond the prescribed limits, including a least once in the middle of surgery.  (Ex. 18, Howe

Report ¶¶ 69-71; *see also* Ex. 22 at Restore-000014224-31, 33-39; Ex. 46 at Restore-00030379.)

### C.    Restore's Deceptive Conduct

12.    Restore-"repaired" EndoWrists continued to bear Intuitive's trademarks, including marks protected by incontestable federal registrations such as "Intuitive Surgical" (Ex. 47), "EndoWrist" (Ex. 48), and "da Vinci Surgical System" (Ex. 49).  (*See* Ex. 50 at p.15; ECF 109-34 at Restore-000015661-66 (Restore EndoWrist service procedure).)

13.    Restore informed customers that "repaired" EndoWrists were "[g]uaranteed to maintain the same functionality" (Ex. 51 at Restore-00018746) and that there were "no changes" to the "performance or safety specifications of the instrument."  (ECF 32-1.)

14.    Customers testified that their decisions to do business with Restore were based on information from Restore regarding patient safety and instrument conformance to original specifications.  (██████████████████████████ ██████ █████████████████████████████ )

15.    Some customers' service agreements with Intuitive were terminated for violation of those contracts' terms due to use of Restore's unauthorized service. Although new contracts were subsequently executed, the relationship between Intuitive and the customer was jeopardized.  (██████ Ex. 54.)

16.     Restore targets its marketing to hospitals with da Vincis, and "repaired" EndoWrists are acquired by the same departments at hospitals that deal with Intuitive.  (Ex. 41, Parker Tr. 86:24-88:20; Ex. 7, Vautrot Tr. 85:4-86:17.)

### D.     Restore's Claims of Cost Savings

17.     Restore represented to customers that "hospitals can save $100,000 per year per robot by repairing and re-using da Vinci endoscopic instruments." (*See* Ex. 55 at Restore-00033666-67; *see also* Ex. 20.)

18.     Restore's marketing of savings of "$100,000 per year per robot," however, depended "greatly on how many instruments per year" a customer needed for repair, as well as if the customer had "[Restore] perform repairs and/or preventative maintenance" on the da Vinci.  (Ex. 41, Parker Tr. 161:20-164:16; Ex. 51 (Parker Ex. 5).)

19.     Restore's advertisements regarding estimated savings were calculated based on an assumption that a customer "on average … did about 300 procedures a year and that generated about 150 instrument purchases times the $650 on average per instrument [Restore was] saving them."  (Ex. 7, Vautrot Tr. 126:12-127:20.)

20.     Restore marketing materials suggested "example savings" for a "hospital" of $498,650 per year, which was based on "repair" of approximately 750 EndoWrists.  (Ex. 29 at Restore-00009565; Ex. 7, Vautrot Tr. 181:10-183:13; *see also* Ex. 55 at Restore-00033671.)

21.    From 2018-20, Restore "repaired" 95 EndoWrists.  (Ex. 56, Smith Report Table 1.)  Restore's largest customer purchased 17 Restore-"repaired" EndoWrists.  (*Id.*.)

22.    Restore presented customers with cost-savings analyses comparing the "Da Vinci" price of an EndoWrist purchased from Intuitive—containing 10 uses—to the "Restore Robotics repair fee"—representing the value of a "repair" that circumvented the use count to add 9 uses to an EndoWrist.  (*See* Ex. 55 at Restore-00033671; *see also* Ex. 57 at Restore-0000918-82.)

23.    Restore promised "annual savings" based off of a cost-per-instrument rather than a cost-per-use comparison.  (*See* Ex. 55 at Restore-00033671; *see also* Ex. 7, Vautrot Tr. 126:12-126:23; Ex. 30 at Restore-00052774.)

**E.    Restore's Attempted "Hack" of the da Vinci System**

24.    The da Vinci connects to Intuitive's proprietary service laptop (or the "distributor's toolkit") (Ex. 41, Parker Tr. 135:12-137:20) and Intuitive's computer network for remote technical support.  (Ex. 58.)

25.    Intuitive has never authorized Restore to access the da Vinci system.  (*See* Ex. 41, Parker Tr. 135:12-137:20.)

26.    Restore's CEO, Clif Parker, called former Intuitive employee Ben Lipson on behalf of Restore about circumventing the da Vinci security and "accessing the software on the laptop."  (Ex. 41, Parker Tr. 135:12-137:20.)

Parker reached out to Lipson because he purportedly had knowledge about the development of da Vinci technology.  (*Id.*)

27.    Following that call, Lipson informed Intuitive that "Clif [Parker] wanted me to hack into the system to help the 'PM Due' message go away."  (Ex. 59 at Intuitive-00595668-69.)  Lipson told Parker "the communications protocol to get onto the system was almost impossible to crack into, and that I knew nobody who could help him." (*Id.*)

28.    Parker ultimately abandoned his attempt to circumvent Intuitive's security after concluding, "it was a futile effort; and [Lipson] said it – it couldn't be done." (Ex. 41, Parker Tr. 139:19-140:1.)

