# Exhibit 2

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

| | |
|---|---|
| RESTORE ROBOTICS LLC, RESTORE ROBOTICS REPAIRS LLC, and CLIF PARKER ROBOTICS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> INTUITIVE SURGICAL, INC., <br><br> Defendant. <br> INTUITIVE SURGICAL, INC., <br><br> Counterclaimant, <br><br> v. <br><br> RESTORE ROBOTICS LLC and RESTORE ROBOTICS REPAIRS LLC <br><br> Counterclaim Defendants. | Civil Case No. 5:19-cv-55-TKW-MJF |

**EXPERT REPORT OF HEATHER S. ROSECRANS**

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

**August 20, 2021**

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.    QUALIFICATIONS ................................................................................1

    A.    FDA Career ........................................................................1

    B.    Professional Publications and Presentations ...........................5

    C.    Present Position ..................................................................6

II.    OVERVIEW OF FDA REGULATION OF MEDICAL DEVICES AND RELEVANT BACKGROUND ................................................................6

    A.    FDA Regulatory Authorities, Mission, and Structure ..............6

    B.    Regulation of Medical Devices ............................................7

    C.    Device Classification .........................................................8

        1.    Class I Devices ......................................................9

        2.    Class II Devices ..................................................10

        3.    Class III Devices .................................................10

    D.    Device-Related Activities and Functions Regulated by FDA ...........11

    E.    Premarket Notification Submission (510(k)) .........................13

        1.    Valid Scientific Evidence ......................................14

        2.    Substantial Equivalence .......................................16

        3.    Performance Data Requirements ...........................17

        4.    Labeling Requirements ........................................18

        5.    510(k) Review Process .........................................19

        6.    510(k) Decisions .................................................21

    F.    Other Pathways to Market for Medical Devices .......................22

        1.    510(k)-Exempt Devices .......................................22

        2.    *De Novo* Classification .......................................22

        3.    Premarket Approval Application ("PMA") ...............23

    G.    Prohibition on Sale of a Device Prior to 510(k) Clearance or PMA Approval ..........................................................................23

    H.    FDA Postmarket Regulation of Medical Devices .....................24

    I.    FDA's Approach to Remanufacturing, Refurbishing, and Servicing ...........25

    J.    Relevant Background on Restore's Business Related to EndoWrist Instruments ......................................................................29

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

III.   EXPERT OPINIONS ................................................................................31

    A.   Usage Limits Cannot Be Removed Without 510(k) Clearance Because FDA Cleared the EndoWrist Instruments as Limited Use Devices ......................31

    B.   Restore's Argument that FDA's "Substantial Equivalence" Determination Means EndoWrist Instruments Can Be Treated the Same Way as Traditional Laparoscopic Instruments Is Flawed ................................................34

        1.   "Substantial Equivalence" Does Not Mean the FDA Considers a Predicate Device and the Cleared Device to Be the Same .........................34

        2.   Restore Improperly Relied on FDA's "Substantial Equivalence" Determination to Bypass Usage Limits ......................................................36

    C.   Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent with FDA's Regulatory Requirements .................................37

        1.   FDA's 510(k) Clearance of EndoWrist Instruments Requires Intuitive to Market and Sell EndoWrist Instruments in a Manner Consistent with the Usage Limits Cleared by FDA in the 510(k) ............37

        2.   Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent with FDA's Labeling Requirements ..............38

    D.   Restore Introduced a New Medical Device (the Interceptor Board) into Commerce and, Without 510(k) Clearance, Marketed a Device That Was Misbranded and Adulterated ................................................................................41

        1.   The Interceptor Board Is a Medical Device ................................................41

        2.   Restore Introduced the Interceptor Board Into Interstate Commerce ........43

        3.   Because the Interceptor Board Is a Device That Moved in Interstate Commerce, Restore Required 510(k) Clearance Before Marketing the Device ................................................................................46

        4.   The Interceptor Board Marketed by Restore Is Misbranded and Adulterated Under the FDCA ......................................................................48

        5.   Restore Must Be Responsible For Compliance with Medical Device Reporting Requirements ................................................................50

    E.   In the Alternative, Restore Was Required to Obtain 510(k) Clearance as A Remanufacturer ................................................................................................50

        1.   Restore Significantly Changed the Intended Use of the EndoWrist Instrument by Bypassing FDA-Cleared Usage Limits .............................52

        2.   Restore's Insertion of the Interceptor Board Did Not Constitute a "Repair" of EndoWrist Instruments ............................................................56

        3.   Restore's Analysis in its Letter to File was Flawed and Inapplicable, and Does Not Exempt Restore from Obtaining 510(k) Clearance ................................................................................................58

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

|  |  | 4. | Restore's Position on the Type of Reusable Medical Devices That Qualify for 510(k) Clearance Is Incorrect | 61 |
|---|---|---|---|---|
|  |  | 5. | Intuitive Was Not Required to Obtain 510(k) Clearance Before Increasing the Usage Limits of Certain EndoWrist Instruments | 62 |
|  | F. | | Iconocare Health Solution's 510(k) Submission Supports the Conclusion that 510(k) Clearance Is Necessary for the Interceptor Board | 64 |
|  | G. | | FDA's Interactions with Restore, BPI, and Rebotix Further Support the Conclusion that the Interceptor Board Needed 510(k) Clearance | 68 |
|  | H. | | Intuitive's Customer Communications Noting That Restore Needed 510(k) Clearance for the Interceptor Were Appropriate and Based on a Reasonable Interpretation of FDA Law | 72 |
|  | I. | | Restore Failed to Adequately Investigate Whether a 510(k) Was Needed Prior to Making Representations to Customers | 74 |
| IV. | CLOSING | | | 76 |
| APPENDIX A | Curriculum Vitae of Heather S. Rosecrans | | | 77 |
| APPENDIX B | Materials Relied Upon by Heather S. Rosecrans | | | 96 |
| APPENDIX C | Heather Rosecrans's Expert Testimony and Deposition Experience | | | 106 |

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

1.      I am a Food and Drug Administration ("FDA" or "agency") regulatory affairs consultant with expertise in matters concerning premarket regulation of [medical][1] devices.  My career includes more than thirty years of public health and medical device experience at FDA. The knowledge and experience obtained during my three-decade career at FDA—specifically while serving on the 510(k) Staff—provide me with the expertise necessary to offer expert opinions in this case.  A copy of my curriculum vitae is attached as Appendix A.

2.      I have been engaged as an employee of Greenleaf Health, Inc. ("Greenleaf"), by Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Defendant/Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive"), to opine on issues relating to 510(k) clearance and related regulatory requirements in connection with Case No. 5:19-cv-55-TKW-MJF, *Restore Robotics LLC, et al. v. Intuitive Surgical*.  I am being compensated at the hourly rate of $850, plus reimbursable expenses, to prepare this report.  My compensation is in no way dependent on the outcome of this matter.

## I.      QUALIFICATIONS

### A.      FDA Career

3.      In 1976, I was awarded a Bachelor's Degree from Pfeiffer College where I majored in Biology.  Shortly after graduation, I began a 33-year career at FDA—the majority of which was spent working in what is now known as the Center for Devices and Radiological Health ("CDRH").  CDRH is responsible for regulating firms who manufacture, repackage, re-label, and/or import medical devices for commercial distribution in the United States.

---

[1]   Section 201(h) of the Federal Food, Drug, and Cosmetic Act ("FDCA") uses the term "device" to define "medical devices" regulated by FDA.  This document uses the term "medical device," which is the term used in FDA regulations located at Title 21 of the Code of Federal Regulations.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

4.      From 1978 to 1980, I held the position of Biologist in the Division of Clinical
Laboratory Devices in the premarket review office at the FDA's Bureau of Medical Devices
(now CDRH).  My principal responsibilities included reviewing and tracking premarket
notification submissions ("510(k)s") and Premarket Approval Applications ("PMAs").
Additionally, I was responsible for researching, interpreting, and drafting proposed and final
microbiology device classification regulations.[2]  In 1980, I was assigned to the PMA Section in
the premarket review office where I served as a Consumer Safety Officer.  The PMA Section
(later renamed "PMA Staff" and now called Division of Regulatory Programs 1 (Submission
Support)) oversees and coordinates the administrative and regulatory review of PMAs, product
development protocols ("PDPs"), Humanitarian Device Exemptions ("HDEs") and associated
submissions such as Environmental Assessments, Color Additive Petitions, Device Master Files,
patent term extension petitions, and post-approval reports under Section 515 of the Federal Food,
Drug, and Cosmetic Act ("FDCA" or "the Act").[3]

5.      The CDRH PMA Section was in the newly organized Program Management Staff
("PMS" and later called the Program Operations Staff ("POS") in the Office of Device
Evaluation ("ODE"), now called the Office of Product Evaluation and Quality ("OPEQ"), at
CDRH).  I held the position of Consumer Safety Officer in the PMA Section from 1980 until
1987.  In this role, I was responsible for overseeing the review of PMAs and PDPs to ensure that
they were reviewed in accordance with statutory criteria and established regulations, procedures,
policies, and timeframes, as well as participating in the development of related regulations,
procedures, policies, and timeframes.  During this time, I was also responsible for developing

---

[2]   *See* 21 C.F.R. Part 866 (final regulations).

[3]   *See* FDCA § 515; 21 U.S.C. § 360e.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

appropriate educational materials and other guidance regarding PMA-related activities for use by CDRH, including the review staff, other FDA medical product Centers, and other stakeholders.  I also provided training on PMAs and PDPs for the agency as well as for external stakeholders.

6.      In 1987, I joined the 510(k) Section of POS in ODE.  The 510(k) Section in ODE (later known as the "510(k) Staff" and now called the 510(k), *De Novo*, 513(g), Device Determinations and Custom Devices Lifecycle Team in the Division of Regulatory Programs 1 (Submission Support, OPEQ)) is responsible for overseeing and coordinating the regulatory and administrative review of 510(k) submissions in CDRH, assisting other Centers at FDA with 510(k)s, and providing information on the 510(k) Program to other regulatory agencies and stakeholders.

7.      From 1987 until 1992, I served as a Consumer Safety Officer in the 510(k) Section, where I provided regulatory, administrative, and policy oversight of CDRH's review of 510(k)s. While serving in the 510(k) Section, I also assisted in writing the interim and final rules titled, "Medical Devices; Substantial Equivalence; 510(k) Summaries and 510(k) Statements, Class III Summary and Certification; Confidentiality of Information."[4]  Additionally, I established the process for the rescission of 510(k) substantial equivalence decisions and worked on a published proposed rule for the process.[5]

8.      From 1992 to 2010, although my titles changed several times, my basic job responsibilities remained the same, and varied at times as new statutory requirements were implemented.  These titles included: (1) Acting Section Chief of the 510(k) Section; (2) Supervisory Consumer Safety Officer of the 510(k) Staff; and (3) Director of the 510(k) Staff.

---

[4]    *See* 59 Fed. Reg. 64,295 (Dec. 14, 1994) (final rule); 57 Fed. Reg. 18,062 (April 28, 1992) (interim rule).

[5]    66 Fed. Reg. 3,523 (proposed Jan. 16, 2001).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

During this timeframe, I was the primary contact on issues related to the implementation of the

510(k) requirements under the Safe Medical Devices Act of 1990 ("SMDA")[6], 510(k)

Summaries, 510(k) Statements, and Class III Certifications and Summaries to ensure the uniform

interpretation of the law.  I supervised the programmatic review of 510(k) submissions and

513(g) requests, device classification processes, petitions for reclassification, and product codes.

Following the enactment of the Food and Drug Modernization Act of 1997 ("FDAMA"), my

responsibilities expanded to include the implementation of certain exemptions for Class I and II

type devices, petitions for Class II exemption from 510(k), the evaluation of automatic Class III

designation (*De Novo* Program), and other regulatory requirements.  Additionally, I was

responsible for drafting regulations and guidance regarding the above areas.  I also trained

CDRH and FDA's Center for Biologics Evaluation and Research ("CBER") staff on statutory

and regulatory requirements as well as procedures and policies—including any new regulations,

guidance, policies, or procedures.  Examples of training sessions where I served as an FDA

Instructor can be found in my curriculum vitae, attached as Appendix A.

       9.      In addition, during this time period, I coordinated the regulatory review process of

510(k) submissions, including device determinations, between the CDRH premarket review staff

and the CDRH Office of Compliance staff.  I also managed any necessary coordination with the

Office of Combination Products ("OCP") (prior to 2002 when OCP was established, FDA's

Ombudsman handled combination products), the Center for Drug Evaluation and Research

("CDER"), and CBER for these programs.

      10.     In 2009, I served as the CDRH lead in responding to the Government

Accountability Office's ("GAO") study of the 510(k) Program.  Also, in 2009 I served as a point

---

[6]   *See* Pub. L. No. 101-629 (1990).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

of contact when FDA commissioned the Institute of Medicine ("IOM") to undertake an assessment of the 510(k) Program to determine what, if any, changes should be made to the program.

11.     During the IOM's 18-month review of the 510(k) Program, I provided training to the IOM review committee to educate members on the 510(k) Program.  I gave a presentation to the IOM at its first public meeting in March 2010 titled, "Understanding the Premarket Notification (510(k)) Process: History from 1976 to 2010."  As a member of the CDRH 510(k) Working Group, I also participated in the internal evaluation of the 510(k) Program and subsequent "Plan of Action for Implementation of 510(k) and Science Recommendations," which was published in draft in August 2010.

12.     Additionally, while serving as Director of the 510(k) Staff, I was responsible for identifying and resolving precedent-setting issues arising from reviews.  I also provided expert consultation for the CDRH premarket review staff concerning the administrative and regulatory review of 510(k) submissions, determinations regarding substantial equivalence (including review of unique decisions and all not substantially equivalent decisions), exemption from 510(k) requirements, 510(k) proposed and final decisions, not actively regulated device decisions, enforcement discretion decisions, classification, product codes, and reclassification for a device type, as well as 513(g) requests.

### B.     Professional Publications and Presentations

13.     During my time at FDA, I co-authored numerous guidance documents intended to provide FDA's current thinking on issues relating to the 510(k) Program and submissions to FDA staff and all stakeholders.  In addition, I have spoken on behalf of FDA in multiple forums, including national conferences, FDA advisory committee meetings, and international symposiums.  Additional details concerning the publications that I authored or co-authored and

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

the events where I gave presentations regarding the FDA 510(k) program can be found in my

curriculum vitae, attached as Appendix A.

### C.    Present Position

14.    I joined Greenleaf in September 2010 as Senior Regulatory Advisor.  I presently

serve as Executive Vice President of Medical Devices and Combination Products at Greenleaf.  I

am responsible for providing strategic regulatory consulting services for Greenleaf clients,

advising on issues related to the review of 510(k) submissions, CDRH regulatory policies, and

FDA's regulation of combination products.  During my tenure at Greenleaf, I have kept abreast

of developments at the FDA concerning the 510(k) Program, including reviewing and consulting

on applicable statutes, regulations, and guidance and speaking on those issues.

15.    In addition to my work at Greenleaf, I presently serve as Vice President of

Regulatory Affairs at the Medical Device Manufacturers Association ("MDMA").  In this role, I

offer overall policy advice to MDMA and its members regarding FDA device regulation.

16.    During my time at Greenleaf and MDMA, I have spoken at industry and other

stakeholder events where I provide insight and guidance regarding FDA's 510(k) Program.

Additional details concerning the events I have spoken at can be found in my curriculum vitae,

attached as Appendix A.

## II.    OVERVIEW OF FDA REGULATION OF MEDICAL DEVICES AND RELEVANT BACKGROUND

### A.    FDA Regulatory Authorities, Mission, and Structure

17.    FDA is a scientific, regulatory, and public health agency.  FDA's statutory

authority is derived from the FDCA.  Its jurisdiction encompasses most food products (other than

meat and poultry), including dietary supplements; human and animal drugs; therapeutic agents of

biological origin; medical devices; radiation-emitting products for consumer, medical, and

6

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

occupational use; cosmetics; animal feed; and, most recently, tobacco products.  The FDCA confers jurisdiction over such products, including devices, when they are in "interstate commerce."[7]  "Interstate commerce" applies to each step in a device's manufacture, packaging, and distribution.  It is very rare that a device on the market is not in "interstate commerce" under the law.  For example, at least some part of device or its packaging will likely originate from out of state or out of the country.  Likewise, it is foreseeable that a finished device will move from state to state.  Based on my experience working at FDA, it is common knowledge that medical devices are presumed to be in interstate commerce, and therefore subject to FDA jurisdiction.

18.     FDA prides itself on being a "science-based, science-led" regulatory agency.  The agency has a strong regulatory and scientific staff.  These resources ensure that FDA decisions are based on up-to-date science and applicable statutory and regulatory provisions.

19.     FDA includes six product Centers: (1) CDRH; (2) Center for Food Safety and Applied Nutrition ("CFSAN"); (3) CDER; (4) CBER; (5) Center for Veterinary Medicine ("CVM"); and (6) Center for Tobacco Products ("CTP").  These Centers review premarket applications, develop scientific and regulatory policy, work with FDA's Office of Regulatory Affairs ("ORA") and its district offices, as well as the National Center for Toxicological Research, to ensure industry compliance with regulatory requirements, and proactively and reactively address issues of potential public health concern.

**B.     Regulation of Medical Devices**

20.     If a product meets the definition of "device" in the FDCA, it will be regulated by FDA as a medical device and be subject to premarket and postmarket regulatory controls.  The statutory definition of a "device" is:

---

[7]     *See, e.g.*, FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).

7

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

[A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component part, or accessory, which is—

> (A)    recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,
>
> (B)    intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
>
> (C)    intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes. The term "device" does not include software functions excluded pursuant to section 360j(o) of this title.[8]

21.    CDRH is responsible for regulating firms who manufacture, repackage, re-label, and/or import medical devices sold in the United States.

22.    The FDA recently reorganized CDRH to integrate its premarket and postmarket programs along product lines, allowing the Center's experts to leverage their knowledge to optimize decision-making across the product life cycle.

**C.    Device Classification**

23.    Medical devices are classified into one of three classes: Class I, II, or III. Regulatory control increases from Class I to Class III.  Most Class I devices are exempt from the 510(k) requirements of the Act; most Class II devices require 510(k) review and a determination by FDA of substantial equivalence prior to commercial distribution in the U.S.; and Class III devices require PMA review and approval prior to commercial distribution in the U.S.

---

[8]    FDCA § 201(h)(1), 21 U.S.C. § 321(h)(1).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

### 1.      Class I Devices

24.      Class I devices are generally subject only to "general controls," because the risks are well understood and general controls are sufficient to provide reasonable assurance of safety and effectiveness.[9]  General controls include: 510(k), banning, misbranding, adulteration, compliance with the applicable portions of the Quality System Regulation ("QSR") for manufacturing and recordkeeping, requirements for issuing notices about repair, replacing or refunding money for devices presenting an unreasonable risk of substantial harm, facility registration and product listing, adverse event reporting, and labeling.[10]

25.      The FDAMA, under Section 510(l), exempted Class I devices from FDA's 510(k) premarket requirement unless the device is intended for a use that is of substantial importance in preventing impairment of human health or presents a potential unreasonable risk of illness or injury.[11]  For those device types falling in the exception as requiring 510(k) submission, the FDA, using valid scientific evidence that there is reasonable assurance of safety and effectiveness, must determine that the device is substantially equivalent to a legally marketed predicate device prior to commercial distribution in the U.S.  FDA also has regulations on limitations of exemptions from the 510(k) requirements of the Act.[12]  Examples of Class I devices include elastic bandages, examination gloves, non-prescription sunglasses, and certain hand-held surgical instruments.

---

[9]   *See* 21 C.F.R. § 860.3(c)(1).

[10]   All classes of devices are subject to general controls.  General controls are the baseline requirements of the FDCA that apply to all medical devices—Class I, II, or III.

[11]   FDCA § 510(l), 21 U.S.C. § 360(l).

[12]   *See* 21 C.F.R. § 8xx.9.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

### 2.   Class II Devices

26.     Class II devices are devices for which general controls alone are insufficient to provide reasonable assurance of their safety and effectiveness.  However, the risks of the device are well understood, and in addition to the general controls, special controls can be identified to address the risks.  Special controls include performance standards, FDA guidance documents, special labeling requirements, tracking of implantable devices, clinical data, and other actions the agency deems necessary to provide reasonable assurance of safety and effectiveness.[13]

27.     In addition to general and special controls, Class II devices require 510(k) review (unless specifically exempted from the 510(k) requirements of the Act subject to limitations of exemptions) and a determination by FDA, using valid scientific evidence,[14] that there is reasonable assurance of safety and effectiveness that demonstrates the device is substantially equivalent to a legally marketed predicate device prior to commercial distribution in the U.S. Most devices, most new indications for use, and most new technologies go to market in the U.S. under the 510(k) requirements of the FDCA.  Moreover, many significant-risk devices go to market via the 510(k) route, including most implants and life-sustaining and life-supporting devices.  Examples of Class II devices include powered wheelchairs, bone cement, knee implants, ventilators, dialysis systems, and surgical drapes.

### 3.   Class III Devices

28.     In addition to general controls, Class III devices are those that must go through the PMA process and receive approval by FDA to provide reasonable assurance of their safety and effectiveness prior to commercial distribution in the U.S.  The risks for this generic type of

---

[13]   *See* 21 C.F.R. § 860.3(c)(2).

[14]   21 C.F.R. § 860.7.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

device are not well understood, and therefore special controls cannot be identified to address the risks.[15]  Examples of Class III devices that require a PMA are mechanical heart valves, breast implants, drug-eluting coronary stents, most pacemakers, intraocular lenses, extended wear contact lenses, certain in vitro diagnostics, and new devices that have been found not to be substantially equivalent to legally marketed devices because of lack of a predicate device, a new intended use, or a new technology raising a different type of safety and effectiveness question.

### D.      Device-Related Activities and Functions Regulated by FDA

29.      FDA's regulations apply to a wide range of roles and activities related to medical devices.  If a firm engages in any of these activities, it would be subject to varying levels of FDA regulation.  Depending on its role in the development, manufacture, processing, or distribution of a medical device, a firm may be considered to be, among other things, a manufacturer, a specification developer, a repackager/relabeler, an initial importer, or a distributor.  *See* Table 1, *infra*.  Regulatory roles are not mutually exclusive.  For example, a firm may be an initial importer that also repackages devices.  A firm that assumes multiple roles is held to the regulatory obligations of each role.

