# Exhibit 11

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
 2                   PANAMA CITY DIVISION
 3
     RESTORE ROBOTICS LLC and
 4   RESTORE ROBOTICS REPAIR
     LLC,
 5
              Plaintiffs,       Civil Action File
 6                              No. 5:19-cv-55-TKW-MJF
         v.
 7
     INTUITIVE SURGICAL, INC.,
 8
              Defendant.
 9   _____
10   INTUITIVE SURGICAL, INC.,
11            Counterclaimant,
12       v.
13   RESTORE ROBOTICS LLC and
     RESTORE ROBOTICS REPAIR
14   LLC,
              Counterclaim
15            Defendants.
16
17     *** CONFIDENTIAL - ATTORNEYS EYES ONLY ***
18         VIDEOTAPED DEPOSITION OF KEVIN MAY
              Taken by Remote Conference
19                   May 6, 2021
                      9:00 a.m.
20
21      Valerie N. Almand, RPR, CRR, CCR-B-531
         Alan Pokotilow, Legal Video Specialist
22         Chris McMillen, Concierge Tech
23
24
25
```

Case 5:19-cv-00055-TKW-MJF  Document 145-11  Filed 01/27/22  Page 3 of 15
CONF AEO Kevin May                                              May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 41

1  number on that, Mr. Ruby?
2          MR. RUBY:  That would be Bates 53884.
3          MR. DeBAUGH:  Chris, the way that these
4  were produced they have mislabeled Bates so we
5  can't do it by the Bates, so we're just going to
6  have to do it by page number.  Could you just
7  scroll down, Chris, to that page right there?
8          THE CONCIERGE:  Okay.
9  BY MR. RUBY:
10     Q.  Mr. May, we've put on the screen a
11 document that says final report technical file
12 review, and then there's some pages that follow
13 it.  I wonder if you'd take a look at that
14 document and tell me if you've ever seen this
15 before.
16     A.  I've seen that document.
17     Q.  And under what circumstances did you
18 first see that document?
19     A.  I mean, we were discussing with -- let me
20 see.  So in the very beginning in our relationship
21 with Rebotix, Rebotix was doing all the work.  It
22 was not until later on that Restore Robotics
23 Repairs started doing the work.  I would assume it
24 was somewhere right before we -- that Restore
25 Robotics Repairs actually started to do the work.

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 4 of 15
CONF AEO Kevin May                                                May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 42

1    Q.  Did you ever acquire from any source
2 additional documents of DQS Medical relating to
3 the Da Vinci Surgical System in addition to the
4 exhibit that I've put up on the -- the first page
5 I've put up on the screen?  And you're welcome to
6 look at the following pages too.
7           THE CONCIERGE:  Just let me know if you
8 need me to scroll, Mr. May.
9           THE WITNESS:  I can't scroll it?  Yeah,
10 scroll down.  I mean, it's a -- I think it's a
11 30-page document or something, right?  Okay, you
12 can scroll fast.
13           THE CONCIERGE:  Okay.
14           THE WITNESS:  Yeah, keep going fast.  I
15 just want to make sure I've seen all the pages.
16           THE CONCIERGE:  That's the final page.
17    A.   That's the document.  I have seen that
18 document.
19 BY MR. RUBY:
20    Q.   And my question is:  Did you ever, right
21 up till today, see any additional document that
22 appeared to be prepared by DQS Medical as part of
23 their work pertaining to the robotic surgical
24 instrument?
25    A.   Not that I recall.  I recall this is the

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 5 of 15
CONF AEO Kevin May                                                May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 43

1  only document I received.
2       Q.   Does this document, the one that you've
3  seen, appear to refer to other related work done
4  by DQS Medical?  In other words, is there a
5  reference in here to exhibits or attachments or
6  words to that effect?
7       A.   The way I interpret it is there is a list
8  of documents that they reviewed.
9       Q.   Yes.
10      A.   And then they included those documents on
11 the -- on there, just to say we reviewed the
12 following documents and these are the documents we
13 reviewed, and then there was a series of lists of
14 documentation.  That's my interpretation of that,
15 not that think created more doc -- not that they
16 created more information, but that they reviewed
17 that information.  But I'd have to go back and
18 look directly -- if you'd scroll up a couple more
19 pages.  That's all I remember.  One more -- right,
20 stop right there, down a little bit more.  Yeah,
21 it's just a list of documents that they reviewed
22 during their assessment of the technical file.
23      Q.   Did you understand from this report
24 whether or not DQS Medical had itself done any
25 testing of any kind of surgical instruments as

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 6 of 15
CONF AEO Kevin May                                                May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 44

1  part of its engagement?
2      A.  No.  My understanding is that DQS was an
3  authorized representative for a notified body in
4  Europe for Europe regulations, and so I believe
5  DQS was just reviewing.  I don't believe they were
6  actively doing testing.  My understanding was is
7  that Rebotix presented all of the test data in a
8  report form called a technical file, and that DQS
9  reviewed for its -- make sure it was compliant to
10 the various regulations for European standards.
