# Exhibit 41

Page 1

ATTORNEYS' EYES ONLY

1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
2                   PANAMA CITY DIVISION
3
4     RESTORE ROBOTICS LLC and
      RESTORE ROBOTICS REPAIRS
5     LLC,
                              CIVIL ACTION FILE
6            Plaintiffs,
                              NO. 5:19-cv-55-TKW-MJF
7          vs.
8     INTUITIVE SURGICAL, INC.,
9            Defendant.
      ~~~~~~~~~~~~~~~~~~~~~~~~~~
10
11

          REMOTE VIDEO 30(b)(6) DEPOSITION OF
12              RESTORE ROBOTICS LLC
                      and
13          RESTORE ROBOTICS REPAIRS LLC
                    THROUGH
14          CLIFTON "CLIF" EARL PARKER
                      AND
15     CLIFTON "CLIF" EARL PARKER, INDIVIDUALLY
16
17

                  May 4, 2021
18
                  9:59 a.m.
19
20
               7506 Holly Circle
21          Panama City Beach, Florida
22
23
24       S. Julie Friedman, CCR-B-1476
25

Case 5:19-cv-00055-TKW-MJF   Document 145-41   Filed 01/27/22   Page 3 of 25
AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 85

1    ever have the performance specifications for the

2    intercept -- for the da Vinci instrument in which any

3    interceptor technology was installed?

4         A.   We have the documents that were given to

5    us by Rebotix, as well as the reports that were

6    generated by the German company, as well as the

7    Intuitive instructions for use.

8              Anything past that, would be a question

9    for Mr. May.

10        Q.   Well, do you know whether Restore Robotics

11   or any of its affiliated -- affiliated companies have

12   ever had the performance specifications for any of

13   the instruments in which it installed the interceptor

14   technology?

15        A.   Is that a question or a statement?

16             MR. RUBY:  May we have the question read

17        back, please.

18   (Whereupon, the record was read by the reporter as

19   requested.)

20             THE WITNESS:  Thank you.

21             I do not know if that -- those particular

22        words that you used, if there's such a document

23        called that.  That would be a question for Mr.

24        May.

25             MR. RUBY:  Let's --  I'd like to call up

Page 86

1        as an exhibit Bates No. 40519 and the following

2        pages.  It runs all the way to 40544.

3               THE CONCIERGE TECH:  All right.  Please

4        stand by.

5               What was the first number, Mr. Ruby?

6               MR. RUBY:  40519.

7               THE CONCIERGE TECH:  All right.  Please

8        stand by.

9               MR. DeBAUGH:  Allen, what's the --  Is

10       that a Restore-produced document.

11              MR. RUBY:  Let's see.

12              THE CONCIERGE TECH:  I found it, Doug.

13       It's --

14              MR. DeBAUGH:  Okay.

15              THE CONCIERGE TECH:  -- at the top.  I

16       think it starts as 40518.

17              MR. DeBAUGH:  All right.

18              THE CONCIERGE TECH:  But it's a 27-page

19       document.  I'm going to go ahead and share here.

20              That document is now available.  Does that

21       document looks correct, Mr. Ruby?

22              MR. RUBY:  It does.

23              (Exhibit 3 was marked for identification.)

24       Q.    (By Mr. Ruby)  All right.  Mr. Parker,

25    would you look please first at this e-mail dated

Page 87

1    June 23rd, 2019.  This appears to be an e-mail from

2    Mr. Colletti to you, dated June 23rd, 2019.  You've

3    already told us who Mr. Colletti is.  Does this

4    appear to be an e-mail that you received from Mr.

5    Colletti?

6          A.    It does.

7          Q.    Okay.  And just looking briefly for now at

8    the following pages, what do these appear to be?

9          A.    This appears to be a PowerPoint

10   presentation that Jake and myself were going to be

11   giving at one of their sales conferences, national

12   sales conferences with all of their employees.

13         Q.    And was the audience for this PowerPoint

14   presentation, did it include sales and marketing

15   people who were expected to go out and try to develop

16   sales for Restore Robotics?

17         A.    That's my understanding.  Yes.

18         Q.    Would you look please.  It's just about

19   two pages in at the --  I can use the Bates numbers;

20   and they're not all that easy to spot, Mr. Parker.

