# Exhibit 56

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

| | |
|---|---|
| **RESTORE ROBOTICS LLC, and**<br>**RESTORE ROBOTICS REPAIR LLC** | |
| Plaintiff/Counterclaim<br>Defendant, | Case No. 5:19-cv-55 |
| v. | |
| **INTUITIVE SURGICAL, INC.,** | JURY TRIAL DEMANDED |
| Defendant/Counterclaim<br>Plaintiff. | |

**EXPERT REPORT OF LOREN K. SMITH, PH.D.**
**AUGUST 20, 2021**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ...................................................................................1

    A.   QUALIFICATIONS ...............................................................................1

    B.   ASSIGNMENT ....................................................................................2

    C.   SUMMARY OF OPINIONS ....................................................................3

II.  BACKGROUND ...........................................................................................6

    A.   PARTIES ............................................................................................6

        1.   Intuitive ..................................................................................6

        2.   Restore ...................................................................................7

    B.   DISPUTE ............................................................................................9

III. DAMAGES ANALYSIS ...............................................................................10

    A.   DISGORGEMENT OF RESTORE'S APPARENT PROFITS.........................10

        1.   Framework ............................................................................10

        2.   Analysis................................................................................11

    B.   LOST PROFITS .................................................................................14

        1.   Framework ............................................................................14

        2.   Analysis................................................................................15

IV.  CONCLUSION ...........................................................................................21

APPENDIX A.    DATA ...............................................................................22

    1.   RESTORE'S SALES DATA ..................................................................22

    2.   INTUITIVE I&A SALES DATA ............................................................24

    3.   MATCHING RESTORE'S CUSTOMERS TO INTUITIVE CUSTOMERS .......25

    4.   ASSIGNING BUT-FOR PRICES TO THE RESTORE TRANSACTIONS .........28

APPENDIX B.    ALTERNATIVE CALCULATIONS .........................................29

    1.   LOST PROFITS WITH ALTERNATIVE PRICE IMPUTATION ...................29

    2.   LOST PROFITS ACCOUNTING FOR DISCARDED INSTRUMENT USES..................30

APPENDIX C.    INTUITIVE SALES TRENDS ...............................................33

I.    **EXECUTIVE SUMMARY**

    A.    QUALIFICATIONS

1.    My name is Loren K. Smith. I am a Principal at The Brattle Group and have been an economic consultant since April 2013. From September 2005 to March 2013, I was a staff economist at the U.S. Federal Trade Commission ("FTC"). I received my Ph.D. in economics from the University of Virginia in 2006.

2.    I specialize in the application of economic and econometric tools to regulatory investigations and legal disputes. I have taught economics and econometrics to undergraduate and graduate students at the University of Virginia and Johns Hopkins University. I have taught courses on the application of economic and econometric tools to antitrust matters to lawyers and economists of foreign antitrust agencies in South Africa, Hungary, and Brazil, and at Fordham University. My research has been published in leading economics and antitrust journals, including the Journal of Applied Econometrics, the Journal of Economics and Management Strategy, and the Antitrust Law Journal.

3.    While at the FTC, I led economic investigations into high-profile mergers and single-firm conduct matters. I also supported litigation and settlement efforts. Since leaving the FTC for private practice, I have consulted with clients on government investigations, federal merger challenges, and private litigations in a wide variety of industries, including healthcare, retail, lodging, medical devices, and various consumer products and intermediate goods.

4.    I have significant experience studying the economics of healthcare, including several matters that required detailed economic analyses of markets for medical devices and healthcare services. On behalf of medical device manufacturers, healthcare providers, and the federal government, I have analyzed the impact of mergers and certain contracting practices on consumer welfare.

5.    My curriculum vitae, which provides additional details on my qualifications, including my prior testimony and publications, is provided in Exhibit A.

### B.   ASSIGNMENT

6.     I have been asked by counsel for Intuitive Surgical, Inc. ("Intuitive") to evaluate the extent of Intuitive's damages from the misconduct alleged in its counterclaims against Restore Robotics LLC ("Restore Robotics") and Restore Robotics Repair LLC ("Restore Robotics Repair") (collectively "Counterclaim Defendants"; also "Restore") in the above-captioned matter.[1] Specifically, I have been asked to quantify (i) Restore's profits to be disgorged; and (ii) Intuitive's lost profits from Restore's alleged false advertising, unfair competition, deceptive and unfair trade practices, and tortious interference with contract.[2]

7.     I reviewed the factual record, including quantitative and qualitative evidence. To evaluate Intuitive's damages, I applied standard economic and econometric principles and tools. The quantitative information I rely on includes:

- sales data from both parties; and

- financial data from Intuitive.

8.     The qualitative evidence I rely on includes:

- the parties' ordinary-course documents and testimony;

- documents from third-party industry participants;

- academic literature; and

- other publicly available information.

9.     A list of the materials that I have considered in forming my opinions in this report is attached as Exhibit B.

10.     The work presented in this report was conducted by me and staff at The Brattle Group working under my direction. The Brattle Group bills my time on this matter at $875 per hour.

---

[1]     Defendant's First Amended Counterclaims, Case No. 5:19-cv-00055, United States District Court, Northern District of Florida, Panama City Division, November 27, 2019 ("Counterclaim").

[2]     Counterclaim, at pp. 27-32.

Neither my compensation nor the compensation of The Brattle Group depends in any way on the outcome of this case.

11.     My work in this matter is ongoing. I reserve the right to supplement my analyses and conclusions should any additional information be provided to me after the submission of this report.

### C.     SUMMARY OF OPINIONS

12.     It is my opinion that the amount of Restore's profits to be disgorged is $886,786 and the amount of Intuitive's lost profits is $790,306. Specifically, my analysis leads me to conclude the following.

13.     The amount of Restore's profits to be disgorged is $886,786, calculated as follows:

- I rely on documents produced by Restore that are represented to contain all of Restore's transactions related to da Vinci systems or EndoWrist instruments through December 31, 2020.

- I understand from counsel that Intuitive's position is that all of Restore's transactions involving the "repair" of EndoWrist instruments,[3] the "repair" of da Vinci systems, and the sale of preventive maintenance contracts resulted from unlawful conduct that Intuitive is challenging in its counterclaims.

- Based on instructions from counsel, I exclude from my calculations (i) all sales made by Restore Robotics Repair because such sales were made only to Restore Robotics; and (ii) Restore Robotics' sales of second-hand EndoWrist instruments, systems, and testing services.[4]

---

[3]     I understand that Intuitive alleges that Restore misrepresents the nature of its services as "repairs." I refer to certain of Restore's services as "repairs" for convenience only and express no opinion as to whether that term accurately describes any work that Restore performs.

[4]     I refer to transactions that Restore has categorized as "Purchase" as sales of second-hand instruments, as I understand that all U.S. sales of new Intuitive instruments occur exclusively through Intuitive's own sales organization. Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 11. I assume that Restore sold these instruments without modifying the usage counters. As discussed below,

- I understand from counsel that, for purposes of the disgorgement analysis, Intuitive bears only the burden of establishing Restore's sales, and that it is Restore's burden to prove any costs or deductions, including any portion of sales that it claims is not attributable to the challenged conduct.[5]

- Hence, based on the above assumptions and calculations, and pending Restore's proof of any offsets to its challenged revenues, the amount of Restore's profits to be disgorged is $886,786.

- I have constructed my workpapers such that my calculations of Restore's disgorged profits can be adjusted depending on the claims on which Intuitive prevails in the litigation.

14.     The amount of Intuitive's lost profits is $790,306, calculated as follows:

- The lost profits calculation entails computing the incremental profits that Intuitive would have earned had Restore not engaged in the challenged conduct.

- It is my opinion that each EndoWrist instrument "repair" by Restore (and their distributors and agents) effectively displaced one new instrument sale by Intuitive.

  o I understand that a "repair" of an EndoWrist instrument by Restore included resetting the device's usage counter to zero, while leaving the counter limit unchanged. Hence, a "repaired" device and a new device would contain the same number of uses.

  o Evidence and basic economic principles indicate that it is highly unlikely that, in the absence of Restore's challenged conduct, customers would have meaningfully changed their volume of da Vinci procedures from what they performed in the actual world.

---

some Restore instrument sale transactions indicate a number of "uses" that is less than the maximum for a new instrument.

[5]     I reserve the right to evaluate any claims that Counterclaim Defendants make regarding these costs, including any evidence presented in rebuttal to this report.

- Restore's sales data allow me to identify the Intuitive device that each EndoWrist instrument "repair" transaction displaced. For each Intuitive device "repaired" by Restore (and their distributors and agents), I obtain Intuitive's corresponding net price for the corresponding new device from Intuitive's data on all U.S. instruments and accessories sales during the relevant time period.

  o Some of Restore's customers for the challenged transactions appear to be distributors, which I understand are not Intuitive customers. In all but one case, the ultimate healthcare provider customer can be determined. For the remaining "apparent distributor" customer, I calculate Intuitive's but-for revenues using the quantity-weighted average net selling price for all U.S. customers for the device in question for the same year as the challenged transaction.[6]

  o I match each of Restore's healthcare provider customers by name to the corresponding Intuitive customer or customers using a combination of a computer algorithm, evidence in the record, and public sources.[7] For these "matched" customers, I calculate Intuitive's but-for revenues using the customer-specific quantity-weighted average net selling price for the device in question for the same year as the challenged transaction.[8]

- For challenged transactions other than EndoWrist instrument "repairs," I conservatively estimate that each dollar of Restore's income displaced the equivalent amount of income by Intuitive. This estimate is based on the observation that (i) Restore advertised itself as a cheaper alternative to Intuitive for system repairs and preventive maintenance contracts; and (ii) the Restore customers' decision to

---

[6]   Quantity-weighted average calculated as total net sales divided by total quantity.

[7]   In 8 out of 11 cases, this results in a unique match. *See* Table 5. The remaining cases are typically health systems for which the Restore customer only can be narrowed down to a set of member facilities.

[8]   As shown below, any imprecision in name matching likely has minimal impact on my lost profits calculations.

purchase from Restore would be irrational unless they had expected to spend at least as much with Intuitive in the but-for world.

- Intuitive's but-for revenues on the challenged transactions are $995,646.

- I calculate Intuitive's lost profits as its but-for revenues times Intuitive's contribution margins on the associated business lines (instruments and accessories for lost instrument sales revenues, and services for the other lost revenues) for the corresponding years.[9]

- Intuitive's lost profits on the challenged transactions are $790,306.

- I have constructed my workpapers such that my lost profit calculations can be adjusted depending on the claims on which Intuitive prevails in the litigation.

## II.    BACKGROUND

### A.    PARTIES

#### 1.    Intuitive

15.    Intuitive is a publicly traded company that designs, manufactures, and markets da Vinci Surgical Systems.[10] Intuitive designs its da Vinci Surgical Systems to "enable complex surgery using a minimally invasive approach."[11] A da Vinci Surgical System is comprised of "an ergonomic surgeon console or consoles, a patient-side cart with an interactive arm or arms, a high-performance vision system, and proprietary instruments and accessories."[12] Instruments used with the da Vinci Surgical System include the EndoWrist family. EndoWrist instruments

---

[9]     The years are 2018 through 2020. *See* Table 4.

