## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**RESTORE ROBOTICS, LLC**, et al.,

     **Plaintiffs**,

**v.**                                 **Case No. 5:19cv55-TKW-MJF**

**INTUITIVE SURGICAL, INC.**,

     **Defendant**.

_____/

## ORDER ON *DAUBERT* MOTIONS

This case is before the Court based on the parties' *Daubert*[1] motions (Docs. 110, 111).   No hearing is necessary to rule on the motions, and upon due consideration of the motions, the responses (Docs. 116, 118), the replies (Docs. 127, 130), and the attachments to these filings, the Court finds that Defendant's motion is due to be denied and Plaintiffs' motion is due to be granted in part and denied in part as described below.

### Background

This is a complicated case involving the da Vinci surgical robot system and the EndoWrist instruments used with the system.  Defendant manufactures the robot system and its instruments, and Plaintiffs allege (among other things) that Defendant

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

uses its monopoly power in the surgical robot market and illegal tying agreements with robot customers to exclude Plaintiffs from the instrument and robot service aftermarkets in violation of the Sherman Act.[2]  Defendant denies Plaintiffs' claims and asserts that (among other things) Plaintiffs engaged in unfair competition under the Lanham Act,[3] committed deceptive trade practices under federal and state law, and tortiously interfered with Defendant's relationships with its customers through their business of "servicing" the robot systems and instruments to extend their use beyond authorized limits.  Plaintiffs deny these counterclaims.

Discovery closed in October 2021, after which both parties filed motions for summary judgment and *Daubert* motions.  All of the motions are fully briefed and ripe for rulings.  The Court will rule on the *Daubert* motions first because they will impact the evidence that the Court will consider when ruling on the motions for summary judgment.  Also, the issues raised in the *Daubert* motions are not as complex as the issues raised in the motions for summary judgment, which will take the Court considerably more time to work through.

Plaintiffs' *Daubert* motion (Doc. 111) seeks to exclude some or all of the opinions of three of Defendant's experts:  Heather Rosecrans, Dr. Sara Parikh, and Dr. John Bomalaski.  Defendant's *Daubert* motion (Doc. 110) seeks to exclude some

---

[2]  15 U.S.C. §§1, 2.

[3]  15 U.S.C. §1051, et seq.

2

of the opinions of one of Plaintiff's experts, Professor[4] Cristina DePasquale.  The Court will address the challenges to each expert in turn, after summarizing the controlling legal standards.

## Analysis

"*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

For expert testimony to be admissible, "(1) the expert [must be] qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions [must be] sufficiently reliable as determined by the sort of inquiry mandated in [*Daubert*]; and (3) the testimony [must] assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Delva*, 922 F.3d 1228, 1251 (11th Cir. 2019) (quoting *United States v. Holt*, 777 F. 3d 1234, 1265 (11th Cir. 2015)).  These three requirements are commonly referred to as "qualification, reliability, and helpfulness." *Payne v. C.R. Bard, Inc.,* 606 F. App'x 940, 942 (11th Cir. 2015).  The proponent of the testimony

---

[4]   Although Professor DePasquale has a Ph.D., she stated in her deposition that she preferred to be referred to as "Professor" rather than doctor. *See* Doc. 110-1, at 4 (depo. pg. 6).

bears the burden of establishing each requirement by a preponderance of the evidence.  *Id.*

With respect to the first factor (qualification), the proponent must show that its witness has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court."  *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702). The qualifications inquiry is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility."  *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009).  If the expert is qualified to testify, the subject matter of the testimony must be within the scope of his or her expertise.  *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).

