## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**RESTORE ROBOTICS, LLC, et al.,**

      **Plaintiffs**,

v.                               **Case No. 5:19cv55-TKW-MJF**

**INTUITIVE SURGICAL, INC.,**

      **Defendant**.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This complex antitrust case was filed more than three years ago, in February 2019.  Discovery closed in October 2021, after which the parties filed motions for summary judgment (Docs. 109, 112).  No hearing is necessary to rule on the motions, and upon due consideration of the motions, the responses (Docs. 115, 117), the replies (Docs. 122, 126), and the attachments to those filings, the Court finds that the motions are due to be granted in part and denied in part.

### Background

Defendant Intuitive Surgical, Inc., manufactures the da Vinci surgical robot system and the EndoWrist instruments used with the system.  These products have "510(k) clearance"[1] from the Food and Drug Administration (FDA) and are sold to

---

[1] "510(k) clearance" is the regulatory process pursuant to which a medical device that is "substantially equivalent" to a device that is already on the market can be cleared for sale without

hospitals and other health care facilities for use in surgical procedures.  The da Vinci system can cost more than $1.7 million, and replacement EndoWrist instruments can cost more than $100,000.

From 1999 to 2017, Intuitive was the only manufacturer cleared by the FDA to sell surgical robots in the United States.  There are now several other competitors in the surgical robot market, but Intuitive still has the largest share of the market by far.

The EndoWrist instruments can only be used for a pre-programmed number of procedures, and once the "usage limit" is reached, the instrument becomes inoperable.  Intuitive does not offer services that would extend the usage limit, so once the limit is met, the customer will have to purchase a new EndoWrist.  The usage limits were described in the Intuitive's submissions to the FDA to obtain 510(k) clearance of the EndoWrist, but there is conflicting evidence as to whether the limits serve any legitimate medical or patient safety purpose.

Intuitive requires da Vinci customers to sign a Sales, Licensing, and Service Agreement (SLSA), pursuant to which the customer agrees that it will purchase replacement EndoWrists from Intuitive, use the EndoWrists consistent with

---

undergoing the far more rigorous pre-market review and approval process.  *See* 21 U.S.C. §360(k); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478-79 (1996).  The process focuses on the equivalence of the devices, not their safety or efficacy.  *See Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304, 1317-18 (11th Cir. 2017).

Intuitive's instructions for use (including the usage limits), and will not allow EndoWrists to be repaired, restored, or reconditioned in a manner inconsistent with those instructions. Under the SLSA, service is provided by Intuitive either through a monthly service plan or on a "time and materials" basis—although the first year of service is typically included with the purchase of the system. The SLSA provides that Intuitive has no obligation to service systems that have been serviced or repaired by an unapproved party, but it does not explicitly prohibit customers from purchasing unused EndoWrists or "partially used" EndoWrists (i.e., instruments that have not yet reached their pre-programmed use limits) from sources other than Intuitive.

Plaintiffs Restore Robotics, LLC and Restore Robotics Repairs, LLC (collectively, "Restore") were founded in 2018 to provide "repair" services on surgical robots, including those manufactured by Intuitive.

Plaintiff Clif Parker Robotics (CPR) sells unused and partially used EndoWrists that it purchases from hospitals and other medical facilities through Restore. The namesake of CPR, Clif Parker, is the majority owner and CEO of Restore.

Restore licensed technology from non-party Rebotix Repair, LLC, that it used by bypass the usage counter on the EndoWrist, allowing the instrument to be used for an additional 10 uses. Restore also serviced the da Vinci system, although

3

Restore could only perform limited repairs or maintenance because it did not have access to Intuitive's proprietary "distributor's toolkit."

Restore sold its "repair" services to at least 11 of Intuitive's customers between 2018 and October 2019 when Rebotix's licensing agreement with Restore expired. Rebotix decided not to renew the licensing agreement because Restore's business was not performing as expected.[2] Restore has since made efforts to develop its own technology to override the EndoWrist usage limit or license similar technology from another source.

