**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

RESTORE ROBOTICS, LLC,      )
RESTORE ROBOTICS REPAIRS, LLC, )
and CLIF PARKER ROBOTICS, LLC, )
                      )
         Plaintiffs,    ) Case No: 5:19cv55
                      )
      v.           )
                      ) April 27, 2022
INTUITIVE SURGICAL, INC.,     )
                      ) 2:01 PM
         Defendant.     )
_____ )

INTUITIVE SURGICAL, INC.,     )
                      )
         Counterclaimant,   )
                      )
      v.           )
                      )
RESTORE ROBOTICS, LLC,      )
RESTORE ROBOTICS REPAIRS, LLC, )
                      )
  Counterclaim Defendants.   )
_____ )

**TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE PROCEEDING**
**BEFORE THE HONORABLE T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 31)**

Court Reporter:        MEGAN A. HAGUE, RPR, FCRR, CSR
                     111 North Adams Street
                     Tallahassee, Florida 32301
                     megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:


For the Plaintiffs:       Jeffrey L. Berhold, P.C.
                          By:  JEFFREY L. BERHOLD
                               Attorney at Law
                               jeff@berhold.com
                          1230 Peachtree Street, Suite 1050
                          Atlanta, Georgia 30309

                          Harrison, Rivard, Duncan
                          By:  WILLIAM GERALD HARRISON, JR.
                               Attorney at Law
                               wharrison@harrisonrivard.com
                          101 Harrison Avenue
                          Panama City, Florida 32401



For the Defendant:        Allen J. Ruby
                          By:  ALLEN J. RUBY
                               Attorney at Law
                               allen@allenruby.com
                          15559 Union Avenue, Suite 138
                          Los Gatos, California 95032

                          Skadden, Arps, Slate, LLP
                          By:  KAREN MARY LENT
                               Attorney at Law
                               karen.lent@skadden.com
                          One Manhattan West
                          New York, New York 10001

1              **P R O C E E D I N G S**

2        (Call to Order of the Court at 2:01 PM on Wednesday,

3   April 27, 2022.)

4              THE COURT:  Good afternoon, everyone.  This is

5   Case No. 5:19cv55, Restore Robotics versus Intuitive Surgical.

6   I know we have a number of attorneys on the line.

7              Just for record purposes, why don't you all introduce

8   yourself and then let me know who's going to be speaking on

9   behalf of the plaintiff and then on behalf of the defendant.

10             So starting with the plaintiff, who do I have on the

11  line?

12             MR. BERHOLD:  Good afternoon, Your Honor.

13  Jeff Berhold for Plaintiff Restore Robotics and Plaintiff

14  Restore Robotics Repairs.

15             Mr. Harrison was not planning to join us today, but I

16  have talked with him ahead of this conference.

17             MR. HARRISON:  Yes, I'm on.

18             Good afternoon, Your Honor.

19             MR. BERHOLD:  Oh, great.

20             THE COURT:  But you're going to be handling things on

21  behalf of the plaintiff, Mr. Berhold?

22             MR. BERHOLD:  Yes, Your Honor.

23             MR. RUBY:  Good morning, Your Honor.  My name is Allen

24  Ruby for Intuitive.  I'll be handling things regarding trial and

25  the particulars of the trial portion of our discussion.  If for

1    whatever reason that we get into particulars of the motions or

2    pending motions or things like that, I'll ask the Court's

3    permission that my colleague, Ms. Lent, be allowed to handle

4    that.

5              THE COURT:  All right.  Anyone else you want to have

6    an appearance from for today's purposes from Intuitive?

7              MR. RUBY:  We don't foresee that, Your Honor.

8              THE COURT:  All right then.  And we're not waiting for

9    anyone else?

10             MR. RUBY:  We're not for Intuitive.

11             MR. BERHOLD:  Nor for Restore.

12             THE COURT:  All right.  And our court reporter is

13   remote, as we all are, and so when you speak, if you'll just

14   identify yourself so she can attribute the comments to the

15   correct person.

16             The purpose of our call today is to get this case set

17   for trial based on the summary judgment order that was entered.

18   I know that a motion for reconsideration as to part of that

19   order has been filed.  And the response deadline for that, I

20   believe, runs later this week, and so I don't intend to get into

21   the merits of that today, although I do have some thoughts that

22   I might share with the parties because it's my understanding

23   that that motion only sought reconsideration of part of the

24   order and that, irrespective of what happens with that, the

25   other issues that there are factual disputes on will still need

1    a trial.

2            So I think, unless the parties tell me differently,

3    that the time that we're spending getting this case set for

4    trial will not be time wasted, irrespective of what happens with

5    that motion.

