## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

RESTORE ROBOTICS LLC, et. al

     Plaintiff/Counterclaim
Defendants,

v.

INTUITIVE SURGICAL, INC.,

     Defendant/Counterclaim
Plaintiff.

Case No. 5:19-cv-55-TKW-MJF

## JOINT PRETRIAL STIPULATION

Pursuant to this Court's Order Scheduling Trial and Pretrial Conference and Establishing Related Deadlines and Procedures (Dkt. No. 164), Plaintiffs and Counterclaim Defendants Restore Robotics LLC and Restore Robotics Repairs LLC (collectively, "Restore") and Defendant and Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive") hereby file their Joint Pretrial Stipulation.

## A.    BASIS OF FEDERAL JURISDICTION

This Court has federal jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22 because the claims in this action arise from an Act of Congress regulating commerce or protecting trade

and commerce against restraints and monopolies.  This action was brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.

## B.     CONCISE STATEMENT OF THE CASE

Restore has brought this civil action alleging Intuitive, which makes the da Vinci Surgical System, has monopolized and attempted to monopolize trade in the da Vinci robot service aftermarket and the Si EndoWrist instrument aftermarket in violation of Section 2 of the Sherman Act.  Restore has also included claims that Intuitive has engaged in illegal tying and exclusive dealing in the da Vinci robot service aftermarket and the Si EndoWrist instrument aftermarket in violation of Section 1 of the Sherman Act.[1]  Intuitive denies these claims.

Intuitive has asserted counterclaims based on federal and Florida laws arising out of Restore's advertising and related activities relating to the da Vinci and EndoWrists: first, that Restore engaged in false advertising in violation of the Lanham Act by misrepresenting the nature of its own services and of Intuitive's business; second, that Restore engaged in false designation of origin or "passing off" in violation of the Lanham Act by misrepresenting Restore-serviced

---

[1] Although Restore contends that the complaint is not limited to the S/Si aftermarket, the Court has ruled that "this case is about Plaintiff's alleged exclusion from the aftermarkets related to S/Si, not the X/Xi."  Dkt. No. 192 at 3.

EndoWrists as original Intuitive EndoWrists; third, that Restore engaged in unfair competition; fourth, that Restore violated the Florida Deceptive and Unfair Trade Practices Act; and fifth, that Restore engaged in tortious interference with Intuitive's contracts with its customers.  Restore denies these counterclaims.

## C.   BRIEF GENERAL STATEMENT OF EACH PARTY'S CASE

### Restore's Statement of Its Case

Intuitive sells the da Vinci brand of surgical robots for minimally-invasive soft-tissue surgery ("surgical robots").  The da Vinci robot has an average sales price in the United States of more than $1.5 million.  The da Vinci is a closed system designed to operate with proprietary components and parts, *e.g.*, robot arms, and the proprietary EndoWrist instruments.  During the life of the robot, Intuitive also sells robot service and EndoWrist instruments to the owners of the robots.

Intuitive has a market share of 99.9% of surgical robots sold and used in the United States.  Asensus Surgical (formerly TransEnterix) is the only other company marketing and selling a surgical robot in the United States.  The Senhance System by TransEnterix received clearance from the FDA on October 13, 2017.  The Senhance System required 12 to 13 years and hundreds of millions of dollars to enter the U.S. market.  Intuitive placed 865 robots in the United States in 2021.  Asensus placed one system in the United States in 2021.  Intuitive had an

installed base of 4,139 robots in the United States at the end of 2021.   Asensus had

an installed base of no more than 5 systems in the United States at the end of 2021.

There are peculiar characteristics of surgical robots, including immersive 3D

vision, intuitive motion, and tremor control.   There are unique benefits to robotic

surgery for the patient, including better physical access, less conversions to open

surgery, shorter length of stay, less complications, lower rates of readmission, and

quicker return to normal activity.   There are also ergonomic benefits to the

surgeon, who can remain seated at a workstation during the procedure.   There are

also benefits to the hospital in recruiting physicians, increasing sales, and

enhancing reputation.  The benefits are so significant that hospitals are willing to

incur lower gross margins associated with converting to robotic surgery.  Despite

the much higher initial and operating costs for the robot, hospitals are steadily

converting to robotic surgery.