29.    When Intuitive received Lipson's email detailing Parker's efforts to circumvent its security protocols, recipients of that email contacted Intuitive's General Counsel, Kara Reiter, asking her to address the situation.  (Ex. 60, Reiter Tr. 19:21-20:5; Ex. 61 at Intuitive-00454114-15.)

30.    Reiter investigated the facts and circumstances surrounding the "hack" and assessed, planned, and oversaw Intuitive's response.  (Ex. 62 at 9-10; Ex. 60, Reiter Tr. 18:18-21:15; Ex. 61.)  She also worked with counsel to establish the key facts and appropriate response to the attempted security breach.  (Ex. 62 at 9-10; Ex. 60, Reiter Tr. 21:10-22:8.)

**ARGUMENT**

I. **RESTORE IS NOT ENTITLED TO SUMMARY JUDGMENT ON INTUITIVE'S CFAA COUNTERCLAIM**

The CFAA provides a private right of action if there is (A) an actual *or attempted* violation of the CFAA's criminal provisions; (B) conduct that caused, or would have caused, at least one of five enumerated outcomes; and (C) either damage or loss. 18 U.S.C. §§1030(a), (b), (c)(4)(A)(i), (e)(8), (e)(11), (g); *see, e.g.*, *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268, 1322 (S.D. Fla. 2003) (holding defendant liable for CFAA violations when it "attempted … to intentionally access without authorization [the plaintiff's] protected computers"), *aff'd in part, rev'd in part on other grounds sub nom. Four Seasons Hotels v. Consorcio Barr, S.A.*, 138 F. App'x 297 (11th Cir. 2005). The enumerated acts giving rise to CFAA liability include accessing or attempting to access a "protected computer" without authorization, causing damage or loss. 18 U.S.C. §1030 (a)(5). "Loss" is defined to include "any reasonable cost to any victim, including the cost of responding to an offense, [and] conducting a damage assessment." 18 U.S.C. §1030(e)(11).

Restore argues it is entitled to summary judgment because Intuitive lacks evidence that Restore attempted to access Intuitive's da Vinci and that Intuitive suffered a loss. (Motion at 10-11.)  Restore is wrong on both fronts.

**A.      Restore Attempted To Access Intuitive's da Vinci**

Restore argues that "Intuitive has produced no evidence that Restore took any affirmative steps to breach the security on a customer's da Vinci Surgical System, much less the security on Intuitive's computer network." (*Id.* at 10.)  But it is undisputed that Parker, Restore's CEO, attempted to enlist a former Intuitive employee to access the da Vinci, and when the request was made, the former employee interpreted Parker's request as "hacking" into the system.

Liability attaches under the CFAA when a defendant instructs another individual to access computer networks to which the defendant does not have access.  *See, e.g.*, *Enargy Power Co. v. Xiaolong Wang*, No. 13-11348-DJC, 2013 WL 6234625, at \*1, \*3, \*11 (D. Mass. Dec. 3, 2013) (granting preliminary injunction where defendant solicited employee to access plaintiff's computer systems); *Sprint Nextel Corp. v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 690 (D. Md. 2017) (denying summary judgment to defendant that hired a third party to hack into computer system), *vacated in part on other grounds sub nom. Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113 (4th Cir. 2019).  Under the plain language of the statute, liability does not depend on whether the defendant ultimately is successful in accessing networks without authorization or merely "attempts" to do so.  18 U.S.C. §1030(b); *see also Four Seasons*, 267 F. Supp. 2d at 1321-22.

Restore does not dispute that it lacks authorization to access the da Vinci system or that the system is a "protected computer" under the CFAA.[7]  (ISI SOF ¶¶24-25.)  Nor does it dispute that Parker called Lipson, the former Intuitive employee, to inquire whether Lipson's knowledge of the da Vinci's technology could be used to circumvent that system's security, and that Lipson informed Intuitive that "***Clif [Parker] wanted me to hack into the system*** to help the 'PM Due' message go away."  (Statement of Additional Undisputed Material Facts ("ISI SOF") ¶¶26-27) (emphasis added).)  The conversation between Parker and Lipton concerned technical details about how Intuitive's software worked.  (*Id.* ¶27.)  This was not, as Restore suggests, merely "commonplace computer activity" such as "go[ing] to a message board" for general information (Motion at 11), but rather a clear attempt to access a protected computer without authorization that is actionable under the CFAA.  *See* 18 U.S.C. §1030 (a)(5).

Restore's arguments to the contrary mischaracterize the facts and law. Restore first attempts to deflect Lipson's communications by citing a purported

---

[7]  As Restore acknowledges, the da Vinci connects to both Intuitive's proprietary service laptop and Intuitive's own computer network for remote technical support. (Statement of Additional Undisputed Material Facts ("ISI SOF") ¶24.)  This interconnectedness renders the system a "protected computer" under the CFAA. *See Miller v. 4Internet*, LLC, 433 F. Supp. 3d 1188, 1198 (D. Nev. 2020) ("The term 'protected computer' essentially means 'any computer connected to the internet, including servers, computers that manage network resources and provide data to other computers.'").