**Table 1.**

| ROLE | ACTIVITIES | 21 C.F.R. § __ |
|------|-----------|----------------|
| **Manufacturer** | • A person who designs, fabricates, manufactures, remanufactures, prepares, propagates, compounds, assembles, or processes a device is a "manufacturer" <br> • A person who relabels, repacks, repackages, or reprocesses is considered a "manufacturer" for purposes of certain regulatory requirements | 803.3, 806.2(g), 807.3(d), 820.3(o), 821.3(c), 822.3(g) |

---

[15]    A "[g]eneric type of device" is defined in FDA regulations as "a grouping of devices that do not differ significantly in purpose, design, materials, energy source, function, or any other feature related to safety and effectiveness, and for which similar regulatory controls are sufficient to provide reasonable assurance of safety and effectiveness."  21 C.F.R. § 860.3(i).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

| ROLE | ACTIVITIES | 21 C.F.R. § __ |
|---|---|---|
| | • A person who initiates specifications for a device that is manufactured by a second party is considered a "manufacturer" for purposes of certain regulatory requirements<br>• An initial importer of a foreign manufacturer is considered a "manufacturer" for purposes of certain regulatory requirements | |
| Specification Developer | • A person who initiates specifications for devices that are manufactured by a second party (*i.e.*, a contract manufacturer) for subsequent distribution by the person initiating the specifications is a "specification developer"<br>• A "specification developer" is considered a "manufacturer" for purposes of certain regulatory requirements | 803.3, 806.2(g), 807.3(d), 820.3(o), 821.3(c), 822.3(g) |
| Repacker, Repackager, or Relabeler | • A person who repackages or in any way changes the container, wrapper, or labeling of a device in furtherance of the distribution of the device from the place of original manufacture is a "repacker, repackager, or relabeler"<br>• A person is not considered a "repacker, repackager, or relabeler" if it merely packs previously packaged/labeled individual devices into packages for the convenience of the user<br>• A "repacker, repackager, or relabeler" is considered a "manufacturer" for purposes of certain regulatory requirements | 803.3, 806.2(g), 807.3(d), 820.3(o), 821.3(c), 822.3(g) |
| Distributor | • A person (other than the manufacturer or importer) who furthers the marketing of a device from the original place of manufacture to the person who makes final delivery or sale to the ultimate user, but who does not repackage or otherwise change the container, wrapper, or labeling of the device or device package is a "distributor" | 803.3, 807.3(b), 807.3(s), 821.3(h), |

30.     The FDCA and FDA regulations primarily focus, and impose the most burdensome requirements, on entities involved in the manufacture of medical devices.  As noted above, a manufacturer includes any person who designs, fabricates, manufactures, remanufactures, prepares, propagates, compounds, assembles, or processes a medical device.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

Generally, manufacturers must comply with the premarket notification requirements and submit a 510(k), unless the device is exempt, or a *de novo* classification request or a PMA is required.[16]

31.     When a manufacturer is required to file a 510(k), it must receive an FDA determination of substantial equivalence prior to: (i) initial marketing of a device; (ii) making a change or modification to a cleared device that could significantly affect the safety or effectiveness of the device; or (iii) making a major change or modification to the intended use of its previously cleared device.[17]

**E.     Premarket Notification Submission (510(k))**

32.     As noted in Section I, my regulatory expertise is focused on the 510(k) Program. While at FDA, I played a pivotal role in the 510(k) Program's development and evolution.  This section will provide details on the 510(k) Program as it relates to Intuitive's EndoWrist instruments and the claims in the litigation.

33.     The 510(k) process refers to Section 510(k) of the FDCA and is used for devices that are required to be reviewed by FDA for a determination, using valid scientific evidence for reasonable assurance of safety and effectiveness, regarding substantial equivalence to a legally marketed Class I or Class II device, unless the device type has been exempted from the 510(k) requirements of the Act.  More than 90 percent of medical devices fall within FDA's 510(k)

---

[16]   In addition, manufacturers must comply with other provisions of the FDCA, including (i) registering their establishments and listing their devices (FDCA § 510, 21 U.S.C. § 360; 21 C.F.R. Part 807); (ii) complying with good manufacturing practice (GMP)/Quality System Regulation (QSR) requirements (unless device type is exempt) (FDCA § 520(f)(1), 21 U.S.C. § 360j(f)(1); 21 C.F.R. Part 820); (iii) complying with medical device reporting requirements (FDCA § 519, 21 U.S.C. § 360(i); 21 C.F.R. Part 803); (iv) providing public notification of unreasonable risk of substantial harm from a marketed device, and repairing, replacing, or refunding (FDCA § 518, 21 U.S.C. § 360h); (v) conducting postmarketing surveillance (FDCA § 522, 21 U.S.C. § 360l; 21 C.F.R. Part 822); (vi) complying with FDA's mandatory recall authority (FDCA § 518(e), 21 U.S.C. § 360h(e); 21 C.F.R. Part 810); (vii) tracking certain device types (FDCA § 519(e), 21 U.S.C. § 360i(e); 21 C.F.R. Part 821); and (viii) reporting removals and corrections (FDCA § 519(f), 21 U.S.C. § 360i(f); 21 C.F.R. Part 806).

[17]   21 C.F.R. § 807.81(a).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

authority.[18]   The FDCA requires FDA to review a 510(k) in 90 calendar days, but also requires

that a submitter receive an order from FDA allowing one to market the device.  The FDA review

requirements for a 510(k) are to determine: (1) that there is a predicate device;[19] (2) that the new

device has the same intended use; (3) that the new device is of the same technology, or a

different technology that does not raise a new type of safety and effectiveness question as

compared to the predicate; and (4) that performance data demonstrate that the new device is at

least as safe and effective as the predicate.[20]  A device that requires 510(k) clearance may not be

marketed until the applicant receives an "order" from the FDA, which states that the new device

has been determined to be substantially equivalent through the 510(k) decision-making process,

that it is at least as safe and effective as the legally marketed predicate device.  Marketing a

device that requires 510(k) clearance prior to obtaining such clearance is a violation of Section

502(o) of the FDCA (misbranding of a device), Section 501(f)(1)(B) of the FDCA (adulteration

of a device), and Section 502(f)(1) of the FDCA (required new device to have labeling with

adequate directions for use).

## 1.   Valid Scientific Evidence

34.   During the 510(k) process, FDA relies on valid scientific evidence to make a

determination of substantial equivalence to a predicate device.[21]  Submitters are required to

---

[18]   *See* U.S. General Accounting Office, *Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, Medical Devices: FDA's 510(k) Operations Could Be Improved* 2 (Aug. 1988), http://archive.gao.gov/d16t6/136821.pdf.

[19]   Any legally U.S. marketed device, which does not require a PMA, may be used as a predicate.  This includes a device that: has been cleared through the 510(k) process; was legally marketed prior to May 28, 1976 that does not require a PMA (a preamendment device); was on the U.S. market after May 28, 1976 as a Class III device (Premarket Approval); was later downclassified to Class II or I device; is 510(k) exempt; is of a type that has been classified through the *de novo* petition process.

[20]   *See* 21 C.F.R. § 807.92(a)(3).

[21]   *See* 21 C.F.R. § 860.7(g)(1).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

provide such evidence in their 510(k) application.[22]  The evidence required may vary according to the characteristics of the device type, its conditions of use, the existence and adequacy of warnings and other labeling, and the extent of experience with its use.  The submitter of a 510(k) for a Class II type device must also demonstrate to FDA's satisfaction how any specified special controls have been met/addressed in order to receive a determination of substantial equivalence.

35.     Although a 510(k) submitter may provide any form of evidence to substantiate the safety and effectiveness of its device, the agency relies upon only valid scientific evidence to determine whether there is reasonable assurance regarding safety and effectiveness to demonstrate equivalence. Valid scientific evidence is defined as:

> Evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use.[23]

36.     Almost every 510(k) includes performance data,[24] consisting of bench, animal, and/or clinical data, as well as reports of significant human experience based on the marketing of the predicate device(s).  According to FDA/CDRH policy, required information that has already been submitted to the agency by a firm, such as in the instance of its previous 510(k), need not be resubmitted in the new 510(k), but may be incorporated by reference.[25]  For example, Intuitive provided data to the FDA on January 4, 2002, to support specific usage limits when

---

[22]   *See id.* § 860.7.

[23]   *Id.* § 860.7(c)(2).

[24]   Only 510(k)s for devices that are identical in every aspect do not require any performance data.

[25]   *Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1)* (Jan. 10, 1997); *see also* FDA, *Guidance for Industry and FDA Staff: The Least Burdensome Provisions: Concept and Principles* (Feb. 5, 2019), https://www.fda.gov/media/73188/download.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

FDA reviewed the first 510(k) for the EndoWrist® Endoscopic Instruments (K013416).[26]  After initially providing this data for K013416, Intuitive did not need to provide the data again in subsequent 510(k) submissions for the EndoWrist, because the data was incorporated by reference in future submissions.

### 2.     Substantial Equivalence

37.     For a new device to be determined to be "substantially equivalent" by FDA to one or more legally marketed predicate devices, it must have the same intended use as the predicate device and either the same technological characteristics as the predicate or, if different technological characteristics, the information submitted must demonstrate that the device is as safe and effective as the predicate and does not raise different questions of safety and effectiveness than the predicate.[27]  Again, performance data is required to demonstrate that the new device is at least as safe and effective as the predicate (unless it is identical to the predicate, then a comparison of specifications is adequate).[28]  The majority of 510(k)s received by FDA for review has some differences in the indication for use and/or technological characteristics when compared to the predicate, and therefore include performance data.  Any device legally marketed in the U.S. that does not require a PMA may be used as a predicate.

38.     The content of a 510(k) basically includes: the device name and class; an establishment registration number (if one has been received); an "Indications for Use Statement"; directions for use; photographs or engineering drawings, where applicable; a 510(k) summary or 510(k) statement; proposed labeling; substantial equivalence comparison with the predicate;

---

[26]   Intuitive-00481167.

[27]   *See* FDCA § 513(i), 21 U.S.C. § 360c(i).

[28]   *See* 21 C.F.R. § 807.92(b).

16

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

supporting performance data (bench, animal, and/or clinical); and "[a]ny additional information regarding the device requested by FDA that is necessary to make a finding as to whether or not the device is substantially equivalent to a [predicate] device.[29]

39.     In addition to the above-mentioned requirements, a 510(k) must include a statement that all data and information submitted are truthful and accurate and that no material fact has been omitted.[30] The truthful and accurate statement requirement carries significant legal implications, which may result in judicial action should FDA determine that false information was provided or material facts were omitted.

### 3.     Performance Data Requirements

40.     It is a common misperception that 510(k)s do not contain performance data. If there are any differences in the indications for use between a new device and a predicate and/or there are any different technological characteristics, the submission will need to contain the descriptive characteristics as well as performance data, including bench, animal, and/or clinical data for FDA to review to determine if the new device can be found substantially equivalent to the predicate device or not.[31] A clinical study generally must be conducted in accordance with FDA's Investigational Device Exemption (as previously defined, "IDE") regulations.[32]

---

[29]   21 C.F.R. § 807.87; *see also* FDA, *Guidance for Industry and FDA Staff: Refuse to Accept Policy for 510(k)s* (Sep. 13, 2019), https://www.fda.gov/media/130647/download.

[30]   21 C.F.R. § 807.87(l).

[31]   *See* FDA, *Evaluating Substantial Equivalence in Premarket Notifications [510(k)]: Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program* 23 (July 28, 2014), https://www.fda.gov/media/82395/download.

[32]   21 C.F.R. Part 812. *See also* FDCA § 520(g), 21 U.S.C. § 360j(g). Clinical studies conducted in the United States also must comply with FDA's Good Clinical Practices regulations, including 21 C.F.R. Part 50, "Protection of Human Subjects, and 21 C.F.R. Part 56, "Institutional Review Boards." *See also* Guidance for Industry: E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1) (March 2018), available at https://www.fda.gov/downloads/Drugs/Guidances/UCM464506.pdf (accessed July 1, 2021).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

41.     21 C.F.R. § 807.87(m) requires a manufacturer to submit any "additional

information regarding the device requested by [FDA] that is necessary for the [FDA] to make a

finding as to whether or not the device is substantially equivalent."  This regulation thus gives

the agency the ability to request whatever data is needed in conducting its review of substantial

equivalence, subject to least burdensome principles.

### 4.     Labeling Requirements

42.     FDA regulations require that all 510(k)s include "proposed labels, labeling and

advertisements sufficient to describe the device, its intended use, and the directions for its use."[33]

Where applicable, photos or engineering drawings should be supplied.  The purpose of the

submission of the proposed labeling in the 510(k) is to provide adequate information to FDA so

that all language needed to sufficiently describe the device, including its intended use and

instructions for use, are included in the FDA review process.[34]  To be found "substantially

equivalent," a device must either have the same "indications for use" as a predicate device, or

any differences in the indications for use between the device and the predicate must not

constitute a new intended use (*i.e.*, the device's intended therapeutic/diagnostic effect) as

determined by FDA review.[35]  The indications for use are normally found in the indications

---

[33]   *Id.* § 807.87(e).

[34]   FDA has regulatory authority over the labeling, including promotional materials, for all medical devices. However, FDA's regulation of device advertising is limited to a subset of medical devices.  The Federal Trade Commission (FTC) regulates the advertising, as opposed to the labeling, of most devices under Sections 12-15 of the Federal Trade Commission Act, which prohibit false or misleading advertising.  15 U.S.C. §§ 52-55. Sections 502(q) and 502(r) of the FDCA authorize FDA to regulate the advertising of certain devices, which are known as restricted devices.  21 U.S.C. § 352(q) and (r).  Section 502(r) also states that restricted devices are not subject to Sections 12-15 of the Federal Trade Commission Act. *Id.* § 352(r).  Thus, FDA regulates the advertising of restricted devices while the FTC regulates the advertising of non-restricted devices.

[35]   FDA, *Indications for Use Statement* (Feb. 6, 1996), http://www.lb7.uscourts.gov/documents/15cv9986.pdf.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

section of the labeling, but indications may also be inferred from other parts of the labeling, such as the precautions, warnings, and contraindications.[36]

### 5.    510(k) Review Process[37]

43.    Reviewers at FDA's CDRH include engineers (biomedical, chemical, material, electrical, etc.), physicians, microbiologists, biologists, physiologists, chemists, toxicologists, statisticians, etc. who perform scientific reviews of 510(k) submissions as well as other premarket applications.

44.    Once the appropriate review group is selected, a lead reviewer is selected by OHT management based on the specialty and experience with the type of device to be reviewed.  Upon receipt of the 510(k) submission, the lead reviewer follows procedures and applies certain criteria in determining whether the 510(k) meets a minimum threshold of acceptability and should be accepted for substantive review.[38]  If the submission is determined to be administratively incomplete, the 510(k) submitter will receive a "Refuse to Accept" notification, which details omissions and inadequacies.

45.    Once the 510(k) submission is determined to be administratively complete, the reviewer begins his or her review.  If the reviewer needs additional information to complete the review, he or she will either telephone or email the submitter with a request or prepare a letter requesting additional information, which will detail the additional information needed.[39]  Prior to

---

[36]    *Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1)* (Jan. 10, 1997).

[37]    The personnel titles used in this section reflect the titles used prior to the recent reorganization of CDRH.

[38]    *See* FDA, *Guidance for Industry and Food and Drug Administration Staff: Refuse to Accept Policy for 510(k)s* (Sep. 13, 2019), https://www.fda.gov/media/83888/download.

[39]    Requests for Additional Information may also be requested by a CDRH supervisor per the delegations on authority.  *See FDA Staff Manual Guide* 1410.406 (Nov. 13, 2018), https://www.fda.gov/media/80114/download.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

requesting any information from the 510(k) submitter and placing the 510(k) on hold, the reviewer will compile all information received via internal consultations.  A 510(k) may not be placed on hold without supervisory concurrence.  The reviewer may also work interactively with a 510(k) submitter to obtain additional information and not place the 510(k) on hold for that additional information.[40]

46.     It is the lead reviewer's responsibility to present a final recommendation on the 510(k) through the supervisory review chain.  The lead reviewer's recommendation addresses whether a new device should be found substantially equivalent or not.  Following receipt of the lead reviewer's recommendation, the supervisory review chain will make a determination on the 510(k) submission to find the 510(k) for the device to be substantially equivalent or not.

47.     The FDCA states that the Commissioner will make decisions on submissions. FDA has delegated through the proper administrative procedures the authority for decision-making at certain supervisory levels.[41]  Once a recommendation regarding substantial equivalence is made by the lead reviewer, it is then forwarded, as part of the 510(k) submission, to the supervisor for concurrence/final determination and signature by the supervisor.  Should a supervisor disagree on a lead reviewer's recommendation, the supervisor must submit an "override memo," which begins a process for reaching a resolution.[42]  Once a decision is made, a "decision letter" is sent to the submitter.  There is also an appeals process under 21 C.F.R. § 10.75.[43]

---

[40]  *See* FDA, *Guidance for Industry and Food and Drug Administration Staff: FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals* (Oct. 2, 2017), https://www.fda.gov/media/73507/download.

[41]  21 C.F.R. § 10.75.

[42]  *See id.*

[43]  *See* FDCA § 517A, 21 U.S.C. § 360g-1.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

### 6.    510(k) Decisions

48.    FDA responds to a 510(k) submission in one of three ways.  FDA can (i) decide that a device is substantially equivalent to a legally marketed device that does not require a PMA; (ii) decide that the device is not substantially equivalent; or (iii) notify the 510(k) submitter that additional information is required to determine whether the device is, in fact, substantially equivalent (this includes a refusal to accept decision which will not start the review clock).[44]

49.    If FDA determines that a device is not substantially equivalent (for reasons other than lack of performance data), the 510(k) holder may submit a request for Class I or Class II designation through the *de novo* petition process, file a reclassification petition, or submit a PMA.  If FDA determines the device is not substantially equivalent for lack of performance data, the submitter may provide more performance data for FDA review in a new 510(k) submission.

50.    If FDA determines that the 510(k) for a device is substantially equivalent, the 510(k) holder may proceed to market the device in the U.S. and will also need to comply with the general controls under the Act and any special controls if the device is classified as Class II.

51.    FDA regularly publishes guidance documents to FDA staff, industry, and other stakeholders to assist in reviewing and developing medical devices.  Guidance documents are also used to outline specific review and enforcement approaches so as to ensure that the agency acts in an effective, fair, and consistent manner.  Guidance documents do not establish legally enforceable rights or responsibilities and are not legally binding on the public or the agency.  Rather, they explain how the agency believes relevant statutes and regulations apply to certain regulated activities.

---

[44]    21 C.F.R. § 807.100(a).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

**F.      Other Pathways to Market for Medical Devices**

52.      Aside from 510(k) clearance, there are several other pathways to market for medical devices.

**1.      510(k)-Exempt Devices**

53.      Section 510(l) of the Act has exempted almost all Class I device types.[45]  If a manufacturer's device falls into a generic category of exempted Class I type devices, a 510(k) submission and FDA determination of substantial equivalence are not required before marketing the device in the U.S.[46]  Under Section 510(m) of the FDCA, FDA exempted certain Class II device types, subject to certain limitations, from the 510(k) requirements.[47]  If a device falls into a generic category of exempted Class I or Class II devices, a 510(k) submission and FDA determination of substantial equivalence are not required before marketing the device.

54.      If a Class I or Class II device is not exempt, a 510(k) is required and the substantial equivalence standard applies.

**2.      *De Novo* Classification**

55.      Devices not otherwise classified by regulation in Class I, II, or preamendment type yet still unclassified, by default, are Class III devices.  Until 1997, such devices required a PMA, regardless of the product's risk level.  Mandating PMA review for low and moderate risk devices made little sense; as a result, Congress attempted to remedy the problem in 1997 with the passage of FDAMA.  The law gave FDA the authority to automatically downclassify a new Class III device if the device is low to moderate risk, and if general controls are sufficient, to place the device into Class I, and if general controls in combination with special controls (when

---

[45]   FDCA § 510(l), 21 U.S.C. § 360(l).

[46]   *Id.*; *see also* 21 C.F.R. § 876.9.

[47]   FDCA § 510(m), 21 U.S.C. § 360(m).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

special controls for the type device can be developed) are sufficient to place the device into Class II, to provide a reasonable assurance of safety and effectiveness.

### 3.  Premarket Approval Application ("PMA")

56.    A PMA is required for Class III devices and must contain information on safety and effectiveness related to the specific device.

57.    As outlined in Section 513 of the FDCA, devices are subject to PMA approval "to provide reasonable assurance of [their] safety and effectiveness."[48]  PMAs typically include the results of extensive clinical trials, bench tests, laboratory studies, animal studies, and references to any standards relevant to a device's safety or effectiveness.[49]  FDA can only approve a PMA if, after considering all of this information, it finds reasonable assurance that the device is safe and effective.[50]

### G.  Prohibition on Sale of a Device Prior to 510(k) Clearance or PMA Approval

58.    The linchpin of device regulation under the FDCA is the requirement that FDA clear or approve the submission for the device (unless exempt) before it may be introduced or delivered for introduction into interstate commerce.  There are a couple of theories of liability under the FDCA that FDA asserts for improperly distributing a device that has not received requisite FDA 510(k) clearance or PMA approval.

59.    FDA contends that the marketing of a medical device prior to clearance violates Section 510(k) of the FDCA, which states that "[e]ach person who is required to register under

---

[48]   FDCA § 513(a)(1)(C), 21 U.S.C. § 360c(a)(1)(C).  Relevant FDA procedures implementing Section 513 of the FDCA are found at 21 C.F.R. Part 814.

[49]   FDCA § 515(c)(1), 21 U.S.C. § 360e(c)(1) .  FDA regulations describe in greater detail the required content of a PMA.  *See* 21 C.F.R. § 814.20.

[50]   FDCA § 515(c), 21 U.S.C. § 360e(c); *see also* 21 C.F.R. § 860.7(c).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report [certain information to FDA]."[51]  A device that lacks required 510(k) clearance is misbranded under Section 502(o) of the FDCA.[52]

60.     Sale of a device prior to approval may also trigger the statutory requirement that a manufacturer obtain premarket approval.[53]  A device is considered adulterated under Section 501(f)(1)(B) of the FDCA when a firm fails to obtain PMA approval.[54]

**H.     FDA Postmarket Regulation of Medical Devices**

61.     FDA's mandate under the FDCA to assess "reasonable assurance of safety and effectiveness" for medical devices marketed in the United States extends to the postmarket period as well.  This mandate is implemented through a complex and comprehensive regulatory system prescribed by the FDCA and FDA regulations.

62.     Ensuring the safety and effectiveness of medical devices in the United States throughout the product lifecycle is at the core of FDA's mission.  Responsibility for ensuring compliance with all regulatory requirements falls to CDRH and ORA.

63.     CDRH employs a cadre of scientific and technical professionals, including engineers, scientists, physicians, and statisticians, to review information provided for marketed devices, including information related to design specifications, pre-clinical and clinical

---

[51]   FDCA § 515(k), 21 U.S.C. § 360e(k).

[52]   21 U.S.C. § 352(o).

[53]   FDCA § 515(a), 21 U.S.C. § 360e(a).

[54]   FDCA § 501(f)(1)(B), 21 U.S.C. § 351(f)(1)(B).  For an example of the FDA enforcing this statute, see Warning Letter to Tenderneeds Fertility LLC (Apr. 13, 2020), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/tenderneeds-fertility-llc-603383-04132020.  For a device requiring a PMA, the notification required by Section 510(k) of the FDCA is deemed satisfied when a PMA is pending before the agency.  21 C.F.R. § 807.81(b).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

performance data, manufacturing processes, and postmarket surveillance.  CDRH experts evaluate, approve, and monitor postmarket studies, including Section 522 studies, and also review, assess, and trend adverse event reports from health care providers, health care facilities, and manufacturers.  Each of these individuals performs a vital role in helping to ensure the safety and effectiveness of a medical device in the postmarket period.