11     Q.  And did you have an understanding as to
12 who had done the testing which was reported and
13 reflected in this technical file you just referred
14 to?
15     A.  No, I don't know who did the testing.  I
16 don't know who did the -- you know, each different
17 specialty would have a different lab or a
18 different company that would do the testing, and
19 typically somebody like Rebotix would hire those
20 people to do the testing.  Then they would get a
21 published report and then they would provide that
22 in the technical file.  So it could be various
23 vendors.
24     Q.  Did you ever ask Rebotix ever who had
25 done the testing on -- in Europe on the robotic

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 7 of 15
CONF AEO Kevin May                                              May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 45

1   instruments?
2       A.  We had asked for additional testing, and
3   I like to see the raw reports, that's my
4   preference.  But they were very hesitant and they
5   didn't want to give us the -- all of the baseline
6   reports.  They only wanted to give us this review
7   of all the different reports, because they
8   considered it proprietary.
9       Q.  When you say they only wanted to give us
10  this review, you mean this review, the DQS Medical
11  report that we're looking at?
12      A.  Yes.
13      Q.  All right.  So you did ask Rebotix for
14  test reports that reflected the actual testing
15  done on the surgical instruments; is that right?
16  You made the request.
17      A.  Yes.
18      Q.  And did you just tell me that Rebotix
19  declined the request because they said there was
20  proprietary information in the actual test
21  reports?
22      A.  Yes.
23      Q.  Other than the DQS Med report that we've
24  been discussing, did you ever receive from Rebotix
25  any test reports that had been done before you

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 8 of 15
CONF AEO Kevin May                                                May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 46

1  signed the deal with Rebotix done with respect to
2  their interceptor technology and surgical
3  instruments?
4       A.   Well, can you clarify what you mean by
5  the deal that was done with Rebotix?  I'm not sure
6  I 100 percent understand.
7       Q.   Okay.  As I use the term, the deal, I'm
8  referring to a written contract which provided for
9  a business relationship between Rebotix and
10 Restore.  I think I understand that there may have
11 been more than one such contract, and for now I
12 mean now to incorporate this into my question so
13 you don't have to be uncertain about it -- that
14 there was more than one contract, now I want to
15 use the first contract as sort of a benchmark in
16 terms of time.  But the deal is a signed written
17 agreement between Rebotix and Restore.  Is that
18 understandable to you?
19      A.   No, because there were two different
20 contracts or agreements between Restore and
21 Rebotix.  The first one was Rebotix -- that
22 Restore was just going to be a distributor for
23 Rebotix.  Rebotix was going to do all the work and
24 Restore was only going to be a distributor.
25           Then there was another subsequent deal or

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 9 of 15
CONF AEO Kevin May
Restore Robotics LLC v Intuitive Surgical
May 6, 2021

Page 47

1    agreement that Restore Robotics Repairs signed an
2    agreement with Rebotix to purchase the knowledge,
3    the quality system, and all the other things that
4    go along with the service from Rebotix.  So there
5    was two different -- at different times there was
6    two different relationships with Rebotix, one as a
7    distributor, and then one as a -- where we
8    actually did the work.
9         Q.   Thank you.  I think I can ask you a
10   different question that may make things easier for
11   you.
12             At any time ever did Rebotix provide any
13   written reports of testing that was done on the
14   surgical instruments other than the DQS Med report
15   that we've put up on the screen and you've looked
16   through?
17        A.   There were other summary documents, but
18   the raw material documents, no.
19        Q.   And you had asked for the raw material
20   documents, hadn't you?
21        A.   Yes, we had.
22        Q.   Now, you've made reference to something
23   called a technical file; is that right?
24        A.   Correct.
25        Q.   At any point did you ask Rebotix if you

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 10 of 15
CONF AEO Kevin May                                              May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 48

1    could look at the entire technical file?
2         A.   Yes.
3         Q.   And what was Rebotix' response, if any?
4         A.   Their response was that the testing and
5    the testing protocols and the raw data of the
6    material was proprietary, and that they would be
7    more than happy to provide it to us during any
8    sort of ISO or regulatory audit, but just to have
9    the information was something they didn't want to
10   do, because it's proprietary in nature.  But they
11   would support us.
12        Q.   Did Rebotix ever supply to you, and by
13   you I include Restore Robotics and Restore
14   Robotics Repair, all or any portion of the
15   technical file?
16        A.   Just the DQS assessment of the technical
17   file, that report in front of me right now.
18        Q.   Did you tell me that Rebotix did supply
19   to you at some point some summaries of testing
20   that they said had been done on the surgical
21   instruments with the interceptor chip installed?
22        A.   That last couple words broke up.
23        Q.   With the interceptor chip installed.
24        A.   Could you repeat the whole question
25   again?  I'm not sure I followed through.

1    Q.  I can do that.  Did Rebotix ever supply
2    to you and your companies any summaries of what
3    Rebotix said was testing that had been done on
4    surgical instruments in connection with
5    installation of the interceptor technology?