21   Up the page that has Bates No. 40520, and it's got

22   your name on the left side of the page.

23               I think it's up on the screen now, the one

24   I want to ask you about.

25         A.    Yes.  I see that.

AEO 30(b)(6) Clifton Earl Parker                May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 88

1      Q.    You see that there's a -- a line item

2   that's called, "Finding the Right Target."

3            Do you see that?

4      A.    I do.

5      Q.    In the context of this kind of sales

6   presentation, what does target mean?

7      A.    Potential customer.  I'm assuming.  I did

8   not create this slide, so I'm just assuming that's

9   what he means by that.

10     Q.    All right.  Well, did -- did you make a

11  presentation using these slides?

12     A.    We made the presentation together, so

13  we --  I did some of the slides, and he did some.

14     Q.    In this context, would target mean

15  hospitals and perhaps other healthcare providers who

16  might have purchased or be purchasing a da Vinci

17  robotic surgical system?

18     A.    Yes.  As well as Neptune Rover, which is

19  another product line that we offer.  You know, see

20  the next line below.  It says "Rover Repair Update."

21            So we -- we provided services for both

22  those products to hospitals and surgery centers.

23     Q.    Now would you look please at -- a few --

24  few more pages down.  There's a slide.  It's on -- on

25  Bates Page 40525.

Page 89

1              Yeah.  I think that's it.  It says,

2      "Restore Robotics' Solution."

3              Do you see that?

4      A.    Yes.

5      Q.    And does that appear to be the Restore

6      Robotics' logo on that page?

7      A.    Yes.

8      Q.    Is there anything about this page which

9      suggests to you that this particular slide was

10     prepared by you or -- or someone at your company as

11     opposed to Medline?

12     A.    It would have been myself or someone in my

13     company.

14     Q.    All right.  If you look please at this box

15     on the left side of the page, there's a paragraph

16     that says, quote, "The PM," dash, "ONLY program."

17             Do you see that?

18     A.    Yes.

19     Q.    And --  And to read the whole sentence

20     into the -- the record, "The PM-ONLY program provides

21     the confidence and certainty of knowing that the

22     surgical robot remains within 'spec.'"

23             Do you see that?

24     A.    Yes.

25     Q.    What does spec mean there, Mr. Parker?

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 107

1    be able to buy instruments.  They would lose, you

2    know, surgeon training, that sort of thing.

3              So when those things are piled on, that

4    made it very difficult, if not impossible, to

5    continue sales efforts and --  And they would receive

6    threatening letters from Intuitive, both the hospital

7    and sometimes the distributors would receive letters

8    from Intuitive threatening them, and so that caused

9    them to continue to drop off.

10        Q.    Oh.  Do you attribute the attrition of all

11   of the reps and all of the distributors who did cease

12   working on the store account to the conduct of

13   Intuitive?

14        A.    At least 99 percent.  I haven't looked at

15   each one to see what the reason, but that is by far

16   the overwhelming reason.  There may be one or two for

17   some other reason that I don't recall at the time;

18   but by far, almost all of them were because of the

19   actions of Intuitive.

20        Q.    Did the --  Did the reps, did they have a

21   quota as part of their financial arrangements

22   with Restore?

23        A.    They had designated customers and

24   timelines that they had to both make contact with

25   those hospitals, as well as a timeline to have them

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 108

1    become customers; or they would lose them as a

2    protected account.

3        Q.    Did the distributors have quotas?

4        A.    No.  It was the same model of not a quota

5    per se, but here's your --  We worked together to

6    come up with a protected customer list, and it's

7    typically ones they had great relationships with.

8    They're already communicating with, already selling

9    them the products; and so they, you know, have those

10   relationships.

11          And they had the same situation where they

12   had to make contact with the -- with the customer,

13   provide some sort of proposal, and close the sale

14   within a period of time before losing them as a

15   protected customer.

16          It doesn't mean they couldn't sell to

17   them.  They just --  They would not be dedicated to

18   them.

19       Q.    Did you tell me you had -- that your

20   companies had two distributors in the United States?

21       A.    Correct.

22       Q.    Who were they?

23       A.    Medline and Alliance HealthCare.

24          It's technically Medline ReNewal.  It's a

25   division of Medline.

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

                                                    Page 109

 1       Q.     And Alliance was the other one?

 2       A.     Correct.

 3       Q.     And --  And what were the total sales

 4    generated by your two American United States

 5    distributors?