[10]    Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at pp. 6-8.

[11]    Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 5.

[12]    Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 5.

(such as clip appliers, needle drivers, and monopolar cautery instruments) apply Intuitive's EndoWrist technology.[13]

16.    Most EndoWrist instruments are designed with a usage life of a defined number of procedures. Intuitive has noted that "the products manufactured and sold by Intuitive are designed and tested to achieve a targeted level of safety, precision and dexterity for a limited number of uses."[14] I understand that these limited-use EndoWrist instruments include a programmed memory chip, which functions as a usage counter and informs the customer that the instrument has expired – i.e., reached the maximum number of uses – at which point the instrument will "no longer function" with the system. As specified in Intuitive's Sales, License, and Service Agreement ("SLSA"), Intuitive's customers expressly acknowledge that they will not use EndoWrist instruments after they have exceeded the usage limits, nor will they use any EndoWrist instrument that has been subject to repair, refurbishment, or reconditioning that is not approved by Intuitive.[15] Customers can buy new EndoWrist instruments from Intuitive to replace expired ones.[16]

### 2.    Restore

17.    Restore Robotics is a privately held company that focuses on medical equipment sales and business development for Restore Robotics Repair.[17] The company owners are Kevin May,

---

[13]    "Da Vinci Instruments," Intuitive, accessed July 11, 2021, https://www.intuitive.com/en-gb/products-and-services/da-vinci/instruments. *See also* "Da Vinci X/Xi Instrument & Accessory Catalogue," Intuitive, March 2021, accessed July 25, 2021, https://www.intuitive.com/en-gb/-/media/Project/Intuitive-surgical/files/pdf/da-vinci-x-xi-instrument-accessory-catalogue-europe.pdf?la=en-GB&hash=9D6F575394160A0A057B3C204B7DC51B.

[14]    Counterclaim, at ¶ 50.

[15]    SLSA (Intuitive-00005135), dated December 28, 2016, at § 8 ("Instruments and Accessories are subject to a limited license to use those instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive.").

[16]    *See id.* ("Instruments and Accessories will be made available to Customer from Intuitive pursuant to separate orders placed by Customer to Intuitive from time to time in accordance with the terms and conditions contained in the then current Instrument and Accessory Catalog.").

[17]    Vautrot (5/11/2021) Dep. Tr. 27:19-25 ("Q. What is the relationship between Restore Robotics Repair and Restore Robotics? A. Restore Robotics Repair in effect is the -- does the work, does the -- the repair, and

Clif Parker, and Mills Vautrot.[18] Restore Robotics' original business plan involved "repairing" EndoWrist instruments and resetting the instruments' usage counters using technology developed by Rebotix Repair LLC.[19] Restore Robotics later expanded into other business lines, including da Vinci Surgical System "repairs" and sales of second-hand instruments.[20] In 2020, Restore Robotics had over $60 million in sales.[21]

---

Restore Robotics does the business development and -- and those kinds of activities. Client management and that kind of stuff.").

[18] May (5/6/2021) Dep. Tr. 13:24-14:4 ("Q. What are the respective ownership interests of yourself and Mr. Parker in Restore Robotics LLC? A. It's, I believe, 17 percent is my portion and then I don't remember how the rest of it's broken out between Clif and Mills."). *See also* Parker (5/4/2021) Dep. Tr. 10:8-10 ("Q. Who -- Who are the present owners of Restore Robotics? A. Myself, Kevin May, and G. Mills Vautrot."). *See also* Vautrot (5/11/2021) Dep. Tr. 26:24-27:6 ("Q. Do you have an ownership interest in Restore Robotics? A. I do. Q. And how much of Restore Robotics do you own? What percentage? A. 31. Q. Who owns the remaining 69 percent? A. Clif and Kevin.").

[19] Parker (5/4/2021) Dep. Tr. 26:7-13 ("Q. When you began business as Restore Robotics, what was the business plan, if any, that you had for -- for that company? A. The primary business plan was to repair the EndoWrist instruments; reset the counter; and, you know, provide hospitals with a reduced cost for the instruments that they owned."). *See also* Parker (5/4/2021) Dep. Tr. 29:24-30:7 ("Q. Going back to approximately mid-April of 2018, what did Mr. May describe to you about his meeting with someone from Rebotix at a -- I think you said a trade show? A. He described they had a technology that would allow the counter in the EndoWrist to be reset, or they could be used for an additional ten uses, and he thought it was a great opportunity and wanted us to examine it further.").

[20] Parker (5/4/2021) Dep. Tr. 26:14-21 ("That later morphed into a -- a full product offering which included the repair of the robot itself and the sale of preowned instruments, and the plan was to have a -- a number of large distributors here in the U.S. and international and some smaller distributors to fill in the -- the gaps where the large distributors did not have any presence."). *See also* Parker (5/4/2021) Dep. Tr. 117:20-118:2 ("Q. Did those financial statements that you looked at tell you how much profit was made by Restore Robotics and the Robotics Repair? A. Not specifically for the instruments, because you've got to keep in mind Restore Robotics does a number of other things as well, so it does, you know, repairs on the other medical devices and, also, in the PPE sales business as well."). *See also* Parker (5/4/2021) Dep. Tr. 88:14-20 ("Q. In this context, would target mean hospitals and perhaps other healthcare providers who might have purchased or be purchasing a da Vinci robotic surgical system? A. Yes. As well as Neptune Rover, which is another product line that we offer. You know, see the next line below. It says "Rover Repair Update."").

[21] Parker (5/4/2021) Dep. Tr. 118:3-11 ("So I look at the entire financials, number one; and I looked at the sales numbers from the EndoWrist and Robotic Repairs business; and the EndoWrist and Robotic Repairs business, I believe, in 2018 and 2019 generated over a million dollars in sales. Restore Robotics in whole did over $60 million in sales in 2020, which included a -- a little bit on the -- on the sale of some robotic instruments, but on other repair business as well.").

18.     Restore Robotics Repair is a privately held company owned by Kevin May and Clif Parker.[22] Its services include "repairs" of EndoWrist instruments, including bypassing the instruments' usage limits.[23] Restore Robotics Repair shares a commercial facility in Suwanee, Georgia with Restore Robotics and operates a repair shop in Anaheim, California.[24]

### B.     DISPUTE

19.     This matter originated with Restore's February 27, 2019 antitrust complaint against Intuitive.[25] On November 27, 2019, Intuitive filed its current counterclaims, alleging, among other things, false advertising, unfair competition, deceptive and unfair trade practices, and tortious interference with contract ("the challenged conduct").[26]

20.     This report quantifies Intuitive's damages arising from the challenged conduct. I have not been asked to opine on the legality of the conduct at issue. Rather, I have been asked by counsel for Intuitive to quantify Intuitive's damages assuming that Intuitive prevails on the merits of each of its counterclaims.[27]

---

[22]     May (5/6/2021) Dep. Tr. 14:5-9 ("Q. And what are the respective ownership interests of the members in Restore Robotics Repairs? A. 50 percent Kevin May and 50 percent Clif Parker.").

[23]     Vautrot (5/11/2021) Dep. Tr. 48:5-14 ("Q. Okay. Can you describe the services that Restore Robotics markets to its customers with respect to any Intuitive products? A. The -- with regard to the EndoWrist, that we can repair it in a way that adds another set of uses to the instrument. And with regard to the -- to the robot, being able to provide preventative maintenance with certain limitations and being able to provide repair service to the degree that we're able."); Vautrot (5/11/2021) Dep. Tr. 27:19-25 ("Q. What is the relationship between Restore Robotics Repair and Restore Robotics? A. Restore Robotics Repair in effect is the -- does the work, does the -- the repair, and Restore Robotics does the business development and -- and those kinds of activities. Client management and that kind of stuff.").

[24]     Parker (5/4/2021) Dep. Tr. 60:25-61:2 ("Q. And where was that repair shop of Restore Robotics Repairs? A. In Anaheim, California."). *See also* Parker (5/4/2021) Dep. Tr. 63:1-5 ("Q. Was the Suwanee, Georgia space that was shared between Restore Robotics and Restore Robotics Repairs commercial space or industrial space or both or neither? A. Commercial space.").

[25]     Complaint, Case No. 5:19-cv-00055, United States District Court, Northern District of Florida, Panama City Division, February 27, 2019.

[26]     Counterclaim, at pp. 27-32.

[27]     As noted above, I have constructed my workpapers such that my calculations can be adjusted depending on the claims on which Intuitive prevails.

## III.    DAMAGES ANALYSIS

21.    I analyze damages in two ways: First, I compute profits to be disgorged as sales received by Restore from their EndoWrist "repairs," da Vinci system "repairs," and preventive maintenance contracts; and second, I compute lost profits to Intuitive from the challenged conduct.

### A.    DISGORGEMENT OF RESTORE'S APPARENT PROFITS

#### 1.    Framework

22.    I have been instructed by counsel for Intuitive to perform a disgorgement analysis. I understand from counsel that Intuitive's position is that all of Restore's transactions involving the "repair" of EndoWrist instruments, the "repair" of da Vinci systems, or sales of preventive maintenance contracts resulted from unlawful conduct that Intuitive is challenging in its counterclaims. Counsel has further instructed me that for purposes of the disgorgement analysis, Intuitive bears only the burden of establishing Restore's challenged revenues and that it is Restore's burden to prove any costs or deductions.[28] Accordingly, for purposes of the disgorgement analysis, I have calculated Restore's sales of the "repair" of EndoWrist instruments, the "repair" of da Vinci systems, and the sale of preventive maintenance contracts. I have not attempted to calculate any costs or deductions that Restore might claim.

23.    I understand that the proper scope of Intuitive's damages claims and the legitimacy of Restore's claimed costs and/or deductions are ultimately matters for the Court and/or the trier of fact to decide. I have therefore constructed my workpapers such that the profits to be disgorged readily can be adjusted according to subsequent rulings and findings.

---

[28]    I reserve the right to evaluate any claims that Counterclaim Defendants make regarding these costs, including any evidence presented in rebuttal to this report.

## 2.    Analysis

24.    The key sources that I use to calculate Restore's profits earned through the challenged conduct are Restore's sales data, covering transactions from July 11, 2018 through December 28, 2020.[29]

25.    Restore's sales data contain information on sales of EndoWrist "repairs," sales of da Vinci system "repairs," and sales of preventive maintenance contracts by customer and date of transaction.[30] Additional details about each transaction include:

- invoice number;

- customer name, address, and ship-to address;

- descriptive information about the transaction (including type of "service" and, for "repairs," identifying information about the device "repaired");

- quantity sold;

- sale price; and

- amount invoiced.

26.    Appendix A contains a detailed discussion of Restore's sales data and my treatment of them.

27.    Table 1 below summarizes Restore's challenged transactions by transaction type. As shown in the table, Restore had 121 challenged transactions from 2019 through 2020, of which 95 were for EndoWrist instrument "repairs," 11 were for da Vinci system "repairs," and 15 were for preventive maintenance contracts. The total value of the challenged transactions was $888,786, of which $235,205 was for EndoWrist instrument "repairs," $36,581 was for da Vinci system "repairs," and $615,000 was for preventive maintenance contracts.