With respect to the second factor (reliability), the reasoning or methodology underlying the expert's testimony must be scientifically valid and must be properly applied to the facts, and "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).  The reliability inquiry focuses "on the expert's principles and

methodology, and not on the conclusions that they generate." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). Additionally, an expert "may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

With respect to the third factor (helpfulness), Fed. R. Evid. 702 requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." As the Supreme Court explained in *Daubert*,

> [t]his condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. The consideration has been aptly described . . . as one of "fit." . . . Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

509 U.S. at 591-92. However, an expert opinion will only help a factfinder if "it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

Finally, the Court must remain mindful that the purpose of a *Daubert* motion is to keep "junk science" out of the courtroom, not to assess the persuasiveness of the expert's opinion. *See Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331,

1339 (11th Cir. 2020) (affirming district court's *Daubert* ruling because the objections to the expert's testimony went to the weight of the testimony, not its admissibility). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Thus, "[a]s long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (citation omitted) (quoting *Daubert*, 509 U.S. at 590).

With these standards in mind, the Court now turns to the specific issues raised in the parties' *Daubert* motions—starting with the experts challenged in Plaintiffs' motion.

<u>Heather Rosecrans</u>

Ms. Rosecrans was a longtime U.S. Food and Drug Administration (FDA) employee responsible for handling 510(k)[5] submissions who now works as a regulatory affairs consultant specializing in 510(k) clearance issues. Defendant

---

[5] §510(k) of the Food, Drug, and Cosmetic Act (codified at 21 U.S.C. §360(k)).

retained Ms. Rosecrans to opine on issues concerning 510(k) clearance and related regulatory requirements for its products and Plaintiffs' services.

Plaintiffs do not contest Ms. Rosecrans' qualifications, but rather argue that her methodology is unreliable and that her opinions will not be helpful.

*1. Reliability*

With respect to reliability, Plaintiffs argue that there is "too great an analytical gap" between Ms. Rosecrans' opinions and the facts of the case because the FDA has not actively prohibited Plaintiffs from deploying their repair technology and has knowingly continued to permit it.  Defendant responds that Ms. Rosecrans analyzed the facts of the case (including the alleged fact that the FDA informed Plaintiffs that their activities required 510(k) clearances) and drew upon FDA law and regulations and her own experience with the clearance process in order to reach her opinions.

The Court agrees with Defendant because, at bottom, Plaintiffs' argument seems to be a disagreement with Ms. Rosecrans' conclusion that FDA clearance was required, not an attack on her methodology in reaching that conclusion.  A *Daubert* motion is not the appropriate time to assess the merits of the parties' legal arguments concerning FDA clearance.  As such, there is no basis for excluding Ms. Rosecrans' opinions under the reliability prong.

2. *Helpfulness*

With respect to helpfulness, Plaintiffs assert that Ms. Rosecrans' opinions will not be helpful to the trier of fact because the Court has already ruled that it will not adjudicate the question of whether Plaintiffs must obtain FDA clearance. Plaintiffs also argue that her opinions amount to legal conclusions, and as such are prohibited.

Defendant responds that Ms. Rosecrans' opinions are relevant to numerous issues bearing on the merits of Plaintiff's Sherman Act claims. First, Defendant argues that Plaintiffs must prove that their business was lawful in order to establish antitrust injury, which Defendant claims Plaintiffs cannot do because of their noncompliance with the 510(k) clearance regulations. Second, to counter Plaintiffs' assertion of monopolization, Defendant argues that the FDA specifically cleared usage limits with respect to EndoWrists. Third, Defendant argues that it had a reasonable procompetitive justification for representing to its customers that Plaintiffs' repaired instruments were unsafe, namely that they lacked 510(k) clearance. Fourth, contrary to Plaintiff's position, Defendant contends that FDA regulations and practice concerning usage limits do not permit repair of EndoWrists.

The Court agrees with Defendant that Ms. Rosecrans' opinions on these topics will be helpful to the trier of fact in understanding Defendant's arguments countering Plaintiffs' claims, but only insofar as the opinions are offered to "provide a roadmap to the 510(k) regulatory framework" and an explanation of FDA's practices and