Restore and CPR claim that Intuitive uses its monopoly power in the surgical robot market along with tying[3] and exclusive dealing agreements with its customers (such as the SLSA) to monopolize or attempt to monopolize (1) the da Vinci and EndoWrist service aftermarkets and (2) the EndoWrist repair and replacement aftermarkets. Intuitive denies these claims and alleges that Restore violated various

---

[2]  Restore attributes its lack of business to Intituitive's anti-competitive actions, whereas Intuitive attributes it to other factors, such as the fact that 510(k) clearance has not been obtained from the FDA for EndoWrists "repaired" using Rebotix's technology.

[3]  Tying is "an agreement by a party to sell one product [or service] but only on the condition that the buyer also purchases a different (or tied) product [or service]." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985). Here, Restore initially identified four different tying combinations: (1) sale of da Vinci parts conditioned on purchase of da Vinci service, (2) sale of da Vincis conditioned on purchase of da Vinci service, (3) da Vinci service conditioned on the purchase of EndoWrists, and (4) sale of da Vincis conditioned on the purchase of EndoWrists. However, it later abandoned any claims based on the first combination. *See* Doc. 117, at 28.

federal and state laws through its deceptive practices in connection with its "repair" business.

Additional facts pertinent to the parties' claims are interspersed in the analysis section below.

## Analysis

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "material" if it would change the outcome of the litigation, and a dispute about a material fact is "genuine" if the evidence as a whole could lead a reasonable jury to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party must show more than a "metaphysical doubt as to the disputed facts").

The party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Once the moving party meets that burden, the non-movant must go beyond the pleadings and identify evidence of record showing a genuine factual dispute for trial.  *Id.*

When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). The Court's role at the summary judgment stage is not to weigh the evidence, but rather to "conclude whether [the evidence] is so one-sided that the result of any trial is inevitable." *Turner v. Phillips*, 2022 WL 458238, at *4 (11th Cir. Feb. 15, 2022).

The Court has carefully considered all the issues raised in the parties' motions for summary judgment under these legal standards, but the Court sees no reason to provide a detailed analysis of every issue raised in the motions because the parties largely agree on the contours of the controlling substantive law and it is apparent from a review of the voluminous evidence submitted by the parties that disputed issues of fact remain on nearly all the claims. Thus, although this Order at least summarily addresses all the claims raised in the parties' motions, the more detailed analysis in the Order is reserved for the claims on which summary judgment is warranted and the issues on which additional guidance may be helpful for trial.

<u>Intuitive's Motion</u>

Intuitive seeks summary judgment on all the claims asserted by Restore and CPR because (1) Restore lacks antitrust standing since it cannot establish that its business is lawful or that it was adequately prepared to continue in the business after its licensing agreement with Rebotix ended, (2) Restore cannot define relevant

antitrust markets, (3) Restore cannot establish that Intuitive engaged in anticompetitive conduct through tying or exclusive dealing, and (4) there is no evidence supporting CPR's sole claim that Intuitive told customers not to sell EndoWrists to CPR.  Additionally, Intuitive seeks partial summary judgment on its tortious interference counterclaim.  Each argument will be discussed in turn.

*First*, with respect to antitrust standing, Intuitive argues that Restore cannot establish antitrust injury as to its EndoWrist "repair" business because the FDA has concluded that technology overriding the use limits in the EndoWrist requires 510(k) clearance, which it is undisputed that Restore has not received.  The evidence on this issue is not as clear-cut as Intuitive argues, and although the FDA has signaled that 510(k) clearance is required, it has not definitively said so.  Indeed, as recently as November 2021, the FDA has merely stated that overriding the use limits in the EndoWrist "may be remanufacturing the [device] … in a manner that potentially violates the FD&C Act" (emphasis added).