6            Is that your understanding, Mr. Berhold?

7            MR. BERHOLD:  Jeff Berhold, that is correct,

8    Your Honor.  That is my understanding.

9            THE COURT:  Mr. Ruby, you agree with that?

10           MR. RUBY:  Your Honor, I wonder if I could defer to

11   Ms. Lent on that motion-related issue?

12           THE COURT:  All right.  Ms. Lent, do you understand

13   the question?

14           MS. LENT:  I do, Your Honor.  Karen Lent.  And that is

15   correct that there would be claims regarding servicing of

16   da Vinci, da Vinci surgical machines, that would proceed despite

17   the ruling on the motion for reconsideration.

18           THE COURT:  Okay.  And then along that same line,

19   though -- well, let me step back and do this in a different

20   order.

21           I know the parties mediated the case back in May of

22   2021, so about a year ago now.  And over the course of the

23   proceedings from that point forward, the parties reported that

24   they planned to return to mediation initially after the expert

25   reports were prepared and then after the briefing was done on

 1    the summary judgment motions.  And then none of that actually

 2    happened, and I made inquiry of the parties whether they did

 3    still plan to do that voluntarily, and the last I was told was

 4    that back in February the parties wanted summary judgment

 5    rulings.

 6             And so now that you've gotten summary judgment

 7    rulings, have the parties had any conversations about going back

 8    to the mediator and seeing whether they could get all or part of

 9    the case resolved?

10             Mr. Berhold?

11             MR. BERHOLD:  Thank you, Your Honor.  Jeff Berhold

12    here.

13             No, there has not been a discussion along those lines.

14    The parties have not had that discussion, no.

15             THE COURT:  Is there a -- from the plaintiff's

16    perspective, is that -- if they're ordered to do that, is that a

17    waste of time and resources or not?

18             MR. BERHOLD:  Jeff Berhold again.  I would -- I think

19    that there may still be at least one important condition that

20    needs to take place that would be productive -- lead to more

21    productive mediation.

22             I would -- that that -- that precondition could happen

23    at any time, so it's possible if we set a mediation in four

24    weeks or six weeks that it might be an opportune time for

25    mediation.

1          THE COURT:  And let me -- let me ask you this, and not

2    to pry into things that I don't need to know or don't have a

3    right to know, but when you say "precondition," are you talking

4    about anything pending here in the court, or is this external

5    business matters?

6          MR. BERHOLD:  Something outside the -- what's

7    happening in the court.

8          THE COURT:  Okay.

9          Anything else you want to add before I let Mr. Ruby or

10   Ms. Lent weigh in on that?

11         MR. BERHOLD:  No, Your Honor.  Thank you.

12         THE COURT:  All right.  Mr. Ruby or Ms. Lent, do the

13   defendants have a different perspective about the potential

14   productivity of an additional mediation, and also are -- you

15   understand the language Mr. Berhold is speaking about, whatever

16   this precondition is?  I mean, I don't want to know if I don't

17   need to know, but just make sure the parties at least understand

18   what each other are talking about.

19         MR. RUBY:  Your Honor, this is Allen Ruby.  I'd be

20   speculating to some degree about what Mr. Berhold meant by a

21   precondition, but assuming it's a well-founded speculation, then

22   I think the defendants -- or defendant wouldn't be confident or

23   even think it's very likely that mediation at this point would

24   be productive.  We would agree with his conclusion on that.

25         THE COURT:  Okay.

1          I guess -- and we'll weave this into our time frames

2     and our discussions, but my anticipation has been this is going

3     to be a lengthy trial, a complicated trial, a costly trial and

4     that before we infringe upon citizens to come in and help the

5     parties resolve their dispute, I was, in all likelihood, going

6     to order the parties back to mediation.

7          I certainly don't want to force the parties to do

8     something that has got absolutely no hope of success, but it

9     just makes a lot of sense to me, given the complex nature of

10    this, rather than putting this in the hands of six to eight lay

11    people, that the parties make an effort to resolve this case,

12    because I think the exposures that are there on both sides of

13    the case warrant serious consideration of whether giving this

14    case to a jury makes a lot of sense.

15         So that likely will be part of what I weave into the

16    pretrial order that requires the parties to do that, and I'm

17    certainly open on the timing of that, based upon whatever this

18    precondition is out there that may or may not happen.  And

19    perhaps the ruling on the motion for reconsideration may

20    facilitate some of those discussions or get people off their

21    expectations about what might happen at trial.  So that's going

22    to be part of what comes of our discussions today.

23         But looking, then, at the trial side of things in the

24    event that the parties, when they all are ordered to go to

25    mediation, are unsuccessful in that regard, from the plaintiff's

1  perspective, what would you anticipate from a number of trial

2  days that we would need?