Intuitive is the sole original manufacturer of EndoWrist instruments for use

with the da Vinci.  The da Vinci Si robots are only compatible and cleared for use

with EndoWrist instruments designed, engineered, and manufactured for the da

Vinci Si robots.  Intuitive does not disclose performance specifications for

determining functionality and safety on the first or any subsequent use of the

EndoWrist instrument.  The surgeon must determine the usability and safety of the

instrument – like other reusable surgical instruments – before and during the procedure based on his or her own professional judgment.

Intuitive limits nearly all Si EndoWrists to 10 uses. Those limits have not changed for more than 20 years over the first three generations of the da Vinci. Intuitive has designed the Si EndoWrist instruments with an unencrypted circuit board to count the number of uses and prevent additional usage by deleting all information on the circuit board necessary for the instrument to operate with the robot system upon reaching the usage limit.

When customers initially acquire their da Vinci, they sign the Intuitive Sales, Licensing, and Service Agreement ("SLSA"). Service renewals incorporate the terms of the SLSA. The SLSA requires the customer only use EndoWrist instruments on the da Vinci for the maximum number of uses set forth by Intuitive. So long as hospitals do not violate the terms of the SLSA, they can place "separate orders . . . from time to time" to purchase the necessary EndoWrist instruments, and da Vinci accessories like surgical drapes, as needed for the life of the robot from Intuitive at prices and terms (such as the usage limit) to be determined by Intuitive at the time of the purchase of the instrument or accessory. The SLSA also prohibits the customer from using instruments repaired or refurbished without approval of Intuitive. Intuitive has never approved the repair or refurbishment of EndoWrists by hospitals or independent service organizations and has never had a

process for doing so. The restrictions are not necessary to preserve consumer demand because customers would prefer to repair their instruments to get more use out of their instruments and robots.

Intuitive represents that it is the "sole provider" of service for the da Vinci Surgical System. Intuitive is the sole manufacturer or exclusive distributor of the specially designed da Vinci robot parts, including the robot arms. The parts are only available to customers through the purchase of da Vinci robot service from Intuitive. In addition, the da Vinci robot system will only restart if Intuitive inputs the product serial number for the replacement part. So long as hospitals do not violate the terms of the SLSA, they can obtain preventative maintenance and other service for the robot under contracts of one or more years – and time and materials at an hourly rate of $995 plus the cost of parts – from Intuitive. The SLSA provides that Intuitive can refuse to provide any service on the robot if repairs have been made by an individual other than an Intuitive technician.

Restore was founded to provide repair services on EndoWrist instruments to extend their useful lives. Restore started as the exclusive U.S. distributor for Rebotix, which had an existing technology for bypassing the usage counter on the EndoWrist instruments for use on the da Vinci Si robots. The FDA has never issued a warning letter or taken enforcement action against any company for extending the EndoWrist usage limits without a 510(k). Since the introduction of

the Rebotix technology in the United States in 2018, the FDA has never stopped

Rebotix or any other ISO from repairing EndoWrists or resetting their usage limits

without clearance.  Intuitive itself sold X/Xi extended use instruments for nearly

two years without a 510(k).

When Restore entered the market, there were more than 1,000 da Vinci Si

robots in use in the United States.  A few months later, Restore licensed the

technology and took over the role of servicing the instruments and continued as

exclusive U.S. distributor.  Restore also hired two former Intuitive field service

engineers that were trained and certified on the da Vinci S and da Vinci Si to

perform robot service on those models.