26

declaration from Lipson that, despite being executed on April 1, 2021, was never produced in discovery and is disclosed for the first time in Restore's motion. (Restore Ex. 1.)  In this newly-disclosed declaration, Lipson reaffirms his prior declaration signed on or about August 2, 2019 (much closer in time to the attempted hack), in which he ***confirmed*** that Parker "wanted me to hack into the Intuitive system."  If anything, the new declaration confirms there are fact issues that must be resolved by a jury concerning Lipson's conversation with Parker,[8] including the credibility of that declaration given Lipson's prior email to Intuitive sent immediately after his call with Parker describing the request to "hack into the [da Vinci] system."

Restore next contends that it did not "attempt" to violate the CFAA because it did not "'perform objectively culpable and unequivocal acts toward accomplishing the crime.'"  (Motion at 10 (quoting *United States v. St. Hubert*,

---

[8]  The new declaration states, without explanation, that "[Restore] did not want to access Intuitive's computer system or network in Sunnyvale, CA."  (Restore Ex. 1.)  Lipson lacks foundation to testify to Parker's intent when he called Lipson, and thus cannot provide testimony to create a fact dispute here.  In any event, the assertion is also inconsistent with Lipson's statement in his August 2, 2019 declaration, which Lipson verifies he "provided Intuitive."  It also ignores that accessing Intuitive's da Vinci would impact the da Vinci's connection to Intuitive's broader network, which is used, among other things, to facilitate the maintenance services Restore sought to circumvent.  (ISI SOF ¶24.)  Tellingly, Parker did not testify that he abandoned his attempt to enlist Lipson's help because it would have involved accessing Intuitive's computer network, but rather because "it was a futile effort; and [Mr. Lipson] said it – it couldn't be done."  (*Id*. ¶28.)

909 F.3d 335, 351 (11th Cir. 2018)), *abrogated in part by United States v. Davis*, 139 S. Ct. 2319 (2019)).)  That standard, however, requires only that Restore "intended to commit every element" of a CFAA violation.  *St. Hubert*, 909 F.3d at 352.  In light of Parker's attempt to procure the "hacking" of Intuitive's systems, Restore cannot genuinely contend that there is no evidence of its attempt.

Restore also suggests that it could not have attempted to violate the CFAA because Intuitive did not "belie[ve] that there was even a risk that Restore has breached security." (Motion at 10.)  Yet Restore offers no authority for the proposition that the CFAA requires that a plaintiff believe an attempt to breach its security would be successful, nor is any such requirement suggested anywhere in the text of the statute.  18 U.S.C. §1030(b).  Regardless, the record shows that Intuitive took Lipson's message about the proposed "hack" seriously.  (ISI SOF ¶¶29-30.)

Finally, Restore suggests that it should not be liable because the CFAA is primarily a criminal statute (Motion at 11) and Intuitive's counterclaim purportedly "asks the Court to read the CFAA to 'attach criminal penalties to a breathtaking amount of commonplace computer activity.'"  (Motion at 11 (quoting *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021)).)  But the CFAA plainly permits civil enforcement for violations of the Act and, as discussed above, Restore's conduct is well within the bounds of conduct deemed actionable under the statute.  Restore's

reliance on *Van Buren* is misplaced because the activity deemed non-actionable in that case was defendant's running a license-plate search using a database that he was ***authorized*** to access. *See id.* at 1653-54. Restore, on the other hand, knew that it was not authorized to access Intuitive's system, which is why it targeted a former Intuitive employee for the purpose of "hacking" Intuitive's system.

### B.   Intuitive Suffered Loss Due To the CFAA Violation

The CFAA provides a private right of action to "[a]ny person who suffers damage ***or loss*** by reason of a violation of this section." 18 U.S.C. §1030(g) (emphasis added). Intuitive seeks to recover for loss flowing from its response and assessment of Restore's attempt to commit a CFAA offense. (ECF 49 ¶87.)[9] "Loss" is defined to include "the cost of responding to an offense." 18 U.S.C. §1030(e)(11).

This Court previously held that cognizable loss may be established by evidence that, "[i]n response to [Restore's] attempted hack, [Intuitive's] staff and outside counsel were engaged to determine the scope of the potential intrusion and to assess and plan [Intuitive's] response." (ECF 53 at 1.) As the Court recognized, recovery for this type of loss is well-supported by both statutory language and case

---

[9] Restore's arguments that Intuitive did not suffer damages or impairment are irrelevant because Intuitive does not seek to recover on that ground. (Motion at 11.)

29

law.  (*Id.* (citing 18 U.S.C. §1030(e)(11); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); *Aquent LLC v. Stapleton,* 65 F. Supp. 3d 1339, 1345 (M.D. Fla. 2014)).)