64.     The function of ORA is to serve as the "eyes and ears" of medical product Centers, including CDRH.  FDA investigators, based in district offices around the U.S., and more recently around the world, are tasked with performing on-site inspections of manufacturing and other corporate facilities as well as clinical trial sites, to provide first-hand verification of the activities at those facilities and assess whether regulated activities are performed in accordance with the FDCA and FDA regulations.  Information procured during inspections is then evaluated by compliance experts in the field office and shared with the appropriate Center's scientific, technical, and regulatory experts.  The findings of the investigator, typically in "483 notices," and assessments made by the field offices provide key information to assist FDA as it considers the safety and effectiveness of marketed medical devices.

65.     The following are postmarket regulations that all device manufacturers must comply with: (i) medical device reports (MDRs); (ii) reports of corrections and removals; (iii) Section 522 Studies; (iv) device tracking; (v) routine and for-cause inspections; (vi) regulatory communications; and (vii) mandatory recalls.

**I.      FDA's Approach to Remanufacturing, Refurbishing, and Servicing**

66.     As noted above, a remanufacturer is considered to be a manufacturer under 21 C.F.R. Part 807, and thus subject to premarket notification requirements, including 510(k)

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

requirements.[55]  The determination of whether the activities a firm performs are remanufacturing

affects the applicability of regulatory requirements under the FDCA and FDA regulations.[56]

FDA has consistently enforced requirements under the FDCA and implementing regulations with

respect to entities engaged in remanufacturing, including but not limited to registration and

listing, adverse event reporting, the QSR, and marketing submissions.[57]

67.      A remanufacturer is "any person who processes, conditions, renovates,

repackages, restores or does any other act to a finished device that significantly changes the

finished device's performance and safety specifications, or intended use."[58]  Because a

remanufacturer is considered to be a manufacturer, it is subject to the registration requirements

of 21 C.F.R. § 807.20, and thus required to submit a premarket notification submission under 21

C.F.R. § 807.81 before legally marketing the device at issue.  A remanufacturer who holds a

510(k) for the device at issue and changes or modifies the device and then introduces or

reintroduces a remanufactured device into commercial distribution would be required to submit a

premarket notification submission per the requirements in section 807.81(a)(3).  A

remanufacturer who does not hold a 510(k) for the device at issue and plans to hold or offer for

---

55   FDA's website indicates that remanufacturers are required to register and list with FDA, and has as long as I can remember.  *See Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018).

56   86 Fed. Reg. 33305 (June 24, 2021), https://www.govinfo.gov/content/pkg/FR-2021-06-24/pdf/2021-13360.pdf (accessed July 26, 2021).

57   *Id.*

58   21 C.F.R. § 820.3(w).  Although the definition of "remanufacturer" comes from the QSR, FDA has historically relied on this definition more broadly.  *See, e.g.,* FDA, *Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administration Staff* 5 & n.20, (June 24, 2021), https://www.fda.gov/media/150141/download (relying on the same regulation to define "[r]emanufacture"); Compliance Program Guidance Manual (CPGM) 7382.845, "Inspection of Medical Device Manufacturers," at 17 (Feb. 2, 2015), available at https://www.fda.gov/media/80195/download (accessed July 18, 2021) ("Remanufacturers are persons who process, condition, renovate, repackage, restore or do any other act to a finished device that significantly changes the finished device's performance or safety specifications or intended use [21 CFR 820.3(w)].").

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

sale the remanufactured device for the first time—*i.e.*, introduces the remanufactured device into commercial distribution—would be required to submit a premarket notification submission under section 807.81(a)(2) and to receive a FDA determination of substantial equivalence prior to marketing.

68.    FDA distinguishes "remanufacturing," which is subject to the 510(k) requirements under the FDCA, from "refurbishment" and "servicing" of medical devices, which would not require 510(k) submission.[59]  An example of the agency's thinking on the differences between these activities is an Advance Notice of Rulemaking that FDA published in the Federal Register.[60]  There, FDA proposed to define "servicers," as opposed to "remanufacturers," as "persons who repair a device to return it to the manufacturer's fitness for use specifications, and perform the manufacturer's recommended scheduled preventive maintenance" and who "do not significantly change a finished device's performance or safety specifications, or intended use."[61]  FDA proposed to define "refurbishers" as "persons who, for the purpose of resale or redistribution, visually inspect, functionally test and service devices, as may be required, to demonstrate that the device is in good repair and performing all the functions for which it is

---

[59]    FDA has never required "refurbishers" or "servicers" of medical devices to register and list with the FDA and obtain 510(k) clearance.  As it stands as of the date of this report, FDA's website clearly indicates that servicers/refurbishers are not required to register or list with FDA.  *See Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018).

[60]    FDA's statements in the Federal Register are more binding than those made in guidance documents.  62 Fed. Reg. at 67,011, 67,012.  FDA regulations state that "[a] statement of policy or interpretation made in . . . [a]ny portion of a Federal Register Notice . . . , e.g., a notice to manufacturers or a preamble to a proposed or final regulation" binds FDA as an advisory opinion "unless subsequently repudiated by the agency or overruled by a court."  21 C.F.R. § 10.85(d)(1); *see also id.* § 10.85(e) ("The Commissioner may not recommend legal action against a person or product with respect to an action taken in conformity with an advisory opinion which has not been amended or revoked.").

[61]    62 Fed. Reg. at 67012.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

designed."[62]  In addition, FDA stated that refurbishers may or may not cosmetically enhance a device and preventive maintenance procedures may or may not be performed.[63]  FDA stated that "[r]efurbishers do not significantly change a finished device's performance or safety specifications, or intended use."[64]

69.     It is clear from the regulatory history that any act that results in a significant change to a finished device's performance and safety specifications, or intended use, is remanufacturing, and thus requires 510(k) clearance.  In recent years, FDA has attempted to identify in FDA reports and draft guidance certain guidelines concerning the differences between remanufacturing, refurbishment, and servicing.[65]  These reports and draft guidance reflect FDA's more detailed understanding of what is encompassed within each type of activity, but they are not binding.  They are relevant for purposes of this report insofar as they reinforce the FDA's established views concerning remanufacturing, refurbishment, and servicing.[66]  They are further

---

[62]   *Id.*

[63]   *Id.*

[64]   *Id.*

[65]   *See* FDA, *FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices: In accordance with Section 710 of the Food and Drug Administration Reauthorization Act of 2017 (FDARA)* ("FDARA Report") (May 2018), https://www.medequipusa.com/wp-content/uploads/2018/05/FDARA-710-3rd-Party-Servicing-Report.pdf; FDA, *White Paper: Evaluating Whether Activities Are Servicing or Remanufacturing"* *(2018)*, https://www.fda.gov/media/117238/download; FDA, *Draft Guidance for Industry and FDA Staff: Remanufacturing of Medical Devices (Remanufacturing Draft Guidance)* (June 2021), https://www.fda.gov/media/150141/download; *see also* "Remanufacturing of Medical Devices; Draft Guidance for Industry and Food and Drug Administration Staff; Availability," 86 Fed. Reg. 33305 (June 24, 2021), https://www.govinfo.gov/content/pkg/FR-2021-06-24/pdf/2021-13360.pdf.

[66]   *See, e.g.*, FDARA Report at 24 ("Servicing returns or maintains a finished device's safety and performance specifications and intended use whereas remanufacturing significantly changes the finished device's performance, safety specifications, or intended use.  Because remanufacturing can have a significant impact on the safety and effectiveness of the device, FDA has interpreted regulatory requirements such as those under the [QSR] to apply to remanufacturers and has actively regulated them as manufacturers.  FDA is currently and will continue to interpret existing requirements for those third parties engaged in remanufacturing.") (footnotes omitted); Remanufacturing Draft Guidance at 3 (citing 21 CFR 820(w)) (noting that remanufacturing is "the processing, conditioning, renovating, repackaging, restoring, or any other act done to a finished device that significantly changes the finished device's performance or safety specifications, or intended use"); *id.* at 3-4

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

relevant in that the Remanufacturing Draft Guidance analyzes what constitutes a significant

change in intended use.  It defines intended use as "[t]he general purpose of the device or its

function, which encompasses the indications for use."[67]  It adds that, "[g]iven that the purpose of

servicing is to return the device to the safety and performance specifications established by the

OEM and to meets its original intended use, any change to the intended use should be evaluated

to determine whether the activity is remanufacturing."

### J.   Relevant Background on Restore's Business Related to EndoWrist Instruments

70.   My understanding is that, for some period of time, Plaintiffs/Counterclaim

Defendants Restore Robotics LLC and Restore Robotics Repairs LLC ("Restore") offered a

service to hospitals in which they inserted a proprietary "Interceptor" circuit board (the

"Interceptor board") purchased from Rebotix Repair LLC ("Rebotix") into EndoWrist

instruments to replace the Intuitive circuit board.[68]  The Interceptor board introduces technology

---

(noting that the designations of servicer and remanufacturer are not mutually exclusive and that the same entity
may meet the definition of either designation based on their activities on one or multiple devices).

[67]   *Id.* at 4; *see also* 21 C.F.R. § 801.4 (definition of "intended use").

[68]   *See* REBOTIX162404.  ██████████████████████████████████████████████
████████████████████████  I understand that Restore, using a protocol prepared by Rebotix, took the Intuitive chip that
controls the usage limits (*i.e.,* "harvested" it) and installed the Intuitive chip onto the Interceptor board. *See*
May Tr. at 85:12-86:17 ("Q.  Let me go back to the installation for a minute, since we had to take a break.
After the original [Intuitive's factory chip] was removed from the circuit board, did you tell me that it was
reattached to a different circuit board that was part of the interceptor technology?  Yes?  A.  That's correct.  Q.
And was the memory chip that had been on the factory circuit board removed from the factory circuit board and
connected to a new circuit board and connected to the factory chip on that new circuit board?  Yes?  A.  Yes.
Q.  Was the factory chip connected, physically connected, to the chip that was supplied by Rebotix as part of
the interceptor kit?  A.  Yes.  Q.  So the factory chip as part of the installation was reconnected to the original
memory chip and was also connected to the new chip that was supplied by Rebotix.  Do I have that straight?  A.
The memory chip was taken off of the original circuit board and put onto the interceptor board.  Q.  Okay.  Yes.  And
the interceptor board contained the original chip from the factory, the memory chip that you just told us, and
also a new chip that was supplied by Rebotix as part of the interceptor package, right?  A.  Yes.").  Regardless of
how the technology functions, I understand that the Interceptor technology functions by communicating with
the Intuitive-installed components and bypassing the FDA-cleared usage limits.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

to the EndoWrist instrument that bypasses the original usage limits set and enforced by a separate chip that Intuitive installs in its FDA-reviewed and cleared EndoWrist instruments. Through the insertion of the Interceptor board, Restore caused EndoWrist instruments to function beyond the predetermined number of uses for which Intuitive had programmed the instruments and for which they were FDA cleared.[69] Restore paid Rebotix a license fee that permitted Restore to perform the service on its own.[70] Restore then sold the service to hospitals, performed the service, and provided hospitals with EndoWrist instruments that had newly installed Interceptor boards.[71]

71.     In addition to inserting the Interceptor board to bypass the usage counter in the EndoWrist instruments, Restore also claims that it evaluated the instruments and provided any necessary maintenance, akin to the types of repairs performed on non-robotic, multiple use laparoscopic instruments.[72] Restore claims that the instruments then received additional inspections and safety testing.[73] My understanding is that when Restore had the right to use the Interceptor technology from Rebotix, hospitals shipped their instruments to Restore's MediVision facility in Anaheim, California, where the Interceptor board was added and all of the

---

[69] *See* May Tr. at 112:2-8 ("Q. The whole idea of the interceptor chip was to give the particular instrument the ability to do more than, let's say it was a ten-use instrument, for example. The whole purpose was to enable that instrument to be used more than 10 times, right? A. Yes.").

[70] Restore Complaint ¶ 87; Plaintiffs Restore Robotics LLC and Restore Robotics Repairs LLC's Supplemental Responses to Intuitive Surgical Inc.'s First Set of Interrogatories at 2 ("Rebotix Repair, LLC . . . is the entity referenced in the allegations about payment of a license fee . . . .").

[71] Parker Tr. at 50:1-50:12, 55:16-56:2.

[72] Restore-00012160 at Restore-00012172 (noting they "Repair/Sharpen/Adjust the distal tip tool as needed").

[73] *Id.* (performing "Further testing and inspection to confirm validity of repair and fitness of unit for use as well as additional ultrasound cleaning").

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

purported repairs took place,[74] after which Restore shipped the instruments with the newly installed boards back to the respective hospitals.[75]  Restore claims that the hospitals maintained ownership of the instruments at all times.  Restore also claims that it was not selling any product, only "repairing" its customers' instruments.[76]

## III.   **EXPERT OPINIONS**

72.    To develop opinions for this case, I referenced relevant parts of the following items: the FDCA; U.S. Code of Federal Regulations, Title 21; FDA guidance documents; and FDA reports and other statements.  I also reviewed the factual record, including the parties' ordinary-course documents, the testimony of Kevin May, Clif Parker, Rick Ferreira, Rafal Chudzik, Ron Arkin, and Mark Johnson, documents produced by third parties, and other publicly available information.  A list of materials I considered in forming my opinions in this report is attached as Appendix B.  Provided with this information, I hold the following expert opinions, based on my training, experience, education, and review of the documents.

### A.    **Usage Limits Cannot Be Removed Without 510(k) Clearance Because FDA Cleared the EndoWrist Instruments as Limited Use Devices**

73.    The original 510(k) for Intuitive's EndoWrist family of instruments as well as subsequent 510(k)s repeatedly demonstrate that the instruments were intended for limited use, as

---

[74]   Parker Tr. at 113:16-20 ("Q.  So did Medivision install interceptors?  A.  Yes.  They did.  Q.  In Anaheim?  A. Yes."); *see also* Restore-00055573 (instructing hospitals to "ship [used EndoWrist instruments] to the Restore Robotics USA Service Center located at 4883 E. La Palma Ave., Suite 501B, Anaheim, CA 92807").

[75]   *See* Restore-00034138 at Restore-00034140 ("We pack and ship the same instruments back that you submitted for restoration.").

[76]   *See, e.g.*, May Tr. at 120:11-23 ("No.  The FDA regulation doesn't apply to service, so it's not a new device that we're introducing to the market.  We never take ownership of the device.  This is a very specific point in the law.  The FDA doesn't regulate you if you do not take ownership of the device.  We are provided by the hospital, the hospital knowingly sends it out to a third party servicing company, third party servicing company repairs the device, inspects the device, and sends it back to the hospital.  The FDA does not regulate that.  It's a service.").

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

cleared by FDA.  FDA cleared the original 510(k) (K965001) for the Intuitive Surgical

Endoscopic Instrument Control System on July 31, 1997, with the following indications for use:

> The Intuitive Surgical Endoscopic Instrument Control System is intended for accurate control of selected endoscopic instruments including, rigid endoscopes, blunt endoscopic dissectors and endoscopic retractors during thoracoscopic and laparoscopic surgical procedures.  It is intended to be used by professionals in operating room environments.[77]

The device description included in the 510(k) Summary for K965001 states that the system's

accessories are "resposable" and "limited use" instruments.[78]  Similarly, the device description in

the 510(k) Summary for K990144 states that the instruments are "resposable" and "limited

use."[79]  The fact that the "indications for use" in the 510(k) Summaries do not specifically state

that EndoWrist instruments are subject to limited use makes no difference, as the usage

limitations were clearly indicated in the device descriptions.

74.     Moreover, the record shows that FDA required and reviewed the usage limits as

part of its 510(k) clearance of the EndoWrist® Endoscopic Instruments.  FDA cleared the

K013416 510(k) for the EndoWrist® Endoscopic Instruments in January 2002.[80]

75.     During the review of K013416, FDA asked specifically about the limited use

feature for the instruments.[81]  In a deficiency letter dated December 12, 2001, FDA writes:

> [Y]ou state that the instruments are re-usable for a limited number of uses.  The instruments are programmed for a limited number of uses to ensure reliability and consistent performance, and have non-volatile, "add-only" memory that the system decrements after each use.  Please specify the number of uses for each instrument and

---

[77]   Intuitive-00691212.

[78]   Intuitive-00691208.

[79]   Intuitive-00691203.

[80]   Intuitive-00481178.

[81]   Intuitive-00481166.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

> describe how the numbers were determined.  Please provide data to
> support the claim.[82]

To address this submission deficiency identified by FDA, Intuitive provided data to support the

programmed number of uses.[83]  On January 4, 2002, in response to the FDA's deficiency letter,

Intuitive explained to FDA:

> The number of uses is determined by testing instruments under
> conditions that replicate actual clinical use, and cycling these
> instruments for wear expected during the specified number of
> procedures.  Each cycle includes cleaning, sterilization, connection
> / disconnection with the system, and exercising the instruments with
> representative motions (duration and loading) expected during a
> procedure.  Performance measurements are made periodically (e.g.,
> at the end of each cycle or set of cycles) to confirm that the
> instrument is still performing as intended, and the life testing is
> continued until failure or a specified number of cycles are
> successfully completed.[84]

It was only after Intuitive provided this rationale and data to support the programmed number of

uses, along with other required information/data, that FDA determined that it could issue 510(k)

clearance for the EndoWrist instruments.

76.     Given that the FDA issued a deficiency letter that sought the details and data

concerning the reusable feature of these instruments, it is my opinion that FDA clearance was

dependent upon the FDA's acceptance of this data.  Further, in my opinion, based on my

experience, FDA viewed the EndoWrist instruments in K013416 and any future versions of the

EndoWrists as being subject to usage limits.  In the event Intuitive or any third party attempted to

---

[82]   *Id.*

[83]   Intuitive-00481168.

[84]   *Id.*

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

market an EndoWrist to make it reusable beyond the validated usage limits, a new 510(k) would be required, as this is a change that could significantly affect safety and effectiveness.[85]

**B. Restore's Argument that FDA's "Substantial Equivalence" Determination Means EndoWrist Instruments Can Be Treated the Same Way as Traditional Laparoscopic Instruments Is Flawed**

**1. "Substantial Equivalence" Does Not Mean the FDA Considers a Predicate Device and the Cleared Device to Be the Same**

77.     Restore alleges in its complaint that FDA determined that the EndoWrist was "substantially equivalent" to predicate devices already on the market from other manufacturers of surgical instruments, such as forceps, graspers, retractors, shears, etc., that do not "have limits on the number of use."[86]  Because of this substantial equivalence determination, Restore argues, among other reasons, that Intuitive's usage limits are not based on any regulatory requirements and are designed only to "extract consumer surplus, *i.e.*, monopoly profits, from its customers."[87]  Restore also asserts that because the predicate devices for the FDA's substantial equivalence determination are multi-use surgical instruments without usage limits, and because companies "repair" surgical instruments without 510(k) clearance, by default EndoWrist instruments may similarly be "repaired" without any 510(k) clearance.[88]

78.     Restore's arguments reflect a fundamental misunderstanding of the meaning of substantial equivalence and the regulatory terms.  "Substantially equivalent" in the FDA

---

[85]   21 C.F.R. § 807.81(a)(2) (with respect to third parties); 21 C.F.R. § 807.81(a)(3) (with respect to Intuitive).  Intuitive, as the 510(k) holder, could increase the validated usage limit without filing a 510(k) and instead filing a Letter to File if they used the same testing methods and protocols that were described in previously cleared 510(k)s and met the same specifications.  *See infra.* Section III.E.5.

[86]   Restore's Second Amended Complaint ¶ 91.

[87]   *Id.* ¶¶ 88-91.

[88]   *See* Restore-00008152 at Restore-00008158.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

regulatory context has a specific meaning; an FDA finding that a medical device is "substantially

equivalent" to a predicate in no way implies that the medical device is the same as the predicate.

79.     The term "substantial equivalence" is defined by the FDCA and addressed by

FDA in regulations and guidance.  Although Congress did not define "substantial equivalence"

when enacting the Medical Device Amendments Act of 1976, an excerpt from a House

Committee Report provides insight into Congress's thinking with respect to the term:

> The term "substantially equivalent" is not intended to be so narrow
> as to refer only to devices that are identical to marketed devices nor
> so broad as to refer to devices which are intended to be used for the
> same purposes as marketed products.  The Committee believes that
> the term should be construed narrowly when necessary to assure the
> safety and effectiveness of a device but not so narrowly where
> differences between a new device and a marketed device do not
> relate to safety and effectiveness.[89]

Congress plainly intended to give FDA discretion to interpret the meaning of substantial

equivalence, and intended that safety and effectiveness be considered.

80.     In 1990, the Safe Medical Devices Act of 1990 (SMDA) amended the FDCA to

include a statutory definition for substantial equivalence.[90]  The SMDA provided:

> (i)(1)(A) For purposes of determinations of substantial
> equivalence . . . , the term "substantially equivalent" or "substantial
> equivalence" means, with respect to a device being compared to a
> predicate device, that the device has the same intended use as the
> predicate device and that the Secretary by order has found that the
> device—
>
> (i) has the same technological characteristics as the predicate device,
> or
>
> (ii)(I) has different technological characteristics and the information
> submitted that the device is substantially equivalent to the predicate

---

[89]   H.R. Rep. No. 94-853, at 36-37 (1976).

[90]   *See* Safe Medical Devices Act of 1990, Pub. L. No. 101-629, 104 Stat. 4511 (1990); FDCA § 513(i); 21 U.S.C.
§ 360c(i).  This definition was already being implemented in practice and was based on the definition of
"substantial equivalence" in Guidance on the CDRH Premarket Notification Review Program, 510(k)
Memorandum K86-3 (June 30, 1986).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

device contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that the device is *as safe and effective as a legally marketed device*, and (II) *does not raise different questions of safety and efficacy than the predicate device*.

(B) For purposes of subparagraph (A), the term "different technological characteristics" means, with respect to a device being compared to a predicate device, that there is a significant change in the materials, design, energy source, or other features of the device from those of the predicate device.[91]

Clearly, the statutory definition of "substantial equivalence" does not require or even contemplate that a new and predicate device be identical. Moreover, as the statute makes clear, it is for FDA alone to make a determination of "substantial equivalence," not a submitter or entity seeking to market a medical device.

### 2. Restore Improperly Relied on FDA's "Substantial Equivalence" Determination to Bypass Usage Limits

81.     The fact that Intuitive's original 510(k)s for EndoWrist instruments (K965001 and K990144) relied in part on Class 1 and Class 2 laparoscopic instruments—which do not have usage limits and are either single or multi-use instruments—as predicate devices does not mean they are identical to EndoWrists, and therefore that the EndoWrist usage limits can be bypassed. Restore's use of the FDA's "substantial equivalence" determination to justify the addition of the Interceptor board and criticize Intuitive's implementation of usage limits is wholly improper and reflects a lack of understanding of regulatory law.

82.     Indeed, the regulatory history of the EndoWrist instruments establishes just the opposite: although Intuitive identified certain laparoscopic instruments with either single use or multi-use as "predicate devices," FDA plainly cleared the EndoWrist instruments as limited-use devices. I understand from reviewing documents in the litigation and the expert report of Dr.