6        A.  Yes.
7        Q.  And when did that happen?  When were
8    these summaries provided to you?
9        A.  It was 2018.  I don't remember the exact
10   date.
11       Q.  Did you read these summaries?
12       A.  Yes.
13       Q.  Did you retain them in your files?
14       A.  Yes.
15       Q.  Did you provide them to your attorney as
16   part of the discovery process that's been going on
17   in this case?
18       A.  Yes.
19       Q.  And these summaries that I'm asking you
20   about, are they different from the DQS Medical
21   report that we've been looking at?
22       A.  They were a summary of the DQS Medical
23   reports, but there was also additional information
24   stating that they did some additional testing.
25   But there was not a lot of details in that

1     Q.   And did you ever get an answer to that?
2     A.   No, we never received a letter.
3     Q.   The next sentence says, We receive
4  objections like the one below and without that
5  document or at the very least the test data
6  showing validations, we are finding it difficult
7  to make headway, summary data is not acceptable to
8  these level of customers as they want underlying
9  data.  Do you see that?
10    A.   Yes.
11    Q.   Did you compose that sentence?
12    A.   I don't believe so.  I believe Clif
13 composed that, but I'm sure I reviewed it.
14    Q.   Did you or your companies ever receive
15 the test data showing validation from Rebotix?
16    A.   So we only received the summary reports
17 and the DQS document that stipulated that the
18 validation was there and it was put together
19 properly by the authorized representative, DQS.
20         But at this stage in the game we had some
21 large customers and the hospital systems, they
22 wanted -- they said, If you're not going to
23 provide us the 510(k) give us the data as far as
24 some of the other characteristics of the device.
25 For instance, biocompatibility -- hold on, let

Case 5:19-cv-00055-TKW-MJF   Document 145-11   Filed 01/27/22   Page 13 of 15
CONF AEO Kevin May                                              May 6, 2021
Restore Robotics LLC v Intuitive Surgical

Page 164

1  me -- biocompatibility, your process verification
2  and validation, your sterilization testing,
3  various things like that.  So the hospitals were
4  just pushing back and they said, Okay, we
5  understand you're saying you don't need a 510(k).
6  Show us the testing you have done so that we can
7  feel more comfortable.
8          And so we were pushing back at Rebotix,
9  Hey, we can land these customers if we have a
10 little bit more information because of the undue
11 pressure that they're getting from Intuitive
12 Surgical, they want to be right.  They wanted to
13 have -- they wanted to have all their concerns
14 resolved.
15      Q.  Did you or Mr. Parker or Restore Robotics
16 or Restore Robotics Repair ever receive from
17 Rebotix the test data or the summary data referred
18 to in the last sentence of the paragraph text?
19      A.  We did not receive the documents that
20 were in the appendix on the DQS.  We did not
21 receive that.
22      Q.  Please listen to my question.  I'm asking
23 you about test data and summary data as referred
24 to in this paragraph.  And it's a simple question.
25 Did you or your companies or Mr. Parker, as far as

Page 165

1    you know, ever receive that test data or summary
2    data from Rebotix?
3         A.   Only the data from DQS.
4         Q.   Let's do it again.  Did you or
5    Mr. Parker, as far as you know, or your companies
6    ever receive from Rebotix the test data or summary
7    data which is referred to in the exhibit?
8              MR. BERHOLD:  Objection.
9         A.   The summaries are referred to in the DQS
10   documents.  So we had the summaries.  The raw
11   data, the protocols for doing the testing and
12   whatnot, that we never received.
13   BY MR. RUBY:
14        Q.   There's reference here in this sixth
15   paragraph right at the very end to what is called
16   underlying data, do you see that?
17        A.   Yes.
18        Q.   Did Rebotix ever provide the underlying
19   data?
20        A.   No.
21        Q.   On the second page, the first full
22   paragraph begins, Our two biggest obstacles, do
23   you see that?
24        A.   Yes.
25        Q.   It says, quote, Our two biggest obstacles

1   are Intuitive Surgical Corp/sales rep interference
2   and lack of regulatory data.  Who composed that?
3        A.   I would say probably Clif.
4        Q.   And did you agree with the assertion in
5   this letter that the two biggest obstacles that
6   you were facing was Intuitive Surgical Corp/sales
7   rep interference and lack of regulatory data?
8        A.   Yes, but with an explanation.
9        Q.   Is the explanation in the letter so you
10  can read it to me?
11       A.   No.
12       Q.   Do you want to explain your answer, go
13  ahead.
14       A.   Well, a lack of regulatory data was the
15  fact that the raw material for the reports and the
16  hospitals, because of the Intuitive Surgical
17  interference, they were really pushing us for the
18  raw data.  So that's what that regulatory data is
19  referring to.
20       Q.   The third sentence in that paragraph
21  says, We have been asking for and still require
22  the following.  Proof that a 510-K is not required
23  (letter from FDA) and verification and validation
24  detailed (not summaries) reports (to name a few:
25  Risk analysis, cleaning and sterilization