 6       A.     I don't know.

 7       Q.     No idea?

 8       A.     I don't know off the top of my head.  No.

 9       Q.     More or less than a hundred dollars?

10       A.     Did you say a hundred dollars or a hundred

11    thousand?

12       Q.     Hundred dollars.

13       A.     Oh, yeah.  Much --  Much more.  Less than

14    a million.  I don't know if it's more than a hundred

15    thousand.  I have to look and see.

16       Q.     Somewhere between a hundred thousand and a

17    million dollars total sales generated by your two

18    United States distributors -- yes?

19       A.     That's a fair guess.

20       Q.     And --  And do you attribute the --

21    those -- those sales numbers to what you say are --

22    that conduct by Intuitive?

23       A.     Absolutely.

24       Q.     No other cause?

25       A.     I'm not aware of any at the moment.  No.

AEO 30(b)(6) Clifton Earl Parker                May 4, 2021
Restore Robotics LLC v Intuitive Surgical

                                                    Page 110

1              MR. RUBY:  Let's take a -- a ten-minute

2         break now.  Come back at --  What time is it

3         now?

4              Who's --  Who's keeping that number?

5              THE VIDEOGRAPHER:  The total time on the

6         record?  Let me go off record; and I'll give you

7         that information, if that's okay.

8              MR. RUBY:  Yeah.  Sure.

9              THE VIDEOGRAPHER:  The time is now

10        1:28 p.m.  We're going off the record.

11   (Lunch recess from 1:28 p.m. to 2:24 p.m.)

12             THE VIDEOGRAPHER:  The time is now

13        2:25 p.m.  We're back on the record.

14             Please continue.

15        Q.   (By Mr. Ruby)  How many installations of

16   the interceptor technology were accomplished that

17   Restore got paid for?

18        A.   I don't know the number off the top of my

19   head, but it was in the hundreds.

20        Q.   And what was Restore's profit on each

21   installation?

22        A.   On each instrument --  Well, it depends on

23   the -- the -- the model that we're working with.  For

24   example, if we're working with the reps --  As I told

25   you, we had about, you know, 75, 85 reps; and the way

AEO 30(b)(6) Clifton Earl Parker                May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 134

1    that, in fact, there had been nine procedures

2    previously done, use -- at least nine procedures

3    previously done, including that instrument?

4         A.    So the hospitals track all of that data,

5    so that's --  That's information that -- that a

6    hospital will have access to, as well as that's --

7              You know, you'll have to ask the -- a

8    surgeon; but, typically, in most, instruments are

9    used hundreds and hundreds of times, so to have an

10   instrument that's only used 9 times or 20 times or 40

11   times is exceedingly rare in the medical device

12   space, other than single-use instruments, which are

13   designed to be used one time, but still are --

14   Sometimes they're used multiple times.

15             But in the multi-use arena, instruments

16   are used typically hundreds of times before they're

17   discarded; and so that's not anything unusual in the,

18   you know, laparoscopic or -- or endoscopic space.

19        Q.    Yes.  But my question is:  How would the

20   surgeon know how many uses -- how many uses a

21   particular instrument had been used in once the

22   interceptor was installed?

23        A.    They track those instruments by serial

24   number, and they have that data in their system.

25        Q.    They being the surgeons?

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 135

1      A.    No.  The hospital.

2      Q.    So in -- in your long study of surgical

3  practice and all the operating rooms you've been in,

4  how many times have you seen a surgeon about to

5  commence a surgery call up Hospital Records and ask

6  them to run the serial numbers on a particular piece

7  of equipment to find out what its history was?

8            Is that something you saw very often?

9      A.    I --  I can't say that I've seen that.  I

10  can't say that I've ever seen a surgeon ask how many

11  times has any instrument been used ever.

12     Q.    Who is Ben Lipson?

13     A.    He's a former Intuitive engineer.

14     Q.    A friend of yours?

15     A.    No.

16     Q.    In --  In approximately the summer of

17  2019, did you call Mr. Lipson?

18     A.    I did.

19     Q.    Where --  Where was he when you -- you --

20  Well, strike that.

21           Did you reach him by telephone?

22     A.    I did.  I think it was through WhatsApp,

23  'cause he was on the other side of the world in

24  Macao.

25     Q.    And had somebody given you his phone

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 136

1    number?