---

[29]      Restore-00055935; Restore-00055937.

[30]      Restore-00055935; Restore-00055937.

**Table 1: Restore's Challenged Transactions by Type**

| Transaction Type | | Instr Number | Units Sold | | | # of Trans. | Avg Sale Price per Unit | Total Sales ($) |
|---|---|---|---|---|---|---|---|---|
| | | | 2018 | 2019 | 2020 | | | |
| | | | [A] | [B] | [C] | [D] | [E] | [F] |
| **Instrument "Repairs"** | | | | | | | | |
| SERVICE Monopolar Curved Scissors | [1] | 420179 | 2 | 20 | 7 | 17 | $ 1,852 | $ 55,505 |
| Fenestrated Bipolar Forceps | [2] | 420205 | - | 6 | 14 | 11 | $ 2,014 | $ 41,050 |
| Mega Needle Driver | [3] | 420194 | 3 | 5 | 8 | 10 | $ 1,540 | $ 24,950 |
| Mega SutureCut Needle Driver | [4] | 420309 | 2 | 15 | 2 | 14 | $ 1,325 | $ 24,850 |
| Dissecting Forceps | [5] | 420227 | 5 | 6 | - | 7 | $ 1,700 | $ 18,300 |
| ProGrasp Forceps | [6] | 420093 | 1 | 10 | - | 11 | $ 1,602 | $ 17,625 |
| Hot Shears Monopolar Curved Scissors | [7] | 420179 | - | 3 | 4 | 4 | $ 2,244 | $ 15,925 |
| Maryland Bipolar Forceps | [8] | 420172 | - | 2 | 3 | 5 | $ 2,080 | $ 10,400 |
| Cadiere Forceps | [9] | 420049 | - | 5 | - | 5 | $ 1,500 | $ 7,500 |
| Large Needle Driver | [10] | 420006 | - | 4 | - | 4 | $ 1,706 | $ 6,825 |
| Repair of Permanent Cautery Hook | [11] | 420183 | - | 3 | - | 3 | $ 1,425 | $ 4,275 |
| Mega SutureCut Needle Driver | [12] | 420309 | - | - | 2 | 1 | $ 1,900 | $ 3,800 |
| 8mm Mega SutureCut Needle driver | [13] | 420209 | - | 1 | - | 1 | $ 1,900 | $ 1,900 |
| Repair | [14] | | 1 | - | - | 1 | $ 1,200 | $ 1,200 |
| Large Clip Happier | [15] | 420230 | 1 | - | - | 1 | $ 1,100 | $ 1,100 |
| **Instrument "Repairs" Total** | [16] | | **15** | **80** | **40** | **95** | | **235,205** |
| **System "Repairs"** | | | | | | | | |
| Repair | [17] | | - | 7 | 2 | 6 | $ 2,629 | $ 16,806 |
| Battery Labor | [18] | | - | 23 | - | 1 | $ 375 | $ 8,625 |
| MISC-Labor | [19] | | - | - | 1 | 1 | $ 5,850 | $ 5,850 |
| PR1247 (Battery for Patient Side Cart) | [20] | | - | 2 | - | 2 | $ 2,200 | $ 4,400 |
| Non-Inventory | [21] | | - | - | 2 | 1 | $ 450 | $ 900 |
| **System "Repairs" Total** | [22] | | **-** | **32** | **5** | **11** | | **$ 36,581** |
| **Other** | | | | | | | | |
| Preventive Maintenance | [23] | | - | 15 | - | 15 | $ 41,000 | $ 615,000 |
| **Total** | [24] | | **15** | **127** | **45** | **121** | | **$ 886,786** |

Sources and Notes:

1. From workpaper '4. Disgorgement\Table 1 to 3.xlsx'.

[16]: Sum of rows [1] through [15]

[22]: Sum of rows [17] through [21]

[24]:= [16]+[22]+[23]

28.    Table 2 below summarizes Restore's challenged transactions by customer. As displayed in the table, Restore's sales data include 12 different customers with challenged revenues.[31] The

---

[31]    Some end customers shown in Table 2, such as Baylor Scott and White Health and Hillcrest HealthCare System, are hospital systems with multiple, distinct ship-to customers in the Restore sales data.

largest customers by dollar value were Baylor Scott and White Health, Trinity Mother Frances, and Hillcrest HealthCare System.

**Table 2: Restore's Challenged Revenues by Customer**

| Customer Name | | 2018 | 2019 | 2020 | Total | % of Total |
|---|---|---|---|---|---|---|
| | | [A] | [B] | [C] | [D] | [E] |
| Baylor Scott and White Health | [1] | $ 3,550 | $ 664,256 | $ 2,750 | $ 670,556 | 76% |
| Trinity Mother Frances | [2] | $ - | $ 21,650 | $ 80,000 | $ 101,650 | 11% |
| Hillcrest HealthCare System | [3] | $ - | $ - | $ 9,825 | $ 9,825 | 1% |
| Panama City Surgery Center | [4] | $ 10,200 | $ 21,000 | $ - | $ 31,200 | 4% |
| Conway Regional Medical Center | [5] | $ 10,500 | $ 14,300 | $ - | $ 24,800 | 3% |
| R2 Surgical / Medco Blue | [6] | $ - | $ 13,372 | $ 900 | $ 14,272 | 2% |
| Lowell General Hospital | [7] | $ - | $ 10,450 | $ 1,333 | $ 11,783 | 1% |
| OTSEGO Memorial Hospital (Medline Industries Inc) | [8] | $ - | $ 10,100 | $ - | $ 10,100 | 1% |
| Central Washington Hospital (Medline Industries Inc) | [9] | $ - | $ 5,175 | $ - | $ 5,175 | 1% |
| Pacific Coast Surgical Center | [10] | $ - | $ 4,250 | $ - | $ 4,250 | 0% |
| K and B Surgical | [11] | $ - | $ 2,250 | $ - | $ 2,250 | 0% |
| Riverside Medical Center | [12] | $ - | $ 925 | $ - | $ 925 | 0% |
| **Total** | [13] | $ 24,250 | $ 767,728 | $ 94,808 | $ 886,786 | 100% |

Sources and Notes:

1. From workpaper '4. Disgorgement\Table 1 to 3.xlsx'.

2. Restore customers with no challenged revenues excluded.

3. Baylor Scott and White Health includes Baylor Scott & White Hospital, Baylor Surgicare at North Dallas, Baylor Scott & White – All Saints, Baylor Medical at McKinney, and Baylor Medical Center – Grapevine.

4. Hillcrest HealthCare System includes Hillcrest Medical Center and Hillcrest Hospital South.

[13]: Sum of rows [1] through [12]

[E]:= [E]/[D][13]

29.     My calculation of Restore's revenues subject to disgorgement is reported in Table 1 and Table 2. Table 3 below presents these amounts by transaction type.

**Table 3: Restore's Profits to Be Disgorged**

|  |  | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
|  |  | [A] | [B] | [C] | [D] |
| Preventive Maintenance | [1] | $     - | $   615,000 | $     - | $   615,000 |
| Instrument "Repairs" | [2] | $ 24,250 | $   129,622 | $ 81,333 | $   235,205 |
| System "Repairs" | [3] | $     - | $    23,106 | $ 13,475 | $    36,581 |
| **Total Disgorgement** | [4] | **$ 24,250** | **$   767,728** | **$ 94,808** | **$   886,786** |

Sources and Notes:

1. From workpaper '4. Disgorgement\Table 1 to 3.xlsx'.

[4]: = [1] + [2] + [3]

[D]: = [A] + [B] + [C]

## B.   LOST PROFITS

### 1.   Framework

30.     I have been instructed by counsel for Intuitive to perform a lost profits analysis. Below, I describe the Restore transactions that factor into my calculations. I also understand that the proper scope of Intuitive's damages claims is ultimately a matter for the Court and/or the trier of fact to decide. Therefore, I have constructed my workpapers so that Intuitive's lost profits readily can be adjusted according to subsequent rulings and findings.

31.     I follow a standard economic methodology for computing damages, which consists of calculating the difference in the injured party's (here, Intuitive's) profits in two worlds: (i) the "but-for" world, in which the alleged misconduct (here, the challenged conduct) did not occur, and (ii) the actual world, in which it did.[32] Because the challenged conduct entails business diverted from Intuitive, Intuitive's actual sales and profits on the Restore transactions at issue are zero. Therefore, the lost profits calculation amounts to computing Intuitive's but-for world profits – i.e., the profits that Intuitive would have earned had Restore not engaged in the challenged conduct.

---

[32]     Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd ed., Washington, DC: National Academies Press, 2011, 425-502, at pp. 429-430.

### 2.    Analysis

32.    The key data that I use to calculate Intuitive's lost profits are (i) Restore's sales data, (ii) Intuitive's instruments and accessories ("I&A") sales data, and (iii) information on Intuitive's contribution margins for its I&A and services businesses.

### a.    Restore's Sales

33.    Appendix A contains a detailed discussion of Restore's sales data and my treatment of them. I include for consideration Restore's transactions for (i) EndoWrist instrument "repairs," (ii) da Vinci system "repairs," and (iii) "preventive maintenance" contracts.

### b.    Intuitive But-For Revenues

### (1)    EndoWrist Instrument "Repairs"

34.    I determine that each EndoWrist instrument "repair" by Restore (and their distributors and agents) effectively displaced one new instrument sale by Intuitive. I base this determination on several observations. First, I understand that each "repair" entailed resetting the instrument's usage counter to zero, while leaving the counter limit unchanged.[33] Hence, a "repaired" device and a new device would allow the same number of uses.[34] Second, economic logic applied to the evidence here indicates that it is highly unlikely that in the relevant but-for world customers would have meaningfully changed their volume of da Vinci procedures from what they

---

[33]    Parker (5/4/2021) Dep. Tr. 210:6-16 ("Q. Okay. Does your technology permit the instrument in which it's installed to carry on through an unlimited number of surgical procedures? A. Well, technically, you could do that except the robot will not allow it so -- So, you know, there's an instrument is a ten-use instrument and you put 20 lives on it and you connect it to the robot, it's going to say I don't understand this. It's not going to work. So you can't put more lives on it than the original manufacturer set the robot to recognize.").

[34]    The initial reset of the usage counter using the Interceptor chip requires one remaining use on the EndoWrist instrument. Restore-00000970, at -981; Restore-00022922 (Parker Exhibit 2), at -923. *See also*, Papit (6/2/2021) Dep. Tr. 75:22-76:3 ("Q. What's the difference that you're -- what's the difference between the 29 and the 20? Let me just explain why I'm a little confused. You get the EndoWrist, and it needs to have one life left on it for the Interceptor to work, right? A. Just the first time."). Thus, customers effectively lost one use of the EndoWrist instrument prior to the first reset. In Appendix B, I present an alternative lost profits calculation that accounts for the possibility of shortened instrument lives.

performed in the actual world.[35] One principal reason for this is that the time period over which Restore (and their distributors and agents) sold EndoWrist "repairs" to individual healthcare providers (i.e., July 2018 through July 2020) was short – in many instances, healthcare providers made only 1-2 purchases from Restore, and among healthcare provider customers with more than 2 transactions, the period over which Restore interacted with the healthcare provider customers lasted from 4 to 15 months.[36]

35.     I obtain Intuitive's but-for prices by matching (i) a Restore ship-to customer, (ii) an Intuitive instrument identifier, and (iii) a year to the corresponding prices from the Intuitive sales data. Appendix A contains a detailed discussion of the Intuitive sales data and my treatment of them.