procedures.  In that regard, Ms. Rosecrans' opinions will help the jury understand the complex regulatory scheme and determine the facts bearing on Plaintiffs' compliance therewith.  However, Ms. Rosecrans cannot offer an ultimate opinion as to Plaintiffs' compliance or noncompliance with regulatory requirements, because "an expert may not testify that certain conduct did or did not violate the law."  *In re Delta/Airtran Baggage Fee Antitrust Lit.*, 245 F. Supp. 3d 1343, 1362 (N.D. Ga. 2017); *see also Montgomery*, 898 F.2d at 1541; *In re 3M Combat Arms Earplug Prods. Liab. Lit.*, 2021 WL 765019, at *43 (N.D. Fla. Feb. 28, 2021) (permitting expert testimony explaining FDA regulatory requirements, but declining to allow an expert to give his own interpretation of the regulations or to opine on whether the defendant violated the regulations).  The role of the Court is to determine the law regarding 510(k) clearance and instruct the jury what was required of Plaintiffs under the law, and the role of the jury is to resolve any disputed questions of fact bearing on Plaintiffs' compliance (or not) with the law with the aid of any pertinent expert testimony regarding the complex regulatory scheme.

The Court did not overlook Plaintiffs' argument that the Ms. Rosecrans' testimony about the 510(k) clearance regulations and process would be unhelpful because the Court has already ruled that 510(k) clearance requirements cannot be adjudicated in this case.  However, the Court's discussion of that issue in its Order on Plaintiffs' motion to dismiss Defendant's counterclaims is far narrower than

Plaintiffs contend in their *Daubert* motion. Rightly or wrongly, the Court simply ruled in that Order that a determination of the truth or falsity of the claim in Plaintiffs' advertising that it did not need 510(k) clearance was within the exclusive purview of the FDA and could not be litigated in the <u>Lanham Act</u> context. *See* Doc. 44, at 6. The question of whether Plaintiff's alleged need for 510(k) clearance could be litigated in the <u>Sherman Act</u> context was not before the Court in that (or any other) Order, and on that issue, the Court tends to agree with Defendant that Plaintiffs will need to show that their repair work did not require 510(k) clearance in order to establish that their busines was lawful and that any injury they suffered was caused by Defendant's anticompetitive conduct rather than the FDA's regulatory requirements. *See In re Wellbutrin XL Antitrust Lit. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017); *In re Canadian Import Antitrust Lit.*, 470 F.3d 785, 791 (8th Cir. 2006).

*     *     *

In sum, Ms. Rosecrans' opinions are reliable and helpful (and, thus, admissible) within the limits identified above. However, Ms. Rosecrans may not give an ultimate legal opinion on Plaintiffs' compliance with regulatory requirements or espouse her own personal interpretations of relevant regulations to the extent that they differ from the FDA's public interpretations.

Dr. Sara Parikh

Dr. Parikh is the president of a marketing research and consulting firm.  She has an M.A. and Ph.D. in Sociology and over 30 years of experience of designing and conducting research surveys, including surveys for Lanham Act litigation. Defendant retained Dr. Parikh in connection with its Lanham Act counterclaims to conduct a survey to determine how prospective customers perceived the claims in Plaintiffs' advertising that Defendant contends are willfully deceptive.

Plaintiffs do not contest Dr. Parikh's qualifications, but rather make several arguments as to her methodology and its reliability in their initial motion.  Then, in their reply, Plaintiffs pivot to arguing that Dr. Parikh's survey would not be helpful to the jury.

*1. Reliability*

With respect to reliability, Plaintiffs argue that Dr. Parikh's survey is not "tied to the real world"—and it failed to "present the applicable products in a manner that a consumer would encounter them in the actual marketplace," *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 2019 WL 7376782, at *6 (S.D. Fla. Sept. 26, 2019)—because hospitals engage in complex decision-making involving many employees who have different roles, yet Dr. Parikh improperly instructed respondents not to refer to any other materials or confer with outside

individuals.  Additionally, Plaintiffs argue that Dr. Parikh improperly used leading, closed-ended questions.

Defendant responds that Dr. Parikh's methods were consistent with fundamental principles of survey design intended to ensure objectivity and accuracy of responses.  Defendant further responds that Plaintiffs' reliance on *Pinnacle* is misplaced because that case dealt with likelihood of confusion in product trademark infringement cases, not false advertising of services in which there are no products at issue.  Lastly, Defendant asserts that Dr. Parikh's questions were appropriate, and even if they were leading, that would only bear on the survey's weight, not its admissibility.