In any event, the critical issue in this case is not whether 510(k) clearance is required to override the use limits in the EndoWrist (because that is an issue for the FDA to determine in the first instance),[4] but rather whether the "material cause" of

---

[4]  The Court previously implied that it would need to decide whether 510(k) clearance was required for Restore's "repair" services, *see* Doc. 149, at 10, but upon further consideration, the Court finds that it does not have the authority (or if it does, it should not exercise that authority) to usurp the FDA's responsibility for deciding that issue in the first instance.  Additionally, the cases cited by Intuitive in which a regulatory impediment to a competitor's business was considered in the context of antitrust standing involved regulatory schemes that unquestionably would have

Restore's injuries was anticompetitive restrictions imposed on EndoWrist customers in the SLSA (as Restore claims) or whether it was the lack of FDA clearance for Restore's "repair" services or other factors unrelated to Intuitive (as Intuitive claims). *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury ….").

"[T]he question of causation is generally a factual question for the jury," *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979), and here, there is evidence from which a jury could find that Intuitive's alleged anticompetitive conduct was a material cause of Restore's injuries because although there is evidence that some health care facilities were unwilling to use Restore's services because of the lack of clearance and/or the uncertainty about whether clearance was required, there is also evidence that other facilities were willing to use (and did use) Restore's services notwithstanding those issues. Thus, when the evidence is viewed in the light most favorable to Restore, a jury could find that Restore would have continued to provide its EndoWrist "repair" services to at

---

made the competitor's business unlawful. *See, e.g.*, *In re Wellbutrin XL Antitrust Lit. Indirect Purchaser Class*, 868 F.3d 132, 164-69 (3d Cir. 2017). Here, by contrast, it is still an open question as to whether 510(k) clearance is required for Restore's EndoWrist "repair" service.

least some health care facilities (unless and until the FDA enjoined it from doing so) but for the restrictions imposed in the SLSA.

The Court did not overlook Intuitive's argument that Restore could not have continued to provide its "repair" services after October 2019 when Rebotix terminated its licensing agreement with Restore. However, because there is evidence from which the jury could find that the "lack of performance" that led to the termination of the licensing agreement was a direct result of Intuitive's alleged anticompetitive conduct, the mere fact that the licensing agreement was terminated would not necessarily preclude the jury from finding that a material cause of Restore's alleged injuries was Intuitive's alleged anticompetitive conduct.

Likewise, there is evidence from which a jury could find that Restore had developed its own technology in conjunction with another company, Iconocare Health Solutions, that would have allowed it to continue providing "repair" services on EndoWrists starting in July 2020. Although it is undisputed that Restore had not deployed that technology and that Iconocare had sought (but not yet obtained) 510(k) clearance for the technology, there is evidence from which a jury could find that Restore had the technicians and facilities in place that would allow it to continue to provide its "repair" services with the Iconocare technology just as it had done with the Rebotix technology, but for the anticompetitive restrictions imposed on EndoWrist customers by Intuitive in the SLSA. Moreover, a jury could find that any

further preparatory steps by Restore would have been futile in light of the anticompetitive restrictions.  Thus, whether viewed in terms of antitrust injury or Restore's capacity as an efficient enforcer, factual issues preclude summary judgment based on Intuitive's argument that Restore was unprepared to compete in the EndoWrist repair market after October 2019 when Rebotix terminated its licensing agreement.

Additionally, as to the da Vinci service market, Intuitive argues that Restore lacks standing because it would be unable to compete in that business without access to Intuitive's proprietary technology.  On this issue, although it is undisputed that Restore cannot provide the full range of da Vinci service without Intuitive's distributor's toolkit,[5] there is record evidence from which a jury could find that Restore could (and did) still perform some services on the da Vinci without access to that technology but for the impacts of the exclusive dealing provisions of the SLSA.