3          MR. BERHOLD:  I would estimate 10 to 15 trial days.

4          THE COURT:  And would that be just for your case or

5  for the entire case?

6          MR. BERHOLD:  The entire case, Your Honor.

7          THE COURT:  All right.  Mr. Ruby, what would you

8  anticipate?

9          MR. RUBY:  Our estimate, Your Honor, is 20 days, a

10 4-week case, excluding opening statements and closing arguments

11 and jury selection.  We spent a lot of time trying to scope this

12 out, and it would be about, our best estimate, 20 days of

13 evidence for the whole case.

14         THE COURT:  Okay.  And let me ask this question:

15 Would either of those numbers -- estimates be different or would

16 they change in any way if the motion -- depending upon the

17 ruling on the motion for reconsideration?

18         Mr. Berhold?

19         MR. BERHOLD:  I would guess that that would shorten

20 the case somewhat.

21         THE COURT:  By what magnitude would you think?

22         MR. BERHOLD:  I'd still think it'd be -- might move it

23 closer to 10 days rather than 15 days, but I don't know that --

24 I think -- I don't think it'd be a -- I don't think it would

25 have -- I don't know that it would reduce the trial time by more

1  than, say -- oh, say, 20 percent is my best guess.

2          THE COURT:  Mr. Ruby, do you -- what would you

3  think -- if that motion were granted, what would you think that

4  would do to your trial estimate?

5          MR. RUBY:  I think it would reduce our trial estimate

6  by five days at least.

7          THE COURT:  Okay.  All right.

8          As you can imagine, finding a three- to four-week

9  block of time on the calendar is quite a challenge, and even

10  though this case has been pending for a significant amount of

11  time, I don't see a block of time that big this calendar year.

12  And so I would be looking into the next calendar year, primarily

13  because the way we work is we have our criminal weeks blocked

14  off for each month through the year, and so those dates are

15  really difficult to move around at this point.

16          We don't have those started yet for 2023, and so that

17  creates a lot more flexibility.  It will create some inherent

18  complications in getting those cases set, but -- and so if

19  you're wanting four weeks of time, I think the -- really the

20  first point at which I would feel comfortable in opening up the

21  calendar would be in February of 2023.

22          What does that look like for the plaintiff?

23          MR. BERHOLD:  Jeff Berhold for Restore.  We had not

24  looked that far ahead.  It should not be an issue for counsel.

25  I do not expect that it would be an issue for the client or

```
1   other witnesses.  I would need to check to be sure.  We
2   certainly would like a trial much sooner, but --
3           THE COURT:  Well, if y'all can do the trial --
4           MR. BERHOLD:  (Indiscernible crosstalk.)
5           THE COURT:  If y'all can do the trial in two weeks, I
6   can find a lot more places to put it, but a four-week trial is
7   just -- it just is a little more complicated than just putting
8   it on the calendar, and so I'm -- that's where we are,
9   unfortunately.
10          MR. BERHOLD:  Jeff Berhold again.  I would expect that
11  Restore would make February work if that's the earliest possible
12  date.
13          THE COURT:  All right.  What does that look like for
14  Intuitive?
15          MR. RUBY:  It looks pretty good.  We have no reason to
16  believe that any of our witnesses or counsel would be disabled
17  or unable to appear in February.  We did only check people out
18  thoroughly through the end of this year, so we'd want to do
19  another check, but we could do that very quickly, and, as I say,
20  I would expect that what we'll hear is an all clear for
21  February.
22          THE COURT:  Is there -- and, again, I'm -- you know,
23  if the parties in good faith are telling me that they need three
24  to four weeks to try this case, then that's what they need, and
25  we'll accommodate that, but is it -- is it inhumanly
```

1    impossible -- if that's a word -- to figure out a way to try

2    this case in a couple of weeks?

3            MR. BERHOLD:  Jeff Berhold here.  I think it's

4    possible to get it done in two weeks if, for example, the

5    parties were put on a clock.  I think it could be done, and that

6    may be to the benefit of everyone, including the jury.

7            THE COURT:  Mr. Ruby, you're the one that started the

8    bidding at 20 days, and that would cut that in half.

9            MR. RUBY:  Yeah, I could not in good faith promise or

10   even hold out a high probability that it could be done fairly to

11   all parties in two weeks.

12           I could -- and I'm prepared to elaborate on that if

13   the Court wanted me to, but we've -- we've looked at it.  We

14   started with one day, you know, and I can't do it in one day,

15   and we tried to be very systematic about it.  There were

16   hundreds of hours of depositions taken.  And those don't

17   translate, of course, one to one to a trial, but there is some

18   connection.