Intuitive strictly enforced the SLSA to prevent hospitals from turning to

Restore or other third parties to repair EndoWrists or service da Vinci Surgical

Systems.  Restore received interest directly or indirectly from more than 100

hospitals.  Many hospitals declined to enter a relationship with Restore because of

the SLSA.  Many hospitals stopped purchasing from Restore after Intuitive notified

them that Intuitive would terminate the SLSA or was terminating the SLSA.  There

were no adverse events reported to the FDA's MAUDE database for EndoWrists

repaired by Restore.  Due to the lack of sales, Restore and Rebotix did not renew

the distribution agreement in October 2019.

After the termination of the distribution agreement, Restore developed its own technology for resetting the usage counter on the Si EndoWrists.  It was ready to deploy its own Si technology to reset the usage counter and provide repair services on the Si EndoWrists by July 1, 2020.  Restore also hired Alliance Healthcare Partners to apply for clearance from the FDA to market and sell remanufactured Si EndoWrists based on the Restore technology through a shell company Iconocare Health Solutions (K210478).

On September 30, 2022, the FDA granted clearance to Iconocare for K210478 to market and sell remanufactured 8 mm Monopolar Curved Scissors using the Restore technology.  The FDA found that "[t]he performance testing demonstrates that reprocessed devices are as safe and effective as the predicate [Intuitive S/Si EndoWrists] and operate as originally intended."  The FDA further found that testing, including electrical safety testing of the Restore printed circuit board, was "conducted . . . to confirm . . . that the device is safe and effective for its intended use."  "The design, materials, and intended use of the 8mm Monopolar Curved Scissors Instruments, after an additional ten (10) reuse cycles are equivalent to the predicate device. The mechanism of action of the reusable device is identical to the predicate device in that the same standard mechanical design, materials, and sizes are utilized."  Pending the acquisition of Iconocare by Restore, Restore receives all proceeds, net of commissions and expenses, from the

sale of any Si EndoWrists remanufactured under K210478.  Nevertheless, it has

been futile to deploy the technology on a large scale in the face of the SLSA.

**Intuitive's Statement of Its Case**

Intuitive denies the allegations in Restore's Complaint, and asserts

counterclaims against Restore under the Lanham Act, 15 U.S.C. § 1125(a);

common law unfair competition; violations of Florida's Deceptive and Unfair

Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-213; and common law

tortious interference with contract.

*First*, Restore cannot meet its burden to establish that its business was either

viable or lawful, and therefore, cannot establish antitrust injury or that its purported

injury is directly attributable to Intuitive's alleged misconduct, as opposed to the

FDA regulatory requirements, customers' reasonable concerns about patient safety

and compliance with FDA requirements, and other factors.  Restore also cannot

establish antitrust injury regarding its EndoWrist "reset" business after October

2019—when Restore's contract with Rebotix Repair LLC ended and Rebotix

ceased providing Restore with access to its technology for overriding EndoWrist

use limits—because Restore at that time had not fully developed and

commercialized technology to override EndoWrist use limits.

While Restore claims to be on the verge of acquiring legal rights to an

alternative technology for resetting EndoWrists (the "Iconocare technology") that

it participated in funding and that recently received FDA clearance for a single reset of one instrument, it has no basis for claiming injury relating to that technology and clearance, because, among other things, Restore (a) has not taken the necessary steps to enter a business using that technology since it exited the business nearly three years ago and (b) cannot show that Intuitive is taking, or has taken, any action that would interfere with any such operations for which Restore possesses FDA clearance.  Similarly, Restore cannot demonstrate that it was Intuitive, rather than Restore's admitted inability to provide complete and competent servicing, that caused harm to its da Vinci service business.

*Second*, Restore cannot satisfy its burden to define a relevant antitrust market in which Intuitive allegedly has harmed competition.  In order to succeed on its antitrust claims, Restore must establish, among other things, that Intuitive is a monopolist.  The evidence will establish that, ever since Intuitive first launched the da Vinci, robotic-assisted minimally invasive surgery has competed with the other surgical modalities, including open and laparoscopic surgeries.  Surgeries using the da Vinci remain a minority of all surgeries for which it could be used. As a result, Intuitive does not have monopoly power in any properly-defined relevant antitrust market.