Intuitive suffered such a loss when responding to Parker's attempted "hack." Recipients of Lipson's email contacted Intuitive's General Counsel and asked her to address the situation.  (ISI SOF ¶29.)  The General Counsel then investigated the facts and circumstances surrounding the hack and assessed, planned and oversaw Intuitive's response.  (*Id.* ¶30.)  The costs associated with this assessment and response constitute loss under the CFAA, and Restore fails to advance any plausible argument to the contrary.[10]

Restore also argues that Intuitive has not suffered a loss but relies on the same decisions that this Court cited to support its conclusion that Intuitive alleged loss under the CFAA.  (Motion at 11.)  Both *Brown Jordan* and *Aquent* confirm that actionable loss includes costs incurred in direct response to a CFAA offense,

---

[10] Restore's argument that Intuitive relies on "attorney argument" as evidence of loss is misplaced.  (Motion at 12 (citing *Sartori v. Schrodt*, 424 F. Supp. 3d 1121, 1129 (N.D. Fla. 2019).)  Evidence of loss is supported by Intuitive's interrogatory responses, emails with Lipson and Reiter's testimony.  (Ex. 62 at 9-10; Ex. 60, Reiter Tr. 18:18-22.1; Ex. 61.)  Restore's argument that Intuitive did not respond to Restore's attempted hack, based on DeSantis's testimony, is similarly meritless. As DeSantis repeatedly testified, he was not personally involved in the response to Parker's attempted hack and lacked firsthand knowledge of the details of Intuitive's response.  (Ex. 63, DeSantis Tr. 74:13-24; 75:15-76:19.)

even if the computer system itself was not harmed.  *See Brown Jordan*, 846 F.3d at

1174; *Aquent*, 65 F. Supp. 3d at 1344-45.  Restore also cites cases standing for the

unremarkable proposition—inapplicable here—that litigation expenses or legal

fees *wholly unrelated* to a CFAA violation are not cognizable losses.  (Motion at

12.)  Several of those decisions recognize that investigative work relating to a

CFAA violation qualifies as loss under the CFAA.  *See, e.g.*, *Mortg. Now, Inc. v.

Stone*, No. 3:09cv80/MCR/MD, 2010 WL 11519201, at \*5, \*13 (N.D. Fla. Sept. 29,

2010); *Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*, 497 F.

Supp. 2d 627, 647-48 (E.D. Pa. 2007).

## II.   RESTORE IS NOT ENTITLED TO SUMMARY JUDGMENT ON INTUITIVE'S FDUTPA COUNTERCLAIM

Restore does not dispute that Intuitive has met the substantive elements of a

claim for damages under FDUTPA.[11]  Rather, Restore wrongly argues that

"FDUTPA does not apply to actions that occurred outside of Florida" and

Intuitive's counterclaim thus fails because it purportedly has not demonstrated that

any consumer in Florida was "aggrieved by" Restore's deceptive acts.  (Motion at

13.)

---

[11] A claim for damages under FDUTPA requires three elements:  "(1) a deceptive
act or unfair practice; (2) causation; and (3) actual damages."  *Diamond Resorts
Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1115 (M.D. Fla. 2019) (quoting
*Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)).

*First*, Restore is wrong about the statute's geographic scope.  Courts have recognized that FDUTPA protects out-of-state consumers when "the offending conduct took place predominantly or entirely in Florida." *Bank of Am., N.A. v. Zaskey*, No. 9:15-cv-81325-ROSENBERG/HOPKINS, 2016 WL 2897410, at *9 (S.D. Fla. May 18, 2016); *see also Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 WL 1570057, at *5 (S.D. Fla. May 2, 2012) (relief could be sought on behalf of out-of-state consumers because "[t]here are no geographic or residential restrictions contained in the express language" of FDUTPA).  Courts therefore allow FDUTPA claims against businesses in Florida, even where certain of their in-state acts target or impact out of state consumers. *See, e.g., FTC v. Info. Mgmt. Forum, Inc.*, No. 6:12-cv-986-orl-31 KRS, 2013 WL 3323635, at *6-7 (M.D. Fla. June 28, 2013).

There is a substantial nexus between Florida and Restore's deceptive practices.  Restore is a Florida limited liability company with its principal address in Panama City Beach, Florida.  (ISI SOF ¶1.)  Significant portions of Restore's operations were directed toward, and occurred in, Florida.  For example, Restore directed consumers to send their instruments to St. Petersburg to be "repaired." (*Id*. ¶2.)  Restore also targeted and sold it services to consumers in Florida, including through the use of distributors.  (*Id.* ¶¶3-5.)  The foregoing conduct is sufficient for FDUTPA to apply.  *See Info. Mgmt. Forum*, 2013 WL 3323635, at *7

(permitting FDUTPA claim because defendant, "a Florida corporation, directed false and misleading telephone communications to consumers around the country").

*Second*, consumers have been injured because of Restore's deceptive acts and practices in multiple ways. "Under FDUTPA, [p]laintiffs suffer[] damages when they purchase[] something that [is] not what they were led to believe they were purchasing." *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2011); *accord Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 990-91 (Fla. Dist. Ct. App. 2004) (finding injury under FDUTPA where consumer "did not get what she bargained for"). That is precisely what happened to customers that were deceived into utilizing Restore's "repair" services: they received Restore-"repaired" EndoWrists qualitatively different from, and inferior to, Intuitive-manufactured EndoWrists, despite their having been informed that the "repaired" EndoWrists were "[g]uaranteed to maintain the same functionality" and that there were "no changes" to their "performance or safety specifications." (ISI SOF ¶¶8, 13.)