---

[91]   SMDA, Pub. L. No. 101-629, § 12, 104 Stat. 4511 (1990) (emphasis added).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

Robert Howe prepared for Intuitive in this litigation that the functionality of EndoWrist instruments as used with the da Vinci system is not the same as that of earlier, legally marketed laparoscopic instruments.[92]  Indeed, based on diagrams and descriptions contained in the 510(k)s, it appears that although the distal ends of the EndoWrist instruments are similar to traditional laparoscopic instruments, the proximal ends are very different.[93]

### C. Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent with FDA's Regulatory Requirements

#### 1. FDA's 510(k) Clearance of EndoWrist Instruments Requires Intuitive to Market and Sell EndoWrist Instruments in a Manner Consistent with the Usage Limits Cleared by FDA in the 510(k)

83.     Restore asserts in its complaint that the usage limits for EndoWrist instruments "are not based on any regulatory requirements from the FDA."[94]  This assertion is wrong.  As explained previously in Section III.A, FDA reviewed the usage limits identified by Intuitive and supporting data as part of FDA's review of the first 510(k) for the EndoWrist® Endoscopic Instruments (K013416).  It was only after Intuitive provided this data to support Intuitive's usage limits, along with other required information/data, that FDA cleared the 510(k).  The EndoWrist instruments in K013416 included usage limits.  FDA cleared the 510(k) with such limits, and any future versions of the EndoWrists had to be subject to usage limits absent a new 510(k).

84.     Restore asserts in certain marketing materials various forms of the argument that because the FDA's clearance letter, which includes the Indication for Use, does not specify a certain number of uses for EndoWrist instruments, the instruments are not subject to usage limits and can be re-used over and over again, as long as they test to specifications.[95]  This argument

---

92   *See* Intuitive-00018120; Intuitive-00082056.

93   *See, e.g.*, Intuitive-00692643 at Intuitive-00692664-Intuitive-00692668.

94   Restore's Second Amended Complaint ¶ 89.

95   Restore-00000885.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

fundamentally misunderstands the 510(k) review process and how FDA makes a determination regarding substantial equivalence requiring valid scientific evidence.  As noted above, a device is cleared based on and in light of the materials submitted to the FDA, and, with respect to EndoWrist instruments, there is no question that Intuitive's submission included usage limits. Indeed, the labeling for the EndoWrist device, which expressly indicates the limited number of uses, was reviewed and cleared by FDA as part of the 510(k) process.

85.     Because the EndoWrist instruments are subject to usage limits that were reviewed and cleared by FDA, Intuitive's regulatory obligation was to sell the device with these limits, consistent with the EndoWrist's 510(k) review and FDA clearance determination.  For Intuitive or a third party like Restore to market their own Interceptor board, with or without a predetermined number of uses, FDA would need to clear a new 510(k) for such a device.

### 2.     Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent with FDA's Labeling Requirements

86.     Part of the regulatory obligation for Intuitive to sell EndoWrist instruments consistent with the 510(k) clearance (including the cleared usage limits) is the need to comply with applicable labeling requirements—another general control under the FDCA.  Pursuant to applicable regulations, device labeling for prescription type devices must present detailed information about the risks and benefits of the device in the manner dictated by FDA.  Under Section 502(f)(1) of the FDCA, a device "shall be deemed to be misbranded . . . . (f) [u]nless its labeling bears (1) adequate directions for use. . . ."[96]  FDA has defined "adequate directions for use" to mean "directions under which the layman can use a device safely and for the purposes for which it is intended."[97]  Because prescription devices are, by definition, safe for use only under

---

[96]   FDCA § 502(f); 21 U.S.C. § 352(f).

[97]   21 C.F.R. § 801.5.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

healthcare practitioner supervision, FDA has "exempted" such prescription devices from the requirement of adequate directions for use for a lay person if, among other conditions, their labeling complies with certain requirements.[98]  These requirements include providing "information for use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it is intended."[99]  Basically, this means that the labeling must bear adequate directions for use for healthcare practitioners licensed by the state in which they practice to use the device.

87.     Additionally, because instructions on how to adequately reuse a prescription device are critical to ensuring that licensed practitioners can reuse the device safely and effectively, FDA guidance applicable to reprocessing medical devices in healthcare settings interprets adequate reprocessing instructions to be part of providing adequate directions for use under 21 C.F.R. § 801.5 and a condition for exemption from adequate directions for use under 21 C.F.R. § 801.109.[100]  The guidance document provides six criteria for "clear reprocessing instructions, which will ensure users understand and correctly follow the reprocessing instructions."[101]

88.     Criterion 5 identifies a number of elements that should be included in the label to make sure the reprocessing instructions are comprehensive.  One of these elements—Reuse

---

[98]   21 C.F.R. § 801.109.

[99]   *Id.* § 801.109(c).

[100]   *See* FDA, *Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling – Guidance for Industry and FDA Staff:* (May 17, 2015), https://www.fda.gov/media/80265/download.

[101]   *Id.* at 8.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

Life—specifies that the labeling should either (1) inform the user of how many times the device can be reused, based on testing; or (2) provide the user with a mechanism or method to ascertain whether the device has exceeded its use life.[102]  Specifically, the guidance states:

> Reuse life may also be addressed by validating the number of times the product can be reprocessed and reused, and providing this specification in the labeling.  If the reuse life of a device is limited to a specific number of use/reprocessing cycles, the labeling should also describe a specific tracking method for the number of reuse cycles.  It may be appropriate for labeling to remind the user that the specific number of reuse cycles is dependent on full compliance with the directions for use of the device.[103]

89.     Further, FDA has recognized as a consensus standard ISO17664, Second edition 2017-10, Processing of health care products – Information to be provided by the medical device manufacturer for the processing of medical devices.[104]  ISO17664 governs the information to be provided by a medical device manufacturer for the reprocessing of medical devices.  This standard provides: "If the service life of the medical device is limited by the number of processing cycles or some other end of life indicator(s) this information shall also be provided in the labeling."[105]

90.     These criteria/requirements for labeling are not met by Restore's purported "repair" process to bypass usage limits on the EndoWrist instruments.  Restore's insertion of the Interceptor board overrode the mechanism Intuitive put in place to ensure that the user knows when the device has exceeded its use life as determined by appropriate testing that was reviewed and cleared by FDA.  The addition of the Interceptor board does not return the instrument to its

---

[102] *Id.* at 20.

[103] *Id.*

[104] *See Recognized Consensus Standards*, FDA https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfstandards/search.cfm (last updated Dec. 21, 2020).

[105] ISO 17664:2017, "Processing of health care products — Information to be provided by the medical device manufacturer for the processing of medical devices."

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

original state, rather it permits the instrument to be used beyond the FDA-cleared usage limits without FDA clearance for the new device and the change in its intended use.

**D.    Restore Introduced a New Medical Device (the Interceptor Board) into Commerce and, Without 510(k) Clearance, Marketed a Device That Was Misbranded and Adulterated**

91.    Based on my understanding of the record, Restore introduced into commerce a board—called the "Interceptor"—that it purchased from Rebotix (who does not have a 510(k) clearance for the device) and inserted into EndoWrist instruments to bypass Intuitive-validated and FDA-cleared usage limits.  The Interceptor board is a medical device (as a component that is a finished device in final form sold to the end user) that under the FDCA required 510(k) clearance prior to its introduction into interstate commerce.  Because Restore (and Rebotix) failed to obtain 510(k) clearance for the Interceptor board, it was misbranded and adulterated under the FDCA.

### 1.    The Interceptor Board Is a Medical Device

92.    The Interceptor board is a "device" as defined by the FDCA.  The statutory definition of a "device" includes device components.  The FDCA defines "device" as:

> [A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, ***including a component***, part, or accessory, which is—
>
> (1)    recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,
>
> (2)    intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
>
> (3)    intended to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

of any of its primary intended purposes.  The term "device" does not
include software functions excluded pursuant to section 360j(o) of
this title.[106]

93.     The Interceptor board, as installed in an EndoWrist instrument that Restore

marketed and sold to end users, is a finished device component (as opposed to a component of a

finished device) in finished form for sale to an end user.  FDA has defined and distinguished

these concepts in the QSR, guidance, and on its website, among other places:

- The QSR defines a "finished device" as "any device . . . that is suitable for use
  or capable of functioning, whether or not it is packaged, labeled, or
  sterilized."[107]

- FDA guidance has explained that "a finished device component" is "a device
  in finished form held for sale to an end user that is suitable for use or capable
  of functioning, whether or not it is packaged, labeled or sterilized."[108]

- When explaining that 510(k)s may be submitted for "finished components" on
  its website, FDA distinguishes between finished and unfinished device
  components.  FDA stated: "A finished component is sold to the end user while
  an unfinished component cannot be used by the end user until further
  manufacturing steps occur . . . .  Finished components are packaged and
  labeled for use and are for general sale while unfinished components are
  usually only sold to other device manufacturers for inclusion in another
  medical device."[109]

94.     Restore did not sell the Interceptor board to another device manufacturer as an

unfinished component to ultimately be incorporated into a finished device.  Rather, Restore itself

installed the Interceptor board directly into the Intuitive EndoWrist instrument and then provided

the altered EndoWrist instrument with this new finished device directly to end users as part of

---

[106]  FDCA § 201(h), 21 U.S.C. § 321(h) (emphasis added).

[107]  21 C.F.R. § 820.3(l).

[108]  FDA, *Sterilized Convenience Kits for Clinical and Surgical Use, Final Guidance for Industry* 3-4 (Jan. 7,
2002), https://www.fda.gov/media/71358/download.

[109]  *Content of a 510(k)*, FDA, https://www.fda.gov/medical-devices/premarket-notification-510k/content-510k (last
updated Apr. 26, 2019).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

Restore's service.  As installed in the EndoWrist by Restore, the Interceptor board is suitable for use and capable of functioning[110] without further manufacturing steps,[111] and is sold to end users as such.[112]  The Interceptor board thus satisfies the definition of a finished device component as set forth above.  Accordingly, Restore is a manufacturer as that term is defined in the FDCA, and thus required to comply with the premarket notification requirements.

### 2.    Restore Introduced the Interceptor Board Into Interstate Commerce

95.    FDA's jurisdiction extends to the Interceptor board (a medical device), because the Interceptor board moved in interstate commerce.  The FDCA confers jurisdiction on FDA to regulate devices when they are in "interstate commerce."[113]  Based on my experience working at FDA, it is common knowledge that medical devices are presumed to be in interstate commerce and therefore subject to FDA jurisdiction.

96.    The record is replete with evidence that the Interceptor board, both before and after it was installed in EndoWrist instruments, moved in interstate commerce.  I understand from the record that Rebotix or an affiliated entity owns the intellectual property for the Interceptor board, and paid for the board to be built by a third-party entity.[114]  It is fair to

---

[110]  *See, e.g.,* REBOTIX162404 at REBOTIX162404 (describing the functionality of Interceptor board); May Tr. at 112:2-8 ("The whole idea of the interceptor chip was to give the particular instrument the ability to do more than, let's say it was a ten-use instrument, for example.  The whole purpose was to enable that instrument to be used more than 10 times, right?  A.  Yes.").

[111]  *See* Parker Tr. at 50:9-12 ("[A]nd then [Rebotix] started selling us their interceptor system, and then we would then mark up that service and sell to our customers.  And we would perform the work.").

[112]  *See, e.g.,* Restore-00034138 at Restore-00034140 ("We pack and ship the same instruments back that you submitted for restoration.").

[113]  *See, e.g.,* FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).

[114]  *See* Gibson Tr. at 39:12-41:19 (discussing that Rebotix contracted with G5 to develop the interceptor technology and another third party, Quality Contract Manufacturing Services, to actually manufacture the interceptors for purchase by Rebotix).  G5 Engineering Services is located in Tallahassee, Florida.  *See* REBOTIX074001 at REBOTIX074003.  Quality Contract Manufacturing Services is located in Sarasota, Florida.  *See* REBOTIX130194.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

presume that the parts used to manufacture the Interceptor board (including that build by a third-party entity) moved in interstate commerce.  Rebotix (located in St. Petersburg, Florida) then sold the Interceptor chip to Restore, whose main business operations related to its EndoWrist instruments were located in Anaheim, California.[115]  Restore then arranged for hospitals, either by itself or through third-party distributors authorized by Restore to market the Interceptor board, to ship EndoWrist instruments to Restore's facility in Anaheim, California.[116]  In Anaheim, MediVision[117] employees inserted the Interceptor boards into the hospitals' EndoWrist instruments,[118] and then shipped the EndoWrist instruments with the Interceptor boards installed back to hospitals in the different states from which they came.[119]  The record unequivocally shows the new EndoWrist instruments with the Interceptor boards crossing state lines and moving through interstate commerce.

    97.    I have reviewed record evidence where Restore claims it is merely "repairing" the EndoWrist instruments, but this is not the case.  As support for its position, Restore draws from FDA's proposed approach to "servicing," as reflected in the FDARA Report and the FDA white paper titled "Evaluating Whether Activities Are Servicing or Remanufacturing."[120]  Restore argues that "[t]here are no changes to the performance or safety specifications of the instrument . . . [and] [t]he devices intended use is not significantly altered"[121] by its advertised

---

[115]  Parker Tr. at 60:25-61:2 ("Q. And where was that repair shop of Restore Robotics Repairs?  A.  In Anaheim, California.").

[116]  *See* Restore-00055573 (instructing hospitals to "ship [used EndoWrist instruments] to the Restore Robotics USA Service Center located at 4883 E. La Palma Ave., Suite 501B, Anaheim, CA 92807").

[117]  MediVision is a wholly-owned subsidiary of Restore.  *See* Restore-00002728.

[118]  *See* Parker Tr. at 113:16-20 ("Q. So did Medivision install interceptors? A. Yes.  They did.  Q.  In Anaheim? A.  Yes.").

[119]  *See, e.g.*, Restore-00034138 at Restore-00034140 ("We pack and ship the same instruments back that you submitted for restoration.").

[120]  *See supra* Section II.I.

[121]  Restore-00002650 at Restore-00002651.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

"repair" process.  But Restore is not simply "repairing" a component of the EndoWrist instruments, and returning the instruments to their original state.  Rather, Restore is placing a brand new finished device component not manufactured by Intuitive—the Interceptor board—into interstate commerce for the first time for use in FDA-reviewed and cleared Intuitive EndoWrist instruments.

98.     Restore has argued that, unlike a manufacturer that repackages and sells EndoWrist instruments, it never took ownership of the instruments, and thus did not require a 510(k).[122]  This argument is not persuasive, because the Interceptor board, which is supposedly suitable for use and was designed to function within the EndoWrist instrument, was sold to end users as part of Restore's service.  The new finished device then moved in interstate commerce, thus subjecting it to FDA jurisdiction.  The fact that Restore did not take ownership of the EndoWrist instruments themselves and repackage them for sale is not relevant.

99.     Moreover, because the newly added Interceptor board is being sold to customers as part of Restore's EndoWrist services, it is being introduced into commercial distribution[123] for the first time, thus triggering the requirements for FDA 510(k) premarket review and a determination regarding substantial equivalence under 21 C.F.R. § 807.81(a)(2).

100.     In sum, Restore's argument that it was not subject to FDA jurisdiction because it was not engaged in interstate commerce is not credible.

---

[122]  *See* May Tr. at 120:11-23 ("No.  The FDA regulation doesn't apply to service, so it's not a new device that we're introducing to the market.  We never take ownership of the device.  This is a very specific point in the law.  The FDA doesn't regulate you if you do not take ownership of the device.  We are provided by the hospital, the hospital knowingly sends it out to a third party servicing company, third party servicing company repairs the device, inspects the device, and sends it back to the hospital.  The FDA does not regulate that.  It's a service."); *see also* Restore-00002650 at Restore-00002651 (noting that no 510(k) is needed, in part, because "[t]he hospital never loses ownership of the instrument.").

[123]  21 C.F.R. § 807.3(b) ("Commercial distribution means any distribution of a device intended for human use which is held or offered for sale.").

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

> **3.   Because the Interceptor Board Is a Device That Moved in Interstate Commerce, Restore Required 510(k) Clearance Before Marketing the Device**

101.    Because Restore introduced a completely new finished device component into commerce for the first time to be used directly by an end user, the Interceptor board required FDA 510(k) review and a clearance determination under Section 510(k) of the FDCA and 21 C.F.R. § 807.81(a)(2) (either by Rebotix or Restore) before Restore could market the Interceptor board.  There is no ambiguity about this.  This is not a repair of an Intuitive device/component, but rather introduction into commerce of a new finished device component that Restore installed in EndoWrist instruments, and thus "manufactured."

102.    Section 510(k) of the FDCA requires "[e]ach person who is required to register . . . and who proposes to begin introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery," to submit a notification to FDA.[124]  Similarly, 21 C.F.R. § 807.81(a) and (a)(2) state that:

> [E]ach person who is required to register his establishment pursuant to § 807.20 must submit a premarket notification submission to [FDA] at least 90 days before he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use which meets . . . the following criteria:  . . . (2) [t]he device is being introduced into commercial distribution for the first time by a person required to register . . . .[125]

Restore's sale of the Interceptor board in EndoWrist instruments to customers plainly falls under Section 510(k) and the relevant regulations.

---

[124]   FDCA § 510(k), 21 U.S.C. § 360(k).

[125]   21 C.F.R. § 807.81(a), (a)(2).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

103.    *First,* Restore is a "person" as defined by the FDCA.  The FDCA states that the term "person" includes an "individual, partnership, corporation, and association."[126]

104.    *Second*, Restore was required to register its establishment pursuant to 21 C.F.R. § 807.20.  Section 807.20 addresses who must register its device establishment and list its devices.[127]  Section 807.20(a) states that "[a]n owner or operator of an establishment . . . who is engaged in the manufacture, preparation, propagation, compounding, assembly, or processing of a device intended for human use shall register and submit listing information for those devices in commercial distribution."  Sections 807.20(a) and (a)(6) further state that:

> The registration and listing requirements shall pertain to any person who is engaged in the manufacture, preparation, propagation, compounding, assembly, or processing of a device intended for human use, including any person who . . . . (6) [m]anufactures components or accessories that are ready to be used for any intended health-related purpose and are packaged or labeled for commercial distribution for such health-related purpose . . . .[128]

105.    Restore engaged in the "manufacture, preparation, propagation, compounding, assembly, or processing of a device."  FDA regulations at 21 C.F.R. § 807.3(d) define "[m]anufacture, preparation, propagation, compounding, assembly, or processing" as "the making by chemical, physical, biological, or other procedures of any article that meets the definition of a device in section 201(h) of the [FDCA]."  The Interceptor board, as installed in EndoWrist instruments, is a finished device component.[129]  As part of its service process, Restore removed the Intuitive circuit board, removed the memory chip from the Intuitive board, added it to the Interceptor board, installed this new board into the EndoWrist instrument, and then made

---

[126]  FDCA § 201(e), 21 U.S.C. § 321(e).

[127]  *See also Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018).

[128]  21 C.F.R. § 807.20(a), (a)(6).

[129]  *See supra* Section III.D.1.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

this new component fully functional, as per its own determination, in the EndoWrist instrument.
As such, Restore "manufactured" a finished device component, thus qualifying it as a
manufacturer under 21 C.F.R. § 807.3(d).

106.    Moreover, Section 807.3(d)(3) includes in the definition of manufacturer anyone
who engages in the "[i]nitiation of specifications for devices that are manufactured by a second
party for subsequent commercial distribution by the person initiating specifications."  A
specifications developer may initiate all the specifications for a device, change the specifications
of an existing device, or adopt an existing device (including its specifications) as its own to then
introduce the device into interstate commerce.  An outside party may actually make the device,
but the specifications developer is responsible for the device and its introduction into interstate
commerce, thus necessitating the need for a 510(k).  Here, Restore sought the Interceptor board
from Rebotix and marketed and sold the Interceptor board within EndoWrist instruments to
hospitals while describing its functionality: to override the EndoWrist usage limits and permit
additional uses.  Restore was thus the manufacturer of the Interceptor board, as defined by the
FDA, because it initiated the specification for the Interceptor board for subsequent commercial
distribution.

107.    Under either analysis, Restore acted as the manufacturer of the Interceptor board
and was required to register its establishment and apply for 510(k) review and clearance to seek a
determination from FDA that the EndoWrist instrument with the new Interceptor board was
substantially equivalent to a predicate device prior to marketing.

    **4.    The Interceptor Board Marketed by Restore Is Misbranded and
Adulterated Under the FDCA**

108.    The key tenet of device regulation under the FDCA is the requirement that FDA
clear or approve the submission for the device (unless 510(k) exempt) before it may be

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

introduced or delivered for introduction into interstate commerce.  There are multiple theories of liability under the FDCA that FDA may rely upon to assert that an entity has improperly distributed a device that has not received requisite FDA 510(k) clearance or PMA approval.

109.    FDA might assert that the marketing of a medical device prior to clearance violates Section 510(k) of the FDCA, which states that "[e]ach person who is required to register under this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report [certain information to FDA]."[130]  A device that lacks a required 510(k) is misbranded under Section 502(o) of the FDCA.[131] Because Restore did not submit a 510(k) for review and a clearance determination prior to introducing the Interceptor board into interstate commerce, the Restore Interceptor is misbranded and in violation of the FDCA.

110.    All devices under the FDCA are considered to be in Class III until otherwise classified via the 510(k) classification process into Class I or Class II (to include 510(k) exempt or by a FDA determination of substantial equivalence) or approved via the PMA process.[132] Commercial distribution of a device prior to approval (without PMA approval or having been classified into Class I or II under the 510(k) process) may also trigger the statutory requirement that a manufacturer obtain premarket approval.  A device would be considered adulterated under Section 501(f)(1)(B) of the FDCA when an entity fails to obtain PMA approval.  Because

---

[130]  FDCA § 510(k), 21 U.S.C. § 360(k).

[131]  FDCA § 510(o), 21 U.S.C. § 352(o).

[132]  In addition, Section 513(f)(2) of the FDCA allows persons to submit a de novo request to FDA for devices "automatically" classified into Class III if a person believes its device is appropriate for classification into Class I or Class II and determines, based on currently available information, there is no legally marketed predicate device.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

Restore did not obtain PMA approval prior to introducing the Interceptor board into interstate commerce, and the Interceptor board was not otherwise classified into Class I or II, the Interceptor board is also adulterated and in violation of the FDCA.

### 5. Restore Must Be Responsible For Compliance with Medical Device Reporting Requirements

111.    Moreover, it is critical from a patient and user safety perspective that Restore comply with the device reporting requirements, along with the other general controls under the FDCA.  One of the general controls under the FDCA is that a device manufacturer is responsible for compliance with the medical device reporting requirements in 21 C.F.R. Part 803.  Given that Restore was the manufacturer of the Interceptor board, as described in Section III.D.1 and introduced the Interceptor board into commerce, it is the only entity, practically speaking, situated to receive and address any complaints and track issues related to its installation of the Interceptor board.  As a manufacturer, Restore is also required to file medical device reports as required under 21 C.F.R. Part 803.