2         A.    Yes.

3         Q.    Who gave you his phone number?

4         A.    I think --  I think it was William

5    Hufstetler or Matt Roberts, one of those two

6    gentlemen.  I don't recall a hundred percent.

7         Q.    Where were you when you -- you placed your

8    call to Mr. Lipson?

9         A.    In the Restore Robotics office in Suwanee,

10   Georgia.

11        Q.    Why did you call him?

12        A.    Because a customer had asked me if there

13   was a way to remove the preventative -- preventive

14   maintenance message on the robot, and I was told that

15   he was involved with Intuitive back when that was

16   being developed, and he may know how it worked and if

17   it was possible to do that.

18        Q.    Who told you that?

19        A.    It was either Mr. Hufstetler or Mr.

20   Roberts.

21        Q.    Who was the customer?

22        A.    Baylor Scott & White, I think.

23              It was either Baylor Scott & White or

24   Heart & Health.  I think it was -- it was one of

25   those two.  Both of them have asked us to do that.

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

                                                      Page 137

1    I'm not sure which one preceded the -- the other.

2          Q.    How long did you talk with Mr. Lipson?

3          A.    About 15 minutes.

4          Q.    Was there anything about the call that

5    sticks out in your memory?

6          A.    Yeah.  I asked him if it was, you know,

7    possible to remove the -- the message.

8                And short answer was no.

9                And then he explained, you know, the

10   process that you had to have access to the software

11   on a laptop.  It had to connect to like 11 different

12   boards throughout the systems, the surgeon's console,

13   and the robot.  And had to check and make sure

14   certain, you know, actions had taken place over a

15   certain period of time.

16               Each board would be reset, and then you

17   had to have the -- the software on the laptop go

18   through and check each one of those, and then the

19   message would be removed if all those conditions were

20   met.

21         Q.    Did you say anything in this conversation

22   with Mr. Lipson about hacking into a system?

23         A.    Never.

24         Q.    Did Mr. Lipson say anything about hacking?

25         A.    No.

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 138

1      Q.    Did either of you say anything where

2    somebody might have misinterpreted the use of the

3    word "hacking," like somebody said I have a hacking

4    cough, or I just went to the hardware store, and I

5    bought a hacksaw?

6            Was there any use of the word "hack" in

7    any context in your -- your conversation?

8      A.    I'm not aware of that word being used at

9    all.

10     Q.    Did you ask Mr. Lipson if he could help

11   you by gaining entry to the Intuitive system?

12     A.    No.  Once he told --

13           MR. BERHOLD:  Objection.

14           THE WITNESS:  What?

15           MR. BERHOLD:  Sorry.  Objection.

16           MR. RUBY:  What's the --

17           THE WITNESS:  Once he told us --

18           MR. RUBY:  -- objection?

19           What's the objection?  If it's to form,

20       maybe I'll rephrase.  So what's the objection?

21           MR. BERHOLD:  Oh, sorry, Allen.  Are you

22       referring to the -- When you say system, are you

23       referring to the da Vinci surgical system?

24           MR. RUBY:  I'm not --  I'm not answering

25       questions.  I'm just trying to do my job.

AEO 30(b)(6) Clifton Earl Parker        May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 139

1          I asked the question.  You made an
2     objection.  I want to understand what the
3     objection is, so maybe I'll rephrase it.  I
4     don't know what I'll do, but I need --  I want
5     to respect you sufficiently to understand what
6     your objection is.
7          MR. BERHOLD:  Well, let me be more blunt.
8     The phrase --  Objection.  The phrase "Intuitive
9     system" is vague and ambiguous.
10          MR. RUBY:  I withdraw the question.
11     Q.    (By Mr. Ruby)  Did you ask Mr. Parker
12 (sic) if he would be willing to hack into whatever
13 computer system was responsible for this PMD -- PM
14 due message?
15     A.    You said Mr. Parker.  So you want to
16 restate the question with the right --
17     Q.    Sure.
18     A.    -- name?
19     Q.    Sure.  Did you ask Mr. Lipson if he would
20 help you by hacking into the system which was showing
21 the message PM due?
22     A.    So no, at any time did the word "hack"
23 ever come up.  And I did not even ask him for his
24 help once he described what was required, because it
25 was it was a futile effort; and he said it -- it

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 140

1    couldn't be done.