36.     Precise matching between Restore and Intuitive for the instrument and the year is straightforward. In most cases, the Restore transaction includes a 6-digit Intuitive product ID for the instrument that was "repaired." Where the product ID is not present, the Restore transaction includes an Intuitive instrument name that uniquely identifies the instrument.

37.     In many cases, customer names can be matched as well, because certain keywords in the Restore customer names match a single customer in the Intuitive sales data. However, in some cases, a Restore customer only can be matched to a group of Intuitive customers.[37] In one case, no matching Intuitive customer can be found. This unmatched Restore customer, R2

---

[35]     I am aware of no evidence that the availability of Restore's "repair" services caused any customer to perform more da Vinci surgeries than the customer otherwise would have performed in a but-for world in which Restore's services did not exist, and the customer would have been required to purchase a new EndoWrist instrument after reaching the usage limit for that instrument.

        This does not imply that customers are insensitive to changes in the price of EndoWrist instruments, particularly over longer time periods.

[36]     Workpaper '5. Lost Profits\output\Transaction Data Checks.csv'. Of the 10 matched Restore ship-to customers, 4 made more than two purchases of "repair services" (as measured by the number of unique invoices). Workpaper '5. Lost Profits\output\Transaction Data Checks.csv'. The unmatched Restore customer appears to be a distributor and so its purchases provide little insight into individual healthcare providers' purchasing patterns.

[37]     This is typically the case when the Restore ship-to customer is part of a hospital system that is an Intuitive customer, but the ship-to facility itself is not a distinct Intuitive customer.

Surgical/Medco Blue, is an apparent distributor.[38] Appendix A describes how I matched each of the Restore healthcare customers to their counterparts in Intuitive's sales data.

38.     For each matched Restore customer and instrument, I compute Intuitive's but-for price as the quantity-weighted average net price observed for transactions with the matched Intuitive customer(s) involving that instrument in that year. Of 91 Restore transactions involving matched Restore customers, I compute prices for all but 8 transactions in this way.[39] For the remaining 8 transactions, Intuitive sold the same instruments to the relevant customers in other years, and the prices for those sales were the same in each year. Accordingly, for these 8 remaining transactions, I use prices for the same instrument/customer combination in a different year to estimate the missing prices.

39.     For Restore's apparent distributor customer, no precise customer match can be found in the Intuitive sales data. For this customer, I compute the Intuitive but-for price as the quantity-weighted average net price of all Intuitive transactions involving that instrument in that year.[40]

40.     Intuitive's lost revenues for instrument sales are equal to the Restore quantities times the but-for Intuitive net prices described above. As seen in Table 4, these lost revenues total approximately $344,065.

---

[38]     "About Us – R2 Surgical," R2 Surgical, accessed August 10, 2021, https://r2surgical.com/pages/about-us; "About Us – Medco Blue," Medco Blue, accessed August 10, 2021, https://medcoblue.com/about-us/. R2 Surgical and Medco Blue share an address, so I treat them as a single entity. *See* "Contact Us – R2 Surgical," R2 Surgical, accessed August 10, 2021, https://r2surgical.com/pages/contact-us; "About Us – Medco Blue," Medco Blue, accessed August 10, 2021, https://medcoblue.com/about-us/. The Restore sales data include other apparent distributor customers, but the ultimate healthcare provider customer is identified in the ship-to address.

[39]     In addition, one instrument, with ID 420209, has no matching price in the relevant time period because Intuitive did not sell that instrument to any customer after October 2017. I exclude this transaction from consideration, conservatively assuming zero lost profits to Intuitive from its sale.

[40]     As shown in Appendix B, my lost profits calculations for healthcare provider customers are materially unchanged if I replace customer-specific prices with national quantity-weighted average prices. Therefore, I would expect my lost profits calculations for distributor customers to be similarly unaffected if I were to replace national quantity-weighted average prices with customer-specific prices.

41.     None of the Restore customers appear to have had rebate agreements with Intuitive that would have reduced the effective unit price below the but-for Intuitive net prices.[41] Additionally, the Intuitive sales data do not reveal any transactions after 2018 with sales quantity equal to zero for instruments or accessories for the matched Restore customers that would indicate rebates.[42]

### (2)   Da Vinci System "Repairs"

42.     I conservatively estimate that each dollar of Restore's da Vinci system "repair" income displaced the equivalent amount of system repair income by Intuitive. This estimate is based on the observations that (i) Restore advertised itself as a cheaper alternative to Intuitive for system repairs,[43] and (ii) the Restore customers' decision to purchase from Restore would be irrational unless they had expected to spend at least as much with Intuitive in the but-for world.[44] As seen in Table 4, Intuitive's lost revenues for these transactions are $36,581.

### (3)   Preventive Maintenance Contracts

43.     I conservatively estimate that each dollar of Restore's preventive maintenance income displaced the equivalent amount of preventive maintenance income by Intuitive. This estimate is based on the observations that (i) Restore advertised itself as a cheaper alternative to Intuitive for preventive maintenance,[45] and (ii) the Restore customer's decision to purchase from Restore would be irrational unless the customer had expected to spend at least as much with Intuitive in

---

[41]     Intuitive-00701739, Intuitive-00701743, Intuitive-00701744, Table 5. Intuitive did have a rebate agreement with the Baylor Scott & White hospital system. However, this agreement covered instrument and accessory purchases only. Intuitive-00701739. Baylor Surgicare at North Dallas, the only Baylor entity that purchased instrument "repair" services from Restore (and, hence, from whom Intuitive lost instrument and accessories revenues) is not on the agreement's list of "eligible buyers." Intuitive-00701739.

[42]     Workpaper '5. Lost Profits\output\Transaction Data Checks.csv'.

[43]     See, e.g., Restore-00022922 (Parker Exhibit 2), at -927.

[44]     Likewise, the Restore customers' decision to purchase from Restore would be irrational if the Restore customers were under contracts that allowed them to obtain the same service from Intuitive for free or a lesser amount.

[45]     See, e.g., Restore-00022922 (Parker Exhibit 2), at -927.

the but-for world.[46] As seen in Table 4, Intuitive's lost revenues for these transactions are $615,000.

### c.   *Intuitive Contribution Margins*

44.     I obtained Intuitive's contribution margins for the years 2017 through 2020 from a document that I understand to have been prepared in the ordinary course of Intuitive's business.[47] This document provides annual contribution margins, separately for "Systems," "I&A," and "Services." I use the values reported for 2018 (82.5 percent for services and 73.8 percent for I&A), 2019 (81.6 percent for services and 75.1 percent for I&A), and 2020 (82.9 percent for services and 75.3 percent for I&A), the years of Restore's challenged sales.

45.     In determining lost profits, it would be appropriate to deduct costs that Intuitive avoided in the actual world, but would have incurred in the but-for world in connection with making sales that would have occurred absent the challenged conduct. Economic logic applied to the evidence in this case indicates that Intuitive's operating expenses—comprising (i) selling, general, and administrative expenses and (ii) research and development expenses—would not have meaningfully changed in the but-for world.[48] Intuitive's lost revenues from instrument sales in 2019 represent only a small fraction, 0.008 percent, of its instrument and accessories revenues in that year.[49] Similarly, Intuitive's lost services revenues (system repairs and preventive maintenance contracts) represent 0.09 percent of its services revenues in 2019.[50] Operating expenses are unlikely to meaningfully change with such small incremental increases in

---

[46]     Likewise, the Restore customers' decision to purchase from Restore would be irrational if the Restore customers were under contracts that allowed them to obtain the same service from Intuitive for free or a lesser amount.

[47]     Intuitive-00595405.

[48]     Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 66. To the degree that these expenses are included in Intuitive's contribution margins, my lost profits calculations will understate Intuitive's actual losses.

[49]     Intuitive reported $2.4 billion in global instrument and accessory revenue for 2019. Intuitive earned 70 percent of its 2019 revenues (across all lines of business) in the U.S. (Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 47.) Intuitive's lost revenues in 2020 represent a smaller percentage of its 2020 global instrument and accessory sales ($2.5 billion). (Table 4; Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 47.)

[50]     Intuitive reported $724.2 million in global services revenue for 2019. Intuitive's lost revenues in 2020 represent a smaller percentage of its 2020 global services revenues ($723.8 million). (Table 4; Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 47.)

Intuitive's revenues. Hence, I do not deduct any such costs from my calculation of Intuitive's lost profits.

### d.    *Intuitive Lost Profits*

46.    As seen in Table 4, Intuitive's lost profits are $790,306.

**Table 4: Intuitive Lost Profits on Restore's Challenged Transactions**

| | | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| | | [A] | [B] | [C] | [D] = [A] + [B] + [C] |
| But-For Net Revenues from Restore Robotics Instrument "Repairs" | [1] | $   35,900 | $   199,865 | $   108,300 | $   344,065 |
| Contribution Margin For Instrument "Repairs" (%) | [2] | 73.75% | 75.12% | 75.30% | |
| **Contribution Margin For Instrument "Repairs"** | **[3]** | **$   26,477** | **$   150,133** | **$   81,550** | **$   258,161** |
| | | | | | |
| But-For Net Revenues from Restore Robotics Preventive Maintenance Contracts | [4] | $   - | $   615,000 | $   - | $   615,000 |
| Contribution Margin For Preventive Maintenance Contracts (%) | [5] | 82.50% | 81.64% | 82.87% | |
| **Contribution Margin For Preventive Maintenance Contracts** | **[6]** | **$   -** | **$   502,113** | **$   -** | **$   502,113** |
| | | | | | |
| But-For Net Revenues from Restore Robotics System "Repairs" | [7] | $   - | $   23,106 | $   13,475 | $   36,581 |
| Contribution Margin For System "Repairs" (%) | [8] | 82.50% | 81.64% | 82.87% | |
| **Contribution Margin For System "Repairs"** | **[9]** | **$   -** | **$   18,865** | **$   11,167** | **$   30,032** |
| | | | | | |
| **Total But-For Net Revenues** | **[10]** | **$   35,900** | **$   837,971** | **$   121,775** | **$   995,646** |
| **Total Contribution Margin** | **[11]** | **$   26,477** | **$   671,111** | **$   92,717** | **$   790,306** |

Sources and Notes:

1. From workpaper '5. Lost Profits\Table 4.xlsx'.

2. Transactions span July 11, 2018 to December 28, 2020

[1],[4],[7]: Restore Robotics quantity sold*Intuitive price

[2],[5],[8]: Intuitive contribution margin (%) for the corresponding Intuitive category

[3]: [1]*[2]

[6]: [4]*[5]

[9]: [7]*[8]

[10]: [1]+[4]+[7]

[11]: [3]+[6]+[9]

**IV.     CONCLUSION**

47.     It is my opinion that the amount of Restore's profits to be disgorged is $886,786 and the amount of Intuitive's lost profits is $790,306.