The Court agrees with Defendant.  Putting aside Plaintiffs' questionable reliance on trademark infringement cases involving physical <u>products</u> in a case involving alleged false advertising of <u>services</u>, the evidence persuades the Court that Dr. Parikh designed and conducted her survey in accordance with generally accepted and recognized survey design principles.  Although some of Plaintiffs' critiques may be valid, the Court sees no fatal flaws that would make Dr. Parikh's survey opinions inadmissible.  Rather, the alleged methodological flaws identified by Plaintiffs go more to the weight that the factfinder should give to the survey than its admissibility. *See Cardenas v. Toyota Motor Corp.*, 2021 WL 5811741, at *5 (S.D. Fla. Dec. 6, 2021) ("[A]rguments about a consumer survey's methodology generally go to

weight, not admissibility."); *FTC v. On Point Global LLC*, 2021 WL 4891334, at *8 (S.D. Fla. Sept. 23, 2021) (arguments as to leading questions and bias were "more adequately considered an objection going to the weight of the evidence rather than its admissibility." (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003))); *Edmondson v. Caliente Resorts, LLC*, 2017 WL 10591833, at *11 (M.D. Fla. Aug. 31, 2017) ("Objections to the technical validity of the survey properly go to the weight to be accorded to the survey rather than to its admissibility.").

The Court did not overlook Plaintiffs' argument that Dr. Parikh failed to accurately replicate the complex real-world decision-making in which hospitals engage. However, so long as scientifically valid methods are employed, an expert need not precisely replicate real-world conditions and the failure to do so goes to weight, not admissibility. *See Mizrahi v. Yamaha Motor Corp., U.S.A.*, 2019 WL 3318527, at *5-6 (S.D. Fla. July 19, 2019) (failure to replicate real-world conditions went to accuracy, not admissibility); *see also Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

### 2. *Helpfulness*

In their reply, Plaintiffs essentially rehash their reliability arguments under the guise of the helpfulness prong, contending that the alleged flaws in Dr. Parikh's

survey make it unhelpful because it does not show that the advertising here had the potential to confuse real-world customers. Again, the Court is not persuaded because these contentions are more properly directed to the weight of Dr. Parikh's opinions, not their admissibility.

*     *     *

In sum, because Dr. Parikh's opinions are reliable and helpful, there is no basis for the Court to exclude them under *Daubert*.

Dr. John Bomalaski

Dr. Bomalaski is a surgeon with extensive training and experience in both traditional and robotic surgery, including more than 2,600 robotic-assisted surgeries using the da Vinci surgical system. Defendant retained Dr. Bomalaski to opine on the surgical benefits of the da Vinci, as well as the risks of using EndoWrists beyond FDA cleared usage limits and using da Vincis that have been serviced by a third party.

Plaintiffs do not categorize their challenges to Dr. Bomalaski's opinions, but it appears that they are essentially attacking the reliability of his opinions by asserting that they are not based on his own experience.[6]

---

[6] Plaintiff also makes what are arguably qualifications arguments, i.e., that Dr. Bomalaski is not qualified to render certain opinions because he lacks the requisite experience. However, in this case, these arguments are two sides of the same coin, and the outcome would be the same under either categorization.

*1. Reliability*

Plaintiffs argue that Dr. Bomalaski lacks sufficient experience to reliably opine on the increased risks to patient safety of using instruments repaired or serviced by a third party because he lacks an engineering background sufficient to comment on the safety or reliability of those instruments, and that his other opinions concerning the risks of using such equipment are not based on his own experiences or are inconsistent with his own experiences. Defendant counters that Dr. Bomalaski's experiences form a reliable basis for and are consistent with his opinions, and that Plaintiffs mischaracterize Dr. Bomalaski's testimony in an effort to cast doubt on the reliability of his opinions. The Court agrees with each party in part.