*Second*, with respect to Restore's alleged failure to define a relevant antitrust market, there is evidence (namely the opinions of Restore's expert economist) from which a reasonable jury could find that (1) laparoscopic surgery is not viewed by the relevant consumers (e.g., health care facilities and surgeons) as a substitute for

---

[5]   The Court previously ruled that Intuitive has no obligation to share its proprietary technology with Restore (or anyone else) and that its failure to do so cannot serve as a basis for Restore's antitrust claim.  *See* Doc. 31, at 16-19.

robotic surgery such that the market for robotic surgery equipment is distinct from the broader surgical equipment market, and (2) distinct aftermarkets exist for repair and replacement of EndoWrists and for servicing the da Vinci robot system because there is a consumer demand for those services and there is evidence that Intuitive sells and prices them separately.[6]   Although there is conflicting evidence from Intuitive's experts on both points, the Court is required to view the evidence in the light most favorable to Restore at this stage of the case.  Ultimately, it will be up to the jury to decide which expert to believe.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1306 (Fed. Cir. 2011) ("It is decidedly the jury's role to evaluate the weight to be given to the testimony of dueling qualified experts."); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573-74 (11th Cir. 1991) ("The parameters of a given market are questions of fact …, and therefore summary judgment is inappropriate if there are material differences of fact.").

*Third*, with respect to the substantive antitrust violations alleged by Restore, there is evidence (namely the opinions of Restore's expert economist) from which the jury could find that the tying and exclusive dealing arrangements embodied in

---

[6]   The Court did not overlook Intuitive's argument that EndoWrists are essential components of the robot system such that they cannot be considered separate products for antitrust purposes.  However, it is undisputed that customers can and do purchase new EndoWrists separately from the robot system once the EndoWrists reach their usage limits.  Likewise, it is undisputed that Intuitive separately prices and sells its da Vinci repair services on a "time and materials" basis under certain circumstances.

the SLSA violate the "rule of reason"[7] because (1) those restraints have substantial anticompetitive effects that harm consumers, and (2) the anticompetitive effects outweigh the alleged procompetitive rationale for the restraints.  On the first point, as to tying, there is evidence from which the jury could find that the combined cost of the tied and tying products exceeded their combined fair market value, *see Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982);[8] and as to exclusive dealing, there is evidence from which the jury could find that as a matter of "market reality," Intuitive effectively forces customers into using its da Vinci repair services (even those services that do not require the distributor's toolkit) because the SLSA states that Intuitive has no obligation to provide services on a system that has been serviced by someone other than Intuitive and that any unauthorized service will void the system's warranty.[9]  On the second point, although the Court agrees with

---

[7]  The Court did not overlook Restore's argument that the per se rule applies to tying arrangements, but the Court finds that the rule of reason applies because the tying arrangements at issue involve patented products.  *See* Doc. 31, at 3 n.3 (citing *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006)).

[8]  The Court did not overlook Intuitive's argument that Restore's expert did not analyze what the separate prices for the da Vinci system, its services, and EndoWrists would be in the but-for world, but a review of the expert's report shows that she at least considered the effect on price that the changes in the but-for world would have for each of the products and services at issue before determining the aggregate effect of those changes on the total package price.  Whether the expert's analysis is sufficient to persuade a jury is an issue for trial, not summary judgment.  *See* Doc. 149 at 22-25.

[9]  The Court did not overlook the "market reality" that the full range of service to the da Vinci system cannot be provided without access to the proprietary distributor's toolkit, but there is evidence that Restore could still perform some services on the da Vinci without access to the distributor's toolkit were it not for the impacts of the exclusive dealing provisions of the SLSA.

Intuitive that patient safety can be a legitimate justification for restraints on trade, there is evidence from which the jury could find that the patient safety justifications for the usage limits are pretextual (or overbroad) because the limits are arbitrarily low and "repaired" EndoWrists function the same as new instruments. Likewise, issues of fact remain as to Intuitive's "goodwill" justification, namely whether Intuitive could protect its goodwill and maintain the quality of its products by specifying product standards rather than imposing exclusivity agreements. The Court did not overlook that there is conflicting evidence from Intuitive's economist expert on both points, but as noted above, the jury will have to resolve this "battle of the experts."