19           We didn't waste our time in discovery on either side,

20   I felt, and we tried to get at the issues, and it just -- it

21   takes a long time.  There's a technical aspect to the case

22   and -- again, I don't want to take the Court's time with matters

23   with which the Court's already familiar, but there's a

24   commercial aspect and there are financial aspects to the

25   evidence.

1          And the accusation of monopoly goes back more than 20

2    years, so there's a considerable time period that needs to be --

3    in our view, needs to be covered in the evidence to make sense

4    of how we get from here to there on either side's account of

5    things.  So I wouldn't want anyone to think that we were

6    especially gratified by the idea that it would take 20 days of

7    evidence, but that's where the evidence, facts and the

8    depositions and discovery led us.

9          And I haven't even mentioned -- then I'll stop -- but

10   the documents, the thousands and probably tens of thousands of

11   documents were exchanged and, again, those -- not all of them or

12   even most of them or even a big part of them are going to be in

13   evidence, but they were exchanged in discovery for a reason on

14   one side or the other.  So I actually believe that our estimate

15   means we -- assumes, as it should, that we're going to be

16   working hard and full days and ready to go and ready to use the

17   time productively.

18         THE COURT:  Okay.  Well, I appreciate that, and I'm

19   very familiar with the extensive record that I saw, and I'm sure

20   that was only a component of what the parties exchanged during

21   discovery, so I certainly understand this is a complicated case.

22   And you have very smart folks that will be sitting on a jury

23   like this, but a lot of this is close to being over my head and

24   I'm fairly confident it'll be over a lot of jurors' heads, and

25   it's -- if the parties aren't able to simplify this for the

1    jury, I pity your clients as to how -- what they may do with

2    this case.

3            But, in any event, we will block the month of February

4    for Restore v. Intuitive.  We'll start on the 6th of February

5    with jury selection, and I will work with our courtroom deputy

6    clerk and our jury coordinator to figure out a way to -- maybe

7    try to prescreen people for their availability for that length

8    of time, because that is a big ask to get people to give up a

9    month of their time to sit on a jury.

10           We've got people who through COVID were more than

11   willing to come in and do their civic duty, but we weren't

12   asking them to do it for a month, and so that's going to be a

13   challenge.  My hope is, though, that once we are able to screen

14   out people that would be unwilling or unable to give us that

15   length of time, the actual selection part of the process I

16   wouldn't anticipate would take any longer than it normally would

17   because the case, while complicated, is not something that I

18   would expect a lot of people have strong feelings on one way or

19   the other.

20           So it would seem to me that we would be -- once we get

21   people that would be able to commit that amount of time, we

22   would be able to pretty easily get a jury out of a normal size

23   pool.  So my hope would be -- my expectation would be that we

24   would be able to get that jury selected that first day, and if

25   all things go better than hoped, we would go ahead and be able

1   to begin opening statements.

2           And so normally what I do once we get a trial set is

3   back up about two weeks before that for a final pretrial

4   conference that is a true final pretrial conference.  It is

5   dealing more with last -- not last minute, but true motions in

6   limine, things that you have evidentiary reasons or prejudice

7   reasons for keeping out of the jury, not *Daubert*-type issues

8   which have come and gone at this point.

9           But given the length of time that we're going to be

10  together, given my anticipation based upon the experience with

11  the filings I've gotten thus far, I suspect we're going to get a

12  fair number of complicated motions that we're going to have to

13  deal with, so it seems to me it would make sense to build a

14  little bit more time in between the start of trial and that

15  pretrial -- final pretrial conference in the event that there

16  are issues that come up there that we need to have last-minute

17  resolutions on.  So I would be looking at something maybe in

18  that first to second week of January for a final pretrial

19  conference.

20          What do those weeks look like for the plaintiff?

21          MR. BERHOLD:  Jeff Berhold here, Your Honor.

22          That should be -- the January 9th or 16th should be --

23  sorry.  Were you speaking specifically of that Monday of the

24  week or just those weeks generally?

25          THE COURT:  I was just talking about those weeks

1  generally.

2          MR. BERHOLD:  Yeah, so -- sorry.  Jeff Berhold again.

3          Those weeks look fine for me.  It's possible that

4  Mr. Rivard or Mr. Duncan may be attending in addition to

5  Mr. Harrison, or in lieu of Mr. Harrison, but I expect that we

6  would have someone there from Harrison Rivard without any

7  problem.

8          THE COURT:  Mr. Ruby, what do those weeks look like

9  for Intuitive?

10          MR. RUBY:  May I ask, Your Honor, whether it's the

11  Court's practice to or does the Court sometimes do these

12  pretrial conferences electronically, or would we be looking at

13  an in-person event with the Court?

14          THE COURT:  I would anticipate that we would do this

15  in person, and sometimes I do do them electronically, but

16  typically only when it's -- there's nothing substantive to

17  discuss, and I anticipate we'll have substantive things to

18  discuss.