Restore also cannot prove the existence of either purported "aftermarket" because Restore cannot establish that EndoWrists or da Vinci service occupy a

10

relevant market distinct from the da Vinci.  If anything, the evidence will demonstrate that the da Vinci, EndoWrists, and service are sold as a single, integrated product.

Regardless of the relevant market or markets that are found and the issue of market power in such markets, Restore cannot meet its burden to prove that Intuitive's challenged conduct is anticompetitive.  The evidence will demonstrate that the number of lives for the EndoWrists were set by Intuitive, and cleared by FDA, with a margin of safety designed to minimize instrument failure during surgery.  Without any visibility into or involvement with the activities of third parties to reset the usage counter, Intuitive had no way of ensuring that those instruments maintained an appropriate margin of safety.  Similarly, Intuitive has legitimate business justifications for its contractual provisions relieving Intuitive of any obligation to perform da Vinci service if a customer decides to use an unauthorized, third-party service provider—as Intuitive cannot vouch for the capabilities of such a third party and should not be obligated to fix a third party's mistakes.  Ultimately, Restore will not be able to prove that Intuitive's actions were inconsistent with a legitimate concern for patient safety.

*Finally*, the evidence will demonstrate that Restore violated federal and state laws with its conduct vis-à-vis customers.  Intuitive's counterclaims for false advertising, unfair competition, and violations of FDUTPA are principally based

on Restore's misrepresentations to customers about the nature, safety, and cost of Restore's service to reset EndoWrist usage counters.  The evidence will demonstrate that Restore knowingly and willfully deceived customers by misrepresenting:  (1) that Restore's service was authorized or approved by Intuitive; (2) that Restore was qualified to perform its services; (3) that there were no material consequences for customers using Restore's services; (4) that using Restore's services would save customers large amounts of money; and (5) that Restore's use counter reset service was a mere "repair."  With respect to Intuitive's counterclaim for false designation of origin, or "passing off," the evidence will demonstrate that Restore knowingly and falsely presented serviced EndoWrists as still being Intuitive-manufactured products with the same functionality, safety, and reliability as new EndoWrists, including by virtue of the fact that "reset" EndoWrists continued to bear Intuitive names and trademarks, with insufficient indication that the instruments had been adulterated by Restore.  With respect to the tortious interference counterclaim, the evidence will demonstrate that Restore knowingly induced Intuitive's customers to breach their service contracts with Intuitive by having EndoWrist lives extended by Restore.

## D.   EXHIBITS TO BE OFFERED AT TRIAL

Restore's list of exhibits (including physical/tangible exhibits that it may offer at trial), and Intuitive's objections to such exhibits, is attached as Exhibit 1.

Intuitive's list of exhibits (including physical/tangible exhibits that it may offer at trial), and Restore's objections to such exhibits, is attached as Exhibit 2. Neither list includes exhibits used solely for impeachment or demonstratives.

The parties' exhibit lists include the exhibit number to be used at trial and a description sufficient to identify the exhibit (*e.g.*, production number, deposition exhibit number, or otherwise). The parties agree that the description of documents on their respective exhibit lists is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the document.

This order contains the parties' good-faith efforts to identify the exhibits to be used at trial, except for demonstratives and exhibits to be used solely for impeachment, as well as all objections to the admission of such exhibits. Subject to the remaining provisions of this Order, no party may add to its exhibit list or offer into evidence at trial an exhibit not present on its list, absent agreement of the parties or order of the Court upon good cause shown.