The "repaired" EndoWrists contained new and unauthorized circuit boards, did not meet original instrument specifications, and had not been adequately tested to ensure safe and effective use beyond the FDA-cleared limits. (*Id*. ¶¶6-7, 9.) Restore-"repaired" EndoWrists further suffered failures when used beyond the

33

prescribed limits, including in the middle of surgery.[12]  (*Id*. ¶11.)  Testimony from Restore customers confirms that Restore's deceptive messaging factored into their decision to do business with Restore.  (*Id*. ¶14.)

The foregoing constitutes sufficient evidence of harm to consumers under FDUTPA.  *See, e.g., N.C.W.C., Inc. v. Land & Sky Invs., LLC, Fla.*, No. 6:20-cv-397-Orl-37EJK, 2020 WL 6064597, at *3 (M.D. Fla. May 22, 2020) (allegation that defendants "deliver an inferior product, and that at least one consumer bought Defendants' product, which lacked certain features" held sufficient harm under FDUTPA); *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1325-26 (S.D. Fla. 2014) (plaintiffs adequately alleged injury by purchasing vehicles that did not meet the advertised safety ratings).

Consumers also were harmed in at least two other ways beyond merely receiving different (and inferior) products from what they were promised:  (1) they suffered financial harm because of Restore's misleading cost-savings analyses (ISI SOF ¶¶17-23); and (2) some had their contracts with Intuitive terminated for violation of those contracts' terms, and even where new contracts were

---

[12] Actual instrument failure is not a prerequisite for injury to be cognizable under FDUTPA. *See Collins*, 894 So. 2d at 990 (finding "no requirement in FDUTPA that a defect manifest itself ... by causing injury").

subsequently executed, the relationship between Intuitive and the customer was jeopardized. (*Id.* ¶15.)

For the above reasons, the record reflects at minimum a genuine fact issue as to consumer injury, and Restore's motion for summary judgment on the FDUTPA counterclaim should be denied.

## III.   RESTORE IS NOT ENTITLED TO SUMMARY JUDGMENT ON INTUITIVE'S PASSING OFF COUNTERCLAIM

Restore argues it cannot be liable for passing off because it purportedly never "told customers" that it was affiliated with Intuitive. (Motion at 14-15.) As an initial matter, whether Restore expressly told customers that it was affiliated with Intuitive is not dispositive of whether customers were deceived. As set forth in Section IV.B.1 *infra*, deceptive messages can be implied, and there is evidence of customers being deceived regarding Restore's affiliation in this case. Regardless, Restore misunderstands Intuitive's passing off cause of action.

The crux of Restore's unlawful "passing off" was its false presentation of "repaired" EndoWrists as still being Intuitive-manufactured products with the same functionality, safety, and reliability as new EndoWrists, when in fact those instruments were heavily modified and qualitatively different from—indeed, inferior to—genuine Intuitive instruments. (ISI SOF ¶¶7-9, 11.) *See Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 647 (describing "passing off" as "when a producer

misrepresents his own goods or services as someone else's").  Despite containing completely new (and unauthorized) circuit boards and other modifications, and being modified for use beyond their safe, prescribed, and FDA-cleared use limits, Restore-"repaired" EndoWrists continued to bear Intuitive's federally registered and incontestable trademarks.  (*Id*. ¶12.)  Restore exacerbated that deception with suggestions to customers that its "repaired" EndoWrists were "[g]uaranteed to maintain the same functionality" and that there were "no changes" to their "performance or safety specifications of the instrument." (*Id*. ¶13.)  This conduct alone is sufficient to demonstrate a genuine factual dispute with respect to passing off.  *See, e.g.*, *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 855-56 (9th Cir. 2002) (triable issue of fact because plaintiff "presented evidence that [defendant's] rebuilds" of endoscopes "were the construction of a different product associated with [plaintiff's] trademark"); *MetroPCS Wireless, Inc. v. Virgin Mobile USA, L.P.*, No. 3:087-CV-1658-D, 2009 WL 3075205, at *7 (N.D. Tex. Sept. 25, 2009) (fact issue regarding whether "reflashing" cell phones to other networks "fundamentally transforms a handset so as to create a new product").

Neither of Restore's arguments to the contrary has merit.

A.      **Restore Made a "Use In Commerce"**

Restore argues that its service cannot constitute an actionable "use in commerce" under the Lanham Act because "the owner requests modification and intends to retain ownership." (Motion at 15.) This Court ***already expressly rejected*** this argument. Indeed, the Court recognized the broad "reach afforded to 'commerce' under the Lanham Act" and the sufficiency of Intuitive's allegation "that Plaintiffs' repairs effectively change [Intuitive's] robots into a different product" that "retain" Intuitive's "name and trademarks, but lack the quality, safety, and precision of [an Intuitive]-manufactured, FDA-cleared surgical device." (ECF 44 at 8-9 (quoting ECF 41 at 14).)

Restore apparently seeks reconsideration of that decision, based on decisions from other jurisdictions. But this Court is not the only court in this Circuit to recognize that Restore's conduct would constitute "use in commerce." "If [a] reconstructed product still bearing the original manufacturer's trademark is so altered as to be a different product from that of the original manufacturer, the repair transaction involves a 'use in commerce.'" *Elf Cocoon, LLC v. Philip Stein Holdings Inc.*, No. 09-20893-CIV-HUCK/O'SULLIVAN, 2009 WL 10667773, at *19 (S.D. Fla. Aug. 11, 2009) (quoting *Karl Storz*, 285 F.3d at 856; *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §25:39 (5th ed. 2017 & Supp. 2021) (where modifications are "so extensive or basic that it

would be false and misleading to keep the original trademark on the changed product," retention of the "original maker's trademark on the substantially changed instrument" may be actionable even where "*the words* 'used' or *'repaired' were used*" (emphasis added)).