### E. In the Alternative, Restore Was Required to Obtain 510(k) Clearance as A Remanufacturer

112.    As explained in Section III.D, Restore's insertion of the brand-new Interceptor board into Intuitive's EndoWrist instruments constituted manufacturing, thus requiring 510(k) clearance prior to Restore's marketing of the device in the United States.  My understanding from the record is that when Rebotix submitted a 510(k) on December 8, 2014 for its EndoWrist service, it described the addition of the Interceptor board as "remanufacturing."[133]  Similarly, I understand that FDA communications in the record state that third-party repairs of EndoWrist

---

[133]  REBOTIX170421; REBOTIX171030.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

instruments constituted "remanufacturing" if they bypassed usage limits on the instruments, and thus required a 510(k).[134]

113.    Under this alternative paradigm, it is my opinion that by bypassing the FDA-cleared usage limits for the Intuitive EndoWrist instruments through use of the newly added Interceptor board, Restore engaged in remanufacturing under 21 C.F.R. Part 807.  FDA defines "[r]emanufacturer" in the QSR as "any person who processes, conditions, renovates, repackages, restores or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use."[135]  As explained below, when looking at the Intuitive 510(k) submissions, it is clear that the intended use of the EndoWrist instrument included usage of the instrument for a limited number of uses, as defined through Intuitive's testing process and cleared by the FDA.  By bypassing the FDA-cleared usage limits, Restore caused a significant change in the intended use of EndoWrist instruments.[136]  Accordingly, Restore has assumed the status of a remanufacturer of the EndoWrist instruments.  As such, these remanufactured instruments with the Interceptor board require 510(k) submission, review,

---

[134]   REBOTIX040231; Restore-00001248.

[135]   21 C.F.R. § 820.3(w).  Although the definition of remanufacturer comes from the set of regulations related to QSR regulations, FDA has historically relied on the definition of remanufacturer more broadly.  *See, e.g.*, Remanufacturing Guidance at 5 & n.20 (relying on the same regulation to define "[r]emanufacture").  Such a definition is consistent with how the FDA has historically made the distinction between remanufacturers and services.  *See, e.g.*, 62 Fed. Reg. at 67.011, 67.012 (proposed Dec. 23, 1997) ("Servicers do not significantly change a finished device's performance or safety specifications, or intended use."); FDA, *Compliance Program Guidance Manual 7382.845, Inspection of Medical Device Manufacturers* pt. III at 17 (Feb. 2, 2015), https://www.fda.gov/media/80195/download ("Remanufacturers are persons who process, condition, renovate, repackage, restore or do any other act to a finished device that significantly changes the finished device's performance or safety specifications or intended use [21 C.F.R. 820.3(w)]"); *cf. Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018) (requiring a remanufacturer to register and pay the fee).

[136]   Dr. Cal Rabang of the FDA noted in June 2018 that extending the useful life of an EndoWrist instrument beyond the use-life counter would change the device's specifications.  REBOTIX166916.  This may well be true, but lacking the necessary technical expertise, I am not in a position to opine on whether or not this occurs.  Should it be proven that a substantial change has occurred in the EndoWrist instruments' performance or safety specifications as a result of the insertion of the Rebotix Interceptor board, this could be yet another ground to find that Rebotix engaged in remanufacturing.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

and a clearance determination by FDA before they may be introduced into interstate commerce.[137]

### 1. Restore Significantly Changed the Intended Use of the EndoWrist Instrument by Bypassing FDA-Cleared Usage Limits

114.    In the recent Remanufacturing Guidance, the FDA refers to "[i]ntended use" as the "general purpose of the device or its function, which encompasses the indications for use."[138] The Remanufacturing Draft Guidance also specifically notes that the "FDA uses [the term "intended use"] consistent with the meaning of intended uses in 21 CFR 801.4,"[139] which states that:

> [T]he words intended uses or words of similar import in §§ 801.5, 801.119, 801.122 and 1100.5 of this chapter refer to the *objective intent of the persons legally responsible for the labeling of devices.* The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by *labeling claims, advertising matter, or oral or written statements by such persons or their representatives.*[140]

Additionally, in guidance related to determining substantial equivalence, FDA has defined intended use to mean the "general purpose of the device or its function, and [which term] encompasses the indications for use," and relies on Section 513(i)(1)(E)(i) of the FDCA to note that "the FDA's determination of intended use of a device 'shall be based upon the proposed labeling' submitted in a 510(k)."[141]  The intended use can be determined from the "four corners"

---

[137]  *See* 21 C.F.R. § 807.81(a)(2).

[138]  Remanufacturing Draft Guidance at 4.

[139]  *Id.* at 4 n.19.

[140]  21 C.F.R. § 801.4 (emphasis added).  FDA recently finalized a new rule interpreting 21 C.F.R. § 801.4, which will go into effect September 29, 2021.  86 Fed. Reg. 41,383 (Aug. 2, 2021).  My analysis with respect to intended use remains the same under same under the new final rule.

[141]  FDA, *The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]: Guidance for Industry and Food and Drug Administration Staff* 16 (July 28, 2014), https://www.fda.gov/media/82395/download.  The term "indications for use . . . describes the disease or

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

of the 510(k) in the event uses are stated outside the indications for use section of the proposed labeling in the 510(k).

115.     Under both definitions, it is clear that when looking at Intuitive's 510(k) submissions, the company's objective intent is that EndoWrists were designed to be used for a limited number of times based on performance testing demonstrating reasonable assurance of safety and effectiveness.  The 510(k)s submitted by Intuitive for its EndoWrist instruments (1) clearly state that EndoWrist instruments are intended for a limited number of uses and (2) explicitly identify those usage limits in the device architectural requirements/specifications, in the device user manual, and on the label.  FDA reviewed these specific data and determined the 510(k)s to be "substantially equivalent" and therefore cleared for the EndoWrist instruments as described in their 510(k)s.

116.     For example, Intuitive's very first 510(k) for EndoWrist instruments (blunt dissectors and retractors) received FDA clearance on July 31, 1997 (K965001), and the accompanying 510(k) summary noted (in both the device information and the device description) that the tools or instruments would only be intended for "limited reuse."[142]  When Intuitive sought to expand the 510(k) clearance to encompass the first series of EndoWrist® Endoscopic Instruments (K013416) (also known as the IS 1000 series), it noted in the EndoScopic Instrument Control System architectural specifications that the da Vinci system was designed for "resposable instruments," and that these instruments "may only be used a limited number of times."[143]  Intuitive submitted a 510(k) for these instruments and then was told by FDA staff to

---

condition the device will diagnose, treat, prevent, cure or mitigate, including a description of the patient population for which the device is intended."  *Id.* (citing 21 C.F.R. § 814.20 (b)(3)(i)).

[142]  Intuitive-00691208-Intuitive-691209.

[143]  Intuitive-00692310 at Intuitive-00692312 and Intuitive-00692417.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

instead submit a PMA for these instruments, which was subsequently converted back to a 510(k) (K990144) by FDA.[144]  That converted submission (K990144) includes all information submitted in the PMA and clearly denotes in the device description that the "instruments are programmed for a limited number of uses to ensure the reliability and consistent performance, and have non-volatile 'add-only' memory that the [da Vinci surgical system] decrements after each use."[145]  It further contains a sketch of the EndoWrist instrument noting where the "Tool ID/End of use electronics" are to be installed which contain "a printer circuit board wired to connector 'pins' in the housing . . . [that] store[s] number of uses remaining in memory."[146]  The da Vinci Surgical Guide, which was incorporated into the instrument instructions for use, also makes clear that all Intuitive instruments can only be used for a limited number of procedures and that they cannot be used after they have expired.[147]  The carton label identified the actual number of uses for the core instruments—10 each.[148]  The life testing results submitted to the FDA as part of that file also established both the usage limits for each instrument and how Intuitive arrived at those numbers.[149]

---

[144]   Intuitive initially submitted a 510(k) for the core set of IS 1000 instruments (K990144) on January 19, 1999. Intuitive-00692310.  On May 19, 1999, the FDA informed Intuitive that it must file a PMA instead.  Intuitive-00692185.  The FDA then reversed course and converted the PMA back to that 510(k) and cleared the 510(k) on July 11, 2001.  Intuitive-00691205.

[145]   Intuitive-00692643 at Intuitive-00692662.

[146]   Intuitive-00692643 at Intuitive-00692668.

[147]   Intuitive-00692643 at Intuitive-00692710 (Instruction manual submitted with K990144 PMA noting that "[a]ll ISI Instruments can be used for a limited number of procedures to ensure reliability and consistent performance. . . .  When Instruments expire, they can no longer be used.").

[148]   For the labels submitted with the PMA that was converted to a 510(k) (K990144), *see* Intuitive-00694522 at Intuitive-00694586-Intuitive-00694593.

[149]   *See* Intuitive-00694043 at Intuitive-00694248-Intuitive-00694301 (containing the tool cycle test submitted with the PMA converted to K990144).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

117.    Following the FDA's clearance of the IS 1000 series of surgical instruments in

K013416, Intuitive submitted numerous 510(k) submissions for new types of EndoWrist

instruments and for new da Vinci system models.  These 510(k) submissions are replete with

similar evidence in device descriptions, architectural specifications, device sketches, user

instruction manuals, carton labels and life testing records that Intuitive intended for EndoWrist

instruments to be used a limited number of times, up to the limit set by Intuitive according to its

internal testing process, and which FDA again cleared.[150]  This conclusion is further buttressed

by the product catalogs, which constitute labeling, available on Intuitive's website, which clearly

indicate the usage limit for each individual EndoWrist instrument.[151]  In 2001, the FDA

exchanged detailed correspondence with Intuitive to clarify the number of uses for each

instrument and to elicit an explanation of how the use limits were determined.  This exchange

reflects the importance of usage limits to the design of EndoWrist instruments, and how such

---

[150]  For device descriptions, *see, e.g.*, Intuitive-00515501 at Intuitive-00515508-00515509, Intuitive-00515514-00515515 (noting that the device description for K013416 submission covering round-tooth forceps, long tip forceps, cadiere forceps, and chichon tissue forceps, atraumatic fenestrated graspers, needle drivers, scissors, and scalpels stated that "[t]he instruments are re-usable (for a limited number of uses) . . . [and] are programmed for a limited number of uses to ensure reliability and consistent performance, and have non-volatile 'add-only' memory that the Instrument Control System decrements after each use."); Intuitive-00493504 at Intuitive-00493505 (noting that the device description in Intuitive's K131861 submission for instruments compatible with the Model IS 4000 surgical system stated that "[EndoWrist instruments] are programmed with a maximum number of surgical procedures based upon life testing."); Intuitive-00510907 at Intuitive-00510954 (noting that the substantial equivalence rationale in Intuitive's K131861 submission also noted that "[e]ach instrument is reusable for a fixed number of procedures. . . .  The system electronically records the number of uses on each instrument and will not operate an instrument that has exceeded the maximum number of specified uses.").  For instruction manuals, *see, e.g.*, Intuitive-00515501 at Intuitive-00515581 (Instructions for use submitted with K013416 510(k) noting that the instrument "is provided pursuant to a limited license [and] . . . [u]pon expiration of the instrument's programmed lifetime, this limited license expires); Intuitive-00492204 at Intuitive-00492211 (Instructions for use submitted with K131861 510(k) containing similar disclaimer on limited use license).  For carton labels, *see, e.g.,* Intuitive-00515501 at Intuitive-00515535, Intuitive-00515540, Intuitive-00515546, Intuitive-00515550, Intuitive-00515556 (K013416); Intuitive-00496155 (K131861).  For life testing results, *see, e.g.*, Intuitive-00493612 at Intuitive-00493651-Intuitive-00493670 (summarizing the life test results submitted in the K131861 510(k) for Model IS4000 instruments).

[151]  *See generally* Intuitive Surgical, Inc., *Da Vinci X/Xi Instrument & Accessory Catalog*, (Nov. 2020), https://www.intuitive.com/en-us/-/media/Project/Intuitive-surgical/files/pdf/xi-x-ina-catalog-no-pricing-us-1052082.pdf?la=en&hash=189164507BDFEC40E9DAB44BA10731A5.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

limits provide reasonable assurance of safety and effectiveness to demonstrate substantial equivalence.[152]

118.    Thus, the intended use of EndoWrist instruments, as revealed in the four corners of the Intuitive 510(k)s that FDA cleared, including the device labeling, was to be limited to a predetermined number of uses as set by Intuitive pursuant to its testing protocols that FDA reviewed and cleared within the 510(k)s.  The usage limits would be enforced by a chip Intuitive manufactured and described in the 510(k)s, and which itself was cleared as part of the 510(k) review.  Restore's insertion of the new Interceptor board, which bypasses the FDA-cleared usage limits for the Intuitive EndoWrist instruments and allows reuse of the instruments, is thus a significant change to the intended use of the Intuitive instruments.

## 2.    Restore's Insertion of the Interceptor Board Did Not Constitute a "Repair" of EndoWrist Instruments

119.    Restore claims that it did not remanufacture the EndoWrist instruments, but instead merely repaired them, and therefore did not require 510(k) review and clearance to add the Interceptor board to EndoWrist instruments.[153]  Restore claims that hospitals have been repairing reusable Class 1 and Class 2 laparoscopic surgical instruments for decades without needing to submit a 510(k) because that service constitutes a repair and is not regulated by the FDA.  Similarly, Restore claims that its services related to EndoWrist instruments are no different as they only constitute a repair of the devices.[154]  Such a comparison between previously FDA-cleared laparoscopic instruments and EndoWrist instruments is flawed.  The

---

[152]   *See* Intuitive-00481167 (Intuitive's response to FDA deficiency letter for K013416 510(k)).

[153]   Restore's Supplemental Responses to Intuitive's Interrogatory No. 10.

[154]   Restore-00002650 at Restore-00002651 ("Da Vinci instruments are marketed by Intuitive Surgical as 'reusable instruments,' so like many other re-suable instruments, they can be cleaned and re-used without the hospital or a service company obtaining a 510(k).").

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

EndoWrist instruments are operated by an Intuitive chip that allows the instruments to only be used for a number of times that has been shown to provide reasonable assurance of safety and effectiveness to demonstrate substantial equivalence, as opposed to other legally marketed laparoscopic instruments.  Restore's addition of a new device (the Interceptor board) to these instruments goes well beyond what the FDA would consider a "repair."

120.     The laparoscopic surgical instruments that hospitals repair without requiring 510(k) clearance are reusable instruments—they are not labeled for a predetermined number of uses and FDA did not review data supporting the specified number of uses.  In contrast, EndoWrist instruments are intended for limited reuse up to a predetermined number of lives based on data regarding safety and effectiveness, which was submitted to and reviewed by FDA as part of the 510(k) process.  Therefore, extending the number of useful lives of other types of reusable, legally-marketed laparoscopic instruments does not change their intended use, and I believe the hospitals/users have their own way of determining the useful life of such instruments.  As I explained in Section III.B, the fact that Intuitive relied on some of these other types of legally-marketed laparoscopic instruments as predicate devices within FDA's classification of 21 C.F.R. § 876.1500 to establish substantial equivalence does not mean the EndoWrist instruments are exactly the same as such instruments, and therefore are also considered to be reusable devices.  FDA determined the Intuitive EndoWrist instruments to be substantially equivalent to predicate laparoscopic instruments based on a review of the information submitted in the 510(k) including (i) the predicate, (ii) the intended use, and (iii) technology and performance data to provide reasonable assurance of safety and effectiveness.

121.     Moreover, Restore's argument that a change in ownership of the EndoWrist instrument is necessary for its action to constitute remanufacturing is incorrect.  No such

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

distinction exists in the FDA regulations and guidance to distinguish whether or not a change in ownership is considered to be remanufacturing as opposed to repair.

122.    As I explained in Section III.D.2, the fact that the instruments are shipped from Anaheim, California, to hospitals located in other states is sufficient for the instruments to be "in commerce" and therefore subject to FDA's jurisdiction.  Moreover, as a remanufacturer (and manufacturer), Restore is subject to the registration requirements of 21 C.F.R. § 807.20, and thus required to submit a premarket notification submission under 21 C.F.R. § 807.81 because it is introducing a new, remanufactured device into commercial distribution for the first time and to receive a determination of substantial equivalence from FDA.  While the EndoWrist instrument the hospital receives back from Restore appears the same as the one they shipped to Restore, and has most of the original parts, as well as a newly installed Interceptor board, the hospital is in fact receiving a remanufactured device from Restore that has been significantly altered and therefore constitutes a new device being introduced into commerce as per FDA laws, regulations and guidance.

### 3.    Restore's Analysis in its Letter to File was Flawed and Inapplicable, and Does Not Exempt Restore from Obtaining 510(k) Clearance

123.    In a Letter to File dated October 1, 2018, Restore, acting through its wholly-owned subsidiary MediVision,[155] outlined and analyzed the changes that it made to the EndoWrist instruments.[156]  MediVision concluded that Restore did not need to obtain 510(k) clearance to market and sell its "service" of adding the Interceptor board to bypass usage limits. MediVision's analysis suffers from fundamental flaws that raise questions about Restore's

---

[155]  Restore-00002728.

[156]  Restore-00007128–Restore-00007139.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

understanding of the regulatory requirements for a company purportedly in the business of servicing medical devices.

124.    In this Letter to File, Restore stated that it extended the life of the EndoWrists "beyond the listed number of uses limited by a counter installed by the original equipment manufacturer" (OEM).[157]  Restore did so with the "Interceptor," which provided a "factory resettable use counter while maintaining the ability of the Da Vinci Surgical Robot to access all data in the OEM memory and to count uses as usual."[158]  The Letter to File analyzed whether Restore's extension of the usage settings beyond those established by Intuitive required Restore to obtain 510(k) clearance.[159]  In doing so, Restore applied the principles in CDRH's guidance document titled "Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1), issued on January 10, 1997" ("1997 Guidance"), which was reissued in updated form on October 25, 2017 ("2017 Guidance").[160]  Restore concluded that it was not required to obtain 510(k) clearance.

125.    Restore's analysis begins with a fundamental misunderstanding of the guidance relevant to its activities as a third-party company.  Both the 1997 Guidance and the 2017 Guidance apply when the holder of a 510(k) for a device, which here would be Intuitive, is

---

[157]  Restore-00007128.  The OEM being referred to here is Intuitive, who is in fact the 510(k) holder for the 510(k) cleared by the FDA.

[158]  *Id.*

[159]  Restore-00007128–Restore-00007139.

[160]  *Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1)* (Jan. 10, 1997) (1997 Guidance).  I was the FDA contact on the original 1997 guidance and one of the co-authors of the guidance. This was the first guidance issued by FDA to provide FDA's best guidance for FDA and its stakeholders on FDA's regulation on modifications to devices that are legally marketed in the U.S. (either 510(k) cleared or 510(k) exempt) that do not require a Premarket Approval Application (PMA) as per 21 C.F.R. § 807.81(a)(3). The guidance, both from 1997 and the second iteration from 2017, using the same basic principles with more up-to-date examples, emphasizes that the decision on whether to submit a 510(k) or not depends upon any change(s) that "could" significantly affect safety or effectiveness as per the above referenced FDA regulation.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

assessing whether a change to its own device requires the submission of a new 510(k) under 21 C.F.R. § 807.81(a)(3).[161]

126.    The 1997 Guidance and 2017 Guidance clearly did not apply to Restore, because it did not hold a 510(k) clearance nor did it have a legally marketed device that was exempt from the 510(k) requirements under the FDCA.  Rather, Intuitive was (and still is) the holder of the 510(k).  Restore was not able to "piggyback" off Intuitive's 510(k) clearance in deciding if the changes to the Intuitive device that Restore sought to make required a 510(k) in the form of an internal Letter to File; that option is only available to the 510(k) holder.  Moreover, even if the standard in 21 C.F.R. § 807.81(a)(3)[162] was applicable, Restore would still be required to file a 510(k) because it was implementing a change or modification that could significantly affect the device's safety or effectiveness and/or change the device's intended use,[163] something the Letter to File did not even address.

127.    Restore instead was required to determine whether introducing its finished device component into U.S. commercial distribution for the first time (inside the EndoWrist instrument) required a 510(k) submission and a clearance determination by FDA.  That is, the analysis that Restore should have performed was whether, under 21 C.F.R. § 807.81(a)(2), it was required to submit a 510(k) and receive FDA clearance before introducing "a device into commercial

---

[161]  2017 Guidance at 6 ("This guidance will aid manufacturers of medical devices subject to premarket notification requirements who intend to modify a 510(k)-cleared device (or group of devices) . . . (also referred to together as 'existing devices'), during the process of deciding whether the change exceeds the regulatory threshold of 21 CFR 807.81(a)(3) for submission and clearance of a new 510(k).")

[162]  21 C.F.R. § 807.81(a)(3) states that a premarket notification is required if "[t]he device is one that the person currently has in commercial distribution or is reintroducing into commercial distribution, but that is about to be **significantly changed or modified** in design, components, method of manufacture, or **intended use**." (emphasis added).

[163]  *See supra* Section III.E.1.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

distribution *for the first time*" by anyone required to register.[164]  Anyone who qualifies as a

manufacturer or a remanufacturer of a device must register with the FDA.[165]  Restore is a

manufacturer of the Interceptor board, which, as installed in an Intuitive EndoWrist instrument

that Restore marketed and sold to end users, is a finished device component for sale to an end

user.[166]  In the alternative, consistent with FDA's regulation of remanufacturers (as reflected

most recently in the recent 2021 Draft Guidance), Restore remanufactured EndoWrist

instruments because it significantly changed their intended use.[167]  In both instances, Restore is

introducing a new medical device into commercial distribution for the first time, and was thus

required to submit a 510(k) and receive FDA clearance prior to marketing its own device.[168]

### 4.      Restore's Position on the Type of Reusable Medical Devices That Qualify for 510(k) Clearance Is Incorrect

128.    Restore asserts that FDA "recognizes only two types of use cases: [s]ingle use

[and] [m]ultiple use" and that "[EndoWrist instruments] are classified as multiple use by the

FDA."[169]  Restore's assertion that FDA only recognizes two categories of devices—single use

and multiple use—is incorrect.  No regulatory scheme exists that divides medical devices into

these two categories.  The FDA reviews a 510(k) as it was submitted and makes a determination

---

[164]  *Id.*

[165]  FDCA § 510(b)(2), 21 U.S.C. § 360(b)(2) ("During the period beginning on October 1 and ending on December 31 of each year, every person who owns or operates any establishment in any State engaged in the manufacture, preparation, propagation, compounding, or processing of a device or devices shall register with the Secretary his name, places of business, and all such establishments); see also *Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018).

[166]  *See supra* Section III.D.

[167]  *See supra* Section III.E.1.

[168]  *See* 21 C.F.R § 807.81(a)(2).

[169]  Restore-00012160 at Restore-00012175.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

on whether or not to clear it on that basis—which can include the agency asking for additional information prior to making a final determination.[170]

129.    The baselessness of Restore's position is exposed by Mr. Rafal Chudzik, who advised Restore in connection with the Iconocare 510(k), and whose opinion is consistent with my report. Mr. Chudzik testified that insertion of a board to extend the life cycles on EndoWrist instruments required a 510(k) because "you're taking a product that is beyond what its originally been cleared to be used for and so whether its remanufactured or reprocessed, at the end of the day, you have a 510(k) that says that the FDA agrees with you that it's a safe and effective medical device."[171] Mr. Chudzik's analysis would be incorrect if there was a classification of multi-use instruments that placed any type of "repair" outside the purview of the FDA, which of course there is not.