2              I took it that it couldn't be done; and

3    there was no more discussion about that, that

4    particular subject.

5         Q.    Did you talk about other subjects?

6         A.    We talked about the reusing of the

7    instruments and resetting the counter.

8         Q.    What did you say about that?

9         A.    I think he asked us what, you know, what

10   all were we doing.

11             And I just explained to him that we were

12   installing a interceptor system that prevented the

13   instruments from expiring where they could be reused

14   to save the hospital money.

15        Q.    Was there any discussion between the two

16   of you about the difference between training

17   instruments and instruments that were meant to be

18   used in surgery with humans?

19        A.    Oh, that's possible.

20        Q.    What do you remember?

21        A.    I don't remember that, but I'm sure that's

22   likely.

23        Q.    What prompts you to think that that was

24   likely when you don't remember what was said?

25        A.    Because I've had that conversation with

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 141

1    other people multiple times.

2          Q.    What did he tell you?

3          A.    He was under the impression that the FDA

4    required -- there was an FDA mandate that the

5    instruments only be used ten times.

6          Q.    Did you have any expectation one way or

7    the other as to whether that the phone conversation

8    you had with Mr. Lipson was being recorded by

9    anybody?

10         A.    No.

11         Q.    Did --  In this conversation, did Mr.

12   Lipson tell you that he thought you were being

13   unethical in your approach to him?

14         A.    I don't recall that at all.  No.

15         Q.    Did you tell Mr. Lipson that you had a

16   materials expert study the standard instruments and

17   the training instruments to see whether there were

18   differences between them?

19         A.    Probably.  Yes.

20         Q.    Do you remember?

21         A.    I don't remember exactly; but, vaguely, as

22   part of that same conversation, you know, dealing

23   with, you know, what's the difference between a

24   training instrument that can be used a hundred times

25   versus a nontraining instrument?  Are they made from

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 160

1        Q.    Is the units ordered describing a

2    situation where the -- a customer is ordering a

3    hundred interceptor treatments on one unit of

4    monopolar curved scissors?

5        A.    That's showing a hundred units, a hundred

6    EndoWrist instruments being repaired.

7        Q.    All right.  And the hot shears curved

8    scissors had a usage limit of ten; is that right?

9        A.    Correct.

10       Q.    So this "Units Ordered" column provides a

11   calculation as to savings based on the -- the

12   ordering of a capacity for a thousand procedures

13   with -- which used the monopolar curved scissors?

14       A.    That's correct.  Now that's not talking

15   about one physical instrument.  That would be a

16   hundred different instruments over a period of time.

17       Q.    All right.  Well, do you --  Strike that.

18            Did you in 198 -- or 2018 or '19 or '20,

19   have any notion in your mind about how many years

20   would pass by before a single robot, before one robot

21   would be used as a tool in a thousand surgeries that

22   also used the hot shears?

23       A.    No.  I didn't put these numbers in, by the

24   way; so I don't know the -- the situation.  I don't

25   know if this is one hospital, one robot.  Is this ten

AEO 30(b)(6) Clifton Earl Parker        May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 161

1    robots?  Is this 50 robots?

2              I don't know the -- the indication.  Or is

3    this --  You know, that would be a question for

4    the -- the salesperson that put that information in

5    there.

6              But we do know when we have conversations

7    with hospitals and they tell us how many instruments

8    they use per year, that information, you know, is

9    pretty reliable and accurate; and we go by that

10   but --

11             So without knowing more information, I

12   can't tell you how many --  You know, I don't know if

13   this was for one robot or ten or a hundred, so

14   there's no way possible for me to answer that

15   question accurately.

16             MR. RUBY:  Well, now can we have marked,

17        please, Restore 18746.

18             THE CONCIERGE TECH:  Sure.  Please stand

19        by.

20             (Exhibit 5 was marked for identification.)

21             THE CONCIERGE TECH:  All right.  That

22        document is now on the screen.

23             MR. RUBY:  Well, I asked for 18746.  Is

24        that what you have up there?

25             THE CONCIERGE TECH:  It starts at 18745,

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

                                              Page 162

1        and it looks like Page 2 is 18746.