Loren K. Smith, Ph.D.

August 20, 2021

## APPENDIX A.        DATA

### 1.    RESTORE'S SALES DATA

48.    I rely on documents produced by Restore that are represented to contain all of Restore's transactions related to da Vinci systems or EndoWrist instruments through December 31, 2020. The data cover the period from July 11, 2018 through December 28, 2020,[51] and they include the following fields:

- Type: equal to "Invoice" for all transactions;

- Date;

- Num: an apparent invoice number;

- Name: an apparent customer name;

- Name Address: an address that appears to be a bill-to address;

- Memo: text field describing a product or service;

- Item: contains additional information describing the transaction;

- Qty: the apparent quantity;

- Sales Price;

- Amount: equal to Qty times Sales Price; and

- Ship To Address;

- Service Type: one of "PM," "Purchase," "Repair," "Robot Repair," "Sell to CPR."[52]

---

[51]    Restore-00055935; Restore-00055937; Email message from Jeffrey Berhold to Michael Menitove, "RE: Restore v. Intuitive – Restore production," June 18, 2021.

[52]    I refer to transactions that Restore has categorized as "Purchase" as sales of second-hand instruments, as I understand that all U.S. sales of new Intuitive instruments occur exclusively through Intuitive's own sales organization. Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020, at p. 11. I assume that Restore sold these instruments without modifying the usage counters. This appears to be so for at least some of Restore's instrument sales. For example, Restore reports sales of 8 units of "REF 410298 (Intuitive Surgical Stapler 45 14mm)," with the memo field indicating 30 to 49 "uses." Restore-00055937. That product has 50 "firings" when new. Rebotix001387, at -1404.

49.     For instrument-related transactions, the Item field generally includes a 6-digit code and description of an Intuitive instrument, for example:

- "REF 420093 (ProGrasp Forceps)";

- "REF 420194 (Mega Needle Driver)"; and

- "REF 420172 (Maryland Bipolar Forceps)".

Based on a comparison of the product descriptions in the parties' sales data, the 6-digit codes in Restore's sales data appear to correspond to Intuitive's identifiers for the same products.

50.     The "Service Type" field appears only in one of the two sources of Restore's sales data: Restore-00055937. For the other (Restore-00055935), I categorize instrument-related transactions as either "repairs" or second-hand instrument sales as follows:

- If the "Memo" or "Item field" indicates that the instrument is unused (e.g., "new out of box"), then I categorize the transaction as a second-hand instrument sale.

- For the remaining transactions, if the same instrument-price combination appears in Restore-00055937 and uniquely identifies either a "repair" or a second-hand instrument sale, then I categorize the transaction in Restore-00055935 in the same way.

- For the remaining transactions, if the same instrument-price combination appears in the transactions data for Clif Parker Robotics LLC,[53] I categorize the transaction as a second-hand instrument sale, as I understand that Clif Parker Robotics LLC performed no EndoWrist instrument "repairs."[54]

- I conservatively exclude from consideration any transactions that remain uncategorized after the foregoing steps.[55]

---

[53]   Restore-00055938.

[54]   I understand that Restore counsel has represented that Clif Parker LLC's only EndoWrist-related transactions are sales of second-hand instruments. Email message from Jeffrey Berhold to Michael Menitove, "RE: Restore v. Intuitive – Restore production," June 18, 2021. *See also,* May (5/6/2021) Dep. Tr. 14:25-15:2 ("Q. What does Clif Parker Robotics do? A. Clif Parker Robotics sells used medical equipment.").

[55]   Restore's revenues on these excluded transactions were $62,155. Workpaper '1. Restore Transactions Data\Restore Transactions Data Categorized.xlsx'.

51.     I exclude from consideration two transactions that Restore has categorized as instrument "repairs" but for which the Memo field indicates "no repair no charge." I also exclude one transaction that Restore has categorized as an instrument "repair" transaction for which the Memo field indicates "Warranty repair no charge."

### 2.     INTUITIVE I&A SALES DATA

52.     I rely on data produced by Intuitive that cover "all worldwide sales for instruments and accessories from January 2013 through March 2021."[56] These data include the following fields:

- Posting Date: date of data referenced;[57]

- Comp Code: selling legal entity;[58]

- Customer: "Code identifying [a] specific customer";[59]

- Customer Name: text field corresponding to the customer code;[60]

- Ship-to Party: "Code identifying shipping information";[61]

- Ship-to Party Name: "Customer name or identifying code";[62]

- SO Item: line number within a particular sales order;[63]

---

[56]     Intuitive-00695234, Intuitive-00695144, Intuitive-00595436, Intuitive-00595435, Intuitive-00595434, Intuitive-00595406, Intuitive-00595407, Intuitive-00595408, Intuitive-00595409, Intuitive-00595410, Intuitive-00595411, Intuitive-00595412, Intuitive-00595413, Intuitive-00695233, Intuitive-00595415, Intuitive-00595416, Intuitive-00595417, Intuitive-00595418, Intuitive-00595419, Intuitive-00595420, Intuitive-00595421, Intuitive-00595422, Intuitive-00595423, Intuitive-00595424, Intuitive-00595425, Intuitive-00595426, Intuitive-00595427, Intuitive-00695232, Intuitive-00595428, Intuitive-00701322; Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021.

[57]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[58]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[59]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2. *See also*, Intuitive Surgical, Inc. Responses to Restore's Data Questions, July 9, 2021, at p. 4.

[60]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[61]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[62]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[63]     Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

- Product: "Code identifying the product sold";[64]

- Material Description: text field that "identifies the item sold,"[65] e.g., "STAPLER,SUREFORM 60,SPU,BOX OF 6,IS4000";

- Sales Qty: quantity sold;[66]

- Unit: values include "BOX," "EA," "FT," "ROL," and "USE";[67]

- Currency: currency in which customer paid;[68]

- Net Sales: "Total net sales, subtracting discounts from gross sales";[69]

- Net Price per Qty: "Net sales by currency divided by the quantity of product sold (i.e., the value in the field 'Net Sales by Curr' divided by the value in the field 'Sales Qty')";[70]

53.    Sales records with negative values may represent returns, credits, or other adjustments such as rebates.[71] Sales records with Sales Qty equal to zero pertain to "adjustments separate from a sale, such as rebates or contractual credit memos."[72]

### 3.    MATCHING RESTORE'S CUSTOMERS TO INTUITIVE CUSTOMERS

54.    Restore's sales data contain 11 unique ship-to customers for challenged EndoWrist instrument "repair" transactions.[73] I matched Restore's customer names to a list of more than

---

[64]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[65]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[66]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2. *See also*, Intuitive Surgical, Inc. Responses to Restore's Data Questions, July 9, 2021, at pp. 4-5.

[67]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 2.

[68]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 3.

[69]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 3. *See also*, Intuitive Surgical, Inc. Responses to Restore's Data Questions, July 9, 2021, at p. 5.

[70]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 3.

[71]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 4. *See also*, Intuitive Surgical, Inc. Responses to Restore's Data Questions, July 9, 2021, at pp. 4-5.

[72]    Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 4.

[73]    Table 5. I merge some Restore customers for purposes of price matching. Generally, this is because the merged Restore customers are affiliated with each other and must be combined in order to obtain an

3,000 unique customer names from the Intuitive sales data using the *agrepl* string matching function in R.[74] This function searches for approximate matches for a specified keyword within a target character string using the generalized Levenshtein edit distance.[75] I used the default distance of 0.1 and set the argument "ignore case" to "TRUE."[76] For each Restore customer name, the function returned a list of candidate matches. From this list, I eliminated obvious mismatches by visual comparison. Examples of such mismatches are:

- "VASSAR BROTHERS MEDICAL CENTER - NY" for "Trinity Mother Frances" (keywords: "Trinity" or "Mother" or "Frances");

- "ROCKLAND AND BERGEN SURGERY CENTER" for "K and B Surgical" (keywords: "K and B" or "K&B"); and

- "GLENDALE ADVENTIST MEDICAL CENTER -" for "R2 Surgical / Medco Blue" (keyword: "R2" or "Medco").[77]

55.     From the remaining list of match candidates, I identified the matching Intuitive customers using information from the case record and public sources. Most candidate matches were excluded by comparing the ship-to address of the Restore customer (from Restore's sales data) with the Intuitive customer's address (either the state obtained from the Intuitive customer name or the customer street address obtained from a web search).[78]

---

unambiguous match to the Intuitive sales data. *See* workpaper '4. Disgorgement\Table 1 to 3.xlsx'. Matching is only necessary for EndoWrist instrument "repair" transactions because I conservatively assume for the other challenged transactions that Intuitive's lost revenues equal Restore's revenues.

[74]    Customers of the U.S. legal entity as indicated by "Comp Code."

[75]    "Agrep: Approximate String Matching (Fuzzy Matching)," RDocumentation, accessed July 10, 2021, https://www.rdocumentation.org/packages/base/versions/3.6.2/topics/agrep.

[76]    "Agrep: Approximate String Matching (Fuzzy Matching)," RDocumentation, accessed July 10, 2021, https://www.rdocumentation.org/packages/base/versions/3.6.2/topics/agrep.

[77]    *See* workpaper '3. Customer Matching/research/Stage 1 - Customer Matching Research.xlsx', tab 'Customer Matching Criteria 0.1'.

[78]    The rationale for accepting or rejecting each candidate match is contained in workpaper 'Hospital3. Customer Matching Detail'/research/Stage 1 - Customer Matching Research.xlsx', tab 'Customer Matching Criteria 0.1'.

56.     To test the robustness of my name-matching procedure, I obtained a larger set of candidate matches by using the Levenshtein edit distance value of 0.2. The incremental candidate matches yielded no new matches. This, along with the extreme discrepancy between many of the candidate matches and Restore's customer names, indicates that the matching algorithm likely captured all Intuitive customers of the same name, including misspelled ones.[79]

57.     For the Intuitive customers matched by name, I additionally searched for other Intuitive customer names that had a common Intuitive "Customer" identifier but were not found via string matching. I found none.

58.     Table 5 lists the Restore customer name, the corresponding keyword searched, the number of candidate matches returned, and the number of matching Intuitive customers found.

**Table 5: Keywords and Match Statistics**

| Restore Ship To Customer | | Keyword | Levenshtein Distance of 0.1 | | Levenshtein Distance of 0.2 | |
|---|---|---|---|---|---|---|
| | | | Candidate Matches | Matches | Candidate Matches | Matches |
| Baylor Surgicare at North Dallas | [1] | Surgicare | 3 | 2 | 47 | 2 |
| Central Washington Hospital & Clinics Campus (Medline Industries Inc) | [2] | Medline or Washington | 17 | 1 | 24 | 1 |
| CHI Conway Regional Medical Center | [3] | Conway | 4 | 1 | 7 | 1 |
| K and B Surgical Center | [4] | K and B or K&B | 3 | 1 | 24 | 1 |
| Lowell General Hospital | [5] | Lowell | 3 | 1 | 29 | 1 |
| Otsego Memorial Hospital (Medline Industries Inc) | [6] | Otsego or Medline | 1 | 1 | 12 | 1 |
| Pacific Coast Surgical Center | [7] | Pacific | 4 | 1 | 4 | 1 |
| Panama CIty Surgery Center | [8] | Panama | 1 | 1 | 26 | 1 |
| R2 Surgical / Medco Blue | [9] | R2 or Medco | 2,689 | 0 | 2,689 | 0 |
| Riverside Medical Center | [10] | Riverside | 12 | 1 | 17 | 1 |
| Trinity Mother Frances | [11] | Trinity or Mother or Frances | 71 | 4 | 119 | 4 |
| **Total** | [12] | | **2,808** | **14** | **2,998** | **14** |

Sources and Notes:
From workpaper '3. Customer Matching\research\Stage 1 - Customer Matching Research.xlsx'.
[12]: Sum of rows [1] through [11]

---

[79]     Further, as seen in Appendix B, the effect of any missed matches is likely to be relatively small, as my calculations of Intuitive's lost profits from the matched Restore customers is virtually unchanged if I replace customer-specific prices with national-average ones.