Plaintiffs' argument that Dr. Bomalaski does not know the details of how his instruments are manufactured or repaired is not persuasive. Irrespective of whether Dr. Bomalaski knows precisely how his instruments are manufactured or repaired in an "engineering" sense, his decades of experience as a surgeon still qualify him to opine on the potential consequences to patient health and safety of using inadequate instruments to perform surgical procedures. Likewise, Plaintiffs' arguments that Dr. Bomalaski does not know or care whether he operates with repaired instruments not subject to FDA clearance or whether he uses repaired instruments that have exceeded their recommended use limits are contradicted by Dr. Bomalaski's opinion and

testimony, in which he explains that he and other surgeons rely on their relationships of trust with their hospitals, instrument manufacturers, and government regulators in order to ensure adherence to appropriate safety standards.

However, Plaintiffs' argument that Dr. Bomalaski lacks a basis for his various opinions regarding the opinions of patients, other surgeons, and payors towards repaired instruments is more convincing. Although Dr. Bomalaski has an adequate basis to explain to the factfinder how he feels about using repaired robotic surgical instruments, his own experience is not a sufficient basis to permit him to testify as to what other doctors think. *See In re 3M Combat Arms Earplug Prod. Liab. Lit.*, 2021 WL 684183, at *4 (N.D. Fla. Feb. 11, 2021) ("[The expert] has not provided any other basis, such as a survey or a widely distributed publication or even an email, to support the extrapolation of this knowledge to the entire … community [of medical personnel]."); *Bartlett v. Mut. Pharm. Co., Inc.*, 742 F. Supp. 2d 182, 195 (D.N.H. 2010) ("[M]ost courts have prohibited experts from testifying … about 'what doctors generally think,' unless the testimony is based on something more reliable than simply the expert's own experience as a doctor."); *In re Seroquel Prod. Liab. Lit.*, 2009 WL 3806436, at *8 (M.D. Fla. July 20, 2009) ("[N]one of Plaintiffs' experts may properly testify regarding whether physicians generally read and comprehend drug labels, or whether doctors generally understand the contents of the … label. Such opinions are impermissibly speculative. However, the witnesses …

16

may express [their own] opinions … without reference to the asserted perceptions of other doctors.").  Similarly, although Dr. Bomalaski may testify as to the actual known perceptions of his patients over the course of his career (assuming such testimony can overcome hearsay or other evidentiary objections), he may not speculate as to the opinions of patients in general.

*     *     *

In sum, Dr. Bomalaski's opinions are reliable (and, thus, admissible) to the extent identified above.  However, Dr. Bomalaski may not testify as to perceptions of other doctors and patients in general.

Professor Christina DePasquale

Professor DePasquale has a Ph.D. in Business Economics from the University of Michigan and is an Associate Professor at the Carey Business School at Johns Hopkins University.  She has published, presented, and taught in microeconomics, including healthcare economics.  Plaintiffs retained Professor DePasquale to opine on antitrust market definition, monopoly power, anticompetitive effects, and damages.[7]

---

[7]  More specifically, Professor DePasquale opines that (1) the U.S. surgical robot market is a relevant antitrust market, (2)  Defendant has monopoly power in that market and in the instrument and service aftermarkets, (3) Defendant can use its monopoly power to charge supracompetitive prices in the relevant markets, and (4) Plaintiffs suffered damages based on assumptions that Plaintiffs' agreement with Rebotix would be renewed and Plaintiff would have deployed its own technology upon its completion.

Defendant does not challenge Professor DePasquale's general qualifications, but it argues that she is not qualified to provide certain opinions. Also, Defendant argues that, for various reasons, Professor DePasquale's testimony is unreliable and unhelpful.

### 1. Qualifications

Defendant only contests Professor DePasquale's qualifications insofar as they relate to her opinion that patient safety is not a procompetitive justification for Defendant's alleged anticompetitive conduct. Plaintiffs respond that Professor DePasquale is entitled to support her economic analysis by testifying to its basis and any underlying facts or reasonable assumptions that would support her opinion, and that her proffered testimony is only her opinion on how the market likely views patient safety based on her economic experience and the facts of the case.