*Fourth*, with respect to CPR's claims, the Court agrees with Intuitive that the record contains no evidence from which a jury could find that Intuitive prohibited its customers from purchasing unused or partially used EndoWrists from CPR or anyone else. The only evidence cited by CPR in support of this claim is the testimony of the manager of a surgery center. That testimony shows that that Intuitive "strongly discouraged" and did not "support" the surgery center procuring unused and partially used EndoWrists from sources other than Intuitive, but it does not support a finding that Intuitive "prohibited" customers from purchasing unused

---

Moreover, the "market reality" that only Intuitive has the distributor's toolkit necessary to perform most significant da Vinci repairs and maintenance makes its threats to withhold service and void the warranty even more significant.

and partially used EndoWrists (as compared to "repaired" EndoWrists) from CPR or anyone else because the manager acknowledged that Intuitive clarified to him that the SLSA "does not prohibit the use of used or unopened instruments purchased from other sources." Thus, Intuitive is entitled to summary judgment on the claims asserted by CPR.

*Finally*, with respect to the tortious interference counterclaim, Intuitive must show "(1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of [Restore]; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage … as a result of the interference." *Howard v. Murray*, 184 So.3d 1155, 1166 (Fla. 1st DCA 2015). The undisputed evidence establishes the first two elements,[10] but factual disputes remain as to whether Restore's interference with the business relationships between Intuitive and its customers was justified by the "competition privilege" or unjustified because the means employed by Restore were unfair, deceptive, or otherwise "improper." *See Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So.3d 646, 650-51 (Fla. 4th DCA 2020); *Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, 2019 WL

---

[10] Restore disputes that it knew the terms of any of the contracts at issue, but it is not necessary to know the specific terms of the contract in order to commit tortious interference. *See Morrow v. Putnal*, 2007 WL 1875879, at *3 & n.1 (M.D. Fla. June 27, 2007).

277733, at *9 (M.D. Fla. Jan. 22, 2019).  Accordingly, Intuitive is not entitled to partial summary judgment on its tortious interference counterclaim.

### Restore's Motion

Restore seeks summary judgment on five of the six counterclaims asserted by Intuitive.[11]  Specifically, Restore argues that (1) it is entitled to summary judgment on the Computer Fraud and Abuse Act (CFAA) counterclaim because there is no evidence of a crime or that Intuitive suffered a loss; (2) it is entitled to summary judgment on the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) counterclaim because no consumer was aggrieved by its acts and practices; (3) it is entitled to summary judgment on the passing off counterclaim because there is no likelihood of consumer confusion between Intutive's products and those "repaired" by Restore; (4) it is entitled to summary judgment on the false advertising counterclaim because the challenged advertisements were not false or misleading; and (5) it is entitled to summary judgment on the common law unfair competition counterclaim for the same reasons it is entitled to summary judgment on the passing off and false advertising claims.  Each counterclaim will be discussed in turn.

---

[11]  The only counterclaim on which Restore does not seek summary judgment is the tortious interference counterclaim on which Intuitive seeks partial summary judgment.

*CFAA*

Under the CFAA, it is unlawful to "intentionally access[] a protected computer without authorization, and as a result of such conduct, cause[] damage and loss." 18 U.S.C. §1030(a)(5)(C). It is also unlawful to conspire or attempt to commit such an offense. 18 U.S.C. §1030(b). A person who suffers damage or loss by reason of a violation of the CFAA may bring a civil action against the violator if the violation caused certain outcomes, including an aggregate loss of $5,000 under §1030(c)(4)(A)(i)(I). *See* 18 U.S.C. §1030(g).

Here, it is undisputed that Restore did not <u>actually</u> "hack" into Intuitive's computer system,[12] but Intuitive claims that there is at least a factual dispute as to whether Restore <u>attempted</u> to do so. The Court disagrees.[13]

The undisputed evidence shows that Restore's CEO, Clif Parker, asked a former Intuitive employee if he could circumvent the da Vinci system's security measures to remove a "PM [preventative maintenance] due" message. The former

---

[12] To the extent Restore argues that Intuitive cannot assert a claim under the CFAA because the "protected computer" in the da Vinci system is owned by the customer, not Intuitive, the Court rejects this argument because there is no requirement that the entity asserting a civil CFAA claim must have been the "owner" of the protected computer. *See Sargeant v. Maroil Trading Inc.*, 2018 WL 3031841, at *12 (S.D. Fla. May 30, 2018) ("[A] person may assert a CFAA claim even if he does not own, operate, or maintain the relevant server. 'The civil remedy extends to any person who suffers damage.'" (quoting *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004))).