19          Also, it'll give you an opportunity -- whoever's going

20  to be trying the case an opportunity to meet with the court --

21  courtroom deputy clerk and go through the evidence presentation

22  system, which I think will be very important in this case given

23  the document-intensive nature of it, to make sure that you're

24  very familiar with that system.

25          So, yes, it will be in person.

1          MR. RUBY:  Then both those weeks still look fine to

2    me, and I'd look forward to it.  There's something that I may

3    need to move by a matter of a day or so, but I would stay

4    comfortably within a window that would let me do this, which I

5    look forward to.

6          I wonder if Your Honor would mind if I just -- while

7    we're on the call, if I ask Ms. Lent and Ms. Winner if their

8    schedules are okay for those weeks?

9          THE COURT:  Sure, they can weigh in.

10          MS. WINNER:  This is Sonya Winner.  And, yes, that

11    would -- those weeks would be fine with me.  Thanks for asking.

12          MS. LENT:  This is Karen Lent.  Same for me.  Thank

13    you.

14          MR. RUBY:  Thank you, Your Honor.

15          THE COURT:  Now, understanding that I think everyone

16    is traveling in from somewhere, and Pensacola is not the easiest

17    place to get to from some places, do the parties have a

18    preference of what point during that week, and whether it be

19    morning or afternoon during those weeks?

20          MR. BERHOLD:  Jeff Berhold here.  I'll probably have

21    the easiest trip just jumping from Atlanta to Pensacola.  I

22    would -- and I -- other than trying to avoid Monday -- a Monday

23    or a Friday, just because those are more difficult days for air

24    travel, I don't have a preference on day or time of day.

25          MR. RUBY:  And, Your Honor, Mr. Berhold and I don't

1    always agree on everything, but I'm glad to say that on this

2    point -- and there'll be others -- we do agree, as long as --

3    more toward the middle of the week is better; Fridays and

4    Mondays are more difficult, and thank you for asking.

5            THE COURT:  All right.  Well, let's do it on Wednesday

6    the 11th, and I will set it for 2 o'clock that day.  And so

7    those of you who are adventurous or maybe Mr. Harrison and those

8    driving over from Panama City can just drive over in the morning

9    and fly in that morning if you need to, and we'll set it at

10   2 o'clock.

11           We'll block two hours, again, with the anticipation

12   that there'll be substantive issues that we'll need to talk

13   through as well as logistical issues of the trial.  And

14   hopefully by then we will have a better sense with the jury side

15   of things as to how we're going to get a panel in that'll be

16   willing to give us that amount of time such that we'll -- our

17   jury selection, hopefully, will be very smooth and uneventful.

18           The other dates -- so those two dates will be -- the

19   trial date and the pretrial conference date will be included in

20   a pretrial order that will go out based upon our conversations

21   today.  And the other dates that will be included in that order

22   will work backwards from the pretrial conference date, and those

23   will be dates for the parties to file their pretrial

24   stipulation, jury -- proposed jury instructions, proposed voir

25   dire, proposed verdict form, as well as the date backed up from

1  that that will be for the parties to sit down together for their

2  attorney conference to begin that process or to fine tune that

3  process.

4          Those dates are left -- well, the attorney conference

5  date is less important to me than the date that's established

6  for the filing of the documents because that's what will trigger

7  me to begin my pretrial conference preparation.  So if when the

8  parties get the order there are concerns with either of those

9  dates, but in particular the attorney conference date, I'm happy

10  to move that whenever, wherever, and we can do that the day

11  before everything's due, as far as I'm concerned.  As long as

12  you get the stuff filed that I need filed when I want it filed,

13  how you get to that point is of less concern to me.

14          So that's what you'll see next from me is that order.

15  And, again, if there are any provisions in the order that are

16  causing any sort of concern, y'all have been very, very good in

17  working together on procedural and logistical matters, and I'm

18  confident that you can work out any issues and bring them to my

19  attention and I'll implement them accordingly.

20          The mediation component of this, again, as I said

21  before, I understand -- I heard what the parties said, that the

22  likelihood of a successful mediation may not be great, but

23  before we inconvenience the citizens of this district for a

24  month, I think the parties and counsel and I owe it to them to

25  know that every effort to resolve this case was exhausted before

1   we go down the trial road.  And so the order will include a

2   mandate for the parties to go back and in good faith, with open

3   minds, attempt to resolve their differences.

4          The question I would have for that is, given

5   Mr. Berhold's reference to a four- to six-week precondition

6   that's out there, what time frame -- what date would be a good

7   one for a deadline for that to take place?