## E.   WITNESSES TO BE CALLED AT TRIAL

Attached hereto as Exhibits 3 and 4 are Restore's witness list and Intuitive's witness list, respectively. Restore objects to Ben Lipson under Rule 401, 402, and 403. Restore has already filed a motion in limine relating to his testimony. Dkt. No. 198 at 1-2. Although Intuitive has filed motions in limine to preclude the admission of certain testimony that might be proffered by witnesses on Restore's

list, Intuitive has not asserted a blanket objection to any of the witnesses on Restore's list.

## F.  CONCISE STATEMENT OF FACTS WHICH ARE ADMITTED

1.    The relevant geographic market for the antitrust claims in this action is the United States.

2.    For purposes of the antitrust claims, the conduct occurred in interstate commerce and substantially affected interstate commerce.

## G.  CONCISE STATEMENT OF THOSE ISSUES OF LAW UPON WHICH THERE IS AGREEMENT

1.    This Court has personal jurisdiction over the parties for purposes of the claims in this action.

2.    Venue is proper in the Panama City Division of the Northern District of Florida pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2).

3.    This Court has the authority to grant injunctive relief in favor of Plaintiffs pursuant to Rule 65 of the Federal Rules of Civil Procedure and Section 16 of the Clayton Act, 15 U.S.C. § 26.

4.    This Court has the authority to award damages to Plaintiffs in an amount to be trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

5.    This Court has the authority to award Plaintiffs the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, on their federal antitrust claims.

6.     This Court has the authority to grant injunctive relief in favor of Defendant pursuant to Rule 65 of the Federal Rules of Civil Procedure.

7.     This Court has the authority to award damages to Defendant.

8.     This Court may award reasonable attorney fees to the prevailing party on the Defendant's counterclaims in certain circumstances under the Lanham Act.

9.     This Court may award reasonable attorney's fees and costs to the prevailing party on the Defendant's counterclaim in certain circumstances under the Florida Deceptive and Unfair Trade Practices Act.

## H.     CONCISE STATEMENT OF THOSE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

The parties' views of the issues were sufficiently far apart that each side has included a list.

### Plaintiffs' List

### *Antitrust Claims (Claims 1-8)*

1.     What is the relevant product market?

### *Monopolization (Counts 1 and 5)*

1.     Does Intuitive have monopoly power in the relevant market?

2.     Has Intuitive willfully acquired and maintained monopoly power in the relevant market through anticompetitive acts or practices?

### *Attempted Monopolization (Counts 2 and 6)*

1.     Did Intuitive attempt to monopolize trade in relevant market?

15

2.      Did Intuitive have the specific intent to monopolize the relevant market?

3.      Has Intuitive engaged in predatory conduct in the relevant market?

4.      Did Intuitive have a dangerous probability of success in achieving monopoly power in the relevant market?

### *Illegal Tying (Counts 3 and 7)*

1.      Are there separate products, a tying and a tied product?

2.      Did Intuitive force customers to buy the tied product to get the tying product?

3.      Did Intuitive have sufficient economic power in the tying product market to coerce the buyer to accept the tied product?

4.      Were there anticompetitive effects in the tied market?

5.      Was a not insubstantial amount of interstate commerce in the tied product market?

### *Exclusive Dealing (Counts 4 and 8)*

1.      Did Intuitive enter agreements with its customers to provide products or services in the relevant market on an exclusive basis?

2.      Did the restraints foreclose a substantial share of the relevant market?

3.      Did the restraints have an anticompetitive effect?

4.      Did Intuitive have a legitimate procompetitive justification for the restraints?

5.      Were the restraints reasonably necessary to achieve some procompetitive benefit?

6.      Did the procompetitive effects outweigh the anticompetitive effects?

7.      Is there a substantially less restrictive alternative to achieve the same procompetitive effects?

***Antitrust Damages (Counts 1-8)***

1.      Was Restore injured in its business or property by Intuitive's anticompetitive conduct?

***False Advertising (Counterclaim 1)***

1.      Was Restore's advertising false or misleading?

2.      Did Restore's advertising deceive, or have the capacity to deceive, customers?

3.      Did Restore's deception have a material effect on purchasing decisions—*i.e.*, was Restore's advertising likely to influence customers' decisions to use Restore's services?