Restore's modifications to EndoWrists—breaking into the instruments, replacing their circuit boards, and overriding their carefully calibrated use limits (ISI SOF ¶¶6-7) —"alter" EndoWrists "as to be a different product." *Elf Cocoon*, 2009 WL 10667773, at *19. As such, the "use in commerce" determination should not be taken away from the trier of fact.

**B.   There Is a Fact Dispute Concerning Likelihood of Confusion**

Restore next contends that Intuitive has failed to proffer evidence of likelihood of confusion, and that a reasonable jury could not "conclude that customers in the real world are likely to confuse Intuitive Surgical with Restore Robotics in the marketplace." (Motion at 16.)  This argument fails as well.

*First*, for the reasons discussed above, the question for the passing off counterclaim is not whether customers believe Intuitive and Restore are the same company, but rather whether customers are deceived as to whether the purportedly "repaired" EndoWrists bearing Intuitive trademarks are Intuitive products. Accordingly, Restore's argument is inapposite.

**Second**, there is ample evidence for a jury to conclude under the likelihood-of-confusion factor balancing test in *Custom Manufacturing & Engineering, Inc. v. Midway Services, Inc.*, 508 F.3d 641 (11th Cir. 2007) that customers were likely deceived by Restore's passing off.  For example:  (1) the Intuitive trademarks are strong, as they are not generic or descriptive, and are protected by incontestable federal trademark registrations (factor 1)[13] (ISI SOF ¶12); (2) the marks on Intuitive EndoWrists and the "repaired" instruments are not changed by Restore and thus are identical (factor 2) (*Id.*); (3) the goods appear virtually identical (despite internal differences) and are presented by Restore as having the same functionality (factor 3) (Response to Restore's Statement of Facts ("Response") 17; ISI SOF ¶13); (4) Intuitive and Restore have the same customers, and both genuine and "repaired" EndoWrists are acquired by the same departments at hospitals (factor 4) (ISI SOF ¶16);[14] and (5) Restore repeatedly and falsely

---

[13] *See PODS Enters., LLC v. U-Haul In'tl, Inc.*, 126 F. Supp. 3d 1263, 1272-73 (M.D. Fla. 2015) (plaintiff introduced sufficient evidence of likely confusion, including "evidence that it possessed two incontestable federal trademark registrations, favoring a finding of a strong mark" because ***incontestable marks are "'presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark'"*** (emphasis added).

[14] Restore's contention that the customer "can only get new instruments direct from Intuitive and can only get repair service direct from Restore or through its network of sales representatives" (Motion at 21) is at odds with its entire theory underlying its antitrust claims that there is a competitive market for "repair and replacement of EndoWrists."  (ECF 77 ¶36.)  In any event, Restore markets its service as directly competing with new instruments from Intuitive, and targets the

presented the instruments that it serviced as merely "repaired" *Intuitive* instruments with the same functionality as new EndoWrists sold by Intuitive despite knowledge to the contrary, demonstrating intent to deceive (factor 6) (ISI SOF ¶¶6-9, 13).

Restore purports to identify other evidence weighing against a finding of likely confusion, but Restore is not entitled to usurp the jury's role in considering and weighing all of the factors. Summary judgment can only be granted if "no material issues of fact exist" with respect to likelihood of confusion, *Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*, 2010 WL 331752, at *5 (S.D. Fla. Jan. 20, 2010), which they do here. In fact, even evidence that Restore cites confirms that summary judgment is *inappropriate*. For example, Restore points to the etched "R's" on "repaired" instruments (Motion at 20), but the image provided by Restore shows the "R's" are barely visible, requiring Restore to use a large arrow to highlight them, and even assuming that all customers (and surgeons using the instruments at hospitals) had seen those "R's," there is no evidence that they understood the significance of those letters. (Response 17.)

---

same customers through the same trade channels. *Cf. Custom Mfg.*, 508 F.3d at 648-49 (describing the fourth confusion factor as "the similarity of the parties' retail outlets, trade channels, and customers"); *U-Haul Int'l*, 126 F. Supp. 3d at 1273 (finding sufficient evidence that fourth factor weighed in favor of confusion where "the parties ... through their respective [products], directly competed with each other").

In sum, there is a genuine fact dispute regarding likelihood of confusion that precludes a finding of summary judgment on Intuitive's passing off counterclaim.