130.    Furthermore, as I previously discussed in Section III.A, Intuitive's device was cleared as a limited reuse device and during the review of the 510(k), FDA followed up to inquire about how usage limits were set. Thus, any attempt to remove usage limits by Intuitive would require 510(k) review and clearance as a change that could significantly affect safety and effectiveness, or intended use, as per 21 C.F.R. § 807.81(a)(3).

### 5.    Intuitive Was Not Required to Obtain 510(k) Clearance Before Increasing the Usage Limits of Certain EndoWrist Instruments

131.    FDA's *Deciding When to Submit a 510(k) for a Change to an Existing Device: Guidance for Industry and Food and Drug Administration Staff based on 21 CFR 807.81(a)(3)* specifically permits 510(k) holders to make certain changes to their own cleared 510(k)s without

---

[170]   21 C.F.R. § 807.87(m).

[171]   Chudzik Tr. at 86:24-87:4.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

submitting a new 510(k) for the change.[172]  One such type of change is a change in expiration

dating, which is analogous to a change in usage limits.  The guidance specifically states:

> Generally, . . . changes in the expiration date for use of a device do
> not require submission of a new 510(k).  FDA relies on the QS
> regulation (21 CFR Part 820) to reasonably assure the safety and
> effectiveness of devices with these types of changes.  This is true
> whether or not the manufacturer applies an expiration date because
> of package integrity considerations, e.g., sterility, or because of a
> finite shelf-life of the device.  However, where methods or protocols
> that are not described in a previously cleared 510(k) are used to
> support new package integrity or shelf-life claims, submission of a
> new 510(k) is likely required.  FDA recognizes that methods or
> protocols may be updated to reflect newly recognized versions of
> consensus standards.  Submission of a new 510(k) is likely not
> required in such circumstances.[173]

132.    In 2020, Intuitive announced the Extended Life Program in which certain

instrument models would have their usage limits increased slightly (*i.e.*, from 10 lives to 14, 15,

or 18 lives, depending on the instrument model).  In Intuitive's Non-Filing Justifications

("NFJs"), more commonly referred to as Letters to File in regulatory parlance, Intuitive

documented in its files that are subject to FDA inspection that the increases to the usage limits

were derived using the same testing methods and protocols that were described in previously

cleared 510(k)s and met the same specifications and therefore, no new 510(k) was required.[174]

133.    In contrast, Restore does not hold a previously cleared 510(k) and therefore has

not yet supported the usage limits for a cleared device using testing methods or protocols to

FDA's satisfaction.  In addition, unlike Intuitive, Restore has not relabeled the EndoWrist

---

[172] *See* FDA, *Deciding When to Submit a 510(k) for a Change to an Existing Device: Guidance for Industry and Food and Drug Administration Staff* (Oct. 25, 2017), https://www.fda.gov/media/99812/download.

[173] *Id.* at 27-28.

[174] *See* Intuitive-00552632; Intuitive-00552652; Intuitive-00552665; Intuitive-00552682; Intuitive-00552697; Intuitive-00552716; Intuitive-00552728.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

devices for a new, specified limited number of uses (as supported by testing data in a 510(k)),

but instead effectively tells its customers that Intuitive's prescribed number of uses for the device

are arbitrary.[175]

### F. Iconocare Health Solution's 510(k) Submission Supports the Conclusion that 510(k) Clearance Is Necessary for the Interceptor Board

134.    My conclusion that Restore was required to obtain 510(k) clearance for its

EndoWrist services is further supported by the fact that on February 13, 2021, Iconocare Health

Solutions ("Iconocare") submitted a 510(k) (K210478) to FDA for extending the useful life of

the 8mm Monopolar Curved Scissors, a type of EndoWrist instrument,[176] for an additional 10

lives beyond the usage limit cleared by the FDA, for a total of 19 lives.[177] Iconocare is a

company affiliated with Alliance Health Partners.[178]  Restore funded all aspects of the 510(k)

submission—Restore paid Alliance for all of the fees related to developing the technology,

conducting the relevant validations, and filing the submission and maintaining all follow-up

---

[175]   *See* Restore-00000094 ("Intuitive Surgical's instructions about how many uses a robotic instrument should have are random and based entirely on efforts to maximize profits (to our knowledge, no studies exist to limit the number of uses to a certain number).").

[176]   *See* AHP002395 (Iconocare's 510(k) submission for remanufactured 8mm Monopolar Curved Scissors); AHP002623 (cover letter to FDA accompanying Iconocare's 510(k) submission).

[177]   *See* Chudzik Tr. at 58:10-58:16 ("Well, because you mentioned the word 'additional' 19 cycles, and we're not - - we're not adding additional 19.  We've got the ten – you know, the original product life cycle but it's cleared and then the 510(k) seeks an additional ten.  So there would be a total of 19.  But an addition 10 to the existing 510(k) that Intuitive owns.").

[178]   *See* Ferreira Tr. at 56:4-14 ("Q.  And what entity submitted the 510(k) on behalf of Restore Robotics?  A. Iconocare Health Solutions.  It's an LLC.  Q.  And why did Iconocare submit the 510(k)? . . .[A.]  So Iconocare submitted it because the whole essence of our relationship with Clif was going to be when we completed it, we would sell him that 510(k), and it was easier if it was in an entity that had nothing else in it."); *id.* at 60:11-12 ("Need to do this in Iconocare - don't want to expose Innovative to any litigation.").

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

correspondence with the FDA.[179]  Alliance then agreed that it would sign over the Iconocare

510(k) to Restore after receiving clearance from the FDA.[180]

135.     My understanding is that the Iconocare 510(k) covers a process in which a new

hardware/software component is inserted into an Intuitive EndoWrist instrument (the "Iconocare

chip").  Although I understand this is a different technology from the Interceptor board, it

appears that insertion of the Iconocare chip has the same result, *i.e.*, permitting EndoWrist

instruments to be used beyond their validated usage limits.[181]  As explained below, Alliance

concluded that the insertion of the Iconocare chip to bypass usage limits required 510(k)

clearance.

136.     Moreover, in a cover letter accompanying the 510(k) submission, Iconocare

acknowledged that it was "seek[ing] clearance to extend the useful life of the device beyond

what was designed, **intended,** and labeled by the original manufacturer."[182]  This representation

is consistent with my conclusion that using a board/chip to bypass validated usage limits is a

significant change to the intended use of EndoWrist instruments—in addition to my opinion that

this is introducing a device into commercial distribution for the first time.

---

[179]   Parker Tr. at 205:9-12 ("Q.  How do you know about this technology that you say was developed by Alliance
        HealthCare?  A.  Because I funded it.  Restore Robotics funded it."); Ferreira Tr. at 90:8-10 ("Yes.  I mean,
        we've got a contract with Clif and Clif basically pays us $25,000 a month to manage the project.").

[180]   *See* Ferreira Tr. at 56:9-12 ("So Iconocare submitted it because the whole essence of our relationship with Clif
        was going to be when we completed it, we would sell him that 510(k).").

[181]   I understand that the Alliance chip would emulate Intuitive's original EPROM memory chip in the device to
        increase the number of instrument uses, as compared to the Interceptor board, which "intercepts" the signal
        from Intuitive's memory chip to increase the number of uses.  *Compare* Chudzik Tr. at 10:18-11:11 *with* Parker
        Tr. at 34:21-35:8.

[182]   AHP002623 (emphasis added).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

137.     FDA accepted Iconocare's 510(k) submission[183] and issued a letter to Iconocare

placing the 510(k) on hold requesting additional information.[184]  FDA's acceptance of the 510(k)

and the issuance of a request for additional information indicates a determination by FDA that

510(k) clearance is necessary for the insertion of a chip/board to bypass Intuitive's EndoWrist

usage limits.  The letter requesting additional information also noted that Iconocare "may not

market this device until [Iconocare has] received a letter from FDA allowing [it] to do so."[185]

Moreover, an email from Rafal Chudzik, the Vice President of R&D and Operations at Alliance,

to FDA that memorialized minutes of a phone meeting with FDA about the Iconocare 510(k)

noted that the FDA believed that "[s]ince Iconocare is changing the device specification by

increasing the number of uses, we consider this as a remanufactured device and would like to

indicate as such."[186]  As I detailed in Section II.I of this report, remanufacturers are required to

register with the FDA and meet the 510(k) requirements under the FDCA, *i.e.* 510(k) submission

or documentation of exemption from 510(k).  To the best of my knowledge, as of the date of this

report, the Iconocare 510(k) is still being reviewed by FDA, as FDA's website does not indicate

that any 510(k) under Iconocare's name has been cleared.[187]

138.     Restore's justification for seeking a 510(k) clearance for the Iconocare chip but

not for the Interceptor board is that Restore anticipates using a different business model in which

it will package and sell remanufactured EndoWrists to customers with the Iconocare chip, as

---

[183]   *See* AHP000525 (K210478 acknowledgement letter from the FDA).

[184]   *See* AHP000527 (K210478 request for additional information letter from the FDA).

[185]   *Id.*

[186]   AHP002062 at AHP002064.

[187]   "*510(k) Premarket Notification,*" FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm (last accessed 8/14/2021).

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

opposed to "repairing" them for customers, as it did with the Interceptor board.[188]  As I

previously discussed in Section III.E.2, this distinction is unavailing.  It is nothing more than a

sleight of hand to recharacterize what is plainly manufacturing and/or remanufacturing activity

as a "repair" so that Restore can avoid 510(k) clearance for how it handled the Interceptor board.

139.    Indeed, Restore's position has been rejected by Mr. Chudzik, who assisted in

preparing the Iconocare 510(k).  Mr. Chudzik testified that the insertion of a board into the

EndoWrist to extend its life cycles would require "a premarket notification to the FDA to review

all the data to make sure that it ultimately provides a safe effective product that's substantially

equivalent to the predicate device."[189]  According to Mr. Chudzik, "In [Iconocare's] case because

we were extending the life of a cleared medical device, we're required to submit a 510(k) . . .

you're taking a product that is beyond what its originally been cleared to be used for and so

whether its remanufactured or reprocessed, at the end of the day, you have a 510(k) that says that

the FDA agrees with you that it's a safe and effective medical device."[190]  Mr. Chudzik testified

that there was no distinction between whether the instrument with the newly installed chip was

being resold or repaired for the hospitals, confirming that 510(k) clearance was still required and

---

[188]    *See* May Tr. at 195:19-196:4 ("And so [Alliance] suggested that we could change our business strategy and we can get a 510(k), which would allow us to take ownership of the device, so we could buy instruments and then we could reprocess them -- sorry, we could – we could remanufacture them, because now that we take ownership it's remanufacturing, and then we could store them in stock and then we could sell them to customers without having them to send it in as service.  That would be a different business model.").

[189]    Chudzik Tr. at 33:16-34:1.  Mr. Chudzik's position, which is consistent with mine, is similar to the testimony of Ron Arkin, another regulatory consultant that Restore turned to for advice as to whether a 510(k) was needed with respect to the insertion of the Interceptor board.  Mr. Arkin testified that after reviewing the circumstances surrounding the EndoWrist repair process involving the Interceptor Board, he "was leaning towards the fact that [Restore] needed to do a 510(k) as a result of the "modification of the counter."  Arkin Tr. at 71:11-72:15. While Mr. Arkin may not have been formally retained by Restore, and may have only had access to limited materials provided to him by Restore, he was still inclined to believe that circumventing the EndoWrist usage limits would likely require a 510(k) submission.

[190]    Chudzik Tr. at 83:20-87:4.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

that "[t]he regulations are . . . standalone clear what they require from companies filing 510(k)s for this kind of work."[191]

### G.    FDA's Interactions with Restore, BPI, and Rebotix Further Support the Conclusion that the Interceptor Board Needed 510(k) Clearance

140.    My conclusion that Restore engaged in manufacturing of a new device by inserting its new Interceptor board into Intuitive's EndoWrist instruments, and therefore needed 510(k) review and a clearance determination,[192] is consistent with and reinforced by FDA statements made on three separate occasions: (1) email correspondence between Restore and two individuals at the FDA (Dr. Je Hi An and Commander Jitendra Virani) in February and March 2020; (2) FDA's additional information request/response to Rebotix's submission of a 510(k) titled "Remanufactured EndoWrist" instruments on December 18, 2014; and (3) a 2018 email exchange between BPI Medical (an authorized Rebotix distributor that was similarly situated to Restore) and Dr. Cal Rabang at the FDA, copied to his supervisor.[193]

141.    *First*, Restore received an email from Dr. Je Hi An from the FDA on February 20, 2020, who noted, "You state on your website www.restorerobotics.com that you restore robotic instruments and extend the lives of these instruments [more] than the intended limit.  Based on this information, we believe that a 510(k) is needed before you continue your operation."[194] Restore responded on February 27, 2020, arguing that its "services meet[] the definition of

---

[191]  *Id.* at 109:2-22.

[192]  Or, in the alternative, Restore remanufactured the EndoWrist instruments and required 510(k) clearance, as outlined in Section III.E.

[193]  I understand that a predecessor of Rebotix called Rebotix, LLC filed the 510(k).  Given that the same installation process is at issue (the addition of an Interceptor board to the EndoWrist instrument) and given the overlap in ownership and control between Rebotix and Rebotix, LLC, I am comfortable treating the companies as the same for purposes of this analysis.

[194]  Restore-00001248 at Restore-00001256.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

repair," that "the device ownership is always maintained by the hospital," and that no 510(k) was necessary.[195]  On March 9, 2020, CDR Jitendra Virani, the then-Team Lead for the Robotic Assisted Surgical Devices Team, responded to Restore, requesting additional information to make sure Restore's activities "do not significantly change the performance or safety specifications, or intended use as described in 21 CFR 820.3(w)," the definition of remanufacturing.[196]  Restore never provided this information, and on July 12, 2020, represented to CDR Virani that it had "indefinitely ceased its robotics repair services for business reasons that predate the pandemic."[197]  This exchange shows that the FDA views an activity that extends EndoWrist instrument lives beyond their validated limits to require 510(k) clearance and prohibits companies like Restore from continuing operations without 510(k) clearance.

142.    *Second*, on December 18, 2014, Rebotix submitted a 510(k) to the FDA for remanufactured EndoWrist instruments,[198] utilizing a process that is identical to the so-called "repair" process that Restore marketed—insertion of the Interceptor board to bypass usage limits and extend the life of the EndoWrist instrument.[199]  Rebotix withdrew this 510(k) after FDA identified a number of deficiencies with its 510(k) submission that Rebotix was unwilling or unable to remedy.[200]  Thus, by filing this 510(k), Rebotix explicitly acknowledged that a 510(k)

---

[195]  *Id.* at Restore-00001255.

[196]  *Id.* at Restore-00001254.

[197]  *Id.* at Restore-00001249.

[198]  *See* REBOTIX170421, REBOTIX169947, REBOTIX169926, REBOTIX169588, REBOTIX169504, REBOTIX169166, REBOTIX169683, REBOTIX169168, REBOTIX169360, REBOTIX170053, REBOTIX169167.

[199]  The device description section of Rebotix's 510(k) states that the "Rebotix Re-Manufactured EndoWrists are identical to the OEM versions with the exception of the following modifications: · Addition of a PCB assembly internal to the device to extend the uses to an addition 11 uses as displayed on the host system. · The Tool End is polished. · Where applicable, blade is sharpened. ·Re-manufacturer information is added to the device housing." REBOTIX169947 at REBOTIX169950.

[200]  *See* REBOTIX171073.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

submission was necessary for any EndoWrist instrument "repair" process that involves the insertion of the Interceptor board.  The fact that Rebotix, the developer of the Interceptor board at issue, determined that 510(k) review and clearance was necessary bolsters my conclusion that Restore required 510(k) clearance for the "service" it sold to customers.[201]

143.    As further support for my conclusion, once FDA received Rebotix's 510(k) submission, it determined through its review that a 510(k) was necessary (regardless of whether they concluded Rebotix was engaged in manufacturing or remanufacturing).  FDA sent a letter to Rebotix after reviewing the 510(k) identifying numerous deficiencies with Rebotix's 510(k) submission, requesting additional information, and placing the 510(k) on hold pending a complete response from Rebotix to FDA's letter.[202]  In this deficiency letter, FDA specifically told Rebotix it could not market its device without FDA clearance and, if it did so, it would be in violation of the FDCA.[203]  Rebotix eventually withdrew its 510(k) submission, noting that it would "not be able to respond to the deficiencies within the [maximum] 180-day allotted timeframe," and that it was its "intent to resubmit the 510(k) at a later date once the data has been collected and compiled."[204]  Rebotix never did resubmit its 510(k).

144.    *Third*, in or around May 2018, Robert Overmars, the CEO of BPI Medical, had a phone call with Dr. Rabang (identified by FDA staff as the lead reviewer responsible for the da

---

[201]  Just as Restore argues, Rebotix asserts that it is somehow immune from 510(k) clearance because hospitals retained ownership of the instruments.  REBOTIX146948 at REBOTIX-146954.  The fact that Rebotix and Restore have purported not to take ownership of the instrument is of no moment.  As explained in Section III.D.2, this rationale is flawed and does not obviate the need for the Interceptor board to have 510(k) clearance before being introduced into commercial distribution for the first time.

[202]  *See* REBOTIX171058.  The FDA identified deficiencies related to device description, Rebotix's procedures for remanufacturing, labeling, cleaning validation, sterilization validation, biocompatibility testing, electromagnetic compatibility and electrical safety testing, and general performance testing conducted to validate the remanufacturing process.  *See* REBOTIX171030.

[203]  *See id.*

[204]  REBOTIX171076.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

Vinci surgical system) to discuss whether a 510(k) would be required for third-party repairs of EndoWrist instruments.[205]  At the time, BPI was acting as a distributor for Rebotix—in a substantially similar position as Restore at the time—marketing and selling Rebotix's EndoWrist "repair" process without 510(k) clearance.

145.    On May 21, 2018, Mr. Overmars emailed Dr. Rabang to gain further clarification as to why a 510(k) would be necessary for the repair of EndoWrist instruments, to which Dr. Rabang replied that "if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed," which would make BPI a "remanufacturer." Dr. Rabang reasoned that because remanufacturers "meet the definition of 'manufacturer' specified in 21 CFR 820.3(o) and are required to register and list according to 21 CFR 807.20," and because EndoWrist instruments are classified as Class II devices, BPI "would be subject to premarket notification (510(k)) requirements defined in 21 CFR 807.81."[206]  These statements are consistent with my opinion (as outlined in Section III.E) that Restore engaged in remanufacturing of the EndoWrist instruments and required 510(k) clearance prior to commercial distribution in the U.S.

146.    Although Dr. Rabang's email contains a boilerplate disclaimer that the communication represents an informal communication and does not represent FDA's formal position, I find the email response to be notable and an expression of FDA's views on the issue. Based on my 33 years of experience at the FDA, it is not uncommon for the FDA to weigh in on certain issues in answers to questions submitted via email, particularly when the answer is clear cut and uncontroversial.  In my experience, the FDA typically weighs in with responses via

---

[205]   REBOTIX040231 at REBOTIX040236.

[206]   *Id.* at REBOTIX040235.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

phone or email if the question is a "no-brainer." This is what Dr. Rabang's response appears to be here. Indeed, Dr. Rabang would have been well situated to weigh in on the 510(k) issue given that he was the lead reviewer at the time for Intuitive's 510(k) submissions. The fact that Dr. Rabang copied Long Chen, his supervisory Branch Chief, gives even greater weight to his response.

### H.   Intuitive's Customer Communications Noting That Restore Needed 510(k) Clearance for the Interceptor Were Appropriate and Based on a Reasonable Interpretation of FDA Law

147.   For all the reasons previously explained in Section III.D, it is my expert opinion that Restore manufactured a finished device component in finished form for sale to an end user and placed it in interstate commerce to an end user without 510(k) clearance as required by the FDCA and FDA regulations. Therefore, I fully agree with Intuitive's position as voiced to its customers that Restore was selling a finished device to the end user without required 510(k) clearance in violation of the FDCA.

148.   In addition, because Intuitive had concerns about patient safety, which appear to be well-founded upon learning that the Interceptor evaded FDA-cleared usage limits, it was reasonable and perhaps a moral responsibility for Intuitive to attempt to notify its customers regarding its patient safety concerns.

149.   In fact, FDA issued a draft guidance responding to "stakeholder requests for specific guidance regarding a firm's voluntary correction of misinformation when that misinformation is created or disseminated by an independent third party."[207] Recognizing that the internet and social media in particular have made it much easier for independent third parties

---

[207]   FDA, *Guidance for Industry: Internet/Social Media Platforms: Correcting Independent Third-Party Misinformation About Prescription Drugs and Medical Devices: Draft Guidance* 1 (June 2014), https://www.fda.gov/media/88545/download.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

to disseminate misinformation, the draft guidance addresses how manufacturers can address misinformation in the context of the internet and social media specifically.  However, the very existence of the draft guidance indicates how widespread the practice of manufacturers correcting third-party misinformation actually is today.

150.    Moreover, several of the recommendations in the draft guidance are applicable outside the internet and social media context.  The "draft guidance sets forth approaches a firm may use once it decides to voluntarily correct misinformation about its own product that is created or disseminated by an independent third party who is not under the firm's control or influence."[208]  The draft guidance recommends, among other things, that a firm's voluntary corrective information:

- "Be relevant and responsive to the misinformation"

- "Be limited and tailored to the misinformation"

- "Be non-promotional in nature, tone, and presentation"

- "Be accurate"

- "Be consistent with the FDA-required labeling for the product"

- "Be supported by sufficient evidence"

- "Disclose that the person providing the corrective information is affiliated with the firm that manufactures, packs, or distributes the product"[209]

I reviewed examples of documents that Intuitive sent to hospital customers regarding third parties extending the usage limits of Intuitive devices.[210]  The documents appear to be consistent with FDA's recommendations related to correcting third-party misinformation.

---

[208]  *Id.* at 5.

[209]  *Id.* at 5-6.

[210]  *See, e.g.,* AHS_MGMT-INTUITIVE_0000239 at AHS_MGMT-INTUITIVE_0000241-AHS-MGMT-INTUITIVE_0000246; Intuitive-00439677; Intuitive-00211764.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

I.   **Restore Failed to Adequately Investigate Whether a 510(k) Was Needed Prior to Making Representations to Customers**

151.   I understand that Restore made representations to customers that it did not need 510(k) clearance and that Intuitive has alleged that Restore made these representations without adequately vetting the issue of 510(k) clearance internally.  Based on my experience and the review of documents in the record, I conclude that Restore did not adequately investigate whether a 510(k) was needed before making representations to customers that none was needed.

152.   Restore repeatedly touted to customers that no 510(k) clearance was needed. Restore shared a FAQ marketing document with Medline,[211] a distributor for Restore, which said that "Da Vinci instruments are marketed by Intuitive Surgical as 'reusable instruments,' so like many other re-usable instruments, they can be cleaned and re-used without the hospital or service company obtaining a 510(k)," and further noted 510(k) clearance was unnecessary because:

> The hospital never loses ownership of the instrument…[w]e do not sterilize nor do we provide sterile device after the repair…[t]here are no changes to the performance of safety specifications on the instrument…[t]he devices intended use is not significantly altered…and [t]he EndoWrist 510K and IFU denote the instrument as reusable device and they remain so."[212]

153.   In another marketing document that Restore provided to hospital customers, Restore claims that "our service violates none of the standards that could necessitate a 510K," and reiterates some of the same points while also noting that "[b]y the FDA's definition, in order

---

[211]   Colletti Tr. at 18:17-25 ("Q.  Medline did not perform an assessment on whether a 510(k) repair was needed? A.  That's correct.  Q.  Okay.  So -- So perhaps I misunderstood.  When there was a determination made that a 510(k) was not necessary, who made that determination?  A.  A determination was made by Restore of whether or not a 510(k) was necessary for a repair product.").