2                MR. RUBY:  Thank you.  Please put up 18 --

3        Put up the predecessor page then, and let's take

4        a look at it.  Oh, okay.

5        Q.    (By Mr. Ruby)  Mr. Parker, the -- this

6    appears to be --  Page 187045 appears to be an

7    e-mail, October of 2018, from you asking to print 75

8    of the brochures attached on the heavy paper.  "I

9    need to mail 50 to Premier next week."

10               Who is Premier?

11       A.    Premier is a group purchasing organization

12   that handles the purchasing of about 2,000 hospitals.

13   They're located in Charlotte, North Carolina.

14       Q.    All right.  And did you look upon them as

15   a -- potentially a substantial customer?

16       A.    Yes.

17       Q.    All right.  Were you trying to sell to

18   them?

19       A.    Yes.

20       Q.    Did you send this --  As part of that

21   sales effort, did you send this brochure that we just

22   started to look at, the next page, 18746?

23               THE WITNESS:  Can you go down a little

24       further.

25               It looks familiar.  Yes.

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 163

1     Q.    (By Mr. Ruby)  Do you recognize the

2   instruments in this sales brochure as being Intuitive

3   Surgical instruments?

4           THE WITNESS:  Can you slide back up just a

5           little bit.

6           I know the second one from the right

7           appears to be an Intuitive instrument, 'cause

8           it's got the IS on it.  The other ones, I -- I

9           don't know a hundred percent if they are.

10    Q.    (By Mr. Ruby)  Well, does -- does this

11  give you any clue, the -- the language that says

12  Innovative Solutions for da Vinci S and Si surgical

13  Robots.

14          Does that help you one way or the other in

15  telling us whether you think that these -- all of

16  these instruments shown in the brochure were

17  Intuitive instruments?

18    A.    No.  'Cause I don't know where the -- the

19  physical instruments came from, the pictures came

20  from.  I didn't create the brochure.

21          MR. RUBY:  Now let's go to the bottom of

22          the -- this graphic.  No.  I'm sorry.  I mean --

23          I meant the top here.

24    Q.    (By Mr. Ruby)  Where it says, "SAVE OVER

25  $100,000 PER YEAR PER ROBOT," do you see that?

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 164

1      A.    Yes.

2      Q.    And this was not the only brochure in

3  which this promise was printed; is that true?

4            MR. BERHOLD:  Objection.

5            THE WITNESS:  Correct.  I don't know that

6      I would call it a promise.

7      Q.    (By Mr. Ruby)  Well, what do you call it?

8      A.    I mean, it's a potential savings for the

9  hospital of over a hundred thousand dollars.  It's

10  going to depend greatly on how many instruments per

11  year they repair and how many robots -- if they

12  perform -- if they have us perform repairs and/or

13  preventive maintenance.

14            But if they do both repairs and preventive

15  maintenance, on the average, it will be over a

16  hundred thousand per year per robot.

17      Q.    Help me to find in this brochure any of

18  the qualifications that you just told us about to the

19  idea of saving over a hundred thousand dollars per

20  year per robot?

21      A.    Well, it's a very generic brochure, so

22  it's not getting into all the specific details.  That

23  comes when we sit down with the customer and start

24  looking at, okay, how many instruments do you use per

25  year on the robot?  Are you going to have preventive

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 165

1  maintenance or, you know, repair services done by

2  Restore.

3      Q.    Well, this is not the only brochure you

4  authorized saying save over a hundred thousand

5  dollars per year per robot, is it?

6      A.    No.  I'm sure there's different versions

7  and other brochures.

8      Q.    Yeah.  And that assertion about saving

9  over a hundred thousand dollars per year per robot

10  depended on a number of things, didn't it?

11          You've told us about some of them in -- in

12  your testimony.  How many procedures, how many units,

13  did they subscribe to other services, those were all

14  qualifiers, weren't they?

15      A.    Sure.

16      Q.    And you omitted those from your

17  advertising, didn't you?

18          MR. BERHOLD:  Objection.

19      Q.    (By Mr. Ruby)  You can answer.

20      A.    I did not put in the things that you just

21  mentioned.  I did not say those.  I wouldn't call it

22  omitting.  It was not a on-purpose omission.  It was

23  here's what can happen.

24          I think everybody knows, you know, when

25  you're promoting a product or a service, you know,