### 4.   ASSIGNING BUT-FOR PRICES TO THE RESTORE TRANSACTIONS

59.   I obtain customer-specific net prices for the instruments "repaired" by Restore from the Intuitive sales data by the following procedure:

- *Exclude non-U.S. sales*: U.S. sales are defined as "sales made by the Intuitive US registered company, which is Intuitive Surgical, Inc."[80] U.S. sales are indicated by Company Code 2000, except in 2012, when they are indicated by the combination of Company Code 3000 and Currency equal to "USD".[81]

- *Exclude zero- or negative-valued transactions*. Because negative quantities or dollar amounts may represent returns, credits, or other adjustments,[82] they may be misleading indicators of an instrument's net selling price. Similarly, because records with Sales Qty equal to zero pertain to "adjustments separate from a sale, such as rebates or contractual credit memos,"[83] they do not represent typical selling prices. Therefore, I exclude line items with zero- or negative-valued quantities.

- *Exclude internal sales.* I exclude transactions with customer names including the words "internal" or "Intuitive."

- *Exclude instrument sales that are measured per box or use.* I exclude transactions with units that are "USE" or "BOX".

- *Exclude training instruments*. I understand that product codes with the suffix "-T" are sold for training purposes.[84]

- *Match prices to Restore healthcare provider customers and products.* I calculate the Intuitive net price for each matched Restore customer, product, and year as total Intuitive

---

[80]   Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 4.

[81]   Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 4.

[82]   Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 4.

[83]   Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021, at p. 4.

[84]   Intuitive-00701322. Training instruments also appear in the Intuitive I&A sales data with other signifiers, but not for the product codes at issue here.

net sales divided by total quantity for that product and year for all Intuitive customers matched to the Restore customer. I match Restore's 6-digit product codes to the first 6 digits of the 8-digit Intuitive codes.[85]

- *Match prices to Restore's apparent distributor customer and products.* I calculate the Intuitive net price for each 6-digit product and year as total Intuitive net sales divided by total quantity for that product and year for all Intuitive customers.

## APPENDIX B.        ALTERNATIVE CALCULATIONS

### 1.    Lost Profits with Alternative Price Imputation

60.     Table 4 presents my calculation of Intuitive's but-for revenues using customer-specific prices for the matched Restore customers. Table 6 below presents an alternative calculation of Intuitive's but-for revenues, using national quantity-weighted average prices (by product and year) for all EndoWrist instrument "repair" transactions. As can be seen in the table, Intuitive's lost profits under this alternative calculation differ by $8 from those presented in Table 4.

---

[85]     I exclude the one EndoWrist instrument "repair" transaction for which no instrument name or number is provided.

**Table 6: Intuitive Lost Profits on Restore's Sales of EndoWrist "Repairs"**
**(National Average Prices)**

|  |  | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
|  |  | [A] | [B] | [C] | [D] = [A] + [B] + [C] |
| But-For Net Revenues from Restore Robotics Instrument "Repairs" | [1] | $  35,888 | $  199,925 | $  108,263 | $  344,076 |
| Contribution Margin For Instrument "Repairs" (%) | [2] | 73.75% | 75.12% | 75.30% |  |
| **Contribution Margin For Instrument "Repairs"** | **[3]** | **$  26,469** | **$  150,178** | **$  81,523** | **$  258,169** |
| But-For Net Revenues from Restore Robotics Preventive Maintenance Contracts | [4] | $  - | $  615,000 | $  - | $  615,000 |
| Contribution Margin For Preventive Maintenance Contracts (%) | [5] | 82.50% | 81.64% | 82.87% |  |
| **Contribution Margin For Preventive Maintenance Contracts** | **[6]** | **$  -** | **$  502,113** | **$  -** | **$  502,113** |
| But-For Net Revenues from Restore Robotics System "Repairs" | [7] | $  - | $  23,106 | $  13,475 | $  36,581 |
| Contribution Margin For System "Repairs" (%) | [8] | 82.50% | 81.64% | 82.87% |  |
| **Contribution Margin For System "Repairs"** | **[9]** | **$  -** | **$  18,865** | **$  11,167** | **$  30,032** |
| **Total But-For Net Revenues** | **[10]** | **$  35,888** | **$  838,031** | **$  121,738** | **$  995,657** |
| **Total Contribution Margin** | **[11]** | **$  26,469** | **$  671,156** | **$  92,689** | **$  790,314** |

Sources and Notes:
1. From workpaper '5. Lost Profits\Table 6.xlsx'.
2. Transactions span July 11, 2018 to December 28, 2020
[1],[4],[7]: Restore Robotics quantity sold*Intuitive price
[2],[5],[8]: Intuitive contribution margin (%) for the corresponding Intuitive category
[3]: [1]*[2]
[6]: [4]*[5]
[9]: [7]*[8]
[10]: [1]+[4]+[7]
[11]: [3]+[6]+[9]

## 2.   LOST PROFITS ACCOUNTING FOR DISCARDED INSTRUMENT USES

61.    As discussed above, the initial reset of the usage counter using an Interceptor chip requires that one use remain on the EndoWrist instrument.[86] Thus, customers effectively discard one (paid) use of the EndoWrist instrument when purchasing an initial "repair" from Restore. When crediting that initial "repair" to Intuitive in the form of an instrument sale in the but-for world, the first use of the but-for instrument could be construed as substituting for the discarded

---

[86]      Restore-00000970, at -981; Restore-00022922 (Parker Exhibit 2), at -923. *See also*, Papit (6/2/2021) Dep. Tr. 75:22-76:3 ("Q. What's the difference that you're -- what's the difference between the 29 and the 20? Let me just explain why I'm a little confused. You get the EndoWrist, and it needs to have one life left on it for the Interceptor to work, right? A. Just the first time.").

use. However, the discarded use would not occur in the but-for world—e.g., in the but-for world, an instrument with a usage limit of ten would be used ten times, rather than provided to Restore after nine uses (leaving the tenth use "discarded"). Therefore, the revenue attributable to the but-for instrument's first use could be interpreted as revenue that Intuitive would not have earned in the but-for world.

62.     The instruments "repaired" by Restore can be used at least 10 times each.[87] Thus, a reduction of 10 percent in Intuitive's but-for revenues on initial "repairs" by Restore would exclude revenue potentially attributable to the discarded use. Such an adjustment applies only to initial "repairs," because I understand that, after the initial reset, subsequent resets could be performed on instruments that had reached the counter limit.[88] However, Restore's sales data do not permit me to distinguish initial "repairs" from later "repairs" to the same instrument. Therefore, I apply the 10 percent reduction to all of Intuitive's but-for revenues for Restore's EndoWrist instrument "repairs." As shown in Table 7, doing so would reduce Intuitive's lost profits from $790,306 to $764,490.

---

[87]     Table 1; Rebotix001387.pdf. *See also* "Da Vinci X/Xi Instrument & Accessory Catalogue," Intuitive, March 2021, accessed July 25, 2021, https://www.intuitive.com/en-gb/-/media/Project/Intuitive-surgical/files/pdf/da-vinci-x-xi-instrument-accessory-catalogue-europe.pdf?la=en-GB&hash=9D6F575394160A0A057B3C204B7DC51B.

[88]     Restore-00000970, at -981; Restore-00022922 (Parker Exhibit 2), at -923. *See also*, Papit (6/2/2021) Dep. Tr. 75:22-76:3 ("Q. What's the difference that you're -- what's the difference between the 29 and the 20? Let me just explain why I'm a little confused. You get the EndoWrist, and it needs to have one life left on it for the Interceptor to work, right? A. Just the first time.").

**Table 7: Intuitive Lost Profits on Restore's Challenged Transactions**
**Accounting for Discarded Instrument Uses**

| | | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| | | [A] | [B] | [C] | [D] = [A] + [B] + [C] |
| But-For Net Revenues from Restore Robotics Instrument "Repairs" | [1] | $    32,310 | $   179,878 | $    97,470 | $       309,658 |
| Contribution Margin For Instrument "Repairs" (%) | [2] | 73.75% | 75.12% | 75.30% | |
| **Contribution Margin For Instrument "Repairs"** | **[3]** | **$    23,830** | **$   135,120** | **$    73,395** | **$       232,345** |
| But-For Net Revenues from Restore Robotics Preventive Maintenance Contracts | [4] | $          - | $   615,000 | $          - | $       615,000 |
| Contribution Margin For Preventive Maintenance Contracts (%) | [5] | 82.50% | 81.64% | 82.87% | |
| **Contribution Margin For Preventive Maintenance Contracts** | **[6]** | **$          -** | **$   502,113** | **$          -** | **$       502,113** |
| But-For Net Revenues from Restore Robotics System "Repairs" | [7] | $          - | $    23,106 | $    13,475 | $        36,581 |
| Contribution Margin For System "Repairs" (%) | [8] | 82.50% | 81.64% | 82.87% | |
| **Contribution Margin For System "Repairs"** | **[9]** | **$          -** | **$    18,865** | **$    11,167** | **$        30,032** |
| **Total But-For Net Revenues** | **[10]** | **$    32,310** | **$   817,985** | **$   110,945** | **$       961,240** |
| **Total Contribution Margin** | **[11]** | **$    23,830** | **$   656,098** | **$    84,562** | **$       764,490** |

Sources and Notes:

1. From workpaper '5. Lost Profits\Table 7.xlsx'.

2. Transactions span July 11, 2018 to December 28, 2020

[1]: Restore Robotics quantity sold*Intuitive price*0.9, applied to Restore Robotics related transactions for the given category

[4],[7]: Restore Robotics quantity sold*Intuitive price

[2],[5],[8]: Intuitive contribution margin (%) for the corresponding Intuitive category

[3]: [1]*[2]

[6]: [4]*[5]

[9]: [7]*[8]

[10]: [1]+[4]+[7]

[11]: [3]+[6]+[9]

**APPENDIX C.        INTUITIVE SALES TRENDS**

63.      The figures below depict, for each matched Restore customer, Intuitive's actual net revenues from the specific product codes corresponding to the EndoWrist models "repaired" by Restore (dark blue bars) for that customer and, where applicable, Intuitive's but-for revenues on units "repaired" by Restore (light blue bars).[89] Values for 2021 are annualized, based on Q1 2021 amounts, and are shaded to distinguish them from historical sales in the other years.