The Court agrees with Plaintiffs. Professor DePasquale is not opining as to whether the products at issue are actually safe; rather, she is explaining, based on her economic expertise and the facts provided to her, how the market might respond to concerns about patient safety. Also, it appears that the specific statements to which Defendant objects, *see* Doc. 127, at 12, are merely Professor DePasquale summary of the facts and testimony she was provided and relied on to formulate her opinion. Professor DePasquale has sufficient qualifications to render the resulting

opinion, and Defendant's challenge to the factual assumptions underlying the opinion go to the weight of the opinion, not its admissibility.

## 2. *Reliability*

*First*, Defendant argues that Professor DePasquale's market definition opinion is unreliable because she failed to meaningfully consider whether laparoscopic and open surgery are substitutes for robotic-assisted surgery that should be included within the relevant market, but rather she relied on "common sense and anecdotal evidence" (Doc. 110, at 32 (depo. pg. 120)) to determine that they are not substitutes. Plaintiffs counter that Professor DePasquale explained how the surgical robot market is not constrained by competition from laparoscopic surgical equipment because of the unique costs and benefits of surgical robots, looked at quantitative economic evidence regarding demand substitution, and noted other indicia of a relevant market for surgical robots.

The Court agrees with Plaintiffs that Professor DePasquale's market definition opinion is based on more than "common sense and anecdotal evidence" and is supported by qualitative and quantitative economic evidence, with adequate consideration of potential substitutes. If Defendant believes that Professor DePasquale's consideration and rejection of potential substitutes was imperfect or lacking in some respects, then it is free to raise that concern through cross-examination or its own expert.

*Second*, Defendant argues that Professor DePasquale's monopoly power opinion is unreliable (at least insofar as it relies on supracompetitive pricing as an indicator of monopoly power) because it is contrary to law since it uses the Lerner Index of Monopoly Power[8] to analyze Defendant's prices relative to its *marginal* costs, not its *total* costs, and fails to account for Defendant's substantial research and development expenses and other fixed costs that result in Defendant's actual gross margins not being as high as they appear.  *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) ("Certain deviations between marginal cost and price, such as those resulting from high fixed costs, are not evidence of market power.  In this case, there was overwhelming evidence that [the defendant's] … business is subject to enormous expenses that are not reflected in its short-run marginal costs." (internal citation omitted)); *In re Remeron Direct Purchaser Antitrust Lit.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005) ("[W]ithout evidence that sheds light on material factors such as [the defendant's] price relative to its total costs (marginal *and* fixed) and whether output was restricted, monopoly power cannot be found as a matter of law.").  Plaintiffs counter that Professor DePasquale's analysis did account for total costs, including whether substantial fixed costs were cutting into the high gross margins.

---

[8]  This index expresses the difference between price and marginal cost as a percentage of price in order to show the likelihood of supracompetitive pricing, and hence of monopoly power.

The Court agrees with Plaintiffs.  Although expert opinions that are contrary to law are inadmissible, *Martinez v. Rabbit Tanaka Corp. Ltd.*, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006), there is no Eleventh Circuit precedent holding that the Lerner Index is unreliable as a matter of law, and other courts have accepted that index as a valid method of identifying monopoly power, s*ee, e.g.*, *In re Opana ER Antitrust Lit.*, 2021 WL 2291067, at *9 (N.D. Ill. June 4, 2021) ("[T]he Lerner [I]ndex is a well-established method implemented in the field of economics to find evidence of market power, although not conclusive in and of itself."); *In re Aggrenox Antitrust Lit.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016) (citing the Lerner Index as a "generally accepted economic means of analyzing the probability that given prices are supracompetitive using price and marginal cost."); *see also Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 42 (S.D.N.Y. 2016) (explaining that the Second Circuit, in *Eastman Kodak*, did not reject use of the Lerner Index in all circumstances, but rather only based on the facts of that particular case, especially given the lack of product differentiation in the relevant market).  The fact that antitrust economists have criticized the use of the Lerner Index in cases where there are high fixed costs goes to the weight of the Professor DePasquale's opinion, not its admissibility.  *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("The identification of [methodological] flaws in generally reliable scientific evidence is precisely the role of cross-examination."); *Dial Corp.*, 165 F. Supp. 3d

at 42 (explaining that disagreements over economist's methodologies, including use of the Lerner Index, went to weight, not admissibility).