[13] Based on this ruling, the Court need not address Restore's alternative argument that Intuitive lacks standing to assert a CFAA claim because there is no evidence that it suffered any damage or loss.

employee told Mr. Parker that it would be almost impossible to do so without Intuitive's proprietary laptop.  Mr. Parker did not pursue the matter any further because he concluded that it was a "futile effort."

Under these circumstances, no reasonable jury could find that Restore attempted to violate the CFAA because to be convicted of an "attempt" to commit a federal crime, a defendant "must … have taken a substantial step toward the commission of the offense."  *United States v. St. Hubert*, 909 F.3d 335, 351 (11th Cir. 2018); *see also United States v. Keys*, 703 F. App'x 472, 475 (9th Cir. 2017) (applying the substantial step test in a CFAA criminal case).  Merely soliciting another person to commit a crime (as Mr. Parker arguably did here) is not an attempt because the defendant "must do more than merely plan or prepare for the crime; he or she must perform objectively culpable and unequivocal acts toward accomplishing the crime."  *St. Hubert*, 909 F.3d at 351; *see also United States v. Veliz*, 800 F.3d 63, 72 n.9 (2d Cir. 2015) ("Although the common law treatment of solicitation is not uniform, the majority view was that a mere solicitation is not an attempt."); *United States v. Dolt*, 27 F.3d 235, 239 (6th Cir. 1994) ("[S]olicitation is not the essential equivalent of attempt because solicitation does not require an overt act on the part of the defendant to complete the crime."); *United States v. Williams*, 260 F. Supp. 2d 1368, 1378 (S.D. Ga. 2003) (discussions and meetings that did not result in an agreement or plan were not a substantial step); *United States v. Gomez*,

17

15 M.J. 954, 966 (A.C.M.R. 1983) ("The mere solicitation of another to commit a crime does not constitute an attempt.").

*FDUTPA*

The elements of a FDUTPA claim are "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So.3d 207, 212 (Fla. 4th DCA 2019). "While an entity does not have to be a consumer to bring a FDUTPA claim, it still must prove the elements of the claim, including an injury to a consumer." *Id.*

Here, Restore argues that it is undisputed that "there is no consumer aggrieved by [its] acts or practices" because its customers were satisfied with its repair services.[14] However, as Intuitive argues, there is evidence from which the jury could find that the consumers did not get what they bargained for because, among other things, there is evidence that the "repaired" EndoWrists were qualitatively inferior to Intuitive-manufactured EndoWrists, and there is also evidence that some

---

[14] To the extent that Restore argues that it is entitled to summary judgment on the FDUTPA claim because there is no <u>Florida</u> consumer injured by its alleged unfair or deceptive practices, that argument is meritless. *See Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1260-62 (Fla. 3d DCA 2000) (holding that FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation" and that it applies "where … the offending conduct occurred entirely within this state … even where the persons affected by the conduct reside outside the state."); *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1323 (S.D. Fla. 2016) ("The statute protects non-Florida consumers only when the alleged wrongful conduct occurred within the State of Florida."); *FTC v. Info. Mgmt. Forum, Inc.*, 2013 WL 3323635, at *6-7 (M.D. Fla. June 28, 2013) ("FDUTPA applies where the offending conduct occurred within Florida, even where those persons affected by the conduct reside outside of the state.").

18

customers' service agreements with Intuitive were terminated for using Restore's unauthorized "repair" service. The jury could find from this evidence that consumers were injured by Restore's practices despite their general satisfaction with its repair services. Thus, Restore is not entitled to summary judgment on the FDUTPA counterclaim.