8          Mr. Berhold?

9          MR. BERHOLD:  Thank, Your Honor.  Jeff Berhold here.

10         The -- I would suggest mediation by the end of June.

11         And, you know, if there -- we could always come back

12   if we thought -- we can notify the Court if we think that

13   there's some reason why it needs to be put off, but I think that

14   we're going to cross that last bridge well before the end of

15   June, and then we can go ahead and schedule something for

16   sometime in June.

17         THE COURT:  All right.  Mr. Ruby, is that date --

18   deadline suitable?

19         MR. RUBY:  I'd like to defer to Mr. Berhold on that.

20   And, yes, I'm assuming in that -- and I hope this is right --

21   that just as we did the mediation electronically the first time,

22   that the -- subject to the mediator's approval, that that's an

23   option if we were to get this done by the end of June.

24         THE COURT:  All right.  Well, here's what -- and on

25   that, I will defer to the mediator.  They're best suited to know

1  whether -- well, let me ask this question:  Do you anticipate

2  going back to Mr. Caparello, or do you intend to go somewhere

3  else?

4         MR. BERHOLD:  Jeff Berhold here.

5         We were happy with the work of Mr. Caparello and would

6  prefer to resume with him rather than restarting the process.

7  That would be the preference from Restore.

8         MR. RUBY:  And Intuitive completely agrees, and to the

9  extent -- if it came to pass that the June deadline were a

10  problem for Mr. Caparello, I think we would discuss between

11  counsel submitting a proposed modification of the order to --

12  for the Court's approval to extend the time a little bit so that

13  we could fit us into his busy schedule.  I thought he worked

14  very hard and was very fair, and we'd hate to see it change out

15  of that.

16         THE COURT:  All right.  Well, that sounds good.  I

17  think what I'll do to avoid you needing to come back to me, I

18  will set in the order a deadline of the end of June, but include

19  in the order the flexibility of the parties to agree to a later

20  deadline.

21         I'll probably say something to the effect of without

22  Court approval you can extend that deadline to the end of

23  October, say, because if we get to that point -- if it gets

24  beyond that, that's probably going to be about the point in time

25  that I'm going to start working with the courtroom deputy clerk

 1    and the jury people to try to figure out how we're going to

 2    accomplish this.

 3            And so if it bleeds past that point, I'd want to at

 4    least be aware of it, but up to that point, I'm probably --

 5    after dealing with the motion for reconsideration, probably

 6    going to do my best to forget about surgical robots for a fair

 7    amount of time.

 8            All right.  Scheduling-wise that's, I think, all I

 9    wanted to talk about today.  I did want to just make a few

10    comments about the motion for reconsideration, understanding

11    that the briefing is still ongoing there.

12            But, Mr. Berhold, was there anything from a scheduling

13    perspective that you thought we were going to talk about that we

14    haven't or that you think we should talk about?

15            MR. BERHOLD:  No, Your Honor.

16            THE COURT:  All right.

17            Mr. Ruby?

18            MR. RUBY:  No, Your Honor, we don't.

19            THE COURT:  All right.  And just briefly and, again,

20    understand that I've only seen one side of the story on the

21    motion for reconsideration and that I look forward to seeing the

22    other side of the story, I guess some thoughts I have on this is

23    irrespective of how that motion comes out on the question of

24    whether there is antitrust injury or whether Restore is an

25    efficient enforcer given what the FDA has apparently finally

1    done, I'm not ultimately sure that's going to make a difference

2    that what the FDA has done makes a difference on the analysis in

3    the summary judgment order regarding antitrust standing.

4           But I do think -- and, again, subject to being briefed

5    accordingly, I do think it makes a significant difference on the

6    question of damages, because even if you're able to persuade me,

7    as you did before, that there are people out there that were

8    willing to continue to use these services when it was uncertain

9    as to what the FDA was going to require or not require, within

10   those damages, we're living in a but-for world that we now

11   know -- at least subject to being told otherwise, we now know is

12   different than the but-for world that Dr. DePasquale was living

13   in.

14          And I guess I'm just struggling to understand, given

15   how the evidence was developed, and presumably how it's locked

16   in at this point, how the plaintiff is going to be able to show

17   that there are people out there that were willing to use these

18   services if in this but-for world that we now are living in they

19   required clearance that it's undisputed that isn't there.

20          And so I guess I'm really kind of -- and understanding

21   that the -- the wrist, the EndoWrist side of the business is

22   where the biggest dollar value is on the antitrust case, I guess

23   I'm really, really wondering what that decision does to the

24   damages side of this case.

25          And there's still a pretty large number that could be

1   trebled on the robot surgery side of the case, but it's a lot

2   smaller number than the one that if trebled would have a lot of

3   zeros after it on the risk side of the case.  And unless I'm

4   just completing missing something -- and I'm, again, open to the

5   briefing on it -- I just don't know how that damage number on

6   the risk side of the case is anything close to what

7   Dr. DePasquale estimated based upon the but-for world that she

8   was living in before the FDA did what they did.