4.      Was Restore's conduct willful—*i.e.*, did Restore know that it was engaged in false advertising or act with indifference to Intuitive's rights?

5.     Was use of the Intuitive trademark necessary to accurately describe a characteristic of the services offered by Restore?

6.     Has Intuitive been injured as a result of the false or misleading advertising?

### *Passing Off (Counterclaims 2 and 3)*

1.     Did Restore use the Intuitive trademark in connection with its services in a manner that was likely to cause confusion among consumers that its repair services provided customers with the same functionality, safety, and reliability as new EndoWrists?

2.     Was Restore's conduct willful—*i.e.*, did Restore know that it was engaged in passing off or act with indifference to Intuitive's rights?

3.     Was use of the Intuitive trademark necessary to accurately describe a characteristic of the services offered by Restore?

4.     Did Intuitive sustain any economic injury to its business proximately resulting from Restore's wrongful acts?

### *FDUTPA (Counterclaim 4)*

1.     Did Restore engage in a deceptive or unfair act or practice in the conduct of its trade or commerce?

2.     Were Restore's actions likely to mislead a person or company, acting reasonably in the circumstances, to the person or entity's detriment?

3.     Did Restore's actions offend established public policy?

4.     Were Restore's actions immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers?

5.     Did Restore's actions produce substantial injury to Intuitive?

6.     Was the injury outweighed by benefits to competition that the practice produces?

7.     Was the injury one that Intuitive could have reasonably avoided?

8.     Were Restore's actions the legal cause of actual damage sustained by Intuitive?

### *Tortious Interference (Counterclaim 5)*

1.     Did contracts exist between Intuitive and its customers, of which Restore was aware?

2.     Were the contracts unenforceable as illegal or contrary to public policy?

3.     Did Restore intentionally and unjustifiably interfere with these contracts?

4.     Was Restore's conduct related to competition between Restore and Intuitive?

5.     Did Restore use improper means to compete?

6.      Did Restore's interference cause Intuitive's customers to breach the contract, resulting in damages to Intuitive?

**Defendant's List**

**Restore's Claims**

1.      Has Restore met its burden to prove that its business of resetting EndoWrists was legal without FDA clearance?[2]

*Claims 1 & 5: Monopolization (da Vinci Robot Service and EndoWrist Instrument Aftermarket) – Sherman Act, 15 U.S.C. § 2*

1.      Was open surgery and/or laparoscopic surgery reasonably interchangeable with robotic-assisted surgery, such that the relevant antitrust market is not limited to robotic-assisted surgery but includes other surgical modalities?

2.      Did Intuitive have monopoly power in the relevant antitrust market(s) that the jury determines exists?

3.      Did Intuitive adequately disclose its restrictions regarding use limits for S/Si EndoWrists and/or servicing the da Vinci Surgical System before customers acquired the da Vinci Surgical System?

---

[2] The Court's Order on Motions for Summary Judgment (Dkt. No. 158) suggests that this is an issue of fact.  Intuitive has respected the Court's ruling by including it as an issue of fact that remains to be litigated, but continues to maintain, consistent with its summary judgment motion and arguments, that the legality of Restore's business is an issue of law.

4.      Did distinct relevant antitrust markets exist for the aftermarkets that Restore alleges in this case?

5.      Did Intuitive willfully acquire and maintain monopoly power in the alleged aftermarkets in this case?

6.      Did Intuitive engage in anticompetitive acts or practices in the alleged aftermarkets in this case?

7.      Did Intuitive have procompetitive justifications for its conduct?

8.      Were Intuitive's procompetitive justifications for its conduct pretextual?

9.      Was Restore injured in its business or property by Intuitive's conduct?

***Claims 2 & 6: Attempted Monopolization (da Vinci Robot Service and EndoWrist Instrument Aftermarket) – Sherman Act, 15 U.S.C. § 2***

1.      Was open surgery and/or laparoscopic surgery reasonably interchangeable with robotic-assisted surgery, such that the relevant antitrust market is not limited to robotic-assisted surgery but includes other surgical modalities?