## IV.   RESTORE IS NOT ENTITLED TO SUMMARY JUDGMENT ON INTUITIVE'S FALSE ADVERTISING COUNTERCLAIMS UNDER THE LANHAM ACT AND COMMON LAW

### A.   Restore Does Not Dispute That Certain of Its Deceptive Statements Cannot Be Resolved At Summary Judgment

Intuitive alleged that Restore's advertising is comprised of several categories of deceptive statements regarding its unauthorized "repair" service, including willful misrepresentations that:

1. Restore's service is authorized or approved by Intuitive (ECF 49 ¶¶1, 3, 35-37, 39-43, 62);

2. Restore is qualified to perform its service (*id.* ¶¶ 1, 3, 35-36, 62);

3. There are no material consequences for customers using Restore's services, such as risks to patient safety or voiding Intuitive warranties and service contracts (*id.* ¶¶ 3, 36-37);

4. Restore has properly analyzed whether FDA 510(k) clearance is needed for its service, when in fact Restore plainly has not done so and intentionally ignored guidance on that issue (*id.* ¶¶ 6-8, 35, 44-49, 62);

5. Restore's service saves customers substantial amounts of money; for example, "$100,000 per year per robot" (*id.* ¶¶ 3, 35, 38, 62); and

6. Restore's service is a mere "repair" to fix broken instruments, without disclosing that Restore breaks into and makes major modifications to EndoWrists, such as replacing original circuit boards with unauthorized "Interceptor" technology (*id.* ¶¶ 5, 35, 38-39).

Restore argues (incorrectly) that it is entitled to summary judgment on the first four of the above categories of statements, but does not address either its claim to save customers substantial costs or its misrepresentation of its service as a benign "repair." Accordingly, Intuitive's false advertising counterclaims must be presented to the jury at least with respect to those deceptive statements.[15]

**B.    Restore Fails to Establish That It Is Entitled to Summary Judgment Regarding Any Advertising Claims It Addresses**

Even with respect to the deceptive advertising statements Restore addresses, its arguments are easily debunked.

To succeed on a Lanham Act false advertising claim, a plaintiff must show five distinct elements: (1) the advertising is "false or misleading"; (2) the advertising "deceived, or had the capacity to deceive, consumers"; (3) "the deception had a material effect on purchasing decisions" (i.e., "materiality"); (4) an effect on interstate commerce; and (5) injury. *Hickson Corp. v. N. Crossarm Co.*,

---

[15] Even if Restore had addressed these misrepresentations, any argument for summary judgment would be meritless. The record reflects that Restore's claims to save customers "$100,000 per year per robot" and similar statements are unsupported and untrue. (ISI SOF ¶¶17-23.) Restore undisputedly represented its adulteration of EndoWrists as routine "repair" despite the major changes that it makes to the instruments, and there is evidence of customer confusion about the nature of Restore's service—including survey evidence reflecting that significant portions of Restore's customer base did ***not*** expect that Restore's service included certain steps that Restore performs, such as discarding Intuitive's circuit board and replacing it with a third-party circuit board. (*Id.* ¶¶6-9, 13-14.)

357 F.3d 1256, 1260 (11th Cir. 2004). Restore argues solely that certain of its statements were not false or deceptive.

### 1.   Authorization

Restore's suggestion that it cannot be liable because it purportedly never expressly "told a customer that it was authorized by Intuitive" (Motion at 22) misconstrues applicable law.  Advertising claims need not be "literally false" to be actionable; false messages that are implied or "misleading" are actionable where a plaintiff presents evidence of deception such as "through the use of consumer surveys." *Edmondson v. Caliente Resorts, LLC*, No. 8:15-cv-2672-T-23TBM, 2017 WL 10591833, at *8 (M.D. Fla. Aug. 31, 2017).

Moreover, Restore's assertion that "there is no evidence that hospitals were misled into believing that Restore was authorized by Intuitive" (Motion at 22) is untrue.  There is substantial supporting evidence, including that:

- At least one hospital contacted Intuitive to ask whether Intuitive was affiliated with Restore.  (Response 13.)

- Restore sought (albeit ineffectively) to reduce confusion from its ads by removing images of and references to Intuitive instruments and adding fine print. (*Id*.)

43

- Survey evidence indicates that a significant portion of the target audience for Restore's marketing mistakenly believed that Restore is authorized, approved or endorsed by Intuitive. (*Id.*)[16]

Dr. Parikh's survey results are not the only evidence of deception regarding authorization, but even if they were, as detailed in Intuitive's Opposition to Restore's Motion to Exclude Expert Testimony, Restore's criticisms of Dr. Parikh's survey are not only meritless, but at most would bear on the *weight* of Dr. Parikh's opinions, not their admissibility. *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844-45 (11th Cir. 1983); *cf. Edmondson*, 2017 WL 10591833, at *10 (explaining that it is "rare" for a survey to be found "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible"). Dr. Parikh presented a representative sample of Restore's target customers with the "main flyer" that Restore utilized to market its services (Response 13), and her survey generated helpful and reliable results.[17]

---

[16] Although Restore implies that the results are unhelpful because they "only found 27%" confusion (Motion at 22 n.9), courts routinely conclude that deception of this magnitude is actionable. *See, e.g.*, *Rice v. Brand Imports, L.L.C.*, No. 1:09-CV-3254-MHS, 2010 WL 11549769, at *4 (N.D. Ga. Sept. 16, 2010) (survey result of 31% found "probative of actual confusion"); 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §32:185 (5th ed. 2017 & Supp. 2021) ("[F]igures in the range of 25% to 50% have often been relied upon as support for a finding of likelihood of confusion").