[212]   Restore-00002650 at Restore-00002651.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

to violate the standard of 'significantly altered' we would have to change the EndoWrist into a single use device."[213] As I have previously discussed, none of these arguments are meritorious.

154.    Notably, these representations fail to mention anything about the fact that (1) Restore inserted a brand-new Interceptor board into the Intuitive EndoWrist instrument; (2) Restore bypassed the usage limits set and validated by Intuitive and cleared by the FDA, changing the intended use of the instruments; (3) Restore received advice from Arkin Consulting Group (a regulatory consultant) in July 2019 that Restore should set up a pre-submission meeting with FDA to determine for certain whether a 510(k) would be necessary;[214] and (4) Restore funded Iconocare's 510(k) submission in which it is seeking regulatory 510(k) clearance for the extension of the usage limit of an EndoWrist instrument by 10 lives using the Iconocare chip, a new EEPROM chip that performs a similar function as the Interceptor board.

155.    I would have expected to see some form of analysis in Restore's records addressing these issues before concluding that it was permissible for Restore to represent to customers that FDA 510(k) clearance was not necessary and that FDA was wrong.  However, I saw no such analysis.  Instead, Restore drew a false equivalence based on the relevant business model as to whether a hospital retains title to an EndoWrist instrument.  Once again, the FDCA requires FDA to make determinations regarding substantial equivalence and not a manufacturer on their own unless the device type meets the 510(k) exemption criteria under the FDCA and regulations on limitations to exemption or if the device type requires a PMA.  Even when a device has been determined to be exempt from the 510(k) requirements of the FDCA by the firm

---

[213]    Intuitive-00552745 at Intuitive-00552751.
[214]    ACG000006.

HIGHLY CONFIDENTIAL –SUBJECT TO PROTECTIVE ORDER

required to register, FDA has the final determination when there is any question on the device's

exemption status.

**IV.** **CLOSING**

156.   I hold the opinions expressed in this report to a reasonable degree of regulatory

certainty. I reserve the right to supplement my opinions if I acquire additional information.

_____          _____

                                                                          August 20, 2021
Heather S. Rosecrans                                                 Date
Executive Vice President, Medical Devices and Combination Products
Greenleaf Health, Inc.

**APPENDIX A**

**Curriculum Vitae of Heather S. Rosecrans**

# Heather S. Rosecrans, F.R.A.P.S.

**Contact Information**

**Address:** 13012 Mimosa Farms Ct. Rockville, MD 20850

**Phone:** 240-401-0604 (Mobile)

---

**Professional Experience**

Greenleaf Health, Inc.
*Executive Vice President, Medical Devices and Combination Products*
*Washington, DC*
*9/2010 – present*

As an Executive Vice President at Greenleaf Health, I am responsible for providing strategic consulting services for Greenleaf clients. These services include strategic consultation on issuesrelated to the Food and Drug Administration's (FDA's) regulation of medical devices and combination products including regulatory and policy guidance, training and review of submissions.

Medical Device Manufacturers Association (MDMA)
*Vice President, Regulatory Affairs*
*Washington, DC*
*9/2010 – present*

In my role as Vice President, Regulatory Affairs at the Medical Device Manufacturers Association I offer policy advice to MDMA and its members regarding FDA device regulation.

Regulatory Affairs Professional Society (RAPS)
In 2016 I was selected as a Fellow of the Regulatory Affairs Professional Society (F.R.A.P.S.)

**FDA/Center for Devices and Radiological Health (CDRH)**
*Section Chief/Expert Supervisory Consumer Safety Officer*
*White Oak, MD*
*6/2008 – 9/2010*

As Director of the 510(k), in addition to what is noted in the section on 7/2006 to 1/2008, I developed and implemented administrative and regulatory policy for the Premarket NotificationProgram (510(k)), the Evaluation of Automatic Class III Designation (De Novo), 513(g) Program, Classification and Reclassification, Device Product Codes, as well as citizens petitionsand other regulatory requirements.

- During the Institute of Medicine's (IOM's) 18-month review of the 510(k) Program, I provided training to the IOM review committee to educate members on the 510(k) Program at their first public meeting in March 2010. My presentation to the IOM committee was titled, "Understanding the Premarket Notification (510(k)) Process: History from 1976 to 2010."

- In 2009, the Government Accountability Office (GAO) Study of the 510(k) Program was completed and reported upon to Congress. I was the lead in responding to GAO on this study and have spoken at many conferences on this topic as well as briefing for FDA.

- I prepared the Office of Management and Budget (OMB) paperwork for documents related to the above referenced programs including addition of any new forms or requirements.

# Heather S. Rosecrans, F.R.A.P.S.

- In 2009 I briefed the new Commissioner and Deputy Commissioner several times on the510(k) Program.

- In 2009 I was quite honored to have received a Certificate of Appreciation for Outstanding Service from the U.S. Military Special Operations Command (SOCOM) Ground Application Program Office for outstanding support to the United States' SOCOM Medical Research and Development Program for playing a critical role in the success of SOCOM's Medical Research and Development program. I was recognized fordirectly contributing to the successful fielding of mission essential medical devices that had a direct impact on improved lifesaving capabilities within SOCOM and have enhanced the combat casualty care to our first line Soldiers.

FDA/CDRH
*Acting Division Director/Program Operations Staff*
*Rockville, MD*
*1/2008 – 6/2008*

I served as Acting Director of the Program Operations Staff within the Office of Device Evaluation (the current director was on a 6-month detail and returned). I supervised the staff andthe administrative and regulatory policy review of all CDRH premarket programs including: theInvestigational Device Exemption (IDE) Program; the Humanitarian Device Exemption (HDE) Program; the Premarket Approval Application (PMA) Program; as well as the 510(k) Program, 513(g) Program, De Novo and Classification and Reclassification Programs. This included day to day oversight and quality assurance for all programs as well as involved long range planning and strategic initiatives for these programs. With the passage of the Food and Drug Administration Amendments Act of 2007 (FDAAA), there were many programmatic strategies and initiatives to develop and expand for these programs.

- In 2008 I implemented the public health program for CDRH, and became the CDRH contact, for the Center for Medicaid and Medicare Services' (CMS) HCPCS Program for CMS coding of new devices and/or new device indications. In this capacity I provided oversight and ensured compliance with all CDRH regulations governing public health. If there were any problems, I resolved those problems with the involved parties throughout the organizations. I spoke to the American Medical Association (AMA) on this process tohelp them understand in relation to their procedural coding. I helped AMA identify questions and issues that arose with new devices going to market and how the codesrelated.

FDA/CDRH
*Section Chief/Expert Supervisory Consumer Safety Officer*
*Rockville, MD US*
*7/2006 – 12/2007*

As Director of the 510(k) Staff, I supervised the administrative and policy review of 510(k) submissions, 513(g) requests, classification, petitions for reclassification, petitions for exemptionfrom 510(k) and other regulatory requirements. I coordinated the regulatory review and process decisions of these submissions that includes:

- Oversight of the review/decision of these submissions to assure consistency, completeness, and conformance with established procedures, policies, and applicablelaws and regulations;

- Identifying precedent setting issues arising from the reviews and resolving these issuesthrough consistent interpretation of policies or instituting new policies, as needed;

# Heather S. Rosecrans, F.R.A.P.S.

- Coordinating the regulatory review process, including classification and equivalence decisions, between the CDRH premarket review staff (ODE and OIVD) and the Office of Compliance, CDER, and CBER;

- Providing expert consultation for the CDRH premarket review staff for the administrative and regulatory review of 510(k) submissions including unique substantially equivalent decisions, rescissions, 513(g) requests, not-a-device, not actively regulated decisions, and classification and reclassification for a device type;

- Coordinating the responses for 510(k) submissions submitted for products regulated by the Consumer Product Safety Commission, (e.g., exercise equipment), the Environmental Protection Agency, (e.g., pesticide detection kits), or the Occupational Safety and Health Administration (e.g., embalming equipment), including responding to firms where FDA and the other regulatory entities have dual authorities;

- Leading the CDRH 510(k) Quality Review Team that meets quarterly to retrospectively discuss and review 510(k) decisions. This team was established based on recommendation from the Inspector General, HHS to ensure consistency in the review and determinations of substantial equivalence for 510(k)s. The impact of this review has led to better documentation in 510k reviews and consistent interpretation of the 510(k) regulations, guidance and policies;

- Providing CDRH premarket review expertise in the development of a combination product session for the FDA Science Forum; and

- Developing and implementing policy for 510(k) reviews in unique situations with great public health consequences (e.g., unique clearances for devices needed for the U.S. Military during Desert Shield and Storm (awarded FDA Group Recognition Award 1992), the War in Iraq, the War on Terror and Hurricane Katrina).

**FDA/CDRH**
*Section Chief/Supervisory Consumer Safety Officer*
*Rockville, MD US*
*4/1993 – 7/2006*

In 1993 I was promoted to the position of Chief of the 510(k) Staff. As stated above, I was often called upon to deal with overarching issues encountering FDA. Specific examples included participating on working groups such as the CDRH Office of Compliance (OC) 510(k)/Good Manufacturing Practice (GMP) Program Development Group, FDA Desert Shield/Storm Task Force, the 510(k) Reengineering Team (under the Reengineering Government Initiative of Vice President Al Gore), and the Supplemental Data Validation Team for single use and disposable reprocessed devices.

- I drafted regulations, and I was the contact person, on implementation of the 510(k) requirements under the Safe Medical Devices Act of 1990 (SMDA) to the Federal Food, Drug, and Cosmetic Act (the Act) on 510(k) Summaries, 510(k) Statements, Class III Certifications and Summaries to ensure uniform and consistent interpretation of the law. I also trained CDRH and CBER Staff on these new laws.

- I drafted regulations and guidance and I was the contact person, for implementation of the new 510(k) requirements under the Food and Drug Administration Modernization Act of 1997 (FDAMA) (Class I and II Exemption Regulations from the 510(k) Requirements of the Act, Class II Petitions for Exemption Guidance, and Limitations of Exemption from the 510(k)

# Heather S. Rosecrans, F.R.A.P.S.

Requirements of the Act Regulation) to ensure uniform and consistent interpretation of the law. I also trained CDRH and CBER Staff.

- I drafted guidance and I was the contact person, and I trained CDRH and CBER staff, to implement the Medical Device User Fee Modernization Act of 2002 (MDUFMA) for theindustry and the agency to ensure uniform and consistent interpretation of the law for 510(k) review actions, goals, including user fees and refund policies impacting every 510(k) submitted to the agency and to ensure uniform and consistent interpretation of thelaw.

- I was the CDRH representative developing the agency Standard Operating Procedures forInter-Center review of combination products and Inter- Agency consults along with representatives from the FDA Office of the Commissioner, the Center for Drug Evaluation Research (CDER), and the Center for Biologic Evaluation and Research (CBER) including the Inter-Center training for the newly established Office of Combination Products

- I represented CDRH on the inter-agency working group for the co-packaging guidancedocument for agency regulated products (device/drug, drug/biologic, biologic/device).

*FDA/CDRH*
*Consumer Safety Officer/510k Staff*
*Rockville, MD*
*10/1987 – 4/1993*

In 1987 I joined the 510(k) Section of the Program Operations Staff (POS) within the Director'sOffice of CDRH's Office of Device Evaluation. By way of background, the 510(k) Section oversaw and coordinated the regulatory and administrative review of 510(k) submissions to CDRH, by which the vast proportion of new medical devices entering the US market undergo premarket evaluation by FDA. My primary responsibilities on this staff were:

- Served as a key contact person for the CDRH and FDA on 510(k) matters;

- Provided regulatory and policy oversight of the ODE divisions' scientific review of 510(k)s to assure that they were in accordance with established procedures, policies, time frames;

- Provided regulatory guidance regarding application of Sections 510(k), 513(f)(1), and 513(g) of the Act, the 510(k) implementing regulations, and ODE policy;

- Drafted text and provided training and guidance for preparation of routine and nonroutine correspondence with manufacturers regarding their 510(k) submissions;

- Provided authoritative guidance to other CDRH and FDA components including FDA field offices, other federal, state and foreign government agencies as well as the device industry, health care professionals and consumers;

- Reviewed 510(k)-related correspondence and related documents prepared by the ODE divisions to assure consistency, completeness and conformance with applicable laws, regulations, procedures, and policies;

- Coordinated 510(k) submissions where consultations were needed by other Centers within FDA (*i.e.*, CDER and CBER);

# Heather S. Rosecrans, F.R.A.P.S.

- Conducted studies as needed to identify and define problems in the review of 510(k)s-- compile the background, analyze the issues, discuss with other offices in CDRH, and provide recommendations to the ODE Director for corrective action;

- Represented FDA at professional meetings and FDA-sponsored or co-sponsored educational programs;

- Prepared and participated in a briefing for the Office of Management and Budget, the Health and Human Services' Office of the Inspector General, and the GAO on the 510(k) program;

- Assisted in writing the regulation, proposal and final, entitled "Medical Devices; Substantial Equivalence; 510(k) Summaries and 510(k) Statements, Class III Summaries; Confidentiality of Information"; and

- Established the process for the rescission of 510(k) substantial equivalence decisions based on fraud or total lack of data for an indication for use or technology, followed byproposed rule to rescind 510(k) substantial equivalent decisions.

FDA/CDRH
*Consumer Safety Officer/ Premarket Approval Staff (PMA Staff)*
*Silver Spring, MD*
*12/1980 – 10/1987*

I worked on the PMA Staff within the Office of Device Evaluation (ODE) of the FDA's CDRH. The PMA Staff oversaw and coordinated the administrative and regulatory review of Premarket Approval Applications (PMAs), product development protocols (PDPs) and associated submissions such as Environmental Assessments, Color Additive Petitions, Device Master Files,patent term extension petitions, and PMA post approval reports. While a member of the PMA Staff, I handled PMA matters for four of seven ODE reviewing divisions as follows:

- Oversaw the four ODE Divisions' administrative and regulatory review of PMAs andPDPs to assure that the applications were reviewed in accordance with established procedures, policies and time frames;

- Provided administrative and regulatory guidance regarding the PMA process to the ODE and other CDRH staff, other FDA staff, the device industry, health care professionals andproviders, and other federal, state and foreign government agencies;

- Maintained the PMA database and tracking system and biweekly provided each review branch within each of the ODE divisions with detailed printouts to assist in managing thereview of pending submissions for quality assurance and to provide information/data for publication in each of the ODE's Annual Reports;

- Coordinated the statistical review of PMAs by CDRH's Office of Science and Technology, the required good manufacturing review by CDRH's OC, and the PMA approval decision review, when appropriate, by FDA's Office of General Counsel forconsistency of FDA review and policy;

- Represented FDA at professional meetings and FDA-sponsored or cosponsorededucational and training programs;

# Heather S. Rosecrans, F.R.A.P.S.

- Reviewed all PMA-related correspondence and related documents prepared by four ODEdivisions for filing decisions, requests for additional information and approval, approvable, not approvable or denial decisions to assure consistency, completeness and conformance with applicable laws, regulations, procedures and policies;

- Coordinated, for CDRH, with the Office of the Associate Commissioner for RegulatoryAffairs, the FEDERAL REGISTER announcements of approval or denial decisions to assure consistency, completeness and conformance with applicable laws, regulations, procedures and policies;

- Developed appropriate educational materials and other guidance regarding PMA related activities for use by ODE reviewers and the device industry; -developed needed PMA- related data and other information in response to inquiries by congressional offices, ODEand other CDRH Staff, FDA, device trade associations and other stakeholders; and

- Conducted studies as needed to identify and define problems in the review of PMAs andPDPs; complied the necessary background data and other information; analyzed the issues; and provided recommendations for corrective action. I supervised the PMA Staffand its activities whenever the Director of the PMA Staff was on travel or leave.

FDA/CDRH (known as the FDA/Bureau of Medical Devices at that time)
*Biologist/Division of Clinical Laboratory Devices*
*Silver Spring, MD*
*12/1978 – 12/1980*

While a reviewer in the Microbiology Branch, I performed the following:

- Reviewed and tracked 510(k)s and PMAs in the Microbiology Branch within theDivision of Clinical Laboratory Devices, Office of Device Evaluation;

- Researched, interpreted and wrote proposed microbiology classification device regulations (21 CFR 866), and coordinated them through CDRH and the FDA Office ofGeneral Counsel and the FDA Office of the Associate Commissioner for Regulatory Affairs, prior to their publication in the Federal Register;

- Arranged, organized, participated and wrote minutes for the Microbiology AdvisoryPanel Meetings to discuss the proposed classification regulations and microbiology premarket applications presented before the agency for review;

- Arranged and participated in internal meetings with the microbiological industry todiscuss questions on their applications; and

- Prepared letters to the device industry regarding questions on their applications and /or telephoned to request additional information, as well as prepared final decision letters tonotify of clearance, approval, non-clearance or not approval to market.

# Heather S. Rosecrans, F.R.A.P.S.

**Education**

Pfeiffer College

*Bachelor of Science in Biology, May 1976*

---

**FDA/CDRH Job-Related Training**

- A Case Study in Leadership-Lincoln (Vision), Sept. 2009

- CDRH Leadership Forum: Case Study in Leadership – Teddy Roosevelt, March 2009

- Advanced Topics in Regulatory Issues, January 2009

- Guidance Prioritization and Development, January 2009

- FDA EEO Training, July 2008

---

**Professional Publications**

FDA/CDRH Guidance Documents

Issuance Date: 1/10/1997
Guidance Name: Deciding When to Submit a 510(k) for a Change to an Existing Device
Contact: Heather Rosecrans

Issuance Date: 5/20/1997
Guidance Name: Convenience Kits Interim Regulatory Guidance
Contact: Heather Rosecrans

Issuance Date: 2/19/1998
Guidance Name: Procedures for Class II Device Exemptions from Premarket Notification
Contact: Heather Rosecrans

Issuance Date: 10/22/1998
Guidance Name: Frequently Asked Questions on the New 510(k) Paradigm
Contact: Heather Rosecrans

Issuance Date: 3/12/2000
Guidance Name: Use of Standards in Substantial Equivalence Determinations
Contact: Heather Rosecrans

Issuance Date: 12/3/2002
Guidance Name: Determination of Intended Use for 510(k) Devices; (Update to K98-1)
Contact: Heather Rosecrans

# Heather S. Rosecrans, F.R.A.P.S.

Issuance Date: 5/21/2004
Guidance Name: FDA and Industry Actions on Premarket Notification (510(k)) Submissions:
Effect on FDA Review Clock and Performance Assessment – Guidance for Industry and FDA Staff
Contact: Heather Rosecrans

Issuance Date: 5/28/2004
Guidance Name: User Fees and Refunds for Premarket Notification Submissions (510(k)s)-Guidance for
Industry and FDA Staff
Contact: Heather Rosecrans

Issuance Date: 8/12/2005
Guidance Name: Format for Traditional and Abbreviated 510(k)s
Contact: Heather Rosecrans

Issuance Date: 8/29/2009
Guidance Name: User Fees and Refunds for Premarket Notification Submissions (510(k)s)-Guidance for
Industry and FDA Staff
Contact: Heather Rosecrans

FDA/CDRH Regulations

Regulation on 510(k) Summaries, 510(k) Statements, Class III Summaries and Certification
Published Proposal: April 28, 1992
Finalized: December 14, 1994

Draft Rule: Medical Devices; Rescission of Substantially Equivalent Decisions and Rescission
Appeal Procedures
Published Proposal: 2001

Post-FDA Publications

Issuance Date: 1/2021
Book Title: Diagnostics at a Crossroads: Navigating IVD Regulation in a Changing Environment
Chapter: Trying to Fit a Square Peg into a Round Hole: Perspectives on the Regulation of In Vitro
Diagnostic Devices at the Center for Devices and Radiological Health
Authors: Maura Norden, Heather Rosecrans, and Dan Schultz, Greenleaf Health, Inc.