---

[89]      *See* workpaper '6. Trends Analysis'.

### Baylor Surgicare at North Dallas



### Central Washington Hospital



### CHI Conway Regional Medical Center



### Lowell General Hospital



### OTSEGO Memorial Hospital



### Pacific Coast Surgical Center



34



# EXHIBIT A

# Smith Curriculum Vitae

# Loren K. Smith

Principal and Practice Co-Leader of Global Antitrust & Competition
The Brattle Group
1800 M St NW
Suite 700 North
Washington, DC 20036
202-419-3354

## EDUCATION

| | |
|---|---|
| January 2006 | University of Virginia, Ph.D. in Economics |
| May 2001 | University of Virginia, M.A. in Economics |
| December 1996 | Mississippi State University, B.B.A. in Marketing, *Magna Cum Laude* |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| April 2020–Present | Principal, The Brattle Group, Washington, DC |
| April 2016–March 2020 | Executive Vice President, Compass Lexecon, Washington, DC<br>Senior Vice President, April 2014 – March 2016<br>Vice President, April 2013 – March 2014 |
| September 2005–March 2013 | Staff Economist, U.S. Federal Trade Commission, Washington, DC |
| June 2002–May 2005 | Instructor, University of Virginia, Charlottesville, VA<br>*Courses:* Intermediate Microeconomics |
| September 1999–May 2001 | Teaching Assistant, University of Virginia, Charlottesville, VA<br>*Courses:* Principles of Microeconomics, Principles of Macroeconomics, Graduate Math-Economics, Graduate Econometrics, Intermediate Microeconomics<br>Research Assistant, University of Virginia, Charlottesville, VA<br>Edgar Olsen, Charles Holt |

## FIELDS OF SPECIALIZATION

Antitrust and Competition Economics
Applied Microeconomics
Industrial Organization
Applied Econometrics

**TESTIMONY**

Testimony as Economic Expert on behalf of the Federal Trade Commission, In Re: *Federal Trade Commission and Commonwealth of Pennsylvania v. Thomas Jefferson University and Albert Einstein Healthcare Network*, In the Eastern District Court of Pennsylvania, Case No. 2:20-cv-01113-GJP, Deposition: August 26, 2020; Trial: September 15 and 16, and October 1, 2020.

**REPORTS**

Expert Report of Loren K. Smith, PhD, In Re: *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, In the United States District Court Middle District of Florida Tampa Division, Case No. 8:20-cv-02274; July 26, 2021.

"Brief of Antitrust Economists as Amici Curiae in Support of Defendants-Appellants Urging Reversal," In the United States Court of Appeals for the Sixth Circuit; St. Luke's Hospital et al., v. ProMedica Health System, Inc. et al.; On Appeal from the United States District Court for the Northern District of Ohio; No. 3:20-cv-02533; March 1, 2021.

Expert Reports of Loren K. Smith, In Re: *Federal Trade Commission and Commonwealth of Pennsylvania v. Thomas Jefferson University and Albert Einstein Healthcare Network*, In the Eastern District Court of Pennsylvania, Case No. 2:20-cv-01113-GJP, Report: July 23, 2020, Rebuttal Report: August 20, 2020.

Expert Report of Loren K. Smith, In Re: *United States of America and the State of North Carolina v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, In the District Court of North Carolina, Case No. 3:16-cv-00311-RJC-DCK, October 5, 2018.

Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003, (with Beth Freeborn and Peter Vander Nat), December 2012.

**SELECTED CONSULTING WORK RELATED TO ANTITRUST INVESTIGATIONS**

Provided written and oral presentations to the U.S. Federal Trade Commission related to a proposed acquisition of a pipeline prescription pharmaceutical product (2020).

Presented and provided multiple written submissions to the U.S. Federal Trade Commission related to a proposed merger of two major hospital systems (2020).

Presented and provided multiple written submissions to the U.S. Federal Trade Commission related to a proposed merger of polyurethane foam manufacturers (2019).

Presented to the U.S. Federal Trade Commission related to a merger that, in part, proposed to combine existing and pipeline branded drugs with similar indications (2019).

Presented and provided a written submission to the U.S. Federal Trade Commission related to

the proposed merger of branded pharmaceutical manufacturers (2019).

Presented to the U.S. Federal Trade Commission related to a proposed hospital merger (2018).

Submitted a white paper and gave a presentation to the U.S. Federal Trade Commission related to a proposed merger of factory-built home manufacturers (2018).

Presented to the U.S. Federal Trade Commission related to a proposed merger of food manufacturers (2017).

Presented to the U.S. Federal Trade Commission related to a proposed merger of personal and home cleaning manufacturers (2017).

Presented to the U.S. Department of Justice related to accusations of anticompetitive exclusionary conduct against a hospital system (2017).

Provided economic and econometric analysis of alleged damages, the results of which were used in a mediation that reached a favorable settlement (2016–2017).

Submitted a coauthored white paper and participated in presentations to the U.S. Federal Trade Commission related to accusations of anticompetitive exclusionary conduct against a manufacturer of medical device inputs (2015-2016).

Gave multiple presentations to the U.S. Federal Trade Commission related to a proposed merger of retail chains (2014).

Provided economic analysis related to the proposed acquisition of two community hospitals. The results were submitted to the U.S. Federal Trade Commission (2014).

Developed empirical analyses that demonstrated a lack of competitive interaction with a proposed merger partner. The results were submitted to the U.S. Federal Trade Commission (2014).

Coauthored two white papers that were submitted to the U.S. Department of Justice related to a proposed hospital acquisition (2013).

Coauthored three white papers that were submitted to the U.S. Federal Trade Commission related to a proposed acquisition in the supermarket industry (2013).

Coauthored a white paper that was submitted to the U.S. Federal Trade Commission related to a proposed acquisition in the retail auto parts industry (2013).

As economic expert for the U.S. Federal Trade Commission, evaluated the likely competitive effects of a merger of data service providers (2011).

## LITIGATION SUPPORT WORK

In support of Robert Willig and with Bryan Keating, developed economic and econometric evidence, and assisted in the preparation of expert reports and testimony on behalf of the Defendants in Re: *UFCW & Employers Benefit Trust v. Sutter Health, et al.*, Case No. CSG 14-538451.

In support of Mark Israel and with Theresa Sullivan, developed economic and econometric evidence on behalf of the U.S. Federal Trade Commission in Re: *Federal Trade Commission et al. v. Draftkings, Inc. and FanDuel Limited*, Civil Action No. 17-cv-1195 (KBJ).

In support of Jonathan Orszag, developed economic theories and assisted in the preparation of an expert report and deposition testimony on behalf of Plaintiffs in Re: *Innovation Ventures, LLC v. Nutrition Science Laboratories, LLC et al.*, Case No. 2:12-cv-13850.

In support of Mark Israel and with Theresa Sullivan, developed merger simulations and assisted in preparation of expert reports and testimony on behalf of Defendants in Re: *U.S. and Plaintiff States v. Anthem and Cigna*, Civil Action No. 1:16-cv-01493.

In support of Robert Willig, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants in Re: *Methodist Health Services Corporation v. OSF Healthcare System*, Civil Action No. 1:13-dv-01054-SLD-JEH.

In support of Robert Willig and with Bryan Keating, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants in Re: *Federal Trade Commission and Commonwealth of Pennsylvania vs. Penn State Hershey Medical Center and PinnacleHealth System*, Civil Action No. 1:15-cv-02362.

In support of Mark Israel, developed economic and econometric evidence, and assisted in the preparation of expert reports and testimony on behalf of the U.S. Federal Trade Commission in Re: *Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp.*, Civil Action No. 15-cv-00256 (APM).

## PUBLICATIONS AND OTHER PUBLICLY AVAILABLE PAPERS

"The Competitive Implications of Private Label Mergers," (with Matt Schmitt), 2021, American Bar Association's *Antitrust Law Journal*, available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/publishing/antitrust_law_journal/alj-833/schmitt-smith.pdf

"Understanding the Econometric Tools of Antitrust – With No Math!" (with Michael Cragg and Charles Gibbons), 2021, American Bar Association's *Antitrust*, available at https://www.americanbar.org/groups/antitrust_law/publications/antitrust_magazine/2021/atmag-spring2021-vol35-no2/
(*Concurrences* and the George Washington University Law School's Competition Law Center 2021 Antitrust Writing Awards Winner – Best Business Articles: Economics)

"Clarifying Bundle Markets and Distinguishing Them from Cluster Markets" (with Kevin Hahm), 2021, American Bar Association's *The Antitrust Source,* available at https://www.americanbar.org/content/dam/aba/publishing/antitrust_source/2021/feb-2021/atsource-feb2021-full.pdf

"The Use of Econometrics in Merger Reviews" (with Christopher R. Rybak), 2020, American Bar Association's *Economics Committee Spring Newsletter*, available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/administrative/antitrust_law/aba-economics-committee-newsletter-spring2020.pdf

"Platforms, Entry, and Innovation,"(with Bryan Keating), 2019, Comment to Federal Trade Commission Hearings Announcement (Docket ID FTC-2019-0032), available at https://www.regulations.gov/document?D=FTC-2019-0032-0016

"Unilateral Effect Analysis of Health Care Markets," *Economics of Health Care Mergers & the Pharmaceutical Industry* (an ALHA Antitrust Practice Group Toolkit), 2019, available at https://www.healthlawyers.org/Members/PracticeGroups/Antitrust/Pages/default.aspx

"Do Retail Mergers Affect Competition? Evidence from Grocery Retailing," (with Dan Hosken and Luke M. Olsen), *Journal of Economics and Management Strategy*, Vol. 27, Iss. 1, pp. 3-22, Spring 2018.

"Toward a More Complete Treatment of Efficiencies in Merger Analysis: Lessons from Recent Challenges," (with Jonathan M. Orszag), *The Antitrust Source*, Vol. 16, No. 1, October 2016.

"The Prominence of Market Definition in Antitrust Evaluation and Litigation," (with Maria Stoyadinova), *Global Antitrust Economics: Current Issues in Antitrust Law and Economics*, Eds. Douglas H. Ginsburg and Joshua D. Wright, New York: Institute of Competition Law, 2016, pp. 103-116.

"Can Entry or Exit Event Studies Inform Horizontal Merger Analysis? Evidence from Grocery Retailing," (with Dan Hosken and Luke M. Olsen), *Economic Inquiry*, Vol. 54, Iss. 1, pp. 342-360, January 2016.

"Dynamics in a Mature Industry: Entry, Exit, and Growth of Big-Box Grocery Retailers," (with Dan Hanner, Dan Hosken, and Luke M. Olsen), *Journal of Economics and Management Strategy,* Vol. 24, Iss. 1, pp. 22-46, Spring 2015.

"Dynamics and Equilibrium in the Market for Commercial Aircraft," *Journal of Applied Econometrics*, Vol. 27, Iss. 1, pp. 1-33, February 2012.

"New Market Policy Effects on Used Markets: Theory and Evidence," *The B.E. Journal of Economic Analysis & Policy*, Vol. 9, Iss. 1 (Topics), Article 32, July 2009.