Moreover, it appears that the Lerner Index was only part of Professor DePasquale's analysis because she cited additional evidence, including Defendant's gross margins and market shares, and barriers to entry in the relevant markets, to support her ultimate conclusions. For example, Professor DePasquale discussed total costs inherent to the market, including research and development costs, in her report's discussion of barriers to entry, and she explained in her rebuttal report why she did not view Defendant's fixed costs as significant in this case.[9] All of this, taken together, is sufficient to render Professor DePasquale's monopoly power opinion reliable for *Daubert* purposes.

*Third*, Defendant argues that Professor DePasquale's anticompetitive effects opinions are unreliable because (1) they are contrary to law since she failed to analyze what the combined prices for Defendant's products would be absent the challenged conduct (i.e., if they were sold separately in the but-for world), and

---

[9] On this point, the Court did not overlook Defendant's argument that Professor DePasquale impermissibly engaged in new analysis of Defendant's total costs for the first time in her rebuttal report. However, when viewed in context, it is clear that this "new" analysis was merely presented to rebut the opinion of Defendant's economist expert (Dr. Smith) on this issue and to explain why Professor DePasquale did not consider research and development expenses significant to her analysis in this case. This was permissible. *See Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 2020 WL 1666763, at *9 (S.D. Fla. Apr. 3, 2020) (collecting cases permitting rebuttal experts to advance new arguments and evidence, provided that it is intended solely to contradict or rebut an opposing expert); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 396 (M.D. Fla. 2018) (same).

(2) Professor DePasquale failed to perform analysis to support her opinions on patient safety justifications, but rather merely relied on record facts.

As to the first point, Plaintiffs respond that Professor DePasquale assumed that Defendant would continue to charge monopolistic prices, rather than lowering its prices, in the absence of the challenged tying.  Under those conditions, Professor DePasquale concluded that absent the challenged conduct, customers would have had the option of using Plaintiffs' services at a lower price, thereby paying lower average prices overall.[10]

The Court agrees with Defendant that the case law seems to require separate consideration of the tied and tying products in order to determine whether the combined price was greater than if they had been sold independently absent the challenged conduct.[11]   However, as Plaintiffs point out, for the purposes of her

---

[10]   Plaintiffs also argue that because they are a competitor seeking lost profit damages, they need not offer a precise calculation of the combined prices in the absence of the tie, but rather need only show that the combined price is likely to be lower on average if the products were sold independently.  Plaintiffs cite no authority for this argument.

[11]   *See* Doc. 31, at 6 ("[P]laintiff is required to show that 'the combined price for the tying and tied products was greater than if they had been sold independently.'" (quoting *Metzler v. Bear Auto. Serv. Equip. Co., SPX*, 19 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998)); *see also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982) ("[I]njury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value.  The rationale behind this requirement is apparent: A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the [defendant] for the tying product.  Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed.").

analysis, Professor DePasquale worked under the assumption, made based on her economic experience, that Defendant would continue to charge monopolistic prices, even without the tie.  Experts are generally entitled to render opinions under a set of stated assumptions, so long as they are reasonable and have some foundation in the factual record.  *See Maiz*, 253 F.3d at 667 (qualified expert was "entitled to state reasonable assumptions … in order to put his opinions in context"); *In re Mushroom Direct Purchaser Antitrust Lit.*, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) ("Courts have found that 'most contentions that [expert] assumptions are unfounded go to the weight, not the admissibility, of the testimony, and a district court has discretion … to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'" (quoting *In re Air Cargo Shipping Servs. Antitrust Lit.*, 2014 WL 7882100, at *15 (E.D.N.Y. Oct. 15, 2014))).  And in context, Professor DePasquale's assumption is not necessarily unreasonable, because, as Plaintiffs argue, she made that assumption because the existing customers in the tied market (the instrument or service aftermarkets) have already purchased the tying products (the surgical robots), and therefore could not benefit from any change in price of the tied products and services.  Although Professor DePasquale's assumptions are certainly open to attack on cross-examination—and Defendant may well prevail on summary judgment or at trial if Plaintiffs cannot produce evidence sufficient to meet the combined price element

seemingly required under Eleventh Circuit law—Professor DePasquale's assumptions do not render her opinion unreliable as contrary to law.