*Passing Off*

The parties disagree as to the precise contours of Intuitive's "passing off" claim. Restore interprets the claim as alleging that it represented its services to be authorized or endorsed by Intuitive, whereas Intuitive explained that "[t]he crux of Restore's 'passing off' was its false presentation of 'repaired' EndoWrists as still being Intuitive-manufactured products with the same functionality, safety, and reliability as new EndoWrists, when in fact those instruments were heavily modified and qualitatively different from—indeed, inferior to—genuine Intuitive instruments." No matter how the claim is construed, the Court agrees with Intuitive that there is evidence from which the jury could find in its favor.

With respect to Restore's characterization of the claim, although there is no evidence that Restore <u>explicitly</u> represented that its services were authorized or endorsed by Intuitive, there is evidence from which the jury could find that Restore <u>implicitly</u> did so through its marketing materials that, according to the results of the

19

survey conducted by Intuitive's expert, created the impression that Restore was authorized, affiliated, or endorsed by Intuitive.

With respect to Intuitive's characterization of the claim, it is undisputed that Intuitive has enforceable trademark rights in the EndoWrist instruments, and there is evidence from which a jury could find the other element necessary to establish a prima facie case—i.e., that consumers were likely to confuse EndoWrists "repaired" by Restore as still being Intuitive products.  *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (quoting *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997)).  For example, although the EndoWrists "repaired" by Restore had nondescript "R" etched on the instrument, they continued to bear Intuitive's distinctive trademarks as if they were still Intuitive products despite the fact that the usage limit had been removed.[15]  Additionally, Restore specifically marketed the "repaired" instruments as having the exact same functionality and performance as Intuitive-manufactured instruments.  These factors (and those listed in Intuitive's

---

[15]  The Court summarily rejects Restore's "threshold" argument that its repair services does not constitute a "use in commerce" under the Lanham Act, because there is evidence from which the jury could find that the removal of the usage limit effectively makes a "repaired" EndoWrist into a different product such that it would be misleading to retain Intuitive's trademark on the "repaired" instrument.  *See Elf Cocoon, LLC v. Philip Stein Holdings, Inc.*, 2009 WL 10667773, at *19 (S.D. Fla. Aug. 11, 2009) ("If [a] reconstructed product still bearing the original manufacturer's trademark is so altered as to be a different product from that of the original manufacturer, the repair transaction involves a 'use in commerce.'" (quoting *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 856 (9th Cir. 2002)).

response, Doc. 115, at 39-40) are more than enough for the "passing off" claim to withstand summary judgment. *See Custom Mfg.*, 508 F.3d at 648 (listing the factors to be considered and balanced in determining whether a "likelihood of confusion" exists, including the similarity of the marks, the similarity of the goods, evidence of actual confusion, and the defendant's intent to capitalize on the plaintiff's business reputation); *accord Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335-41 (11th Cir. 1999).

*False Advertising*

To prove false advertising under Lanham Act, Intuitive must show that "(1) the advertisements … were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

Intuitive's false advertising claim is based on six "categories of deceptive statements regarding [Restore's] unauthorized repair services," only four of which are the subject of Restore's motion for summary judgment: (1) that Restore's service is authorized or approved by Intuitive; (2) that Restore was qualified to perform its service; (3) that Restore has properly analyzed whether 510(k) clearance is required

for its services; and (4) that Restore's services save customers substantial amounts of money.[16]   Restore does not contest that it made these statements (and there is evidence from which the jury could find that it did), but Restore argues that there is no evidence from which the jury could find that the statements were false or misleading.  For the most part, the Court disagrees.

As to the first category of statements—that Restore told consumers that it was "authorized" by Intuitive—although there is no evidence that Restore falsely told potential customers that its services <u>were</u> authorized by Intuitive, there is evidence from which the jury could find that Restore's advertising was misleading (and at least had the capacity to deceive potential customers) by not clearly and conspicuously stating that Restore was <u>not</u> authorized by Intuitive.  Indeed, the results of the survey conducted by Intuitive's expert showed that a substantial percentage of prospective targets of the advertising believed that Restore was authorized, affiliated, or endorsed by Intuitive.