9          So that's why it seems to me that the time may be soon

10  and maybe that this is all the precondition that was being

11  intimated to.  It seems the time is right for the parties to

12  figure out a way to resolve this case from a business side,

13  because the legal side and the expert side got a whole lot

14  murkier here.

15         So, again, understand these are just preliminary

16  comments, but I feel like I've looked at this case enough to

17  know where some of the significant points are, and while I don't

18  know if the FDA's ruling changes the legal analysis, I think it

19  changes other sides of this case that I hope the parties are

20  really giving some serious thought to.

21         So understanding that you're going to file -- file a

22  response and maybe address all of those concerns, Mr. Berhold,

23  anything you want to add at this point?

24         MR. BERHOLD:  So, yes.  Thank you, Your Honor.  Jeff

25  Berhold here again.

1          Yes.  So, actually, the FDA has not taken any

2   enforcement action at this point.  I understand that Intuitive

3   has offered an email from a staffer at the FDA.

4          As far as the -- this issue of damages, Professor

5   DePasquale was actually focused on the EndoWrist repairs for the

6   Si which is being -- actually being phased out.  So it's been --

7   so far -- it's now April of 2022.  It's been 45 months since

8   Restore got into the business, and she actually in her

9   projections of damages -- to address specifically your point

10  today, she was actually projecting that that business was

11  declining significantly anyway over the -- in a but-for world

12  already.

13         So most -- the lion's share of the EndoWrist damages

14  in her model have already accumulated prior to any decision, any

15  enforcement action that may be forthcoming from the FDA.

16         THE COURT:  Well, like I said, I'll keep an open mind.

17  I just don't understand how the but-for world that she assumed,

18  which was one that FDA approval -- or clearance was not

19  required, that we now know is actually a different but-for

20  world, how that's all going to make sense, but maybe I'm just

21  not thinking about it right and I'll be persuaded otherwise.

22         Mr. Ruby or Ms. Lent, you want to weigh in on this

23  question at all?

24         MS. LENT:  Your Honor, it's Ms. Lent, and I would

25  appreciate just a few thoughts.

1          Completely agree with your analysis on damages, but I

2     would say that with respect to antitrust injury, I don't think

3     the record shows that it is uncertain whether there would have

4     been -- you know, whether clearance was required.  What we've

5     submitted to you with the new evidence in our motion for

6     reconsideration is some documents that we got from FDA in

7     response to our FOIA request, which just came in, you know, a

8     year and a half after we put the request in, showing that all

9     the way back in the spring of 2020, the FDA concluded that what

10    Restore was doing required 510(k) clearance but took no action

11    on it because Restore told the FDA that it wasn't conducting

12    that business anymore.

13          And so we know that had Restore continued, there would

14    have been a much different scenario and a much different action

15    taken by FDA and it would be consistent with what we've seen

16    from FDA that was just filed in the Rebotix case saying, We made

17    a decision -- We -- not some low-level FDA people, but the --

18    you know, those folks who are investigating the conduct of both

19    Restore and Rebotix have made a decision that resetting the

20    usage counter on EndoWrist requires 510(k) clearance, consistent

21    with the decision that we saw in the FDA records from the FOIA

22    request in the spring of 2020, that it required 510(k)

23    clearance.

24          So I think the but-for world now shows that clearance

25    was required and, you know, there should not be an analysis of

1   whether any customers would have been willing to use Restore's

2   resetting of the usage counter business back in 2020, because

3   that's not -- that wouldn't have been possible.  That was

4   illegal.

5         THE COURT:  Well -- and, again, I'm just giving you my

6   preliminary thoughts, and what I'm suggesting -- and, again,

7   I'll just caveat it -- I will keep an open mind when I get the

8   response, and if there's a request for a reply, I'm sure I'll

9   get more briefing on it.  But I could envision a circumstance

10  where Restore wins the battle, so to speak, on the motion for

11  reconsideration and that ends up being denied, but is going to

12  ultimately lose the war at trial given the development which

13  appears to be undercutting a lot of the assumptions that were

14  out there on that side of the table.

15        And so, again, I'm raising this issue now in the

16  context of not giving you a definitive ruling because I haven't

17  gotten all the briefing on it, but to, one, give you the benefit

18  of the thought so you can shape your response -- and I'll go

19  ahead and authorize a reply within seven days after the response

20  coming in -- since we've got plenty of time between now and

21  trial, and plenty of time between when you're going to mediate

22  the case -- to help shape those filings in light of my

23  preliminary thoughts, number, one.