2.      Did Intuitive have monopoly power in the relevant antitrust market(s) that the jury determines exists?

3.      Did Intuitive adequately disclose its restrictions regarding use limits for S/Si EndoWrists and/or servicing the da Vinci Surgical System before customers acquired the da Vinci Surgical System?

21

4.     Did distinct relevant antitrust markets exist for the aftermarkets that Restore alleges in this case?

5.     Did Intuitive engage in anticompetitive acts or practices in the alleged aftermarkets in this case?

6.     Did Intuitive have procompetitive justifications for its conduct?

7.     Were Intuitive's procompetitive justifications for its conduct pretextual?

8.     Did Intuitive have the specific intent to monopolize the alleged aftermarkets in this case?

9.     Was there a dangerous probability of Intuitive monopolizing the alleged aftermarkets in this case?

10.     Was Restore injured in its business or property by Intuitive's conduct?

### Claims 3 & 7: Tying (da Vinci Robot Service and EndoWrist Instrument Aftermarket) – Sherman Act, 15 U.S.C. § 1

1.     Were the da Vinci Surgical System, da Vinci service, and EndoWrists separate products?

2.     Did Intuitive have sufficient market power with respect to the da Vinci Surgical System to enable it to restrain competition in the alleged aftermarkets in this case?

3.    Was the availability of the da Vinci Surgical System conditioned on the purchase of EndoWrists and/or service from Intuitive?

4.    Did the alleged tying unreasonably restrain trade such that it had a substantial adverse effect on competition?

5.    Did Intuitive's agreements yield a procompetitive benefit?

6.    If the agreements collectively yielded a procompetitive benefit, could this benefit have been reasonably achieved through substantially less anticompetitive means?

7.    Was Restore injured in its business or property by Intuitive's conduct?

### Claims 4 & 8: Exclusive Dealing (da Vinci Robot Service and EndoWrist Instrument Aftermarket) – Sherman Act, 15 U.S.C. § 1

1.    If the jury finds that Restore has met its burden to prove a relevant antitrust market limited to robotic-assisted surgery, did Intuitive have substantial market power in the alleged relevant aftermarkets in this case?

2.    Did Intuitive's agreements with its customers substantially foreclose a substantial share of the alleged aftermarkets in this case?

3.    Did Intuitive's agreements have a substantial adverse effect on competition with respect to the alleged aftermarkets in this case?

4.    Did Intuitive's agreements yield a procompetitive benefit?

5.      If the agreements collectively yielded a procompetitive benefit, could this benefit have been reasonably achieved through substantially less anticompetitive means?

6.      Was Restore injured in its business or property by Intuitive's conduct?

**Intuitive's Claims**

***Counterclaim 1: False Advertising – Lanham Act, 15 U.S.C. § 1125(a)(1)***

1.  Was Restore's advertising false or misleading?

2.  Did Restore's advertising deceive, or have the capacity to deceive, customers?

3.      Did Restore's deception have a material effect on purchasing decisions—i.e., was Restore's advertising likely to influence customers' decisions to use Restore's services?

4.      Was Restore's conduct willful—i.e., did Restore know that it was engaged in false advertising or act with indifference to Intuitive's rights?

***Counterclaim 2: False Designation of Origin/Passing Off – Lanham Act, 15 U.S.C. § 1125(a)(1)***

1.      Were customers likely to be confused about whether EndoWrists modified by Restore were Intuitive-made EndoWrists or Intuitive-approved EndoWrists with the same functionality, safety, and reliability as new EndoWrists?

2.      Was Restore's conduct willful—i.e., did Restore know that it was engaged in passing off or act with indifference to Intuitive's rights?