[17] Restore misrepresents the nature and purpose of Dr. Parikh's survey when it argues that Intuitive has "conceded" that the survey does not "show that hospitals

2.   Qualifications

Restore argues that because its claims that it is qualified to perform services

on da Vincis and EndoWrists are true, it cannot be liable.  (Motion at 23.)  Restore

ignores the evidence demonstrating it was ***not*** qualified.

Both field service engineers, McDaniel and Gordon, who performed da

Vinci "service" for Restore were credentialed many years earlier and were not in

compliance with Intuitive's rigorous requirements that field service engineers be

continually educated and up-to-date with changes in software and technology.

(Response 12.)  In addition, McDaniel and Gordon performed substandard service

while employed by Intuitive.  (*Id.*)  Moreover, they received initial training only on

the da Vinci, not EndoWrists, and Restore cannot establish that they were qualified

to "repair" EndoWrists.  (*Id.*)

3.   Cost Savings

Restore does not seek summary judgment regarding its false claim that its

services will save customers substantial (and specified) amounts of money by

using its services, and instead, addresses only its failure to inform customers that

———————————————

in the real world of complex decision making are likely to believe that Restore
Robotics has been authorized by Intuitive." (Motion at 22.)  Dr. Parikh testified
that her survey was not intended to measure the separate false advertising element
of ***materiality***.  (Ex. 64, Parikh Tr. 38:13-39:3.)  Because her survey pertains to the
element of ***deception***, it measures whether customers received the allegedly
deceptive advertising messages.

use of its services risks violating their contracts with Intuitive.  (Motion at 23-24.)

Restore does not dispute that it failed to inform customers of such risks or that its

advertising deceived customers as to a lack of such risks (illustrated by evidence

including Dr. Parikh's survey.)  (Response 12, 13.)  Rather, Restore contends that

any such deception may have been rectified, or was harmless, because Intuitive

purportedly has not put forth "evidence that reasonable consumers would not check

their contracts before using Restore" or that "consumers would not have used

repaired instruments in violation of the terms of their contracts to see if Intuitive

would enforce their contracts." (Motion at 24.)

Restore's arguments are sheer speculation.  The notion that customers would

have used "repaired" instruments knowingly in violation of their Intuitive contracts

is squarely contradicted by Restore's own theory of its affirmative case, a central

allegation of which is that its "repair" business was impaired by virtue of

Intuitive's outreach to customers informing them of the warranty and contract

terms that would be voided if the customer were to use Restore's services. (ECF 77

¶¶98-104.)

### 4.   Determination Regarding 510(k) Clearance

Restore wrongly argues that its statements indicating to customers that it

appropriately analyzed whether its EndoWrist "repairs" required 510(k) clearance

were a legal "opinion."  (Motion at 25.)  In the wake of this Court's decision on the

Motion to Dismiss (ECF 44), Intuitive re-framed its false advertising counterclaim such that it is not challenging the literal falsity of Restore's claim that it did not require such clearance; rather, the alleged deception is that Restore insufficiently analyzed that issue, regardless of whether its ultimate conclusion was correct or aligned with any ultimate FDA determination. (ECF 49 ¶¶ 6-8.) Thus, the jury is presented with purely a *factual* question: Was Restore's analysis sufficient?

The evidence demonstrates that it was not. ████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ This creates a clear factual question for the jury.

## **CONCLUSION**

For the foregoing reasons, Intuitive respectfully requests that the Court deny

Restore's motion for partial summary judgment.

DATED:  December 10, 2021            Respectfully submitted,

/s/ Karen Lent

KAREN HOFFMAN LENT (*Pro Hac Vice*)        DAVID L. McGEE
MICHAEL H. MENITOVE (*Pro Hac Vice*)        Fla. Bar No. 220000
JORDAN A. FEIRMAN (*Pro Hac Vice*)          BEGGS & LANE, RLLP
SKADDEN, ARPS, SLATE,                        501 Commendencia Street
  MEAGHER & FLOM LLP                         Pensacola, FL 32502
One Manhattan West                           Telephone: (850) 432-2451
New York, NY 10001                           dlm@beggslane.com
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com

MICHAEL S. BAILEY (*Pro Hac Vice*)          ALLEN RUBY (*Pro Hac Vice*)
1440 New York Avenue, N.W.                   Attorney at Law
Washington, DC 20005                         15559 Union Ave. #138
Tel: (202) 371-7000                          Los Gatos, CA 95032
michael.bailey@skadden.com                   Tel: (408) 477-9690
                                             allen@allenruby.com

*Counsel for Intuitive Surgical, Inc.*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Intuitive certifies this Memorandum complies with the 10,500 word count limitation set forth in the Court's November 5, 2021 Order regarding the word limits for summary judgment filings, excluding the parts exempted by Local Rule 7.1(F).

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2021, I caused **INTUITIVE
SURGICAL INC.'S RESPONSE IN OPPOSITION TO RESTORE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT** to be served on the
following counsel of record by email:

| William Gerald Harrison, Jr. | wharrison@harrisonrivard.com |
|---|---|
| Jeffrey Berhold | jeff@berhold.com |

/s/ Karen Lent

KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com