**Additional Information**

Training for FDA Staff

Date: 1/1998
Title: Food and Drug Administration Modernization Act (FDAMA) Priority Premarket Implementation
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/1998
Title: Preamendment Status Determinations
Location: FDA, Rockville, MD
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 6/1998
Title: 510(k) Intended Use Workshop
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2002
Title: Medical Device Tracking Seminar (21 CFR 821)
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2002
Title: 1st Annual CBER/CDRH Reviewer Best Practices Workshop University of MD
Shady Grove Conference Center
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 10/2002
Title: 510(k) Medical Device User Fee Modernization Act (MDUFMA) Premarket Training
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 1/2003
Title: Medical Device Tracking (21 CFR Part 821)
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2003
Title: 2nd Annual CBER/CDRH Reviewer Best Practices Workshop University of MD
Shady Grove Conference Center
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 10/2003
Title: Summary of Technical Documents (STED) – An Internationally Harmonized Format for
Review of Device Safety and Effectiveness – Training
Location: FDA, Rockville, MD
Role: FDA Instructor

Title: AMDM/FDA Office of In Vitro Diagnostic Devices (OIVD) Workshop:
Practical Considerations in Preparing 510(k)s
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2004
Title: 3rd Annual CBER/CDRH Reviewer Best Practices Workshop University of MD
Shady Grove Conference Center
Location: FDA, Rockville, MD
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 4/2005
Title: AMDM/FDA OIVD Workshop: Practical Considerations in Preparing 510(k)s
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 1/2006
Title: 510(k) Training for CBER and CDER with the Office of Combination Products
Location: FDA, White Oak, MD
Role: FDA Instructor

Date: 4/2006
Title: FDA Science Forum/CDRH Premarket Regulation with Combination Products
Location: Washington, DC
Role: FDA Instructor

Dates: 1990-2006
Title: 510(k), Reclassification, Classification, & 513g – New Reviewer Training
Location: FDA, Rockville, MD
Role: FDA Instructor

Training for Stakeholders while at FDA

Date: 3/2003
Title: 510(k) Update
Location: San Francisco, CA
Organization: Regulatory Affairs Professional Society (RAPS) International Symposium
Role: FDA Instructor

Date: 3/2003
Title: 510(k) Submissions
Location: Rockville, MD
Organization: Canadian Institute for Health Care Professionals (CIHCP)
Role: FDA Instructor

Date: 6/2003
Title: 510(k) Update
Location: Washington, DC
Organization: AdvaMed's 13th Annual Device Submissions Workshop
Role: FDA Instructor

Date: 8/2003
Title: 510(k) Update
Location: Washington, DC
Organization: RAPS Role: FDA Instructor

Date: 10/2003
Title: US & EU Medical Device Classification and Regulatory Pathways
Location: Baltimore, MD
Organization: RAPS 2003 Annual Conference Exhibition
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 11/2003
Title: 510(k) Webcast
Location: 48 Registered Sites Across the US
Organization: RAPS
Role: FDA Instructor


Date: 3/2004
Title: 510(k) Update and Training
Location: Rockville, MD
Organization: Food and Drug Law Institute (FDLI)/CDRH In-House Training
Role: FDA Instructor


Date: 5/2004
Title: 510(k) Third Party Review Program
Location: Santa Clara, CA
Organization: RAPS Conference West Coast Symposium
Role: FDA Instructor


Date: 6/2004
Title: 510(k) Update
Location: Irvine, CA
Organization: 7th Annual FDA – Orange County Regulatory Affairs (OCRA)
Educational Conference
Role: FDA Instructor


Date: 6/2004
Title: New Medical Device User Fee Modernization Act 510(k) Guidance
Location: Crystal City, VA
Organization: AdvaMed's 14th Annual Device Submissions Workshop
Role: FDA Instructor


Date: 9/2004
Title: What Every Medical Technology Company Should Know About the 510(k) Process
Location: Washington, DC
Organization: Latham & Watkins LLP with the Medical Device Manufacturers Association (MDMA)
Role: FDA Instructor


Date: 9/2004
Title: U.S. FDA Seminars 510(k) Update, IDE Update, PMA Update
Location: United Kingdom (London, Leeds, Edinburgh)
Organization: British Medical Device & Diagnostic Manufactures – UK Trade & Investment (UKTI)
Role: FDA Instructor


Date: 9/2004
Title: 510(k) Update and Medical Device Appeals
Location: Washington, DC
Organization: Medical Device Industry Initiatives Grassroots Task Force Meeting
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 11/2004
Title: Regulatory Affairs and 510(k)
Location: Seattle, WA
Organization: University of Washington, Graduate School
Role: FDA Instructor

Date: 11/2004
Title: 510(k) Program
Location: Seattle, WA
Organization: Organization of Regulatory and Clinical Associates (ORCA) Meeting
Role: FDA Instructor

Date: 2/2005
Title: How to Plan for Premarket Meetings with CDRH
Location: Rockville, MD
Organization: AdvaMed (Audio conference to 50 sites)
Role: FDA Instructor

Date: 3/2005
Title: 510(k) Update
Location: Seattle, WA
Organization: Medical Device Industry Initiatives Grassroots Task Force Meeting
Role: FDA Instructor

Date: 3/2005
Title: 510(k) Update and Appeals
Location: Kirkland, WA
Organization: ORCA Washington State Meeting
Role: FDA Instructor

Date: 3/2005
Title: Device Premarket Update
Location: Durham, NC
Organization: International Society for Pharmaceutical Engineers/Educational Forum
Role: FDA Instructor

Date: 5/2005
Title: What a Great 510(k) Should Look Like
Location: Arlington, VA
Organization: AdvaMed's 15th Annual Device Submissions Workshop
Role: FDA Instructor

Date: 5/2005
Title: Medical Device Regulatory Update
Location: Triangle Park, NC
Organization: North Carolina Medical Device Organization (NCMD)
Role: FDA Instructor

Date: 9/2005
Title: New Guidance in 510(k)
Location: Washington, DC

# Heather S. Rosecrans, F.R.A.P.S.

Organization: Medical Device Industry Initiatives Grassroots Task Force Meeting
Role: FDA Instructor

Date: 9/2005
Title: 510(k) Update and Training
Location: Boston, MA
Organization: MassMedic and MDMA
Role: FDA Instructor

Date: 10/2005
Title: Today's 510(k) – An Update and Q&A with FDA & Industry
Location: Baltimore, MD
Organization: RAPS
Role: FDA Instructor

Date: 10/2005 Title: Software Summit
Location: Arlington, VA
Organization: AdvaMed International Meetings FDA Training
Role: FDA Instructor

Date: 10/2007
Title: US FDA Product Codes
Location: Washington, DC
Organization: Global Harmonization Task Force (GHTF) Meeting
Role: FDA Instructor

Date: 10/2007
Title: Device Reclassification
Location: Alexandria, VA
Organization: Orthopedic Surgical Manufacturers Association (OSMA)
Role: FDA Instructor

Date: 10/2007
Title: FDA's Device Premarket Review
Location: Santa Clara, CA
Organization: University of California Santa Clara School of Law
Role: FDA Instructor

Date: 10/2007
Title: Premarket Notification (510(k))
Location: Rockville, MD
Organization: AdvaMed Audioconference
Role: FDA Instructor

Date: 11/2007
Title: What Should Every Medical Device Company Know About the Regulations Governing
Market Approval in the United States
Location: Stockholm, Sweden
Organization: SwedenBIO
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 11/2007
Title: How to Enter and Succeed in the US Marketplace
Location: Stockholm, Sweden Organization: SYNERGUS
Role: FDA Instructor

Date: 3/2008
Title: The 510(k) Program, The Past, Present, & Future
Location: Washington, DC
Organization: Food and Drug Law Institute (FDLI) Annual Conference
Role: FDA Instructor

Date: 4/2008
Title: Premarket Notification
Location: Bethesda, MD
Organization: Office of In Vitro Diagnostic-AMDM Annual Workshop
Role: FDA Instructor

Date: 4/2008
Title: Premarket Notification
Location: Boston, MA
Organization: Association of Clinical Research Professionals (ACRP)
Role: FDA Instructor

Date: 6/2008 Title: 510(k) Update
Location: Irvine, CA
Organization: Orange County Regulatory Association (OCRA)
Role: FDA Instructor

Date: 10/2008
Title: FDA's Center for Devices and Radiological Health
Location: Oakland, MI
Organization: Beaumont Seminar, Oakland University
Role: FDA Instructor

Date: 10/2008
Title: 510(k) Process Review Considerations
Location: Mt. View, CA
Organization: Medical Device Manufacturers' Association
Role: FDA Instructor

Date: 10/2008
Title: Process for FDA Approval
Location: Chicago, IL
Organization: American Medical Association's (AMA's) CPT/HCPAC Advisory Committee
Role: FDA Instructor

Date: 10/2008
Title: 510(k) Submissions – The Course for Beginning Regulatory Affairs Professionals for
Preparing a 510(k)
Location: Rockville, MD Organization: AdvaMed MTLI
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 10/2008
Title: Interactive Review Process for 510(k)s and PMAs
Location: Rockville, MD
Organization: RAPS, Webcast
Role: FDA Instructor

Date: 3/2009
Title: 510(k) Program Update
Location: Seattle, WA
Organization: Organization of Regulatory and Clinical Associates (ORCA)
Role: FDA Instructor

Date: 3/2009
Title: CDRH and Premarket Review
Location: Ann Arbor, MI Organization: University of Michigan
Role: FDA Instructor

Date: 3/2009
Title: CDRH and 510(k) Program Update
Location: Ann Arbor, MI Organization: BioArbor
Role: FDA Instructor

Date: 3/2009
Title: CDRH
Location: Ann Arbor, MI
Organization: University of Michigan's Medical Innovation Center
Role: FDA Instructor

Date: 3/2009
Title: PMA and 510(k) Review Process Seminar
Location: Boston, MA
Organization: Medical Device Manufacturer's AssociationRole: FDA Instructor

Date: 4/2009
Title: CDRH and Premarket Review
Location: Bethesda, MD
Organization: Uniformed Services University for Health Sciences (USUHS)
Role: FDA Instructor

Date: 4/2009
Title: What is a 510(k)? What is Reclassification?
Organization: Association of Clinical Research Professionals (ACRP)

Date: 6/2009
Title: Discussion of the 510(k) Program for Venture Capitalists
Location: Boston, MA
Organization: The Gray Sheet
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 6/2009
Title: 510(k) Hot Topics and 510(k) Orientation
Location: Rockville, MD
Organization: Regulatory Affairs Professional Society
Role: FDA Instructor

Date: 6/2009
Title: 510(k) Hot Topics
Location: Irvine, CA
Organization: FDA-Orange County Regulatory Affairs (OCRA) Annual Meeting
Role: FDA Instructor

Date: 9/2009
Title: What is a 510(k)?
Location: Rockville, MD
Organization: 2009 CDRH Forum for International Regulatory Authorities
Role: FDA Instructor

Date: 9/2009
Title: Hot Topics in 510(k) Today
Location: Philadelphia, PA
Organization: RAPS Annual Conference and Exhibition
Role: FDA Instructor

Date: 10/2009
Title: The 510(k) Reform: FDA, Hill and Industry Perspectives
Location: Washington, DC
Organization: AdvaMed 2009 – The MedTech Conference
Role: FDA Instructor

Date: 3/2010
Title: Navigating the 510(k) Process
Location: Washington, DC
Organization: FDA Training for Institute of Medicine (IOM)
Role: FDA Instructor
Post-FDA Conferences/Trainings

Date: 2010
Title: 510(k) Requirements and Guidance
Organization: Regulatory Affairs Professional Society (RAPS) San Francisco

Date: 2011
Title: A Historical Perspective of the 510(k) Program
Organization: Xavier MedCon

Date: 2012
Title: The 510(k) Program—Update One Year After FDA Internal Study Report
Organization: RAPS Webcast

Date: 2012
Title: The 510(k) Program One Year Later Organization: Annual Medical Devices Summit East

# Heather S. Rosecrans, F.R.A.P.S.

Date: 2012
Title: Update on the 510(k) Program Organization: Drug Information Association (DIA) Conference

Date: 2013
Title: The 510(k) Process
Organization: 22nd Annual Society of Clinical Research Associates (SOCRA) Conference

Date: 2013
Title: 510(k) Requirements and GuidanceOrganization: RAPS San Francisco

Date: 2014
Title: The 510(k) Process Organization: 23rd Annual SOCRA Conference

Date: 2014
Title: Principles of Premarket Classification
Organization: American Bar Association (ABA) Webinar
on FDA Medical Device Law Fundamentals

Date: 2015
Title: Navigating Today's 510(k) Program
Organization: Medical Device Manufacturers Association (MDMA) FDA Forum

Date: 2015
Title: Navigating FDA's Premarket Pathway for Medical Devices Organization:
University of Miami Concept to Commercialization (C2C) Series

Date: 2015
Title: Peeling the 510(k) Onion from Fundamentals to Latest Topics
Organization: RAPS Workshop

Date: 2016
Title: Peeling the 510(k) Onion from Fundamentals to Latest Trends
Organization: RAPS Workshop

Date: 2016
Title: A Look at Today's 510(k) Organization: SOCRA Conference

Date: 2017
Title: 510(k) Modifications: To Submit or Not Submit…That Is the Question!
Organization: Xavier MedCon

Date: 2017
Title: 510(k) Updates: When and How to Work with FDA on Device Modifications
Organization: Florida Medical Manufacturers Consortium, Inc.

Date: 2017
Title: Medical Devices and FDA: What, When, and How
Organization: OCRA Conference

Date: 2017
Title: 510(k) Regulatory Framework Organization: RAPS Conference

# Heather S. Rosecrans, F.R.A.P.S.

Date: 2017
Title: Picking the Right Predicate Organization: RAPS European Union (EU) Conference

Date: 2018
Title: 510(k) Update
Organization: MDMA FDA Forum

Date: 2018
Title: When Things Go Wrong Organization: RAPS (EU) Conference

Date: 2018
Title: How Best to Interact with CDRH Premarket
Organization: Xavier MedCon 2018

Date: 2019
Title: 510(k) Update
Organization: MDMA FDA Forum

Date: 2019
Title: FDA CDRH Director Breakout Session Organization:
Food and Drug Law Institute Annual Meeting

Date: 2020
Title: Navigating the 510(k) Program
Organization: MDMA FDA Forum

Date: 2020
Title: Xavier 510(k) Workshop
Organization: Xavier Health

Date: 2021
Title: Navigating the 510(k), De Novo and 513(g) Programs
Organization: MDMA FDA Forum

Date: 2021
Title: Xavier 510(k) Workshop
Organization: Xavier Health

Date: 2021
Title: What's New with Premarket Submissions and EUAs?
Organization: Xavier Health

# APPENDIX B

## Materials Relied Upon by Heather S. Rosecrans

ACG000006
AHP000369
AHP000373
AHP000404
AHP000521
AHP000524
AHP000525
AHP000526
AHP000527
AHP000658
AHP000706
AHP000708
AHP000729
AHP000732
AHP000803
AHP000832
AHP000850
AHP000853
AHP000857
AHP000870
AHP000882
AHP000903
AHP000928
AHP000939
AHP002062
AHP002130
AHP002395
AHP002446
AHP002448
AHP002623
AHP002680
AHP002829
AHP003709
AHP005099
AHS_MGMT-INTUITIVE_0000239
Intuitive-00082056
Intuitive-00018120
Intuitive-00478591
Intuitive-00481165
Intuitive-00481167
Intuitive-00481176
Intuitive-00481839
Intuitive-00485158
Intuitive-00490612
Intuitive-00490649
Intuitive-00490685

Intuitive-00491017
Intuitive-00491018
Intuitive-00491019
Intuitive-00491901
Intuitive-00492204
Intuitive-00492277
Intuitive-00492705
Intuitive-00492739
Intuitive-00492744
Intuitive-00492768
Intuitive-00492786
Intuitive-00492796
Intuitive-00493504
Intuitive-00493507
Intuitive-00493508
Intuitive-00493612
Intuitive-00494533
Intuitive-00496074
Intuitive-00496109
Intuitive-00496110
Intuitive-00496132
Intuitive-00496138
Intuitive-00496501
Intuitive-00510907
Intuitive-00515501
Intuitive-00552632
Intuitive-00552652
Intuitive-00552665
Intuitive-00552682
Intuitive-00552697
Intuitive-00552716
Intuitive-00552728
Intuitive-00552744
Intuitive-00552745
Intuitive-00691203
Intuitive-00691208
Intuitive-00691213
Intuitive-00691613
Intuitive-00691658
Intuitive-00691659
Intuitive-00691660
Intuitive-00691662
Intuitive-00691666
Intuitive-00691667
Intuitive-00691710
Intuitive-00691802

Intuitive-00691837
Intuitive-00691839
Intuitive-00691840
Intuitive-00691842
Intuitive-00691843
Intuitive-00691847
Intuitive-00691848
Intuitive-00691857
Intuitive-00691980
Intuitive-00692027
Intuitive-00692185
Intuitive-00692230
Intuitive-00692310
Intuitive-00692313
Intuitive-00692314
Intuitive-00692316
Intuitive-00692320
Intuitive-00692321
Intuitive-00692363
Intuitive-00692411
Intuitive-00692433
Intuitive-00692451
Intuitive-00692611
Intuitive-00692643
Intuitive-00693535
Intuitive-00694043
Intuitive-00694522
Intuitive-00694607
Intuitive-00694608

REBOTIX040231
REBOTIX074001
REBOTIX100995
REBOTIX130194
REBOTIX146948
REBOTIX162404
REBOTIX166916
REBOTIX169166
REBOTIX169167
REBOTIX169168
REBOTIX169360
REBOTIX169504
REBOTIX169588
REBOTIX169683
REBOTIX169926
REBOTIX169947

REBOTIX170053
REBOTIX170421
REBOTIX171030
REBOTIX171058
REBOTIX171073
REBOTIX171076
Restore-00000094
Restore-00000885
Restore-00001248
Restore-00002650
Restore-00002728
Restore-00004876
Restore-00007128
Restore-00008152
Restore-00010132
Restore-00012160
Restore-0002650
Restore-00034138
Restore-00055573
Restore-00060739
Restore-00060741
Restore-00062344
Restore-00062348
Restore-00062361
Restore-00062371
Restore-00062373
Restore-00062394
Restore-00062419
Restore-00062443
Restore-00062688
Restore-00063093
Restore-00063245
Restore-00063246
Restore-00063255
Restore-00063284
Restore-00063474
Restore-00063595
Restore-00063598
Restore-00064367
Restore-00064369
Restore-00064384
Restore-00064401
Restore-00064403
Restore-00064407
Restore-00064566
Restore-00064663

Deposition of Chris Gibson (June 22, 2021)
Depositions of Kevin May (May 6, 2021; June 8, 2021)
Deposition of Clif Parker (May 5, 2021)
Deposition of Rick Ferreira (June 7, 2021)
Deposition of Rafal Chudzik (June 7, 2021)
Deposition of Ron Arkin (June 9, 2021)
Deposition of Mark Johnson (April 29, 2021)

Restore's Second Amended Complaint
Restore's Supplemental Responses to Intuitive's Interrogatory No. 10
Rebotix's Complaint
Rebotix's Answer and Affirmative Defenses to Intuitive's Counterclaims

1 C.F.R. § 801.109
21 C.F.R. § 10.75
21 C.F.R. § 10.85
21 C.F.R. § 801.109
21 C.F.R. § 801.4
21 C.F.R. § 801.5
21 C.F.R. § 803.3
21 C.F.R. § 806.2
21 C.F.R. § 807.100
21 C.F.R. § 807.20
21 C.F.R. § 807.3
21 C.F.R. § 807.81
21 C.F.R. § 807.87
21 C.F.R. § 807.92
21 C.F.R. § 814.20
21 C.F.R. § 820.3
21 C.F.R. § 821.3
21 C.F.R. § 822.3
21 C.F.R. § 860.3
21 C.F.R. § 860.7
21 C.F.R. § 876.9
21 C.F.R. § 888.9
21 C.F.R. § 8xx.9
21 C.F.R. Part 50
21 C.F.R. Part 803
21 C.F.R. Part 806
21 C.F.R. Part 807
21 C.F.R. Part 810
21 C.F.R. Part 812
21 C.F.R. Part 814
21 C.F.R. Part 820
21 C.F.R. Part 821

21 C.F.R. Part 822
21 C.F.R. Part 866

FDCA § 201
FDCA § 301
FDCA § 501
FDCA § 502
FDCA § 510
FDCA § 513
FDCA § 515
FDCA § 517
FDCA § 518
FDCA § 519
FDCA § 520
FDCA § 522

57 Fed. Reg. 18 (April 28, 1992) (interim rule)
59 Fed. Reg. 64
62 Fed. Reg. 67011
62 Fed. Reg. 67012
66 Fed. Reg. 3 (Jan. 16, 2001)
81 Fed. Reg. 11477
81 Fed. Reg. 46696
86 Fed. Reg. 33305

H.R. Rep. No. 94-853

Pub. L. No. 101-629 (1990)

15 U.S.C. §§ 52-55
21 U.S.C. § 321
21 U.S.C. § 331
21 U.S.C. § 351
21 U.S.C. § 352
21 U.S.C. § 360
21 U.S.C. § 360(b)
21 U.S.C. § 360(c)
21 U.S.C. § 360(e)
21 U.S.C. § 360(g)-1
21 U.S.C. § 360(h)
21 U.S.C. § 360(i)
21 U.S.C. § 360(j)
21 U.S.C. § 360(k)
21 U.S.C. § 360(m)
21 U.S.C. § 360(l)

Compliance Program Guidance Manual (CPGM) 7382.845, "Inspection of Medical Device Manufacturers," (Feb. 2, 2015), available at https://www.fda.gov/media/80195/download

*Da Vinci X/Xi Instrument & Accessory Catalog*, Intuitive Surgical, Inc. (Nov. 2020), available at https://www.intuitive.com/en-us/-/media/Project/Intuitive-surgical/files/pdf/xi-x-ina-catalog-no-pricing-us-1052082.pdf?la=en&hash=189164507BDFEC40E9DAB44BA10731A5

Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1) (January 10, 1997)

Draft Guidance for Industry: Internet/Social Media Platforms: Correcting Independent Third-Party Misinformation About Prescription Drugs and Medical Devices (June 2014), available at https://www.fda.gov/media/88545/download

FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices: In accordance with Section 710 of the Food and Drug Administration Reauthorization Act of 2017 (FDARA), available at https://www.medequipusa.com/wp-content/uploads/2018/05/FDARA-710-3rd-Party-Servicing-Report.pdf

FDA Staff Manual Guide 1410.406 (November 13, 2018), available at https://www.fda.gov/media/80114/download

FDA Website, *Content of a 510(k)* (updated Apr. 26, 2019), available at https://www.fda.gov/medical-devices/premarket-notification-510k/content-510k

FDA Website, *Who Must Register, List and Pay the Fee*, available at https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee

FDA, *Draft Guidance for Industry and FDA Staff: Remanufacturing of Medical Devices (Remanufacturing Draft Guidance)* (June 2021)

FDA, *Evaluating Substantial Equivalence in Premarket Notifications [510(k)]: Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program* 23 (July 28, 2014), https://www.fda.gov/media/82395/download.

FDA, *Public Workshop- Medical Device Servicing and Manufacturing Activities* (Dec. 10-11. 2018), available at https://wayback.archive-it.org/7993/20201222125933/https://www.fda.gov/medical-devices/workshops-conferences-medical-devices/public-workshop-medical-device-servicing-and-remanufacturing-activities-december-10-11-2018-12102018

FDA, *Recognized Consensus Standards*, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfstandards/search.cfm

FDA, *White Paper: Evaluating Whether Activities Are Servicing or Remanufacturing* (2018), available at https://www.fda.gov/media/117238/download

FDA, *Final Guidance for Industry: Sterilized Convenience Kits for Clinical and Surgical Use* (Jan. 7, 2002), available at https://www.fda.gov/media/71358/download

FDA, *Guidance for Industry and FDA Staff: Deciding When to Submit a 510(k) for a Change to an Existing Device* (Oct. 25, 2017), available at https://www.fda.gov/media/99812/download

FDA, *Guidance for Industry and FDA Staff: Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling* (May 17, 2015), available at https://www.fda.gov/media/80265/download

FDA, *Guidance for Industry and FDA Staff: The Least Burdensome Provisions: Concept and Principles* (Feb. 5, 2019), https://www.fda.gov/media/73188/download.

FDA, *Guidance for Industry and Food and Drug Administration Staff: FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals* (October 2, 2017), available at https://www.fda.gov/media/73507/download

FDA, *Guidance for Industry and Food and Drug Administration Staff: Refuse to Accept Policy for 510(k)s* (September 13, 2019), available at https://www.fda.gov/media/83888/download

FDA, Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] (July 28, 2014), available at https://www.fda.gov/media/82395/download

FDA, *Guidance for Industry: E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1)* (March 2018), available at https://www.fda.gov/downloads/Drugs/Guidances/UCM464506.pdf

FDA, *Guidance on the CDRH Premarket Notification Review Program, 510(k) Memorandum K86-3* (June 30, 1986).

FDA, *Indications for Use Statement* (February 6, 1996), available at http://www.lb7.uscourts.gov/documents/15cv9986.pdf

FDA, Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administration Staff U.S. Food & Drug Admin. (June 24, 2021), available at https://www.fda.gov/media/150141/download

FDA, Warning Letter to Tenderneeds Fertility LLC (Apr. 13, 2020), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/tenderneeds-fertility-llc-603383-04132020

U.S. General Accounting Office, *Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, Medical Devices: FDA's 510(k) Operations Could Be Improved* (Aug. 1988), available at http://archive.gao.gov/d16t6/136821.pdf

Expert Report of Dr. Robert D. Howe in Civil Case No. 5:19-cv-55-TKW-MJK (Filed August 20, 2021)

**APPENDIX C**

**Heather Rosecrans's Expert Testimony and Deposition Experience**

**HEATHER ROSECRANS'S EXPERT TESTIMONY/DEPOSITION EXPERIENCE**

*Rhododendron Holdings, LLC, et al. v. Thomas Bradley Harris, et al.*

- Provided testimony at a deposition on December 18, 2019