## AWARDS AND HONORS

Who's Who Legal Competition – Competition Economists, 2019 - 2021

Who's Who Legal Competition: Future Leaders – Economists, 2017, 2018 (named one of the four "Most Highly Regarded" competition economists in North America in 2018)

Award for Outstanding Scholarship: for outstanding contributions to the economics literature and to the pursuit of scholarship at the Federal Trade Commission, 2012

Janet D. Steiger Award: for outstanding contributions to the Pay-for-Delay Team, Federal Trade Commission, 2012

Predoctoral Fellowship, Bankard Fund for Political Economy, University of Virginia, 2003-2004

Research Grant, Darden Business School, University of Virginia, 2002

Graduate Fellowship, University of Virginia, 1999–2002

## MISCELLANEOUS

*REFEREE*

*International Journal of Game Theory*

*International Journal of Industrial Organization*

*Economic Theory*

*Journal of Policy Analysis and Management*

*TEACHING*

*Full Courses:*

Econonometrics – Johns Hopkins University, 2008

Intermediate Microeconomics – University of Virginia, 2002–2005

*Mini Courses:*

"Mergers" with Miguel de la Mano, Sean Ennis, and Nicolas Hill – Fordham Law School, 2012

"The Economics of Vertical Restraints" – GHV, Budapest, HU, 2010

"Quantitative Methods for Merger Investigation" with Keith Brand – CADE, Brasilia, BR, 2009

"Quantitative Methods for Antitrust Economists" – Competition Commission, Pretoria, ZA, 2007

"Introduction to Quantitative Methods for Antitrust Lawyers" – FTC, 2006, 2007, and 2008

*PRESENTATIONS AND SEMINARS*

American Bar Association Antitrust Enforcement Priorities for the Healthcare Industry in 2021 Roundtable

Troutman Pepper – Antitrust Economics – The Building Blocks, Webinar

American Health Law Association Education Center – Antitrust Enforcement Update on Hospital and Health System Mergers, Webinar

Fordham Competition Law Institute – 47th Annual Conference on International Antitrust Law and Policy and Antitrust Economics Workshops, Webinar

Concurrences and Fordham University School of Law – Antitrust in Life Sciences Conference, Webinar

American Bar Association Economics Fundamentals, Webinar

15th Annual Kirkland Antitrust & Competition Institute – Intersection of Antitrust and Everything Else, Washington, DC

Pepper Hamilton's Annual Antitrust CLE Event, Philadelphia, PA

Fordham Competition Law Institute – 44th Annual Conference on International Antitrust Law & Policy, New York, NY

International Industrial Organization Conference, Boston, MA

GCR Live 2nd Annual Antitrust Litigation USA, New York, NY

The Global Antitrust Economics Conference – George Mason School of Law, Arlington, VA

Compass Lexecon – Economics Seminar, Washington, DC

Southern Economic Association – Annual Meeting, New Orleans, LA

University of Maryland – Econometrics Seminar, College Park, MD

Bureau of Labor Statistics – Empirical IO Seminar, Washington, DC

Drexel University – Industrial Organization Seminar, Philadelphia, PA

American Social Sciences Association – Annual Meeting, Philadelphia, PA

Southern Economic Association – Annual Meeting, New Orleans, LA

University of Virginia – Microeconomics Seminar, Charlottesville, VA

International Industrial Organization Conference, Chicago, IL

*COMMUNITY ACTIVITIES*

Tutor, Community Club, Washington, DC, 2007–2011

**CITIZENSHIP**

United States

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**EXHIBIT B**
**Materials Considered**

| Bates-Stamped Documents |
| --- |
| [1] Intuitive-00005135 |
| [2] Intuitive-00593897 |
| [3] Intuitive-00595404 |
| [4] Intuitive-00595405 |
| [5] Intuitive-00595406 |
| [6] Intuitive-00595407 |
| [7] Intuitive-00595408 |
| [8] Intuitive-00595409 |
| [9] Intuitive-00595410 |
| [10] Intuitive-00595411 |
| [11] Intuitive-00595412 |
| [12] Intuitive-00595413 |
| [13] Intuitive-00595415 |
| [14] Intuitive-00595416 |
| [15] Intuitive-00595417 |
| [16] Intuitive-00595418 |
| [17] Intuitive-00595419 |
| [18] Intuitive-00595420 |
| [19] Intuitive-00595421 |
| [20] Intuitive-00595422 |
| [21] Intuitive-00595423 |
| [22] Intuitive-00595424 |
| [23] Intuitive-00595425 |
| [24] Intuitive-00595426 |
| [25] Intuitive-00595427 |
| [26] Intuitive-00595428 |
| [27] Intuitive-00595434 |
| [28] Intuitive-00595435 |
| [29] Intuitive-00595436 |
| [30] Intuitive-00695144 |
| [31] Intuitive-00695232 |
| [32] Intuitive-00695233 |
| [33] Intuitive-00695234 |
| [34] Intuitive-00701322 |
| [35] Intuitive-00701343 |
| [36] Intuitive-00701739 |
| [37] Intuitive-00701743 |
| [38] Intuitive-00701744 |
| [39] Rebotix001387 |
| [40] Rebotix175326 |
| [41] Restore-00000970 |

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[42] Restore-00009387
[43] Restore-00012292
[44] Restore-00022922
[45] Restore-00055935
[46] Restore-00055937
[47] Restore-00055938
[48] Restore-00055939

---

**Case Documents**

[49] Complaint, Case No. 5:19-cv-00055, United States District Court, Northern District of Florida, Panama City Division, February 27, 2019.

[50] Defendant's Answer, Affirmative Defense and Counterclaims, Case No. 5:19-cv-00055, United States District Court, Northern District of Florida, Panama City Division, September 30, 2019.

[51] Defendant's Answer, Affirmative Defenses and Counterclaims, Case No. 8:20-cv-02274, United States District Court, Middle District of Florida, Tampa Division, April 2, 2021.

[52] Defendant's First Amended Counterclaims, Case No. 5:19-cv-00055, United States District Court, Northern District of Florida, Panama City Division, November 27, 2019.

[53] Intuitive Surgical, Inc. Responses to Rebotix Repair, LLC's Data Questions, July 10, 2021.

[54] Intuitive Surgical, Inc. Responses to Restore's Data Questions, July 9, 2021.

---

**Depositions**

[55] Kevin May Deposition Transcript and Exhibits, May 6, 2021.

[56] Glenn Papit Deposition Transcript and Exhibits, June 2, 2021.

[57] Clif Parker Deposition Transcript and Exhibits, May 4, 2021.

[58] Mills Vautrot Deposition Transcript and Exhibits, May 11, 2021.

---

**Miscellaneous**

[59] Email message from Jeffrey Berhold to Michael Menitove, "RE: Restore v. Intuitive – Restore production," June 18, 2021.

---

**Publicly Available Documents**

[60] "Agrep: Approximate String Matching (Fuzzy Matching)," RDocumentation, accessed July 10, 2021, https://www.rdocumentation.org/packages/base/versions/3.6.2/topics/agrep.

[61] "Da Vinci X/Xi Instrument & Accessory Catalogue," Intuitive, March 2021, accessed July 25, 2021, https://www.intuitive.com/en-gb/-/media/Project/Intuitive-surgical/files/pdf/da-vinci-x-xi-instrument-accessory-catalogue-europe.pdf?la=en-GB&hash=9D6F575394160A0A057B3C204B7DC51B.

[62] Intuitive Surgical, Inc. Form 10-K for Fiscal Year Ended December 31, 2020.

[63] Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in Federal Judicial Center, Reference Manual on Scientific Evidence, 3rd ed., Washington, DC: National Academies Press, 2011, 425-502.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Websites

[64] "About Us – Medco Blue," Medco Blue, accessed August 10, 2021, https://medcoblue.com/about-us/.

[65] "About Us – R2 Surgical," R2 Surgical, accessed August 10, 2021, https://r2surgical.com/pages/about-us.

[66] "Contact Us – R2 Surgical," R2 Surgical, accessed August 10, 2021, https://r2surgical.com/pages/contact-us.

[67] "Da Vinci Instruments," Intuitive, accessed July 11, 2021, https://www.intuitive.com/en-gb/products-and-services/da-vinci/instruments.

[68] "Ascension St. Vincent's Riverside Hospital," Ascension, accessed Aug 12, 2021, https://healthcare.ascension.org/locations/florida/fljac/jacksonville-ascension-st-vincents-riverside.

[69] "Baptist Health Medical Center-Conway," Baptist Health, accessed Aug 12, 2021, https://www.baptist-health.com/baptist-health-conway-ar/.

[70] "Baylor Scott & White All Saints Medical Center – Fort Worth," Baylor Scott & White, accessed Aug 12, 2021, https://www.bswhealth.com/locations/fort-worth/.

[71] "Baylor Scott & White Locations," Baylor Scott & White, accessed Aug 18, 2021, https://jobs.bswhealth.com/us/en/locations.

[72] "Baylor Scott & White Surgical Hospital – Las Colinass," Baylor Scott & White, accessed Aug 12, 2021, baylorlascolinas.com.

[73] "Baylor Scott & White Surgical Hospital at Sherman," Baylor Scott & White, accessed Aug 20, 2021, https://baylorsherman.com/location/.

[74] "Baylor Scott & White Surgical Hospital Fort Worth," Baylor Scott & White, accessed Aug 20, 2021, https://www.bshfw.com.

[75] "Baylor Scott and White Surgicare Mansfield," Baylor Scott & White, accessed Aug 20, 2021, https://www.mansfieldsurgerycenter.com.

[76] "California Pacific Medical Center," California Pacific, accessed Aug 12, 2021, https://www.sutterhealth.org/cpmc.

[77] "Conway Regional Medical Center," Conway Regional, accessed Aug 13, 2021, https://www.conwayregional.org/locations/conway-regional-medical-center.

[78] "Hillcrest HealthCare System Locations," Hillcrest HealthCare, accessed Aug 18, 2021, https://hillcrest.com.

[79] "MedStar Washington Hospital Center," MedStar Washington, accessed Aug 12, 2021, https://www.medstarwashington.org.

[80] "Providence Regional Medical Center Everett," Providence Regional, accessed Aug 12, 2021, https://www.providence.org/locations/wa/providence-regional-medical-center-everett.

[81] "Riverside Regional Medical Center," Riverside Regional, accessed Aug 12, 2021, https://www.riversideonline.com/locations/hospitals/riverside-regional-medical-center.

[82] "Riverside University Health System Medical Center," Riverside University, accessed Aug 12, 2021, https://en.wikipedia.org/wiki/Riverside_University_Health_System_Medical_Center.

[83] "The George Washington University Hospital," The George Washington University, accessed Aug 12, 2021, https://www.gwhospital.com.

[84] "UW Medical Center," University of Washington, accessed Aug 12, 2021, https://www.uwmedicine.org/locations/uw-medical-center.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

[85] "Washington Hospital," Washington Hospital, accessed Aug 12, 2021, https://whs.org/locations-practices/washington-hospital/.

[86] "Washington Regional Medical System," Washington Regional, accessed Aug 12, 2021, https://www.wregional.com.

[87] "Washington University School of Medicine in St. Louis," Washington University, accessed Aug 12, 2021, https://medicine.wustl.edu.