As to the second point, Plaintiffs respond that Professor DePasquale's opinion as to product safety is made as an economist in response to Dr. Smith's competing opinion that tying was necessary (and justified) to protect Defendant's reputation and goodwill by ensuring patient safety, and that she adequately explained why the restraints in this case do not promote competition in quality and safety based on the facts available to her in the record. The Court agrees. As discussed above, Professor DePasquale is not opining as to whether the products and services at issue in this case are actually safe; rather, she is referencing record facts to provide an economic opinion as to how these market restraints might ultimately impact product quality and patient safety. Experts are permitted to rely on a permissible view of the record facts to formulate an opinion in their area of expertise. *See McDowell*, 392 F.3d at 1299 (noting that an expert's opinion must "fit" the facts of the case).

*Fourth*, Defendant argues that Professor DePasquale's damage calculations concerning EndoWrist repair services are unreliable because she makes assumptions that are unsupported by and contrary to the record. Specifically, Defendant takes issue with Professor DePasquale's assumptions that in the but-for world, (1) Rebotix would have supplied technology to Plaintiff from October 2019 through June 2020, and (2) in July 2020, Plaintiff would have launched a repair business using its own

technology.  Plaintiffs counter that there is evidence from which a jury could conclude that each of these assumptions were reasonable in the but-for world.

The Court agrees with Plaintiffs.  An expert is entitled to base her opinion on reasonable assumptions, particularly in the antitrust damages context where there is an inherent degree of uncertainty and speculation.  *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969); *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1579 (11th Cir. 1983) (ascertainment of antitrust damages is "necessarily imprecise").  Here, Professor DePasquale's assumptions underlying her damages' opinions have record support and are not inherently unreasonable.  Thus, Defendant's challenges go more to the weight of the opinions than their admissibility.

### 3. *Helpfulness*

With respect to helpfulness, Defendant essentially rehashes its reliability arguments.

*First*, Defendant argues that Professor DePasquale's market definition opinion is unhelpful because testimony based on "common sense" will not assist the trier of fact.  However, this argument is unpersuasive because, as discussed above, this opinion is not based solely on common sense.

*Second*, Defendant argues that Professor DePasquale's monopoly power opinion is unhelpful because it is contrary to law. However, because the Court found above that her opinion is not contrary to law, this argument is also unpersuasive.

*Third*, Defendant argues that Professor DePasquale's anticompetitive effects opinion is unhelpful, essentially because it is unreliable. However, because Professor DePasquale's opinion meets the reliability prong of *Daubert*, this argument is unpersuasive.

\*      \*      \*

In sum, because Professor DePasquale is qualified to render her opinions and the opinions are reliable and helpful, the Court has no basis under *Daubert* to exclude the opinions.

### Conclusion

In sum, for the reasons stated above, it is **ORDERED** that

1.     Defendant's *Daubert* motion (Doc. 110) is **DENIED**.

2.     Plaintiffs' *Daubert* motion (Doc. 111) is:

(a)     **GRANTED in part** as to Heather Rosecrans, and she may not offer an ultimate legal opinion as to Plaintiff's compliance or noncompliance with the FDA's regulatory requirements or espouse personal interpretations of those requirements that that differ from the FDA's official interpretations;

(b)     **DENIED** as to Dr. Sara Parikh; and

(c)     **GRANTED in part** as to Dr. John Bomalaski, and he may not testify as to the knowledge, thoughts, or opinions of doctors and patients in general.

**DONE and ORDERED** this 7th day of February, 2022.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

28