As to the second category of statements—that Restore was qualified to service da Vincis and repair EndoWrists—there is evidence from which the jury could find that the statement was at least misleading.  Specifically, although there is evidence

---

[16]   The two categories of statements on which Restore does not seek summary judgment are its statements that there are no material adverse consequences for customers who use Restore's services and that Restore's failure to disclose that its repair service "breaks into and makes major modifications to EndoWrists [by] replacing original circuit boards with unauthorized … technology."

that Restore's technicians were experienced and at least some of them had been trained and certified by Intuitive, there is also evidence that the technicians were credentialed many years ago and were not up to date with changes in software and technology.

As to the third category of challenged statements—that Restore properly analyzed its obligations under FDA clearance regulations—based on the Court's ruling at the motion to dismiss stage of the case, *see* Doc. 44, at 6, Intuitive is no longer challenging the falsity of Restore's claim that its services do not require 510(k) clearance (because that is an issue for FDA to decide in the first instance), but rather it is asserting that the "alleged deception is that Restore insufficiently analyzed th[e] issue, regardless of whether its ultimate conclusion was correct or aligned with any ultimate FDA determination." Stated another way, Intuitive is arguing that Restore's statements that its services do not require 510(k) clearance are at least misleading because it is undisputed that the FDA has raised questions and concerns about regulatory compliance. The problem with that argument is that "[s]tatements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact, unless a court or agency of competent jurisdiction has clearly and unambiguously ruled on the matter." *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 889 F. Supp. 2d 1304, 1317 (M.D. Fla. 2012) (internal quotation marks omitted); *accord Coastal Abstract Serv., Inc. v. First*

*Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999); *see also Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 488-89 (D.C. Cir. 1996); *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230-31 (3d Cir. 1990).  Thus, Restore's statements concerning the need for 510(k) clearance are not actionable.

As to the fourth category of statements—that Restore provides cost savings over Intuitive—there is evidence from which a jury could find that these statements are at least misleading because they do not account for the potential costs that customers might face if their warranties are voided for using unauthorized repair services.

In sum, factual disputes preclude summary judgment on all of Intuitive's false advertising claims, except for the claim based on Restore's statements concerning 510(k) clearance for its repair services.

### Common Law Unfair Competition

An unfair competition claim under Florida law has the same elements as an unfair competition/false advertising claim under the Lanham Act—i.e., "deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion." *Webster v. Dean Guitars*, 955 F.3d 1270, 1277 (11th Cir. 2020) (quoting *Donald Fredrick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986)); *Anderson v. Upper Keys Bus. Grp., Inc.*, 61 So.3d 1162, 1167 (Fla. 3d DCA 2011).  Here, Restore argues that it is entitled to summary judgment on Intutive's

common law unfair competition counterclaim for the same reasons that it is entitled to summary judgment on the passing off and false advertising claims under the Lanham Act.  Based on the Court's rulings on those claims, it follows that Restore is not entitled to summary judgment on the common law unfair competition claim.

### Conclusion

In sum, for the reasons stated above, the Court finds that the evidence in this case is not so one-sided that the result of a trial would be inevitable, except with respect to the claims asserted by CPR, the CFAA counterclaim, and one aspect of the false advertising counterclaim.  Accordingly, it is **ORDERED** that:

1.     Intuitive's motion for summary judgment (Doc. 109) is **GRANTED in part** and the claims asserted by CPR are **DISMISSED with prejudice**.  The motion is otherwise **DENIED**.

2.     Restore's motion for partial summary judgment (Doc. 112) is **GRANTED in part** and the CFAA counterclaim and the false advertising claim concerning 510(k) clearance are **DISMISSED with prejudice**.  The motion is otherwise **DENIED**.

3.     Within 7 days from the date of this Order, the parties shall confer and advise the Court of several mutually agreeable dates and times during the following two weeks for a telephonic case management conference to schedule this case for trial.

**DONE and ORDERED** this 11th day of April, 2022.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**