24        And really, probably primarily, number two, to suggest

25  that a resolution short of a trial that puts this complicated

1   issue in the hands of six lay people that comes up with a

2   number, whatever it might be, that ends up getting trebled is in

3   nobody's interest.

4          And, in fact -- I guess the last thing I would say --

5   and, again, I don't want this to be perceived as saying I don't

6   want to try this case because, you know, frankly, we don't get

7   into the courtroom enough, and knowing that I'd have four weeks

8   of time in the courtroom, even if it's about surgical robots, is

9   kind of enticing to me, but -- and I'm confident this will be a

10  very well tried case given the lawyers involved.

11         But what I would suggest to you, and I hope you take

12  back to your clients, is it's very hard to predict how a jury

13  might view this case.  I could very well see the jury looking at

14  this case and saying these usage limits are just completely

15  arbitrary; what's the difference between 10 versus 12 versus 20

16  from a medical necessity standpoint?

17         And they could look at that and say, you know, what's

18  really happening here is you have the manufacturer arbitrarily

19  and artificially setting these usage limits low so they can sell

20  more of their expensive products.  And given the cost of health

21  care, we -- and, again, I'm speaking from a hypothetical jury

22  standpoint -- we're offended by that, and we're going to punish

23  them for it.

24         Alternatively, they could look at this case and see

25  what Restore is doing, this repair service where they're

1  essentially jail-breaking an iPhone and putting something called

2  an interceptor into a medical device, and they could look at

3  that and say this is not a -- an on-the-up-and-up-type activity,

4  and it's not something we're going to reward and we're going to

5  punish them on the counterclaim side of it.

6       So I could see a jury putting -- saying, I'm going to

7  put a pox on both of your houses, particularly after sitting

8  there for four weeks of time.  So in that circumstance, the only

9  winner in this case are the attorneys who have gotten a heck of

10 a lot of billable hours at the expense of the clients.

11      And so, again, I don't say that to disparage the

12 attorneys in this case in any way, because I have the utmost

13 respect and appreciation for the way you've worked together and

14 the way you've simplified a very complicated legal issue down

15 for someone like me to understand, but I would strongly,

16 strongly suggest that you both go back and communicate with your

17 clients, even more so than you probably have already, the risk

18 that they're facing by bringing this case to a jury and how it

19 could be perceived on both sides of this, and such that a

20 mediated resolution, a business side resolution, is a lot better

21 solution for all involved.

22      And so I know I said a lot there.  I'm sure there's a

23 lot of it that warrants a response and will get responses, but,

24 Mr. Berhold, I'll give each side a last view to sum up where we

25 are in this case and any last thoughts, and then we'll close

1    down for the day.

2            So anything else you want to add?

3            MR. BERHOLD:  Thank you, Your Honor.  Jeff Berhold

4    here again.

5            Thank you for your insights.  I agree that a -- and

6    Restore agrees that a business solution would be better than a

7    legal solution here.  We've tried off and on to identify that

8    business solution.  Hopefully conditions will be ripe to try

9    again shortly, and I won't -- in order to avoid prolonging this

10   call, I won't dive back into the merits of the motion for

11   reconsideration or the trial generally.  I think your points are

12   well-taken here by plaintiff's counsel, and we thank you for

13   them.

14           THE COURT:  Thank you.

15           Mr. Ruby, Ms. Lent, anything else you want to add?

16           MR. RUBY:  Your Honor, is there something you'd like

17   to --

18           MS. LENT:  It's Ms. Lent.  Nothing from me,

19   Your Honor.

20           THE COURT:  Anything from you, Mr. Ruby?

21           MR. RUBY:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  Well, thank you for your time.

23   I appreciate, as I said, everything that has come up to this

24   point.  And, as I said, Intuitive is authorized, if you'd like,

25   to file a reply within seven days after the response comes in on

1    the motion for reconsideration.  Obviously, you're not required

2    to file a reply, and if you do, it needs to comply with the

3    page and word limits in the local rules.

4           So I look forward to seeing those filings, and I'll

5    get a ruling out on the motion for reconsideration as quickly as

6    I can after that.  And I will get a scheduling order for the

7    trial with the dates that we've talked about out either this

8    afternoon or tomorrow.

9           Thank you for your time, and we're adjourned.

10          MR. RUBY:  Thank you.

11          MR. BERHOLD:  Thank you.

12          MS. LENT:  Thank you, Your Honor.

13     (Proceedings concluded at 2:52 PM on Wednesday, April 27,

14    2022.)

15                         * * * * * * * *

16          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
17    Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
18    transcript.

19

20    /s/ Megan A. Hague                      5/2/2022

21    Megan A. Hague, RPR, FCRR, CSR          Date
     Official U.S. Court Reporter
22

23

24

25