### Counterclaim 3: Common Law Unfair Competition

1.      Did Restore compete with Intuitive for a common pool of customers?

2.      Did Restore engage in fraudulent or deceptive conduct?

3.      Did the fraudulent or deceptive conduct cause customer confusion?

### Counterclaim 4: FDUTPA

1.      Did Restore engage in a deceptive or unfair act or practice in the conduct of its trade or commerce?

2.      Were Restore's actions the legal cause of actual damage sustained by Intuitive?

### Counterclaim 5: Tortious Interference with Contract

1.      Did contracts exist between Intuitive and its customers, of which Restore was aware?

2.      Did Restore intentionally and unjustifiably interfere with these contracts?

3.      Did Restore's interference cause Intuitive's customers to breach the contract, resulting in damages to Intuitive?

I.      **CONCISE STATEMENT OF THOSE ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT**

The parties have not identified any such issues, other than the admissibility of certain evidence (which are the subject of pending motions *in limine*) and the proper jury instructions to be given the jury (which will be addressed, along with the proposed jury verdict, pursuant to the Court's order setting the procedure to address the jury instructions, Dkt. No. 211).

J.      **CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF RULES OF EVIDENCE OR THE FEDERAL RULES OF CIVIL PROCEDURE**

The parties have exchanged pre-trial disclosures pursuant to the Court's Orders.  That process has revealed disputes with respect to the application of the Federal Rules of Evidence to certain documents and testimony.  The parties will continue to meet and confer as they finalize their trial presentations and will seek the Court's resolution of any remaining disputes before proffering any such documents or testimony into.

K.      **MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT**

Restore has filed 4 motions in limine.  Restore also expects to file a motion to exclude the proposed testimony in the supplemental expert report of Heather Rosecrans served on December 13, 2022.

Intuitive has filed 7 motions in limine.  Those motions were filed on December 14, 2022, consistent with the deadline established in Section 4.C of this Court's Order Scheduling Trial and Pretrial Conference and Establishing Related Deadlines and Procedures.  (Dkt. No. 164 at 2.)  Restore has recently served a supplemental report from its economic expert.  Intuitive is continuing to analyze that report and expects to serve a responsive report and/or object to the admissibility of some of the content in the supplemental report.  Intuitive has not yet determined whether any of those objections should be presented in a separate pretrial motion or are instead more efficiently presented at time of trial when and if Professor DePasquale seeks to present that material in her testimony.

**L.     COUNSEL'S ESTIMATES OF THE LENGTH OF THEIR RESPECTIVE CASES AND THE TRIAL AS A WHOLE**

The parties estimate that the trial will last approximately four weeks, in total. Restore anticipates that its case will last 4 trial days (excluding openings and closings), and that its rebuttal case, if any, will last 1/2 trial day, although it may be less depending on Intuitive's case.  Intuitive estimates that its case will last 8-10 days (excluding openings and closings), although it may be less depending on Restore's case.

Dated:  December 23, 2022

/s/ Jeff Berhold

Jeffrey L. Berhold (*Pro Hac Vice*)
Georgia Bar No. 054682
jeff@berhold.com
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
Telephone:  (404) 872-3800

William G. Harrison
HARRISON RIVARD DUNCAN
& BUZZETT
Fl. Bar No. 0765058
101 Harrison Avenue
Panama City, Fl 32401
Telephone:  (850)-769-1414
wharrison@harrisonrivard.com

**Counsel For Plaintiffs Restore
Robotics LLC and Restore Rebotics
Repair LLC**

Respectfully submitted,

/s/ Karen Lent

DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com

ALLEN RUBY (*Pro Hac Vice*)
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690
allen@allenruby.com

SONYA D. WINNER (*Pro Hac Vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
swinner@cov.com

ANDREW D. LAZEROW (*Pro Hac Vice*)

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
alazerow@cov.com

***Counsel for Defendant/Counterclaim
Plaintiff Intuitive Surgical, Inc.***

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.